## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

THE ESTATE OF KEITH FRANKLIN, by its Personal Representative, KAREN FRANKLIN,

        Plaintiff,

-vs-

STATE OF MICHIGAN DEPARTMENT OF CORRECTIONS-DUANE WATERS HEALTH CENTER, DANIEL H. HEYNS, individually and in his official capacity as the former Director of the Michigan Department of Corrections, CORIZON HEALTH, INC., a subsidiary of VALITAS HEALTH SERVICES, INC., JANAK R. BHAVSAR, M.D., individually and in his official capacity, DANIEL T. CARREL, D.O., individually and in his official capacity, SCOTT L. HOLMES, M.D., individually and in his official capacity, MCLAREN HEALTH CARE CORPORATION, a Michigan nonprofit corporation, CHERYL KOVALSKI, D.O., individually and in her official capacity, jointly and severally,

        Defendants.

Case No. 16-13587
Hon.
Magistrate Judge

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

STEVE J. WEISS (P32174)
PATRICIA A. STAMLER (P35905)
HERTZ SCHRAM PC
*Attorneys for Plaintiff*
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
(248) 335-5000

{H0386290.1}

## <u>PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL</u>

NOW COMES Plaintiff, The Estate of KEITH FRANKLIN, by its Personal Representative, KAREN FRANKLIN, by and through its attorneys, Hertz Schram PC, and for its Complaint states as follows:

### <u>Parties</u>

1.      KAREN FRANKLIN is the Personal Representative of the Estate of KEITH FRANKLIN.

2.       Plaintiff's decedent KEITH FRANKLIN ("FRANKLIN"), for all times relevant to this Complaint, was a resident of Carson City, Montcalm County, Michigan, and as a citizen of the United States was entitled to all rights and privileges accorded to all citizens of the United States.

3.      Defendant STATE OF MICHIGAN, DEPARTMENT OF CORRECTIONS ("MDOC"), and DUANE WATERS HOSPTIAL ("DWH") are governmental units, acting under the color of state law.

4.      Defendant CORIZON HEALTH, INC. ("CORIZON") is a subsidiary of Valitas Health Services, Inc., with its principal place of business in Brentwood, Tennessee and is for all times relevant to this Complaint, a Delaware corporation, doing business throughout the State of Michigan.

5.      Defendant DANIEL H. HEYNS ("HEYNS"), for all times relevant to the Complaint was the duly appointed Director of the State of Michigan's

Department of Corrections.    HEYNS is sued in his official and individual capacities.

6.    Defendant JANAK R. BHAVSAR ("BHAVSAR"), M.D. is, for all times relevant to this Complaint, a licensed medical doctor in the State of Michigan, and for all times relevant was employed with CORIZON and/or the MDOC and assigned to work at the Michigan Department of Corrections ("MDOC").  BHAVSAR is sued in his official and individual capacities.

7.    Defendant DANIEL T. CARREL, D.O. is, for all times relevant to this Complaint, a licensed doctor of osteopathic medicine, in the State of Michigan, and for all times relevant was employed with CORIZON and/or the MDOC and assigned to work at MDOC.  CARREL is sued in his official and individual capacities.

8.    Defendant SCOTT L. HOLMES, M.D. is, for all times relevant to this Complaint, a licensed medical doctor, in the State of Michigan, and for all times relevant was employed with CORIZON and/or the MDOC and assigned to work at MDOC.  HOLMES is sued in his official and individual capacities.

9.    Defendant MCLAREN HEALTH CARE CORPORATION ("MCLAREN"), a Michigan nonprofit corporation, and does business as a number of entities including, McLaren Greater Hospital and McLaren Medical Oncology Associates in Lansing, Michigan.

{H0386290.1}

3

10.     Defendant CHERYL KOVALSKI, D.O. is, for all times relevant to this Complaint, a licensed doctor of osteopathic medicine, in the State of Michigan, and for all times relevant was employed with MCLAREN, and pursuant to a contract between CORIZON and MCLAREN, provided medical care to inmates in the MDOC.  KOVALSKI is sued in her official and individual capacities.

## Jurisdiction and Venue

11.     This action arises under 42 U.S.C. § 1983, § 1988 to redress the deprivation, under color of state law, rights, privileges and immunities secured by Plaintiff under the Constitution of the United States.

12.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1391.

13.     Venue is proper pursuant to 28 U.S.C. § 1391(b), as various acts complained of occurred, in part, in Jackson, Michigan.

## General Allegations

14.     The Charles Egeler Reception and Guidance Center ("RGC") located in Jackson, Michigan "serves as a quarantine facility responsible for intake processing of all male offenders who are adjudicated adults sentenced to a term of incarceration with the Michigan Department of Corrections" ("MDOC") (MDOC's website).

15.     RGC also houses the Duane L. Waters Health Center ("DWH").

16.    DWH located in Jackson, Michigan, has 112 inpatient beds and houses prisoners with medical needs that cannot be met at other correctional facilities throughout the State. "DWH provides acute medical, outpatient, surgical, and long-term care" and "administers a program outside the health center to care for 64 extended-care patients who do not require inpatient care at DWH, but whose needs could not be met in general population." http://www.michigan.gov/corrections/0,4551,7-119-68854_68856_68858---,00.html (last visited 10-1-16).

17.    The MDOC currently operates under a federal (Hadix) consent decree at, among other sites the RGC and DWH, arising out of prisoners' claims of deliberate indifference to their medical needs in violation of their constitutional rights.

18.    From 1998 to the present, MDOC has contracted with CORIZON to provide healthcare to inmates housed at its correctional facilities.

19.    According to its website, CORIZON serves "more prison inmates than any other private entity, which gives our team the confidence, expertise and experience to…develop a program suited to your unique needs."

20.    CORIZON's "staffing model" recognizes that "a collaborative effort between the medical and behavioral healthcare providers is a key component of [its] delivery system and enhances the outcomes of [its] patients."

{H0386290.1}

5

www.corizonhealth.com/About-Corizon/StaffingModel (last visited on 5/27/16).

Further, CORIZON claims that due to "…the previously unmet medical needs of the inmate population prior to incarceration, it is paramount to embrace a delivery system of this type." *Id.*

21.     CORIZON states on its website that

> in order for the special needs of individuals with chronic diseases such as HIV/AIDS, Hepatitis C, and cancer to be managed optimally, all disciplines must work diligently together. This integration of care by both the medical and behavioral health providers is a hallmark of Corizon Health's healthcare delivery system. Whether [it is] the provider of comprehensive services or solely the medical or behavioral health provider.

*Id.*

22.     CORIZON claims to have a "company culture" that "includes an emphasis on open communication and transparency, teamwork and accountability. Those same goals provide the foundation for [its] corporate commitment to a culture of **patient safety**." (*Id.* at A culture of patient safety) (last visited on 5/27/16, emphasis supplied).

23.     On information and belief, CORIZON provides healthcare services to over 530 correctional facilities and serves approximately 378,000 inmates in 28 states.

24.     On information and belief, CORIZON employs approximately 14,000 people.

{H0386290.1}                                    6

25.     On information and belief, CORIZON's annual revenue is approximately $1.5 billion.

26.     On information and belief, CORIZON's provision of healthcare in the prisons is done under the Health Maintenance Organization ("HMO") model, with an emphasis on cutting costs.

27.     From at least August 2012 through July 31, 2014, prisoners in the MDOC had no other option for medical treatment except through CORIZON and its staff or agents.

28.     Beginning in approximately June 2012, MCLAREN entered into a contract with CORIZON (hereafter the CORIZON/MCLAREN contract), on behalf of the State of Michigan, to provide medical care to MDOC prisoners.

29.     Prior to the effective date of the CORIZON/MCLAREN contract, MDOC prisoners in need of intensive treatment, including chemotherapy, received medical care at hospitals located near the particular prison where he/she was institutionalized.

30.     Upon information and belief, the CORIZON/MCLAREN contract was created to save the State of Michigan in excess of $1 million per annum.

31.     At any one time, approximately 1100-1150 prisoners are housed at RGC and the prisoners' length of stay at RGC is typically 30-45 days.

{H0386290.1}

32.     On information and belief, the RGC processes a minimum of 20 prisoners through its intake on a daily basis.  Sometimes RGC's intake can range from 20 to 80 prisoners per day.

33.     On information and belief, MDOC policy mandates that each prisoner undergo a medical examination called a "health clearance physical" before he is transferred from the RGC to another facility.

34.     On information and belief, a prisoner at RGC has an initial intake screening within hours after arriving at RGC.

35.     On information and belief, the intake screening area at RGC is staffed by a supervising nurse and up to three additional nurses.

36.     On information and belief, the intake screening area at RGC is located in close proximity to the staff doctors and other medical providers (e.g., nurse practitioners and physician's assistants).

37.     On information and belief, the intake screening includes, *inter alia*, taking and recording vital signs and weight, obtaining the inmate's consent for lab testing, review of the inmate's medical history, starting tuberculosis testing and instruction on how the inmate should complete a "kite" form.

38.     On information and belief, the nurses who screen inmates use a medical history form available on the NextGen system, the electronic medical record program used throughout the MDOC's prison system.

39.     On information and belief, the nursing staff working at MDOC take medical histories on the NextGen medical history form and document the inmate's medical problems in the NextGen problem list.

40.     On information and belief, MDOC policy requires that each inmate also undergo a health clearance physical performed by a medical provider before he is transferred to another facility.

41.     On information and belief, the health clearance physical requires the medical provider to take the inmate's complete medical history, including his family history and social history that would affect his overall health; a <u>full</u> physical examination and a review of lab tests.

42.     On information and belief, a purpose of MDOC's health clearance physical is to ensure that an inmate can be transferred safely from a medical perspective, from RGC to another facility.

43.     On information and belief, a purpose of MDOC's health clearance physical is to identify the inmate's medical condition to determine his treatment needs.

44.     On information and belief, after the medical provider completes the health clearance physical on the inmate and has updated the inmate's medical record, a MDOC nurse collects the inmate's file.

45.     On information and belief, after the medical provider performs the health clearance physical, a MDOC nurse completes a Transfer Assessment Screen ("TAS") detailing the inmate's health conditions.

46.     On information and belief, the MDOC nurse reviews the inmate's file and he/she assigns it a code which reflects whether the inmate may be transferred safely and what specific conditions a receiving facility would need to satisfy for the inmate to be housed there in light of his medical needs.

47.     On information and belief, an inmate's file might receive a specific code denoting that due to his medical needs he had to be assigned to: a) a facility within a specified distance of a prison hospital like Duane Waters; or b) that the inmate has no medical restrictions on where he can be housed; or c) that the inmate cannot be transferred at that time.

48.     On information and belief, the MDOC nurse reviews the inmate's records for his chronic care requirements, medications that are restricted, mental health issues, certain lab tests and disclosures.

49.     On information and belief, other components of the TAS populate automatically with information already in the inmate's records.

50.     On information and belief, the MDOC nurse then checks a print preview of the TAS to determine its accuracy and completeness, saves the document in a final form in the computer system, puts a copy of the TAS in the

inmate's chart and takes a copy of the TAS to the RGC's medical records department.

51.    On information and belief, the RGC's Health Information Managers complete data entry on a daily basis for all inmates who have been cleared for transfer.

52.    On information and belief, the RGC's Health Information Managers review the inmate's TAS against the resources of the facility where the inmate is being transferred, and if the facility lacks the resources to provide the inmate with appropriate medical care, the inmate will remain at RGC pending transfer to a facility that has the appropriate resources.

***Franklin at RGC***

53.    On or about August 6, 2012, FRANKLIN, who was then age 47, with a prior family history of cancer and a prior history of smoking, was incarcerated at RGC. FRANKLIN entered RGC for assessment, screening and classification prior to his placement in a general population correctional facility within the MDOC.

54.    On or about August 7, 2012, FRANKLIN presented to BHAVSAR for a medical evaluation for chronic constipation and liver disease.

55.    BHAVSAR is one of CORIZON'S Medical Directors also known as a "key contact physician."

56.     On or about August 7, 2012, BHAVSAR performed a physical examination of FRANKLIN.

57.     On or about August 7, 2012, BHAVSAR examined, among other things, FRANKLIN's "neck/thyroid."

58.     On or about August 7, 2012, BHAVSAR authored a report setting forth the results of his medical evaluation of FRANKLIN, and reported that, among other things, his inspection of FRANKLIN's neck and thyroid "reveals symmetry. No thyromegaly or thyroid nodules detected. No cervical adenopathy and he commented that "? Palpable lymphnode 2-3 cm below L angle of jaw."

59.     On or about August 7, 2012, BHAVSAR created an "Assessment/Plan" for FRANKLIN following his examination of him.

60.     On or about August 7, 2012, BHAVSAR's assessment of FRANKLIN was: "Hepatitis C viral w/o hepatic coma (070.51) constipation (564.0)."

61.     On or about August 7, 2012, BHAVSAR's treatment plan for FRANKLIN was:

   a.   Labs as ordered;
   b.   MP follow-up at med.clear. or PRN;
   c.   CCC for Hep C to be determined at medical clearance;
   d.   Accommodations updated and reviewed;
   e.   Kite healthcare PRN;
   f.   Patient does not qualify for tennis shoes;
   g.   Encouraged to maintain healthy weight and to lose weight;
   h.   Provided docusate samples (4 caps) to help start with BM;
   i.   Waiting for picture [of hands] to be taken.  Will await to find out about the strap/band around his wrist.

62.     On or about August 7, 2012, BHAVSAR provided FRANKLIN "Instructions/Education" regarding the following:

    a.    Review of medications;
    b.    Take new medication as prescribed;
    c.    Increase fluid intake;
    d.    Increase activity level;
    e.    Follow exercise program;
    f.    Patient education provided and patient voiced understanding.

63.     On or about August 7, 2012, BHAVSAR ordered the following labs for FRANKLIN:

    a.    PT/INR Prothrombin Timed
    b.    Comp Panel and CBC/Plt/Thyroid
    c.    Hepatitis C viral Load by Branch DNA

64.     On or about August 7, 2012, BHAVSAR did not create a plan of care for the "palpable lymphnode 2-3 cm" he detected during his physical examination of FRANKLIN.

65.     On or about August 7, 2012, BHAVSAR did not order any follow-up medical testing, treatment or labs for FRANKLIN pertaining to the "palpable lymphnode 2-3 cm" that he detected during his physical examination of FRANKLIN.

66.     On or about August 7, 2012, BHAVSAR did not provide any instructions or education to FRANKLIN regarding the "palpable lymphnode 2-3 cm."

67.     On or about August 7, 2012, BHAVSAR did not schedule any follow-up appointments with FRANKLIN regarding the "palpable lymphnode 2-3 cm."

68.     On or about August 7, 2012, BHAVSAR did not refer FRANKLIN to any medical provider for care or treatment of the "palpable lymphnode 2-3 cm."

69.     On or about August 7, 2012, BHAVSAR treated FRANKLIN following his receipt of a positive anti-body to Hepatitis C and a negative HIV test.

70.     On or about August 21, 2012, BHAVSAR performed a physical examination of FRANKLIN, but he did not examine FRANKLIN's neck or thyroid despite having documented two weeks earlier on August 7, 2012 that FRANKLIN had a "palpable lymphnode 2-3cm."

71.     On or about August 21, 2012, BHAVSAR did not provide any care or treatment to FRANKLIN for the "palpable lymphnode 2-3cm."

72.     On or about August 21, 2012, BHAVSAR authored a report regarding FRANKLIN'S medical visit that stated, in part, that FRANKLIN's "chief complaint/reason for visit: this 47 year old male presents with intake (rgc/whv/rcf/mbp)."

73.     On or about August 21, 2012, BHAVSAR's report did not address FRANKLIN's "palpable lymphnode 2-3 cm" and his report reveals he did not examine FRANKLIN's neck or thyroid.

74. On or about August 21, 2012, BHAVSAR's Assessment/Plan for FRANKLIN stated the following: Hepatitis C viral w/o hepatic coma (070.51) constipation (564.0) deformity, oth required, finger NOS (736.20). The plan comments state:

      a.    Cleared to a 002 site;
      b.    Reviewed and signed CHJ 630 and CHJ 225 and copies given to patient;
      c.    Labs in 2 months: CBC, CMP, PT/INR;
      d.    MP follow-up in Hepatitis CCC in 3 months;
      e.    HAV and HBC vaccine series initiated;
      f.    Labs reviewed in detail. All questions answered;
      g.    Will d/w HUM regarding contacting brother for his braces;
      h.    Encouraged to increase water intake and fiber in diet to avoid constipatin (sic).

75. On or about August 21, 2012, BHAVSAR ordered the following labs for FRANKLIN:

      a.    (PT/INR) Prothrombin Time
      b.    Comp Panel and CBC/Plt/Thyroid

76. On or about August 21, 2012, BHAVSAR did not create a plan of care for the "palpable lymphnode 2-3 cm" he detected during his physical examination of FRANKLIN on or about August 7, 2012.

77. On or about August 21, 2012, BHAVSAR did not order any follow-up testing, treatment or labs for FRANKLIN, pertaining to the "palpable lymphnode 2-3 cm" that he detected during his physical examination of FRANKLIN on or about August 7, 2012.

78.     On or about August 21, 2012, BHAVSAR did not note in his medical report that FRANKLIN presented at intake on August 7, 2012 with a "palpable lymphnode 2-3 cm."

79.     On or about August 21, 2012, BHAVSAR did not document in his assessment of FRANKLIN's medical condition that FRANKLIN had presented with a "palpable lymphnode 2-3 cm" on or about August 7, 2012.

80.     On or about August 21, 2012, BHAVSAR only issued the following medical order: "Housing: Bottom bunk."

81.     On or about August 22, 2012, Schulcz, R.N., prepared the "Intrasystem Transfer Summary ("ITS") – Transferring Facility" which stated that FRANKLIN's "current chronic problems" were "Hepatitis C viral w/o hepatic coma" and "Deformity, oth acquired, finger NOS."

82.     The ITS dated August 22, 2012 for FRANKLIN contained a list of "current active/open orders" which did not include reference to any order for testing, evaluation or other follow-up for the "palpable lymphnode 2-3 cm" documented in BHAVSAR's August 7, 2012 report.

83.     The ITS dated August 22, 2012, for FRANKLIN contained "comments" which stated "Prisoner cleared by Dr. Bhavsar to 002.  Prisoner has No Restricted Medications, No Mental Health Follow-Up, No Pain Mngt., No special accommodations, yes chronic care, dna completed, hbv declined."

84.     The August 22, 2012, Schulcz's ITS listed the sole chronic problems noted for FRANKLIN were hepatitis C viral without hepatic coma and deformity requiring orthotic for his fingers.  The ITS does not reference chronic care for FRANKLIN'S "palpable lymphnode 2-3 cm."

### *Franklin at Carson City Correctional Facility*

85.     On or about August 24, 2012, the MDOC transferred FRANKLIN to Carson City Correctional Facility ("CCCF") which is referred to as "DRF" throughout the MDOC.

86.     On or about August 31, 2012, BOWERMAN, R.N., performed an Intake medical assessment of FRANKLIN, which indicated his chief complaint/reason for visit was "This 47 year old male presents with tas" and "History of Present Illness" "1. TAS."

87.     Upon information and belief, "TAS" is the acronym for Transfer Admission Summary.

88.     The August 31, 2012, Intake Form regarding FRANKLIN also listed his chronic problems (Hepatitis C viral and deformity), his past medical/surgical history, diagnostics history, allergies and vital signs.

89.     The August 31, 2012 Intake Form does not refer to the "palpable lymphnode 2-3 cm."

90.   On or about August 31, 2012, BOWERMAN authored an "Intrasystem Transfer Summary – Receiving Facility" regarding FRANKLIN, containing his name, inmate identification number, date of summary, location and the user's name (BOWERMAN).  It also contains a "subjective" section and an "objective" section. The section labeled "subjective" states, among other things, the following:

> Patient is not currently receiving any medical…treatments including pending specialty care appts...patient does not have current medical…concern(s)…

91.   The objective section of the August 31, 2012, BOWERMAN stated in the FRANKLIN Intrasystem Transfer Summary – Receiving Facility form stated, in part, "No physical deformities observed" and that "No follow up is needed" for FRANKLIN.

92.   On or about September 7, 2012, Defendant MDOC assigned FRANKLIN to Daniel T. CARREL, D.O. and FRANKLIN received a HBV injection from JoAnn A. Black, R.N.

93.   On or about October 23, 2012, BOWERMAN collected various lab specimens from FRANKLIN.

94.   On or about October 23, 2012, BOWERMAN authored a document regarding FRANKLIN's medical detail orders which did not address his "palpable lymphnode 2-3 cm."

95.     On or about October 30, 2012, Jillian E. Kondel, R.N., performed an "Annual Nurse Well Encounter for Keith Franklin."

96.     On or about October 30, 2012, Kondel's observations and review did not include FRANKLIN's neck or lymphnodes and there is no reference to FRANKLIN's "palpable lymphnode 2-3 cm."

97.     On or about November 16, 2012, Kent D. Filsinger, P.A., saw FRANKLIN for a "chronic care visit" where he conducted a physical exam of FRANKLIN.

98.     On or about November 16, 2012, Filsinger's physical exam report stated, in part, that he did not examine FRANKLIN's neck/thyroid despite BHAVSAR's findings of a "palpable lymphnode 2-3 cm" on the physical exam he performed on or about August 7, 2012.

99.     On or about November 16, 2012, P.A. Filsinger's Assessment/Plan did not address FRANKLIN's "palpable lymphnode 2-3 cm."

100.    On or about June 6, 2013, Filsinger's report for FRANKLIN's chronic care stated that his chief complaint/reason was "infectious disease and HCV" and Filsinger conducted a physical examination of FRANKLIN, including his lumbar spine, but he did not evaluate the "palpable lymphnode 2-3 cm."

101.   Filsinger's report sets forth an assessment/plan dated June 6, 2013 addressed sprained lumbar, "Hepatitis C viral w/o hepatic coma and deformity, oth acquired finger NOS" but did not address the "palpable lymphnode 2-3 cm."

102.   On or about June 14, 2013, FRANKLIN presented to CARREL for "chart review."

103.   On or about June 14, 2013, CARREL's report contained numerous subheadings including an area for physical examination.  The physical examination portion of the report is left blank, indicating CARREL did not perform a physical examination of FRANKLIN.   Neither the chronic problems nor past medical/surgical history sections note that FRANKLIN has a "palpable lymphnode 2-3 cm."

104.   On or about August 6, 2013, CARREL authored a report indicating that FRANKLIN's chief complaint/reason for visit pertained to his "infectious disease." Although CARREL's report references chronic problems and a history of present illness, neither section contains information about "palpable lymphnode 2-3 cm." CARREL performed a physical exam, but there is no reference to an examination of the neck or thyroid.

105.   On or about September 15, 2013, D. Nell, R.N., completed a nursing chart review of FRANKLIN's medical record and deemed him medically cleared to work in Food Service.  However, after completing this nursing chart review, D.

Nell(?), R.N., did not indicate that Keith Franklin had a "palpable lymphnode 2-3 cm."

106.   On or about September 27, 2013, FRANKLIN met with CARREL for chart review, and CARRELL's report stated that FRANKLIN's chief complaint/reason for visit was "chart review."  Despite CARREL's review of FRANKLIN's chart, there is no reference to FRANKLIN's "palpable lymphnode 2-3 cm" reflected in either his history of present illness or chronic problems.  Although the chart update form contains a section for a physical exam, CARREL did not perform a physical exam.

107.   On or about October 9, 2013, FRANKLIN met with Melissa Herald, R.N., regarding frequent urination and Herald's report stated the following: "noted pt has a large firm nodule on R side of neck.  States he had it evaluated one year ago in August and it is now 5-6 times larger.  Has not asked for treatment because he was concerned it would hold up his parole."  Herald's report also indicates that she requested "MP to evaluate nodule on neck.  MP will order an x-ray and follow up in two weeks."  Herald's report also indicated that she placed an order for MSP Sick Call follow up after x-ray of neck.  Per Dr. HOLMES."

108.   On or about October 16, 2013, HOLMES generated an administrative note indicating that FRANKLIN had presented for chart review.  The report indicates history of present illness "chart review" that "an x-ray had been ordered to

occur on October 30, 2013, and that on November 6, 2013, a provider visit would occur to examine the neck mass."

109.   On or about October 16, 2013, HOLMES authored a requisition to the x-ray department for the x-ray of FRANKLIN's neck, spine and 4+ views bilateral."

110.   On or about October 16, 2013, HOLMES authored a clinical progress note indicating that CRV neck x-rays ordered, MSP visit ordered.

111.   On or about October 23, 2013, FRANKLIN met with HOLMES for a "provider visit – scheduled" and per his October 23, 2013 report, FRANKLIN presented with musculoskeletal and genitourinary/renal, and that he had history of present illness "musculoskeletal."  Additional comments:

> 48 year-old white man here for neck pain and frequency of urination.  He has lump to the right side of the neck.  He first noticed this 15 months ago.  This is getting bigger, it's not painful.  There's no weight loss.  No night sweats.  He feels tired but this is 'figured I'm 49 and getting old and I'm really busy.'  Then there's frequency of urination that 'comes and goes…'  Last night he was up once, night before he was up '10 times.'  He's trying to hold it, 'but that doesn't do the trick.'

112.   Per HOLMES's his physical exam of FRANKLIN's neck/thyroid revealed

> no thyromegaly or thyroid nodules detected.  No cervical adenopathy.  Comments: there's a firm mass right side of neck about 4 cm max diameter.  This is not freely mobile feels rubbery and fixed to underlying structures, it's not thyroid as is (sic) does not move with thyroid gland in swallowing maneuver.  The mass feels deep to the SCM.

113.   HOLMES's October 23, 2013 report also indicates with regard to the lymphatic system the following:

> "there is/are no palpable submental, submaxilliary, anterior cervical, posterior cervical, axilliary, inguinal, lymph nodes."

114.   HOLMES's assessment/plan noted the following: "swelling/mass/lump, lclzd, sprfc (782.2), poor...plan comments: "there's a suspicious neck mass which needs further evaluation.  407 CT is sent.  This is non tender and there's low suspicion for a simple dx of lymphadenophy/lymphadenitis. Regardless will create order for penicillin," and on October 30, 2013 "chart review/update CRV 407 sent 10-23-13 "status."

115.   On or about October 30, 2013, HOLMES completed a consultation request for FRANKLIN seeking a CT scan of the neck to evaluate a "worrisome neck mass" and stated, in part, failed outpatient therapies: "this mass is persistent, it does not feel like lymph node material.  This mass has been progressing in size for over a year and there is suspicion here for ominous neck mass that needs further evaluation."

116.   On or about October 30, 2013, FRANKLIN underwent a soft tissue neck x-ray.

117.   On or about November 5, 2013, Jenda L. Cole prepared a consultation form for FRANKLIN for a CT scan of the neck to evaluate worrisome neck mass, stating, in part, failed outpatient therapies: "this mass is persistent, it does not feel

like lymph node material.  This mass has been progressing in size for over a year and there's suspicion here for ominous neck mass that needs further evaluation."  On the same report, it indicates that the criteria are met for the CT scan request.

118.   On or about November 14, 2013, WPA Beardslee authored a consultation request for FRANKLIN seeking a CT scan of the neck to evaluate worrisome neck mass, stating, in part, FRANKLIN failed outpatient therapies indicating

> this mass is persistent, it does not feel like lymph node material. This mass has been progressing in size for over a year and there's suspicion here for ominous neck mass that needs further evaluation.  Indicating further that the criteria is met for the consultation request.

119.   On or about November 20, 2013, FRANKLIN met with HOLMES for a scheduled provider visit.   HOLMES's report states that the sole chief complaint/reason for the visit was "presentation with infectious disease."  Further, the report notes the history of present illness is "infectious disease."  However, HOLMES' additional comments: "49 year-old white man here for hcv ccc.  He's about to have CT neck for further evaluation of right side neck mass.  Today he feels fine."  The report also states, in part, "neck/back/thyroid: comments: persistent mass right neck at SCM."  HOLMES's assessment/plan does not indicate follow-up for mass on right neck.

120.   On or about November 20, 2013, HOLMES sent a second 407 requesting CT-scan of FRANKLIN's neck mass.

121.   On or about November 20, 2013, FRANKLIN underwent an annual nurse well-encounter with Peggy Hynes, R.N., who failed to refer to or follow-up on the mass on the right side of FRANKLIN'S neck.

122.   On or about November 21, 2013, FRANKLIN presented for an unscheduled nurse visit to address post ER/inpatient/specialist follow-up.

123.   On or about November 21, 2013, Bowerman's report noted, in part, that she ordered an appointment for FRANKLIN for November 22, 2013 for chart review/update: post off-site CTR lateral neck.

124.   On or about November 22, 2013, CARREL authored a chart update report stating that FRANKLIN returned from a CT of his right neck mass, that CARREL "scheduled a visit next month to discuss the result" and that the appointment date for the interpretation of the right neck mass, CT of neck in November would occur on December 16, 2013.

125.   On or about November 25, 2013, HOLMES requested a consultation for an ENT with a view for biopsy of a suspicious mass on the right neck with the presumed diagnosis of "swelling/mass/lump, lclzd, sprfc 782.2."  HOLMES's report further indicates "49 year-old man with a mass in the left (sic) neck that according to the CT appears to be suspicious for malignancy.  Our goal here is to request

approval for an ENT consult as this mass needs to be biopsied for further direction."

HOLMES' report indicates lab and x-ray data as follows:

> 11/21/13 CT report: one bulky header genius mass deep to the SCM muscle with considerable mass effect as described above and inseparable from the tonisillar pillar. Neoplastic process primary consideration with further recommendation as above. 2) Probable branchial cleft cyst. 3) cervical lymph adenopathy with a probable prominent intraparotid lymph node vs pleomorthic adenoma on the right.

126. On or about December 2, 2013, Cindy Shepherd authored a consultation request for FRANKLIN seeking an ENT consult with "a view for biopsy of suspicious mass right neck" and the request contains reference to the 11-21-13 CT report, and that the criteria is met for the requested ENT consult.

127. On or about December 5, 2013, WPA Beardslee authored a consultation report for the requested ENT consult review for biopsy of suspicious mass in FRANKLIN'S right neck and that Steven Bergman, D.O., indicated in his review on December 2, 2013, that an appointment for January 6, 2014, at ENT Associates of Jackson with Dr. Greenberg was approved under the timeframe approved by HOLMES.

128. On or about December 13, 2013, FRANKLIN attended a scheduled provider visit with CARREL.

129. On or about December 13, 2013, CARREL's report stating FRANKLIN's

history of present illness 1) ENT additional comments: "this 49 y/o WM has a R inferior parotid and submandibular mass. He had a recent CT scan which showed the lesions, and he is scheduled to see ENT next month. He first noticed the mass 1½ years ago.

The report states the physical exam revealed, in part, neck/thyroid: "he has some masses at the angle of the R jaw and a 2.1 cm submandibular mass." Further, CARREL's assessment/plan stated

swelling/mass/lump, lclzd, sprfc (782.2), poor. Plan comments: I told him he has an appointment with an ENT in the next month. I increased his Naproxyn again and gave him #10 acetaminophen 500 mg and #20 ibuprofen 200 mg. I scheduled him for an appointment next month."

130. On or about January 15, 2014, FRANKLIN initiated a kite he stating "I had an appointment with ENT specialist but haven't yet."

131. On or about January 16, 2014, Depue responded to the kite indicating FRANKLIN had an upcoming appointment with MP to discuss concerns "approx 1/18/14."

132. On or about January 17, 2014, FRANKLIN presented to CARREL for a scheduled visit with the chief complaint of "ENT." The report states FRANKLIN had a recent CT scan which showed "a mass deep to the RSCM muscle, parotid mass and cervical lymphadenopathy." The report states he is scheduled to see the ENT later this month. "He first noticed the mass one and half years ago." Further, FRANKLIN's ENT appointment was "cancelled because of weather. He feels the mass is growing. When he opens his mouth, he has pain." On physical exam

CARREL reported that FRANKLIN has "a solid fixed lesion on his R neck that is 15 cm by 5cm. It is R submandibular and extends to his R preauricular and postauricular area." (Emphasis supplied) CARREL's plan was to increase FRANKLIN's Naproxyn and his Terazosin, that FRANKLIN will see the ENT at the end of the month, and gave him a bottle of Milk of Magnesia for constipation.

133.   On or about February 13, 2014, FRANKLIN presented to CARREL for a scheduled provider visit. CARREL's report of February 13, 2014, states that FRANKLIN presented with "ENT" and the additional comments indicate that FRANKLIN was seen for a

> R tonsillar mass with 11 X 5 Lymphadenopathy to his R neck. He saw Dr. Greenberg on 2/10/2014, and he wanted him to have a biopsy under under direct Laryngoscopy and then a Esophagoscopy in the operating room under general anesthesia. He needs his CT scans. He needs to be off of his Naproxyn and NSAIDS for at least a week before the biopsy.

134.   CARREL's February 13, 2014, assessment/plan indicates "swelling/mass/lump, icizd, sprfc (782.2), poor. He further states, in part, that he sent out for a "407 for a biopsy."

135.   On or about February 13, 2014, CARREL prepared a consultation request for FRANKLIN seeking Laryngoscopy, Esophagoscopy, biopsy by an ENT, Dr. Greenberg.

136.   On or about February 17, 2014, Cindy Shepard prepared a consultation request for FRANKLIN seeking ENT services pertaining to the right tonsillar mass.

137.   On or about February 18, 2014, CARREL authored a consultation request for FRANKLIN for ENT services with Dr. Greenberg as a follow up regarding the right tonsillar mass.

138.   On or about February 18, 2104, CARREL prepared a chart update indicating chart review and that he sent out a "407" for Laryngoscopy and biopsy.

139.   On or about February 18, 2014, CARREL prepared a second consultation request seeking an EGD from Dr. Greenberg, the ENT.

140.   On or about February 19, 2014, Cindy Shepard authored a consultation request for the ENT for the testing for the Laryngoscopy and biopsy with Dr. Greenberg.

141.   On or about February 19, 2014, Cindy Shepard authored a consultation request for EGD with Dr. Greenberg for FRANKLIN.

142.   On or about February 25, 2014, CARREL authored a second consultation request for FRANKLIN to have an Esophagoscopy with ENT Dr. Greenberg.

143.   On or about February 25, 2014, CARREL prepared a chart update indicating FRANKLIN presented for chart review and that he sent out a "407 for Esophagoscopy."

144.   On or about February 26, 2014, Tessa Hagemann authored a consultation request for FRANKLIN to have the test of Esophagoscopy with ENT Dr. Greenberg.

145.   On or about February 27, 2014, WPA Forist authored a consultation request for FRANKLIN for the Esophagoscopy with Dr. Greenberg.

146.   On or about February 27, 2014, WPA Forist authored a consultation request for FRANKLIN to have a Laryngoscopy and biopsy performed with the ENT Dr. Greenberg.

147.   On or about March 11, 2014, FRANKLIN appeared for a chronic care visit with CARREL presenting with the chief complaint of "ENT" and a history of the present illness of a right neck mass, that he is going for a biopsy in the "next few weeks," the doctor had stopped his Naproxyn, complaining of lower back pain and pain in his right jaw from the expansion of the neck mass.  CARREL, per his report, states that he advised FRANKLIN he would have surgery "this month" and that he would ask for Narco for his surgery and beyond.   He also addressed the discontinuation of NSAIDS.

148.   On or about March 19, 2014, FRANKLIN saw HOLMES for follow up after an off-site visit to the ENT where a biopsy of the right tonsil was performed. The pathology is pending.  "He feels bad…the throat is sore and throbbing.  He has

cancer…the ENT specialist told him that this is cancer…that the path report is pending."

149.   On or about March 21, 2014, CARREL authored a chart update indicating that FRANKLIN had returned from an off-site biopsy of a right tonsillar mass, and that Dr. Greenberg will contact MDOC staff with future recommendations.

150.   On or about March 25, 2014, CARREL authored a consultation request for FRANKLIN for an oncology visit with Dr. Layhe to follow up on the pathology report of the biopsy of the right tonsillar mass, which revealed "invasive moderately-differentiated squamous cell carcinoma.   Dr. Greenberg staged him at a T2N3 squamous cell carcinoma of the right tonsil that spread to the right neck.   Dr. Greenberg recommended a referral to a medical oncologist and a radiation oncologist."

151.   On or about March 25, 2014, CARREL updated FRANKLIN's chart and reported

> the pathology report revealed invasive moderately-differentiated squamous cell carcinoma that is strongly positive for p16 immunohistochemical expression.  Dr. Greenberg staged him as a T2N3 squamous cell carcinoma of the right tonsil which spread to the R neck.  He said HPV-related tumors are typically treated with chemo radiation protocols.  He recommended a referral to a medical oncologist and a radiation oncologist as well as a post treatment PET scan.

152.   On or about March 27, 2014, CARREL authored a consultation request for radiation oncology.

153.   On or about March 27, 2014, CARREL authored a chart update indicating that he had sent out a "407 today for the radiation oncologist."

154.   On or about April 7, 2014, Gaskill's clinical progress note stated that FRANKLIN had returned from an off-site oncology appointment with Dr. KOVALSKI, who indicated he needed an MRI with contrast and radiation oncology.  "CRV to NP to get this started."

155.   On or about April 8, 2014, FRANKLIN asked Merren, NP if he could postpone treatment for three months so that he could get a medical parole stating that "she (Dr. KOVALSKI) told me that I may not have 30 days left because the cancer is encroaching on my carotid."  Merren's report also states she reviewed the physician's orders asking for an MRI with contrast of the neck, and radiation oncology ASAP with KOVALSKI and the need to speak with her to coordinate the treatment plan.  Merren requested that HPV testing be done with PATH specimen. In the assessment/plan of April 8, 2014, Merren indicated, in part, that she sent a 407 for an MRI of neck.

156.   On or about April 14, 2014, CARREL authored a document entitled RMO review requesting non-formulary medications and he was going to ask for medical parole for FRANKLIN.

> The oncologist told him that he would die in three months without treatment. He hasn't started treatment yet. He is waiting on an MRI and a visit to the radiation oncologist. This is a HPV cancer.

157.   On or about April 14, 2014, FRANKLIN had a chronic care visit with CARREL.  CARREL's April 14, 2014 report states, in part, that FRANKLIN

> had a biopsy of the R tonsillar mass and the pathology report revealed invasive moderately-differentiated squamous cell carcinoma.  Dr. Greenberg staged him as a T2N3 squamous cell carcinoma of the right tonsil was spread to the right neck.  He recommended a referral to a medical oncologist and a radiation oncologist.  He sought Dr. KOVALSKI, an oncologist, on April 7, 2014, and she asked for an MRI with contrast of the neck.  It was approved and scheduled for 4-16-14.

158.   On or about April 17, 2014, FRANKLIN's chart had a clinical progress note added indicating per CARREL inmate was given a one month "lay-in."

159.   On or about April 17, 2014, CARREL filled out a consultation request for radiation oncology.

160.   On or about April 17, 2014, FRANKLIN appeared for a chart review with CARREL.  The chart update indicates in part, that CARREL sent out "a 407 request for the Radiation Oncologist."

161.   On or about April 17, 2014, CARREL authored a chart update indicating that he "sent out a note to cancel the 407 for Radiology Nuclear Med because it is the wrong service."

162.  On or about April 17, 2014, Merren NP completed a chart update indicating her review of the MRI of the orbits of the face and neck with and without IV contrast.  Her chart update further notes that there is a history of right sided squamous cell carcinoma and she compared this with the CT of FRANKLIN's neck dated November 21, 2013.  She listed her impression as

> persistent heterogeneous irregularly enhancing mass involving the right palatine tonsils right lingual tonsils extending laterally to involve the right parapharyngeal space, encasing the internal carotid artery extending into the right submandibular region. The mass also abuts the lateral aspect of the right periform sinus which is effaced as well as the base of the tongue posteriorly on the right.  Metastatic lymph nodes in the right internal jugular chain posterior triangle and right supraclavicular distribution. Right parotid mass likely due to intraparotid nodal metastasis.

163.  On or about April 22, 2014, CARREL prepared a chart update indicating that FRANKLIN had "returned from an off-site MRI of his right tonsillar cancer with mets to his neck lymph nodes.  The MRI report is in the note from 4/17/14."

164.  On or about April 28, 2014, Dr. _____ [name illegible], a consulting physician's clinical summary submitted to CORIZON stated

> briefly, this is a 49 yo. inmate with T2N3Mx scc of the R tonsil here for evaluation for treatment.  Staging is incomplete and PET-CT is recommended to R/O metastatic disease.  If no evidence of metastatic disease, I would recommend induction chemotherapy to shrink disease prior to proceeding with concurrent chemotherapy given patient's orthopnea (pt would need to lie flat for RT) and sheer extent of disease.  I will discuss

further with pt's med. onc. dr. k. after induction chemotherapy.
Full dictation to follow.

165.   On or about April 23, 2014, FRANKLIN initiated a kite requesting medical commutation.

166.   On or about April 29, 2014, CARREL's chart update stated that FRANKLIN returned from his off-site appointment to McLaren Radiation Oncology on 4/25/14, and the radiation oncologist recommended a PET-CT scan.  If he has no evidence of metastatic disease, he would recommend induction chemotherapy to shrink the disease prior to starting radiation therapy.  He will discuss the case with the medical oncologist.

167.   On or about April 29, 2014, CARREL completed a consultation form seeking a PET-CT Scan.

168.   On or about April 30, 2014, Merren, NP updated FRANKLIN's chart indicating his follow-up appointments in May and June were scheduled and were "inadvertently combined and so reordered today."  The chart review further notes that FRANKLIN is to have "monthly visits due to his cancer."

169.   On or about May 3, 2014, FRANKLIN initiated a kite seeking forms in order to request various medical reports and the parole board evaluation.

170.   On or about May 4, 2014, Ms. Brown responded to FRANKLIN's kite stating the oncologist's report of 4-7-14, radiology oncologist's report of 4-28-14

and the parole board's evaluation information were not contained in the health record.

171.   On or about May 5, 2014, WPA Forist completed a consultation request for a PET-CT scan.

172.   On or about May 6, 2014, Ms. Brown advised FRANKLIN that his request for parole board evaluation could not be processed because it was not in his record.   Further, Brown indicated that the MDOC had only received the hand-written notes from the radiation oncologist.   "There isn't a dictated report yet."

173.   On or about May 7, 2014, FRANKLIN sent an authorization for disclosure of health information to the Carson City Correctional Facility reiterating his request for the oncology consultation report dated 4-7-14, the radiation oncology report dated 4-28-14 and the handwritten notes from the radiologist oncologist.

174.   On or about May 9, 2014, KAREN FRANKLIN initiated a kite on behalf of FRANKLIN related to his cancer and treatment, which stated

> Ms. Franklin states her son told her he did not get a medical parole because the doctor said he could live up to two years with treatment but her son is not getting treatment.   Also questions that if he starts treatment will have to stay in prison or could she take over care.

175.   On or about May 9, 2014, Herald, RN responded to FRANKLIN's kite indicating

> number to the family complaint line issued.   Explained that the doctor stated with treatment he could live greater than two years.

> Patient has a scheduled PET-scan with a follow-up oncology appointment per the oncologist request prior to starting treatment.

176.    On or about May 13, 2014, Eric Mattson, Ombudsman Analyst of the

Legislative Corrections Ombudsman Office sent an email to Brown of the MDOC

stating

> Ms. Brown, good afternoon.  I have a request in regards to Keith Franklin #273184.  Could you please send me his medical records from 04/01/14 to present?  Please include all off-site records as well.  I believe he had multiple appointments with off-site oncologists.

177.    On or about May 15, 2014, Brown, Health Information Manager,

responded to Eric Mattson and provided 42 pages of records.

178.    On or about May 17, 2014, Gaskill responded to FRANKLIN's kite

that his prescription for Norco does not run out until 7-17-14, that only the doctor

can change his medication orders for his prostate meds, that the doctor does not have

Ensure ordered and there is no need for Ensure at this time because he does not have

any weight loss.  He further noted "also the doctor IS seeing you this month, you

have an appt 5-21-14." (Emphasis supplied)

179.    On or about May 19, 2014, Plath, RN prepared a nurse protocol form

indicating FRANKLIN's chief complaints were post ER/in-patient/specialist follow-

up.  Per the Plath's report, FRANKLIN indicated that he returned from an off-site

visit, was supposed to have a PET-scan, but it was not done because he did not have

the prep for the test done properly, he could not get the high protein snack bag and that he was not told he could not have coffee or tea this morning.  The RN report states that, in part, FRANKLIN was in the clinic on 5-18-14, that they discussed the PET-scan procedure and he was given the high protein snack bag detail as well. Plath concluded there was a "knowledge deficit."

180.   On or about May 21, 2014, FRANKLIN had a chronic care visit with HOLMES for hematology/immunology and infectious disease, with a history of present illness of "squamous cell carcinoma of the right pharyngeal area 'tonsillar carcinoma.'  He tells me that he is Stage IV, that he is terminal, he needs more pain pills, he needs a pillow and that he is getting out of prison in the next three weeks." The report also indicates that on physical exam of Mr. Franklin's nose/mouth/throat: "a symmetry of inspection noted, inflamed mass right side of OP, could be soon threatening air space, fungating."  The physical exam of the neck/thyroid notes "range of motion is/has decreased" and that there is "a large right side neck mass, tender."  The assessment and plan states that FRANKLIN has "terminal cancer, pain management, PET-scan is pending, see changes to meds."

181.   On or about May 23, 2014, FRANKLIN initiated a kite complaining that the pain medications did not help.

182.   On or about May 25, 2014, Nagorny responded to FRANKLIN's kite that an appointment with an RN was scheduled.

183.   On or about May 28, 2014, a kite was initiated for a phone call with the Legislative Corrections Ombudsman Eric Mattson who spoke with Richard A. Davenport, MS regarding a psychological evaluation of FRANKLIN for the parole board.  Davenport explained that the request had been received on May 7, 2014, an interview had been conducted on May 21, 2014 and the final report would be completed and in the electronic health records by June 6, 2014.

184.  On or about June 9, 2014, FRANKLIN's mother, KAREN FRANKLIN initiated a kite taken by RN Johnston requesting information about the abdomen x-ray results, and if FRANKLIN went to have his PET scan on June 9, 2014.  Johnston, R.N., reported that x-ray results were not available and that the PET scan was rescheduled due to a family member and FRANKLIN's awareness of the appointment date.

185.   On or about June 10, 2014, CARREL authored a consultation form requesting oncology services through Dr. KOVALSKI.  The consultation report further stated, in part, that Dr. KOVALSKI wanted FRANKLIN admitted to McLaren to start chemotherapy on Friday, June 13.

186.  On or about June 11, 2014, Johnston authored a kite response indicating contact with FRANKLIN's mother, KAREN FRANKLIN regarding his status.  Johnston told Ms. Franklin that the oncologist approved FRANKLIN to start chemotherapy following an upcoming PET scan.  Per Johnston's note, Ms. Franklin

said FRANKLIN told her that he would be admitted to the hospital for five days and did not have to wait for the PET scan. Johnston advised Ms. Franklin that the oncologist decided to wait for the PET scan before starting chemotherapy.

187.   On or about June 12, 2014, Forist requested a consultation for chemotherapy with Dr. KOVALSKI.

188.   On or about June 13, 2014, FRANKLIN met with CARREL regarding his return from an off-site visit to Dr. Layhe, he ordered medications for FRANKLIN, sent out "407's for his upcoming appointments and chemotherapy" and that FRANKLIN can have salt water gargles 4 times a day.

189.   On or about June 13, 2014, CARREL authored an "ACMO" review seeking non-formulary medications of "decadron 8 mg bid one day before each 5-day chemotherapy sessions which will occur three times over the next 60 days." CARREL also ordered "Ensure one can twice a day for 90 days as he goes through chemotherapy for squamous cell carcinoma of his right tonsil with mets to his nodes."

190.   On or about June 13, 2014, CARREL authored a consultation request for chemotherapy oncology at McLaren Hospital indicating in part, "Dr. KOVALSKI wants him admitted to McLaren for continuation of chemotherapy for five days on July 10 and July 31, 2014."

191.   On or about June 17, 2014, Shepard's consultation requested chemotherapy oncology at McLaren indicating, in part, that Dr. KOVALSKI wanted FRANKLIN admitted to McLaren for the continuation of chemotherapy for five days on July 10 and July 31, 2014.

192.   On or about June 17, 2014, FRANKLIN reported to Johnston for an unscheduled visit regarding his return from a PET scan.

193.   On or about June 18, 2014, FRANKLIN saw HOLMES regarding a chronic care visit for "hematology/immunology."  HOLMES noted that FRANKLIN is on pain pills and will start chemotherapy treatment tomorrow [June 19, 2014] and that FRANKLIN's cancer is in his throat, is blocking his nasal passages; and he was reporting chest pain.  HOLMES's report indicates that on the physical exam of the nose/mouth/throat that there is "some encroachment of the right sided OP noted with this cancerous mass & inflammation."

194.   On or about June 18, 2014, Forist authored a consultation for oncology with KOVALSKI which stated, in part, that "he has a painful enlarged tonsil and mets to his R anterior cervical nodes and R post auricular nodes."

195.   From on or about June 19, 2014, to on or about June 23, 2014, FRANKLIN was hospitalized at MCLAREN for the administration of chemotherapy.

196.   On or about June 19, 2014, Ms. Price of the MDOC authored an inpatient case management note regarding FRANKLIN indicating "per McLaren SU CM: (Rachel) pt admit this date for IP Chemo d/t R Tonsillar Mod Diff SCCA.  Five day LOS expected.  CM send for review 6/20/14.  RW, RN."

197.   On or about June 20, 2014, Nikita Price authored an inpatient case management note that per an email of June 20, 2014 received from McLaren SU CM: "patient [FRANKLIN] in for five-day chemo for tonsil cancer.  IS: CPOE inpt, iv decadron, iv, pepcid, emend iv, iv aloxi, iv plantinol, iv taxotere, 5-FUIV.  New admit ip for 5 day chemo, no orders yet./KDRN."

198.   During his hospitalization at MCLAREN, on June 21, 2014, FRANKLIN's lab results were abnormal, including but not limited to:  high white blood cell count; low hemoglobin; high neutrophil; decreased lymph %; low EOS; high aneu; low alym; high glu; high BUN; high BUNCR; low CA; low Tot Prot; low ALB and low AGRC.

199.   KOVALSKI and MCLAREN failed to repeat FRANKLIN's lab work after June 21, 2014, and prior to his discharge on June 23, 2014.

200.   On or about June 23, 2014, MCLAREN discharged FRANKLIN from the hospital, and upon discharge from the hospital FRANKLIN's temperature was 99.2 ∘F, his oxygen level was 95% and he was complaining of nausea and vomiting.

201.   On or about June 23, 2014, when MCLAREN and KOVALKSI discharged FRANKLIN he was in a medically unstable condition.

202.   On or about June 23, 2014, MCLAREN and KOVALSKI discharged FRANKLIN without the prescribing the appropriate medications, including but not limited to neupogen.

203.   On or about June 23, 2014, at 4:30 p.m. MCLAREN and KOVALSKI discharged FRANKLIN, who was medically unstable and had a compromised immune system, back to the prison without special precautions in place to guard against FRANKLIN's exposure to infection.

204.   On or about June 23, 2014, MDOC, CORIZON and/or MCLAREN returned FRANKLIN, who was medically unstable and had a compromised immune system back to the prison without special precautions in place to guard against FRANKLIN's exposure to infection.

205.   On or about June 23, 2014, FRANKLIN returned to Carson City Correctional facility.

206.   On or about June 23, 2014, at 6:59 p.m. FRANKLIN's heart rate was elevated and he was vomiting.

207.   On or about June 23, 2014, McMullen authored a medical detail order indicating an order for a foot basin [for a vomit receptacle].

208.   On or about June 24, 2014, Nikkida Price authored an inpatient case management note noting daily based on Ingham Medical Center – McLaren inpatient clinical notes dated June 23 (sic), 2014, "LABs: WBC 16.2.  HGB 13.6.  ALB 3.0.  BUN 23.  T Prot 5.9.  Patient has been getting CHEMO W/anti emetics around the clock, alternating between Compazine and Regulan for N/V improving.  POSS D/C today.  RW, RN.  Also contained on this inpatient case management note June 24, 2014 per McLaren SU CM (Rachel) patient discharged 6/23/14 RW, RN."

209.   On or about June 27, 2014, Newhall, R.N.'s nurse protocol form stated, in part, "unit officer contacted HCN due to patient [FRANKLIN] complaining of throat pain, that his tongue was feeling like it was swelling, nausea, vomiting and diarrhea over the last 4 days since he returned from chemotherapy."  Newhall stated that FRANKLIN was "placed on a gurney with the rails up with PO fluids and ice given."  CARREL was informed of FRANKLIN's condition and provided a new verbal order of "start IV and run NS and monitor pt."  The orders were read back and verified.  Newhall's note indicated that it was a "difficult IV start [first 4 attempts IVSQ] fifth attempt successful with IV start.  4 bags of 500 ml NS given."

210.  On or about June 27, 2014, Newhall's SOP note stated that FRANKLIN complained of throat pain, tongue feeling like it was swelling and nausea, vomiting and diarrhea over the last 4 days since he returned from chemotherapy.  FRANKLIN also complained of pain when he talked or swallowed;

{H0386290.1}                                                   44

that he vomited after taking his nausea medication; and that he was able to keep water down without difficulty. Newhall's SOP also stated, in part, "pharynx and uvula has swelling and white patches. Tongue pasty in color. LSCTA. No labored breathing, dyspnea or wheezing noted. Respiratory effort is normal. Breath sounds within normal limits." Newhall's plan of care stated FRANKLIN was placed on a gurney with the rails up PO fluids and ice given.

211. On or about June 27, 2014, Newhall informed CARREL of FRANKLIN's condition.

212. On or about June 27, 2014, at 11:57 a.m. FRANKLIN saw CARREL for throat pain, swelling, nausea, vomiting and diarrhea over the last 4 days following his return from 5 days of chemotherapy for squamous cell carcinoma of the R tonsil. CARREL noted that FRANKLIN

> got dizzy and fell today. His initial blood pressure was 70/45. On exam, his pharynx had white patches and erythema. It hurts for him to talk and swallow. He hasn't been able to take his pain or nausea medication because of his vomiting. He didn't take his terazosin either, except he took it once. I gave him solumedrol 125 mg IV for his hypotension and inflammation. He needs a swish and spit solution also."

CARREL's assessment and plan stated that

> I gave him 1 liter of fluids and 125 mg of solumedrol. He needs a swish and spit solution for his throat and pain and nausea meds intravenously. I notified Dr. KOVALSKI's office of his situation and hospital admission. I notified Dr. Coleman, who felt he needed DWH admission. I discussed the case with V. Courtney, the nurse supervisor at DWH who arranged for a bed.

> Then I spoke to Dr. (sic) Lauder (sic) who was the admitting physician (sic).

213.   On or about June 27, 2014, at 1:24 p.m. Bush's clinical progress note indicates that FRANKLIN is resting on a cot when she arrived for duty.  Bush's note further states that the 14:45 IV site was "hep locked and secured to right arm, inmate was placed in cuffs and sat in wheelchair, inmate out the door via wheelchair headed to DWH."

214.   On or about June 27, 2014, at 4:47 p.m. Launder, P.A.'s provider progress note indicates FRANKLIN was sent with "c/on/v, diarrhea and throat pain and that the MSP called the ER and stated inmate was hypotensive with BP of 70/45 after 1,000 cc of NS.  "He just started and had a 5-day course of chemo for tonsil CA.  Unable to keep food down or fluids now.  Dr. CARREL at DRS spoke with Dr. Coleman and they felt he could benefit from admission to DWH for hydration."  Per the PA's progress note, FRANKLIN ambulated into the ER without difficulty with an initial BP of 107/55.  He is "A & O."  Erythema noted in the posterior pharynx. Provider progress note indicated his diagnosis is "hypotension, n/v secondary to recent chemotherapy, tonsil CA."  According to the note, his condition was "stable."

215.   On or about June 27, 2014, at 6:16 p.m. Joanne Gibbs authored a skilled care note containing, in part, FRANKLIN's vital statistics showing that at 6 p.m. FRANKLIN's blood pressure was 93/57, and his pulse ox was 93% with supplemental oxygen.

216. On June 27, 2014, at approximately 8:43 p.m. Ogunedo, R.N., conducted an inpatient nursing admission assessment at DWH for a sub-acute care admission and her admission report states FRANKLIN's chief complaint was nausea and vomiting "R/t 5 days of chemotherapy." The assessment report also includes, in part, under ENMT "bruise to forehead r/t fall before patient got to the hospital, sore throat r/t chemotherapy." Under the musculoskeletal review, the report states "patient complains of general weakness r/t chemotherapy." There are no vital signs recorded in this report.

217. On or about June 28, 2014, prepared at **1:16 a.m.** by Rachael Hullett, RCA reports vitals for **6:45 p.m.** which is at best, an inaccurate medical record or at worst an altered medical record. Hullett's report states, in part, FRANKLIN's blood pressure was 98/60 in a sitting position, his temperature was 97.6, his pulse was 103, his respiration was 18 and his **pulse ox was at 88%**.

218. On or about June 28, 2014, at **7:37 a.m.** more than six hours later and possibly more than 13 hours later (6:45 p.m. on June 27, 2014) Deborah Baltimore, RCA recorded the following vitals for FRANKLIN: his **BP was 70/58** in a sitting position and his **pulse with supplemental oxygen was at 78%**, his pulse rate was 114 and his respiration was at 31.

219. On or about June 28, 2014, at 7:40 a.m. Miller, R.N.'s inpatient nursing progress/SOP note stated, in part, that FRANKLIN's subjective complaint was "I

feel like crap" and her objective evaluation was that FRANKLIN was "resting supine in bed, 0.9 ns running at 125/cc hr through 18g in RAC face red in color, resp frequent and labored, skin hot to touch. **Vital signs show hypotension and tachycardia.  O2 stats under 80% with mask and 5 liters of O2**" and that FRANKLIN had an "Alt in profusion." (Emphasis added). Miller's plan was to send FRANKLIN to Allegiance ER for further evaluation per MP.

220.   On or about June 28, 2014, at 7:40 a.m. Miller prepared a chart update which stated, in part, FRANKLIN's temperature was 97.2 with a blood pressure of **70/58 and a pulse of 115 with respirations at 22**.

221.   On or about June 28, 2014, at 7:45 a.m. Miller's inpatient nursing treatment record reflects, in part, that under mental status, that "patient is noisy" and FRANKLIN had "edema," that his "lung sounds are poor.  Congested patient has dyspnea oxygen at 5 liters," that he had nausea and vomiting and diarrhea; that he was "neurologically weak."  FRANKLIN's pain assessment was at 9.

222.   On or about June 28, 2014, DWH contacted EMS.

223.   On or about June 28, 2014, at approximately 8:00 a.m. EMS recorded FRANKLIN's condition as tachycardic, with a blood pressure of 127/68, a pulse rate of 122, and his pulse oxygen of 82 with supplemental oxygen.

224.   Upon discharge from DWH on June 28, 2014, FRANKLIN's medications were MsContin, Naprosyn, Zofran, Terazosin and Senna.

225.   On or about June 28, 2014, at 8:00 a.m. EMS transported FRANKLIN from DWH to Allegiance Hospital due to shortness of breath.

226.   On or about Saturday, June 28, 2014, at 8:06 a.m. Allegiance Health received a call at 8:06 a.m. regarding the need to transport FRANKLIN due to shortness of breath with the onset of Tuesday [June 24, 2014].

227.   On or about June 28, 2014, at 8:12 a.m.   FRANKLIN arrived at Allegiance Health's emergency department.

228.   On or about June 28, 2014, Dr. Timothy Murray performed a history and physical for FRANKLIN's pulmonary critical care assessment; which noted that FRANKLIN was transferred to the emergency room by EMS for difficulty breathing for three days.  He had been treated with chemotherapy through McLaren Hospital five days prior and was not feeling well since.  He has had chest pain and mouth pain.   In Duane Waters he also had low pressures.   Upon his transfer to the emergency room, he was found to be in respiratory distress with hypoxemia and was started on the Bi-PAP.  Allegiance Hospital was making arrangements to transfer him to McLaren for continuity of care however because of his decreasing status he was diverted to Allegiance where he remained gravely ill.

229.   On June 28, 2014, FRANKLIN was intubated and a central line was placed.  According to the information the physician was able to obtain through DWH in the emergency room, FRANKLIN apparently returned from McLaren on

June 23, 2014 after five days of chemotherapy.  He was evaluated on June 27, 2014 for feeling ill and re-evaluated on June 28, 2014 regarding the above-noted symptoms.

230.   Per Dr. Murray's report, FRANKLIN's chemotherapy was taxol and 5-FU.  Dr. Murray, noted that FRANKLIN did not receive any "neupogen prior to discharge after his chemotherapy."   Dr. Murray's report indicates that the x-ray shows diffuse bilateral infiltrates.   Dr. Murray's impression and plan states as follows:

a.   Acute respiratory failure.

b.   Bilateral infiltrates with neutropenia most worrisome for pneumonia given rapid onset.

c.   Acute chemotherapy toxicity also needs to be considered.

d.   Acute renal failure, probably multifactorial, from poor PO intake, mucositis and sepsis.

e.   Pancytopenia from chemotherapy.

f.   Tonsillar cancer, status post chemotherapy.   Incomplete database.

g.   Decreased level of consciousness of unclear etiology. Pinpoint pupils.  This may be from medication reasons for bleeding although the patient is too unstable for CT of the head.

At this point, we will heroically resuscitate with fluids, pressers, if needed, antibiotics, and neupogen has been added.  We will wait cultures.  We'll choose broadly antibiotics partly to cover hospital-acquired infections.   The time course would speak

{H0386290.1}

against fungal infection.  We will sample sputums.  The prognosis is grave.  We'll update database with information from McLaren.

231.   On June 28, 2014, FRANKLIN's labs were abnormal including:  **WBC .2; RBC 3.82; HBG 11.8; HCT 33.0; BUN 90; Sodium 131; Creatin 6.0; platelets of 35; and abnormal arterial blood gases, demonstrating multi-system organ failure**.

232.   On June 29, 2014, at 8:58 a.m., just over 24 hours after his admission to Allegiance, Keith FRANKLIN died with the diagnosis of:

a.   Bilateral infiltrates, associated with septic shock and multi-organ system failure, most likely pneumonia related to chemotherapy, cannot rule out toxic metabolic/severe systemic inflammatory response related to chemotherapy.

b.   Multi-organ system failure, recalcitrant to heroic intervention.

c.   Acute renal failure.

d.   Tonsillar cancer, recent chemotherapy.

e.   Hepatitis C.

f.   Coagulopathy.

g.   Hyper ammonia.

233.   On June 30, 2014, Dr. Ortiz-Reyes performed an autopsy on FRANKLIN and determined that he died due to neck cancer and complications thereof.

234.   On or about June 30, 2014, at 6:03 a.m., Joshua Schad, BSN, RN's clinical progress note for FRANKLIN stated "Facility was notified that patient expired on 6/29/14."

235.   On or about June 30, 2014, at 2:53 p.m., after FRANKLIN had died on June 29, 2014, Jeremy McMullen R.N., authored an "Addendum to Encounter" stating

> Patient returned from 5-day treatment from McLaren oncology unit with three medication referrals. Patient complained of vomiting earlier after returning to the facility on the west side and had Zofran.  Patient stated he would come back at 2000 for his next dose and just wanted to rest for the time being.  Foot basin issued to use as emesis basin as patient wasn't sure he would make it back to his unit prior to vomiting again.  Patient stated he felt better than prior to leaving facility.  Patient denied any other complaints other than nausea at time of assessment and asked about his new nausea medications.   Pigmentation appropriate for race, skin turgor without tinting, mucous membranes pink moist and intact.  Patient's heart rate elevated and was added to the unscheduled callout for the MP on 6/24/14.

236.   The MDOC records do not contain a treatment record for June 24, 2014, for the alleged "unscheduled" medical "call-out."

237.   On or about July 2, 2014, Nikkida Price of Defendant MDOC prepared an Inpatient Case Management Note which appears to contain "Daily Inpatient Clinical Note(s) from Allegiance Health.

> Part 1 of 2
> 5/30/14; Allegiance fax rec'd from CM Lisa; admission review for 6/28/14, charted 6/30/14;
> Inpatient admission by Dr. Murray.

Per H&P: Pt is 49-yr-old man who was transferred to ER by EMS for difficulty breathing x 3 days. He had been treated with chemo through McLaren hospital 5 days ago. He had not been feeling well since. He has had CP and mouth pain.

In DWH he also had low BP. He was transferred to ER in respiratory distress with hypoxemia. He was started on BIPAP. Arrangements were being made for his transfer to McLaren or continued care, however due to decreasing status he was diverted to Allegiance. He remains gravely ill. Subsequently he was intubated and central line was placed. He has not needed much sedation. He has pinpoint pupils. The pt is unable to provide information. The only available info is from DWH Hospital and ER. The pt apparently returned from McLaren on 6/23/14 after receiving 5 days of chemotherapy. He was evaluated on 6/27/14 for feeling ill and reevaluated today with symptoms as outlined above. On verbal report his chemo was Taxol and 5-FU. Apparently he did not receive any Neupogen prior to d/c after his chemotherapy.

MH: Tonsillar cancer, hepatitis C, BPH.

Dx: Chest pain, mouth pain, respiratory distress.

Dx: Acute respiratory failure, bilateral infiltrates with neutropenia most worrisome for pneumonia given rapid onset, acute chemotherapy toxicity also needs to be considered, acute renal failure, probably multifactorial-poor PO intake, mucositis and sepsis, pancytopenia d/t chemotherapy.

P-79/54 to 102/69, T-96, P-116, pulse ox-89% on 15L/NRB-then 82-93% sat on 100% FIO2-vent, R-23.

Abs: WBC-0.2, Hgb-11.8, Hct-33, plt-35, ABG's-pH-7.200, PCO2-56.6, PO2-61.4, base deficit-6.7, lactic acid-5.3.

a-131, Chl-89, BUN-90, Cr-6, Ca-7.3, GFR-12, INR-1.37, ammonia-41.

Part 2 of 2

XR:

Mild pulmonary venous congestion.

Mild patchy airspace opacity involving LLL field compatible with mild infiltrates.

Q Scan: Normal ventilation and perfusion scan. No evidence of PE.

KG-sinus tachycardia, HR-108.

: ED tx: IV NS @ 125ml/hr, DuoNeb NMT 1hrs of continuous tx, MS IV x 1, Ativan IV x 2, Zosyn IV x 1, Vanco IV x 1, Solucortef IV x 1, NS 2000ml fluid bolus, intubated in ED, central line placed in ED.

___nit Tx; Mechanical ventilation with respiratory interventions q1-2hrs, norepinephrine infusion, vasopressin infusion, ___S@500ml/hr, Zosyn IV q8hrs, Dextrose IV x 1, Sodium bicarb IV x 5, Decadron IV q8hrs, Calcium chloride IV x 3, calcium gluconate IV x 1, epinephrine x 1, Fluticasone INH q12hrs, transfusion of platelets by plasmapheresis, tele, ___imetry, NPO, blood and tracheal aspirate cultures, Oncology consult for neutropenia after chemo with bleeding, arterial line insertion.

Er Progress Note: The pt has progressive MSOF, despite heroic intervention. He failed heroic intervention and was unresponsive to resuscitation. He is now in asystole. Code team felt that all options had been utilized and code was called at 0858. Pt was pronounced dead secondary to diffuse infiltrates, severe sepsis and MSOF refractory to heroic resuscitation. Prison was notified. Pt is likely a coroner inquiry./jm g, rn.

(Emphasis added)

238. Throughout FRANKLIN's custody and care at MDOC's Carson City Correctional Facility and DWH he did not receive a constitutional level of care, including but not limited to:

## BHAVSAR, CARREL, MDOC AND CORIZON

a. Failure to follow up on the 2-3 cm mass on FRANKLIN's neck from August 7, 2012 to March 2014, including, but not limited to:

i. Failing to create a plan of care;

ii. Failing to order follow up testing, treatment or labs;

iii. Failing to seek involvement of needed specialists;

      iv.  Failing to alert FRANKLIN that he had a palpable lymphnode 2-3 cm; and

      v.  Failing to ensure that the mass was appropriately assessed, evaluated and comprehensively treated.

b.    Delay in the diagnosis of the cancer for **1 year, 7 months, 18 days** (from August 7, 2012, to March 25, 2014), thereby delaying cancer treatment;

## <u>MDOC, CORIZON, CARREL AND HOLMES</u>

a.    Even after his cancer was detected but not diagnosed, there was a failure to provide a constitutional level of care in providing chemotherapy, and other needed treatment modalities including the delay in the administration of chemotherapy after diagnosis of cancer.

## <u>McLAREN AND KOVALSKI</u>

a.    Even after his treatment plan was created, and chemotherapy was administered, there was a failure to provide a constitutional level of care including, but not limited to:

      i.  KOVALSKI and/or MCLAREN failing to properly monitor FRANKLIN's medical condition during his inpatient chemotherapy treatment, including but not limited to failing to monitor his vital signs and failing to repeat his CBC prior to discharge from the hospital;

      ii.  Failing to utilize appropriate adjunct treatment to address the effects of chemotherapy;

      iii.  Failing to recognize and treat signs and symptoms of dehydration;

iv.  Failing to avoid untimely discharging of FRANKLIN;

v.  Failing to detect and react to signs and symptoms of infection;

vi.  Failing to react to signs and symptoms of pancytopenia;

vii.  Failing to properly treat FRANKLIN's severe nausea and vomiting, abnormal laboratory findings, and elevated temperature;

viii.  KOVALSKI and/or MCLAREN discharging FRANKLIN from MCLAREN when he was medically unstable;

ix.  KOVALSKI and/or MCLAREN discharging FRANKLIN from MCLAREN to the general prison population;

### MDOC, CORIZON, CARREL AND HOLMES

x.  MDOC, CORIZON, CARREL and HOLMES returning FRANKLIN to Carson City Correctional facility following his discharge from MCLAREN without undertaking necessary health protections for FRANKLIN who had a suppressed immune system;

xi.  Failing to utilize appropriate adjunct treatment to address the effects of chemotherapy;

xii.  MDOC, CORIZON, CARREL and HOLMES returning FRANKLIN to Carson City Correctional facility following his discharge from MCLAREN into the general prison population without undertaking necessary health protections for FRANKLIN who had a suppressed immune system;

xiii.  MDOC, CORIZON, CARREL and HOLMES failing to prescribe FRANKLIN the necessary post-chemotherapy monitoring and post-chemotherapy drugs;

xiv.  MDOC, CORIZON, CARREL and HOLMES failing to monitor FRANKLIN's vital signs after he returned to Carson City Correctional facility following his discharge from MCLAREN;

xv.   MDOC, CORIZON and CARREL's failure to timely transfer FRANKLIN to an appropriate medical facility given FRANKLIN's deteriorating medical condition;

xvi.   Failing to detect and react to signs and symptoms of infection;

xvii.   Failing to recognize signs and symptoms of respiratory compromise and pancytopenia;

xviii.   Failing to timely respond to FRANKLIN's deteriorating medical condition;

xix.   Failing to properly treat FRANKLIN's severe nausea and vomiting, and elevated temperature;

xx.   Failing to timely transfer to a hospital better equipped to administer appropriate medical treatment to FRANKLIN;

xxi.   Failing to diagnose and timely treat respiratory failure;

xxii.   Failing to diagnose and timely treat pancytopenia;

xxiii.   Failing to diagnose and timely treat multi-organ system failure;

xxiv.   Failing to perform laboratory studies.

239.   FRANKLIN suffered metastasis of his cancer, a reduced life expectancy, physical pain and suffering, anxiety, emotional distress, physical sickness and ultimately death due to Defendants' violations of his Constitutional rights.

## <u>COUNT I – 42 U.S.C. § 1983 EIGHTH AMENDMENT<br>UNCONSTITUTIONAL CUSTOM, POLICY, PRACTICE<br>DEFENDANTS MDOC, CORIZON HEALTH, INC.<br>AND DANIEL H. HEYNS</u>

<u>Defendants MDOC and Corizon Health, Inc.</u>

240.   Plaintiff incorporates Paragraphs 1 through 239 as if fully set forth herein.

241.   Since 1998, Defendant CORIZON has remained the current health care provider for the MDOC.

242.   CORIZON is a private prison health care provider with a documented history of indifference to patients' health, safety and welfare.

243.   MDOC and CORIZON restrict outside medical treatment to life-or-death emergencies to enhance profitability.   Thus, patients with urgent medical needs like the decedent, FRANKLIN, suffer from harmful, untreated conditions that shorten their lives and cause great physical pain, including cancer and other conditions that degrade unless treated.   Further, MDOC and CORIZON permit treatable medical conditions to degrade to emergent or life-threatening conditions in order to avoid outside (i.e. non-prison) medical referrals.   MDOC and CORIZON have a history of refusing treatment for non-medical reasons such as cost, and a patient's expected release date.   MDOC and CORIZON are indifferent to the consequent suffering of these patients.

244. CORIZON's history of indifference to human life is well-documented in Michigan and elsewhere, including Florida and Arizona.

245. In Florida, the head of the Florida Department of Corrections sent a letter in 2014 directed to CORIZON'S CEO chastising CORIZON'S utilization management in the provision of its healthcare services to Florida's inmate patient population. (http://www.al.com/news/index.ssf/2014/09cause4_read_florida.html)

246. In Arizona, a CORIZON whistleblower came forward to complain about CORIZON's failure to treat patients in Arizona's correctional system. The whistleblower nurse reported that severe delays in the provision of vital treatment and cost-cutting measures led to premature deaths within the Arizona Department of Corrections. (see http://www.azfamily.com/news/corizon-nurse-blows-whistle-on-patient-healthcare-282211871.html#ixzz3L3jzUQQc)

247. MDOC and CORIZON's review procedure requires a multilevel consultation review form which results in staff who are not treating the inmates to overrule recommendations that are made by the patient's treating doctors for non-medical reasons like cost. This process is done as a matter of policy. Some of the individuals reviewing the consultation requests are not licensed medical professionals.

248. MDOC and CORIZON perform this consultation recommendation review process in accordance with its aggressive utilization management policy

which deprives patients like FRANKLIN of medical necessary treatment in favor of less costly, substandard treatment despite recommendations of licensed, treating physicians.

249.   CORIZON's procedure systematically delays patient care and plans of care that are established by qualified medical professionals such as specialist doctors.  CORIZON systematically delays the approval of medication and diagnostic imaging to monitor patients with cancer that require an advanced imaging such as CTs, MRIs and PET scans.

250.   The MDOC and CORIZON and their medical staff knew that FRANKLIN had a palpable mass 2-3 cm in size as early as August 7, 2012 and failed to perform the requisite tests, follow-up and treatment for the 2-3 cm mass. CORIZON's off-site utilization management delay denied several referrals for cancer treatment and requests for medication.

251.   Whether written or unwritten, the MDOC and CORIZON have a custom, practice or policy that is well-known to its medical staff to generally restrict patient referrals except in instances of life or death emergencies.  This custom, practice, or policy results in delay in treatment, unnecessary suffering by patients and permits treatable conditions to worsen to the point of irreversible harm and death.

252.   Whether written or unwritten, the MDOC and CORIZON have a custom, practice or policy of delaying or refusing medically necessary treatment for non-medical reasons such as cost, type of condition, date of onset of condition, or a patient's remaining length of incarceration.  By way of example, the Consultation Request submitted by attending prison medical providers, that is physicians and nurses for patients to be referred for diagnostics or specialty care are routinely delayed, lost or misplaced by CORIZON.  When they are not lost or delayed the consultation requests are often denied on the basis of "alternative treatment plans." They are medically unreasonable under the circumstances.

253.   Whether written or unwritten, MDOC and CORIZON have a custom, practice or policy of delaying or refusing medically necessary treatment by requiring the exhaustion of knowingly ineffective treatment term "medical management" and/or "protocol."  This custom, practice or policy results in unnecessary suffering by patients and permits treatable conditions to worsen to the point of irreversible harm and death.

254.   Whether written or unwritten, MDOC and CORIZON have a custom, practice or policy that permits non-treating medical providers to deny or overrule requests for treatment by patient's treating physicians for non-medical reasons such as cost.

255.    Whether written or unwritten, MDOC and CORIZON have a custom, practice or policy of deliberately understaffing medical personnel and/or failing to adequately train personnel.  This custom, practice or policy causes delay in patient appointments with medical providers.  Likewise, this custom, practice or policy permits medical staff to make medical decisions, or to order medical services/treatment for which they are not qualified absent oversight by qualified medical staff.  This custom, practice or policy is intended to cut costs for MDOC and CORIZON and to boost CORIZON's profits.  This custom, practice or policy results in unnecessary suffering by patients and permits their often treatable conditions to worsen and become irreversible harm and death.

256.    MDOC and CORIZON deliberately operate a system of healthcare that diffuses tasks and responsibility regarding patient referrals to multiple individuals causing inherent, known delays and treatment.  MDOC and CORIZON's intent is to achieve delays in patient treatment to ultimately reduce the cost of patient treatment and enhance its profits.  This custom, practice or policy results in unnecessary suffering by patients and permits their often treatable conditions to worsen to the point of irreversible harm and death.

257.    MDOC and CORIZON's customs, practices or policies as herein described were deliberately indifferent and resulted in the constitutional deprivation of FRANKLIN's rights.  Consequently, FRANKLIN did not receive timely cancer

treatment.  What was a curable condition, or at worst a treatable condition with anticipated increased life expectancy, became FRANKLIN's death sentence, resulting in his untimely demise on June 29, 2014.

258.  Consequently, FRANKLIN suffered damages including, but not limited to the metastasis of his cancer, extraordinary pain and suffering, anxiety, emotional distress, physical pain, physical sickness, and death.

Defendant Daniel H. Heyns

259.  As the Director of the MDOC, HEYNS had a non-delegable duty to ensure constitutionally adequate medical care to MDOC inmates.  Thus, the MDOC has the statutory right to intervene to ensure constitutionally adequate medical care to MDOC inmates, and reserves the right to do so in its contracts with private healthcare providers like CORIZON.

260.  HEYNS has actual knowledge that the level of patient care within the MDOC during August 2012 through June 30, 2014 was constitutionally inadequate.

261.  On information and belief, HEYNS reviewed monitoring reports which confirm these constitutionally inadequate levels of care.  On information and belief, HEYNS reviewed hundreds of patient grievance appeals describing specific, widespread instances of delay or denial of medically necessary treatment.

262.   Through patient complaints, monitoring reports, and hundreds of grievance appeals directly to HEYNS, he knows that MDOC patients are systematically delayed or denied medically necessary specialist treatment referrals, and that FRANKLIN was one such patient.  This problem has been occurring for years.

263.   Further, on information and belief, HEYNS has actual knowledge that inmates who require urgent specialty referrals are not seen within the 30-day urgent window or a medically reasonable time, and that FRANKLIN was one such patient.  This problem likewise has been occurring for years.

264.   Nonetheless, on information and belief, HEYNS failed to take reasonable measures to ensure that inmates receive a constitutional level of medical care.  For instance, on information and belief:

    a.   HEYNS failed to intervene when the level of medical care is constituently inadequate;

    b.   HEYNS failed to enforce contractual quality control measures with the MDOC's private contractor CORIZON to the detriment of MDOC patients, including the implementation of Corrective Action Plans;

    c.   HEYNS permitted CORIZON to materially breach the terms of its contract with the MDOC to the detriment of patients by failing to adequately staff, train and supervise medical personnel; and

    d.   HEYNS permitted CORIZON to materially breach the terms of its contract with the MDOC to the detriment of patients by failing to deliver the contractually required policy manuals CORIZON is required to provide in the area of patient healthcare and referrals to medical specialists.

265. HEYNS' failure to take reasonable measures to ensure a constitutionally adequate level of medical care to patients as herein described was a moving force behind the deprivation of FRANKLIN's constitutional rights.

266. FRANKLIN suffered predictable, irreversible harm when his cancer metastasized due to the failure of CORIZON and its staff to timely diagnose and treat him, and HEYNS's failure to take reasonable measures to ensure that patients like FRANKLIN could seek timely intervention or recourse from the MDOC.

267. FRANKLIN suffered predictable, irreversible harm when his cancer metastasized due to the MDOC's failure to enforce the contract with CORIZON, despite the known, widespread lack of treatment for inmates with emergent and urgent medical needs, understaffing, and lack of supervision at MDOC facilities.

268. Consequently, FRANKLIN suffered damages, including the metastasis of his cancer, a reduced life expectancy, anxiety, emotional distress, physical pain, physical sickness and ultimately death.

<u>**COUNT II – 42 U.S.C. §1983**</u>
<u>**EIGHTH AMENDMENT – DELIBERATE INDIFFERENCE –**</u>
<u>**DEFENDANTS BHAVSAR, DANIEL T. CARREL, D.O., SCOTT L.**</u>
<u>**HOLMES, M.D., MCLAREN HEALTH CARE CORPORATION, and**</u>
<u>**CHERYL KOVALSKI, D.O.,**</u>

269. Plaintiff incorporates Paragraphs 1 through 268 as if fully set forth herein.

Defendants BHAVSAR, CARREL and HOLMES

270.   CORIZON employs medical providers, including, physicians, nurses, physician assistants, and a supervisory physician (Medical Director).   These individuals are licensed medical professionals who are responsible for patient evaluation, patient diagnosis, patient treatment, patient follow-up, and patient referral for specialist treatment to outside (i.e., non-prison) medical providers when such treatment cannot be provided at the MDOC prison complexes.

271.   CORIZON's Site Medical Director (also referred to as the Key Contact Physician) is responsible for performing routine medical exams on patients, providing medical treatment, testing, referrals, consulting with medical specialists to obtain advice on patient treatment, and supervising clinical services provided by staff to patients.   For all times relevant to this Complaint, BHAVSAR was CORIZON's Site Medical Director.

272.   CORIZON's Staff Physicians provide and supervise medical care to patients.   The Corizon Regional Medical Director supervises the Staff Physician. The Staff Physician supervises the site mid-level providers (i.e., Nurse Practitioners/Physician Assistants).   The Staff Physicians are responsible for providing patient treatment, orders, referrals, testing, and documents all patient encounters on the Continuous Progress Record in S.O.A.P. format (Subjective, Objective, Assessment, and Plan).

273.   CORIZON's Nurse Practitioners and Physician Assistants provide health care to inmates, diagnose and treat inmates within his/her scope of practice, orders diagnostic testing, performs diagnostic testing, initiates medical consultation requests and non-formulary medication requests, and documents all patient encounters on the Continuous Progress Record in S.O.A.P. format.

274.   These Defendants all had personal knowledge that BHAVSAR had detected a palpable mass 2-3 cm in size on FRANKLIN's neck on August 7, 2012, and was not receiving follow-up testing or treatment.

275.   All of these Defendants knew of and consciously disregarded FRANKLIN's serious medical need for treatment by failing to timely evaluate him, timely treat him, timely diagnose him, and timely refer him for urgent specialist care each knew was medically necessary.

276.   Each of these Defendants had the ability and the authority to request urgent, or even emergent, medical treatment for patients like FRANKLIN, but refused to make these referrals or timely make these referrals.

277.   These Defendants contributed to the denial of care, and the delay in treatment until FRANKLIN's cancer became effectively untreatable causing him irreparable harm through the metastasis of his cancer constituting deliberate indifference as set forth in detail above.

278.   A summary of the delay in treatment shows:

| Date | Problem Noted | Test Requested | Test Completed | Time Elapsed Between Test Requested and Test Completed |
|---|---|---|---|---|
| 08/07/12 | 2-3 cm mass detection | None | None | No testing performed |
| 10/09/13 | Mass noted to be 5-6 times larger than 8/7/12 | x-ray to be requested | None | No testing performed |
| 10/16/13 | Follow up on mass | x-ray ordered | 10/30/13 | 14 days |
| 10/23/13 | Follow up on mass | CT scan | 11/22/13 | 30 days |
| 11/22/13 | Follow up on CT | CT interpretation | 12/16/13 | 24 days |
| 11/25/13 | Follow up on mass | ENT consult | 02/10/14 | 77 days |
| 02/13/14 | Need for biopsy, laryngocoscopy, esophagoscopy | Biopsy, laryngocoscopy, esophagoscopy | 03/19/14 biopsy | 34 days |
| 03/25/14 | Follow up on biopsy – cancer finding | Oncology consult | 04/07/14 | 13 days |
| 04/07/14 | Additional imaging of mass | MRI with contrast | 04/17/14 | 10 days |
| 04/25/14 | Additional imaging for cancer staging | PET CT scan | 06/17/14 | 53 days |
| 06/19/14 | Chemo treatment | | 06/19/14 – 06/23/14 | 4 days |

279.  Despite FRANKLIN's ongoing contact with the medical providers in the MDOC system, one year 7 months and 18 days elapsed before FRANKLIN's cancer was diagnosed.

280.  By the time the biopsy on FRANKLIN's mass was done, the ENT Greenberg determined that FRANKLIN's cancer was at Stage IV.

281.  Despite FRANKLIN's oncologist, KOVALSKI's directive to provide FRANKLIN with "prompt treatment" deeming it "necessary" and her request for

"prompt evaluation by Radiation Oncology" to determine if FRANKLIN needed neoadjuvant chemotherapy and then radiation therapy, FRANKLIN did not receive any chemotherapy for the mass until June 19, 2014.

282.  Despite KOVALSKI's recommendation that FRANKLIN undergo additional testing (i.e., MRI and a PET CT) the MRI did not occur until April 16, 2014 and the PET Scan did not occur until June 17, 2014.

283.  Despite FRANKLIN's serious medical condition of tonsillar cancer, Defendants failed to provide any chemotherapy to FRANKLIN until June 19, 2014.

284.  Further, in addition to their failure to treat FRANKLIN's cancer, all of these Defendants failed to prescribe effective pain medication to FRANKLIN. Instead, these Defendants prescribed ineffective pain medication (and at times no pain medication) despite numerous requests from FRANKLIN for effective pain medication, causing FRANKLIN to suffer substantial pain induced by his cancer and the spread of his cancer, which was deliberate indifference.

285.  Because of these Defendants' inaction, FRANKLIN's cancer spread and metastasized.  Thus, these Defendants also harmfully delayed medically necessary treatment FRANKLIN urgently needed.

286.  Each of these Defendants chose less effective medical treatments; including the prescription of ineffective pain medication these Defendants knew were ineffective based on FRANKLIN's repeated complaints and kites regarding

his need for pain medications.  FRANKLIN unnecessarily suffered pain.  This was

deliberate indifference.

b.     On or about June 23, 2014, upon FRANKLIN's release from inpatient

chemotherapy:

### KOVALSKI AND McLAREN

i.   KOVALSKI and/or MCLAREN failed to properly monitor FRANKLIN's medical condition during his inpatient chemotherapy treatment, including but not limited to failing to monitor his vital signs and failing to repeat his CBC prior to discharge from the hospital;

ii.  Failed to utilize appropriate adjunct treatment to address the effects of chemotherapy;

iii. Failed to recognize and treat signs and symptoms of dehydration;

iv.  Failed to avoid untimely discharging of FRANKLIN;

v.   Failed to detect and react to signs and symptoms of infection;

vi.  Failed to react to signs and symptoms of pancytopenia;

vii. Failed to properly treat FRANKLIN's severe nausea and vomiting, abnormal laboratory findings, and elevated temperature;

viii. KOVALSKI and/or MCLAREN discharged FRANKLIN from MCLAREN when he was medically unstable;

ix.  KOVALSKI and/or MCLAREN discharged FRANKLIN from MCLAREN to the general prison population;

**MDOC, CORIZON, CARREL AND HOLMES**

x.  MDOC, CORIZON, CARREL and HOLMES returned FRANKLIN to Carson City Correctional facility following his discharge from MCLAREN without undertaking necessary health protections for FRANKLIN who had a suppressed immune system;

xi.  Failed to utilize appropriate adjunct treatment to address the effects of chemotherapy;

xii.  MDOC, CORIZON, CARREL and HOLMES returned FRANKLIN to Carson City Correctional facility following his discharge from MCLAREN into the general prison population without undertaking necessary health protections for FRANKLIN who had a suppressed immune system;

xiii.  MDOC, CORIZON, CARREL and HOLMES failed to prescribe FRANKLIN the necessary post-chemotherapy monitoring and post-chemotherapy drugs;

xiv.  MDOC, CORIZON, CARREL and HOLMES failed to monitor FRANKLIN's vital signs after he returned to Carson City Correctional facility following his discharge from MCLAREN;

xv.  MDOC, CORIZON and CARREL failed to timely transfer FRANKLIN to an appropriate medical facility given FRANKLIN's deteriorating medical condition;

xvi.  Failed to detect and react to signs and symptoms of infection;

xvii.  Failed to recognize signs and symptoms of respiratory compromise and pancytopenia;

xviii.  Failed to timely respond to FRANKLIN's deteriorating medical condition;

xix.  Failed to properly treat FRANKLIN's severe nausea, vomiting, and elevated temperature;

xx.  Failed to timely transfer to a hospital better equipped to administer appropriate medical treatment to FRANKLIN;

xxi.  Failed to timely respond to FRANKLIN's deteriorating medical condition upon transfer to DWH;

xxii.  Failed to diagnose and timely treat respiratory failure while at DWH;

xxiii.  Failed to diagnose and timely treat pancytopenia while at DWH;

xxiv.  Failed to diagnose and timely treat multi-organ system failure while at DWH; and

xxv.  Failed to perform necessary laboratory studies while at DWH.

287.  Consequently, FRANKLIN suffered damages, including, the metastasis of his cancer, a reduced life expectancy, death, anxiety, emotional distress, pain, physical sickness, embarrassment, shock, anger, and personal humiliation.

## **PRAYER FOR RELIEF**

WHEREFORE, KAREN FRANKLIN, on behalf of the Estate of KEITH FRANKLIN, respectfully requests that this Honorable Court grant the following relief:

A.  Compensatory, non-economic damages for severe emotional distress, physical pain, physical sickness, metastasis of cancer, reduced life expectancy, death, anxiety, emotional distress, shock, anger, embarrassment, and personal humiliation in an amount to be determined at trial;

{H0386290.1}

B.    Compensatory economic damages for reduced future earnings capacity/loss of income, and future health/medical costs and expenses in an amount to be determined by the jury;

C.    Punitive damages in an amount to be determined at trial;

D.    Loss of society and companionship;

E.    Costs of this suit, and reasonable attorneys' fees and expenses pursuant to 42 U.S.C. § 1983, and other applicable law; and

F.    Such further relief as deemed just and reasonable by this Court.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby requests a trial by jury to resolve all claims and issues associated with this action.

Respectfully submitted,

HERTZ SCHRAM PC

By:    */s/ Patricia A. Stamler*
       STEVE J. WEISS (P32174)
       PATRICIA A. STAMLER (P35905)
       *Attorneys for Plaintiff*
       1760 S. Telegraph Road, Suite 300
       Bloomfield Hills, MI  48302
       (248) 335-5000
       sweiss@hertzschram.com
       pstamler@hertzschram.com

Dated: October 6, 2016

{H0386290.1}

73