# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### DETROIT DIVISION

KAREN    FRANKLIN,    as    Personal
Representative  of  the  ESTATE  OF
KEITH FRANKLIN, Deceased,

      Plaintiff,

v.

                                Case No: 2:16-cv-13587
                                Hon. Laurie J. Michelson
                                Magistrate Judge: David R. Grand

STATE OF MICHIGAN, et al.,

      Defendants.

---

| HERTZ SCHRAM PC | CHAPMAN LAW GROUP |
|---|---|
| Steve J. Weiss (P32174) | Ronald W. Chapman Sr., M.P.A., |
| Patricia A. Stamler (P35905) | LL.M (P37603) |
| Attorneys for Plaintiff | Carly Van Thomme (P59706) |
| 1760 S. Telegraph Road, Suite 300 | Kevin A. McQuillan (P79083) |
| Bloomfield Hills, MI 48302 | Attorneys for Defendants Corizon |
| (248) 335-5000 | Health, Inc.; Janak Bhavsar, M.D.; Scott |
| sweiss@hertzschram.com | Holmes, M.D.; and Daniel Carrel, D.O. |
| pstamler@hertzschram.com | 1441 West Long Lake Rd., Suite 310 |
| | Troy, MI 48098 |
| MICHIGAN DEPT. OF ATTORNEY | (248) 644-6326 |
| GENERAL | rchapman@chapmanlawgroup.com |
| John L. Thurber (P44989) | cvanthomme@chapmanlawgroup.com |
| Dana M. Wood (P71955) | kmcquillan@chapmanlawgroup.com |
| Attorneys for MDOC Defendants | |
| P.O. Box 30736 | |
| Lansing, MI 48909 | |
| (517) 373-6434 | |
| thurberj@michigan.gov | |
| woodd9@michigan.gov | |

---

**EXHIBIT M**         Dr. Bomber's Deposition Transcript

# THE ESTATE OF FRANKLIN v. HEYNS, ET AL.

# JEFFREY BOMBER, D.O., 30(B)(6)

## December 19, 2017

*Prepared for you by*



**The Power of Commitment™**

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 1

```
 1              IN THE DISTRICT COURT OF THE UNITED STATES

 2              FOR THE EASTERN DISTRICT OF MICHIGAN

 3                        SOUTHERN DIVISION

 4

 5

 6   THE ESTATE OF KEITH FRANKLIN,

 7   by its Personal Representative,

 8   KAREN FRANKLIN,

 9              Plaintiff,

10        vs.                      Case No. 16-13587

11                                 Hon. Laurie J. Michelson

12

13   DANIEL H. HEYNS, individually

14   and in his official capacity as

15   the former Director of the

16   Michigan Department of

17   Corrections, CORIZON HEALTH,

18   INC., a subsidiary of VALITAS

19   HEALTH SERVICES, INC., JANAK R.

20   BHAVSAR, M.D., individually and

21   in his official capacity,

22   DANIEL T. CARREL, D.O.,

23   individually and in his

24   official capacity, SCOTT L.

25   HOLMES, M.D., individually and
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 2

```
 1   in his official capacity,

 2   jointly and severally,

 3               Defendants.

 4   _____

 5

 6

 7        The 30(b)(6) Deposition of JEFFREY BOMBER, D.O.,

 8        VOLUME I,

 9        Taken at 306 Townsend Street,

10        Lansing, Michigan,

11        Commencing at 11:02 a.m.,

12        Tuesday, December 19, 2017,

13        Before Rebecca L. Russo, CSR-2759, RMR, CRR.

14

15

16   APPEARANCES:

17

18   PATRICIA A. STAMLER

19   Hertz Schram PC

20   1760 South Telegraph Road

21   Suite 300

22   Bloomfield Hills, Michigan 48302

23   248.335.5000

24   pstamler@hertzschram.com

25        Appearing on behalf of the Plaintiff.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 3

1    CARLY VAN THOMME

2    Chapman Law Group

3    1441 West Long Lake Road

4    Suite 310

5    Troy, Michigan 48098

6    248.644.6326

7    cvanthomme@chapmanlawgroup.com

8         Appearing on behalf of Defendants Corizon

9         Health, Inc., Janak Bhavsar, M.D., Scott Holmes, M.D.,

10        and Daniel Carrel, D.O.

11

12   DANA M. WOOD

13   Michigan Department of Attorney General

14   Civil Litigation

15   Employment & Elections Division

16   525 West Ottawa Street

17   Lansing, Michigan 48933

18   517.373.6434

19   woodd9@michigan.gov

20        Appearing on behalf of Defendant Daniel Heyns.

21

22

23

24

25

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 4

```
 1                    TABLE OF CONTENTS

 2

 3    WITNESS                              PAGE

 4    JEFFREY BOMBER, D.O., 30(b)(6)

 5

 6    EXAMINATION BY MS. STAMLER                6

 7

 8                      EXHIBITS

 9

10    EXHIBIT                              PAGE

11    (Exhibits attached to transcript.)

12
```

```
13    DEPOSITION EXHIBIT 1                  64

14    DEPOSITION EXHIBIT 2                 119

15    DEPOSITION EXHIBIT 3                 139

16    DEPOSITION EXHIBIT 4                 146

17    DEPOSITION EXHIBIT 5                 148

18    DEPOSITION EXHIBIT 6                 152

19    DEPOSITION EXHIBIT 7                 153

20    DEPOSITION EXHIBIT 8                 154

21    DEPOSITION EXHIBIT 9                 156

22    DEPOSITION EXHIBIT 10                157

23    DEPOSITION EXHIBIT 11                157

24    DEPOSITION EXHIBIT 12                158

25    DEPOSITION EXHIBIT 13                158
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 5

    1     DEPOSITION EXHIBIT 14                171

    2     DEPOSITION EXHIBIT 15                195

    3     DEPOSITION EXHIBIT 16                195

    4     DEPOSITION EXHIBIT 17                195

    5     DEPOSITION EXHIBIT 18                199

    6     DEPOSITION EXHIBIT 19                201

    7     DEPOSITION EXHIBIT 20                215

    8

    9

   10

   11

   12

   13

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

   25



JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 6

1    Lansing, Michigan

2    Tuesday, December 19, 2017

3    11:02 a.m.

4

5

6                    JEFFREY BOMBER, D.O., 30(b)(6)

7         was thereupon called as a witness herein, and after

8         having first been duly sworn to testify to the truth,

9         the whole truth and nothing but the truth, was

10        examined and testified as follows:

11                   MS. STAMLER:  Let the record reflect that

12        this is a 30(b)(6) deposition, taken pursuant to

13        notice given, and will be used for all purposes

14        permitted under the Federal Rules of Civil Procedure

15        and Federal Rules of Evidence.

16                         EXAMINATION

17   BY MS. STAMLER:

18   Q.   It's my understanding, Dr. Bomber, you're here today

19        as the representative for Corizon Health,

20        Incorporated, is that correct?

21   A.   Correct.

22   Q.   Would you state your full name, for the record?

23   A.   Yes.  My name is Jeffrey Bomber.

24   Q.   And, Dr. Bomber, are you a doctor of osteopathic

25        medicine?




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 7

```
 1   A.   I am.

 2   Q.   And do you understand that you're here as a

 3        representative of Corizon Health, Incorporated, on

 4        several topics?

 5   A.   I do.

 6   Q.   Have you seen a copy of the deposition duces tecum

 7        notice?

 8   A.   I have.

 9   Q.   So you understand that the topics that you're here to

10        testify on are the charting procedures for Corizon,

11        correct?

12   A.   Correct.

13   Q.   All changes that were made to instructions,

14        guidelines, policies and/or practices regarding the

15        diagnosis, treatment, charting and/or referral for

16        cancer and/or specialty services and/or specialty

17        providers from August 1, 2012, through present.  Do

18        you know that?

19   A.   Correct.

20   Q.   You're also here to testify regarding any

21        communication, correspondence, discussion,

22        documentation, or information relating to the adequacy

23        or effectiveness of the means of communicating between

24        physicians, mid-level providers, and nurses regarding

25        patients at Carson City Correctional Facility, RGC,
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

                                                              Page 8

```
 1         Duane Waters Hospital, and/or McLaren Health Care
 2         Corporation.
 3    A.   Yes.
 4    Q.   And finally, you understand you're here to testify
 5         regarding the electronic medical records system used
 6         by Corizon and/or the Michigan Department of
 7         Corrections from August 1st of 2012 through June 30,
 8         2014, and Corizon's knowledge of this system and its
 9         training of its employees on this electronic medical
10         records system, correct?
11    A.   Yes.
12    Q.   Sir, how many times have you testified at a
13         deposition?
14    A.   This would be my third.
15    Q.   When was the last time?
16    A.   The last time was October of this year.
17    Q.   In what kind of case?
18    A.   It was a 36 -- I'm sorry, a 36(b) --
19    Q.   A 30(b)(6)?
20    A.   A 30(b)(6), yes, where I represented Corizon in a
21         similar fashion as today.
22    Q.   On the same topics that you're here to testify on?
23    A.   Similar topics, yes.
24    Q.   What else did you testify on?  When you say they're
25         "similar," it sounds like there's some distinction.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1   A.   I can't say that we discussed all of the topics that
 2        you mentioned, but several of the topics you mentioned
 3        were discussed.
 4   Q.   Were there any that I didn't list that you did testify
 5        to, anything different?
 6   A.   I do not believe so.
 7   Q.   All right.  Prior to October of 2017, when was the
 8        last time you were deposed?
 9   A.   That would be in a previous case where I was the
10        defendant.
11   Q.   What case was that?
12   A.   It was the case of Warren V Bomber.
13   Q.   And was that a 42 U.S.C. Section 1983 lawsuit?
14   A.   I'm not sure.
15   Q.   Do you remember what the claim or claims were that
16        were lodged against you?
17   A.   It was a malpractice claim, did not go to court.
18   Q.   Did it resolve?
19   A.   Yes.
20   Q.   By way of a settlement?
21   A.   Yes.
22   Q.   And did you pay anything out-of-pocket?
23   A.   I did not.
24   Q.   Did Corizon on your behalf pay something?
25                  MS. VAN THOMME:  I object on the basis that
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1        it's a confidential settlement by the terms of the

 2        agreement.

 3                MS. STAMLER:  Okay, fair enough.

 4   BY MS. STAMLER:

 5   Q.   Are you following your counsel's instruction not to

 6        answer that question?

 7   A.   I am.

 8   Q.   All right.  And then I think you said there was a

 9        third time that you were deposed?

10   A.   I was deposed twice in that case.

11   Q.   Okay, sort of a continuation of your deposition?

12   A.   Yes.

13   Q.   Okay.  Let me go over some ground -- so other than

14        those and today's deposition, is that the only

15        deposition -- those are the only depositions you've

16        been involved with?

17   A.   I can't recall any others.

18   Q.   In the case of Warren V Bomber, you said it was a

19        medical malpractice case.  Do you distinguish that as

20        something different from a violation of a prisoner's

21        rights under the Eighth Amendment?

22   A.   I'm not sure I'm qualified to answer that.

23   Q.   You're not?

24   A.   I'm not sure what the designation means.

25   Q.   Sir, in your role as the regional medical director,
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1        you have a responsibility to train Corizon staff, is
 2        that right?
 3   A.   Correct.
 4             MS. VAN THOMME:  Object to form.
 5             MS. STAMLER:  Pardon me?
 6             MS. VAN THOMME:  Object to form.
 7   BY MS. STAMLER:
 8   Q.   Is that one of your duties, sir?
 9   A.   Yes.
10   Q.   And do you have training materials at your disposal to
11        provide to certain staff that you are obligated to
12        train?
13   A.   Yes.
14   Q.   And do you recollect as you sit here today that one of
15        the training items addresses the Eighth Amendment
16        constitutional rights of prisoners?
17   A.   Yes.
18   Q.   And what do you understand those rights to be, sir?
19   A.   They have a right to health care that's equal to the
20        quality of health care in the community.
21   Q.   Is that the sum and substance of your understanding?
22   A.   I do not have it completely memorized.
23   Q.   When was the last time you looked at that standard?
24   A.   Approximately two years ago.
25   Q.   Was that in conjunction with the Warren case?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1    A.    I can't recall.
 2    Q.    When was the last time you provided training to staff
 3          on that topic, if at all?
 4    A.    I haven't provided training on an individual basis in
 5          regards to onboarding.  That's done by the regional
 6          medical directors that report to me.  I have done
 7          group training on other topics throughout the state,
 8          but the actual day-to-day onboarding of new employees
 9          is done by my regional medical directors.
10    Q.    Sir, weren't you a regional medical director?
11    A.    I was.
12    Q.    From what period to what period?
13    A.    From 2009 through 2015.
14    Q.    Right.  So up until 2015 you would have had the
15          responsibility, if I'm not mistaken, to provide that
16          onboarding training to new staff, correct?
17    A.    Correct.
18    Q.    And that staff would be staff physicians, correct?
19    A.    Correct.
20    Q.    Would it also be mid-level providers?
21    A.    Yes.
22    Q.    And so as recently as 2015, you would have had the
23          responsibility to train those individuals on the
24          topic, among others, of the Eighth Amendment
25          constitutional rights that are afforded to a prisoner
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 13

 1          for medical care.  Correct?

 2    A.    Correct.

 3    Q.    So as you sit here today, the only thing you can tell

 4          me is what you testified to, is that right?

 5    A.    Correct.

 6    Q.    Okay.

 7                MS. STAMLER:  Before we get too much

 8          farther in, I want to just make a statement on the

 9          record regarding the thousands of pages of documents I

10          received via email last night after five p.m. from

11          Ms. Van Thomme's office, presumably responsive to the

12          deposition notice or perhaps other discovery requests.

13                I indicated via email to Ms. Van Thomme

14          that I was reserving the right to continue this

15          deposition, since I was afforded virtually no time to

16          review these documents.

17    BY MS. STAMLER:

18    Q.    And I'm just stating that on the record, Dr. Bomber,

19          that you may have to come back.

20                MS. STAMLER:  And again, this morning I was

21          handed I don't know how many pages of documents that

22          Ms. Van Thomme has represented constitute some

23          reference to reports relative to Keith Franklin and

24          his medical care, and I don't know if this is being

25          produced in conjunction with the deposition notice or

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1        if this is just a supplemental document production.
 2               MS. VAN THOMME:  All of the documents we
 3        produced yesterday as well as those that I handed you
 4        this morning are in response to the duces tecum
 5        request and the deposition notice.
 6               MS. STAMLER:  What specific response are
 7        these --
 8               MS. VAN THOMME:  Those are the email --
 9        well, the request is broader; any document that
10        references Keith Franklin.
11               So what we had that you didn't already have
12        was email records, and so you have some of those.  You
13        also have the privilege log of emails that we did not
14        produce because of privilege, and then the reports or
15        what I gave you this morning that were attachments to
16        emails.
17               MS. STAMLER:  Right.  So the record should
18        also reflect that I was handed a 13-page document
19        that's labeled "Corizon Defendant's Privilege Log,"
20        which I've also not had an opportunity to review.
21   BY MS. STAMLER:
22   Q.   Dr. Bomber, let me go over a couple of ground rules
23        for your deposition.
24               First of all, the court reporter is taking
25        down my questions and your answers, and therefore it's
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1          imperative that you respond verbally to my questions.
 2          Do you understand that?
 3   A.     Yes.
 4   Q.     Gestures and nods and "uh-huhs," and things like that,
 5          do not get recorded in the way that we can
 6          intelligently understand the responses, so please
 7          remember to respond verbally.
 8                    Also, if I ask a question and you do not
 9          understand it, please let me know that and I will
10          clarify for you.  Is that understood?
11   A.     Yes.
12   Q.     If you respond to a question, I will assume you've
13          understood it as asked.  Do you understand that?
14   A.     Yes.
15   Q.     Sir, when did you obtain your medical license?
16   A.     I obtained my medical license when I was a resident at
17          Toledo Hospital.
18   Q.     And when was that?
19                    MS. STAMLER:  We're going to take a quick
20          break.
21                    (Off the record at 11:13 a.m.)
22                    (Back on the record at 11:14 a.m.)
23                    MS. STAMLER:  We're back on the record.
24   BY MS. STAMLER:
25   Q.   Dr. Bomber, if you respond to a question I ask you, I
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1        will assume you've understood it as posed.  Do you
 2        understand that?
 3   A.   Yes.
 4   Q.   Now, I was asking you about your background, and you
 5        started to tell me that you got your medical degree
 6        during your residency in Ohio.  Is that what you said?
 7   A.   I believe you asked me when I obtained my license.
 8   Q.   Okay.  And when was that?
 9   A.   That would be --
10   Q.   I'm looking for the date, sir.
11   A.   Okay.  That would be 1995.
12   Q.   And do you consider yourself a specialist in any area
13        of practice?
14   A.   I did my residency in family practice, which is a
15        specialty.
16   Q.   Did you complete your residency?
17   A.   I did.
18   Q.   Did you seek board certification?
19   A.   I did.
20   Q.   And did you obtain it?
21   A.   I did.
22   Q.   And when did you obtain it?
23   A.   That would be in 1996.
24   Q.   Have you maintained your certification every year
25        thereafter?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 17

```
 1   A.   Until last year.

 2   Q.   So up until 2016?

 3   A.   Correct.

 4   Q.   Why did you cease being board-certified then?

 5   A.   I did not have the time to study for the

 6        recertification exam.  I am in the process of studying

 7        it now.  I still am board-eligible.

 8   Q.   And, in your mind, understanding you've held board

 9        certification for virtually your entire medical

10        career, what's the import of having that

11        certification?

12   A.   It sets a standard in terms of knowledge and quality

13        of care.  It is used by insurance companies as a means

14        of certifying physicians and obtaining privileges.

15   Q.   And in order to be board-eligible, you have to

16        actually complete a residency in that specific area of

17        medicine?

18   A.   Yes.

19   Q.   By way of example, family medicine, correct?

20   A.   Correct.

21   Q.   And would it be fair to say, from your view, serving

22        in the various positions you've had for Corizon, both

23        as the regional medical director and your statewide --

24        I'm sorry, what was your other position with Corizon?

25   A.   I was first a site physician in 2008, and then
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 18

```
 1        northern regional medical director starting 2009

 2        through July of 2015, when I became the state medical

 3        director.

 4   Q.   All right.  And in all of those positions up until

 5        2016, you were board-certified.  Would you agree with

 6        me, sir, that not having board certification and not

 7        being board-eligible would diminish the qualities of a

 8        physician?

 9             MS. VAN THOMME:  Object to form.

10   BY MS. STAMLER:

11   Q.   Go ahead and answer.

12   A.   We have a number of physicians who did not complete

13        their residency who are excellent physicians and very

14        well qualified.

15   Q.   So, in your mind -- and I assume you serve as a person

16        who hires physicians, correct?

17   A.   Correct.

18   Q.   In your mind, it doesn't matter to you whether a

19        physician is board-certified or board-eligible, is

20        that correct?

21   A.   We do have a number of physicians who are not

22        board-eligible, for one reason or another did not

23        complete a residency, who provide excellent medical

24        care.

25   Q.   Well, how would you know that prior to hire?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 19

```
 1   A.   We go through a credentialing process and review the

 2        provider's past experience, references, employment

 3        history, education.

 4   Q.   So let me ask the question again.  In your mind, as

 5        somebody who hires physicians for Corizon, it is not

 6        an important qualification for you, as the hiring

 7        doctor, for that individual to either be

 8        board-certified or board-eligible, correct?

 9                 MS. VAN THOMME:  Object to form.

10   BY MS. STAMLER:

11   Q.   Go ahead and answer.

12   A.   Medical providers within Corizon do not need to be

13        board-certified or board-eligible.

14   Q.   But it's a preference listed in the job descriptions,

15        is it not?

16   A.   It is a higher level of certification that would be a

17        preference, yes.

18   Q.   But it's one that you do not give way to, correct?

19                 MS. VAN THOMME:  Object to form.

20   A.   We consider each applicant individually.

21   BY MS. STAMLER:

22   Q.   I'm not asking about "we," I'm asking about you, sir,

23        as a hiring physician.

24   A.   Can you repeat the question, please?

25   Q.   Sure.  Do you, sir -- well, let me have the question
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 20

```
 1          read back.
 2                     (The following portion of the record was
 3                     read by the reporter at 11:19 a.m.:
 4                     "Q. But it's one that you do not give way
 5                     to, correct?")
 6    A.    We certainly consider it during the application
 7          process, yes.
 8    BY MS. STAMLER:
 9    Q.    I'm not asking about "we," sir.  I'm asking about you.
10    A.    Yes, I do consider it during the application process.
11    Q.    So all things being equal, your preference, along with
12          Corizon's, would be to have physicians on board who
13          have either board certification or eligibility for
14          board certification, correct?
15    A.    That would be the preference.
16    Q.    Would it be fair to say, sir, that it is difficult to
17          find doctors to work in the medical field in
18          correctional services?
19    A.    Right now, I'm nearly a hundred percent staffed.  I
20          would say in my nine years of experience there have
21          been difficult time periods where certain sites were
22          hard to fill, but most of the people we have serving
23          now are there because they want to be.  They have a
24          heart to serve the underserved and it's a mission, so
25          I'm finding it less and less difficult.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 21

1   Q.   When did it become less and less difficult?

2   A.   Within the last two years, our recruiting efforts have

3        been more aggressive.  We now have a full-time

4        recruiter here in the Michigan office.

5   Q.   And that happened back in 2015?

6   A.   I would say the process started before that, but, yes,

7        certainly in the last two years we've made several

8        milestones.

9             I don't want to diminish part of your

10       question, though, if I may say that it is difficult,

11       in general, within corrections throughout the nation,

12       not even -- outside of corrections, as well, to

13       recruit medical providers.

14  Q.   You would agree with me -- well, strike that.

15            Have you ever worked in the private sector

16       as a doctor?

17  A.   Yes, ma'am.

18  Q.   Fair to say that doctors in the private sector earn

19       substantially more than physicians working for

20       Corizon?  Do you know that?

21  A.   Not in primary care.

22  Q.   What do you mean by "primary care"?

23  A.   Primary care would be family practice.  Family

24       physicians, nurse practitioners, and PAs that are

25       trained in primary care are paid very well within




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

 1       corrections.

 2   Q.  How does that compare with the private sector, if you

 3       know?

 4   A.  It's very competitive with the private sector.

 5   Q.  Were you ever a Michigan Department of Corrections

 6       employee?

 7   A.  I was not.

 8   Q.  Okay.  So is your first work in the correctional arena

 9       for Corizon?  Is that how you first came to work in

10       that system?

11   A.  It was the company that became Corizon, PHS, that

12       merged with CMS to become Corizon.  So I was first

13       employed by PHS, which did become Corizon.

14   Q.  All right.  When did you work for PHS?

15   A.  That was 2008, starting at the Newberry Correctional

16       Facility.

17   Q.  And that was as a staff physician?

18   A.  Correct.

19   Q.  And you were there, if I understand your earlier

20       testimony, one year?

21   A.  Correct.

22   Q.  And then you went, from there you went to the regional

23       medical director position?

24   A.  Yes, what is called the northern regional medical

25       position.

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 23

1   Q.   And did that include Carson City?

2   A.   No.

3   Q.   What areas does it include?

4   A.   It includes the entire Upper Peninsula, eight

5        facilities within the Upper Peninsula; at the time,

6        Pugsley Correctional, which was near Traverse City,

7        which was subsequently closed; the Oaks in Manistee;

8        Saginaw Correctional Facility; and the St. Louis area

9        correctional facilities.

10  Q.   So you would not have direct knowledge about any way

11       in which Carson City operated its medical clinic,

12       correct?

13  A.   I would know the general policies that we all

14       followed, but not the internal, specific workings of

15       that facility, no.

16  Q.   Have you ever been to that facility?

17  A.   I have.

18  Q.   Since you became the state medical director, correct?

19  A.   Correct.

20  Q.   And when was the first time you were there?

21  A.   I believe it was September of 2015, but I'd have to go

22       back and confirm that on my calendar.  I'm just going

23       from memory.

24  Q.   Have you ever heard of Keith Franklin?

25  A.   I have.

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 24

1    Q.   When did you first learn about him?

2    A.   When I was asked to give this deposition.

3    Q.   Prior to that you did not know anything about him, is

4         that right?

5    A.   I did not, with one caveat.  As I've served as a

6         regional medical director, I have reviewed thousands

7         and thousands of cases in the electronic medical

8         record, for various reasons.

9                So I may have reviewed his chart for some

10        reason at one point, but I was never requested to do

11        so for a deposition.

12   Q.   I understand.  So in what -- and I'm not asking you

13        specifics, but what topic or topics were you called

14        upon as a regional medical director to review

15        prisoners' medical charts?  You said you did it for a

16        variety of reasons.  What would they be?

17   A.   I was in charge of an initiative to look at the

18        quality of care of our patients with diabetes within

19        the state, so I did a statistical analysis of quality

20        care metrics, such as hemoglobin A1c's, for all

21        inmates throughout the state, as well as their

22        cholesterol levels and such.  I was involved in a

23        statewide quality initiative.

24   Q.   So if Mr. Franklin did not have diabetes or an issue

25        with his cholesterol, it's not likely you would have




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 25

```
 1        reviewed his chart, is that fair to say?
 2   A.   That's correct.
 3   Q.   All right.  Did you ever do any review of prisoners'
 4        medical records with respect to sentinel events?  And
 5        by that -- do you know what I mean by that term?
 6   A.   I do.
 7   Q.   And did you do any of that review?
 8   A.   I have done sentinel event reviews, yes.
 9   Q.   And a sentinel event, among others, can be the death
10        of a prisoner, correct?
11   A.   Correct.
12   Q.   So you understand Mr. Franklin died while he was in
13        the care and custody of the Department of Corrections.
14        Do you understand that?
15   A.   Yes.
16   Q.   So he would have been -- do you understand that that
17        would have been a sentinel event under the policies
18        that you're familiar with?
19   A.   Yes.
20   Q.   Did you in the context of a sentinel event do any
21        review with regard to Mr. Franklin's death?
22   A.   I did not.
23   Q.   Do you know who did?
24   A.   At the time, that facility, I believe that would have
25        been Dr. Steve Bergman.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 26

```
 1    Q.   And what was his title?

 2    A.   Regional medical director, southern region.

 3    Q.   Does the sentinel review process end with the regional

 4         director or does it go another level?

 5    A.   Yes, it goes another level.  There is a monthly

 6         meeting.

 7    Q.   And who attends the monthly meeting?

 8    A.   That varies.  The state medical director almost always

 9         is there.  Regional medical directors, depending on

10         the facilities, as well as a corporate representative.

11    Q.   So those would all be Corizon employees?

12    A.   Yes.  We also would invite the chief medical officer

13         from the Michigan Department of Corrections, and they

14         would sometimes attend.

15    Q.   So if I understand it correctly, because of where

16         Mr. Franklin was located at the time of his death,

17         that would have been Mr. Bergman's region, correct --

18         Dr. Bergman's region, correct?

19    A.   Yes.

20    Q.   So to the extent there was a monthly meeting about

21         Mr. Franklin's death, he would have been the regional

22         director present for that, correct?

23    A.   Correct.

24    Q.   Do other regional directors attend those monthly

25         meetings?
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 27

```
 1    A.    Yes.
 2    Q.    So, in other words, even though it covered the
 3          southern region, you, as the northern regional medical
 4          director, would have also been present?
 5                    MS. VAN THOMME:   Object to form.
 6    A.    I may or may not.
 7    BY MS. STAMLER:
 8    Q.    All right.  You may have been present, correct?
 9    A.    I may have.  I don't recall.
10    Q.    Okay.  So as you sit here today, you don't remember
11          any discussion that you were present for at a monthly
12          meeting relative to the sentinel event involving
13          Mr. Franklin, is that correct?
14    A.    I do not recall.
15    Q.    Are meeting minutes kept of those monthly meetings?
16    A.    No.
17    Q.    Why not?
18    A.    The sentinel event form that is completed also
19          includes a place for any potential corrective action,
20          which would be the action component following the
21          sentinel event committee's findings at meeting.
22    Q.    So since you don't remember when you were at this
23          meeting, it's fair to say you would have no idea what,
24          if any, action was taken following a sentinel meeting
25          with regard to Mr. Franklin, is that right?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1                    MS. VAN THOMME:  I'm going to object to you
 2          testifying to any findings from the sentinel event
 3          review to the extent that you might know.  But go
 4          ahead and answer.
 5     A.   I'm sorry, can you repeat the question?
 6     BY MS. STAMLER:
 7     Q.   Sure.  I just want to be sure -- it's fair to say,
 8          since you have no recollection of attending a monthly
 9          meeting where Mr. Franklin's sentinel event was
10          discussed, you also would not recall any action, if
11          any, that was taken following that meeting?
12     A.   Correct.
13     Q.   Do you have a private practice in Engadine, Michigan?
14     A.   I work for Helen Newberry Joy Hospital on a part-time
15          basis at one of their rural clinics.
16     Q.   Is it called the Mackinac Health Clinic?
17     A.   It's called the West Mackinac Health Clinic, in
18          Engadine.
19     Q.   And how much time do you devote to that part of your
20          work?
21     A.   Approximately three half-days per month.
22     Q.   And a half-day is four hours, four-and-a-half hours?
23          How does that work out?
24     A.   Patients are seen between the hours of nine and
25          twelve, and then there's charting.  So it's about four
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 29

```
 1       hours.

 2   Q.  So you do give direct patient care --

 3   A.  I do.

 4   Q.  -- correct?

 5   A.  Correct.

 6   Q.  And these are of inmates or --

 7   A.  No.

 8   Q.  Oh, I'm sorry.

 9   A.  These are private citizens.

10   Q.  Okay.

11   A.  Residents of the area.

12   Q.  And this is a family-practice-type practice that

13       you're engaged in?

14   A.  Yes.

15   Q.  And is the balance of your time devoted to your work

16       for Corizon?

17   A.  Yes.

18   Q.  And I assume Corizon has authorized you to work in a

19       private capacity three days a week -- or part-time

20       three times a month, is that right?

21   A.  Yes.

22   Q.  Is there any reason why a website would indicate that

23       you have expertise in neurology?

24   A.  No.

25   Q.  That's inaccurate, is that correct?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1   A.   Correct.

 2   Q.   And is the West Mackinac Health Clinic located on

 3        West 14034 Melville Street?

 4   A.   Yes.

 5   Q.   Do you have any degree of expertise in either the

 6        treatment of or the diagnosis of cancer?

 7   A.   Within the scope of my training in family medicine.

 8   Q.   And what is that?

 9   A.   To be able to detect and diagnose and generally refer

10        for treatment when cancer is detected.

11   Q.   And by "detect and diagnose," do you consider those

12        two terms synonymous?

13   A.   Detection can come from suspicion.  If there is an

14        abnormal radiograph, for example, or signs and

15        symptoms, then there's suspicion, and then by doing

16        various tests, then you would end up with a biopsy and

17        then the diagnosis.  But detection is that process of

18        assessing the patient, ordering the proper tests, and

19        then diagnosing.

20   Q.   Okay.  So detection is step one, diagnosis is step

21        two, correct?

22   A.   Correct.

23   Q.   All right.  And in your years of practice -- and I

24        take it you've had more than just your part-time work

25        at the West Mackinac Health Clinic where you've seen
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

 1        patients that you've had suspicion of cancer, correct?

 2   A.   Correct.

 3   Q.   I'm not testing your memory but I'm asking for your

 4        best estimate.  How many patients would you say in

 5        your years of medical practice have you detected or

 6        suspected had cancer?

 7   A.   Certainly in terms of hundreds.

 8   Q.   And of those hundreds of patients, do you recollect as

 9        you sit here today how many, if any, had a form of

10        cancer in the tonsils?

11   A.   I would say at least five.

12   Q.   And how recent was the most recent where that was a

13        detected and then diagnosed cancer?

14   A.   You mean in terms of my personal practice, hands-on

15        practice?

16   Q.   Correct.

17   A.   I can't recall.  It's been at least two years.

18   Q.   And would that have been at the West Mackinac Clinic?

19   A.   I believe the last patient I would have detected with

20        a tonsillar cancer would have been in -- actually,

21        when I was practicing in Newberry, but I can't recall

22        a specific year.  There have been a handful.

23   Q.   And do you remember how you initially either detected

24        or suspected that there may be tonsillar cancer?

25   A.   Sometimes patients report, or actually reported a




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

1        mass, a growth, a pressure in their throat and neck,

2        difficulty swallowing.

3    Q.  Anything else?

4    A.  Those are the cases that I recall.

5    Q.  Did you ever have a circumstance where you on physical

6        examination during a palpation of the neck area felt a

7        mass?

8    A.  Yes.

9    Q.  Before the patient complained?

10   A.  Sometimes, yes.

11   Q.  And did you do anything in your course of practice to

12       determine whether that mass was or was not malignant?

13   A.  Yes.

14   Q.  What would be the first step that you did in that

15       circumstance?

16   A.  The first step would be a thorough physical exam.

17       Masses in the neck can be, you know, from

18       lymphadenitis, swollen lymph nodes from infection.  It

19       can also be benign growths, such as lipomas.  And then

20       there can be other disorders, of course, such as

21       thyroid cancer and neck tumors.

22              Most of the time, masses, small

23       lymphoid-type masses in the neck are benign from

24       lymphadenitis.

25   Q.  That really wasn't my question.  You told me a bunch




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

 1          of things it could be.

 2                    What I'm asking you is, what did you do to

 3          determine, upon feeling a mass in the neck area, to

 4          ascertain whether it was or was not cancerous?  What

 5          would be your first step?  Did you do any testing?

 6     A.   If clinical suspicion was high for the mass being from

 7          a lymph node, a course of antibiotics might be the

 8          first course of treatment.  If I had a high index of

 9          suspicion for it being a tumor, then I would refer for

10          imaging and biopsy.

11     Q.   Imaging would be the first step?

12     A.   Imaging could be ultrasound, CAT scan, yes.

13     Q.   MRI?

14     A.   Not usually as a first step.

15     Q.   So either ultrasound or CAT scan?

16     A.   Usually that's the first step.

17     Q.   Would you do an x-ray?

18     A.   That would not be my first, unless I suspected there

19          was a bony involvement, cervical spine involvement.

20     Q.   So not unless you suspected either a bony involvement

21          or a cervical spine problem, correct?

22     A.   Yeah.  X-rays are not really good for diagnosing soft

23          tissue disease.

24     Q.   It's fair to say you would do something upon feeling a

25          mass in someone's tonsillar area, correct?

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

 1   A.   Yes.

 2   Q.   And part of what you would do would be to chart what

 3        you found, correct?

 4   A.   Correct.

 5   Q.   All right.  And we're going to get into the charting

 6        in a little bit, because, as I understand it, one of

 7        your areas of training and knowledge in your various

 8        roles with Corizon is in fact charting.  Correct?

 9   A.   Correct.

10   Q.   All right.  We'll get to that in just a minute.

11             Are you familiar with the Hadix Consent

12        Decree?  Is that something you came into contact with

13        or knowledge of during your years with Corizon?

14   A.   Only that the state medical director at the time,

15        Dr. Orlebeke, mentioned that there was a decree, but I

16        really had nothing to do with it.

17   Q.   So did you have any understanding or appreciation that

18        there is a permanent injunction that was issued

19        against various State actors involving the Hadix case?

20   A.   Yes, I was aware there was one.

21   Q.   Do you know what it pertains to?

22   A.   I believe it had to do with care of inmates at the

23        women's facility, but it was before I was involved

24        with that site.

25   Q.   Did you understand that it also applied to the RGC?




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1   A.   Only in general terms.

 2   Q.   What general terms did you understand?

 3   A.   That there was a decree.

 4   Q.   And that was all you knew?

 5   A.   Basically all I knew.

 6   Q.   In your role as the state medical director, have you

 7        made yourself aware of the contours of the Hadix

 8        permanent injunction as it pertains to any of the

 9        facilities within the Michigan Department of

10        Corrections?

11   A.   My understanding is that it was resolved and settled.

12   Q.   So there is no longer a permanent injunction, that's

13        your understanding?

14   A.   I believe there still are policies and procedures

15        which were the result of that decree.

16   Q.   Do you know what they pertain to, sir?

17   A.   One I know is video surveillance.

18   Q.   Video surveillance of what?

19   A.   Of inmate activity.

20   Q.   Are you aware of any that, any of the topics within

21        the Hadix consent decree or the permanent injunction

22        that pertain to the topic of prisoner medical care?

23   A.   I have not read it.

24   Q.   Do you think that it would be important in your

25        position as the state medical director to know whether
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1          there is an ongoing consent decree as it relates to --
 2          or permanent injunction as it relates to medical care
 3          for inmates within the state correctional system?
 4                  MS. VAN THOMME:  Object to form.
 5   A.   I have not yet read it.
 6   BY MS. STAMLER:
 7   Q.   And you've been in your position as the state medical
 8        director for how long?
 9   A.   Two years.
10   Q.   Is it fair to say that physicians that work in the
11        correctional medical system need specialized training
12        to work in the system?
13   A.   Yes.
14   Q.   What are the contents -- now, I'm just talking general
15        topics -- that you believe in your position that you
16        give this training are unique to the provision of
17        medical care within a correctional system?
18                  MS. VAN THOMME:  Object to form.
19                  MS. STAMLER:  What's wrong with the form?
20                  MS. VAN THOMME:  You said presently he
21        gives the training, which I don't think --
22                  MS. STAMLER:  Thank you for the correction.
23   BY MS. STAMLER:
24   Q.   In your years when you did provide the training -- let
25        me go back.
```



JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 37

```
 1                  What elements of the training that Corizon

 2         provides to its physicians do you understand are

 3         unique to the provision of medical care in the

 4         correctional environment?

 5   A.    Yes, the main difference from practicing in the

 6         community is the fact that you are behind bars.  Any

 7         given warden's main charge is safety, safety of the

 8         inmates and safety of the staff and visitors.

 9                  So there are a number of modules provided

10         by the Michigan Department of Corrections that all of

11         our providers have to complete that deal with safety

12         behind the bars.

13   Q.    How many modules are centered on safety behind the

14         bars?

15   A.    I haven't done mine since 2008, so I can't answer that

16         exactly.

17   Q.    But certainly during the time period that you were

18         regional medical director, you were providing

19         onboarding to your physicians that were coming on,

20         right?

21   A.    The Michigan Department of Corrections provides the

22         modules in safety.

23   Q.    So you can't really testify, as you sit here today, on

24         the topic of training?

25   A.    Yes.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 38

```
 1                    MS. VAN THOMME:  Object to form.
 2    BY MS. STAMLER:
 3    Q.   What elements can you testify to?
 4    A.   I can testify to the elements in our onboarding of all
 5         of our providers, in the onboarding materials.
 6    Q.   Okay.  That's different from what the MDOC provides?
 7    A.   No.  There are also medical service advisory committee
 8         policies and procedures that are also part of the
 9         onboarding training.
10    Q.   Anything else?
11    A.   Yeah.  A reference to all policies and procedures of
12         the MDOC is made during the training, and access to
13         those resources is provided.
14    Q.   What do you mean by that?
15    A.   The resources are now part of the onboarding manual
16         which is available via the web to the providers.
17    Q.   When did that become part of the manual?
18    A.   That has been -- the resources have been in the manual
19         since 2008.
20    Q.   I thought you just said it's now part of the manual.
21    A.   Yeah.  It used to be in paper form, but now it's part
22         of the web-based manual that they can access.
23    Q.   So it's an online manual now?
24    A.   Yes.
25    Q.   And prior to that was there only one manual per
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 39

```
 1        facility?
 2   A.   Each provider was given their own paper manual.
 3   Q.   Okay.  So let me go back, because I think maybe my
 4        question wasn't clear, and that was, I was asking you
 5        what training was unique to physicians in a
 6        correctional setting, and you provided me with a
 7        response as to what the MDOC provides.
 8              What I want to know is, what unique
 9        elements, if any, does Corizon provide in its training
10        to the physicians as it relates to providing service
11        in a correctional facility?
12   A.   Well, we also provide training specific to the
13        correctional environment, for example, topics such as,
14        you know, not being overfamiliar with inmates.  But
15        the training also involves our referral process, the
16        407 consultation process.  It also involves our
17        patient's safety program, sentinel event process.  We
18        also have clinical modules specific to multiple
19        diseases that they are trained in and sign off on.
20   Q.   And I saw those modules and we'll get to those in a
21        minute, but in reviewing those, am I correct in my
22        review that there was nothing specific to cancer other
23        than colon cancer?
24   A.   There's also a module for prostate cancer.
25   Q.   That's really what I meant, prostate cancer.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 40

```
 1   A.   Yes.
 2   Q.   Okay.  So fair to say on the clinical modules, my
 3        recollection is, and I may miss some of them because I
 4        just got the paperwork, but they cover asthma,
 5        diabetes, warfarin, tuberculosis, and prostate cancer.
 6        Do you remember any others?
 7   A.   Hypertension --
 8   Q.   Okay.
 9   A.   -- would be another.
10   Q.   Communicable diseases such as HIV?
11   A.   There's a large section in infectious disease within
12        the onboarding materials.
13   Q.   All right.  There's something on MRSA?
14   A.   There's something on MRSA, HIV, hepatitis C.
15   Q.   Okay, those are the infectious diseases?
16   A.   Correct.
17   Q.   Anything else?  Modules.
18   A.   Those are the ones I recall.
19   Q.   And as I recall with regard to those modules, those
20        are part of Corizon's system that's called "Clinical
21        Pathways for Practitioners"?
22   A.   Yes.
23   Q.   Is that the training program on the modules that you
24        were just testifying to?
25   A.   Yes.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 41

```
 1   Q.   And I think another topic or a couple other topics
 2        that are in these modules are seizures, substance
 3        abuse -- is that right?
 4   A.   Yes.
 5   Q.   -- strokes?
 6   A.   I don't remember the specific modules just on strokes.
 7        The strokes --
 8   Q.   There's a module on warfarin and strokes.  Does that
 9        sound familiar?
10   A.   Some of them are outdated and we're not using.  I'd
11        have to look at the one on strokes to be sure that
12        it's current.
13   Q.   Okay.  I know you haven't been doing this training for
14        folks or onboarding for a couple years now, so this
15        may have changed, but this is what was produced to me
16        at 5:00 last night, so I don't really know.  It's
17        dated 2013, August.
18                 Does that help you in any way know whether
19        these are current or not?
20   A.   I know that we've made some changes in the onboarding
21        manual.  I can't recall if the one on strokes is still
22        in the current version.
23   Q.   Why would it have been removed?
24   A.   They are all being updated right now, actually.
25   Q.   Do you know if there's any effort to update these
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 42

```
 1        modules to include other forms of cancer?
 2   A.   No.
 3   Q.   No, you don't know that, or no, it's not being
 4        considered?
 5   A.   I do not believe that's being considered right now as
 6        training beyond what practitioners would have in their
 7        residencies.
 8   Q.   Did you have any input into the Clinical Pathways
 9        documents?
10   A.   Yes.  I advised that they be updated and made
11        available electronically, which is a need the
12        corporation recognized --
13   Q.   And when did you --
14   A.   -- and is in the process of doing that.
15   Q.   I'm sorry, I cut you off.  You made two
16        recommendations that they be updated and that they be
17        made available online, is that correct?
18   A.   Correct.
19   Q.   And when did you make the recommendation that the
20        Clinical Pathways for Practitioners be updated?
21   A.   That would be when I assumed the role of state medical
22        director.
23   Q.   2015?
24   A.   Yes.  I was not the only one that was advising the
25        company to do so.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1   Q.   All right.  And then you also made the recommendation,
 2        and perhaps others did, as well, to place the Clinical
 3        Pathways modules online for practitioners, is that
 4        right?
 5   A.   Correct.
 6   Q.   And when did you make that recommendation?
 7   A.   At the same time.
 8   Q.   2015?
 9   A.   Yes.
10   Q.   When in 2015?
11   A.   That would have been not long after I started as state
12        medical director, so August.
13   Q.   When was the last time, to your knowledge, that the
14        Pathways had been updated?
15   A.   I don't believe that several of them have been updated
16        since 2013.
17   Q.   And things change in medicine rather rapidly, is that
18        fair to say?
19   A.   Correct.
20   Q.   Did you make a recommendation as to the frequency that
21        these modules should be updated?
22   A.   I did not.
23   Q.   Did anybody?
24   A.   I believe that the intent is to update them yearly,
25        annually.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

1   Q.   Have you had any input into any of the updates?

2   A.   I have not written any of the updates in those areas.

3        I have written the -- I am writing the module for

4        integrated care.

5   Q.   There isn't one currently, right?

6   A.   There is one, a draft one that we've used to start

7        training all our providers in Michigan in integrated

8        care.

9   Q.   When was the draft made?

10  A.   That draft was made starting one year ago, in

11       September of 2016.

12  Q.   So prior to September of 2016, am I correct in

13       understanding that there was not a Clinical Pathways

14       module for integrated care?

15  A.   That's correct.

16  Q.   What is integrated care?

17  A.   Integrated care is a program that's being sponsored by

18       the Center for Medicare and Medicaid Services.  They

19       have funded the American Psychiatric Association with

20       $85 million to go throughout the country to train

21       medical providers and psychiatrists in integrating and

22       creating collaborative care to address the shortage of

23       psychiatrists throughout the nation.

24              There is a severe shortage of

25       psychiatrists, so the program trains primary care

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1        providers to take control, basically, of the care of

 2        patients with mental health disorders such as

 3        depression and bipolar disease, thereby expanding

 4        access to care within the US population.

 5   Q.   So if I'm understanding -- and I may have cut you off,

 6        but let me just ask a question on this.

 7              This program is designed to train general

 8        practitioners to provide a certain level of mental

 9        health services, even though those practitioners are

10        not psychiatrists.  Is that correct?

11   A.   Yeah.  That's part of the training in primary care, is

12        to treat depression.  That's not outside the scope of

13        primary care providers.  Unfortunately, over the years

14        there have been a lot of referrals and the system has

15        overutilized the psychiatrists throughout the nation.

16        And so what we're doing is returning a select number

17        of patients back to the care of the primary care

18        providers.

19   Q.   And how is it determined which patients get a primary

20        care provider, a PCP versus a psychiatrist?

21   A.   There's an algorithm and a set of standards.  These

22        patients are generally stable patients; there's not

23        been a suicide attempt, et cetera, for a one-year

24        period.  They're usually on a single or possibly a

25        double-agent therapy.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 46

```
 1   Q.   Other than the integrated care policy, to your
 2        knowledge, are there any other Clinical Pathway
 3        modules that are currently being drafted?  Not
 4        revised, but new policies?
 5   A.   No.
 6   Q.   All right.  What do you understand Clinical Pathways
 7        to be?  What is it?
 8   A.   These were an adjunct, an additional resource for
 9        providers to enable them to have a quick reference.
10        We have since provided UpToDate as a clinical
11        reference for all our providers.  That is the main
12        reference that we use for our clinical care.
13   Q.   So in addition to Clinical Pathways modules that are
14        now available online, the clinicians that are working
15        within Corizon in Michigan also use UpToDate?
16   A.   Yes.
17   Q.   They have access to that?
18   A.   They do.
19   Q.   And what is UpToDate?
20   A.   UpToDate is a database that is continually updated on
21        a daily basis with the consensus literature and the
22        care of all human disease.
23   Q.   And when did the Corizon system start using UpToDate?
24   A.   I can't give you the exact date.
25   Q.   Well, has it been since you became the state medical
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 47

 1       director?

 2   A.  It was prior to that.  It was when I was northern

 3       regional medical director.

 4   Q.  In what year, if you can tell me?

 5   A.  It would have been -- was it 2013?

 6   Q.  And was that an online system available to all

 7       clinicians?

 8   A.  Yes.

 9   Q.  And do you know, sir, back in 2013 whether the

10       UpToDate software system had any programs relative to

11       the differential diagnosis of cancer?

12   A.  Yes.

13   Q.  What was it called?

14   A.  Oh, there's numerous modules on the detection and

15       diagnosis and treatment of cancer.  Virtually every

16       cancer type should be in UpToDate.

17   Q.  Okay.  So, for example, tonsillar cancer should be in

18       there, correct?

19   A.  I can't recall looking specifically myself, but I

20       would be very surprised if it was not in there, yes.

21   Q.  And part of what the UpToDate system provides for the

22       clinician accessing it is steps to consider upon

23       clinical observation of a patient where the physician

24       may suspect cancer, correct?

25   A.  Yes.

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1    Q.   And so the UpToDate system, correct me if I'm wrong,

 2         would provide for the physician direction as to

 3         whether he or she should have a type of testing done

 4         for a particular suspicious mass, correct?

 5    A.   Correct.

 6    Q.   It might suggest, by way of example, imaging with or

 7         without contrast?

 8    A.   Correct.

 9    Q.   It might suggest a biopsy?

10    A.   It might.

11    Q.   And it might suggest other testing, correct?

12    A.   Correct.

13    Q.   Does it provide guidance in how to do a differential

14         diagnosis?

15    A.   Yes.  A differential diagnosis is usually provided

16         under each category.

17    Q.   Does it also provide to the clinician some of the risk

18         factors to be looking for with regard to a specific

19         type of cancer?

20    A.   Yes.

21    Q.   So by way of example, a person's age?

22    A.   Yes.

23    Q.   A person's gender?

24    A.   Yes.

25    Q.   A person's smoking history?
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 49

```
 1    A.    Yes.

 2    Q.    A person's alcohol use?

 3    A.    Yes.

 4    Q.    Anything else that you could think of that might be

 5          risk factors that would be delineated in this UpToDate

 6          program for cancer detection?

 7    A.    As a risk?

 8    Q.    Yes.

 9    A.    Industrial environmental exposures.

10    Q.    Anything else?

11    A.    Family history is important.

12    Q.    Anything else?

13    A.    That's all I can recall right now.

14    Q.    When was the last time you accessed the UpToDate

15          system, if ever?

16    A.    Yesterday.

17    Q.    Oh.  Did you do that in preparation for your

18          deposition?

19    A.    No.

20    Q.    Okay.  Incidentally, what documents, if any, did you

21          review for your deposition?

22    A.    The only documents I have reviewed are right here with

23          my attorney in these two binders.

24                  MS. VAN THOMME:  The documents we produced.

25
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 50

 1   BY MS. STAMLER:

 2   Q.   So we're clear, the documents that you reviewed for

 3        today's deposition were the ones that your counsel

 4        emailed or her office emailed yesterday evening.

 5             MS. STAMLER:  Is that right, Carly?

 6             MS. VAN THOMME:  Yes.

 7             MS. STAMLER:  All right.

 8   BY MS. STAMLER:

 9   Q.   We'll go through those in a minute.

10             How much time did you spend reviewing the

11        documents in order to prepare for your deposition?

12   A.   Approximately three hours.

13   Q.   And were you the person who provided the documents to

14        your counsel prior to your deposition?

15   A.   Not me directly.

16   Q.   You directed somebody to do that on your behalf?

17   A.   Yes.

18   Q.   All right.  And how long ago did you do that?

19   A.   I can't recall.

20   Q.   Was it a couple weeks ago?

21   A.   I believe it was longer than that.  It was probably

22        more like a month ago.  I'm not sure.

23   Q.   Okay.  And so as you sit here today, the documents

24        that you reviewed for your deposition today were

25        produced, you think, sometime about a month ago to




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

1     counsel.  Is that correct?

2  A.   Whenever counsel requested it, we provided it.

3  Q.   Okay.

4            MS. VAN THOMME:  For the record, not all

5       the documents came through Dr. Bomber.  There were

6       other people in Corizon in different roles who

7       provided different pieces that he's not necessarily

8       aware of the timing.

9  BY MS. STAMLER:

10 Q.   Well, can you tell me, Dr. Bomber, which of the

11      documents you reviewed for your deposition today you

12      assisted in providing to counsel?

13 A.   I would have to go through each one.

14 Q.   Go ahead.  We have some time.  I'd like to know what

15      you provided.

16 A.   Okay.  We provided the clinical onboarding manual.

17      "Clinical Checklist" is the first line in the manual.

18      So this entire document here would have been provided

19      from my office.

20           MS. VAN THOMME:  The whole binder is the

21      manual.

22 A.   Okay, the whole binder then would have -- actually, I

23      think this may have been provided in -- I don't know.

24      This entire document would be from me.

25




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 52

```
 1    BY MS. STAMLER:
 2    Q.   And just so the record is clear, you're referencing a
 3         binder that has the clinical onboarding program, is
 4         that correct?
 5    A.   Yes.
 6    Q.   Is there anything else in that binder?
 7    A.   I don't think so.  Let me see it again ...
 8                   There's, you know, as part of the
 9         onboarding training the MSAT guidelines, the
10         formularies, this is all part of the onboarding
11         training.  There's nothing additional in here.
12    Q.   Okay.  Do you know, roughly, how many pages that
13         amounts to?  Because they are copied back-to-back.
14    A.   At least a couple thousand.
15    Q.   Thank you.  The next binder that's been handed to you,
16         can you tell me in that binder how many items you
17         produced or you directed somebody to produce to
18         counsel?
19    A.   Okay.  This first section on emails, I did not.
20    Q.   I just want to know the ones you did.
21    A.   Okay.  The Corizon job descriptions were provided by
22         my office.  The contract with the State of Michigan
23         was provided either by my Lansing office or our
24         national office, upon their request.
25    Q.   Okay.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1   A.   The section change notice is the same.

 2   Q.   So the contract between Corizon and the State of

 3        Michigan and the change notices related thereto, okay.

 4   A.   And this is more of the contract, the next section,

 5        also.  More of the same.  The next section is more on

 6        the contract, which we provided.

 7   Q.   Are you still on the contract?

 8   A.   I'm still on the contract.

 9   Q.   Okay.

10   A.   And then the medical service advisory committee

11        guidelines, the Corizon hierarchy structure.

12   Q.   I'm sorry, can you go back to the one before the

13        structure.  What did you call that?

14   A.   Yeah, these are the medical service advisory committee

15        guidelines table of contents.  We did provide that.

16   Q.   Medical services --

17   A.   Medical service advisory committee guidelines.  That's

18        also part of the onboarding training materials, and

19        then it has the Corizon hierarchy.

20   Q.   Also known as the organizational chart?

21   A.   Organizational charts.

22   Q.   How many of those charts did you provide?

23   A.   I believe we provided all of this for our attorney.

24   Q.   Okay.

25   A.   These are the remainder of the guidelines, and there's
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1          the formulary, also, in this document which we

 2          provided.  More medical service advisory guidelines,

 3          more medical service advisory guidelines.  So all of

 4          the medical service advisory guidelines were provided

 5          by us.  And the last section, it looks like a repeat

 6          of the hierarchy/organizational structure, additional

 7          copies.

 8   Q.     In binder number 2, other than probably roughly ten

 9          emails, and I'm estimating, the balance of that binder

10          are documents that you or someone on your behalf

11          produced to counsel in this case a month or more ago,

12          is that right?

13                   MS. VAN THOMME:  Object to foundation.

14   A.     Yes.

15   BY MS. STAMLER:

16   Q.     And again, these are copied back-to-back.  What would

17          you estimate the total number of pages to be?

18   A.     Again, at least a thousand.

19   Q.     At least a thousand?

20   A.     At least a thousand.  More like two thousand.

21   Q.     Of the materials that you've just identified on the

22          record that you reviewed in preparation for your

23          deposition, did you devote more time to some than

24          others or did you review them sort of overall?

25   A.     It was a general, overall review.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 55

```
 1   Q.   Okay.  Do you have any idea why -- strike that.
 2              Did you provide a 2017 to 2018 code of
 3        conduct and ethics quiz sheet?
 4              MS. VAN THOMME:  Object to foundation.
 5   A.   I believe that's part of the onboarding materials.
 6   BY MS. STAMLER:
 7   Q.   Do you have any idea why this would be provided for a
 8        case that occurred in 2012 to 2014?  These didn't
 9        exist back then, did they?
10   A.   I don't recall.
11              MS. VAN THOMME:  Object to foundation.
12   BY MS. STAMLER:
13   Q.   Was there a code of conduct and ethics checklist in
14        2012 to 2014?
15   A.   I don't recall.
16   Q.   Is the employee orientation handbook something you're
17        familiar with?
18   A.   Yes.
19   Q.   Was it in place prior to December 5 of 2015?
20   A.   I don't recall the initiation date.
21   Q.   So if the one that was provided to me was dated
22        12-5-15, that certainly would not have been in effect
23        in August of 2012 through June 30th of 2014, is that
24        right?
25   A.   That's correct.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 56

```
 1   Q.   So as you sit here today, sir, you don't know if there
 2        was a handbook in place prior to that date, is that
 3        right?
 4   A.   A handbook on the code of ethics?
 5   Q.   No, the employee handbook that I've just identified
 6        that's dated December 5 of 2015.
 7   A.   I don't recall.
 8             MS. VAN THOMME:  For the record, I thought
 9        we were producing one from the right time frame.  I
10        can get you that one.  I don't even have that with me
11        today because I don't see how any of it's relevant.
12        We produced it because you --
13             MS. STAMLER:  Then why was it produced?
14             MS. VAN THOMME:  Because you asked for all
15        training materials.  That's part of training
16        materials.  It has nothing to do with clinical aspects
17        of training.  It's HR stuff.
18             MS. STAMLER:  Well, I assume HIPAA is
19        related to clinical practice, is it not?
20             MS. VAN THOMME:  Of course it's related,
21        but that's HIPAA stuff.
22   BY MS. STAMLER:
23   Q.   Doctor?
24   A.   So the question to me is, is HIPAA related to clinical
25        practice?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 57

 1    Q.   Yes.

 2    A.   Yes.

 3    Q.   Was there field training done on HIPAA prior to 2016?

 4    A.   Yes.

 5    Q.   Is that something you did as part of the onboarding

 6         program?

 7    A.   No.  I recall that we had it prior to 2016, because I

 8         remember completing those modules when I was a

 9         provider.  Going back to 2009, I believe, we had --

10         we've provided HIPAA training since then in some

11         fashion.

12    Q.   What's reporting and enforcement?  Do you know

13         anything about that topic?

14    A.   I would have to review it.

15    Q.   Did you do any training on these modules?  Are you

16         aware of these?

17    A.   I'm aware.

18    Q.   On HIPAA?

19    A.   I'm aware of those.

20    Q.   Is that part of what you did as onboarding training in

21         your role as a regional medical director?

22    A.   Yes, there's always been some form of HIPAA training.

23    Q.   Do you recall what document or documents contain the

24         training on charting within the Corizon system?

25    A.   Yes.  Part of our onboarding training days includes

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 58

```
1          reviewing charting within the EMR.  We look at good
2          examples of charting and those that would require
3          improvement.  So we do review and train our providers
4          on the EMR, and where to chart and how to chart.
5    Q.    Is that part of a module or is that just on-site
6          training?
7    A.    There is a section in the outline where we reference
8          that, and then that's -- mainly it's part of the
9          training that occurs on-site after the onboarding.
10   Q.    And who does the on-site training on charting?
11   A.    Training is provided initially by our IT director, and
12         then we pair our providers with the provider at their
13         site, one of our teaching providers.
14   Q.    Back in 2012, do you know who the paired provider, the
15         trainer was for the RGC?
16   A.    No, I do not.
17   Q.    And do you know in 2012 to 2014 who the trainer would
18         have been on-site, not the IT person, but the medical
19         provider at Carson City?
20   A.    No.
21   Q.    It's fair to say that the on-site training by the
22         medical provider is only as good as that medical
23         provider's training was, is that right?
24              MS. VAN THOMME:  Object to the form.
25   A.    No.  That's only part of the training.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 59

 1   BY MS. STAMLER:

 2   Q.   Right.  I'm talking about the on-site training.

 3   A.   That's also provided by the regional medical director.

 4   Q.   Oh, okay.

 5   A.   So the regional medical director also reviews the

 6        training and the charting that the new provider does.

 7        There are a number of charts for mid-levels.  Ten

 8        charts per month are reviewed ongoing, and then each

 9        new provider has charts reviewed by the regional

10        medical director, as well.

11   Q.   For what period of time does the regional medical

12        director review those?

13   A.   It varies, anywhere from three months to six months.

14   Q.   And is that ten charts, as well?

15   A.   That varies.  Sometimes there's more, sometimes

16        there's fewer.

17   Q.   So how few and how many?  What's the range?

18   A.   Generally a minimum would be five charts; the maximum,

19        ten charts.

20   Q.   And are those randomly selected?

21   A.   Yes.

22   Q.   And who does the selection?

23   A.   The person who's doing the review.

24   Q.   So if it's the site medical director, that person

25        would select the charts, and then if it's the regional




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 60

```
 1          medical director, the regional medical director would
 2          select the charts?
 3    A.    Generally, that's our process.  Sometimes there have
 4          been others who have assisted in pulling charts.
 5    Q.    And who would that be?
 6    A.    Sometimes the health information manager might pull,
 7          randomly pull ten charts from the record.
 8    Q.    Do you have any idea what the patient census was or
 9          the prison census was at Carson City between 2012 and
10          2014?
11    A.    No, I couldn't give you an exact number.
12    Q.    Based upon a random selection of ten charts per month
13          by the site physician, it's quite feasible that a
14          prisoner housed at a facility with two thousand
15          inmates might never have his chart reviewed, correct?
16    A.    Correct.
17    Q.    And that would be fair to say the same process that
18          the regional medical director uses, which is anywhere
19          from five to ten charts every three to six months,
20          would also result in a likelihood that a prisoner's
21          medical chart might not be reviewed, correct?
22    A.    Correct.
23    Q.    As you sit here today, it would be fair to say you
24          have no idea, sir, whether Keith Franklin's medical
25          chart was ever reviewed to determine whether the
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 61

```
 1        charting was or was not in keeping with Corizon
 2        standards, is that correct?
 3   A.   Correct.
 4   Q.   If it had been reviewed for a determination as to
 5        whether it was or was not in compliance with the
 6        charting requirements under Corizon's rules, would
 7        that be documented somewhere?
 8   A.   It could if it was part of a provider improvement
 9        program.  If there was a pattern of poor charting, for
10        example, that provider would be placed into a provider
11        improvement program, which is a formalized month-long
12        process.
13   Q.   Okay, sort of like a PIP?
14   A.   Yeah, that's a provider improvement program, or a PIP.
15   Q.   Okay.  Other than a disciplinary-type mechanism where
16        a physician might be put on a program to improve his
17        charting, is there any other documentation?  Would it
18        show up in the prisoner's record that there was a
19        problem with charting?
20   A.   No.
21   Q.   So it's really only in the individual's personnel
22        record that we might find some documentation on that
23        topic, if there was a problem, correct?
24   A.   Correct.
25   Q.   All right.  You did mention that there were Corizon
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 62

```
 1          training materials on the topic of charting.  Can you

 2          in those two binders locate those documents for me?

 3          And when you've identified it, please let me know

 4          where it is or what it is.

 5    A.    Okay, so on -- it's page 1.

 6    Q.    Well, just can you identify for the record, is it the

 7          clinical checklist?  Is it a document that has several

 8          numbered paragraphs beginning with "Clinical Checklist

 9          Manual"?

10    A.    Yes, that's the section that it's in.  And the first

11          reference to charting is under "Quality Correctional

12          Care of Michigan, PC.  Orientation Checklist for

13          Medical Providers - QI & IT."

14                    Under "NextGen - IT," how to set up a

15          provider account, setting up preferences.  And then

16          going down through history of present illness, review

17          of systems --

18    Q.    Can I see the document you're referencing?  What was

19          provided to me does not have any Bates number or

20          anything, so I don't know really what you're looking

21          at and they were not in any sort of order.

22                    So let me just take a look and see if I

23          recognize the document.

24    A.    This is the first reference to charting and the

25          elements that need to go into charting.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

1   Q.   I don't see that in the index that was provided.  Is

2        it part of what's indexed here?

3   A.   It's part of that first section.

4   Q.   No, I understand, but on this first page of the binder

5        that starts with "Clinical Checklist Manual," is it

6        referenced in this list at all?

7   A.   I don't think charting is mentioned directly in that

8        list, but there's elements of charting throughout the

9        manual.

10  Q.   I understand, but I don't even see the reference to

11       this particular document that you've turned the page

12       to.

13              I'm sorry, I've now lost it.

14              I think I've gotten back to it.  It's

15       "Orientation Checklist for Medical Providers - QI &

16       IT: New Hire Paperwork."

17              Is that what you're referring to?

18  A.   Yes, that's the first reference to elements of

19       charting.  That's to ensure that they're trained in

20       each component.

21  Q.   Give me a minute, I'll see if I can find it.

22              MS. STAMLER:  Let's go off the record.

23              (Off the record at 12:18 p.m.)

24              (Back on the record at 12:20 p.m.)

25              MS. STAMLER:  I don't see it in the

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
1          paperwork I've received.  I'm not saying it's not

2          here, but in the documents that were underneath that

3          checklist, I don't recall getting that.  No, I don't

4          have it.

5                    In any case, I'm going to mark this because

6          I don't have it to mark and we'll go through it.  Is

7          that all right, Carly?

8                    MS. VAN THOMME:  That's fine.

9                    MS. STAMLER:  Because I don't have it,

10         let's mark this as Exhibit 1.

11                   MARKED FOR IDENTIFICATION:

12                   DEPOSITION EXHIBIT 1

13                   12:21 p.m.

14    BY MS. STAMLER:

15    Q.   Dr. Bomber, you've identified for me that what's been

16         marked as Exhibit 1 to your deposition, "Orientation

17         Checklist for Medical Providers - QI & IT: New Hire

18         Paperwork," is part of your, not you, but Corizon's

19         training materials for oncoming physicians, is that

20         right?

21    A.   Yes.

22    Q.   And what about this document pertains to charting

23         requirements for Corizon?

24    A.   The history of present illness, review of systems,

25         physical exam, assessment, medications, plan, special
```



JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 65

```
 1          accommodations if any, updating allergies, and

 2          identifying the visit as routine or urgent.

 3                    Not all elements are required for every

 4          visit.

 5   Q.     What about that document addresses how a chart should

 6          be done?

 7   A.     Because the providers are trained in how to create a

 8          visit and how to review a visit.  Examples of good

 9          charting are reviewed during this process with the

10          providers.

11   Q.     Okay.  But there's nothing written on Exhibit 1,

12          correct me if I'm wrong, that tells the clinician how

13          to chart, and by that I mean to be accurate, complete,

14          use specific abbreviations, and so forth.  Is that

15          correct?  It's not in that document.  It may be

16          elsewhere.

17   A.     Well, it's here to tell you which components to make

18          sure you include as part of good charting, yes.

19   Q.     All right.  Let me see that document, if I might,

20          since I don't have a copy, I can't locate a copy.

21                    So this is in the NextGen system, is that

22          right?

23   A.     Yes.

24   Q.     That was the software system in place?

25   A.     Yes.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

1    Q.   Back when -- when did that, when was it used?

2    A.   I believe NextGen was implemented in 2008.

3    Q.   And was it still used through 2014?

4    A.   Yes.

5    Q.   So "Setting up Preferences," what does that mean?

6    A.   Setting up preferences is choosing the types of notes

7         that you'll be writing.

8    Q.   What does that mean?

9    A.   We want to make sure that the providers are the only

10        ones writing provider visit notes.  So that if we need

11        to find a record, we will not be, you know -- because

12        there's all sorts of entries from nursing, from

13        behavioral health, et cetera.  So that is to show them

14        how to create a specific note that is specific to

15        medical providers only.

16   Q.   And that way another medical provider who may be a

17        mid-level or a nurse can't get into the physician's

18        notes and add or change it in any way, correct?

19             MS. VAN THOMME:  Object to form.

20   A.   No.  The preferences is just choosing the types of

21        notes that you'll write.  For example, as a

22        psychiatrist, I wouldn't be writing a chronic care

23        clinic visit note.  So the preferences are just the

24        types of notes that any provider would write.

25             The visits are locked by the provider after




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 67

```
 1       they're completed so that no one else can access it.

 2       If they forget to lock it, it's locked automatically

 3       in 24 hours.

 4  BY MS. STAMLER:

 5  Q.  All right.  So it's just a type of note, and by

 6       "type," you mean the type of visit that that provider

 7       might be giving to an inmate, is that correct?

 8  A.  Correct, that's the preferences.

 9  Q.  All right.

10  A.  It might also include -- and I'm not the IT person,

11       but it may include also their access to the formulary,

12       being able to write medications, their access to the

13       labs.  There's different levels of access to the

14       system.

15  Q.  And that's set up through IT, is that right?

16  A.  Yes.

17  Q.  And then "Patient - Search/History," what does that

18       pertain to?

19  A.  That is part of the training to show them how to try

20       to find a patient record.  There is a search component

21       in the EMR.

22  Q.  So that if a patient had medical care at another MDOC

23       facility prior to arriving at the place where he is

24       getting service now, the clinician could search the

25       record and read about the patient's history?
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1   A.   Correct.

 2   Q.   All right.  And that's what this is designed to train

 3        them on, correct?

 4   A.   And also each component of the, of the visit.

 5   Q.   All right.  What about in-box appointments, tasks, and

 6        emails?  What's that about?  Is that part of charting?

 7   A.   That's part of the electronic medical record.  There

 8        is an email system, and that system is used to

 9        communicate among providers, among staff, and also

10        that's used as part of the 407 referral process.

11        That's an email system built within the EMR.

12   Q.   So it's used, if I understood your testimony, between

13        staff within the health unit and also for the use of

14        401 requests -- I'm sorry, 407 requests, is that

15        correct?

16   A.   Correct.

17   Q.   What type of communication via email occurs between

18        medical staff?  Give me some examples.

19   A.   There could be communication between the site

20        physician and the mid-level regarding the care of a

21        patient.  For example, a mid-level may request that

22        the site senior physician see a patient, or they may

23        request that the regional medical director come and

24        visit and see a patient.

25                    There could also be site-to-site
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 69

```
 1        communication in the event of a transfer.  If a
 2        patient is undergoing testing, then often there would
 3        be an email or a telephone call doing a warm handoff.
 4        Certain alerts may be that the health unit manager,
 5        the nurse, you know, might alert a provider saying,
 6        "You're seeing this patient today, please note that he
 7        was in the ER on Saturday," or, you know, to that
 8        effect.
 9   Q.   So it's designed, at least in part, to promote
10        continuity of care, is that right?
11   A.   To promote communication and continuity of care,
12        certainly.
13   Q.   Yes.  Communication is vital to continuity of care,
14        would you agree with that?
15   A.   Yes.
16   Q.   And part of the continuity in care is tied into access
17        to the electronic medical record for each prisoner,
18        correct?
19   A.   By the provider for each prisoner, yes.
20   Q.   Yes.  Let me rephrase it, just so we're clear.
21             Part of the continuity of care that is --
22        strike that.
23             The access to the electronic medical record
24        by a provider for a prisoner is vital to continuity of
25        care, correct?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1   A.   Yes.

 2   Q.   And that is because, sir, part of what the electronic

 3        medical record provides to a provider is a history of

 4        that patient's medical condition or conditions,

 5        correct?

 6   A.   Yes.

 7   Q.   And part of the reason that's important is so that

 8        when the provider sees a patient, he or she can look

 9        at the medical record and say, "This patient has had

10        this problem for some period of time and something

11        else needs to be done to look at this," perhaps,

12        correct?

13   A.   Yes.

14   Q.   So by way of example, if a prisoner had a palpable

15        mass upon a physical examination and it's documented

16        in a medical record, an electronic medical record

17        within the prison system in Michigan, a provider who

18        is seeing that patient next should be able to access

19        that document, correct?

20   A.   Yes.

21   Q.   That requires, of course, the provider to go and look

22        for it, correct?

23   A.   Yes.

24   Q.   Did you during the time you were training physicians

25        when they were coming on board for Corizon impress
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1         upon them the necessity to review the electronic

 2         medical record each and every time they saw a prisoner

 3         patient?

 4    A.   Yes.

 5    Q.   And did that include going back to earlier visits?

 6    A.   Yes.

 7    Q.   Was that part of any sort of training module?

 8    A.   Yes.

 9    Q.   Which training module would we find that in?

10    A.   There was an article that we used to provide called

11         "Own Your Patient," which was written by one of our

12         regional directors, Dr. Coleman, that talked about the

13         ideal approach to your daily work from the time you

14         arrived at the site to the end of your day.  It's just

15         sort of a narrative on, you know, what to look for,

16         how to approach your patients.

17    Q.   Did I hear you say you used to provide that article?

18    A.   I'm not sure it's part of the new version of the

19         onboarding module.

20    Q.   When did that -- strike that.

21              When was that included, that article?

22    A.   I believe it was available in 2012 through at least

23         2015.

24    Q.   And how was it made available to the new physicians

25         that were onboarding, if you will?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1   A.   It was provided at their training.

 2   Q.   In paper form?

 3   A.   Yes, paper form.

 4   Q.   Along with other training materials?

 5   A.   Yes.  I don't believe it was an official part of the

 6        onboarding manual.  It was something that the regional

 7        medical directors gave and reviewed.

 8   Q.   All right.  So it wasn't anything that the onboarding

 9        physician was required to review and be tested on,

10        correct?

11   A.   There would have been no testing, no.

12   Q.   All right.  Anything else that was provided in the

13        course of the onboarding training as it pertains to

14        the need to review a patient's EMR at the time each

15        visit occurs?

16   A.   Yes.  That's part of the time the regional medical

17        director -- the regional medical director actually

18        does the onboarding training for all new providers.

19   Q.   All right.

20   A.   It's part of that session.  The EMR is actually

21        reviewed, is brought up live and they review charts.

22   Q.   And was it your understanding, given the fact that you

23        were training incoming physicians and mid-level

24        providers on the electronic medical record review

25        process, did you tell each and every physician that
```



JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 73

```
 1         you were training there was a necessity to go back and
 2         review the electronic medical record each and every
 3         time you saw a patient?
 4    A.   Yes.
 5    Q.   And, to your knowledge, because I know you were only
 6         in the northern region, do you understand that that
 7         was a systemic directive from Corizon for all of the
 8         regional medical directors to do that?
 9    A.   I believe it was strongly encouraged, yes.
10    Q.   Strongly encouraged?  Was it required, if you know?
11    A.   Well, as part of the training program, being familiar
12         with each section and making sure you're including a
13         section was part of it.  Other than that one document,
14         I don't believe there are other documents that
15         specifically mandate that they review a previous
16         chart.
17    Q.   And as I understood your earlier testimony, that was
18         an article that was not really part of the training
19         module and certainly wasn't tested?
20    A.   It was not tested.
21              MS. VAN THOMME:  Object to form.
22    BY MS. STAMLER:
23    Q.   Do you know, sir, whether Dr. Bergman, who was serving
24         as the southern regional medical director during the
25         relevant time period of this case, that is, from
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 74

```
 1          August 2012 to June 30, 2014, whether he provided that
 2          article to oncoming physicians?
 3    A.    I cannot state that with a hundred percent certainty,
 4          no.
 5    Q.    And do you know whether it was his practice to train
 6          physicians that he was onboarding in the same fashion
 7          you were with regard to the necessity to review the
 8          electronic medical record each and every time a
 9          patient was seen?
10    A.    We would train our own new providers, so I wasn't
11          present during his training.
12    Q.    So you don't know whether he had the same practice
13          that you did, is that correct?
14    A.    I can't be a hundred percent certain, no.
15    Q.    Where did you get the understanding, the knowledge,
16          that that was a necessity, if you will, for medical
17          providers to go back and review the electronic medical
18          record each and every time they saw a patient?
19    A.    My training and reviewing a previous record comes from
20          my time starting as a medical student.  It is germane
21          to the practice of medicine that we review at least
22          the last provider visit.
23    Q.    Is that the only one you would look to, then?
24    A.    No.  I mean, that's where it began for me.  And then
25          the Dr. Coleman article was what I encountered in
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 75

```
 1          corrections.  It's standard practice.
 2     Q.   Let me ask you this.  The Dr. Coleman article, do you
 3          recollect what kind of direction he gave in his
 4          article as to how far back a provider should look into
 5          the medical record when treating a patient?
 6     A.   Yeah.  At least the previous visit.
 7     Q.   Is that the only thing that was supposed to be
 8          reviewed?
 9     A.   It depends on what the patient's being seen for.  If
10          they're being seen for, you know, an acute illness, a
11          cold, upper respiratory infection, it may be that we
12          only go back one record and look at the medication
13          list.  If there's a long, chronic type of illness,
14          then multiple records may be reviewed.
15     Q.   Would HIV be a chronic record -- chronic care concern
16          that you would look back multiple records?
17     A.   We have -- yes, but an infectious disease doctor and
18          his team are responsible for most of the care related
19          to hepatitis as well as HIV.
20     Q.   But as I understood it, inmates with hepatitis C, such
21          as Mr. Franklin, were seen in the chronic care clinic
22          by Corizon medical providers that were not the
23          infectious disease specialists.
24     A.   They're always seen by both.  So, yes, there would be
25          a chronic care clinic for hepatitis for the primary
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 76

```
 1        care provider, but then Dr. Hutchinson and his team
 2        also has a registry and follows each patient.
 3   Q.   With regard to the -- I'm not talking about the
 4        specialty team of infectious disease but the medical
 5        providers within Corizon.  How many records back
 6        should the chronic care provider look back to?
 7   A.   At least to the last chronic care clinic visit.
 8   Q.   So only one visit before?
 9   A.   At least.
10   Q.   And was that your training, with your onboarding?
11   A.   Yes, to make sure that if it was a, you know, chronic
12        care clinic visit, that they review at least the last
13        chronic care visit as well as medications, labs,
14        et cetera.
15   Q.   What about any testing reports, things of that nature?
16        Should they go back and look for those in the next
17        visit?
18   A.   Yes.  We always encourage them to go back and look
19        under the lab module, which would have culture
20        results, biopsy results, blood chemistries.
21   Q.   Continuing on Exhibit 1, "Provider Approval Queue,"
22        what does that mean?
23   A.   We had a system called MTrax, which had all of the
24        appointments and off-site referrals and the tracking
25        of off-site visits as well as off-site referrals, and
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 77

1         that was available up until, I believe, 2015.
2    Q.   Then what happened?
3    A.   The State wanted to have one record where everything
4         was tracked, so that's when they started to utilize
5         the EPM module, or the appointment module within the
6         electronic medical record.  It just made a lot more
7         sense for efficiency to have everything under one
8         electronic vehicle.
9    Q.   So prior to that were there dual records being kept
10        with regard to appointments that were off-site?
11   A.   No.  I believe that they were all in MTrax.
12   Q.   But they were not part of MDOC's records, they were
13        part of Corizon?
14   A.   The MDOC used MTrax, where they partnered with us to
15        use that.
16   Q.   So what was -- I don't understand the change.  Why was
17        it more efficient?
18   A.   Because MTrax is a separate system, electronic
19        software system outside of NextGen.
20   Q.   I see.  So now it's part of NextGen, these records?
21   A.   MTrax is not part of NextGen, the tracking.
22   Q.   No, the information is now kept in NextGen?
23   A.   Correct.
24   Q.   Am I correct in understanding with regard to the
25        scheduling of off-site provider visits, that is, the

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 78

```
 1          specialty areas that the prison doesn't provide -- by

 2          way of example, oncology, radiology -- that those

 3          scheduling visits occur through the Department of

 4          Corrections staff, correct?

 5   A.     Correct.

 6   Q.     In other words, Corizon does not have a role in the

 7          scheduling, is that right?

 8   A.     We partner with them, in that the Blue Cross Blue

 9          Shield provider list is provided to us, to Corizon,

10          and then we provide that to the schedulers to help

11          them to find appropriate specialists, and they

12          actually make the appointments.

13   Q.     Right.  Do you, and by "you," I mean do Corizon

14          employees have any say as to when that appointment

15          gets scheduled?

16   A.     The current system is that the provider is mandated to

17          actually insert into the 407 consultation requests a

18          timeline.

19   Q.     Now they do, but what was it back in 2012 through

20          2014?

21   A.     We were not using that portion of the medical record

22          back at that time.

23   Q.     So how did it work back at that time?  And by "that

24          time," we're talking about August 2012 through

25          June 30, 2014.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 79

```
 1   A.   At that time, the provider would request the
 2        consultation, and then it would be sent through the
 3        email, the 407 email group, which would include the
 4        utilization management physician, as well as the
 5        off-site coordinators, the health unit manager, and
 6        then the scheduler would call the office of the
 7        specialist or the hospital, if it were a test, and
 8        then set up the test for the inmate.
 9   Q.   Well, didn't there have to be an approval before it
10        got to the scheduling?
11   A.   That's why the UM physician is copied.  He has to do
12        an approval of the request first, and then there's a
13        claims number authorized.
14   Q.   And then it goes back to the off-site coordinator?
15   A.   Correct.
16   Q.   And so the first element of that process begins with
17        the medical provider filling out a 407 form, is that
18        right?
19   A.   Yes.
20   Q.   Part of the training that you provided to oncoming or
21        incoming physicians in the onboarding process had to
22        do with the 407 process, correct?
23   A.   Yes.
24   Q.   And, as I understand it, there's two avenues that a
25        407 can be characterized as.  One is routine and one
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 80

```
 1         is urgent, is that right?
 2    A.   Yes.
 3    Q.   And part of the training that is provided to incoming
 4         physicians through Corizon is what constitutes a
 5         routine medical procedure and what is an urgent
 6         medical procedure, correct?
 7    A.   Yes.
 8    Q.   And is that defined in the training materials?
 9    A.   No.  Actually, there's no good literature on that
10         subject.  It's very hard to find specific intervals.
11         It varies from health care system to health care
12         system.
13    Q.   So are you saying --
14    A.   We have no written requirements.
15    Q.   It's up to the medical provider to determine whether
16         he or she deems a 407 to be routine versus urgent, is
17         that correct?
18    A.   We rely on clinical judgment for such, yes.
19    Q.   And in that context, did you, and by "you" I mean
20         Corizon, in its training materials provide any
21         guidance to the physicians that were coming on board
22         as to how they should determine what should be a
23         routine 407 or an urgent 407?
24    A.   Yes, as part of the verbal portion of the onboarding
25         training.  As we reviewed how to create a 407, we
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 81

```
 1         would discuss examples of what would be urgent.
 2    Q.   Can you give me those examples?
 3    A.   Most of the urgent ones are dealing with fractures,
 4         orthopedic injuries, you have to have an x-ray
 5         immediately, and then likely often a referral to an
 6         orthopedic surgeon.  If there were a patient in
 7         distress, in extremis, you don't have to file a 407;
 8         you can transfer that patient to the emergency room or
 9         local hospital.
10    Q.   Well, that's an emergent issue, correct?
11    A.   Yes.
12    Q.   I'm talking about the distinction between urgent and
13         routine.
14    A.   Urgent would be things you need to have usually that
15         same day, like an x-ray.
16    Q.   Is that the policy, that if a 407 is completed as
17         urgent, the prisoner will get treated that same day?
18    A.   The approval will be done usually that day, because
19         they're required to call by phone to the UM department
20         and request an urgent referral.
21    Q.   So that is done by phone call as opposed to in
22         writing?
23    A.   It is most often done by -- it's supposed to be
24         normally done by phone call.
25    Q.   Is that the current process or was that the process
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 82

```
 1        back in 2012 to 2014?
 2   A.   Yes, phone call.
 3   Q.   Phone call.  Isn't there a drop-down box on the
 4        407 form that you can check off as urgent?
 5   A.   Even if they utilize that box, it doesn't matter.
 6        They're still supposed to call.
 7   Q.   Okay, but that wasn't my question.  I understand
 8        they're supposed to call, but isn't there a drop-down
 9        box where the clinician can mark the 407 request as
10        urgent?
11   A.   I'd have to have the electronic medical record up in
12        front of me.  Yes, I do recall there is a drop box for
13        that.
14   Q.   Okay.  Other than somebody that has a fracture who
15        needs an immediate x-ray, or suspected fracture, are
16        there any other circumstances that you train incoming
17        physicians on or trained incoming physicians on where
18        an urgent 407 should be completed?
19   A.   It really comes down to clinical judgment.
20   Q.   So is the answer "no"?
21   A.   There's no written materials, no.
22   Q.   I understand.  But you said you gave verbal
23        instruction on this, and the only example you've
24        provided me today is that with respect to a fracture.
25        Is that correct?
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 83

```
 1   A.   That would be the majority.

 2   Q.   Well, did you give any other verbal instruction as

 3        part of Corizon's training to incoming physicians on

 4        what would constitute an urgent medical matter for a

 5        407 form?

 6   A.   Not specifically.  Again, we defer and rely on

 7        clinical judgment.  And that's what we discuss with

 8        them, to use your clinical judgment.

 9   Q.   And did they have access to anything, back in 2012 to

10        2014, in terms of Corizon's materials or training

11        materials, that would help them determine what was

12        urgent or routine, or is it solely the individual's

13        medical judgment?

14   A.   UpToDate was available.

15   Q.   And did you suggest to them in the course of training

16        that they should access UpToDate to determine whether

17        a particular medical consult or service was urgent or

18        routine?

19   A.   We encourage them to use that, also to call their

20        regional medical director if in doubt.

21   Q.   Other than that, was there anything else that they

22        should look to?

23   A.   Sometimes they will call the specialist that's already

24        cared for that patient and ask them, "Is this

25        something happening that you need to see today or can
```



JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 84

```
 1        this wait a day?"  So that would be another resource.

 2                    We have our M.D. specialists and UpToDate.

 3        Those would be the main resources.

 4   Q.   Does UpToDate, or did UpToDate back in 2012 to 2014

 5        provide examples of what constituted urgent medical

 6        needs versus routine medical needs?

 7   A.   I believe so.

 8   Q.   It actually would articulate that in the UpToDate

 9        software?

10   A.   It would often say this is what needs to be done

11        immediately, yes.

12   Q.   And you would consider "immediately" to be synonymous

13        with "urgent"?

14   A.   I would.

15   Q.   Okay.  And can you recollect as you sit here today

16        what topic or topics in UpToDate identified matters

17        that would be addressed, as you said, I think the term

18        is "immediately"?

19   A.   I would have to go and look at each disease state, but

20        I'm sure that there are references to the types of

21        fractures that would have to be dealt with that day,

22        such as an open or comminuted fracture.

23   Q.   Anything other than a fracture?

24   A.   That's what comes to mind.

25   Q.   Are there any conditions -- I understand you're sort
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 85

```
 1          of focused on fractures because that's the one that's

 2          pretty obvious.  Is there anything else, as you sit

 3          here today, that you can think of during the time

 4          frame of 2012 to 2014 that UpToDate addressed as

 5          something that would require immediate attention?

 6     A.   Again, most things that require immediate attention,

 7          if they're from a cardiopulmonary standpoint, those

 8          patients need to go for evaluation at an ER.  There

 9          are not that many categories that are same-day urgent,

10          you know, other than those.

11     Q.   Other than, I'm sorry, the fracture that you've

12          identified?

13     A.   I think that, you know, cardiopulmonary disease,

14          fractures, those would be the main ones that require

15          urgent intervention.

16     Q.   Is there ever a circumstance, sir, from your

17          perspective, having provided training for a number of

18          years under the various Corizon modules, where cancer

19          might require urgent intervention?

20     A.   Most of the time, no.

21     Q.   But sometimes, because by your answer -- you said

22          "most of the time."  In what circumstance would it be

23          urgent?

24     A.   Certainly.  If there were, let's say, a patient with

25          lung cancer, had metastatic disease, and there was
```



JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 86

```
 1          compression on the airway and the patient couldn't,

 2          you know, was having difficulty breathing, then I

 3          wouldn't even bother with an urgent 407.  That patient

 4          would go to the emergency room.

 5                    So, yes, there are certain conditions

 6          within cancer that would require urgent care.

 7    Q.    Anything else that you can think of?

 8    A.    Well, if the patient is septic because of their

 9          cancer, that would be another urgent need.  Usually

10          the ones I think of mostly would be airway

11          impingement, trouble with -- difficulty swallowing or

12          breathing.

13    Q.    I think you said that the provider approval queue

14          process changed, and I think you gave me the way it

15          works now and the way it worked previously.  From your

16          perspective, understanding how it worked under MTrax

17          versus how it is working now, I think you said that

18          the change was designed to create better efficiencies.

19          Is that your testimony?

20    A.    The major reason for the changes are to ensure that

21          the inmates get the required medications, specialty

22          referrals that they need.  We now require our

23          providers to put a timeline in for the interval that

24          they need to be seen by the specialist.

25                    We also follow each patient, for example,
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 87

```
 1        that's undergoing a cancer workup, in our workup

 2        registry and evaluation program, where any suspicion

 3        of cancer, that patient is put on a registry.  The

 4        site is sent an alert, and the patient is followed

 5        from central case management now to ensure that the

 6        time from suspicion to biopsy is accelerated.

 7   Q.   All right.  You said a lot, and I appreciate it, but

 8        I've gotta break it down a bit, all right?

 9   A.   Okay.

10   Q.   So you said that the reason the system changed in

11        terms of the way in which appointments were scheduled

12        was to ensure that the prisoner got his or her

13        required medications and specialty referrals in a

14        timely fashion.  Is that right?

15   A.   And improved acceleration.  "Acceleration," I believe,

16        is the word I used.

17   Q.   Okay.  And when was that change implemented?

18   A.   That change started around the time that I became the

19        state medical director.

20   Q.   Two years ago?

21   A.   Yes.  I started partnering with our MDOC partner to

22        improve coordination between our providers and

23        schedulers.

24   Q.   And it appears that part of the change that you've

25        articulated is the inclusion of a timeline created by
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 88

1       the medical provider.  Is that correct?

2   A.  Yes.

3   Q.  Where does that get inserted into the electronic

4       medical record?

5   A.  There is a box on the lower right-hand side of the

6       407 consultation form that has a place where you can

7       actually put in a time interval.

8   Q.  Did that exist back in 2012 to 2014 but wasn't being

9       used?

10  A.  It was -- it's in the section utilization department

11      only.  So, no, it was not used by providers then.

12  Q.  So that is a change.

13  A.  That is one of the changes, yes.

14  Q.  And were you a participant in the decision to make

15      that change?

16  A.  Yes, I was.

17  Q.  And who else was involved in that decision on behalf

18      of Corizon?

19  A.  Utilization management physicians.  My boss.

20  Q.  Who's that?

21  A.  Chief medical officer for State corrections,

22      Dr. FallHowe, F-A-L-L-H-O-W-E.  She was involved from

23      a tertiary point of view.  We let her know about the

24      changes we were making, of course.  And then

25      partnering with the medical leadership on the DOC

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 89

```
 1        side, including all the members of the medical

 2        services advisory committee, which would be the chief

 3        medical officer, the health service administrator, all

 4        the regional nursing directors.  We have monthly

 5        meetings together.

 6   Q.   And so one thing that was done, and I understand

 7        you've given me a list, but was the inclusion of the

 8        timeline created by the medical provider.  And so, if

 9        I understand it, and I don't have a 407 form and there

10        may be one buried in all these documents, but there's

11        a second page or third page to that form that has a

12        section that you've described that was previously only

13        completed by the utilization department.  Is that

14        right?

15   A.   Correct.

16   Q.   And it's in that section now that the provider inserts

17        his or her timeline for this patient to be seen for

18        this specific service.  Is that right?

19   A.   Yes.

20   Q.   And that is designed, if I understand, and you haven't

21        said this, so correct me if I'm wrong, that one of the

22        reasons that that has been put in place is to ensure

23        that the prisoner gets medical treatment for whatever

24        that condition is in a timely manner.  Correct?

25   A.   Right.  We want to decrease the interval from
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 90

```
 1        suspicion to treatment.
 2   Q.   And what is the decrease in the interval?  What's the
 3        target?
 4   A.   Again, it's very hard to find literature.  If you
 5        are -- if you have such literature, I would greatly
 6        appreciate your sharing that with me, because it's
 7        very hard, and if you can find --
 8   Q.   I'm a lawyer, not a doctor, so go ahead.
 9   A.   I mean, believe me, I've done literature searches,
10        international and national, trying to find standards
11        for time of referral to time of testing, and it's
12        highly variable.  It depends on the number of
13        specialists available in your area.  A lot of areas
14        have shortages.
15             So we didn't have a set number target.  We
16        had a target to improve, to decrease the time
17        interval.
18   Q.   Was it a percentage of improvement, is that what
19        you're suggesting?  So that if it took, you know, and
20        I'm just making up a time frame, from date of
21        suspicion to date of testing six months, you would
22        want to decrease that interval by what percent?  Is
23        that how it was looked at, or not?
24   A.   We never came up with a specific number or percent,
25        other than we wanted to improve it.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 91

```
 1   Q.   So there's still no target goal here, just the goal is
 2        to improve?
 3   A.   The goal is to continue to decrease the amount of
 4        time.
 5   Q.   By what amount?  Is there a specific set amount or
 6        not?
 7   A.   No.  We never actually put down in writing what a
 8        target goal our number was.
 9   Q.   So how do you know whether you're meeting the goal?
10   A.   We know that we've improved.
11   Q.   But how much have you improved by?
12   A.   I would have to look at this month's data.
13   Q.   So data is being kept?
14   A.   It is.
15   Q.   And what type of data is kept?
16   A.   It is kept within our patient safety program, as well
17        as within our continuous quality and safety
18        improvement program.
19   Q.   Okay, I'm not asking where it's kept, though I thank
20        you for that information.  I'm asking you what type of
21        information is kept.
22   A.   It is data in terms of number of days from suspicion
23        of cancer to the actual biopsy.  We also track this
24        for other disease states, as well.  For chronic
25        debilitating illnesses, we also have a registry, and
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 92

```
 1        we also have a registry within our hospice/CHOICES
 2        program.
 3    Q.  Okay.  I really want to focus, though, on cancer --
 4    A.  Okay.
 5    Q.  -- because we're here about Mr. Franklin and his
 6        cancer issue.  So I appreciate that it's broader than
 7        the cancer topic, and there's been a larger goal to
 8        decrease the time frame between suspicion and
 9        treatment, right?
10    A.  Yes.
11    Q.  For a number of diseases, one of them being cancer,
12        correct?
13    A.  Correct.
14    Q.  So I want to focus on the cancer issue.  What data has
15        been kept on that topic and from what time frame to
16        what time frame?
17    A.  We started our cancer workup registry and evaluation
18        program in August of 2016 until the current date.
19    Q.  And what is the data that's kept?
20    A.  The data that's kept is the type of referral
21        requested.  For example, if the patient went to the ER
22        for acute upper respiratory infection, they'd had a
23        chest x-ray and there was suspicion of a mass, that
24        would be time zero.
25                    So we keep a record of the type of test,
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 93

```
 1        obviously the inmate's name and number.  We keep a
 2        record of when an alert was sent out to the facility
 3        and the number of days until the CAT scan is done.
 4        And then if a CAT scan, for example, is positive, then
 5        that starts the clock again how far from the time of
 6        CT scan to biopsy, if required.
 7   Q.   And what measures, if any, are in place to determine
 8        whether the time frame between each interval is
 9        acceptable?
10   A.   There are no written standards, that I'm aware of,
11        that would pertain to every health care system.  Each
12        health care system is different.  Again, our goal has
13        been to improve that --
14   Q.   I understand.
15   A.   -- process and decrease our --
16   Q.   So what has been the improvement, beginning in 2016 to
17        present, on the cancer analysis?
18   A.   I'm not sure I'm at liberty to disclose that, since
19        it's a joint research program.
20   Q.   Is it proprietary?
21             MS. VAN THOMME:  Can I make an objection?
22        He did say it's part of the patient safety program.
23        If indeed it is part of what goes to the patient
24        safety organization, that would be privileged under
25        the federal patient safety privilege, I believe.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 94

```
 1              This is the first time I'm learning this,
 2         so, you know, my knowledge of exactly if that applies
 3         or how it applies is limited at this time, but ...
 4    BY MS. STAMLER:
 5    Q.   Is it your understanding, Doctor, that this
 6         information that's being kept, this data that's being
 7         assembled, based upon what you've testified to, is
 8         privileged in some fashion?
 9    A.   Yes.  It's part of our patient safety program.
10    Q.   So you're, I assume, following counsel's direction not
11         to answer?  She hasn't really told you not to answer.
12              MS. STAMLER:  But I assume that's your
13         direction?
14              MS. VAN THOMME:  Yes.
15              MS. STAMLER:  Why don't you put it on the
16         record so we can just get ...
17              MS. VAN THOMME:  I'm directing you not to
18         provide specific information that is part of the
19         patient safety program.  You can speak generally about
20         the types of data and the goals of it, but not the
21         specific findings.
22    BY MS. STAMLER:
23    Q.   Are you following your counsel's directive?
24    A.   Yes, I am.
25    Q.   Understanding that you cannot give me the specifics of
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 95

```
 1        what has been determined thus far in this patient
 2        safety program, your testimony is that there has been
 3        improvement, is that correct?
 4   A.   Yes.
 5   Q.   And I assume that's specifically with regard to the
 6        cancer timelines, that is, from suspicion to
 7        treatment, correct?
 8   A.   Yes.
 9   Q.   I'm going back to Exhibit 1.  The next item contained
10        on this exhibit is the "Reason for Visit."  What
11        training with regard to charting relates to reason for
12        visit?
13   A.   Usually the reason for visit is initiated by the
14        nurse.  There are what we call routine nursing
15        referrals and urgent nursing referrals.  The nurses
16        have their own practice, basically their own callout,
17        so they'll be seeing patients, triaging patients, and
18        then they'll advise the scheduler that an inmate needs
19        an appointment and they'll give them the reason for
20        the appointment.
21             The other possibility is if the patient is
22        in a chronic care clinic, then the provider seeing
23        that patient for that chronic care clinic will make
24        the next appointment by placing it into the EMR, and
25        then the scheduler will take it from there.  So the
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1          reason for that subsequent visit would be stated by

 2          the provider.

 3     Q.   So it would appear, for example, for a person with

 4          hep C, as a chronic care visit, correct?

 5     A.   Correct.

 6     Q.   There was nothing in terms of the training Corizon

 7          provided to its medical providers that would preclude

 8          a patient coming for a chronic care visit to be seen

 9          for any other problems, correct?

10     A.   There are specific chronic care clinic visits, types,

11          such as cardiac, or hepatitis C, or asthma, for

12          example, pulmonary.  But the provider always has the

13          option to see patients back at their discretion.

14     Q.   Right.  But during the chronic care visit, isn't a

15          physical performed?

16     A.   Yes.

17     Q.   So if the provider finds something during the course

18          of that visit, he or she can provide medical treatment

19          for that condition that may be outside the chronic

20          care condition, correct?

21     A.   Correct.

22     Q.   "History of Present Illness," I assume that would

23          vary, depending upon what the visit was for.  If the

24          person was there for a chronic care visit, then it

25          would be that illness that he or she was there on the
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 97

```
 1          chronic care visit for, correct?
 2   A.     Yes.
 3   Q.     It might be expanded if there's another issue that
 4          surfaces during that visit, correct?
 5   A.     Yes.
 6   Q.     What charting, direction, or training is provided to
 7          physicians as they're onboarding with Corizon on this
 8          topic?
 9   A.     We ask them to see the patients and complete their
10          chronic care clinic visit.  Often there are other
11          complaints that the inmate wants to discuss.  Those
12          can be deferred to a subsequent visit.
13                 If the provider feels they're urgent, of
14          course, they will deal with them that day.  But
15          because they're there for a half-hour-long chronic
16          care clinic visit, some of those requests may be
17          deferred to another appointment.
18   Q.     "Review of Systems," what does that pertain to?
19   A.     So if you're seeing a patient, for example, for a
20          pulmonary chronic care clinic visit, part of your
21          review of systems would be, you know, to determine how
22          often they're using an inhaler, you know, how often
23          they feel short of breath, do they have a cough.
24                 The review of systems, have they had any
25          pulmonary function testing, and often that bridges
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1        with the history of the present illness.  Often the
 2        components are similar.
 3   Q.   What if the individual presented initially on physical
 4        exam with a palpable mass that was two to three
 5        centimeters in size, what would you expect to see with
 6        respect to review of systems on that topic?
 7   A.   Typically, if you find a mass, of course you want to
 8        chart and document that you found that mass and you
 9        estimate its size.  And questions of review of systems
10        that would be pertinent would be, you know, "Were you
11        aware that it was there," for one.  And, quite often,
12        patients may not even be aware of it at the beginning
13        of a mass.
14             And you might ask questions related to what
15        we call the B symptoms of cancer; "Do you have fever,
16        night sweats, chills, cough, weight loss."
17   Q.   Anything else?
18   A.   Yeah, but again, I mean, it really depends on what
19        type of mass and where it's at.  There might be other
20        questions.  But it would, you know, it'd be a good
21        time to update the history of the patient, you know,
22        were they a smoker, what is your family history of
23        cancer, alcohol use, et cetera.
24   Q.   And with regard to charting on something like that,
25        and we're going to get a little more specific in a
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 99

```
 1        minute, you would certainly document what systems were
 2        reviewed in conjunction with a palpable mass, correct?
 3   A.   Correct.
 4   Q.   And you would -- and you, in your position as a
 5        regional medical director, and this is, I assume,
 6        system-wide in Michigan with Corizon, would train
 7        physicians to document that, correct?
 8   A.   Correct.
 9   Q.   And you would document it, in the training process,
10        accurately and completely, correct?
11   A.   Yes.
12   Q.   And you would use the standard accepted medical
13        abbreviations, correct?
14   A.   The MDOC, along with Corizon, has developed a list of
15        acceptable abbreviations, and, yes, we do provide that
16        to our providers.
17   Q.   And do you recollect when that medical abbreviation
18        list was prepared?
19   A.   It was before I was the state medical director.
20   Q.   Okay.  So if I have a document that's dated January 29
21        of 2014, does that --
22   A.   That would be in the time --
23   Q.   -- sound about right?
24   A.   That would be in the time frame.
25   Q.   All right.  Do you recollect as you sit here today,
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

1      and this isn't a memory test, but do you remember if

2      there were any symbols that are considered acceptable

3      medical abbreviations?

4  A.  Yes, there were symbols or letters.  There were

5      letters.

6  Q.  I understand that, but what about symbols such as a

7      pound symbol?  Do you know what that is?

8  A.  I think there were some that had some other

9      characters, but I don't recall which ones.

10 Q.  All right.  I'll give this to you in just a moment, or

11     maybe your attorney knows where her copy is so we can

12     go through a couple of these.

13          Are you familiar with whether or not the

14     use of the symbol of an exclamation mark is acceptable

15     as a medical abbreviation?

16 A.  I don't recall that being one of them.  Again, there's

17     a lot of them in there.

18 Q.  Okay.  What about the use of a question mark?  Is that

19     considered an acceptable medical abbreviation?

20 A.  Not normally, no.

21 Q.  Do you know whether the capital letter L is an

22     acceptable medical abbreviation?

23 A.  It could be one of our -- it could be one of the

24     choices that we agreed on.  I can't recall.

25 Q.  And if I were to tell you that the capital letter L

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 101

```
 1        stands for "liter," does that sound correct?
 2   A.   Yes, that would be a typical use of the letter L.
 3   Q.   Do you know what, if anything, is an acceptable
 4        abbreviation, a medical abbreviation for the word
 5        "lower"?
 6   A.   The word lower ...
 7                  I can't recall.
 8   Q.   Do you know if there's an acceptable medical
 9        abbreviation for the word "upper"?
10   A.   In terms of anatomical regions, yeah, there's
11        anterior -- anterior, posterior, and inferior are the
12        typical words.
13   Q.   So anterior would be synonymous with upper?
14   A.   Usually, yeah.
15   Q.   And posterior would mean lower?
16   A.   No, that would be distal.
17   Q.   Okay, distal.  You used the words anterior and
18        posterior, so I was just checking.
19   A.   Yeah.
20   Q.   But I'm asking for an abbreviation.
21   A.   I can't recall what we agreed on.
22   Q.   Okay.  Do you know how size of something is
23        documented?  Is it typically done in inches or
24        centimeters or meters, do you know?
25   A.   Typically in centimeters.
```



JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 102

```
 1    Q.    And would the appropriate abbreviation be CM?

 2    A.    Yes.

 3    Q.    All right.  We'll see if we can find that document on

 4          a break so we can -- I want to actually go through it

 5          with you, but I just wanted to see what you could

 6          recall.

 7                    With respect to the physical examination

 8          that's listed in Exhibit 1 to your deposition, what

 9          instruction or training did you provide -- does

10          Corizon provide to the medical provider on physical

11          exam?

12    A.    Again, we review examples of good charting and talk

13          about typical elements that are required.  It would be

14          pertinent to your chronic care clinic visit and your

15          review of systems.  And so, for example, if I was

16          seeing a patient in the cardiac chronic care clinic,

17          as part of their physical exam I'd want to have

18          included was there any jugular venous distention of

19          the neck, were there any bruits in the neck, heart

20          sounds, lung sounds.

21    Q.    Let's talk about what you'd want to do if it was a

22          cancer patient.

23    A.    Well, if I'm seeing a patient that I know has cancer,

24          being followed for a cancer, part of that exam would

25          be, of course, their vital signs, their weight.  Their
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1          weight is a critical vital sign when you're treating a

 2          patient with cancer.

 3                    And then you would ask about their

 4          activities of daily living, and also, as we said

 5          earlier, we talked about the B symptoms; are you

 6          having night sweats, chills?  How's your appetite?

 7          You look and see if they're losing weight and, of

 8          course, their body mass index.

 9   Q.     Anything else?

10   A.     All of those could be part of it.  I mean, the review

11          of systems could be quite extensive.  It really has to

12          be pertinent to the visit type.

13   Q.     I was actually asking about the physical exam.  You've

14          gone back to review of systems.  So can we focus on

15          the physical exam?

16   A.     Sure.  So you would be listening, you know -- we

17          encourage all our providers to always do heart and

18          lungs, as well if you have a patient with cancer, part

19          of that exam could include checking for

20          lymphadenopathy, you know, swollen glands in the neck

21          and even in the groin, if necessary.  You would be

22          reviewing their labs to make sure their labs were up

23          to date, have they had a CBC as part of their exam, to

24          see if they're becoming anemic.  These patients are

25          also followed in our oncology program by our oncology
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 104

```
 1        nurse, so ...

 2   Q.   Is that a current program?

 3   A.   Yes.

 4   Q.   When did that start?

 5   A.   CHOICES has been in existence with oncology,

 6        partnering together to care for our patients with

 7        cancer since, I want to say 2013.

 8   Q.   Are you guessing or do you know?

 9   A.   I'm guessing, because I didn't start the programs.  I

10        have since expanded the programs, but I don't recall

11        the start date.

12   Q.   I've never heard of the program, but what's it called?

13   A.   We have two programs that follow patients with cancer.

14        If they are your typical end-stage patient, they would

15        typically be in hospice in the community.

16   Q.   Okay.

17   A.   We have what's called CHOICES II for that patient.  We

18        have a number of programs, including a helper program,

19        a dog helper program for those patients.

20             But we also have CHOICES I, which is for

21        patients with chronic debilitating illness.  These are

22        not patients that, you know, are expected to die in

23        six months like we see with hospice, but they do have

24        a chronic, debilitative illness, and they're followed

25        on a registry by central case management, as well as
```



 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 105

```
 1       on-site to ensure their needs are being met.  If they
 2       are currently being actively treated for cancer or in
 3       cancer surveillance, they would also be on our
 4       oncology registry for which we have a dedicated
 5       oncology nurse, RN.
 6   Q.  And who is that?
 7   A.  That, right now, is Pamela Duncan, RN.
 8   Q.  Who was that back in 2012?
 9   A.  That was RN Duckworth, D-U-C-K-W-O-R-T-H.
10   Q.  And who ran the CHOICES I program in 2012?
11   A.  We had Brenda, I want to say her name is Brenda Jones.
12       Again, this is before I was the director.
13   Q.  You're not sure?
14   A.  We had also --
15   Q.  Do you know when the registry started?
16   A.  Yeah, I'm pretty sure that we had -- I know we had it
17       in 2014.
18   Q.  Before or after Keith Franklin died?
19   A.  I'm sorry, I don't know when that was.
20   Q.  June 29 or June 30.
21   A.  Of?
22   Q.  2014.
23   A.  I'm pretty sure we had the oncology registry then.
24   Q.  What about CHOICES I?
25   A.  Yes.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 106

```
 1   Q.   It was in effect when?

 2   A.   We would have had that, as well, at that time.

 3   Q.   Did you --

 4   A.   Both programs.

 5   Q.   Did you see the inmates' names on those rosters, if

 6        you will, the registry or CHOICES I?  Is that

 7        something you would have seen routinely?

 8   A.   Not when I was the northern regional medical director,

 9        but I do now and I encourage all of our MDs to be up

10        to date on those registries.

11   Q.   If a patient -- if an inmate had been placed on the

12        oncology registry or the CHOICES I program, would that

13        be reflected in his medical record?

14   A.   If he was in CHOICES, that would be in the -- there

15        would be a note in the medical record.

16   Q.   And that would be part of the electronic medical

17        record?

18   A.   Yes.  There are notes from the CHOICES nurses now in

19        the medical record.  I can't say what they were using

20        at the time of Mr. Franklin's death.  I know they had

21        a separate Excel spreadsheet registry for all patients

22        with cancer.

23   Q.   And where was that kept?

24   A.   That was kept in the Corizon office.

25   Q.   Okay.  Not as part of the medical record for the
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 107

```
 1        inmate, correct?

 2   A.   No.

 3   Q.   I mean, how would I, if I wanted to determine whether

 4        Mr. Franklin was on either the oncology registry or

 5        CHOICES I, determine that from his medical record?

 6        Would I be able to locate that information?

 7   A.   If he were in CHOICES, yes.

 8   Q.   Yeah?  How would it be documented?

 9   A.   There would be a CHOICES note from the CHOICES nurse.

10   Q.   And it's actually called a CHOICES note?

11   A.   I can't recall a specific -- yeah, because each entry

12        has to be specific, and I'm not exactly sure what she

13        titles hers.

14   Q.   Well, what have you seen them titled?

15   A.   It would be a CHOICES addendum-type note.

16   Q.   And if that is not a part of the medical record, would

17        it be fair to conclude that he wasn't placed in

18        CHOICES I?

19   A.   No, again, because the entries back in the beginning

20        of the program were not as comprehensive as they are

21        today.

22   Q.   So the medical record may not be complete or accurate?

23   A.   It may not reflect --

24              MS. VAN THOMME:  Object to form.

25              THE WITNESS:  Sorry.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 108

```
 1   BY MS. STAMLER:

 2   Q.   Go ahead.  It may not reflect what?

 3   A.   It may not reflect at that time a patient was in

 4        CHOICES.

 5   Q.   And what's the point of being in CHOICES I?

 6   A.   CHOICES I and II are integrated care and hospice care,

 7        in my opinion, in its purest form; one, because we are

 8        the patient-centered home, and as part of this program

 9        they receive comprehensive care in terms of their

10        medical needs, their physical needs, their mental

11        health needs by seeing behavioral health, and also

12        their spiritual health by having resource with the

13        chaplains, as well as special helper programs such as

14        the dog helper program, the hospice helper program

15        where inmates are trained to help provide bedside

16        vigils.

17                  It's a very comprehensive plan.  The intent

18        was to ensure that these inmates are having their

19        needs met for their chronic debilitating or terminal

20        illnesses.

21   Q.   And where would that plan be kept if it's not in the

22        electronic medical record?

23   A.   Yeah, it is now part of the record, but there's --

24   Q.   I understand that.  Back in 2012 to '14, where was it

25        kept?
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 109

```
 1   A.   Yes, each patient -- well, first of all, there is a

 2        CHOICES program manual, and then there are forms that

 3        would be filled out, paper forms that would be filled

 4        out that would be tracked by the CHOICES nurse.

 5   Q.   My question isn't what are the forms and how they're

 6        tracked.  Where were those records kept from August

 7        2012 to June 30, 2014?

 8   A.   By the CHOICES nurse, the CHOICES nurse coordinator.

 9        We would have actual physical forms kept in our

10        office.

11   Q.   In Corizon?

12   A.   Yes.

13   Q.   But not part of the patient's medical record?

14             MS. VAN THOMME:  Object to the form and

15        foundation.

16   A.   It may have been part of the paper chart.  There may

17        have been a form inserted in the paper chart, but it

18        was not scanned or placed in the EMR.

19   BY MS. STAMLER:

20   Q.   You're saying a paper may have been placed into the

21        prisoner's paper chart?

22   A.   Yes.

23   Q.   What kind of paper?

24   A.   It's the CHOICES forms from our CHOICES manual.

25   Q.   And if that was not part of the medical record that's
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 110

```
 1          been produced in this case, would it be fair to assume

 2          that if there's no CHOICES I or CHOICES II

 3          documentation in Mr. Franklin's medical record, he was

 4          not receiving CHOICES I or CHOICES II during 2012

 5          through his date of death?

 6     A.   No, I can't say that, because our records were not

 7          part of the EMR at that time in all cases.

 8     Q.   I'm not asking about the electronic medical record.

 9          I'm asking about a paper chart.  All the documentation

10          that exists for Mr. Franklin's medical treatment, both

11          the EMR and paper records, have been produced.

12                 If that document is not in there reflecting

13          CHOICES I, CHOICES II, any notes from a CHOICES nurse,

14          CHOICES I nurse or CHOICES II nurse, can we conclude

15          that Mr. Franklin was not receiving those services?

16     A.   No.

17     Q.   So that means the medical record may not be complete,

18          correct?

19     A.   In terms of having CHOICES documentation, correct.

20     Q.   Correct.  Or with regard to the oncology registry,

21          that wouldn't be a part of his medical record, either,

22          correct?

23     A.   His oncologic care would be a part of the EMR.

24     Q.   But the fact he's been placed on some sort of registry

25          where he was getting heightened attention, that was
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1          not made part of his medical record?
 2     A.   Correct.
 3     Q.   Can you tell me why?
 4     A.   It was a centralized registry to assist with tracking
 5          the patient.  There's really no place in that version
 6          of the EMR to designate an alert of that patient.
 7          It's very difficult, I understand, to add anything to
 8          the EMR.  The version that was purchased, there was
 9          limitations.  We have been working to upgrade the
10          version.  I'm not sure that there really is a good
11          vehicle to contain those types of spreadsheets in the
12          EMR.
13     Q.   Well, what about a hard copy?  What would prevent a
14          hard copy from being placed in the patient's medical
15          record?
16     A.   That would -- well, it has, the registry has all of
17          the patients on it.
18     Q.   Well, it's feasible to, on an Excel spreadsheet, limit
19          what you print out, correct?
20     A.   Yeah, that could be done.  A paper, a paper copy could
21          be inserted into the paper chart.
22     Q.   Incidentally, with regard to the NextGen system, is it
23          correct to say that there's a limitation on how much a
24          provider can write in in terms of notes of his
25          findings?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1   A.   There is a word limit for each box.  I don't know what
 2        that limit is.
 3   Q.   Is there a way to expand upon an entry if you're out
 4        of space in the box?
 5   A.   Oh, certainly you could add an additional note, an
 6        addendum note.
 7   Q.   And how is that done?
 8   A.   You literally create an addendum note.  It's called an
 9        addendum note.
10   Q.   And that's part of the training that the providers
11        receive during onboarding?
12   A.   Yes.
13   Q.   So if a provider were to have testified in the course
14        of this litigation that he had space limitations and
15        couldn't put everything into his note, he would have
16        been capable of and had access to creating an addendum
17        to a medical record, correct?
18   A.   I can't speak for that provider, but we -- and not all
19        providers may remember or know how to do it.  I mean,
20        people do forget.  But we do train them in terms of
21        having the ability to add an addendum note.
22   Q.   Well, as part of that training do you test them at the
23        end of it, to know whether they figured out that they
24        can put an addendum into a medical record?
25   A.   That's not part of the actual -- there are tests in
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 113

```
 1        the onboarding materials, but that is not one of the

 2        tests.

 3   Q.   Would you agree with me, if you don't put an addendum

 4        in and you omit key facts from a medical chart, that

 5        that may create an incomplete medical record?

 6   A.   Personally, I would add another note.  You could do

 7        that, as well --

 8   Q.   Right.

 9   A.   -- add a second note.  I've not often had encountered

10        an example like that, but, yes, there are, to answer

11        your question, there are ways to add more notes.

12                    MR. STAMLER:  Can we take just a

13        couple-minute break?

14                    (Off the record at 1:24 p.m.)

15                    (Back on the record at 1:34 p.m.)

16   BY MS. STAMLER:

17   Q.   We left off, Dr. Bomber, on Exhibit 1 and we were

18        talking about the physical exam and charting.  The

19        next item on Exhibit 1 is "Assessment."  What training

20        does Corizon provide with regard to charting

21        assessment?

22   A.   During the review, during the training, we -- again,

23        the answer is similar.  We review examples of good

24        charting and show our new employees examples of

25        complete charts, which each system should agree.  So
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1        if you have a patient who has an HPI for a cough, then
 2        there should be a pulmonary or HENT review of systems
 3        and then a corresponding exam, you know, of the
 4        throat, heart, lungs, and the assessment should concur
 5        with the chief complaint and the exam.
 6              So let's say the assessment is upper
 7        respiratory infection; then there should be the
 8        elements in the record that support that diagnosis.
 9   Q.   All right.  And that training, if I heard your
10        testimony correctly, is done on-site, verbally.
11        There's nothing written?
12   A.   That starts at the regional office, during their
13        initial onboarding training with the regional medical
14        director.
15   Q.   And so there is something in writing with regard to
16        charting assessment?
17   A.   No, only the documents that specify the elements that
18        need to be in the record.
19   Q.   Okay.  And that is what's contained in Exhibit 1, is
20        that right?
21   A.   Correct.
22   Q.   And then with respect to how it's done, that's
23        basically on-site, showing the clinician examples of
24        good charting, is that right?
25   A.   We start with that, at the regional office during
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

                                                    Page 115

```
 1          their first day of training, and then it continues

 2          on-site.

 3   Q.     Right.  And how much time is devoted in the course of

 4          the training, both at the regional location and then

 5          on-site, to proper charting?

 6   A.     Initially, for the first day of onboarding, it would

 7          be at least two hours of training on the EMR and then

 8          charting.

 9   Q.     Let me break that down before you go on.

10   A.     Okay.

11   Q.     Two hours on the EMR, how much of the time of the two

12          hours is devoted to proper charting?

13   A.     The chart reviews in proper charting, at least one

14          hour.

15   Q.     And that's basically going over what's in Exhibit 1?

16   A.     And examples of actual e-charts in the EMR.  We

17          actually bring the EMR up and we go through examples

18          of good charting.

19   Q.     So what examples are used?  Are they actual prison

20          charts?

21   A.     Yes.

22   Q.     Okay.  And who makes the determination that the charts

23          that are being used as examples of good charting, who

24          does that, who makes that determination?

25   A.     Whomever the regional medical director is that's doing
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 116

```
 1        the training that day.
 2   Q.   Okay.  So when it was you, you would have been the one
 3        selecting the charts?
 4   A.   Yes.
 5   Q.   And how did you do that?  Was that random, or did you
 6        actually ask somebody to find good examples for you?
 7   A.   It was random, but we would -- well, what I would do
 8        is pick some of my better providers and I would look
 9        at their charts.  I knew that I would find examples of
10        good charts, and I do for the most part, but I would
11        pick my best providers.
12   Q.   And fair to say that none of those providers that you
13        would have selected are any of the defendants in this
14        case, because they were not in your region, correct?
15   A.   Correct.
16   Q.   Did you ever look at any of the charting that any of
17        the named defendants, that is, Dr. Holmes, Dr. Carrel,
18        or Dr. Bhavsar, authored?  Did you ever look at their
19        charting?
20   A.   I cannot recall, specifically, but again, in the
21        beginning -- I want to be clear that as the regional
22        medical director in the north and currently, I do
23        review literally thousands of records.
24   Q.   I understand.
25   A.   It's possible that I have looked at theirs.  I don't
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 117

```
 1        recall specifically going to look at theirs in recent
 2        times for any reason.
 3   Q.   Okay.  And it's fair to say you haven't done any sort
 4        of record review in conjunction with this lawsuit, is
 5        that correct?
 6   A.   Correct.
 7   Q.   And it's fair to say you're not here to render an
 8        expert opinion in any fashion in this case, is that
 9        right?
10   A.   Other than to comment on what we delineated in the
11        beginning, no.  My understanding is I'm not to comment
12        on the specifics of this case.  I am not prepared to
13        do so.
14   Q.   Okay.  And it's fair to say that you're not prepared
15        to do so, in part, because you've not been called upon
16        to do so and you surely haven't reviewed any of the
17        medical records in this case, correct?
18   A.   Correct.
19   Q.   So you can't, as you sit here today, tell me one way
20        or the other whether the charting that Dr. Bhavsar did
21        in conjunction with his medical care of Keith Franklin
22        met or did not meet Corizon's standards or
23        constitutional standards, correct?
24   A.   I cannot.
25                  MS. VAN THOMME:  Object to form.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 118

```
 1    BY MS. STAMLER:
 2    Q.   And you cannot render an opinion, as you sit here
 3         today, as to whether Dr. Holmes's charting met
 4         Corizon's standards of charting, correct?
 5    A.   I cannot.
 6    Q.   Nor can you render an opinion as to whether his
 7         charting met the Eighth Amendment constitutional
 8         standards, correct?
 9              MS. VAN THOMME:  Object to foundation.
10    BY MS. STAMLER:
11    Q.   Go ahead and answer.
12    A.   I cannot.
13    Q.   Well, there's an objection as to foundation, but you
14         testified earlier -- let me just ask the same
15         questions with regard to Dr. Carrel.
16              Fair to say you can't render an opinion
17         with regard to whether Dr. Carrel's charting met
18         Corizon's standards for charting, correct.
19    A.   I have not seen the records.  I cannot.
20    Q.   And it's fair to say you also cannot render an opinion
21         as to whether Dr. Carrel's charting met Eighth
22         Amendment constitutional standards, correct?
23              MS. VAN THOMME:  Object to foundation.
24    A.   I cannot.
25
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 119

```
 1   BY MS. STAMLER:

 2   Q.   And part of your, part of your training -- and you

 3        testified to this earlier -- through Corizon is the

 4        provision of information to the providers coming on

 5        board pertaining to the Eighth Amendment, correct?

 6   A.   Correct.

 7             MS. STAMLER:  Carly, do you have any idea

 8        where this document might be?  It's entitled "The

 9        Eighth Amendment."

10             MS. VAN THOMME:  You have my binder.

11             MS. STAMLER:  Okay.  I'm going to hold on

12        to this one because I'm not done yet.  Let me close

13        this up so it doesn't get lost.

14             Let's go off the record a minute while she

15        looks.

16             (Off the record at 1:44 p.m.)

17             (Back on the record at 1:46 p.m.)

18             MARKED FOR IDENTIFICATION:

19             DEPOSITION EXHIBIT 2

20             1:46 p.m.

21   BY MS. STAMLER:

22   Q.   While we were off the record you made some statements

23        with regard to other resources that were available to

24        providers with respect to the Eighth Amendment

25        training, is that right?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1   A.   Yes.  We also --

 2   Q.   Well, let me just -- that's correct?  Yes?

 3   A.   Yes.

 4   Q.   Is that in addition to what's been marked Exhibit 2 to

 5        your deposition?

 6   A.   Yes.

 7   Q.   All right.  What are those other resources that

 8        providers were informed about during the course of

 9        onboarding with Corizon?

10   A.   They also have access via the MTrax link to the NCCHC

11        website, which has all the standards for correctional

12        care.  They also have a link --

13   Q.   I'm sorry, let me interrupt you.  NCCHC?

14   A.   Yes, National Commission on Correctional Health Care,

15        and --

16   Q.   Is that a -- I'm sorry, is that a credentialing

17        organization?

18   A.   Yes, it is.

19   Q.   And is, to your knowledge, the MDOC

20        NCCHC-credentialed?

21   A.   No, they are not.

22   Q.   Is Corizon?

23   A.   We have -- you qualify for certification individually,

24        so yes.  For example, I am certified.

25   Q.   I'm sorry, is the credentialing only to the provider
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

1       as opposed to the facility or the entity?

2   A.  No, they do have accreditation.  It's voluntary, yeah.

3   Q.  All right, so I used the wrong term.  Is the MDOC, to

4       your knowledge, accredited under the NCCHC standards?

5   A.  No.

6   Q.  Is Corizon accredited under the NCCHC standards?

7   A.  I think that's done by contract by state.  We are not,

8       obviously, in Michigan, so I can't answer that.

9   Q.  Okay.  So, to your knowledge, Corizon in Michigan

10      doesn't have the NCCHC accreditation, and nor does the

11      MDOC, correct?

12                  MS. VAN THOMME:  Object to form and

13      foundation.

14  A.  Correct.

15  BY MS. STAMLER:

16  Q.  With regard to your personal accreditation, do you

17      know whether Drs. Carrel, Holmes, or Bhavsar have the

18      NCCHC credential?

19  A.  I do not.

20  Q.  Okay.  Is that something that would be important to

21      you in the process of hiring a provider?

22  A.  No.  We encourage them after they're employed.  Most

23      of them have not been in corrections before, this is

24      their first experience, so we do encourage them.  It's

25      not required.  They have links, they have the link to

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1        the website, which is free.

 2   Q.   Do you know, as you sit here today, whether the NCCHC

 3        website, the portion that addresses the Eighth

 4        Amendment, do you know if it's consistent with what's

 5        been marked Exhibit 2 to your deposition?

 6   A.   I would have to go back and read it on the website and

 7        ensure.  It's been a couple years since I've done

 8        that.  I would think it's consistent.

 9   Q.   Do you know who produced or created what's been marked

10        Exhibit 2 to your deposition?

11   A.   This would have been created by Corizon staff.  This

12        was a joint effort from all the different state

13        contracts, as well as the Corizon central office,

14        which ultimately had final authority on what went into

15        these documents.

16   Q.   "These documents."  It's a single page, right?

17   A.   Yes.  As part of the training manual, this would have

18        come -- ultimate authority on this is the Corizon

19        central office.

20   Q.   All right.  Did you, sir, have any input into

21        Exhibit 2?

22   A.   No.

23   Q.   You did read it, though, in the course of your own

24        onboarding, or not?

25   A.   Yes.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1    Q.    And did you also train medical providers as they were

 2          coming on board to Corizon on this topic?

 3    A.    Yes.

 4    Q.    And other than providing Exhibit 2 to each of the new

 5          medical providers to Corizon, what else did you do

 6          with regard to Exhibit 2?

 7    A.    I'm sorry, can you repeat the question?

 8    Q.    Sure.  When you said you trained medical providers on

 9          Exhibit 2, what did you do in the context of your

10          training?

11    A.    We reviewed this document.

12    Q.    And by reviewing it, did you actually read it to them

13          and then discuss it?

14    A.    I did not read it out loud.  Each one was required to

15          read.

16    Q.    And were they required to sign off on some form

17          indicating that they had read this document entitled

18          "The Eighth Amendment"?

19    A.    They do sign off.  There's a checklist that they sign

20          off on that they do attest that they read it.  There's

21          not a specific test for this document.

22    Q.    Have you ever read the Eighth Amendment to the

23          Constitution?

24    A.    I did back when I was doing my NCCHC certification.

25          It was in the training materials, the whole document.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 124

```
 1   Q.   And what do you recollect -- I understand I'm not
 2        asking you verbatim, but what do you understand the
 3        Eighth Amendment provides?
 4   A.   Again, it's to ensure that the incarcerated
 5        individuals have a constitutional right to health
 6        care, to the same quality and standards as that of the
 7        community.  And as a medical provider within the
 8        correctional system, we are compelled to ensure that
 9        they receive that high quality of care.
10   Q.   You understand that the Eighth Amendment has a
11        prohibition against cruel and unusual punishment.  Do
12        you understand that?
13   A.   Yes.
14   Q.   And did you understand during the time that you've
15        been in your various positions with Corizon that being
16        deliberately indifferent to a prisoner's medical needs
17        can result in a violation of a prisoner's Eighth
18        Amendment right under the Constitution?
19   A.   The thought of doing so is so foreign to me that I
20        can't even conceive of practicing medicine that way.
21        But I do understand the law.
22   Q.   Okay.  So I just want to go back to my question.  Can
23        I have the question again?  Because you gave me a lot
24        of information.  I just want to make sure I got your
25        answer, because I think it's an affirmative response.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 125

```
 1                    (The following portion of the record was
 2                    read by the reporter at 1:53 p.m.:
 3                    "Q. And did you understand during the time
 4                    that you've been in your various positions
 5                    with Corizon that being deliberately
 6                    indifferent to a prisoner's medical needs
 7                    can result in a violation of a prisoner's
 8                    Eighth Amendment right under the
 9                    Constitution?")
10    A.    Yes, I understand that.
11    BY MS. STAMLER:
12    Q.    And did you impress upon in the course of your
13          training various medical providers that that is the
14          standard that applies?
15    A.    As part of the training we instruct our providers, in
16          making sure that inmates receive the care that they
17          need, to never practice in terms of cost.  It's always
18          about getting them the care that they need.  We would
19          never stand in the way of them having access to that
20          care.
21    Q.    That wasn't my question, so listen -- I appreciate
22          that you gave me a response, but I want you to answer
23          the question I'm asking you.
24                    During the course of your time when you
25          were training medical providers that were onboarding
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 126

```
 1        to Corizon, did you impress upon them that the
 2        standard that they had to meet was to not be
 3        deliberately indifferent to a prisoner's medical
 4        needs?  Yes or no?
 5   A.   I didn't phrase it exactly as you do.  I will say that
 6        we referred them to the training materials and Eighth
 7        Amendment and to be aware of what it means, but I
 8        didn't use the exact language you did.
 9   Q.   Well, you see in Exhibit 2 that the language of
10        "deliberate indifference" is used, correct?
11   A.   Right.
12   Q.   Did you have discussion with the medical professionals
13        as they were coming on board as to what that meant
14        under the law?
15   A.   I have.
16   Q.   Okay.  And that was part of your training, correct?
17   A.   Yes.
18   Q.   And did you explain to them that by, for example --
19        well, strike that.
20             Did you give any examples of what might
21        constitute deliberate indifference to medical care?
22   A.   No.
23   Q.   Did you ever discuss in the training process of any
24        medical providers or was it contained in any training
25        module through Corizon that a delay in medical care
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 127

```
 1         could constitute deliberate indifference?
 2    A.   As part of the training, we encourage our staff to
 3         ensure that the inmates get the testing they need in a
 4         timely manner.  We always are clear to our providers
 5         not to practice in terms of the way a lawyer would
 6         practice medicine; that our approach to the patient is
 7         to be a proactive advocate for that patient.  I
 8         encourage them not to be constantly thinking about the
 9         possibility of a lawsuit.  That should be secondary to
10         providing good care.
11              So the way that you're wording this is
12         somewhat foreign to me.
13    Q.   I really -- if you can't answer my question, tell me
14         you can't.  I'm going to ask my wonderful court
15         reporter to repeat the question.  I'm going to ask you
16         to listen to it carefully and see if you can answer
17         it, and if you can't, tell me you can't.
18              (The following portion of the record was
19              read by the reporter at 1:56 p.m.:
20              "Q. Did you ever discuss in the training
21              process of any medical providers or was it
22              contained in any training module through
23              Corizon that a delay in medical care could
24              constitute deliberate indifference?")
25    A.   Yes.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 128

```
 1    BY MS. STAMLER:
 2    Q.   Did you also -- and by "you," I mean you or the
 3         Corizon training materials -- ever advise incoming
 4         medical professionals that a delay in diagnosing a
 5         medical condition could constitute deliberate
 6         indifference?
 7    A.   I have.
 8    Q.   Did you ever train your medical professionals -- and
 9         by "you," I mean you and Corizon and its training
10         materials -- that failure to properly chart a medical
11         condition could constitute deliberate indifference?
12    A.   I'm not sure I phrased it exactly like that.
13         Certainly we reviewed good and high-quality charting,
14         and the reasons for it are to ensure a high quality of
15         care.  I never like threatened them as part of their
16         training, saying, "If you don't do this, you're going
17         to be sued because you're deliberately indifferent."
18         We approach it from the standpoint of, "You need to do
19         this because it's important for good patient care."
20              Have we discussed cases where there, you
21         know, where there were opportunities for improvement,
22         where there may have been errors?  Yes, I have.  But
23         again, I never phrased it that way.
24              So I would have to answer, I can't answer
25         the question that way.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 129

```
 1    Q.    So it would be fair to say you didn't train -- let me

 2          just, let me make sure.

 3                 If you never phrased it that way and didn't

 4          raise it in the context of an Eighth Amendment

 5          protection or potential violation with respect to

 6          charting, it would be fair to say, sir, that during

 7          the course of your training, either on-site or through

 8          the Corizon training materials, onboarding medical

 9          professionals were not told that failure to properly

10          chart a patient's medical record could constitute

11          deliberate indifference to the medical needs of the

12          patient, is that correct?

13                 MS. VAN THOMME:  Object to form.

14    A.    I can't say I always used the term deliberately

15          indifferent.  I would certainly say, you know, at the

16          risk of malpractice or legal ramifications,

17          medical-legal reasons, I may not have always used the

18          term deliberately indifferent.  I can't say that I've

19          always used that term.

20                 Have I used that term as part of the

21          training?  Yes, we've discussed that.  But I can't say

22          I always a hundred percent of the time used that term.

23    BY MS. STAMLER:

24    Q.    I understand that you may not have always used that

25          term.  I want to know, did you use the term, either
```



JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1        the term deliberately indifferent or that a violation
 2        of the Eighth Amendment rights could occur if proper
 3        charting was not done in a prisoner's medical record?
 4   A.   Yes.
 5   Q.   In the case that you testified to earlier in your
 6        deposition, where you were a deponent back -- I don't
 7        recall.  Do you remember when the Warren V Bomber case
 8        was brought?
 9   A.   I don't remember the year.
10   Q.   Do you remember when you testified at your deposition?
11   A.   I don't remember the exact time of year.
12   Q.   Do you know, sir, whether you were accused of
13        violating the prisoner's Eighth Amendment rights?
14   A.   Yes.
15   Q.   What was the underlying claim in that case?  What was
16        the medical condition that was being addressed in that
17        case?
18   A.   I'm not sure I'm at liberty to discuss that.
19   Q.   The pleadings are a matter of public record --
20   A.   Okay.
21   Q.   -- The complaint is.
22             MS. VAN THOMME:  It's okay to answer that.
23   BY MS. STAMLER:
24   Q.   You can't tell me what the case settled for.  I
25        understand there's a confidential settlement
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 131

```
 1        agreement.

 2   A.   All right.

 3   Q.   But the claims that were charged or brought against

 4        you, what did you -- what do you recall those were?

 5   A.   Yeah, it was for failure to provide appropriate

 6        cardiac care in a timely fashion.

 7   Q.   Did the prisoner die?

 8   A.   Yes.

 9   Q.   And were you a responsible physician in regard to

10        completing 407s in that case?

11   A.   Yes.

12   Q.   So this would have been at a point in time when you

13        were giving direct patient care.  Is that correct?

14   A.   Yes.

15   Q.   Was there some concern, sir, at least in terms of the

16        allegation, that you had not filed a form, a 407 form

17        in an urgent fashion?

18   A.   No.  I actually did file the form in the proper

19        fashion.

20   Q.   Was it alleged that the failure to give appropriate

21        cardiac care caused, in a timely fashion caused

22        Mr. Warren's death?

23   A.   It was.

24   Q.   Do you remember who represented the plaintiff in that

25        case?
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 132

```
 1   A.   Yes.  Rebecca Walsh.

 2   Q.   Was that case filed in the federal court in the

 3        northern district, if you remember?

 4   A.   I believe it was actually filed in Grand Rapids, in

 5        the Grand Rapids district.

 6   Q.   In the western district?

 7   A.   Yeah.

 8   Q.   Okay.  I just want to finish off with Exhibit 1.

 9        There's some other items here, "Medication Process;

10        Plan - Instructions, Education, Diet, Lab, X-ray,

11        Orders; Special Accommodations/Medical Detail;

12        Allergies/Immunizations/Past Medical History; Routine,

13        Urgent, Emergent Encounter.

14             You remember those were all items in the

15        orientation checklist for medical providers, correct?

16   A.   Correct.

17   Q.   With regard to charting those items, would your

18        testimony be the same as to those topics, and that is

19        to say that there was basically on-site training on

20        those topics, on how to use the NextGen system and

21        putting this information into the chart?

22   A.   Yes.

23   Q.   All right.  With regard to the section on routine,

24        urgent, and emergent encounter, is there a place in

25        the NextGen system for charts to record whether the
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 133

```
 1        visit was routine, urgent, or emergent?
 2   A.   Yes, the reason for the visit.  At the top drop-down
 3        menu, there's a selection for if it was a chronic care
 4        clinic, provider visit, nursing referral.  There are
 5        different categories.
 6   Q.   And they're categories that basically have a drop-down
 7        box for routine, urgent, or emergent encounter?
 8   A.   When the referral is made to the provider, there's a
 9        nursing note, where they would specify whether this
10        was routine or urgent.  I don't believe we're using
11        any drop-down boxes.
12   Q.   Okay.  So this was a training document for medical
13        providers.  Did that include nurses?
14   A.   No, we don't -- the nurses are MDOC employees.
15   Q.   So why would -- can you explain to me on Exhibit 1 why
16        the section routine, urgent, and emergent encounter
17        would be on there as part of a training module if they
18        weren't using that?
19   A.   No, they would be -- they need to be aware.  In fact,
20        there are guidelines for nursing referrals.  So, yes,
21        they need to be aware of what each type of nursing
22        referral means.
23   Q.   Okay.  But that's not anything that the medical
24        provider would be charting, correct?
25   A.   No.  They would chart from the provider visit, and
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 134

```
 1          they would indicate whether or not it was a provider
 2          visit routine -- or there's a designation for chronic
 3          care and routine.  I forget what the other -- there
 4          are a couple other categories.
 5     Q.   Right.  But there's nothing in the medical provider's
 6          charting in the NextGen system which would have a
 7          drop-down box for routine, urgent, or emergent, is
 8          that correct?
 9     A.   I don't recall.
10     Q.   All right.  And then there's a second section on
11          Exhibit 1 that says "Quality Improvement/Assurance -
12          QI.  What to do if you receive a lawsuit."
13                   What training was provided to the medical
14          providers on this topic through Corizon?
15     A.   The training is very simple and straightforward.  If
16          they receive a request for information from an
17          attorney, from a family, et cetera, that they're to
18          contact our patient safety nurse, who is Karen Mason,
19          and then Karen Mason works with our attorneys.
20     Q.   That's a request for information.  Is that the same,
21          from your understanding, as receiving a lawsuit?
22     A.   Yeah, all of the above.  If they receive anything to
23          do with a possible lawsuit, then they are advised to
24          contact the patient safety nurse.
25     Q.   If that goes in to the patient safety nurse, that
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1        becomes privileged, correct?
 2                   MS. VAN THOMME:  Object to form and
 3        foundation.
 4   BY MS. STAMLER:
 5   Q.   If you know.
 6   A.   I'm not sure.  I would assume yes, because it involves
 7        our -- once it involves our attorneys, that it's
 8        privileged at that point.
 9   Q.   Well, I thought once it went to the patient safety
10        program.  Is that separate from the patient safety
11        nurse?
12   A.   She's part of our patient safety program.  So the way
13        I understand the law is, yes, once it's in our patient
14        safety program, then it's privileged.
15   Q.   Okay.  And without getting into what happened, I
16        assume that's the procedure you followed when you were
17        served with or became aware of the lawsuit against
18        you, is that right?
19   A.   Correct.
20   Q.   What about "Submitting Peer Review/Credentialing,"
21        what's that?
22   A.   Yes, the peer reviews I mentioned earlier for our
23        mid-level providers, we're required to have ten charts
24        reviewed per month.  That's usually the site
25        supervising physician, per routine.  And then each
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 136

```
 1          provider has ten charts reviewed every year by the
 2          regional medical director.
 3     Q.   Okay.  And what's the credentialing side?
 4     A.   We have a credentialing department that ensures that
 5          every provider is up to date in terms of their
 6          licensing, basic life support, their drug control
 7          license, their DEA license.
 8     Q.   Okay.  And then what's "Submitting Mid-Level Review"?
 9     A.   That's the same as I mentioned earlier, with the ten
10          charts per month for all mid-levels.
11     Q.   Okay.  So, as I understand it, the mid-levels are
12          reviewed by the medical provider, the site medical
13          provider within a facility, and the medical providers'
14          charts, that is, the physicians' charts, are reviewed
15          by the regional medical director.  Is that correct?
16     A.   Correct.  In the event of an absence, then the
17          regional medical director would assume the role of
18          doing the mid-level reviews.
19     Q.   It's my understanding that you have familiarity with
20          the contract that is in place between the State of
21          Michigan and Corizon, is that correct?
22     A.   I am familiar with the contract, yes.
23     Q.   And by "familiar," are there certain elements of the
24          contract you're familiar with?
25     A.   I have read through the entire document at one point.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

1   Q.   When was that?

2   A.   Oh, gosh, since that's the old -- we're under the new

3        contract now.  We've been under the new contract for

4        two-plus years.  So the last time I read that would

5        have been in 2013, '14, somewhere in there.

6   Q.   I know it's probably an impossible task, but do you

7        have any notion of what the changes were between the

8        old contract, which I have here today, and the current

9        contract?

10   A.   Yes.

11   Q.   What were the changes?

12   A.   The major changes deal with implementing integrated

13        care in the four-quadrant model for health care.

14   Q.   And you talked about the integrated care topic earlier

15        in your testimony.  Is that what you're referring to?

16   A.   Yes.

17   Q.   What was the four-quadrant -- what was the term you

18        used?

19   A.   Yes, the four-quadrant model for health care is a way

20        of stratifying patients into risk groups.  So

21        quadrant 1 would be a patient who's very healthy and

22        has no medical or mental health diagnoses.  Quadrant 2

23        is a patient with mental health diagnoses and under

24        treatment but no physical health diagnoses.

25        Quadrant 3 is a patient with physical health diagnoses

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 138

```
 1        but no significant mental health.  And a quadrant 4

 2        patient is a patient who has needs both from a mental

 3        health standpoint as well as physical health.

 4   Q.   Those are the ones you're targeting with the training

 5        on some of the psychiatric topics so that the PCP can

 6        provide certain services that may not require a

 7        psychiatrist, is that right?

 8   A.   That's part of it.  It's a much broader program than

 9        just that alone, but that's part of it.

10   Q.   Right, Okay.  And the integrated care and the

11        four-quadrant system that you've just detailed are new

12        under the current contract, is that right?

13   A.   Correct.

14   Q.   And I understand there may be some other changes, but

15        those are the two big ones that you can recall, as you

16        sit here today?

17   A.   That, and using the most sophisticated

18        clinical/analytical tools that are now available.  We

19        have partnered with Optum Corporation to implement the

20        use of Impact Pro®, which is the world's most

21        sophisticated clinical/analytical tool.  I don't know

22        if you want me to expand on that.

23   Q.   No, because it didn't apply when my client was

24        incarcerated, so thank you, but no thanks.  That's

25        beyond what we need today, but thank you for the
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 139

```
 1        offer.
 2              What portions of -- I understand you read
 3        the whole contract, possibly as recently as 2014.
 4        Were there specific components of the old contract
 5        that you in your position as the regional medical
 6        director would have been familiar with or responsible
 7        for complying with?
 8   A.   Well, we had to comply with whatever was in the
 9        contract.  There wasn't anything specific to the
10        northern region, per se.  We were advised to read the
11        contract and be familiar with it, and ensure that we
12        were delivering what we promised.
13   Q.   And did you focus on anything specific in the context
14        of your regional medical director work, or did you
15        look at the entire contract and determine that you
16        needed to know all of it and comply with all of it?
17   A.   There were times where I did refer to it for specific
18        information.
19   Q.   All right.  I'm going to hand you -- we're going to
20        mark this as 3.
21                   MARKED FOR IDENTIFICATION:
22                   DEPOSITION EXHIBIT 3
23                   2:12 p.m.
24   BY MS. STAMLER:
25   Q.   I'm going to represent on the record that that was not
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1         produced by your lawyer, but by the Department of

 2         Corrections -- well, by Dr. Heyns's lawyers.  There

 3         are a number of change notices at the beginning, but

 4         if you could go back, you know, several pages into

 5         this document, you will find an index, and it starts

 6         at MDOC number, which you'll find in the lower

 7         right-hand side of the document, 0947.

 8                   Are you there?  It's a table of contents.

 9    A.   I'm at the table of contents.

10    Q.   All right.  Can you do me the favor of looking through

11         the table of contents and identifying for me, if you

12         would, which items that you were focused on in the

13         context of your regional medical director work back in

14         2012 to '14?

15    A.   Okay.  I reviewed the section 2.080 regarding the

16         State responsibilities, so I was clear on what the

17         State needed to provide.

18    Q.   In that section, what the State was responsible for

19         was equipment and facilities, correct?

20    A.   Correct, and nursing.

21    Q.   And schedulers, right?

22    A.   Scheduling, yes.

23    Q.   Okay.

24    A.   Okay.  I would also have reviewed the claims

25         processing process, Appendix E.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

1    Q.    Okay.  Anything else?

2    A.    Let me go back, if I could, from the beginning.

3    Q.    Sure.

4    A.    I would have reviewed 1.020, the scope of work.

5    Q.    1.020, scope of work.

6    A.    Right.

7    Q.    Okay.

8    A.    And 1.030, roles and responsibilities.  Again, I read

9          the whole thing, but these are ones I recall

10         specifically going back and looking at.

11                    2.060, if I haven't already said that.

12   Q.    Which is?

13   A.    Contract management.

14   Q.    And what about contract management were you reviewing?

15   A.    Personnel qualifications, key personnel.

16   Q.    So that would have been 2.061 and 2.062, correct?

17   A.    Yes.  I also recall looking at Appendix C, contractor

18         quality assurance plan, and then Appendix D,

19         utilization management program.  Those are the main

20         ones.

21   Q.    Okay, thank you for identifying those.

22                    Now, I want to go back and just take a look

23         at some of those, if we can.  We've already talked

24         about 2.080.  So now Appendix E you referenced, the

25         claims processing process, is that right?

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 142

```
 1   A.   Yes.

 2   Q.   Can you turn your exhibit to Appendix E, please?  It's

 3        going to be very close to the end of the document.

 4   A.   Okay, thank you.

 5   Q.   I will tell you right now it's at MDOC_1060.

 6   A.   Okay, I'm on Appendix E.  You also said page 116 on

 7        the bottom, is that correct?

 8   Q.   Yes, that is.

 9   A.   Okay.

10   Q.   And what precisely were you looking at with regard to

11        claims processing?

12   A.   There was a period when we had -- our utilization

13        management physician took another position, and so the

14        regional medical directors, which is consistent with

15        what Corizon did at the time in most states for a

16        time, processed the 407 requests.

17                  So this was just me being familiar with the

18        overall workflow of the claims processing system.

19   Q.   And what time period was it that the UM physician

20        wasn't on board with Corizon?

21   A.   That would have been prior to me becoming state -- it

22        was a period of time in 2014.

23   Q.   So if I understand your testimony, there was a vacancy

24        in the utilization management physician position

25        during some period of time in 2014, is that correct?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 143

```
 1   A.   Yes.

 2   Q.   And during that period of time when there was a

 3        vacancy, you and other regional medical directors were

 4        called upon to perform that function that would have

 5        otherwise been performed by the UM physician.  Is that

 6        correct?

 7   A.   Yes.

 8   Q.   And what was that function or what were those

 9        functions?

10   A.   The function was to review the 407 consultation

11        request and approve, if applicable.  If an alternative

12        treatment plan was advised, we would do so.  The state

13        medical director at the time also reviewed every one

14        of ours, and then the chief medical officer at the

15        time also reviewed them.

16   Q.   So was there a layer or additional layers of review

17        put in place while the UM physician vacancy was there?

18   A.   Yes.

19   Q.   How many levels of review were added, if you will,

20        during that period of time?

21   A.   We have the state medical director and the chief

22        medical officer for the State, but they didn't review

23        every one of them.  They reviewed them randomly.  That

24        was part of what they still did up to the time the

25        last one retired.
```



JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 144

```
 1    Q.   So I take it this was an additional task added to your

 2         duties during that time period?

 3    A.   Yes.

 4    Q.   How long was there a vacancy in the UM physician

 5         position?

 6    A.   I believe it was three to four months.

 7    Q.   And do you remember what three to four months that

 8         was?

 9    A.   I'm sorry, I do not.

10    Q.   Do you know what time of the year?  I understand --

11         was it winter, spring?

12    A.   I can't recall.

13    Q.   Is there anything you could look to?

14    A.   In these documents, no.

15    Q.   In any document.  Would, for example, the org charts

16         show it, that there was a vacancy?

17    A.   No.

18    Q.   It would not?

19    A.   No.  I don't believe so, no.

20    Q.   Why would it not have that information in the org

21         chart?

22    A.   Because when the org charts were made, there wasn't a

23         vacancy.

24    Q.   And they don't update those when vacancies occur?

25    A.   They update it periodically.  I don't know what the
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 145

```
 1        interval is.
 2   Q.   So we couldn't look to the chart to determine when
 3        that position was vacant and when it was filled, is
 4        that right?
 5   A.   No.
 6   Q.   That's not right?
 7   A.   No, you could not look to -- you would have to look
 8        into our UM documents and find out.  And we could also
 9        find out with our personnel, with our recruiter when
10        that occurred.  I don't recall specific dates.
11   Q.   Okay.  We're going to take a look at the org charts a
12        little bit later, so would you be able to, looking at
13        the org charts that have been produced to me,
14        determine looking at those whether that position was
15        vacant for any period of time?
16   A.   It's possible.
17   Q.   Okay.
18             MS. STAMLER:  Carly, I don't know if you
19        have all of these org charts that were produced, and I
20        can't tell if they're duplicates or not because I've
21        not had time to really review them, so I'm just going
22        to -- can you pull all the ones that you brought?  I
23        may have some copies.
24             MS. VAN THOMME:  I don't think I have all
25        of them.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 146

```
 1                     MS. STAMLER:  All right.  Well, let me
 2          start with what I have and let's see what we can do
 3          here.
 4                     MARKED FOR IDENTIFICATION:
 5                     DEPOSITION EXHIBIT 4
 6                     2:23 p.m.
 7   BY MS. STAMLER:
 8   Q.     Have you seen Exhibit 4 to your deposition before?
 9   A.     Yes.
10   Q.     What is it?
11   A.     It's the organizational chart for Corizon MDOC.
12   Q.     Do you know what time period this is from?
13   A.     Yes.  This would have been from the inception, the
14          early inception of the contract, 2008.
15   Q.     Okay.  And it shows you on this organizational chart
16          as being northern regional medical director.  Is that
17          right?
18   A.     Right.  So 2008, 2009.
19   Q.     And it appears from this chart, in that position
20          during this time frame, you would have been reporting
21          to the Corizon state medical director, who is Erin --
22          I'm not going to be able to --
23   A.     Erin Orlebeke.
24   Q.     Thank you.  Can you tell me on Exhibit 4 where, if
25          anywhere, it appears there's a UM physician noted?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1   A.   Yes, it's specifically identified as Dr. Rickey

 2        Coleman, medical director, UM.

 3   Q.   And where is that?

 4   A.   That's off to the right of Dr. Orlebeke, Erin

 5        Orlebeke, Corizon State Medical Director.

 6   Q.   Okay, thank you, I see it.  All right.  So at least as

 7        of 2008 and '09, when you believe this exhibit was

 8        prepared, Dr. Coleman was the UM physician, is that

 9        correct?

10   A.   Correct.

11                 MS. VAN THOMME:  Object to the form.

12                 MS. STAMLER:  What's wrong with the form?

13                 MS. VAN THOMME:  I think he was "a"

14        utilization management physician.  I don't think he

15        was "the" utilization management physician.

16   BY MS. STAMLER:

17   Q.   What was his title?

18   A.   Medical director, UM.  But we did have other UM

19        physicians.

20   Q.   Okay.  Well, when you testified earlier that there was

21        a vacancy in the UM physician role, what did you mean

22        by that?  Did you mean the director position was

23        vacant?

24   A.   That occurred, yes, subsequent to this.

25   Q.   Okay.  But that's who you were referring to, the title
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 148

```
 1       of the position that was vacant was the UM director

 2       position?

 3  A.   We have -- this is a little confusing, but we do have

 4       actually two UM physicians.  We have one UM physician

 5       for inpatient utilization, and we have another UM

 6       physician for outpatient referrals, outpatient

 7       utilization.

 8              At this time when this hierarchy was

 9       formed, Dr. Coleman was filling the role as the

10       medical director for UM, but we also had two other

11       physicians who were part of centralized utilization

12       management, Dr. Squire and Dr. -- there was another

13       physician.  He was there for a short time when I first

14       came on board.  So there were others in addition to

15       this over time.

16  Q.   Okay.  For the time period where you've testified in

17       2014 that there was a vacancy in the UM director

18       position, was it the inpatient or outpatient position?

19  A.   Outpatient.

20  Q.   Okay.

21              MARKED FOR IDENTIFICATION:

22              DEPOSITION EXHIBIT 5

23              2:27 p.m.

24  BY MS. STAMLER:

25  Q.   You've been handed Exhibit 5 to your deposition.  Have
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 149

```
 1          you seen this document before?
 2    A.    Yes.
 3    Q.    And what is it, sir?
 4    A.    This is also an organizational chart/hierarchy of
 5          Corizon Michigan.
 6    Q.    What time frame is this from?
 7    A.    This would be from the time Dr. Myers was CEO, which
 8          would be 2014 and 2015.
 9    Q.    Okay.  And on this document it shows that Dr. Coleman
10          is the medical director over UM.  Do you see that?
11    A.    For IP, inpatient.  See the "IP" before medical
12          director?
13    Q.    Okay.  And above him shows Keith Papendick, outpatient
14          medical director, UM?
15    A.    Yes.
16    Q.    Is that correct?
17    A.    Correct.
18    Q.    Do you see an asterisk next to their names?
19    A.    Yes.
20    Q.    And there's one next to your name, as well, and
21          others, correct?
22    A.    Correct.
23    Q.    And that indicates that they are Quality Correctional
24          Care employees?
25    A.    Yes, that's the PC in Michigan.  We have to practice
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 150

```
 1          under a professional corporation in Michigan.  So

 2          that's the PC that contracts with Corizon.

 3    Q.    Okay.  Looking at this exhibit, are you able to

 4          discern whether Keith Papendick was still on board?

 5    A.    Yes, he was there, and is still there today.

 6    Q.    So when you testified earlier that there was a vacancy

 7          in 2014, was that inaccurate?

 8    A.    I can't say exactly when this report was prepared, but

 9          it would have been shortly prior to him accepting the

10          position.  And again, it was a short time interval, I

11          want to say three to four months.

12    Q.    I understand, but you can't discern from this exhibit

13          what three to four months that was, correct?

14    A.    I cannot.

15    Q.    Was this a newly-created position, the outpatient

16          medical director for UM?

17    A.    No.  It is contractual.  It's one of the ten key

18          positions required by the contract.

19    Q.    So to have a vacancy in that position would have been,

20          from your understanding, a failure to meet that term

21          of the contract, right?

22    A.    No, because there are changes that occurred in the

23          contract, and like -- the DOC was notified and agreed

24          with the temporary program.  I did not coordinate that

25          with the DOC at the time.  Dr. Orlebeke would have
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 151

```
 1        done that.  But certainly they were advised of the
 2        vacancy.  We always advise them when we have a
 3        vacancy.  And we have an interim plan to fulfill that
 4        requirement, which they approved.
 5   Q.   So if I understand your testimony, Corizon, somebody
 6        within Corizon, Dr. Orlebeke, put somebody within the
 7        Department of Corrections on notice that there was a
 8        vacancy for the outpatient medical director over UM,
 9        correct?
10   A.   Correct.
11   Q.   And that a fix or an interim solution was put in place
12        that the Department of Corrections agreed to, is that
13        right?
14   A.   Yes.
15   Q.   Now, this may be an exact duplicate of what has been
16        marked Exhibit 5, so I just want you to look at it
17        before I bother marking it to tell me if it is the
18        same document that was just sent to me twice or maybe
19        more than twice.  Can you tell me if there's any
20        difference between this one and what was marked
21        Exhibit 5?
22   A.   Yes.
23   Q.   What's the distinction in that one?
24   A.   This is when after they hired Dr. Calvin Johnson as
25        Corizon's chief medical officer, they added his name.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 152

```
 1   Q.   All right.  So let's mark that as Exhibit 6.  And I
 2        don't know that I have another copy of that.
 3                  MARKED FOR IDENTIFICATION:
 4                  DEPOSITION EXHIBIT 6
 5                  2:32 p.m.
 6   BY MS. STAMLER:
 7   Q.   All right.  So other than that change on Exhibit 6, is
 8        there anything else that's different between
 9        Exhibits 5 and 6?
10   A.   It will take me a minute to be sure ...
11                  Other than that, it looks the same to me.
12   Q.   Okay.  And what time period is Exhibit 6 from?
13   A.   Again, I'm really just guessing.  I don't have the
14        exact numbers in my head, but what happened was
15        Dr. Myers was hired as CEO, I want to say in 2014, and
16        it was shortly after when Dr. Calvin Johnson came on
17        board.
18                  So this is probably in that time period,
19        2014, 2015, where this is the -- Exhibit 6 would be
20        the update after Dr. Johnson was hired.
21   Q.   So that's a more current version; it's a later version
22        of 5, is that right?
23   A.   It is a later version.
24   Q.   And remind me, what's Calvin Johnson's position?
25   A.   He's no longer with the company, but at the time he
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 153

```
 1        was the chief medical officer.
 2                  MARKED FOR IDENTIFICATION:
 3                  DEPOSITION EXHIBIT 7
 4                  2:34 p.m.
 5   BY MS. STAMLER:
 6   Q.   You've been handed Exhibit 7 to your deposition.  Have
 7        you seen this document before?
 8   A.   It looks similar to Exhibit 5.
 9   Q.   You'll notice on this one there's a vacancy in the
10        chief operations officer.  Do you see that?
11   A.   Right.
12   Q.   Was that the case on Exhibit 5?
13   A.   No.  Scott Bowers was in position at that time as
14        chief operations officer.
15   Q.   When did the vacancy for that position occur?
16   A.   So Exhibit 7 would then precede 5, because Dr. Myers
17        came on board as CEO and he's the one that would have
18        hired Mr. Bowers and Dr. Johnson.  So in terms of
19        chronology, it would be -- Exhibit 7 would precede
20        Exhibit 5.
21   Q.   Do you know what time period Exhibit 7's from?
22   A.   Again, the same year but a different month, and I
23        don't know the months because they were hired fairly
24        quickly.  So these were probably done over -- changes
25        were made in these probably over a couple of months
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 154

```
 1        after Dr. Myers became CEO.

 2    Q.  And --

 3    A.  So in chronology it would be 7 to 5 to 6.

 4    Q.  Does it strike you as odd that none of these

 5        organizational charts have any dates on them?

 6        Wouldn't it help us determine when these were prepared

 7        if there was a date?

 8    A.  It would certainly help us if there was a date.

 9    Q.  Let me show you another exhibit to see if you can

10        discern before -- or another document before we mark

11        it.

12                  Is there any difference between that org

13        chart that I've just handed you and Exhibits 5, 6,

14        or 7?

15    A.  Yes, the main difference is that it identifies

16        Dr. Papendick as outpatient medical director in

17        Exhibit 7, but in the new document it shows the

18        vacancy.

19    Q.  All right.  So let's mark that Exhibit 8.

20                  MARKED FOR IDENTIFICATION:

21                  DEPOSITION EXHIBIT 8

22                  2:36 p.m.

23    BY MS. STAMLER:

24    Q.  And so if I understand your earlier testimony,

25        Exhibit 8 would certainly predate any of the exhibits
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 155

```
 1          that show Dr. Papendick as the outpatient medical
 2          director, correct?
 3   A.     Correct.
 4   Q.     And certainly all of these exhibits that have been
 5          marked thus far show you in the position of a regional
 6          medical director.  Is that right?
 7   A.     Yes.
 8   Q.     And you did not become a state medical director until
 9          2015.  Is that right?
10   A.     Correct.
11   Q.     What was the date in 2015?
12   A.     That would be July 1.
13   Q.     So it's feasible that all of these exhibits where your
14          name appears as the regional medical director for the
15          northern region could be anywhere from the time frame
16          of 2014 through July 1 of 2015, is that right?
17                  MS. VAN THOMME:  Object to form.
18   A.     Yeah, as far as I recall.
19   BY MS. STAMLER:
20   Q.     Okay.  Other than the vacancy reflected for the
21          outpatient medical director over UM, is there any
22          other distinction between Exhibit 8 and the other
23          exhibits?
24   A.     Yes.
25   Q.     What else?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 156

```
 1   A.   In Exhibit 7 it identifies Carol Peacock as our
 2        oncology manager, on the right-hand column, but in
 3        Exhibit 8 she is not identified.
 4   Q.   I'll show you yet another org chart that was produced.
 5        Would you please take a look at that and tell me if it
 6        is any different from any of the prior-marked org
 7        charts?
 8   A.   On initial review, this shows that it's very similar
 9        to Exhibit 7.
10   Q.   Is there any distinction between 7 and the one that
11        has yet to be marked?
12   A.   If I say "yes" and I miss something, is there a
13        consequence to this?  Because I'm having a very, you
14        know -- I mean, I could overlap them.  So if I miss
15        someone here, I mean, what is my consequence?
16             I guess I don't understand this, but I
17        guess I don't see any other difference.
18   Q.   Okay.  So you're saying -- your counsel's pointing to
19        something on the record, or off record, I should say.
20   A.   All right, so, yes.  In this one, Scott --
21   Q.   All right, let's mark it.  If there's a distinction, I
22        want to mark it.
23                   MARKED FOR IDENTIFICATION:
24                   DEPOSITION EXHIBIT 9
25                   2:40 p.m.
```



JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 157

```
 1   BY MS. STAMLER:

 2   Q.   Okay.

 3   A.   Okay, so now this one names Scott Bowers, but

 4        Exhibit 7 does not.  This one does not name the

 5        Corizon chief medical officer, whereas Exhibit 6 does,

 6        Dr. Johnson.  So this one would be in this order.

 7                  So this would be -- I'm trying to put them

 8        in order.  This would be first, just Dr. Myers is

 9        identified.  And then this one is different because of

10        the oncology manager, but still not identified.  In

11        this one, Scott Bowers is identified, and in the last

12        one, Dr. Johnson is identified.

13   Q.   All right.  Well, don't get fixed on what order yet,

14        because I've got several more that have been produced.

15                  MS. STAMLER:  Let's mark these 10 and 11.

16                  MARKED FOR IDENTIFICATION:

17                  DEPOSITION EXHIBITS 10 and 11

18                  2:42 p.m.

19   BY MS. STAMLER:

20   Q.   Have you reviewed Exhibits 10 and 11?

21   A.   I am reviewing Exhibits 10 and 11.

22   Q.   Are you able to discern where in the chronology they

23        belong in terms of the dates of these org charts?

24   A.   Exhibit 10 and Exhibit 5 are very similar.

25   Q.   What are the differences, if any?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 158

```
 1   A.   I don't see any differences.

 2   Q.   Okay.  What about Exhibit 11?

 3   A.   Exhibit 11 appears to be identical to Exhibit 6.

 4   Q.   Okay.  Would you put them in chronological order to

 5        the best of your ability?

 6   A.   Certainly.

 7   Q.   And then once you do that, would you let me know when

 8        you're done?

 9                   MARKED FOR IDENTIFICATION:

10                   DEPOSITION EXHIBITS 12 and 13

11                   2:45 p.m.

12   A.   I believe I have them in chronological order to the

13        best of my ability.

14   BY MS. STAMLER:

15   Q.   All right.  Before we get into the order you've done,

16        I wanted to show you two more org charts that have

17        been produced.  They've been marked as Exhibits 12

18        and 13.  Can you identify those, for the record?

19   A.   Yes.  These are under the current contract from 2015

20        on.

21   Q.   Which one is the most current between 12 and 13?

22   A.   Well, they're both outdated, but item 12 would be the

23        most current.

24   Q.   Okay, all right.  Would you put them in order to the

25        best of your ability now?  I know you've done the
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 159

```
 1        earlier ones, so you just need to add the last two.
 2   A.   Okay.
 3   Q.   All right.  And would you read into the record the
 4        order that you've put them in?
 5   A.   Sure.  As item 1 in order would be Exhibit 8, and
 6        Exhibit 7, then Exhibits 5, 9, and 10 are essentially
 7        the same.  Then Exhibit 11 and Exhibit 6 are the same.
 8        Then in order would be Exhibit 13, and then
 9        Exhibit 12.
10   Q.   Thank you.  Now, with regard to Exhibit 12, which you
11        said is the most current, can you tell me, sir, how
12        many vacancies exist on that chart?
13   A.   Sure.  There's the vacant integrated care
14        coordinator --
15   Q.   I don't want the titles, just give me the number.
16   A.   Oh, the number?
17   Q.   Yeah.
18   A.   Okay.  Two.
19   Q.   Are either of those physician positions?
20   A.   No.
21   Q.   Okay.  On Exhibit 13, how many vacancies exist?
22   A.   Four.
23   Q.   And of those four, are any of those positions filled
24        by doctors?
25   A.   Yes.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 160

```
 1   Q.   How many?

 2   A.   One.

 3   Q.   What position is that?

 4   A.   The chief psychiatric officer or mental health

 5        director.

 6   Q.   Going back to the next one in order, which I think you

 7        said was 11/6, since you said they were one and the

 8        same, how many positions are vacant there?

 9   A.   All right, 11/6.

10   Q.   So they were the same, right?

11   A.   Yes.

12   Q.   How many vacancies?

13   A.   I don't see any vacancies.

14   Q.   All right.  What about the exhibit that immediately

15        precedes it, which would be Exhibits 5, 9, and 10,

16        which you said are all the same, how many vacancies?

17   A.   One.

18   Q.   And what position is that?

19   A.   It's Corizon's chief medical officer.

20   Q.   And that is filled by a doctor?

21   A.   Yes.

22   Q.   Exhibit 7, does it reflect any vacancies -- strike

23        that -- yeah, 7 is the next one in order, right?

24   A.   Yes.

25   Q.   Are there any vacancies?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 161

```
 1   A.   Yes.

 2   Q.   How many?

 3   A.   Two.

 4   Q.   Are either of those positions filled by doctors?

 5   A.   Yes.

 6   Q.   One or both?

 7   A.   One.

 8   Q.   Which position?

 9   A.   Corizon chief medical officer.

10   Q.   Going to the next one in order, would that be

11        Exhibit 6?

12   A.   I have Exhibit 8.

13   Q.   Exhibit 8, okay.  Go ahead.

14   A.   I see three vacancies -- four vacancies.

15   Q.   And are any of those positions filled by doctors?

16   A.   Yes.

17   Q.   How many?

18   A.   Three.

19   Q.   And what are they?

20   A.   Corizon chief medical officer; outpatient medical

21        director; and one regional medical director vacant,

22        southern region.

23   Q.   And what time period is Exhibit 8 from?

24   A.   That would have been right around the time that

25        Dr. Myers assumed control, which would be 2014.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 162

```
 1   Q.   Who filled in for the vacant regional medical director
 2        for the southern region?
 3   A.   Dr. Orlebeke, the state medical director, took care of
 4        that person's duties.
 5   Q.   Along with whatever duties she was responsible for as
 6        the state medical director?
 7   A.   Yes.  And also the other three regional directors
 8        assisted.
 9   Q.   Would that have included you?
10   A.   Yes.
11   Q.   So if I understand correctly, that would also have
12        been at the same time there was no outpatient medical
13        UM person, is that correct?
14   A.   Correct.
15   Q.   So you were not only doing your northern regional
16        medical director work in 2014, but you were also
17        handling some of the outpatient UM review and
18        providing some coverage for the southern regional
19        medical director, is that correct?
20   A.   Correct.
21   Q.   Going on to any other org charts that we haven't
22        covered, are there any we haven't reviewed in the
23        context of vacancies, or have we looked at all of
24        them?  I think that is all of them.
25   A.   That's all I see.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 163

```
1    Q.   Okay, thank you for that.

2              I want to go back to your earlier

3         testimony, Doctor, with regard to the provisions of

4         the contract that you recollected focusing on or

5         returning to focus on after you became the regional

6         medical director, all right?  Do you remember your

7         testimony on that topic?

8    A.   Yes.

9    Q.   All right.  We've looked at Appendix E with regard to

10        claims processing.  Do you recall that?

11   A.   Yes.

12   Q.   And we kind of went off track a bit because you began

13        to talk about why you looked at it, and that had to do

14        with the vacancy in the outpatient UM position,

15        correct?

16   A.   That's the best I recall.

17   Q.   All right.  Is there any other reason or are there any

18        other reasons why you looked at Appendix E?

19   A.   I don't recall any other specific reasons.  And again,

20        I did read the whole contract at one point.

21   Q.   I understand.  I just want to focus on those areas

22        that you said you returned to during the course of

23        your position or positions with the State.

24              Incidentally, as a medical provider, prior

25        to becoming a regional medical director, did you have
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 164

```
 1        access to the contract between Corizon and the State
 2        of Michigan?
 3   A.   It was a public document.  I don't recall accessing it
 4        when I was -- until I became a regional medical
 5        director.
 6   Q.   Okay.  You then testified that you reviewed the scope
 7        of work, which is found at Bates 0955, or page 11 of
 8        the contract.  Would you turn to that, please, sir?
 9             And let me do you a favor, let's get these
10        exhibits out of the way.
11   A.   Do you want me to keep them in order for you?
12   Q.   Thank you.
13   A.   I'm sorry, I'm going to where?
14   Q.   It's pretty far into the document.  I would use the
15        MDOC, it's 0955 number, lower right-hand corner.
16   A.   0995?
17   Q.   No, 0955.
18   A.   0955, 1.020, scope of work?
19   Q.   Correct.  You indicated earlier that you reviewed that
20        scope of work and deliverables.  Is there anything
21        specific in that section of the contract that you
22        focused on?  It goes on for several pages.
23   A.   I don't recall looking for anything specifically.  I
24        do recall looking at the overall scope of work and
25        deliverables, but I don't think I was looking up
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 165

```
 1        anything specifically.

 2   Q.   What did you understand your role as the regional

 3        medical director would be pursuant to the contract?

 4   A.   Sure.  My main roles pursuant to this were to follow

 5        my providers and assure that quality standards were

 6        being met, do chart reviews, help with the recruiting,

 7        you know, helping to develop and maintain a system to

 8        provide the on-site primary care.  I helped with

 9        recruiting, with interviewing, hiring.

10   Q.   Anything else -- and, incidentally, in conjunction

11        with what you just testified to, is that anywhere

12        specified in 1.021?

13   A.   Which part of it?

14   Q.   Any of that.  Chart reviews, recruiting, interviewing

15        and hiring.

16   A.   Well, I mean, it's assumed.  I mean, for example,

17        making sure of the diagnosis and treatment of chronic

18        conditions to reduce unplanned episodes of care and

19        specifically reduce unplanned emergency services.

20   Q.   I see where you're referring to.

21   A.   Okay.

22   Q.   You're under 1.021, A.1.

23   A.   A.1., correct.

24   Q.   All right.  Which addresses diagnosis and treatment of

25        chronic conditions.  Is that right?
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 166

```
 1   A.   Right.

 2   Q.   Okay.  Then there's -- so you're looking at the scope,

 3        is that right?

 4   A.   Yes.  I was very involved on a day-to-day basis with

 5        my providers; fielding phone calls about patients,

 6        going to sites to see patients, to help them, give

 7        them a second set of eyes, so ...

 8   Q.   Were you doing direct patient care as a regional

 9        medical director?

10   A.   Yes.

11   Q.   You were?

12   A.   Yes, at times.

13   Q.   At what time period were you doing that?

14   A.   Oh, periodically I would have to fill in at a site

15        when there was an illness or vacancy, or I would go

16        see inmates together with the providers in cases where

17        there were questions and challenges.

18   Q.   And would you make notes in the patient's chart when

19        you did that?

20   A.   Yes.

21   Q.   And would that have included a -- were you doing that

22        sort of direct patient care during the time period of

23        2017?

24   A.   No.

25   Q.   And when did you stop giving direct patient care?
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 167

```
 1   A.   That would have been in July of 2015, when I became

 2        the state medical director.

 3   Q.   Okay.  Have you ever completed any form of a sworn

 4        statement, whether an affidavit or declaration, for

 5        any sort of litigation involving Corizon?

 6   A.   You mean as a representative of Corizon?

 7   Q.   Correct.

 8   A.   The only time I recall would be in this deposition and

 9        the prior deposition.  I don't recall any others.

10   Q.   Okay.  Have you ever made any sort of statement under

11        oath that in the positions where you've served as an

12        upper-level manager of the administration, as both a

13        regional medical director for Corizon and as the state

14        medical director for Corizon in Michigan, that you did

15        not and have not provided direct medical care to

16        patients?

17   A.   I don't recall providing -- stating that, no.

18   Q.   And if you had stated that, that would have been

19        inaccurate, based on what you've just testified, is

20        that correct?

21   A.   I may have stated that I have not had direct patient

22        care since I assumed the role of state medical

23        director.

24   Q.   That wasn't my question.

25   A.   But prior to that, yes, I did see patients.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1   Q.   So if it's stated otherwise, that would be inaccurate,
 2        correct?
 3   A.   I have as state medical director done reviews of
 4        patients.
 5   Q.   Would you consider that to be direct medical care?
 6   A.   No.  I don't recall seeing inmates in direct medical
 7        care since July.
 8   Q.   Of what year?
 9   A.   Of 2015.
10   Q.   So if you signed a declaration indicating that in your
11        positions as both the regional medical director for
12        Corizon and the state medical director for Corizon,
13        you acted as an upper-level manager, and that your
14        responsibilities include such matters as training,
15        hiring of upper-level medical administrators, dealing
16        with systemic issues related to the provision of
17        health care and peer review, and that you do not and
18        have not provided direct medical care to patients,
19        that would be inaccurate, that last statement?
20             MS. VAN THOMME:  Object to form.
21   BY MS. STAMLER:
22   Q.   Go ahead and answer.
23   A.   I'm sorry, could you read the question again?
24             MS. STAMLER:  Can I have the question back?
25
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 169

```
 1                    (The following portion of the record was

 2                    read by the reporter at 3:04 p.m.:

 3                    "Q. So if you signed a declaration

 4                    indicating that in your positions as both

 5                    the regional medical director for Corizon

 6                    and the state medical director for Corizon,

 7                    you acted as an upper-level manager, and

 8                    that your responsibilities include such

 9                    matters as training, hiring of upper-level

10                    medical administrators, dealing with

11                    systemic issues related to the provision of

12                    health care and peer review, and that you

13                    do not and have not provided direct medical

14                    care to patients, that would be inaccurate,

15                    that last statement?")

16   A.   Okay.  The problem with that is that Corizon calls

17        state medical directors in every other contract

18        regional medical directors.  So, in that context, I am

19        a regional medical director.  A state medical director

20        and regional medical director for this time period are

21        synonymous.  So the answer, with that caveat, is --

22        again, one more time?

23                    MS. VAN THOMME:  Do you have some context?

24        I mean, you're reading from something, but we don't

25        know what you're looking at, so ...
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 170

```
 1                    MS. STAMLER:  I don't have to tell you what
 2         I'm looking at.
 3                    MS. VAN THOMME:  Yeah, but he might not be
 4         able to answer the question without the context.
 5                    MS. STAMLER:  Well, he could tell me if he
 6         can't answer it.  He's already testified that --
 7   BY MS. STAMLER:
 8   Q.    When you became, and correct me if I'm wrong, from the
 9         date you became the state medical director to present,
10         you have not provided direct medical care to inmates.
11         Is that your testimony?
12   A.    Yes.
13   Q.    And the last time you provided direct medical care to
14         an inmate was in your role as a regional medical
15         director, is that correct?
16   A.    Correct, with the understanding that the terminology
17         is synonymous.
18   Q.    Not in Michigan, though, is it?
19   A.    Well, it is if there were Corizon documents that I
20         signed during the time period I am state medical
21         director; it could have referred to me as a regional
22         medical director.
23   Q.    I'm not asking you about a document you may have
24         signed for Corizon.  I'm asking you if you have
25         served, during the course of your role as the site --
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1        strike that -- as the state medical director, whether

 2        you have provided direct patient care to inmates.

 3   A.   I have not provided direct patient care to inmates

 4        since at least July of 2015.

 5                  MARKED FOR IDENTIFICATION:

 6                  DEPOSITION EXHIBIT 14

 7                  3:06 p.m.

 8   BY MS. STAMLER:

 9   Q.   Dr. Bomber, you've been handed Exhibit 14 to your

10        deposition.  I'd like you to turn to the very last

11        page of this exhibit.  Is that, sir, your signature?

12   A.   Yes.

13   Q.   And it says "Jeffrey Bomber, D.O.," is that right?

14   A.   Correct.

15   Q.   Do you recollect signing a declaration on August 21,

16        2017?  Turn to the preceding page of this exhibit.

17   A.   Preceding the signature page?

18   Q.   Yes.

19   A.   Okay.

20   Q.   The very bottom of it, where it says, "I declare under

21        penalty of perjury under the laws of the United States

22        of America that the foregoing is true and correct.

23        Executed on 8-21-2017," did I read that correctly?

24   A.   Yes.

25   Q.   Did you understand at the time that you signed
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1          Exhibit 14 that by signing it you were attesting to

 2          the contents as being true under penalty of perjury?

 3          Yes or no?

 4    A.    Yes.

 5    Q.    Now, turn your attention, sir, to page 2 of the

 6          declaration.

 7    A.    Okay.

 8    Q.    Paragraph 1.  When you signed this, you were more than

 9          eighteen years of age.  Is that correct?

10    A.    Yes.

11    Q.    You were legally competent to make the declaration,

12          correct?

13    A.    Right.

14    Q.    And it says that you were a doctor of osteopathy and

15          licensed to practice medicine by the State of

16          Michigan.  Was that true?

17    A.    Yes.

18    Q.    And were you employed by Corizon Health as the state

19          medical director for Michigan?

20    A.    Yes.

21    Q.    And it says, "I have held this position since July of

22          2015."  Correct?

23    A.    Correct.

24    Q.    And that, "Previously, I was regional medical director

25          for Corizon, a position I held beginning in January
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1         2011" --

 2   A.    Correct.

 3   Q.    -- is that right?

 4   A.    Correct.

 5   Q.    And then you said in your declaration that you were

 6         "competent to testify concerning whether a doctor has

 7         exercised the degree of skill, care, and diligence

 8         exercised by members of that profession, practicing in

 9         the same or similar community, in parentheses and

10         quotes, standard of care."

11                   Did I read that correctly?

12   A.    Yes.

13   Q.    Now, going to the next paragraph, which is number 2,

14         "In the positions noted in paragraph 1 above," and by

15         that which is noted, those are the positions of

16         regional medical director for Corizon and state

17         medical director for Corizon, is that correct?  What

18         positions are noted in paragraph 1 above?

19   A.    I need a moment to confer with my attorney.

20   Q.    You can't with a question pending, you cannot do that.

21   A.    What is the question?

22   Q.    The question is, the two positions that are referenced

23         in paragraph 1 are the state medical director and the

24         regional medical director, correct?

25   A.    Correct.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 174

```
 1   Q.   And then you continued on by saying, "I have acted in
 2        those positions as an upper-level manager of the
 3        administration of care provided by medical providers
 4        in Michigan prisons pursuant to Corizon's contract
 5        with the Michigan Department of Corrections, MDOC.
 6        Correct?
 7   A.   I need a moment to confer with my attorney.
 8   Q.   There's a question pending.
 9   A.   I already answered the question.
10   Q.   No, I just asked you another question.
11   A.   You asked me a new question?
12   Q.   I did.
13   A.   And in the interim I asked to confer with my attorney.
14   Q.   And I think it's highly inappropriate because I want
15        to get the answers to this inquiry, because you've
16        already testified in opposition to what's in your
17        declaration.
18   A.   Repeat the question, please.
19               MS. STAMLER:  Could I have the question,
20        please?
21               (The following portion of the record was
22               read by the reporter at 3:10 p.m.:
23               "Q. And then you continued on by saying, 'I
24               have acted in those positions as an
25               upper-level manager of the administration
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 175

 1                    of care provided by medical providers in

 2                    Michigan prisons pursuant to Corizon's

 3                    contract with the Michigan Department of

 4                    Corrections, MDOC.'  Correct?")

 5   A.   Yes.

 6   BY MS. STAMLER:

 7   Q.   And then you go on to say all the responsibilities

 8        that you were performing, and conclude by saying, "I

 9        do not and have not provided direct medical care to

10        patients."  Did I read that correctly?

11   A.   Yes.  My understanding was in my current role when I

12        signed this, but I can see where it reads that way.

13   Q.   You testified earlier that you had no recollection of

14        signing a declaration, is that right?

15   A.   You know, in my role as state medical director, I sign

16        a lot of different forms.  I did not recall this when

17        you asked me that question, though.  I do recall

18        signing the form, yes.

19   Q.   This has refreshed your memory?

20   A.   Yes.

21   Q.   Have you signed other declarations like this?

22   A.   I believe I have.

23   Q.   How many times?

24   A.   I don't know.

25   Q.   Were they all in conjunction with supporting Corizon

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 176

```
 1        in lawsuits?

 2   A.   They were -- there are a variety of forms that I sign.

 3   Q.   Well, no, I'm asking specifically about declarations

 4        like this, the one that's been marked Exhibit 14 to

 5        your deposition.

 6   A.   I can't recall how many.

 7   Q.   Were you signing this, sir, as an expert witness to

 8        opine on the standard of care?

 9                 MS. VAN THOMME:  Object to foundation.

10   BY MS. STAMLER:

11   Q.   Go ahead and answer.

12   A.   Yes.

13   Q.   So when I asked you earlier in your deposition if you

14        had ever served as an expert witness and you testified

15        you had not, are you changing your testimony now?

16                 MS. VAN THOMME:  Object to foundation.

17   BY MS. STAMLER:

18   Q.   Go ahead and answer.

19   A.   I did not appear in court or have a deposition on this

20        matter.

21   Q.   That wasn't my question that I posed to you.  Are you

22        changing your testimony from earlier to now say that

23        you have in fact served as an expert witness?

24   A.   I don't understand that this is me serving in a court

25        of law as an expert witness.  I'm not sure I
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 177

 1        understand the question.

 2   Q.   Do you believe that Exhibit 14 contains any expert

 3        opinions?  Yes or no?

 4                MS. VAN THOMME:  Object to foundation.

 5   BY MS. STAMLER:

 6   Q.   Go ahead and answer.

 7   A.   Yes, I understand the question now.

 8   Q.   And does it?

 9   A.   Yes.

10   Q.   And do you think that based upon your degree of

11        experience as a physician for a number of years, your

12        education and training, that you have a degree of

13        expertise?

14   A.   Yes.

15   Q.   And that expertise, I think you testified to earlier,

16        is solely in the area of family medicine?

17   A.   Yes.

18   Q.   As you sit here today, Doctor, do you consider

19        Exhibit 14 a declaration including expert opinions?

20        Yes or no?

21                MS. VAN THOMME:  Object to foundation.

22   A.   Yes.

23   BY MS. STAMLER:

24   Q.   How many such declarations have you signed in your

25        position as either a regional medical director or a




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 178

```
 1         state medical director where you've provided expert
 2         opinions for Corizon?
 3    A.   I don't know.
 4              MS. VAN THOMME:  Object to the form and
 5         foundation.  He's a defendant in this lawsuit.  It
 6         says that right on the caption.  Why are you saying
 7         he's an expert witness?
 8              MS. STAMLER:  Well, that's an even more --
 9         where is he a defendant in the caption?
10              MS. VAN THOMME:  Look at the attorneys.  It
11         says, "Attorney for Defendants Dr. Shi Yu Tan, Corizon
12         Health Inc., Dr. Terence Whiteman, and Dr. Jeffrey
13         Bomber."
14              MS. STAMLER:  Okay, that's even more
15         curious as to why he would sign a declaration.
16              MS. VAN THOMME:  Not really.  There's a
17         statute for declarations in 1983 cases.
18              MS. STAMLER:  I understand that.
19              MS. VAN THOMME:  And the attorneys who
20         prepared these did this all the time.  I prefer to use
21         affidavits myself, but this is pretty routine.
22    BY MS. STAMLER:
23    Q.   Dr. Bomber, when I asked you earlier if you'd been in
24         any other lawsuits, your testimony, as I recall, you
25         gave me three lawsuits.  Is that right?
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 179

```
 1   A.   Yes.

 2                   MS. VAN THOMME:  Object to form.

 3   BY MS. STAMLER:

 4   Q.   Does this refresh your memory that you were a litigant

 5        or a defendant in another lawsuit?

 6                   MS. VAN THOMME:  Object to form.

 7   A.   My understanding of the question at the time, I

 8        assumed that you meant if I had ever been involved in

 9        lawsuits where I was named personally and there was a

10        judgment or an award.

11   BY MS. STAMLER:

12   Q.   Okay.  So now understanding that the question was

13        broader than that, how many times have you been sued

14        during your tenure with Corizon?

15   A.   I'm not sure of the number.

16   Q.   Well, you've given me three, we're now aware of four,

17        because Exhibit 14 references you, at least in the

18        Chapman Law Group, as being represented by them.  Is

19        that right?

20   A.   Yes.

21   Q.   How many beyond that can you recall as you sit here

22        today?

23   A.   There were other affidavits I've signed over the past

24        two years.

25   Q.   And were those signed because you were a defendant in
```



JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1        the lawsuit or were you signing them in some other
 2        capacity?
 3   A.   I believe it was in different capacities.
 4   Q.   Well, let's talk about the ones where you were a
 5        defendant.  How many times other than what's been
 6        marked as Exhibit 14 have you signed an affidavit or a
 7        declaration under penalty of perjury?
 8   A.   I don't know the number.
 9   Q.   Can you give me an estimate?  Is it more than
10        twenty times?
11   A.   No.
12   Q.   Is it more than ten?
13   A.   I can't recall.
14   Q.   So somewhere between the four that you've identified
15        on the record today, including what's been marked
16        Exhibit 14, and possibly up to ten?
17   A.   Possibly.
18   Q.   All right, and how many?
19             MS. VAN THOMME:  For the record, I think
20        you originally asked him about depositions --
21             MS. STAMLER:  That's true.
22             MS. VAN THOMME:  -- not lawsuits.
23             MS. STAMLER:  I get it.
24             MS. VAN THOMME:  And some of the
25        depositions he talked about giving he was not a
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1        defendant.  So I think there's a lot of confusion
 2        about --
 3                 MS. STAMLER:  Well, you'll have a chance to
 4        clear it up.
 5                 MS. VAN THOMME:  -- whether you're talking
 6        about depositions or lawsuits.
 7                 MS. STAMLER:  That's fine.  You can clear
 8        it up.
 9   BY MS. STAMLER:
10   Q.   How many times, sir -- you've talked about
11        depositions, so let's be clear.
12                 How many times can you recollect being
13        sued, named as a defendant, during your tenure with
14        Corizon?
15   A.   In context of settlements?  Going to court?
16   Q.   Any time you've been sued as a defendant, where your
17        name is in the caption.
18   A.   There were a handful.  I didn't even realize that this
19        was considered a suit against me, personally.  So I
20        can't give you the exact number.  The number against
21        me, personally, that I recall, was the number I gave
22        you earlier.  Obviously, there may be others where I
23        was named as a defendant with Corizon.
24   Q.   And so as you sit here today, Exhibit Number 14 is the
25        first time, in looking at this, that you've realized
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 182

```
 1        that you were now named as a defendant in a case
 2        brought by Mr. Coonrod against Unknown Sherman, et al.
 3        Is that right?
 4   A.   I assumed I was a representative of Corizon in this,
 5        in this lawsuit, not me being named personally.
 6   Q.   So would that have in any way altered what you would
 7        have signed on behalf of Corizon?
 8              MS. VAN THOMME:  Object to foundation.
 9   A.   No, I acted in accordance and upon the advice of my
10        attorney.
11   BY MS. STAMLER:
12   Q.   Well, I don't want to get into what you discussed with
13        your counsel.  As you sit here today, Dr. Bomber, are
14        there any other declarations or affidavits that you
15        can recollect signing under penalty of perjury?
16   A.   I do not recall the dates or the names.  There are
17        others.
18   Q.   And do you know, sir, whether you were signing those
19        as a litigant or as some type of expert witness for
20        Corizon?
21   A.   I'd have to look at each individual one.
22   Q.   Have you, during the course of your practicing
23        medicine, ever had any disciplinary action taken
24        against your license?
25   A.   No.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 183

```
 1   Q.   Have you ever had your privileges revoked or
 2        suspended?
 3   A.   No.
 4   Q.   Let's finish your review of the contract.  Have you
 5        told me everything that you looked at with regard to
 6        the roles and responsibilities -- strike that -- with
 7        regard to the scope of work as set forth in the
 8        contract at Bates 0955 forward?
 9   A.   Yes.
10   Q.   Now, the next section you said you focused on was
11        1.030, roles and responsibilities.  Would you please
12        turn to that section of the contract?
13   A.   Do you have the page number?
14   Q.   You have to go back to the index.  It's page 34 of the
15        contract.
16   A.   Page 34, 1.030, roles and responsibilities.
17   Q.   Also MDOC_0978 forward.  What section or sections of
18        this provision did you focus on?
19   A.   On page 34, section 1.031 A.8.a., the medical
20        director.
21   Q.   Okay.  Anything else?
22   A.   On page 35, section 8.c., quality improvement and
23        utilization director.
24   Q.   And why would you have looked at that?
25   A.   I believe I wanted to see what the roles of the key
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 184

```
 1        personnel were --

 2   Q.   Okay.

 3   A.   -- what their job descriptions were.

 4   Q.   Anything else?

 5   A.   Those are the ones I recall.

 6   Q.   And with regard to 8.a., key personnel, medical

 7        director, do you understand that section to be the

 8        chief medical officer or all medical directors, such

 9        as regional and state?

10   A.   That's the question.  That's why I reviewed it, to see

11        if that applied to state medical director, regional

12        medical directors, all medical directors, and I don't

13        recall -- I believe I may have discussed it further

14        with my state medical director, but I don't recall.

15   Q.   Well, if you continue reading under 8.a., medical

16        director, there's several sections that specifically

17        address the state medical director.  Is that right?

18   A.   It says the medical director --

19   Q.   Continuing down, look at the second full paragraph

20        under 8.a.

21   A.   The contractor's state medical director will be

22        responsible for the management of all --

23   Q.   I don't want you to read it.  I just want you to

24        indicate for me, do you see that it says "state

25        medical director" throughout that paragraph and the
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 185

```
 1       one that follows?
 2   A.  Yes, but not the preceding one.
 3   Q.  So did you conclude that in reviewing 8.a., the first
 4       section, that applied to all medical directors?
 5   A.  Yes.
 6   Q.  So "This job function must be located in Michigan and
 7       is designated key personnel.  This position must be
 8       staffed at the start of the transition period," did
 9       you understand that all medical director positions had
10       to be staffed at all times?
11               MS. VAN THOMME:  Object to form.
12   A.  These are, yeah, not the utilization physicians.
13       These are the medical directors.
14   BY MS. STAMLER:
15   Q.  Right.  And there were points in time, as you've
16       testified earlier in going through the org charts,
17       that at least on one occasion the regional director
18       for the southern section was vacant, correct?
19   A.  One of the three was for a short time vacant, yes.
20   Q.  Yeah.  And that's a key personnel position, correct?
21   A.  No.
22   Q.  Oh, it's not, okay, so --
23   A.  The state medical director is.
24   Q.  Okay.  So when you said that the first part of
25       paragraph 8.a., where it says "medical director,"
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 186

```
 1        applied to all medical directors, including regional,
 2        are you changing your testimony now?
 3   A.   No.  I think most of that paragraph does apply to all.
 4        But as far as being the key personnel position, the
 5        regional -- assistant regionals are not.
 6   Q.   It's only the state medical director, is that right?
 7   A.   There are ten key positions, and one of them is the
 8        state medical director.
 9   Q.   During your tenure with Corizon, have there been
10        situations where the state medical director was a
11        vacant position?
12   A.   No.
13   Q.   Is another key, another key personnel position the
14        chief medical officer?
15   A.   No -- you mean for Corizon?  No.
16   Q.   Okay.  What are the ten positions?
17   A.   They're in here, somewhere in the contract.
18   Q.   Do you know them offhand?
19   A.   You have the state medical director, the utilization
20        management physician for outpatient services and
21        inpatient services, the quality control nurse.  Yeah,
22        I mean ...
23   Q.   Okay.  And so you have testified that the UM
24        outpatient position was vacant for a period of time --
25   A.   Yes.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 187

```
 1   Q.   -- correct?

 2   A.   That's right.

 3   Q.   That's a key personnel position, correct?

 4   A.   Correct.

 5   Q.   All right.  Anything else in this section that you

 6        focused on?  I think you said that there was the

 7        quality improvement and utilization director.  That's

 8        a key personnel position, correct?

 9   A.   Yes.

10   Q.   And you just wanted to know what those duties were, is

11        that right?

12   A.   Correct.

13   Q.   Any other reason you looked at that?

14   A.   No.

15   Q.   And then the next section you looked at was 2.060,

16        specifically 61 and 62, is that right?

17   A.   Let me find the section ...

18   Q.   Page 46.  Are you there?

19   A.   Yes.

20   Q.   Okay.  Why did you look at those sections?

21   A.   2.062, contractor key personnel --

22   Q.   Well, let's go to 61 first, if we can.

23   A.   Contractor personnel qualifications.  I was just

24        seeking general knowledge.  I don't recall

25        specifically why I looked at that section.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 188

```
 1   Q.   Okay.  And what about as to 2.062, contractor key
 2        personnel?
 3   A.   I wanted to be aware of what was considered the key
 4        personnel in the contract.
 5   Q.   Okay.  Any other reason you looked at that provision?
 6   A.   No.
 7   Q.   All right.  Now, let's go to Appendix C, which I think
 8        was the next item you said you reviewed?
 9   A.   Appendix C ...
10   Q.   It's going to be towards the back of this document.
11   A.   Page 97?
12   Q.   Bates MDOC_1041.  This is the continuous quality
13        assurance plan.  Why were you reviewing Appendix C?
14   A.   Continuous quality improvement has always been an
15        interest of mine.  I have been involved in initiatives
16        regarding quality, quality improvement programs.  I
17        looked at this for several reasons.  One, initiatives
18        that I was responsible for and just to be clear on
19        what the, you know, the State required in terms of
20        CQI.
21   Q.   "CQI" being continuous quality improvement?
22   A.   Right.
23   Q.   And is this anything, this particular topic, any
24        component of the Corizon training for physicians who
25        are onboarding?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 189

```
 1   A.   Yes.  We discuss this in our patient safety program
 2        review.
 3   Q.   Well, that's privileged, as I understand it.  So other
 4        than in the context of some form of peer review, I'm
 5        talking about at onboarding.
 6   A.   Yes.  We tell our providers that are coming in what
 7        quality improvement programs we have ongoing, so that
 8        they're familiar with them --
 9   Q.   Anything else?
10   A.   -- and they may participate in them.  No.
11   Q.   All right.  Any other reason you looked at Appendix C?
12   A.   I don't recall any other reasons.
13   Q.   Okay.  And then I believe the final thing that you
14        identified was Appendix D, which was the utilization
15        management program.
16   A.   Appendix D, at page 111.
17   Q.   What specifically did you look at with regard to
18        Appendix D?
19   A.   Well, in my role as regional medical director, I was
20        responsible to help my providers with appeals if they
21        had any, to be sure of the processes surrounding
22        utilization management and appeals and my
23        responsibilities.
24   Q.   How often were appeals taken?
25   A.   Appeals were actually fairly rare.  In terms of the
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

1      total volume of requests, I might have one appeal in a

2      month.

3   Q.  And this would have been, I assume, in the context of

4      a 407 having been submitted and denied for some

5      reason, is that right?

6   A.  They're never denied, but -- they may be deferred, but

7      never denied.

8   Q.  What's the difference between deferred and denied?

9   A.  There is a difference.  Medicine is a process.  It's

10     not black and white, it's not absolute.  Sometimes a

11     provider might request a CT scan and we find that

12     actually the ultrasound would be a better test, so we

13     might defer the initial request for a CT and recommend

14     that a new 407 be submitted for an ultrasound.

15  Q.  Which is less expensive, an ultrasound or a CT scan?

16  A.  I think CTs have actually become cheaper now.  They

17     used to be more expensive.

18  Q.  When did they become cheaper?

19  A.  I don't know.  I don't focus on that.  And again, we

20     tell our providers not to focus on the cost of any

21     test.  We try to find the right test for the patient,

22     irregardless of cost.

23  Q.  What goes into determining the right test?  Isn't

24     cost-effectiveness a factor?

25  A.  For example, if there's a choice between medications

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 191

```
 1         and one is more cost-effective but equally

 2         efficacious, yes, we will go with the cost-effective

 3         one.  If there's a test that is equally efficacious

 4         but less costly, certainly you go with that.  But it's

 5         always what the patient needs first.  That's why we

 6         use UpToDate.

 7    Q.   Well, do you think an ultrasound image is the same as

 8         a CT scan?

 9    A.   No, they're different.

10    Q.   Which gives a better picture, ultrasound or CT scan?

11    A.   It really depends on what you're looking for.

12    Q.   What about with regard to a mass, a tumor?

13    A.   Sometimes an ultrasound of a tumor gives you more

14         information than a CT scan.  Sometimes one is better

15         for a surgeon that's going to do a biopsy.  You use,

16         you know, ultrasound-guided needle biopsies for the

17         clinician.

18              So there's a lot of, a lot of different

19         reasons you might use one test over the other.

20    Q.   Okay.  407s are never denied, is that your testimony?

21    A.   They're deferred.

22    Q.   Have you ever read any of the transcripts in this

23         case?

24    A.   In the Franklin case?

25    Q.   Yes.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 192

```
 1   A.   No, I said earlier that I --

 2   Q.   I know you didn't review any of the medical records,

 3        but you haven't reviewed any of the deposition

 4        testimony, is that right?

 5   A.   The only thing I've reviewed is what's in the two

 6        binders here today.

 7   Q.   Are you familiar with the notion that 407s can be

 8        denied if they're filled out incorrectly?

 9   A.   Again, we don't use the word "deny."  We would defer

10        them and have them resubmit.

11   Q.   And you've never seen a 407 where it indicates

12        "denied, submitted incorrectly"?

13   A.   If we use that terminology, occasionally I could see

14        where that would happen, but our preferred terminology

15        is deferred.

16   Q.   I understand.  But you have seen the word denied,

17        isn't that right, in the context of a 407 that's been

18        completed improperly?

19   A.   In that context, they may have used the word denied.

20   Q.   And are you familiar with the notion that if the

21        medical provider fills out a 407 seeking the wrong

22        test, for example, a specialty provider says "get an

23        ultrasound done," but the medical provider asks for a

24        CT scan, that would be a basis for the denial of a

25        407, correct?
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 193

```
 1                    MS. VAN THOMME:  Object to form.
 2    A.   That would be a deferral.  And if there's concern by
 3         the provider that the test wasn't approved
 4         appropriately, they would have the right to appeal.
 5         We don't always do exactly what specialists say to do.
 6    BY MS. STAMLER:
 7    Q.   Are you familiar with the concept under the 407
 8         procedure that each procedure that's being requested
 9         by a medical provider has to have its own 407?
10    A.   Yes.
11    Q.   And do you understand, sir, as you sit here today,
12         that by combining two procedures on a 407, that's a
13         basis for a denial?  Yes or no?
14                    MS. VAN THOMME:   Object to form.
15    BY MS. STAMLER:
16    Q.   Go ahead and answer.
17    A.   I would use the word deferred and ask the provider to
18         submit two separate ones.
19    Q.   You would use that, but what does Corizon's procedure
20         say, do you know?
21    A.   And that would be really the only instance I can think
22         of where they might use the word denied, because it's
23         more of a secretarial processing issue.
24    Q.   A secretarial processing issue?
25    A.   Right.  In terms of the provider not correctly
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 194

```
 1           submitting the form in the proper way that it's
 2           supposed to be submitted, then we would ask them to
 3           resubmit the two separate requests, and he may use the
 4           word denied in that context.
 5     Q.    Okay.  Do you, as part of your training, train the
 6           physicians that are coming on board to use separate
 7           407s for separate tests?
 8     A.    Yes.  And sometimes people will make a mistake and
 9           submit two on one.  But, for the most part, they
10           submit each one individually, and that's the way that
11           they're trained.
12     Q.    And you understand that by submitting them
13           incorrectly, that can delay getting the procedure
14           approved, correct?
15     A.    It's usually not a very significant delay.  Usually
16           that's turned around within a day.
17     Q.    I didn't ask you if it was a significant delay.  I
18           simply asked you could it result in a delay.  Is that
19           a yes?
20     A.    Yes, it could.
21     Q.    Have you ever seen a circumstance where a 407 was
22           denied based upon lack of medical necessity being
23           demonstrated?  Yes or no?
24     A.    Again, we use the word deferred.  Then, yes, I have
25           had and seen 407 requests deferred because of lack of
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 195

```
 1        medical necessity.
 2   Q.   Well, if there's no medical necessity, how would it be
 3        ever appropriate to get the particular test done?
 4   A.   Because sometimes it's more appropriate to do other
 5        things in advance of that test.
 6   Q.   So in some ways we're talking semantics.  You use the
 7        word deferred; others may use the word denied.  Is
 8        that correct?
 9   A.   You may.
10   Q.   Is there anything else with regard to the UM program
11        summary that you reviewed as part of Appendix D?
12   A.   No.
13   Q.   Now, job descriptions were produced yesterday evening.
14        I'm just going to mark these and walk through these
15        with you.  Tell me if you've seen these before.
16                  MARKED FOR IDENTIFICATION:
17                  DEPOSITION EXHIBITS 15 - 17
18                  3:40 p.m.
19   BY MS. STAMLER:
20   Q.   Dr. Bomber, you've been handed Exhibits 15, 16, and 17
21        to your deposition.  Have you seen these before?
22   A.   Yes.
23   Q.   And these are job descriptions that are Corizon job
24        descriptions for the positions of staff physician,
25        site medical director, and regional medical director.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 196

```
 1        Is that right?
 2    A.  Correct.
 3    Q.  There are dates that appear at the bottom of each of
 4        these exhibits.  Do you see that?
 5    A.  Yes.
 6    Q.  One indicates -- the first one, Exhibit 15, indicates
 7        the last revision was August 16 of 2013.  Is that
 8        right?
 9    A.  Yes.
10    Q.  Exhibit 16 and 17 have a last revision of 8-1-15.  Is
11        that correct?
12    A.  Yes.
13    Q.  And do you see on Exhibit 15 there is nothing sort of
14        watermarked on it, as compared to 16 and 17, that say
15        "standard" across the two documents?  Do you see the
16        difference?
17    A.  Yes.
18    Q.  Do you know what that means?
19    A.  No.
20    Q.  Do you have any idea whether the descriptions that are
21        contained in Exhibits 16 and 17 are those that existed
22        in 2012 to '14?
23    A.  I would have to see the job descriptions from that
24        time to compare them.
25    Q.  Right.  So we can't tell today, based on what's been
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 197

```
 1        produced, whether these Exhibits 16 and 17 have any

 2        relevance to the job descriptions that existed back in

 3        2012 to '14, correct?

 4   A.   Correct.

 5   Q.   Turning your attention to Exhibit 15, do you know if

 6        Exhibit 15 was the job description in place in August

 7        of 2012?

 8   A.   I can't say with certainty.

 9   Q.   You were a staff physician prior to August of 2013 for

10        Corizon, correct?

11   A.   Correct.

12   Q.   Did you ever see a job description for that job?

13   A.   Yes.

14   Q.   Can you look at Exhibit 15 and tell me if it comports

15        with your memory of the job description?

16   A.   It looks similar.  But again, going by memory and not

17        having the document to compare, I can't address

18        specifics.

19   Q.   Going back to the declaration that you signed, that we

20        reviewed earlier in your testimony, it's right

21        there --

22   A.   Yes.

23   Q.   -- Exhibit 14, were you providing an expert opinion,

24        from your perspective, regarding the medical, direct

25        medical care of others who treated the plaintiff,
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 198

```
 1        Coonrod?  Were you giving opinion on that?
 2   A.   Yes.
 3   Q.   Now, would you agree with me, Doctor, that Corizon's
 4        utilization management process is designed to provide
 5        appropriate, medically-indicated care in a
 6        cost-effective manner?
 7   A.   Yes.
 8   Q.   And that process we've sort of gone over, in part, in
 9        the contract, right?  But there are other documents
10        that were produced in this case addressing utilization
11        management, is that right, do you know, in all the
12        documents you've had somebody directed to turn over to
13        your counsel?
14   A.   Yes.
15   Q.   Are you familiar with where those are located in the
16        documents in those two binders?
17   A.   I'd have to go back and look to be sure.
18   Q.   Okay.  I would appreciate it if you could locate those
19        for me.
20   A.   I've located the document.
21   Q.   Okay.  Can you identify it on the record for me?
22   A.   Certainly.  It's the section in the training manual on
23        introduction to utilization management.
24   Q.   Can I see that so I can try and locate it in the
25        documents that I have?
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 199

```
 1   A.   It's about midway.

 2   Q.   Mine may not be organized in the same manner.

 3                MS. VAN THOMME:  There might be more than

 4        one document under that heading.

 5                MS. STAMLER:  Yeah, I understand.  I'm just

 6        looking for it.  Introduction to utilization

 7        management.  Again, I don't remember seeing that.

 8        We'll go off this document.  Let me just take a look

 9        at it.

10                (Off the record at 3:46 p.m.)

11                (Back on the record at 3:49 p.m.)

12                MS. STAMLER:  I don't recall getting this

13        document, so I'm just going to have to mark, I'm

14        sorry, yours, because I don't know if it's in

15        something I got or not.

16                MARKED FOR IDENTIFICATION:

17                DEPOSITION EXHIBIT 18

18                3:49 p.m.

19   BY MS. STAMLER:

20   Q.   Dr. Bomber, Exhibit 18 is the introduction to the

21        utilization management system.  Is that correct?

22   A.   Correct.

23   Q.   And was this part of the training you provided to

24        physicians that were coming on board?

25   A.   Yes, that's part of the training.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

1  Q.  And this references that Corizon's utilization

2      management department receives outpatient service

3      requests called 407s from different sites within the

4      company.  Correct?

5  A.  The 407 is actually specific to the Michigan

6      Department of Corrections.  It's just their number for

7      the form.

8  Q.  Okay.  Well, this exhibit references the 407, correct?

9  A.  Correct.

10  Q.  407 requests are entered and reviewed in the EMR, is

11      that right?

12  A.  Correct.

13  Q.  And would you agree that the process occasionally

14      requires additional contact with the requesting

15      practitioner to collect all clinical information

16      necessary to complete a review?

17  A.  Yes.

18  Q.  Can that delay the review process?

19  A.  Yes.

20  Q.  "Our outpatient UM nurse reviews all cases and refers

21      those in need of secondary review to the OMD."

22              What does that mean?

23  A.  That would be in the event of an appeal, but -- could

24      I look at the form for a minute?

25  Q.  Oh, sure.  I don't have one to go on, so I'm just

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 201

```
 1         looking at it, but it's the second paragraph, last
 2         sentence.
 3    A.   Okay.
 4    Q.   Then I'm going to need you to hand it back to me.
 5    A.   I believe that's referring to when more information is
 6         required, then the outpatient utilization nurse will
 7         help the provider facilitate that process.  So if the
 8         UM physician needs more information, they're available
 9         to help to speed that up.  It's in the same paragraph.
10    Q.   Are there other documents that you're aware of,
11         Doctor, that address training on the UM program?
12    A.   Yes, there should be more documents in there.
13    Q.   I'm going to ask you or your counsel to locate them,
14         please.
15    A.   Sure.
16                   MS. STAMLER:  Let's go off the record.
17                   (Off the record at 3:52 p.m.)
18                   MARKED FOR IDENTIFICATION:
19                   DEPOSITION EXHIBIT 19
20                   3:55 p.m.
21                   (Back on the record at 3:55 p.m.)
22    BY MS. STAMLER:
23    Q.   Dr. Bomber, have you completed your review of the
24         various documents that you brought or your counsel
25         brought here today --
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1   A.   Yes.
 2   Q.   -- to determine whether you have provided or handed to
 3        me the balance of the training materials on the
 4        utilization management program?
 5   A.   Yes.
 6   Q.   All right.  I'm going to show you what's been marked
 7        Exhibit 19 and ask you, if you would, to simply
 8        identify on the record what Exhibit 19 is, and then
 9        you're going to need to hand it back to me.
10   A.   Exhibit 19, page 1, is the definition of
11        medically-necessary care.
12                  The second page is the Michigan DOC and
13        Quality Correctional Care of Michigan, PC, Specialty
14        Consultation (407) Standard Operating Protocol.
15                  And then the MDOC-Corizon 407 Appeal
16        Standard Operating Procedure.
17   Q.   Now, there's something on the back.
18   A.   There's a mention of the sleep studies available at
19        Duane Waters.
20   Q.   That's not part of the UM?
21   A.   Yes, it is.  It's to show the providers we do have
22        on-site procedures available.
23   Q.   Okay.  All right, can you hand Exhibit 19 back to me?
24                  Do you recall, sir, as you sit here today,
25        whether Exhibit 19 was in effect during the years 2012
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1         through 2014?

 2    A.   Yes.

 3    Q.   This was in fact the training document or documents

 4         used to train physicians that were coming on board

 5         from August of 2012 forward?

 6    A.   Yes.  There may be an updated version of it, but it's

 7         very similar.

 8    Q.   I take it the definition of medically-necessary care

 9         has not changed from August of 2012 to present?

10    A.   It is similar, but with the caveat being that we use

11         UpToDate largely for determining medical necessity.

12         So there may be modifications of that.

13    Q.   Well, you would agree that for something to be

14         medically necessary, there would have to be adequate

15         and essential therapy provided for evaluation or

16         treatment consistent with symptoms, proper diagnosis,

17         and treatment appropriate for the specific patient's

18         illness, disease, or condition?

19    A.   Yes.

20    Q.   And that sort of treatment would be reasonably

21         expected to decrease the disease progression?

22    A.   Yes.

23    Q.   That there's a focus on function, including ADLs,

24         activities of daily living?

25    A.   That is part of it, yes.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 204

```
 1   Q.   That it's providing a safe and effective process
 2        according to the nationally-accepted standard of
 3        clinical evidence?
 4   A.   Yes.
 5   Q.   Do you know what that means?
 6   A.   Yes.
 7   Q.   What?
 8   A.   UpToDate is a nationally-accepted method of
 9        establishing clinical evidence.
10   Q.   You weren't using UpToDate back in 2012, were you?
11   A.   Yes -- well, UpToDate in -- yes, I believe we were.
12   Q.   Okay.  The protocol that's detailed in this training
13        packet gives a standard operating protocol, is that
14        right?
15   A.   Yes.
16   Q.   And there are definitions contained in this protocol,
17        including a routine 407, an urgent 407, and an
18        emergent need.  Is that right?
19   A.   Yes.
20   Q.   And I'm not testing your memory, but I'm going to read
21        these to you and see if you concur that these were the
22        standards that existed beginning in August of 2012 and
23        ending in the time frame of June 30, 2014.
24              The definition of a routine 407 was:  Any
25        specialty request which is medically necessary and not
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 205

```
 1          emergent or urgent and is submitted within sixty days

 2          of the requested service.

 3                  Is that your understanding of the

 4          definition that was in place from August 2012 through

 5          June 30, 2014?

 6   A.     Yes.  But we always exceeded that standard.

 7   Q.     I didn't ask you that question.  I asked you is that

 8          the definition.

 9   A.     Yes.

10   Q.     The urgent 407 is:  A specialty request which is

11          medically necessary and warrants the patient be seen

12          by the consultant within 72 hours of completing the

13          407 request form.

14                  Did you understand that to be the

15          definition in place beginning in August of 2012

16          through June 30, 2014?

17   A.     Yes.

18   Q.     And then emergent need:  The patient's medical

19          condition may require they be sent to the emergency

20          department after notification of the on-call

21          practitioner for evaluation and treatment.

22                  Did you understand that to be the

23          definition during the relevant time frame of August 1,

24          2012, through June 30, 2014?

25   A.     Yes.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 206

```
 1    Q.   It's fair to say that the emergent need does not
 2         require a 407, is that right?
 3    A.   Correct.
 4    Q.   Fair to say that when somebody is in an emergency
 5         condition, that the best and fastest way to transport
 6         them is via an ambulance, correct?
 7    A.   Yes.
 8    Q.   Can you think of any reason when somebody is in an
 9         emergent condition that they would not be transported
10         by an ambulance?
11    A.   No.
12    Q.   Would you agree with me that when a patient in the
13         correctional system is in emergent need of medical
14         care, that it makes sense to get them to the closest
15         hospital to the facility where they're incarcerated?
16              MS. VAN THOMME:  Object to form.
17    A.   Yes.
18    BY MS. STAMLER:
19    Q.   Are medical staff trained in that fashion; that if
20         you've got a prisoner who has an emergent medical need
21         that requires immediate attention, that they be
22         transported by ambulance to the closest hospital
23         located next to -- near the facility where the inmate
24         is incarcerated?
25    A.   Yes, but there are exceptions.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 207

```
 1   Q.   What kind of exception would exist?

 2   A.   Well, for an example, a fracture may be an emergent

 3        need, but the patient is stable and could potentially

 4        be transported by State vehicle.  If the patient is

 5        emergent and having chest pain, cardiopulmonary

 6        arrest, then by ambulance, generally, yes, to the

 7        nearest facility.  But if a patient is stable, they

 8        may be transferred to where we have a secure unit

 9        available.

10   Q.   Okay.  Do you know offhand whether Carson City

11        Hospital provided treatment to inmates that were

12        located in the Carson City Correctional Facility?

13   A.   Yes.

14   Q.   Did they have a secure unit there?

15   A.   No.

16   Q.   So that if a person was suffering from an emergent

17        medical situation, they would have to be transported

18        to a secure location?

19   A.   Not always.  We do admit patients there.

20   Q.   Okay.  You would agree with me that a 407 that's

21        deemed urgent is treated in a faster fashion, at least

22        according to these protocols that I've just gone over,

23        correct?

24   A.   Correct.

25   Q.   And that if a medical provider deems a 407 routine and
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1          not urgent, it's going to get a less quick -- let me
 2          rephrase that.  Let me start over, strike that.
 3                  You would agree that if a medical provider
 4          deems a 407 routine and not urgent, that it will not
 5          be treated within a guaranteed 72 hours, correct?
 6                  MS. VAN THOMME:  Object to form and
 7          foundation.
 8   A.     Well, it's really irrelevant, in that we approve
 9          everything within two days, but technically, yes.
10   BY MS. STAMLER:
11   Q.     Are you saying every single 407 that's submitted,
12          whether it's urgent or routine, gets resolved in two
13          days?
14   A.     Right now we're running at about every -- Q two days,
15          yes.
16   Q.     Right now.
17   A.     Mmm-hmm.
18   Q.     What about 2012?
19   A.     It varied depending on the volume.  I can't speak for
20          exactly 2012.
21   Q.     What about 2013?
22   A.     I can't speak exactly for that, either.
23   Q.     What about 2014?
24   A.     I'd have to look at the numbers.
25   Q.     Right.  So all you can tell me is today.  What I want
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 209

```
 1           to know is, you have no knowledge as to how quickly
 2           the turnaround was on routine versus urgent 407s back
 3           in 2012, '13, or '14, correct?
 4     A.    I know we've been very close to two days for many,
 5           many years going back that far, yes.
 6     Q.    Do you know for sure?
 7     A.    No.
 8     Q.    And you can't tell me how quickly Mr. Franklin got
 9           services based on the 407s that were submitted for
10           him, right?
11     A.    I cannot.
12     Q.    You have no idea how much time elapsed between when a
13           palpable mass was first detected on his neck and when
14           he actually got any form of treatment, whether it was
15           testing or actual treatment?
16     A.    I have not reviewed that case.
17     Q.    Now, in this protocol that has been provided and
18           marked Exhibit 19, there's a procedure for the
19           submission of 407 requests, that it goes to a
20           practitioner via the 407 group, and it's opened in the
21           MTrax.  Is that right?
22     A.    Yes.
23     Q.    Is that still the case?
24     A.    No.
25     Q.    Okay.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 210

```
 1   A.   We're not using MTrax anymore.

 2   Q.   So this would suggest that this is the protocol that

 3        was in place before there was this combined

 4        utilization management storage system --

 5   A.   Yes.

 6   Q.   -- for lack of a better description, am I right?

 7   A.   Yes.

 8   Q.   All right.  It says:  The Corizon UM office will

 9        provide an initial response to the 407 in the EMR and

10        MTrax within three business days of receiving it.

11                 So if a 407 were submitted by a physician

12        on a Friday, it's feasible that three business days in

13        addition to the two weekend days that would be added

14        before a response would be required under this

15        protocol.  Is that right?

16   A.   Yes.

17   Q.   The requesting practitioner was obligated, at least

18        under this protocol, to follow up on all outstanding

19        407s on a daily basis.

20                 How was that documented?

21   A.   They had access to MTrax, which was the tracking

22        system for it, and in doing our chart reviews and

23        audits, that was a part of the audit, to ensure that

24        their filing in response to 407s was timely.

25   Q.   Okay.  So that would have been in those ten random
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 211

 1       charts that were looked at, right?

 2   A.  Yes.

 3   Q.  But other than that, is there a way that anybody could

 4       look into the system to see if a practitioner was

 5       actually following up on all of their outstanding 407s

 6       on a daily basis?

 7   A.  Yes.  The UM department followed an aging report of

 8       some kind.  I don't know what they called it back

 9       then.  But if there were 407s that hadn't been

10       completed and closed out, they reviewed them at, you

11       know, thirty days, sixty days, and so forth.

12   Q.  Thirty and sixty days?

13   A.  There was a process.  I don't remember how many days.

14   Q.  Right.  But how, if at all -- other than the audit

15       that was performed that you've testified to earlier,

16       would there be a way to determine whether the

17       practitioner was actually following up on the

18       outstanding 407s?

19   A.  The UM department had an aging report that they

20       followed.

21   Q.  Other than that?

22   A.  Those would be the three processes.

23   Q.  Three?  What was -- I'm sorry, you had the audit, and

24       the UM aging report, which was, you think, thirty or

25       sixty days out?

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1   A.   Right.

 2   Q.   What was the --

 3   A.   And the practitioner following their 407s.

 4   Q.   What?

 5   A.   In the beginning you had said that the 407s were

 6        followed by the practitioner, yes.

 7   Q.   No, but I want to know how you could ensure that the

 8        practitioner's actually doing the follow-up.

 9   A.   Yes.  Then there were two methods, yes.

10   Q.   Okay.  So then the next step is after the 407 is

11        approved, what will happen under the approval process,

12        or there might be an alternative treatment plan

13        suggested.  Is that right?

14   A.   Yes.

15   Q.   And once that happens, the provider has the

16        opportunity to appeal that decision or accept it.  Is

17        that right?

18   A.   Correct.

19   Q.   And if the appeal happens, how quickly is the appeal

20        addressed?

21   A.   The same day.  The provider at the time, if they had

22        an appeal, would consult with their regional medical

23        director, and then the regional medical director would

24        review the case, and if they concurred with the

25        provider, then they would appeal it to the UM
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 213

1          physician.

2     Q.   And how long did the appeal process take?

3     A.   Just a matter of phone calls.  Usually, you know, a

4          couple of days.

5     Q.   Then there's the appeal standard operating procedure.

6          This is when the medical practitioner is challenging

7          the denial or deferral, based on your testimony, of a

8          particular requested service.  Is that right?

9     A.   Yes.

10    Q.   What training, beyond what you already had when you

11         were first onboarded, did you receive, if any, to

12         serve in the interim role performing utilization

13         management review when there was that vacancy in

14         roughly 2014?

15    A.   Yes, I worked with Dr. Orlebeke, the state medical

16         director, who trained me in the process, and then I

17         was audited on virtually every case initially, and

18         that was pretty much the training.

19    Q.   Was there any decision that you made on the 407

20         process when you were serving in that interim or

21         backup role where your decisions were altered,

22         changed?

23    A.   There were, I believe there were a couple times where

24         the state medical director did disagree with me.

25    Q.   Suggesting you were seeking too much of a service?




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 214

```
 1    A.    Either too much or perhaps the wrong thing.  There
 2          were a couple of cases that, after further review, I
 3          concurred with her.  We always do have the option to
 4          appeal it to the medical services advisory committee,
 5          as well, but I can't recall the specifics of those
 6          cases.  But after review, I generally concurred with
 7          her.
 8    Q.    Are you familiar with a document that's called
 9          "Introduction to Practitioner Clinical Onboarding"?
10    A.    I do recall the document.
11    Q.    And do you remember seeing various protocols or
12          messages by the chief medical officer, anything like
13          that, as part of the onboarding documents?
14    A.    I'd have to look at it again to be sure.
15    Q.    Okay.  Do you have -- does your counsel have anything
16          on this?  There's a document that says "Introduction
17          to Accountable Care Organizations."
18                    MS. VAN THOMME:  How much more do you have?
19                    MS. STAMLER:  I can't say for sure.
20                    MS. VAN THOMME:  I'm running out of time,
21          and, like I said, we had agreed that this was going to
22          be --
23                    MS. STAMLER:  We didn't agree to anything,
24          but I'd like to at least finish this line of inquiry,
25          at least on just this one page.
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 215

```
 1                   MS. VAN THOMME:  Okay, we can do that.
 2                   MS. STAMLER:  And then we're going to make
 3         a record before we close it out.
 4    BY MS. STAMLER:
 5    Q.   Are you on the document that's entitled "Introduction
 6         to Accountable Care Organizations"?
 7    A.   Yes.
 8                   MS. STAMLER:  I just want to take that one
 9         page out of the binder and mark it as Exhibit 20,
10         please.
11                   MARKED FOR IDENTIFICATION:
12                   DEPOSITION EXHIBIT 20
13                   4:14 p.m.
14    BY MS. STAMLER:
15    Q.   Have you seen Exhibit 20 before?
16    A.   Yes.
17    Q.   And can you identify for the record what it is?
18    A.   Yes.  "Introduction to Accountable Care Organizations,
19         Accountable Care Organizations/Patient Centered
20         Medical Home: Message by Chief Medical Officer."
21    Q.   And do you recall receiving this message?
22    A.   Yes.
23    Q.   And would that have been on or around sometime in
24         2013?
25    A.   Yes.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 216

```
 1    Q.   And is this something that you provided to incoming

 2         physicians on or around 2013?

 3    A.   Yes.

 4    Q.   And when there were updates like this, were these

 5         provided to the medical personnel on staff at the

 6         time?

 7    A.   Yes.

 8    Q.   And do you recall if there was a similar message that

 9         was sent by the chief medical officer back in 2012?

10    A.   I do not recall.

11    Q.   You would agree that in the first bullet point, it

12         indicates:  Corizon has particular strength in many

13         areas emphasized by PCMH.

14              First of all, that means patient-centered

15         medical home.  Is that right?

16    A.   Yes.

17    Q.   And the first bullet point says:  Population health:

18         Health care is constitutional right for the

19         incarcerated, and prison inmates constitute a stable

20         base for population-based practice.

21              Did I read that correctly?

22    A.   Yes.

23    Q.   That would be consistent with earlier testimony that

24         you gave with regard to the constitutional right to

25         health care for incarcerated individuals, correct?
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 217

```
 1   A.   Yes.

 2   Q.   And then the next part of this paragraph says:

 3        Practitioners know their patients personally and

 4        patients know their practitioner.  Practitioners can

 5        exercise more control over their patients' diet,

 6        medication compliance, and environment than can their

 7        colleagues in outside communities.

 8                  Did I read that correctly?

 9   A.   Yes.

10   Q.   So is that -- do you understand the latter part of

11        that paragraph to mean that because you have a

12        population that's incarcerated and not free to get

13        medical care elsewhere, you have greater control over

14        your patients?  Is that what you understood that to

15        mean?

16                  MS. VAN THOMME:  Object to form.

17   A.   I understand this to mean that because the

18        practitioner is on-site, that they can have a more

19        extensive and direct impact on the patient's care.  I

20        mean, they're a part of the patient-centered home.

21   BY MS. STAMLER:

22   Q.   And would it surprise you, sir, to learn that the

23        physicians in this case, some of them have testified

24        they had no memory of meeting Keith Franklin, didn't

25        know him, even though they provided medical care to
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 218

```
 1        him?
 2   A.   I'm sorry, so the question is?
 3   Q.   Would it surprise you that they didn't have a personal
 4        recollection of their patient, Keith Franklin?
 5   A.   I guess it would depend on how many years it's been
 6        since they've seen them, how many times they saw them.
 7        You know, there's a lot of movement behind the bars.
 8        Patients are transferred all the time.
 9   Q.   Well, he wasn't from 2012 to 2014, he was at Carson
10        City, except for that very short duration when he
11        received chemotherapy and then ultimately died
12        off-site.
13                  MS. VAN THOMME:  Object to form.
14   A.   So if the provider saw the patient frequently in that
15        time interval, I would be surprised that they didn't
16        know the patient.
17   BY MS. STAMLER:
18   Q.   It certainly wouldn't be in keeping with the message
19        by the chief medical officer, would it?
20                  MS. VAN THOMME:  Object to form.
21   BY MS. STAMLER:
22   Q.   Go ahead and answer.
23   A.   No.
24                  MS. STAMLER:  I'm just going to make a
25        record.
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

```
 1                    I learned at about, I don't know, roughly
 2          ten to four that Ms. Van Thomme has a conflict that
 3          precludes her from staying any longer today.  And her
 4          desire to leave early, she is stating, is premised
 5          upon an email I sent yesterday evening after I
 6          received, I would say probably five thousand pages of
 7          documents, if not more, and more this morning, which
 8          quite candidly was -- I'm outraged and concerned about
 9          the conduct in this case.
10                    I'm not going to belabor it on the record,
11          but it is now 4:20, and she advised me about a half an
12          hour ago she has a conflict and needs to leave early.
13                    So we are going to adjourn for today and
14          we'll pick a date, and I intend to reach out to the
15          Court, because this is going to affect my ability to
16          get an expert report.
17                    MS. VAN THOMME:  And I would like to also
18          add to that that the email I received last night said
19          that plaintiff's counsel was going to seek a
20          continuance from the Court; however, I agreed to the
21          continuance.  And I learned subsequently that the
22          documents that my office produced are not complete and
23          that we need to take another look at that.
24                    So there are multiple issues here.
25          However, I don't intend to obstruct plaintiff's
```




JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 220

```
 1        counsel's ability to complete the deposition or to

 2        have the proper documents that we have not objected

 3        to, and we will agree to extend dates if we have to in

 4        order to make everything that needs to happen, happen.

 5                    MS. STAMLER:  Okay, we're off the record.

 6                    (The deposition was adjourned at 4:19 p.m.

 7               Signature of the witness was not requested by

 8               counsel for the respective parties hereto.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 

JEFFREY BOMBER, D.O., 30(B)(6)
December 19, 2017

Page 221

```
 1                    CERTIFICATE OF NOTARY

 2    State of Michigan )

 3                      ) SS

 4    COUNTY OF KENT    )

 5

 6              I, REBECCA L. RUSSO, certify that this

 7      deposition was taken before me on the date

 8      hereinbefore set forth; that the foregoing questions

 9      and answers were recorded by me stenographically and

10      reduced to computer transcription; that this is a

11      true, full and correct transcript of my stenographic

12      notes so taken; and that I am not related to, nor of

13      counsel to, either party nor interested in the event

14      of this cause.

15

16

17

18

19

20          Rebecca L. Russo

21

22              REBECCA L. RUSSO, CSR-2759

23              Notary Public,

24              Kent County, Michigan.

25      My Commission expires: 6-3-2023
```

 

# THE ESTATE OF FRANKLIN v. HEYNS, ET AL.

## JEFFREY BOMBER, D.O., 30(B)(6)

II

January 22, 2018

*Prepared for you by*



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 222

```
 1              IN THE DISTRICT COURT OF THE UNITED STATES

 2               FOR THE EASTERN DISTRICT OF MICHIGAN

 3                       SOUTHERN DIVISION

 4

 5

 6   THE ESTATE OF KEITH FRANKLIN,

 7   by its Personal Representative,

 8   KAREN FRANKLIN,

 9               Plaintiff,

10          vs.                   Case No. 16-13587

11                                Hon. Laurie J. Michelson

12

13   DANIEL H. HEYNS, individually

14   and in his official capacity as

15   the former Director of the

16   Michigan Department of

17   Corrections, CORIZON HEALTH,

18   INC., a subsidiary of VALITAS

19   HEALTH SERVICES, INC., JANAK R.

20   BHAVSAR, M.D., individually and

21   in his official capacity,

22   DANIEL T. CARREL, D.O.,

23   individually and in his

24   official capacity, SCOTT L.

25   HOLMES, M.D., individually and
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 223

1    in his official capacity,

2    jointly and severally,

3                    Defendants.

4    _____

5

6

7         The 30(b)(6) Deposition of JEFFREY BOMBER, D.O.,

8         VOLUME II,

9         Taken at 306 Townsend Street,

10        Lansing, Michigan,

11        Commencing at 9:48 a.m.,

12        Thursday, January 18, 2018

13        Before Rebecca L. Russo, CSR-2759, RMR, CRR.

14

15

16   APPEARANCES:

17

18   PATRICIA A. STAMLER

19   Hertz Schram PC

20   1760 South Telegraph Road

21   Suite 300

22   Bloomfield Hills, Michigan 48302

23   248.335.5000

24   pstamler@hertzschram.com

25        Appearing on behalf of the Plaintiff.



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 224

1    CARLY VAN THOMME

2    Chapman Law Group

3    1441 West Long Lake Road

4    Suite 310

5    Troy, Michigan 48098

6    248.644.6326

7    cvanthomme@chapmanlawgroup.com

8         Appearing on behalf of Defendants Corizon

9         Health, Inc., Janak Bhavsar, M.D., Scott Holmes, M.D.,

10        and Daniel Carrel, D.O.

11

12   DANA M. WOOD

13   Michigan Department of Attorney General

14   Civil Litigation

15   Employment & Elections Division

16   525 West Ottawa Street

17   Lansing, Michigan 48933

18   517.373.6434

19   woodd9@michigan.gov

20        Appearing on behalf of Defendant Daniel Heyns.

21

22

23

24

25



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 225

```
 1                    TABLE OF CONTENTS

 2

 3    WITNESS                              PAGE

 4    JEFFREY BOMBER, D.O., 30(b)(6), VOL II

 5

 6    EXAMINATION (CONTINUED) BY            6

 7       MS. STAMLER

 8    EXAMINATION BY MS. VAN THOMME        125

 9    RE-EXAMINATION BY MS. STAMLER        135

10    RE-EXAMINATION BY MS. VAN THOMME     149

11

12                    EXHIBITS

13

14    EXHIBIT                             PAGE

15    (Exhibits attached to transcript.)

16

17    DEPOSITION EXHIBIT 21                33

18    DEPOSITION EXHIBIT 22                66

19    DEPOSITION EXHIBIT 23                79

20    DEPOSITION EXHIBIT 24                81

21    DEPOSITION EXHIBIT 25                83

22    DEPOSITION EXHIBIT 26                89

23    DEPOSITION EXHIBIT 27                95

24    DEPOSITION EXHIBIT 28                99

25    DEPOSITION EXHIBIT 29                100
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 226

```
 1      DEPOSITION EXHIBIT 30                    101

 2      DEPOSITION EXHIBIT 31                    102

 3      DEPOSITION EXHIBIT 32                    106

 4      DEPOSITION EXHIBIT 33                    119

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 227

```
 1   Lansing, Michigan

 2   Thursday, January 18, 2018

 3   9:48 a.m.

 4

 5

 6               JEFFREY BOMBER, D.O., 30(b)(6), VOL II

 7        was thereupon called as a witness herein, and after

 8        having first been duly sworn to testify to the truth,

 9        the whole truth and nothing but the truth, was

10        examined and testified as follows:

11               MS. STAMLER:  Let the record reflect that

12        this is the continued deposition of Dr. Bomber.  It's

13        the 30(b)(6) deposition.

14               EXAMINATION (CONTINUED)

15   BY MS. STAMLER:

16   Q.   Good morning, Dr. Bomber.

17   A.   Good morning.

18   Q.   Have you reviewed any items prior to your continued

19        deposition?

20   A.   I have not reviewed any new items.  The only items I

21        reviewed were the ones my attorney gave me initially.

22   Q.   Okay, in other words, that big binder of materials we

23        looked at the last time we were at your deposition, is

24        that correct?

25   A.   Yes.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 228

```
 1   Q.   Okay.  You haven't read your deposition transcript
 2        since then?
 3   A.   I have not.
 4   Q.   Okay.  You would agree with me, Doctor, that cancer is
 5        a serious medical condition, correct?
 6   A.   Yes.
 7                 MS. VAN THOMME:  Object to form,
 8        foundation.
 9   BY MS. STAMLER:
10   Q.   And you would agree with me that a delay in diagnosis
11        of cancer could constitute deliberate indifference to
12        a prisoner's medical needs?
13                 MS. VAN THOMME:  Object to form and
14        foundation.
15   A.   Yes.
16   BY MS. STAMLER:
17   Q.   And you would agree with me that a delay in treating a
18        prisoner who has cancer could also constitute
19        deliberate indifference?
20                 MS. VAN THOMME:  Object to form and
21        foundation.
22   A.   Yes.
23   BY MS. STAMLER:
24   Q.   Are you familiar, sir, with the standard of care as it
25        relates to meeting a prisoner's Eighth Amendment
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 229

```
 1        rights?
 2                    MS. VAN THOMME:  Object to form.
 3    A.   That's a broad question.  In general, yes.
 4    BY MS. STAMLER:
 5    Q.   Okay.  Can you tell me what your understanding is?
 6    A.   Well, the Eighth Amendment, of course, is the
 7         amendment regarding cruel and unusual punishment,
 8         excessive fines and bonds, and cruel and unusual
 9         punishment is not allowed, but in translation for a
10         physician, that means within prison systems is to
11         deliver care, health care to the standard of the
12         community.
13    Q.   And let me just -- I might say this a little
14         differently, but see if you agree with this.
15                    You would agree that whether a doctor has
16         exercised the degree of skill, care, and diligence
17         that would be exercised by members of that profession
18         practicing in the same or similar community is defined
19         as the standard of care, is that right?
20    A.   Yes.
21                    MS. VAN THOMME:  Object to form.
22    BY MS. STAMLER:
23    Q.   It's fair to say that during your tenure as a Corizon
24         employee in the various positions that you've held for
25         the organization, that Corizon had a goal of providing
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 230

```
 1        appropriate medical care in a cost-effective manner,
 2        is that correct?
 3   A.   Yes.
 4   Q.   Can you define for me, based upon your knowledge of
 5        Corizon's policies, training materials, what
 6        "cost-effective manner" means?
 7                   MS. VAN THOMME:  Object to form.
 8                   MS. STAMLER:  What's wrong with the form?
 9                   MS. VAN THOMME:  It's really broad, vague.
10   BY MS. STAMLER:
11   Q.   Do you understand my question, Doctor?
12   A.   Yes.
13   Q.   Can you answer it, please?
14   A.   Yes.  It is a broad question, but, in general, we
15        operate under the premise that we must give our
16        inmates, our patients, what they need, meet their --
17        meet medical necessity; in a cost-effective manner,
18        that means ordering the appropriate tests and making
19        the appropriate referrals, using the appropriate
20        medications, substituting generics or lower-cost
21        medications if the efficacy is the same.
22   Q.   So if I understand your testimony correctly, is the
23        cost-effective component in the care and treatment of
24        prisoners tied to generic drugs only?
25   A.   No.  As I stated, it is also making sure that the
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1        appropriate specialist is -- has as a referral to an
 2        appropriate specialist or the testing is appropriate.
 3                  For example, it may be that an ultrasound
 4        is actually a better test than a CAT scan in certain
 5        instances, and that may be a more cost-effective test,
 6        given the diagnosis.
 7   Q.   Is it your understanding, based on Corizon's policies
 8        and procedures, that in determining whether a patient
 9        should get a particular test or see a particular
10        specialist, that the cost of the test or the
11        specialist is a factor in that determination?
12   A.   Our --
13   Q.   That's a "yes" or "no."
14                  MS. VAN THOMME:  Object to form.
15   A.   Not exactly.
16   BY MS. STAMLER:
17   Q.   Not exactly.  Is it -- it's not considered at all?
18   A.   Not at the physician provider's site level.  We tell
19        our providers not to think about the cost but to
20        always think about what the inmate needs.  The
21        utilization, my utilization management physician, for
22        any organization, may be thinking cost and diverting
23        to a more effective, maybe a less-costly test, where
24        indicated.
25   Q.   Okay, so --
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 232

1    A.    But, no, in general, we don't think about that when
2          we're delivering care to the inmate.
3    Q.    I understand the physician -- at the physician level
4          that's not what happens, but as we've already gone
5          over in your earlier testimony, the 407 process, the
6          utilization management process, requires that a
7          physician fill out a 407 form for a specialist or
8          specialty testing, correct?
9    A.    Correct.
10   Q.    And that the utilization management component of the
11         review process takes into consideration cost, correct?
12   A.    Yes.
13   Q.    Dr. Bomber, are you familiar with the type of
14         specialized services that are not typically provided
15         within the prison facility?
16   A.    I'm not sure I understand the question.  We provide
17         whatever specialty referral is necessary.
18   Q.    I'm saying within the facility as opposed to a
19         referral out.  Do you understand my -- I want to know
20         what is performed outside of the prison facility
21         versus inside.  You're familiar with that, correct?
22   A.    Yes.
23   Q.    All right.  And it's fair to say that you have
24         knowledge as to all of the prisons within the state.
25         Is that right?



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1   A.   I do.
 2   Q.   And you're familiar with the Carson City Correctional
 3        Facility, is that correct?
 4   A.   Yes, I've been there.
 5   Q.   Are you aware whether the Carson City Correctional
 6        Facility has the following capability:  MRI?
 7   A.   No.
 8   Q.   CAT scan?
 9   A.   No.
10   Q.   PET scan?
11   A.   No.
12   Q.   Biopsy of a tumor or mass?
13   A.   In certain instances, yes.  That would be, for
14        example, a superficial skin lesion, nothing evasive.
15   Q.   So a mass that would be two to three centimeters in
16        size would be referred out for biopsy, correct?
17   A.   Yes.
18   Q.   Chemotherapy for cancer?
19   A.   Not at DRF, no.
20   Q.   DRF is Carson City Correctional?
21   A.   I'm sorry, yes, Carson City Correctional.
22   Q.   Thank you.  DRF is its abbreviation?
23   A.   One of the abbreviations, yes.
24   Q.   What about radiation?
25   A.   No.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 234

```
 1   Q.   All of those services that we've just gone over, with
 2        the exception of certain types of biopsies of skin
 3        lesions, all of those require specialty services
 4        outside of the prison facility, correct?
 5   A.   Well, we do chemotherapy at our Duane Waters facility,
 6        but that specific Carson City facility, no, there's no
 7        chemotherapy.
 8   Q.   When is a prisoner referred to Duane Waters Hospital
 9        for chemotherapy as opposed to an inpatient setting
10        such as McLaren Hospital?
11   A.   That program, I should say, was not in existence
12        during the time in question.  We just recently added
13        chemotherapy to Duane Waters.  It's been about, oh,
14        six months or so since we've been doing it.
15   Q.   All right.  So back between 2012 and 2014, Duane
16        Waters Hospital did not provide chemotherapy to prison
17        inmates, correct?
18   A.   Yes, that's correct.
19   Q.   Therefore, inmates were referred off-site for
20        inpatient chemotherapy, correct?
21   A.   Correct.
22   Q.   We went over a lot of elements of the 407 process.  I
23        just have a couple questions about that.
24             Do you agree that the decision to submit a
25        407 form as a routine request versus an urgent request
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 235

```
 1          is in the domain of the medical provider?
 2     A.   Yes.
 3     Q.   Do you have an understanding, sir, of how a 407 that
 4          is designated as routine versus a 407 that is
 5          designated as urgent is treated?
 6     A.   Yes.
 7     Q.   Tell me the distinction.
 8     A.   Our providers are trained to call, to telephone a
 9          request for an urgent referral to speed up the
10          process.
11     Q.   And who do they call?
12     A.   They would call the utilization management department
13          and speak to the nurse.
14     Q.   And who was that back between the time period of 2012
15          to 2014?
16     A.   I would have to go back and look at the employee
17          records to be a hundred percent certain, but I believe
18          it was Lori Minor, RN, at the time, but again, I'm not
19          a hundred percent certain.
20     Q.   So the first step in the urgent 407 referral process
21          is the physician or the medical provider, it could be
22          a nurse practitioner or a PA, would call the
23          utilization management nurse, Lori Minor, or somebody
24          who was in her position?
25     A.   Yes.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1   Q.   Okay.  What's the next step?
 2   A.   And then the utilization management physician is
 3        contacted and receives the request, and then processes
 4        it the same day, usually.
 5   Q.   So there would be a 407 that would be submitted along
 6        with a phone call?
 7   A.   Correct.  Sometimes providers have used email, but we
 8        encourage telephone calls.
 9   Q.   And how does that contrast with a 407 that is sent in
10        as a routine request for testing or referral to a
11        specialist?
12   A.   A routine request would go by email to an email group,
13        which includes the scheduler at the site, the UM
14        department, the UM physician, and the health care
15        team.
16   Q.   And then what happens?
17   A.   And then that's processed.
18   Q.   By who?
19   A.   By our UM department.  There are several employees
20        that process 407s.
21   Q.   And what does it mean to have it processed?
22   A.   To ensure that the form is complete and that all
23        necessary information and copies of tests are
24        available for the UM physician.
25   Q.   And if something is missing, what's the step that
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 237

```
 1          happens next?
 2    A.    Then the UM nurse will request that information from
 3          the provider or the health information manager at the
 4          site, whomever is available to obtain the information.
 5    Q.    Is that done via email or phone call?
 6    A.    Both.
 7    Q.    Okay.  Once all the data that is necessary to analyze
 8          whether the 407 should be approved or not approved,
 9          what happens next ^ sentence make sense??
10    A.    Then the UM physician makes a determination as to the
11          medical necessity.
12    Q.    And do you recollect who the UM physician was during
13          the time period of 2012 to 2014?
14    A.    That would have been Dr. Harriet Squire.
15    Q.    And where was she located at the time?
16    A.    In the UM department, in Lansing, in the regional
17          operations office.
18    Q.    And if it's deemed medically necessary, what happens
19          next in the process?
20    A.    Then the UM physician, as part of that email group,
21          either offers an alternative treatment plan or
22          approves the 407; an authorization number is then
23          generated to go to the hospital or specialist,
24          depending on what the case may be.
25    Q.    You said there's an authorization number that issues?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 238

```
 1   A.   Correct.

 2   Q.   Okay.  And where is that information placed?

 3   A.   That information is generated from the UM department

 4        and then given to the specialist or hospital, whatever

 5        the case may be.  It's a claims authorization number.

 6        When our inmates go out, they're covered under Blue

 7        Cross Blue Shield, so we follow the Blue Cross Blue

 8        Shield policies.

 9   Q.   It looks almost like a fax cover sheet.  I've seen

10        them before.  It's got some information about the

11        prisoner and where he or she may be referred to --

12                  MS. VAN THOMME:  Object to form.

13   BY MS. STAMLER:

14   Q.   -- and perhaps the date of the appointment?

15   A.   Correct.

16                  MS. VAN THOMME:  Object to form.

17   BY MS. STAMLER:

18   Q.   Okay.  And it also references the Blue Cross Blue

19        Shield insurance, correct?

20   A.   It has the authorization number for Blue Cross Blue

21        Shield.

22   Q.   Okay.  You mentioned that if it's approved -- well,

23        what happens at the next stage?  There could be an

24        alternative treatment plan or there could be approval.

25        Isn't there yet a third possibility that the 407 is
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1        rejected and sent back to the provider to revise it in
 2        some fashion if there's an error in it?
 3   A.   We try to ward that off up front.  That's what the
 4        utilization management nurse is charged to do, is to
 5        ensure that the 407 is complete.  But, yes, sometimes
 6        there's additional information requested by the UM
 7        physician.
 8   Q.   And are you familiar with during the time frame of
 9        2012 through 2014 what the time frame by policy or
10        procedure was for a routine 407 processing to occur?
11   A.   I recall that for a routine 407, there was a two-week
12        interval allowed.
13   Q.   And with respect to an urgent request, do you
14        recollect the time interval that is allowed?
15   A.   I believe at the time it was two business days.
16   Q.   And with respect to the routine 407 processing
17        two-week interval, did that include weekends or
18        exclude weeds?
19   A.   It was in terms of business days, so ...
20   Q.   So it would be fourteen business days?
21   A.   Yes.
22   Q.   Did you during your tenure with Corizon in any of the
23        positions that you've held raise concerns with either
24        Corizon administration or the Department of
25        Corrections regarding any concerns having to do with
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1        scheduling either specialty treatment or specialty
 2        testing?
 3   A.   We've always believed that the model in Michigan was
 4        the model for the company.  There may have been
 5        occasional situations where I thought that the
 6        appropriate specialist may not have been utilized and
 7        it should have been a different specialist, or
 8        occasionally maybe a different test would have been
 9        ordered.  But, no, I think the process, overall, is an
10        excellent process.
11   Q.   I just want to be certain you understood my question.
12        I wasn't really asking about whether you might have
13        quarreled with which specialist should have been seen
14        or which test should have been administered but rather
15        the scheduling process itself, and by that I mean that
16        Corizon employees had to rely on Department of
17        Corrections employees to actually do the scheduling of
18        appointments.
19              Did you, sir, in any of your positions,
20        raise concerns about that process?
21   A.   I don't recall.
22   Q.   You don't recall doing that?
23   A.   I do not recall.
24   Q.   Do you ever recall being in any sort of meetings or
25        receiving any sort of documentation either from the
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

1        Department of Corrections or Corizon regarding the

2        topic of the scheduling process?

3   A.   Yes.

4   Q.   Tell me what you've received.

5   A.   We have occasionally encountered instances where

6        specialists did not want to see our patients, but if

7        they are Blue Cross Blue Shield providers, they are

8        contractually required to see our patients, so we've

9        discussed that issue in meetings.

10              We've also discussed increasing our panel

11       of specialists so that we have more specialists

12       available.

13  Q.   Anything else that came up regarding the topic of

14       scheduling with specialists?

15  A.   Yes.  When we instituted our, what we call our Cares

16       program, which is a claims process, we did start to

17       experience a delay.  This was about two years ago.  We

18       were getting closer to the two-week maximum but were

19       able to rectify and remedy that with additional staff.

20       That was after the time in question.

21  Q.   Okay.  Yeah, I'm focused specifically on the time

22       period of August 2012 through June 30, 2014.

23              So the first two items you identified would

24       have been issues raised during that time period?

25  A.   I cannot recall the exact time period.  I have



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 242

```
 1        meetings every day, and it's difficult to be a hundred
 2        percent certain.  Those topics have been discussed
 3        intermittently.
 4   Q.   With respect to the actual scheduling process that
 5        I've already outlined and you've testified to in terms
 6        of who handled the actual calling of the specialist's
 7        office, getting the appointment set and communicating
 8        when that was set, were you ever in any meetings, did
 9        you ever receive any documents, regarding that
10        scheduling process?
11   A.   I'm certain I did intermittently, yes.
12   Q.   And is it fair to say, sir, that you recall that one
13        of the concerns was Corizon did not have authority
14        over the schedulers within the Department of
15        Corrections, correct?
16               MS. VAN THOMME:  Object to form.
17   A.   I don't recall ever saying that myself.
18   BY MS. STAMLER:
19   Q.   Not you, personally, but were you present in a meeting
20        or did you receive documentation indicating that there
21        were concerns about the way in which scheduling was
22        being done?
23   A.   I don't recall.
24   Q.   Is it correct to say, sir, that although Corizon
25        physicians and mid-level providers did not set the
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 243

```
 1       appointments for specialty services, they certainly
 2       could give input into how soon the prisoner should be
 3       seen?
 4   A.  Yes.
 5   Q.  And so that if they were to learn that, for example, a
 6       prisoner was scheduled to see a doctor two months from
 7       the date the 407 was approved, a physician could
 8       easily go to the scheduler and say, "That's not soon
 9       enough"?
10   A.  They could.
11   Q.  And how would that get documented?
12   A.  Well, if there was a change in the scheduling, that
13       would be entered into the electronic medical record on
14       both sides, the medical record side and then the
15       appointment side.
16   Q.  And how would a physician document that he or she made
17       the request of the scheduler within the Department of
18       Corrections to change the date or attempt to get the
19       date changed?
20               MS. VAN THOMME:  Object to form and
21       foundation.
22   A.  It would be entered as a new appointment.  That's the
23       way it would be in the record.
24   BY MS. STAMLER:
25   Q.  So there would be nothing in the medical record that
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 244

```
 1          would reflect, say, Dr. Carrel making a request of the
 2          scheduler to change the date or attempt to change the
 3          date of an appointment?
 4     A.   There's no requirement to write that into a provider
 5          visit note.
 6     Q.   Okay.  We covered some of the topic of charting and
 7          the education that was provided to physicians as they
 8          were being onboarded into the Corizon system.  Do you
 9          remember that during the first part of your
10          deposition?
11     A.   I do.
12     Q.   Okay.  And is it correct to say, sir, that it is
13          fundamental to the care and treatment of an inmate
14          that a medical provider chart his findings in a
15          complete and accurate manner?
16               MS. VAN THOMME:  Object to form.
17     A.   Yes.
18     BY MS. STAMLER:
19     Q.   And it's correct to say that failing to chart in
20          someone's medical record in an accurate and complete
21          manner can constitute deliberate indifference to an
22          inmate's medical needs?
23               MS. VAN THOMME:  Object to form and
24          foundation.
25     A.   Could you repeat the question?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 245

```
 1   BY MS. STAMLER:
 2   Q.   Sure.  Would you agree with me that a physician who
 3        fails to chart in a complete and accurate manner in a
 4        prisoner's medical record can constitute deliberate
 5        indifference to the inmate's medical needs?
 6              MS. VAN THOMME:  Object to form and
 7        foundation.
 8   A.   There's no perfect entry.  I mean, we could always add
 9        more information.  I mean, there's no perfect note.
10        So omitting something I don't believe would be
11        deliberate indifference.
12   BY MS. STAMLER:
13   Q.   Omitting something wouldn't be deliberate
14        indifference?
15   A.   I mean, there's always room for, you know -- I mean,
16        you could chart pages and pages, but, realistically,
17        there's not enough time for that and it's not really
18        necessary.  You need to get the pertinent information
19        regarding that particular diagnosis or case into the
20        EMR.
21   Q.   Right.  And if that's not done, would you agree with
22        me that that could constitute deliberate indifference?
23              MS. VAN THOMME:  Object to form and
24        foundation.
25   A.   I don't really see it that way, since there's
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 246

```
 1          information in other places in the chart, as well.
 2          There's the lab module.  There's the x-ray reports.
 3          The information is available.
 4     BY MS. STAMLER:
 5     Q.   So let's -- I want you to assume for a moment a
 6          physician records in a prisoner's medical record that
 7          there's a palpable mass, two to three centimeters in
 8          size, and notes it's on the wrong side of the person's
 9          body.
10               MS. VAN THOMME:  Object to form.
11     BY MS. STAMLER:
12     Q.   Would you consider that to be a form of deliberate
13          indifference in terms of charting?
14     A.   I would consider it to be a mistake that should be
15          rectified.
16     Q.   And that's the sum and substance of your view, it's
17          just a mistake?
18     A.   I think it's a mistake that should be rectified.  I
19          don't think it's deliberate indifference.
20     Q.   Well, what if it isn't caught?  What if that's one of
21          those charts that doesn't get audited?
22     A.   Again, I would call that a mistake that should be
23          rectified.
24     Q.   Are you familiar with Corizon's guidelines on charting
25          palpable masses?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 247

```
 1    A.    I don't recall a specific guideline for a palpable
 2          mass.
 3    Q.    Do you know how a palpable mass is defined in
 4          medicine?
 5    A.    Yes.
 6    Q.    How is it defined?
 7    A.    Palpable means to touch, to feel.  So it would be a
 8          mass that can be examined by touch, by hand,
 9          essentially.
10    Q.    Would you agree from August 1st of 2012 through
11          June 30, 2014, a doctor of ordinary education,
12          training, and experience in the area of family
13          medicine would, under the same or similar
14          circumstances, chart a palpable mass to include the
15          location of the mass?
16                    MS. VAN THOMME:  Object to form.
17    A.    Yes.
18    BY MS. STAMLER:
19    Q.    Would you expect that person -- and these are all the
20          same foundational questions, that is, from August 1 of
21          2012 through June 30, 2014 -- a doctor of ordinary
22          education, training, and experience would, under the
23          same or similar circumstances, chart a palpable mass
24          to include not only the location of the mass, but the
25          size of the mass, right?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 248

```
 1                   MS. VAN THOMME:  Object to form.
 2  BY MS. STAMLER:
 3  Q.   Correct?
 4  A.   Correct.
 5  Q.   The texture of the mass?
 6  A.   Yes.
 7                   MS. VAN THOMME:  Objection.
 8  BY MS. STAMLER:
 9  Q.   Whether it's firm or not firm, correct?
10  A.   Yes.
11                   MS. VAN THOMME:  Can I get a standing
12        objection to all these questions --
13                   MS. STAMLER:  Sure.
14                   MS. VAN THOMME:  -- about what a doctor
15        would do as standard of care?
16  BY MS. STAMLER:
17  Q.   Would you agree, Doctor -- she's interrupted me to put
18        an objection on, so I want to make sure you understand
19        the preface to this question is that from August 1st
20        of 2012 through June 30, 2014, that a doctor of
21        ordinary education, training, and experience would,
22        under same or similar circumstances, chart a palpable
23        mass to include, and I'm going to give you a list, so
24        just listen to it:  The location of the mass, the size
25        of the mass, the texture of the mass, whether it's
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

 1          fixed or mobile, the skin color over the area of the
 2          mass, and whether the skin is warm to the touch?
 3     A.   That would be typical, yes.
 4     Q.   And one final element:  Whether it's symmetrical or
 5          asymmetrical?
 6     A.   Yes, that would be typical.
 7     Q.   Would you also expect a doctor during that same time
 8          period that I've identified previously of ordinary
 9          education, training, and experience would also chart
10          any diagnoses that he or she was ruling out?
11     A.   We try to generate what you're referring to as a
12          differential diagnosis.
13     Q.   And you would expect to see that in a patient's chart,
14          correct?
15     A.   That would be typical.
16     Q.   And that would be part of meeting the standard of
17          care, correct?
18                    MS. VAN THOMME:  Object to form.
19     A.   Yes.
20     BY MS. STAMLER:
21     Q.   And that would be true, too, of what we talked about
22          earlier, in terms of charting a palpable mass in terms
23          of findings, correct?
24     A.   Correct.
25     Q.   Would you agree with me that the importance of



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 250

```
 1          accurate and complete charting is, in part, for the
 2          continuity of care for a patient's medical treatment?
 3     A.   Yes.
 4     Q.   That a chart that is accurate and complete aids the
 5          next medical provider with background of the patient's
 6          medical condition, correct?
 7     A.   Yes.
 8     Q.   You would agree that accurate and complete charting
 9          includes reference to any education the medical
10          provider provided to the patient on his or her medical
11          condition?
12                    MS. VAN THOMME:  Object to form.
13     A.   Yes.
14     BY MS. STAMLER:
15     Q.   And would you agree with me that it is not sufficient
16          to simply state in a medical chart that patient
17          education was given but not specify what the education
18          was?
19     A.   There's some limitation in the medical record in terms
20          of space available, but there is a box to check that
21          education was provided.
22     Q.   And there's a way to do an addendum to the medical
23          chart to add any notes that might not fit into the
24          form, correct?
25     A.   Yes.  We don't require our providers to put all of the
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 251

```
 1        education they may provide.  Sometimes they give a
 2        handout that may not be entered into the record.
 3        They're required to provide education and check the
 4        box if they did so.
 5   Q.   But looking at that medical record that simply has a
 6        box checked off that patient education was provided
 7        would not tell the next treater in this chain of
 8        treatment that the prisoner might receive what
 9        education the patient received, is that right?
10                  MS. VAN THOMME:  Object to form.
11   A.   Actually, that's more than what was really done in the
12        community at the time, you know --
13   BY MS. STAMLER:
14   Q.   I'm not asking about the community.  I'm asking about
15        what was happening in the prison system.
16   A.   I think it's sufficient, yes.
17   Q.   So that a patient might get education on three
18        different parts of his medical condition -- let's say
19        he's got diabetes, he's got HIV, and he's got a cancer
20        or suspected cancerous mass, correct?  Let's just
21        assume he got education on all three of those issues.
22   A.   Those three diagnoses would be listed if they were
23        seen for those diagnoses that day.
24   Q.   But there would be no way to see, by seeing a
25        check-off box that simply says "patient got
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

1       education," as to what education he received on any
2       one of those three conditions, isn't that true?
3   A.  That's correct.
4   Q.  Are you familiar with Corizon's policies on what
5       should be charted with regard to patient education?
6   A.  Yes.
7   Q.  And what's your understanding?
8   A.  The charting has to include a chief complaint -- well,
9       there's a difference, I should preface, between an
10      acute care visit or urgent care visit and a chronic
11      care clinic visit, but in a chronic care clinic visit,
12      for example, for hepatitis, HIV, cancer, the providers
13      are required to have a chief complaint and a review of
14      systems that corresponds with the chief complaint --
15  Q.  I'm not asking what happens during an appointment.  I
16      just want to know how education to the patient is
17      charted, based on Corizon's policy, how it's supposed
18      to happen.
19  A.  Yeah, the education box provided -- education provided
20      box would be checked, and then the provider may also
21      enter what they said to the patient into the EMR under
22      the assessment and plan.
23  Q.  That's where you would find the notes?
24  A.  Generally, yes.
25  Q.  And are you aware, sir, that Corizon has a policy that


US LEGAL SUPPORT
The Power of Commitment™

JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1          mandates that the information provided to the patient
 2          by way of education is supposed to be in the chart?
 3    A.    Within the Michigan Department of Corrections, the
 4          requirement is that they check the education provided
 5          box.
 6    Q.    My question to you was Corizon's policy, sir.
 7    A.    Yes, we encourage the provider to educate the patient
 8          by giving handouts, if necessary, educating them on
 9          the disease process.  We do have forms that we give
10          patients.
11    Q.    My question to you was quite specific.  Are you
12          familiar, yes or no, with Corizon's policy on what is
13          supposed to be charted with regard to patient
14          education?
15    A.    Within the MDOC, the policy is to make sure that the
16          education provided box is checked and documented.
17    Q.    And that's the sum and substance of what the policy
18          is, is that your testimony?
19    A.    That is what the Michigan Department of Corrections
20          requires within its EMR.
21                You have to understand that Corizon is in
22          many different states, and sometimes we amend and
23          adapt, depending on the electronic medical record and
24          the requirements of the state.
25    Q.    Have you ever seen a Corizon document entitled
```

JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 254

```
 1         "Charting Guidelines: Dos and Don'ts of Charting"?
 2    A.   I believe I have.  There may have been a couple of
 3         different documents, so I'm not sure which one you
 4         have, but, yes, I have seen them.
 5    Q.   And is that a guideline or is that a requirement that
 6         is impressed upon physicians working for Corizon?
 7                   MS. VAN THOMME:  Object to foundation.
 8    A.   That would be a guideline and it would be adapted to
 9         the contract.
10                   MARKED FOR IDENTIFICATION:
11                   DEPOSITION EXHIBIT 21
12                   10:24 a.m.
13    BY MS. STAMLER:
14    Q.   Dr. Bomber, you've been handed Exhibit 21 to your
15         deposition.  It's a document entitled "Charting
16         Documents: Dos and Don'ts of Charting," with the
17         Corizon logo at the top of it.
18                   Have you seen this document before?
19                   MS. VAN THOMME:  Give me a moment ...
20    A.   Yes.
21    BY MS. STAMLER:
22    Q.   And based on the date that appears on the lower
23         left-hand side of the first page of Exhibit 21, it
24         appears that this document was revised in 2013.
25    A.   I see that.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 255

```
 1   Q.   Do you know whether there were charting guidelines in
 2        place prior to 2013?
 3   A.   I don't recall which document was used.
 4   Q.   Are you able to look at Exhibit 21 and tell me what
 5        differences, if any, existed between the 2012 charting
 6        guidelines from Corizon versus what's been marked
 7        Exhibit 21?
 8   A.   I'm not able to do that.
 9   Q.   Okay.  Is this a document, to your knowledge, sir,
10        that was provided to physicians as they were
11        onboarding with Corizon?
12   A.   Yes, certainly from 2013.
13   Q.   And this was part of their initial training, is that
14        right?
15   A.   Yes.
16   Q.   Okay.  The "Documentation Do Guidelines," do you know
17        where those come from?
18   A.   I don't know who exactly wrote the document.
19   Q.   I understand that, but do you know what resources or
20        source materials were used to come up with these
21        guidelines?
22   A.   I do not.
23   Q.   Do you know if they comport with any of the
24        accrediting organizations' charting guidelines?
25   A.   I cannot specify.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 256

```
 1   Q.   Do you know if they comport with the standard of
 2        care --
 3                 MS. VAN THOMME:  Object to --
 4   BY MS. STAMLER:
 5   Q.   -- for medical practitioners?
 6                 MS. VAN THOMME:  Object to form.
 7   A.   In general, I think these are appropriate guidelines.
 8   BY MS. STAMLER:
 9   Q.   Is that a yes, then, they meet the standard of care?
10                 MS. VAN THOMME:  Object to form.
11   A.   I believe so.  They are guidelines.
12   BY MS. STAMLER:
13   Q.   Okay, I know they're guidelines, but I want to know,
14        from your experience -- you're a medical doctor,
15        correct?
16   A.   Yes.
17   Q.   You're a person who trains on or has in the past
18        trained physicians who were coming to work for
19        Corizon.  Is it your belief that these charting
20        guidelines meet the standard of care?
21                 MS. VAN THOMME:  Object to form.
22   A.   Yes.
23   BY MS. STAMLER:
24   Q.   Going through the "do" guidelines, I'm not going to go
25        through each and every one of them, but do you see
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1         there where it says "use only approved abbreviations"?
 2    A.   Yes.
 3    Q.   What abbreviations are being referenced there?  What
 4         are the approved abbreviations?
 5    A.   That depends on the contract.  So within the MDOC,
 6         there is a document of approved abbreviations.  I
 7         don't recall when that was approved, but during my
 8         tenure as northern regional medical director, there
 9         was an MDOC document that specified all of the
10         required abbreviations -- or approved abbreviations.
11    Q.   And it's fair to say that each physician that was
12         coming on board for Corizon was trained on the
13         approved abbreviations, correct?
14    A.   They were given a copy.
15    Q.   Was that a part of the training?
16    A.   I don't recall if it was in 2012.  It certainly is
17         now.  The information is provided electronically.
18    Q.   Okay.  So you're saying back in 2012, physicians that
19         were onboarding may not have received the approved
20         abbreviations that were being used?
21    A.   That's correct.
22    Q.   So that there would be a lack of uniformity as to the
23         abbreviations that a physician would be charting in a
24         prisoner's chart --
25                   MS. VAN THOMME:  Object to form.
```

US LEGAL SUPPORT
The Power of Commitment™

JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 258

```
 1   BY MS. STAMLER:
 2   Q.   -- during that time period?
 3               MS. VAN THOMME:  Object to form.
 4   A.   That's why we formalized the list of abbreviations,
 5        and I don't recall the year that was done.
 6   BY MS. STAMLER:
 7   Q.   Well, was it before or after you became -- before you
 8        changed positions in 2015?
 9   A.   Yes.
10   Q.   It was before then?
11   A.   Yes.
12   Q.   And certainly, it seems, based on at least Exhibit 21,
13        as of 2013 there was an approved abbreviations list?
14   A.   I can't recall when the MDOC official abbreviation
15        list was approved.
16   Q.   Well, it's referenced here, is it not, "use only
17        approved abbreviations"?
18   A.   Well, again, at the time there may not have been
19        MDOC-approved abbreviations.
20   Q.   Were there Corizon-approved abbreviations?
21   A.   I don't recall that being part of the onboarding.  I
22        can't be a hundred percent certain.
23   Q.   Well, looking at this document, Exhibit 21, lower
24        left-hand side, does it not say "Practitioner
25        Onboarding: Documentation and Medical Records"?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1   A.   Yes, but I don't know that there was a list of
 2        approved abbreviations provided in this -- with this
 3        document.
 4   Q.   So even though the charting guidelines indicate as
 5        part of the dos to use only approved abbreviations,
 6        there may not have been any approved abbreviations at
 7        that point in time.  Is that your testimony?
 8   A.   Again, this is given out to multiple different states,
 9        and it has to be applied according to the practices
10        within that specific Department of Corrections, and I
11        don't recall at the time what the list had on it.
12   Q.   So it's fair to say, if I'm understanding your
13        testimony, that Corizon would rely on the MDOC to
14        provide the list of approved abbreviations; is that
15        your testimony?
16   A.   Yeah.  The list has to be specific to a given contract
17        and EMR, to make sure the EMR is compatible with
18        abbreviations, and so forth.
19             So I can't recall what was being used at
20        the time.  I do recall approving abbreviations
21        sometime during my tenure as northern regional medical
22        director.
23   Q.   Okay.  Understanding that, is it fair to say the EMR
24        system that was in place in 2012 through June of 2014
25        was NextGen?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 260

```
 1   A.    Yes.  And I do believe there was a list at the time,
 2         but it had to be revised.  So that's what I recall,
 3         was finalizing and revising the list, but I don't
 4         recall seeing the specific list at the time in 2012.
 5   Q.    When you were trained as a physician, were you trained
 6         in appropriate medical charting abbreviations?
 7   A.    Yes.
 8   Q.    And do you understand, as you sit here today, and I
 9         know you don't know exactly when the list of
10         abbreviations first was endorsed, if you will, and
11         used by Corizon in Michigan and then possibly revised
12         thereafter, did you in reviewing those abbreviations
13         view them as compatible with your training or
14         consistent with the training you had received in
15         medical school?
16   A.    You're referring to the revised document that I recall
17         seeing?  I don't recall what we had in 2012.
18   Q.    Whatever you can recollect in the context of approved
19         abbreviations.
20   A.    Yes, I recall the document.
21   Q.    And were those abbreviations consistent with your
22         medical training and experience?
23   A.    Yes.
24   Q.    Going to the "do not" guidelines on Exhibit 21,
25         there's several bullet points, but there's one in
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 261

```
 1          there that says:  Do not document meaningless
 2          information, which is not relevant to the care of the
 3          patient.
 4                    Did I read that correctly?
 5     A.   Yes.
 6     Q.   That's a directive to not put in superfluous
 7          information, correct?
 8     A.   It's a directive to avoid using meaningless
 9          information.
10     Q.   What would be -- give me an example of something that
11          would be meaningless.
12     A.   I would say, you know, talking about personal things
13          such as, you know, sometimes they'll ask questions
14          about your family, your hobbies, and so forth, and we
15          discourage that type of interchange and adding that
16          into the medical record.
17                    It may be that the inmate wants to talk
18          about baseball, you know, whatever, but it could be a
19          number of things.
20     Q.   There's an underlined section at the very end of the
21          "do not" guidelines which states:  Only chart action
22          taken.  Do you see that?
23     A.   Yes.
24     Q.   Can you explain to me why that's a guideline?
25     A.   Yes.  You only want to chart what actually has
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 262

```
 1       transpired.
 2  Q.   You want it to be accurate, correct?
 3  A.   Correct.
 4  Q.   There's a section right above that that says:  Do not
 5       assign blame.  Do you see that?
 6  A.   Yes.
 7  Q.   I assume that's a guideline to the practitioner not to
 8       blame the patient for his or her medical problem?
 9  A.   No, that's generally not to blame another provider or
10       a nurse.
11  Q.   Oh, okay.  So within the system, don't say,
12       "Dr. So-and-so should have done something sooner"?
13               MS. VAN THOMME:  Object to form.
14  A.   That's the standard of care throughout the nation.
15  BY MS. STAMLER:
16  Q.   But am I right, is that generally what you're talking
17       about there?
18               MS. VAN THOMME:  Object to form.
19  A.   Correct.
20  BY MS. STAMLER:
21  Q.   "What to Chart," do you see that section?
22  A.   Yes.
23  Q.   And there's several bullet points there, is that
24       right?
25  A.   Yes.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 263

```
 1   Q.   What does "full assessment data" mean?
 2   A.   That would be what is pertinent to the visit.
 3        Sometimes there is no testing required.  Sometimes
 4        there are labs and x-rays.  It depends on the
 5        diagnosis.
 6   Q.   So the assessment data pertains to what testing or
 7        labs might be done, is that what you're saying?
 8   A.   It could be as simple as auscultating the patient's
 9        lungs.
10   Q.   Okay.
11   A.   It is an assessment, and if you do so, it should be
12        entered into the record.
13   Q.   So that would include any sort of physical findings
14        during an exam?
15   A.   Yes, that is data.
16   Q.   And that would include, by way of example, palpation
17        or a palpable mass that was found on examination?
18   A.   Yes.
19   Q.   "Follow-up instructions," those should be documented
20        as part of the chart?
21   A.   Yeah.  That's usually done in the appointment mode,
22        where the next appointment for the inmate is made.
23   Q.   So there wouldn't be anything recorded in the chart
24        saying "advised patient to return to the clinic for
25        follow-up testing"?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 264

```
 1   A.   Oh, yes, the appointment would already be made right
 2        at that time.
 3   Q.   Right, but would there be anything recorded in the
 4        chart?
 5   A.   Yes.  When you check the appointment -- you have to
 6        fill in the appointment box.
 7   Q.   So by way of example, if on examination a physician
 8        finds a two to three-centimeter palpable mass in the
 9        lymph node area and documents that, if a follow-up
10        plan was put in place to either do some imaging or
11        prescribe antibiotics, or both, that should be made
12        part of the follow-up instructions, correct?
13             MS. VAN THOMME:  Object to form.
14   A.   It could be just a follow-up appointment, too, but,
15        yes, there would be some entry into the medical
16        record.
17   BY MS. STAMLER:
18   Q.   Regarding those plans, correct?
19   A.   Yes.
20             MS. VAN THOMME:  Object to form.
21   BY MS. STAMLER:
22   Q.   "Significant patient communications," such as a
23        patient reporting any previous history of similar
24        complaints and treatment provided.  Do you see that?
25   A.   I'm sorry, where's that at?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

 1   Q.   Under "What to Chart."

 2   A.   Significant patient communications, such as -- yes, I

 3        see that.

 4   Q.   So that if a patient came in to a clinic and said,

 5        "I'm here for a chronic clinic visit for my hep C, but

 6        I also have this lump on my neck," that all should be

 7        recorded?

 8   A.   Yes.

 9   Q.   Significant patient communication with regard to a

10        threat to sue, why should that be put in the medical

11        record?

12   A.   I think it reflects the state of mind of the patient.

13        If they're angry about an issue, that should be noted.

14   Q.   How's that relevant to medical care and treatment?

15   A.   Well, it's part of looking at the whole patient.  We

16        strongly encourage our providers to be cognizant of

17        mental health issues and make appropriate referrals to

18        mental health if --

19   Q.   So a threat to sue could be a mental health problem?

20   A.   No.  If a patient is angry, it certainly could if

21        they're threatening.

22   Q.   Well, what about a threat to sue, why would that be in

23        the medical record?

24   A.   I think it's important to note if a patient is

25        unhappy, angry, threatening to sue, that that should



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 266

```
 1        be noted.
 2   Q.   And you think that that could signal a mental health
 3        problem?
 4   A.   It could, or it could signal that the patient's needs
 5        are not being met and they need to be met.
 6   Q.   So if a patient were to threaten to sue and it wasn't,
 7        from your perspective as a practitioner, a mental
 8        health problem but rather a concern about the lack of
 9        care, what would you do about that issue?
10   A.   Well, certainly if there was indication of a mental
11        health issue, they'd be referred to mental health,
12        yes.
13   Q.   No, I said if it's not a mental health issue --
14   A.   Not a mental health issue.
15   Q.   -- and the person is threatening to sue, what steps do
16        you take if the prisoner has somehow signaled to the
17        practitioner, "My care isn't meeting my needs"?
18   A.   Certainly you'd want to clarify what those questions
19        are, and sometimes if you're a mid-level you would
20        refer to the site supervising physician, make a
21        referral for that patient to be seen by them, or if
22        you're a site supervising physician, you might refer
23        to the regional medical director to see the patient,
24        too, if the patient seemed dissatisfied with your
25        answers.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 267

```
 1   Q.   And how does that get recorded in the chart?
 2   A.   That would usually be placed into the note at the time
 3        of the visit, saying, such as, "I'm going to refer
 4        this to my supervising physician or my regional
 5        medical director," or the health care team.  There
 6        might be a mini ^ audio? case management plan, where
 7        the inmate is brought in and the RN 13 ^ audio?, the
 8        health unit manager, the provider is there to be sure
 9        that the inmate's needs are being met.
10   Q.   And that would all somehow find itself into the
11        patient's chart --
12   A.   Yes.
13   Q.   -- correct?
14   A.   Yes.
15   Q.   And an absence of that sort of information would
16        suggest that that kind of review had not occurred?
17   A.   It certainly should be entered into the record.
18   Q.   There's a section on the dos and don'ts of charting
19        about correcting a charting error.  Do you see that?
20   A.   Oh, correcting charting error, yes.
21   Q.   All right.  Do you know where that guideline or
22        guidelines came from?
23   A.   Again, I'm not sure who wrote this document.
24   Q.   Then ^ and? you don't know what it's based on, is that
25        right?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 268

```
 1   A.   It would be based on the standard of care.
 2   Q.   Okay.  Is that true for the balance of these
 3        guidelines?
 4   A.   Yes.
 5   Q.   In other words, this entire Exhibit 21, with respect
 6        to dos and don'ts of charting, from your
 7        understanding, background, and work with Corizon, is
 8        premised upon the standard of care, correct?
 9   A.   Yes.
10   Q.   How does somebody correct a charting error on an
11        electronic medical record?
12   A.   You can actually draw a line through it.
13   Q.   How do you initial it?
14   A.   Well, it would be your document; it's already
15        generated under your account name and number.
16   Q.   Right, but it says:  Date, initial and indicate error
17        and reason why.
18   A.   Oh, you can't go back and amend a chart.  It's locked
19        after the visit.
20   Q.   So how does this correcting a charting error apply in
21        an electronic medical record situation if you can't go
22        back in and make any edit?
23   A.   You would have to add an addendum.
24   Q.   So you can't really follow -- strike that.
25                  A practitioner within the Corizon system in
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 269

```
 1        Michigan can't follow this guideline in terms of
 2        what's set forth here in the electronic medical record
 3        system?
 4                  MS. VAN THOMME:  Object to form.
 5   A.   They can't go back and amend the record.
 6   BY MS. STAMLER:
 7   Q.   They have to do an addendum, correct?
 8   A.   Correct.
 9   Q.   So by way of example, if a practitioner wrote the
10        wrong side of the body in terms of a finding, he
11        couldn't go into the record, once it's locked, to
12        change that; he would have to put an addendum into the
13        record, correct?
14   A.   Yes.
15                  MS. VAN THOMME:  Object to form.
16   BY MS. STAMLER:
17   Q.   Continuing to the next page of the guidelines, there's
18        a reminder, if you will, that says, among other
19        things, remember that:  All documentation should be
20        court ready at the end of every shift.
21                  Did I read that correctly?
22   A.   Yes.
23   Q.   What does it mean for the documentation to be "court
24        ready"?
25   A.   That would mean to be complete according to the
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1          requirements of that particular visit, diagnosis,
 2          et cetera.
 3   Q.    What does "court ready" mean?  Is that in anticipation
 4          of litigation?
 5              MS. VAN THOMME:  Object to form.
 6   A.    What it means to me, the way I read it, is to make
 7          sure that the record is as complete as possible for
 8          that given diagnosis.  So if they're there for
 9          complaints of a cold, an upper respiratory infection,
10          then you should have an ear, nose, and throat exam and
11          listen to their lungs.  That would be the minimum
12          required.  So a complete according to the diagnosis.
13   BY MS. STAMLER:
14   Q.    Do you understand what the term "court ready" means?
15              MS. VAN THOMME:  Object to form.
16   BY MS. STAMLER:
17   Q.    Were you ever trained on this policy?
18   A.    Yes, but I think that's open to interpretation.
19   Q.    Did you train practitioners on this policy?
20   A.    I never when I'm training patients, when I'm training
21          providers, think about the legal aspects in terms of
22          practicing day-to-day medicine.  We want them to make
23          sure that they see the patients, examine them
24          appropriately, and give the patients what they need.
25   Q.    Okay.
```



US LEGAL SUPPORT
The Power of Commitment™

JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 271

```
 1   A.   We don't want them practicing in a culture of fear for
 2        litigation.
 3   Q.   So based on your testimony, you didn't train them on
 4        this particular provision?
 5   A.   I think what it's saying to me is to make sure that
 6        your entry is complete.
 7   Q.   Okay.  That's not my question, Doctor.  Listen to my
 8        question.
 9             Did you or did you not train practitioners
10        that were onboarding in the Corizon system on making
11        sure that all documentation should be court ready at
12        the end of every shift?
13             MS. VAN THOMME:  Object to form.
14   A.   They receive this charting guideline from 2013 on,
15        yes.
16   BY MS. STAMLER:
17   Q.   Prior to 2013, do you know whether Corizon had a
18        guideline that required all documentation to be court
19        ready at the end of each shift?
20   A.   I do not recall.
21   Q.   Then there's a reminder, "If you did not see it, do
22        not chart it."  What does that mean, sir?
23   A.   That means not to make things up.
24   Q.   In other words, chart accurately, correct?
25   A.   Not to make things up, that's what that means.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1   Q.   "Do not assume you know what happened," what does that
 2        mean?
 3   A.   Well, if you relate it to the previous comment, you
 4        want to verify your facts.  So if a patient makes a
 5        certain complaint, you want to understand the nature
 6        of that complaint and then verify the findings.
 7   Q.   The next bullet point says:  Follow encounter
 8        guidelines whenever possible.  What does that mean?
 9   A.   That's what I referred to earlier, so that if a visit
10        is for a chronic care clinic visit, the guidelines for
11        that encounter include making sure that you have the
12        elements required, such as the history of present
13        illness or chief complaint, a review of systems, an
14        exam assessment and plan contiguous with the initial
15        diagnosis; all parts of that record should flow
16        together.
17   Q.   Okay.  "These are in subjective/objective intervention
18        format and easy to document assessment findings."
19        What does that mean?
20   A.   Yes, the subjective would be what the patient says,
21        and the objective would be what the provider finds.
22   Q.   And then the intervention is essentially the plan?
23   A.   Yes.
24   Q.   Okay.  "If it is not charted, it did not happen."
25        What does that mean?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1    A.    That means that you have to enter into the record
 2          exactly what happened and what was said; otherwise,
 3          there's no record of it.
 4    Q.    Going back to the last page of this exhibit, there's a
 5          documentation checklist.  Did you understand, sir,
 6          that this was part of the Corizon guidelines for dos
 7          and don'ts of charting?
 8    A.    I recall seeing this document, but it does not have a
 9          date at the bottom.  I'm not sure if it appeared with
10          the first two pages.  I do recall seeing it, but I'm
11          not sure I've seen all of this together.
12    Q.    Okay.  It's the way it was produced to me, but you
13          think it's something separate from the charting
14          guidelines?
15    A.    No.  I can't be a hundred percent certain that they
16          were all together in the same part of the onboarding
17          binder, but I have seen this document.
18    Q.    Okay.  Do you believe that the documentation checklist
19          is tied to charting guidelines, even though it may not
20          have been put together in the binder?
21    A.    Yes, it would be.
22    Q.    Okay.  And there's two separate sort of subheadings,
23          one pertaining to an intake facility and the other for
24          a chronic care visit.  Is that correct?
25    A.    Correct.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1   Q.   All right.  The intake facility, I assume, in Michigan
 2        is referring to the RGC, in Jackson, is that correct?
 3   A.   There's also the Detroit re-entry center.  Sometimes
 4        patients come in through Marquette and also sometimes
 5        through another facility if there's -- it depends on
 6        the location of the inmate.  They might be processed
 7        through Marquette, but then they would be transferred
 8        down to the intake facility, yes.
 9   Q.   So where is the intake facility?
10   A.   The intake facility is in Jackson, Michigan.
11   Q.   The RGC, correct?
12   A.   Correct.
13   Q.   And under this documentation checklist, there's a
14        number of subheadings under the intake facility,
15        correct?
16   A.   Correct.
17   Q.   And sub (d) references a physical examination is done.
18        Is that correct?
19   A.   Correct.
20   Q.   And did you understand, based on your years with
21        Corizon in the various positions that you've held,
22        that the physical exam that is completed at the intake
23        facility for a prisoner is a complete physical exam?
24   A.   If there's an urgent problem, it may not be a complete
25        exam, but, yes, a complete physical exam is required.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 275

```
 1   Q.   Do you see anything on the intake facility
 2        documentation checklist that references patient
 3        education?
 4   A.   No.
 5   Q.   Under subheading 2, it says, "If you are doing a
 6        chronic care visit."  Do you see that subheading?
 7   A.   Yes.
 8   Q.   It has a number of subparagraphs from (a) through (h),
 9        correct?
10   A.   Correct.
11   Q.   And among the list, and you've given me some testimony
12        on what happens at a chronic care visit, there's the
13        documented history, the review of systems, the
14        physical exam, diagnosis updated, right?
15   A.   Yes.
16   Q.   That's (a) through (d).  The physical exam that's done
17        at a chronic care visit, is it akin to the type of
18        physical exam that's done on intake or is it
19        different?
20   A.   It would be different.
21   Q.   Would it be solely focused on the inmate's chronic
22        care condition?
23   A.   That would be the minimum, yes.
24   Q.   What would be the maximum?
25   A.   The maximum is that at that visit the provider may see
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 276

```
 1         something else, or during his exam it triggers him to
 2         look at a different system, different area of the
 3         body.
 4    Q.   Okay.  There's some other things that happen at a
 5         chronic care visit, including order appropriate labs,
 6         specialists, et cetera, medications are addressed, and
 7         then on sub (g) it says "patient education noted."  Do
 8         you see that?
 9    A.   Yes.
10    Q.   And then finally, under (h) it says "degree of control
11         appropriate for documentation (follow NCCHC)."  What
12         does that mean?
13    A.   The NCCHC, National Commission on Correctional Health
14         Care, has standards for control of hypertension, for
15         example, and --
16    Q.   Or diabetes, is that what this is in reference to?
17    A.   Or diabetes.  It's basically fair -- poor, fair, or
18         good control.
19    Q.   There's no documentation checklist in Exhibit 21
20         referencing non-chronic care visits once the inmate's
21         in a facility, in other words, sick calls, is there?
22    A.   Not in this document, no.
23    Q.   Have you ever seen such a documentation checklist for
24         sick calls?
25    A.   There is a sick call document in the MDOC, what do you
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 277

```
 1        call it, processes, and so forth.  There is a document
 2        on guidelines for sick and acute care.
 3   Q.   And do you recollect, sir, as you sit here today, what
 4        documentation is required for that kind of visit?
 5   A.   I can't recall the specifics of that document.  I'd
 6        have to see that document.  But, in general, it would
 7        involve having the chief complaint, the pertinent
 8        exam, assessment/plan, labs, medications, if
 9        necessary.
10   Q.   Do you agree, sir, given your years of experience in
11        the field of medicine and your having served as an
12        educator for onboarding of Corizon physicians, that
13        there are charting errors that occur?
14   A.   Yes.
15   Q.   Are you familiar with any common charting errors?
16   A.   Yes.
17   Q.   Can you give me the examples that you are familiar
18        with?
19   A.   Certainly.  There could be errors of omission, where
20        you omit to record part of the patient's complaint, or
21        you could omit part of the exam.  You could be
22        inaccurate in your description.  There's a plethora of
23        possibilities for error.
24   Q.   I mean, I assume typos happen?
25   A.   Sure.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1   Q.   What about recording the wrong side of the patient's
 2        body, does that happen?
 3   A.   Of course it happens.
 4   Q.   And that happens at least in part because the
 5        examiner's looking at the patient, and my view of your
 6        right side, as I'm looking at you, is actually your
 7        left side, correct?
 8             MS. VAN THOMME:  Object to form and
 9        foundation.
10   A.   There could be several possibilities.
11 BY MS. STAMLER:
12   Q.   But that's one of them, correct?
13   A.   Correct.
14   Q.   Incidentally, did you do any -- and by "you," I mean
15        Corizon -- any enhanced training for physicians that
16        were trained in medicine outside of the United States
17        when they got onboarded into Corizon?
18   A.   Did we provide training outside of the United States?
19   Q.   No-no-no.  Individual physicians who received their
20        medical education in a foreign country, not the United
21        States, who came to work for Corizon, did you provide
22        any additional education to those physicians on
23        charting, by way of example?
24   A.   No.  They would go through the same onboarding
25        process.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 279

```
 1   Q.   Did you do any additional education with regard to
 2        documenting findings in terms of use of abbreviations
 3        that are accepted in the medical community in the
 4        United States?
 5   A.   When we approved the new version of the abbreviations,
 6        we did provide that to all of our providers.
 7   Q.   So is your answer to my question there was no
 8        distinction in the type of training provided to
 9        physicians who were trained in the United States
10        versus those that were trained in foreign countries?
11        Is that right?
12   A.   I don't recall any additional training.
13   Q.   Doctor, were you ever made aware in any of your
14        positions with Corizon about any concerns regarding
15        the adequacy or the effectiveness of communication
16        between doctors, mid-level providers, and nurses with
17        regard to treating patients at Carson City
18        Correctional Facility?
19                  MS. VAN THOMME:   Object to form.
20   A.   I do not recall.
21   BY MS. STAMLER:
22   Q.   Were you ever made aware, Doctor, of any concerns
23        regarding the adequacy or effectiveness of
24        communication between doctors, mid-level providers,
25        and/or nurses regarding patients at the RGC?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 280

```
 1                    MS. VAN THOMME:  Object to form.
 2   A.   Those were not in my region at the time.
 3   BY MS. STAMLER:
 4   Q.   At any point in time, correct?
 5   A.   Oh, they are now.
 6   Q.   Well, I'm asking you, has there ever been concerns
 7        raised regarding that topic?
 8   A.   We are always trying to improve communication.
 9   Q.   So is that a yes?
10   A.   Yes.  We provide education in terms of the chain of
11        command, for example.  We require our providers to --
12        if a patient's transferred, if they're aware a
13        patient's transferred, to provide education to the new
14        intake site, if there's pending testing, and so forth.
15                    If it's a complicated case, we do encourage
16        communication.
17   Q.   And that would be throughout the prison system that
18        Corizon's responsible for providing health care?
19   A.   Yes.
20   Q.   Okay.  Have you ever heard of a software system called
21        InterQual?
22   A.   Yes.
23   Q.   What is that?
24   A.   InterQual is used by health care systems to help
25        determine medical necessity.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1    Q.   Is it akin to the software programs that you've
 2         previously testified to that Corizon uses?
 3    A.   Yes.  It's similar to UpToDate, a little different
 4         format.
 5    Q.   How's it differ?
 6    A.   I can't say, because I don't use InterQual on a daily
 7         basis.
 8    Q.   Have you in the past used it?
 9    A.   No.
10    Q.   Okay.
11    A.   Only I'm aware that the company has it now.  I don't
12         recall if they had it at the time.
13    Q.   What do you mean, the company has it now?
14    A.   We use InterQual now.
15    Q.   Oh, when did that happen?
16    A.   When we went to centralized, corporate went to
17         centralized UM.  I think it's been about going on two
18         years now.
19    Q.   So that would have been approximately 2015 or '16?
20    A.   Approximately.
21    Q.   All right.  Prior to that, what was being used by UM?
22    A.   We used UpToDate.
23    Q.   Okay.  So what are the practitioners using?  Are they
24         using UpToDate or are they using InterQual now?
25    A.   They have UpToDate.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

1  Q.  So there's a distinction between what the

2      practitioners are accessing with regard to clinical

3      assessment tools online in this software program

4      compared to the utilization management team?

5  A.  The utilization management team also has UpToDate.

6      The InterQual guidelines were provided in terms of the

7      most common diagnoses.  They were given a document.

8      Again, this is right around the time we went to

9      centralized UM.

10  Q.  Who was given a guideline?

11  A.  Our providers.

12  Q.  Okay.  So they had the online access to UpToDate, but

13      they were also given, what, a hard copy of the

14      InterQual guidelines?

15  A.  Yes, a hard copy of some of the guidelines.

16  Q.  Some of them.  Which ones were provided?

17  A.  I don't recall.  It's been a while since I looked at

18      the document.

19  Q.  Do you know whether the InterQual guidelines were

20      provided to practitioners between 2012 and 2014 on any

21      type of cancer?

22  A.  I don't believe they were.

23  Q.  And with regard to a hard copy, would that have been a

24      single copy at each prison facility, or did each

25      practitioner get a copy?



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1   A.   You're referring to the InterQual guidelines of two
 2        years ago?
 3   Q.   Well, between 2012 and 2014.
 4   A.   Oh, no, what was available to them was UpToDate in a
 5        software form.
 6   Q.   So the only time they got the InterQual guidelines in
 7        hard copy was about two years ago?
 8   A.   Correct.
 9   Q.   Okay.  So they would not have been accessing InterQual
10        guidelines during the time period of 2012 to 2014, is
11        that right?
12   A.   There certainly could have been individuals that
13        accessed that data.  They have internet at the sites.
14        But we provided UpToDate.  That was our preferred
15        resource.
16   Q.   Do you have any knowledge as to why in the last
17        roughly two years the InterQual guidelines have been
18        provided to the practitioners?
19   A.   What the company is trying to do is standardize the
20        processes among state contracts.  So not all contracts
21        were using UpToDate, not all contracts were using
22        InterQual, so they wanted the UM physicians to have
23        access to both resources.
24   Q.   And I take it, because you said you're familiar with
25        InterQual but you don't use it on a routine basis, you
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 284

```
 1          cannot compare or contrast the qualities between

 2          UpToDate and InterQual, is that a fair statement?

 3     A.   I'm not capable of doing that, no.

 4     Q.   Okay.  Are you familiar with a process in the

 5          electronic medical record system that was at least in

 6          place between 2012 and 2014 that allowed a physician

 7          to put an alert into a patient's medical record?

 8     A.   Yes, there's a place for an alert.

 9     Q.   And how does that alert system work?

10     A.   Well, you enter -- there's a box that you check and

11          can fill out, and then when you open the record and

12          create a new visit, that would be on the first page,

13          would be an alert.

14     Q.   All right.  So let's just call this patient John Doe.

15          Walk me through it.  The practitioner says there's a

16          need for an alert to be placed.  There's a box in the

17          electronic medical record form that can be checked off

18          that would place the alert into the system, is that

19          correct?

20     A.   That's correct, but it's not required.

21     Q.   I'm not asking if it's required.  I'm just asking how

22          the process works.  Am I right so far?

23     A.   Yes.

24     Q.   All right.

25     A.   That's what I recall.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 285

```
 1   Q.   And then once that alert is placed into the system,
 2        the next provider that opens the patient's medical
 3        record will be alerted to the fact that there is this
 4        checked-off alert box, correct?
 5   A.   That's correct.
 6   Q.   And it would prompt that provider to look at the prior
 7        medical record to see what the concern or concerns
 8        were.  Is that correct?
 9   A.   Correct.
10   Q.   Do you know whether there's any guidance that Corizon
11        provided to its medical providers as to when an alert
12        should be used?
13   A.   Again, it's not required within the DOC ^ audio system
14        to fill out that box.
15   Q.   I didn't ask about requirements.  I'm asking, was any
16        guidance provided to the providers during the training
17        or continued training for the Corizon medical
18        providers?
19   A.   I don't think we consistently discussed the alert box.
20   Q.   Do you understand when it's used or why it should be
21        used?
22   A.   It's rarely used, because the, you know, the note --
23        the chart entry should delineate all of the different
24        concerns, diagnoses for that patient.  Plus, there's a
25        diagnosis module which we encourage them to look at
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1        for each visit that alerts them to what their health
 2        problems are.
 3   Q.   Okay.  My question is do you know when it's used, not
 4        whether it's used.  Rarely, or not?
 5   A.   It could be used when you want to convey that a
 6        patient has a certain illness, hepatitis, and may be
 7        on medications that there are drug interactions,
 8        potential, but then the pharmacy portion of the EMR
 9        alerts you to that.  So we don't require the use of
10        it.
11   Q.   I understand.  Have you ever during your years with
12        Corizon seen a medical chart that has an alert on it?
13   A.   Yes, some people have completed the box.
14   Q.   And tell me the circumstances when it's been used.
15   A.   It would alert to -- there's a specific area for
16        allergies, but sometimes providers have reinforced
17        that by adding it to the alert button, or again, if
18        they have a certain disease.
19   Q.   Would cancer be such a disease that you might see an
20        alert in a patient's record?
21   A.   It could be.
22   Q.   Does the alert simply have a check-off box, or is
23        there a place to put notes regarding why the alert was
24        placed?
25   A.   I can't recall.  I'd have to have the EMR up in front
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

1        of me.

2   Q.   Okay.  So it's entirely possible that the alert could

3        also have a note in the chart for follow-up?

4   A.   It's possible.

5   Q.   Is there anything, to your knowledge, in Corizon's

6        charting procedures and guidelines that trains its

7        physicians on when to chart a palpable mass?

8   A.   I don't think there's anything specific to a palpable

9        mass.

10  Q.   Is there anything, to your knowledge, that provides

11       training or guidelines to Corizon physicians regarding

12       charting palpable masses within a certain minimum

13       size?

14  A.   I am not.

15  Q.   You're not aware of anything like that, correct?

16  A.   I believe you asked me if I was familiar, and I'm not.

17       I do not know.  I'm not aware.

18  Q.   Okay.

19                  MARKED FOR IDENTIFICATION:

20                  DEPOSITION EXHIBIT 22

21                  11:08 a.m.

22  BY MS. STAMLER:

23  Q.   Dr. Bomber, you might want to show that to your

24       counsel first.  You've been handed Exhibit 22 to your

25       deposition.  It is a Michigan Department of



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 288

```
 1          Corrections policy directive on the subject of health

 2          services.

 3                    Have you seen this policy directive before?

 4   A.    I've scanned all of the policy directives at one point

 5          or another, including this one.

 6   Q.    So is that a yes?

 7   A.    Yes.

 8   Q.    And this appears to have become effective, according

 9          to the document, on December 29, 2010.  Do you see

10          that?

11   A.    Yes.

12   Q.    All right.  Are you familiar with whether this has

13          been in any way modified or amended since that date?

14   A.    I am not certain.

15   Q.    Okay.  I want to turn your attention to page 5 -- no,

16          strike that, page 6 of the document, beginning with

17          the heading "Outside Health Services at Prisoner's

18          Expense."  Are you familiar with that element of this

19          policy?

20   A.    In general.

21   Q.    And you're aware, sir, that prisoners have the

22          opportunity to seek medical care outside of the

23          prison, but that must be done at the prisoner's

24          expense, including paying for security, paying for

25          transport, is that right?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1   A.   Can you repeat the question?
 2                  MS. STAMLER:  Can I have it back?
 3                  (The following portion of the record was
 4                  read by the reporter at 11:10 a.m.:
 5                  "Q. And you're aware, sir, that prisoners
 6                  have the opportunity to seek medical care
 7                  outside of the prison, but that must be
 8                  done at the prisoner's expense, including
 9                  paying for security, paying for transport,
10                  is that right?")
11   A.   I want to be sure that I understand the part outside
12        the prison, because we do provide, you know, referrals
13        outside the prison, but ...
14   BY MS. STAMLER:
15   Q.   Fair point.  Let me rephrase the question.
16                  You're aware that a prisoner can seek to
17        get health services by an outside qualified health
18        professional --
19   A.   Yes.
20   Q.   -- correct?
21   A.   Yes.
22   Q.   But in order to do so, the prisoner is responsible for
23        all costs, including any costs for transportation and
24        custody coverage, correct?
25   A.   In the event -- yes.  That's true, yes.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 290

```
 1   Q.   And that those costs have to be paid in full in
 2        advance of any medical appointment, correct?
 3                  MS. VAN THOMME:  Object to foundation.
 4   A.   I'd have to -- I don't know that from the top of my
 5        head.  I'd have to -- is that in the document?
 6   BY MS. STAMLER:
 7   Q.   Let me read it to you:  The estimated cost must be
 8        paid in full by or on behalf of the prisoner, or
 9        adequate funds must be encumbered in the prisoner's
10        trust account, prior to receiving the approved health
11        care service.
12                  Did I read that correctly?
13   A.   Yes.
14   Q.   Is that your understanding of how it works in the
15        system?
16   A.   Yes.
17   Q.   Going to the next page of this document, page 7,
18        paragraph JJ?
19   A.   Yes.
20   Q.   Take a moment to review that and let me know when
21        you're done.
22   A.   Yes.
23   Q.   Subparagraph JJ pertains to the requirements that a
24        QHP who's on the outside of the prison health care
25        system must follow in order to treat a prisoner.  Is
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1        that correct?
 2   A.   Yes.
 3   Q.   And the prisoner's required to provide a signed
 4        release, authorizing the QHP to review relevant
 5        portions of the prisoner's health record, correct?
 6   A.   Correct.
 7   Q.   The prisoner must also supply a written agreement from
 8        the QHP to comply with any security measures required,
 9        to furnish the department with a written summary of
10        the findings and any recommendations, and to not
11        provide or order treatment or further testing without
12        prior approval of the warden after the consultation
13        with the appropriate regional medical officer.
14        Correct?
15   A.   Correct.
16   Q.   Do you know how the prisoner gets a form, or is there
17        a form that can be used to create this agreement or
18        this arrangement between the QHP and the prisoner and
19        the prison?
20             MS. VAN THOMME:   Object to foundation.
21   A.   I'm not aware of the form.
22   BY MS. STAMLER:
23   Q.   Turning to page 8 of 10, subparagraph PP?
24   A.   Yes.
25   Q.   This is the section that pertains to a prisoner who
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 292

     1            believes he or she has an urgent or emergent health
     2            condition.  Would you please review that silently and
     3            let me know when you're done reviewing it?
     4     A.     Yes.  I'm finished.
     5     Q.     All right.  Are you familiar with subparagraph PP?
     6     A.     Yes.
     7     Q.     And this is the section that pertains to a prisoner
     8            who believes he or she has an urgent or emergent
     9            health condition and what that prisoner can do to
    10            request health care services.  Correct?
    11     A.     Correct.
    12     Q.     There's also a section of this paragraph that pertains
    13            to what the staff person's requirements are, correct?
    14     A.     Correct.
    15     Q.     And the staff person shall contact the health care
    16            services and convey the prisoner's request, right?
    17     A.     Correct.
    18     Q.     Regardless of the prisoner's custody status, the time
    19            of day, correct?
    20     A.     Correct.
    21     Q.     Or the day, is that right?
    22     A.     Correct.
    23     Q.     In addition, staff is mandated to contact health care
    24            services whenever he or she believes that a prisoner
    25            may have an urgent or emergent health condition even



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 293

```
 1        if the prisoner does not request such health services.
 2        Is that right?
 3   A.   Yes.
 4   Q.   So the duty is not just on the prisoner, but it's also
 5        placed on the staff to make such a call, correct?
 6   A.   Yes.
 7   Q.   And, as I read this, it says:  The contact shall be
 8        responded to within two hours by one or more of the
 9        following methods, as determined by the QHP.
10             Who's the QHP in subparagraph PP?  Is that
11        the medical provider?
12   A.   A qualified health care professional; it could be the
13        nurse.
14   Q.   All right.  And so --
15   A.   It most often is the nurse in this situation.
16   Q.   So a prisoner is exhibiting, or either is observed as
17        having an urgent or emergent need or the prisoner
18        himself says, "I've got, you know, an emergency
19        situation here."  That notification happens, and then
20        the qualified health professional is required to
21        respond within two hours?
22   A.   Yes.
23   Q.   And then one of the methods that can be used is the
24        prisoner shall be allowed to speak directly to the
25        qualified health professional by phone, right?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 294

```
 1   A.   Correct.
 2   Q.   Or the prisoner shall be allowed to go to the health
 3        services area?
 4   A.   Correct.
 5   Q.   Or the qualified health professional shall go to the
 6        prisoner's location to conduct an evaluation.  Is that
 7        right?
 8   A.   Yes.
 9   Q.   And that does not seem to be distinct between what's
10        urgent or emergent, is that correct?
11   A.   It specifies both urgent or emergent.
12   Q.   Okay.  Under subparagraph RR on this same page, can
13        you take a look at that, read that to yourself, and
14        let me know when you're done reviewing it?
15   A.   Yes.  Finished.
16   Q.   Are you familiar with RR?
17   A.   Yes.
18   Q.   This pertains to -- let me read it into the record:
19        Prisoners who require urgent care shall be sent to a
20        local hospital or local emergency clinic if a QHP
21        determines necessary services cannot be provided at
22        the facility.  An ambulance shall be used whenever
23        deemed necessary by appropriate health care staff.
24             Did I read that correctly?
25   A.   Yes.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1   Q.   Do you recollect, sir, what the local hospital or
 2        local emergency clinic is for Carson City Correctional
 3        Facility?
 4   A.   I believe that it would be Sparrow.
 5   Q.   Is that also known as Carson City Hospital?
 6   A.   I think that's a Sparrow-owned hospital.  I've not
 7        been in the facility.  I'm just vaguely familiar with
 8        it, yes.
 9   Q.   I know you haven't been there.  Do you have any idea
10        how close it is located to the prison?
11   A.   I don't recall.
12   Q.   Are you familiar with any other local hospital or
13        local emergency clinic near the Carson City
14        Correctional Facility?
15   A.   No.
16   Q.   And it also indicates an ambulance shall be used
17        whenever deemed necessary by the appropriate health
18        care staff.  Is there some sort of guideline in place
19        either by the MDOC or Corizon indicating when an
20        ambulance should be used and when it should not be
21        used?
22   A.   It's clinical judgment.  I don't recall a policy
23        directive.
24   Q.   So if a prisoner is deemed to be in an urgent need for
25        medical care rather than emergent, would it be the
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1        case that a practitioner could determine that
 2        transport by an ambulance would not be necessary?
 3   A.   Yes.
 4   Q.   You would expect, though, if somebody was deemed to be
 5        in emergent need of medical attention, that that
 6        prisoner would be transported via ambulance?
 7   A.   Yes.  If the inmate is in extremis, yes.
 8   Q.   What does "in extremis" mean?
 9   A.   This policy is for a situation where a patient has
10        respiratory distress, chest pain, you know, an urgent
11        or emergent situation, and would require, you know,
12        possibly advanced life support, advanced cardio life
13        support, so ...
14   Q.   And that's the sort of equipment you would have
15        available in an ambulance?
16   A.   That's correct.
17   Q.   Can you go to the bottom of page 9 in this exhibit?
18   A.   Certainly.
19   Q.   Under subparagraph BBB, there's a heading right above
20        it that says "CFA Inter-Institutional Transfers."  Do
21        you see that?
22   A.   Yes.
23   Q.   All right.  Would you read BBB to yourself and let me
24        know when you're done?
25   A.   Yes.  Yes.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1    Q.    Are you familiar with BBB as it pertains to
 2          inter-institutional transfers?
 3    A.    Yes.
 4    Q.    And is it correct to say that BBB applies to
 5          circumstances where after the initial physical exam is
 6          done at the intake process at the RGC, there's a
 7          determination as to where the prisoner should be
 8          transferred based on his or her medical needs,
 9          correct?
10    A.    This refers to the grid that helps to ensure that each
11          facility has access to an acute care facility.
12    Q.    Okay.
13    A.    So yes.
14    Q.    Okay.  Are you familiar with any policies in place
15          either with the Department of Corrections and Corizon
16          that address the circumstance where a prisoner is
17          discharged from an inpatient chemotherapy treatment
18          setting back to the prison, and it's supposed to be
19          Duane Waters Hospital but gets sent to the wrong
20          facility?  Is there any sort of policy that would
21          address that circumstance?
22                    MS. VAN THOMME:  Object to form and
23          foundation.
24    A.    I'm not aware.
25    BY MS. STAMLER:
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 298

```
 1   Q.   What happens, if you know, if you're familiar with any
 2        circumstance where a prisoner is coming out of a
 3        chemotherapy treatment, inpatient treatment facility,
 4        prior to Duane Waters Hospital having that available,
 5        what if they're put into the general prison population
 6        and they were supposed to actually go to Duane Waters
 7        Hospital?  Is there a mechanism whereby that patient
 8        could be transferred to DWH?
 9             MS. VAN THOMME:  Object to form and
10        foundation.
11   A.   Well, yes, if the patient is transferred to the wrong
12        facility, and staff at the receiving facility
13        recognizes that, then they would call the chief
14        medical officer, or the health unit managers would
15        coordinate that transfer among themselves.  As far as
16        a written policy, I'm not aware.
17   BY MS. STAMLER:
18   Q.   And you're saying that this policy found under BBB in
19        Exhibit 22 does not really address that issue, is that
20        correct?
21   A.   No.  This refers to the grid, the health care -- well,
22        there is a grid.  I've not actually seen the actual
23        grid itself.
24             But, yes, to answer your question, yes,
25        there is a, as it says here, a grid for identifying
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1        where the inmate needs to go, because there may be
 2        certain accommodations; for example, if they're
 3        wheelchair-dependent, not every facility can
 4        accommodate them.
 5    Q.  Okay, so even -- so I may have misunderstood your
 6        testimony, because earlier you said you didn't think
 7        there was a policy that addressed the circumstances
 8        that I've set forth, which is a patient coming out of
 9        an inpatient chemotherapy environment, returned to,
10        supposed to be returned to DWH, Duane Waters, but
11        instead gets put back into a general prison setting,
12        such as Carson City Correctional.
13                 Are you saying that paragraph BBB would
14        apply there as to transferring the inmate from Carson
15        City to Duane Waters?
16                 MS. VAN THOMME:  Object to form and
17        foundation.
18    A.  I need to read it again.
19    BY MS. STAMLER:
20    Q.  Okay.
21    A.  Okay, I believe I understand the policy now.
22                 So this would refer to if a patient was,
23        you know, transferred to DWH because there was a
24        special accommodation or health care service that was
25        available there and not at their facility; then, yes,
```


US LEGAL SUPPORT
The Power of Commitment™

JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 300

```
 1        the patient should have been transferred to Duane

 2        Waters.

 3   Q.   So BBB would apply to that circumstance, correct?

 4              MS. VAN THOMME:  Object to form and

 5        foundation.

 6   A.   If the site could not accommodate the medical need,

 7        yes.

 8   BY MS. STAMLER:

 9   Q.   Okay.  And are you familiar with any -- well, strike

10        that.

11   A.   When you finish this line of questioning, could we

12        take a short break?

13   Q.   Yeah.  Actually, it's a good time to take a break,

14        yeah.

15              (Off the record at 11:26 a.m.)

16              (Back on the record at 11:33 a.m.)

17              MARKED FOR IDENTIFICATION:

18              DEPOSITION EXHIBIT 23

19              11:33 a.m.

20   BY MS. STAMLER:

21   Q.   Sir, you've been handed Exhibit 23 to your deposition.

22        Take a moment to look at it and let me know when

23        you're done reviewing it.

24   A.   Okay, I'm finished.

25   Q.   Have you seen Exhibit 23 before?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 301

```
 1   A.   Yes.

 2   Q.   And what is it?

 3   A.   It's the reception center processing standing orders.

 4   Q.   And apparently, at least In the upper left-hand

 5        corner, it appears that there was a revision to this

 6        document on May 2 of 2006.  Is that right?

 7   A.   Correct.

 8   Q.   All right.  Have you -- is this something, sir, that

 9        was part of the training materials for onboarding

10        physicians through Corizon?

11   A.   This document was subsequently revised, and I don't

12        recall the year it was revised.

13   Q.   Understanding it may have been revised after 2006, are

14        you aware whether this set of standing orders was part

15        of the training materials that onboarding physicians

16        received?

17   A.   Yes.  This is part of the MDOC rules/regulations/

18        processes binder that's at all facilities.  It was

19        also provided electronically, but I can't recall the

20        year it was provided electronically.

21   Q.   All right.  Understanding that this may have been

22        revised, are you able to tell me, as you sit here

23        today, what components of this -- standing orders, I

24        should say, what was modified?

25   A.   I can't recall.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1    Q.   In looking at Exhibit 23, is there any standing order
 2         at least as of 2006 addressing palpable masses or any
 3         sort of suspected tumors?
 4    A.   I don't see any item.
 5    Q.   And, as you sit here today, are you aware of whether
 6         any of the modifications that may have occurred to
 7         this set of standing orders after May 2 of 2006
 8         contained any reference to any standing orders on
 9         palpable masses or tumors?
10    A.   No.
11                   MARKED FOR IDENTIFICATION:
12                   DEPOSITION EXHIBIT 24
13                   11:37 a.m.
14    BY MS. STAMLER:
15    Q.   Doctor, you've been handed "General Health Services
16         Policy & Procedure" pertaining to emergency services,
17         access to care, and informed consent and the right to
18         refuse treatment.  Have you seen these documents
19         before?
20    A.   I have.
21    Q.   And these are part of the Corizon's policies and
22         procedures that are provided to health care providers
23         within the Corizon system, is that right?
24    A.   Yes.
25    Q.   And were these part of the training materials that
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 303

```
 1         were provided to onboarding physicians?
 2    A.   They are, but the MDOC policy for emergency services
 3         provides specific, contract-specific requirements.  So
 4         these would be, you know, in the materials, but
 5         there's an operating procedure that the MDOC has for
 6         emergency services, also.
 7    Q.   All right.  So this is -- fair to say that the policy
 8         and procedures set forth in Exhibit 24 are more
 9         general than the MDOC guidelines that might address
10         these same topics?
11    A.   I'd have to read through the whole document.
12    Q.   All right, we'll take a minute to do so, and let me
13         know when you're done reviewing.
14    A.   There are actually three documents here.  Do you want
15         me to review all three of them?
16    Q.   Yeah.  I just want to know if these are the policies
17         that were provided to physicians as they were
18         onboarding with Corizon.
19    A.   They're not exactly the same as the MDOC policies, but
20         there are certain elements that are similar in nature.
21    Q.   So are the MDOC policies the ones that are provided or
22         are the Corizon policies provided, or both?
23    A.   They have access to both.
24    Q.   Well, what are they instructed on as to whether the
25         Corizon policy should be followed or the MDOC policy
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 304

```
 1        should be followed?
 2   A.   The MDOC policies are followed.
 3   Q.   So why would you provide the onboarding providers with
 4        the general health services policies and procedures if
 5        in fact MDOC's policies essentially override Corizon's
 6        policies?
 7   A.   Again, they're similar elements between the two
 8        documents, and Corizon provides similar onboarding --
 9        well, the same onboarding process to all their
10        contracts so that the providers understand general
11        health services and policies of Corizon.
12   Q.   But at the end of the day, for those providers that
13        are within the Michigan Department of Corrections
14        system, they are obligated to comply with the MDOC
15        policies and procedures, is that correct?
16   A.   The MDOC policies are the ultimate authority, yes.
17             Can I amend my answer?
18   Q.   Hold on, we're marking a document.
19             MARKED FOR IDENTIFICATION:
20             DEPOSITION EXHIBIT 25
21             11:42 a.m.
22   BY MS. STAMLER:
23   Q.   I'm sorry, you wanted to amend your answer?
24   A.   Yes.  I said that the MDOC policies are the ultimate
25        authority.  That may not always be the case.  If
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 305

 1         there's an ethical or medical issue and an NCCHC
 2         policy, that may supersede an MDOC policy.  It's a
 3         rare event.
 4                 I can give you an example, but I want to be
 5         clear that I'm not held to saying that absolutely, a
 6         hundred percent, every MDOC policy is followed to a
 7         hundred percent of the law.
 8    Q.   All right.  There are some circumstances where you're
 9         saying that the national correction -- what does the
10         NCCHC stand for?
11    A.   National Commission on Correctional Health Care.
12    Q.   Those policies may supersede the MDOC's policies?
13    A.   Yes.
14    Q.   Can you give me examples of that?
15    A.   Yes, real life examples.  An inmate, a female inmate
16         was in the visiting room and was observed to receive
17         balloons containing possible contraband substances,
18         which she inserted intravaginally.
19                 There is an MDOC policy which states that
20         we, meaning the health care provider, need to obtain
21         specimens in a situation like that, which would have
22         meant restraining that inmate and removing the foreign
23         body.  But NCCHC guidelines state that we cannot be
24         involved in forensics, not to mention, if that were to
25         be the case, the patient should be, you know, treated



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 306

```
 1        appropriately and sedated, and so forth.
 2                  Fortunately, she willingly gave up the
 3        contraband after it was explained to her that the drug
 4        that she had, which turned out to be Suboxone, could
 5        be absorbed intravaginally and end up killing her.  So
 6        she did, fortunately, submit to the exam.
 7                  So it's the only time in my career that
 8        I've ever had to deal with an ethical issue like that,
 9        but we would not have followed the MDOC policy
10        directly, which in that case was written many, many
11        years ago.
12   Q.   So that is a policy that really needs to be updated in
13        order to come into compliance with the national
14        standard, is that correct?
15   A.   That's correct.
16   Q.   And that really is a law enforcement issue, correct?
17   A.   Correct.
18   Q.   All right.  Going to Exhibit 25, have you seen that
19        document before?
20   A.   Yes.
21   Q.   And this is a policy that is an "Introduction to
22        Pharmacy," is that right?
23   A.   Yes.
24   Q.   And it appears, it's very faint on the lower left-hand
25        side, but that this policy was revised in 2013?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 307

```
 1   A.   Yes.
 2   Q.   Do you know if this policy was in place perhaps in a
 3        different version in 2012?
 4   A.   I cannot recall.
 5   Q.   Are you familiar with the section that pertains to
 6        narcotics prescribing?
 7   A.   Yes.
 8   Q.   Fair to say that there is a high risk for abuse and
 9        unintended use of controlled substances, like
10        narcotics?
11   A.   Yes.
12   Q.   And that these types of medications are reserved for a
13        very limited use, is that right?
14   A.   Yes.
15   Q.   And then examples are provided with regard to alcohol
16        and drug withdrawal.  Correct?
17   A.   Correct.
18   Q.   Post-operative pain management or end-of-life care,
19        correct?
20   A.   Correct.
21   Q.   Those are examples.
22             Would you agree with me, Doctor, that there
23        are circumstances where a prisoner suffering from
24        cancer may need as part of his or her treatment pain
25        medication?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 308

```
 1   A.   Yes.

 2   Q.   And is there anybody within the prison system that

 3        has, to your knowledge, expertise in pain management?

 4   A.   Yes.

 5             MS. VAN THOMME:  Object to foundation.

 6   BY MS. STAMLER:

 7   Q.   Do you know if there was such a person employed at the

 8        Carson City Correctional Facility during the time

 9        period of 2012 through 2014?

10   A.   I do not.

11   Q.   If there is not such -- if there was not such a person

12        with expertise in pain management during that time

13        frame, is that a service that would be considered

14        ancillary and require a 407?

15             MS. VAN THOMME:   Object to form and

16        foundation.

17   A.   No, because we have other programs that are available

18        for a patient such as that.

19   BY MS. STAMLER:

20   Q.   What do you mean, you have other programs?

21   A.   We have our CHOICES program, which is a Hospice-type

22        program, but it's Hospice I and II.  You could be a

23        patient that has, for example, end-stage COPD and

24        still might have a life expectancy on the order of

25        years but would require pain medication; then you
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 309

```
 1        would have access to a different formulary, called our
 2        CHOICES formulary.  We also have a pain management
 3        committee.
 4   Q.   Okay.  So let me ask this.  To the extent a patient
 5        has Stage IV cancer of the tonsils or tonsil, would
 6        you expect that patient to have been placed into the
 7        CHOICES program?
 8   A.   Yes.
 9   Q.   And would you have expected that patient to receive
10        pain management through either the CHOICES program or
11        the pain management committee process?
12                   MS. VAN THOMME:  Object to form and
13        foundation.
14   A.   An exception may be that they refused entry into one
15        of the programs, they would still have medication
16        provided for their pain.
17   BY MS. STAMLER:
18   Q.   Right.  If the patient refused that kind of service,
19        that would be documented as part of his or her medical
20        record, correct?
21   A.   Correct.
22   Q.   If the patient was in the CHOICES I or II program,
23        that would have been documented in the patient's
24        medical record, correct?
25   A.   Yes.
```



US LEGAL SUPPORT
The Power of Commitment™

JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

1   Q.   When did the CHOICES program begin?

2              MS. VAN THOMME:  Object to foundation.

3   A.   I cannot recall a specific date.

4   BY MS. STAMLER:

5   Q.   Was it before or after 2014?

6   A.   I believe it was before 2014.

7   Q.   Was it before or after June 30, 2014?

8   A.   I'm going from memory.  I believe it was before.

9              MARKED FOR IDENTIFICATION:

10             DEPOSITION EXHIBIT 26

11             11:49 a.m.

12  BY MS. STAMLER:

13  Q.   You've been handed Exhibit 26 to your deposition.

14       This is a document that does not have a title on it,

15       but it says at the top "Medical, Approved 1-29-14,"

16       and then below the left-hand column, labeled

17       "Medical," there's a subheading saying "Abbreviation,"

18       and then in the right-hand column, "Meaning."  Do you

19       see that?

20  A.   Yes.

21  Q.   Have you seen Exhibit 26 before?

22  A.   I believe this is similar to a document I've seen on

23       abbreviations before, yes.

24  Q.   And do you know, sir -- I've asked you some questions

25       before about when these abbreviations were deemed



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1        approved.  This says January 29, 2014, correct?
 2   A.   Correct.
 3   Q.   Do you know, as you sit here today, whether there was
 4        a prior list that was approved?
 5   A.   That's what I can't recall.
 6   Q.   Okay.
 7   A.   Yeah.
 8   Q.   I just thought maybe this might refresh your memory.
 9   A.   I do remember discussing this document, but I can't
10        recall the one before it.
11   Q.   Do you see, sir, on the approved list of abbreviations
12        anything that would be used to describe the lower jaw?
13   A.   I'd need a few minutes to go through it and see.
14   Q.   Sure, take your time.
15   A.   How about I start with jaw or lower ...
16             The answer is no.
17   Q.   Do you see anything in there, Doctor, that has an
18        abbreviation for left jaw or right jaw?
19   A.   No.
20   Q.   Do you see anything in there that has an abbreviation
21        for upper jaw?
22   A.   No.
23   Q.   What about an area of the body depicting the tonsil or
24        tonsil lymph nodes?
25   A.   There was one ENT abbreviation, but I don't think it
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1        was exactly what you're referring to.
 2   Q.   And what are you referring to?
 3   A.   It was an oral -- mesia-buccal was a referral to the
 4        mouth, but ...
 5   Q.   I'm sorry, where are you?
 6   A.   I'm going back to see, because there are a couple
 7        references to mouth here, but not the jaw,
 8        specifically.
 9   Q.   Okay.
10   A.   I saw nothing on the jaw.
11   Q.   Nothing -- did you see anything with regard to
12        anything as far as the neck region or throat other
13        than ENT?
14   A.   No.  That's the one, ENT.
15   Q.   So it's fair to say that at least as of January 29,
16        2014, there were not approved abbreviations for lower
17        jaw, left jaw, tonsil, tonsillar area, tonsil lymph
18        nodes, or upper jaw, is that right?
19   A.   Correct.
20   Q.   I see at the very top left-hand side of the
21        abbreviations there are two symbols; one is the pound
22        symbol and one is the at symbol.  Do you see those?
23   A.   Yes.
24   Q.   Other than those two symbols, are there any other
25        approved symbols?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 313

```
 1   A.   No.
 2   Q.   It's correct to say that the abbreviation of a
 3        question mark is not an approved medical abbreviation,
 4        correct --
 5                 MS. VAN THOMME:  Object to form.
 6   BY MS. STAMLER:
 7   Q.   -- on this document?
 8   A.   It's certainly used by many, many health care
 9        professionals.
10   Q.   That wasn't my question.  Is that an approved
11        abbreviation?
12                 MS. VAN THOMME:  Object to form.
13   A.   But it's not disapproved, either.
14   BY MS. STAMLER:
15   Q.   Sir, would you look at Exhibit 26.  Does the symbol of
16        a question mark appear, yes or no?
17   A.   Again, earlier we talked about standard of care in
18        medicine, and a question mark is used quite often.
19   Q.   That's quite different from your earlier testimony in
20        part one of your deposition.
21                 So my question to you, sir, is, is that an
22        approved abbreviation on Exhibit 26?
23   A.   It's not really an abbreviation --
24                 MS. VAN THOMME:  Object to form.
25   A.   -- an abbreviation.  It's a question mark.  I don't
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 314

```
 1        see anything wrong with using a question mark when I'm
 2        writing a note.
 3   BY MS. STAMLER:
 4   Q.   Let's go to the next -- let's go to page 6 of
 5        Exhibit 26.  Do you see the capital letter L?
 6   A.   Yes.
 7   Q.   That's an abbreviation for liter, correct?
 8   A.   Correct.
 9   Q.   Go to the page number 3.  Do you see the letters CM?
10   A.   Yes.
11   Q.   It's an approved abbreviation for centimeter, correct?
12   A.   Correct.
13   Q.   Turning your attention, sir, to page 11 of Exhibit 26,
14        do you see the initials T&A?
15   A.   Yes.
16   Q.   That stands for tonsils and adenoids, correct?
17   A.   Correct.
18   Q.   Do you want to revise your earlier testimony that
19        there isn't an abbreviation addressing tonsils?
20   A.   Yes, I missed it.
21   Q.   Are you able to tell me, sir, as you sit here today,
22        back in 2012, in August, how a chart should read if
23        there was a finding of a two to three-centimeter
24        palpable mass in the tonsil area, what abbreviation
25        should be used?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 315

```
 1            MS. VAN THOMME:  Object to form,
 2        foundation.
 3   A.   What should be used?  It's not necessarily what should
 4        be used.  I could write it out as well as use
 5        abbreviations, but I would say exactly what you just
 6        said.  Likely, I would say there's a two to
 7        three-centimeter palpable node, and I would specify
 8        the area.
 9   Q.   And how would you specify the area?
10   A.   Well, if it was a cervical lymph node, I would say
11        cervical.  If it was a groin lymph node, I would
12        specify the groin area.
13   Q.   What if it was in the tonsillar area, what would you
14        write?
15            MS. VAN THOMME:  Object to form and
16        foundation.
17   A.   Well, you would say submandibular or cervical,
18        anterior chain, posterior chain.
19  BY MS. STAMLER:
20   Q.   Okay.  And I know we talked about this.  I don't want
21        to go over it, but you'd also not only describe the
22        size, but the texture and all the other elements we've
23        gone through, correct?
24   A.   Probably no one would have every element, but
25        certainly at least an adequate description.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 316

```
 1   Q.   You certainly would indicate whether it was
 2        asymmetrical or symmetrical, correct?
 3   A.   Yes.
 4                    MARKED FOR IDENTIFICATION:
 5                    DEPOSITION EXHIBIT 27
 6                    12:00 p.m.
 7                    MS. VAN THOMME:  It's now noon.  How much
 8        longer do you have?
 9                    MS. STAMLER:  I'm not sure.
10                    MS. VAN THOMME:  Okay, because we had
11        four-and-a-half hours the first day, and I'm being
12        generous there.  I think it was a little more than
13        that, but I'm estimating it conservatively.  And we've
14        gone I'd call it two hours so far today.  It's
15        probably been a little more than that.
16                    MS. STAMLER:  Well, I would suggest part
17        one of the deposition may have been a lot slower
18        because of the document dump that occurred and if you
19        want --
20                    MS. VAN THOMME:  Well, the documents could
21        have been produced the day of the deposition.  So I
22        don't think that that --
23                    MS. STAMLER:  We've had this -- wait-wait,
24        this is --
25                    MS. VAN THOMME:  -- is a good reason.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 317

```
 1        However, I do agree that there were some issues with
 2        documents not being complete, which we discovered at
 3        the deposition, and if you need --
 4                 MS. STAMLER:  That's an understatement.
 5                 MS. VAN THOMME -- if you need a little
 6        extra time because of that, we can reach an agreement
 7        on that.  However, you know, it's not like you get a
 8        fresh seven hours.
 9                 MS. STAMLER:  I certainly don't intend to
10        spend an additional seven hours.
11                 MS. VAN THOMME:  No, I'm just asking you to
12        estimate how much time you need so we can reach an
13        appropriate agreement.
14                 MS. STAMLER:  I would hope that I can get
15        done within a half-hour.
16                 MS. VAN THOMME:  Okay.
17                 MS. STAMLER:  But I can't say for sure,
18        because some of these documents produced are virtually
19        illegible, and whether this witness can read them or
20        not will be very interesting.
21                 MS. VAN THOMME:  Well, I should also say at
22        this point that there are two elements to the dep
23        notice.  One had to do with the subject of testimony
24        that this witness can address.  In addition, there
25        were document requests.  Those don't completely
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 318

```
 1      overlap --
 2                  MS. STAMLER:  I understand, but I don't
 3         know what he knows until I ask.
 4                  MS. VAN THOMME:  Correct.  So I don't think
 5         that that part will take long at all.
 6                  MS. STAMLER:  Okay, great.
 7      BY MS. STAMLER:
 8      Q.   You've been handed Exhibit 27 to your deposition.
 9           Have you seen this before, sir?
10      A.   Give me a minute, please.
11      Q.   Let's go off the record while you're reviewing.
12                  (Off the record at 12:01 p.m.)
13                  (Back on the record at 12:02 p.m.)
14      A.   Yes.
15      BY MS. STAMLER:
16      Q.   This is an "Introduction to Diagnosis Procedures,"
17           involving lab formulary, STAT labs, on-site diagnostic
18           tests available.  Correct?
19      A.   Correct.
20      Q.   Fair to say this is part of the onboarding materials
21           provided to practitioners, correct?
22                  MS. VAN THOMME:  Object to form.
23      A.   It states "Practitioner Onboarding: Diagnostic
24           Procedures, Revised Date 2013."
25      BY MS. STAMLER:
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 319

```
 1    Q.   Is that a yes, sir?
 2    A.   Yes.
 3    Q.   It's fair to say that this procedure allows for STAT
 4         labs to be done, correct?
 5    A.   Yes.
 6    Q.   It also allows for on-site diagnostic tests to occur,
 7         either on-site or off-site, right?
 8    A.   Correct.
 9    Q.   So by way of example, a Carson City inmate who needed
10         an MRI or a CAT scan which could not be performed
11         on-site, with the equipment there, could have either
12         had it done by a facility nearby bringing the
13         equipment in or the inmate going to that facility,
14         correct?
15    A.   There are -- we do -- the only thing that goes from
16         one facility to another would be pulmonary function
17         tests.
18    Q.   So an inmate could not go to, for example, Carson City
19         Hospital to have an MRI done?
20              MS. VAN THOMME:  Object to form.
21    A.   No, that's not what I'm saying.  In your question you
22         had asked could we transfer resources or equipment
23         from one site to another site.
24    BY MS. STAMLER:
25    Q.   I'm asking if an inmate needed an MRI, by way of
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 320

```
 1        example, and you don't have MRI equipment at Carson
 2        City, one of two things could happen, based on
 3        Exhibit 27:  The equipment, mobile MRI equipment could
 4        come into the site, or the inmate could go to Carson
 5        City Hospital for the MRI.  Correct?
 6   A.   Okay, yes, all right.
 7   Q.   And that's contemplated under Exhibit 27, correct?
 8   A.   Yes.
 9   Q.   Are you familiar with something called "Date of Birth
10        Project"?
11   A.   I vaguely recall discussing having appointments around
12        a patient's birthday, but I can't recall any specific
13        policy.  I'd have to look back and see it.
14   Q.   Do you sit on the medical service advisory committee?
15   A.   Yes.
16   Q.   And you participate in the creation of guidelines, is
17        that right?
18   A.   Yes, I have participated in the creation of some
19        guidelines.
20                  MARKED FOR IDENTIFICATION:
21                  DEPOSITION EXHIBIT 28
22                  12:05 p.m.
23   BY MS. STAMLER:
24   Q.   You've been handed Exhibit 28 to your deposition,
25        representing this is a table of contents for the
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1      medical service advisory committee guidelines.  Have
 2      you seen this before, sir?
 3 A.   Yes.
 4 Q.   I want you to look at this document and tell me if
 5      there are any guidelines reflected here on treatment
 6      of cancer.
 7 A.   I don't see any specific to cancer.
 8 Q.   Let me show you what's been marked Exhibit 29 to your
 9      deposition, Dr. Bomber.
10              MARKED FOR IDENTIFICATION:
11              DEPOSITION EXHIBIT 29
12              12:07 p.m.
13 BY MS. STAMLER:
14 Q.   Have you seen the guidelines for medical supplies
15      basic list for site levels?
16 A.   I have seen this before.
17 Q.   Fair to say, sir, that in the stock medications list,
18      the medication of compazine is not on there.  Is that
19      right?
20 A.   I don't see compazine.
21 Q.   Therefore, would it fall within the non-formulary
22      approval policy?
23              MS. VAN THOMME:  Object to form,
24      foundation.
25 A.   Yes.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 322

```
 1    BY MS. STAMLER:
 2    Q.   You're familiar, sir, with what's attached as part of
 3         Exhibit 29, the non-formulary approval process?
 4    A.   Yes.
 5    Q.   And compazine would fall within that, correct?
 6    A.   Correct.
 7                   MARKED FOR IDENTIFICATION:
 8                   DEPOSITION EXHIBIT 30
 9                   12:08 p.m.
10    BY MS. STAMLER:
11    Q.   I'm handing you what's been marked Exhibit 30 to your
12         deposition.  Have you seen this guideline pertaining
13         to single person cells?
14    A.   Yes.
15    Q.   Do you know if this policy would apply to an
16         individual who has been undergoing chemotherapy for
17         cancer?
18                   MS. VAN THOMME:  Object to form and
19         foundation.
20    A.   Only item 2 does say a paraplegic patient with
21         colostomy.  So if they just had a colostomy for cancer
22         care, then it's possible.  But I don't see any general
23         guideline for single person cell for a patient
24         undergoing cancer treatment.
25    BY MS. STAMLER:
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1   Q.   Have you ever seen any policies, either from the
 2        Department of Corrections and/or Corizon, that address
 3        how a patient should be treated upon return from
 4        inpatient chemotherapy as far as placement in an
 5        isolated unit, an infirmary, or the Duane Waters
 6        Hospital?  Have you ever seen any policies along those
 7        lines?
 8   A.   Yes, in relationship to radioactive treatments,
 9        radioactive iodine.
10   Q.   Okay, that person should be isolated?
11   A.   It depends on the dose.
12   Q.   Is that the only policy you've seen?
13   A.   That's the only one I recall from memory right now.
14                  MARKED FOR IDENTIFICATION:
15                  DEPOSITION EXHIBIT 31
16                  12:10 p.m.
17   BY MS. STAMLER:
18   Q.   You've been handed Exhibit 31 to your deposition.
19        This is a document entitled "Corrections Environment"
20        and appears to have been prepared by the Corizon
21        Health company for its employee orientation.
22                  Have you seen this document before?
23   A.   I need a moment.
24   Q.   Okay.  We'll go off the record while you review it.
25                  (Off the record at 12:10 p.m.)
```



US LEGAL SUPPORT
The Power of Commitment™

JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 324

```
 1                    (Back on the record at 12:11 p.m.)
 2   A.   I can't recall this specific document.  We do -- I
 3        know we do cover most, if not all these issues in
 4        other documents, but I don't recall this specific
 5        document, not to say I haven't seen it at some time.
 6        I don't remember it.
 7   BY MS. STAMLER:
 8   Q.   All right.  Let's turn your attention to page 2 of
 9        this exhibit, where it indicates "Correctional
10        Culture."  It states, in part, "Primary function of
11        correctional facilities is security," and that the
12        "Mission of health care is secondary to safety and
13        security."  Do you see that?
14   A.   Yes.
15   Q.   Is that in keeping with your understanding and
16        training as a Corizon employee?
17   A.   That's the policy of correctional facilities
18        everywhere.  Security is job one, security and safety.
19   Q.   I'm not asking about the correctional facility.  This
20        is a Corizon training document.  Is that your
21        understanding of Corizon's policies relative to
22        working in the correctional facility?
23                    MS. VAN THOMME:  Object to form.
24   A.   That's what it's based on, but -- okay, yes.  We don't
25        have a choice.  I mean, that's the way it is.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

1    BY MS. STAMLER:

2    Q.   Turning your attention to page 3 of this document,

3         were you trained and did you, sir, provide training to

4         the Corizon physicians about correctional culture and

5         that the inmate population functions differently than

6         the public sector?

7    A.   They receive modules like this from the MDOC that

8         they're required to go through.

9    Q.   So you're saying that even though this is a Corizon

10        document, you haven't seen this?

11   A.   This is very similar to the training that they get

12        with the MDOC modules that they do.

13   Q.   Well, did you get training and did you provide

14        training on the topic that the public sector seeks

15        health care to get well, but the prison population may

16        seek health care to get, quote, special care or perks,

17        close quote?

18   A.   Yes, we discussed that.

19   Q.   And that such perks can include snacks, extra

20        blankets, special shoes, or just a change of scenery?

21   A.   Yes.

22   Q.   Can you turn your attention to page 8 of this

23        document?

24   A.   Page 8.

25   Q.   Under the section entitled "Secondary Gain Examples,"



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1        did you receive training and did you train on this
 2        topic, the medical providers, on secondary gain
 3        examples?
 4   A.   Yes.
 5   Q.   And what was the purpose of training on that topic?
 6   A.   Because it happens.
 7   Q.   Well, was it designed to say you should be more
 8        cautious or more cognizant of the potential for
 9        secondary gain?
10             MS. VAN THOMME:  Object to form.
11   A.   You have to be cognizant of secondary gain, always,
12        for the safety and security.
13   BY MS. STAMLER:
14   Q.   Is that the only reason?
15   A.   At the end of the day, that's the main reason for
16        being aware of secondary gain.  For example, just a
17        toothbrush can be used and filed into a shank and be
18        used as a weapon.  So we always have to be cognizant
19        of the safety issues.
20   Q.   So you're saying that an inmate who's seeking a
21        toothbrush for a dental problem would be denied that
22        because there could be secondary gain?
23   A.   No, I'm saying you have to be cognizant of what they
24        use things for.
25   Q.   Okay.  But that doesn't mean you wouldn't prescribe,
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 327

```
 1        say, pain medication if the inmate actually has pain?
 2   A.   Correct.  No, we would definitely prescribe medication
 3        if needed.
 4                  MARKED FOR IDENTIFICATION:
 5                  DEPOSITION EXHIBIT 32
 6                  12:16 p.m.
 7   BY MS. STAMLER:
 8   Q.   You've been handed 32 to your deposition.  Please
 9        review it.  We'll go off the record while you review
10        it, and let me know when you're done.
11                  (Off the record at 12:16 p.m.)
12                  (Back on the record at 12:17 p.m.)
13   A.   Okay, I'm done.
14   BY MS. STAMLER:
15   Q.   Have you seen Exhibit 32 before?
16   A.   I have seen it but not studied it.
17   Q.   Okay.  When was the last time you saw this?
18   A.   I can't recall.  I probably saw it when it first came
19        out.
20   Q.   All right.  This is dated December 5 of 2015.  Do you
21        know if this document or something similar to it
22        existed before December of 2015?
23   A.   I'm not certain.
24   Q.   So this, at least noted here, is part of the employee
25        orientation for Corizon, correct?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 328

```
 1   A.   I don't think we're including this in the current
 2        manual.  It may have been in there in 2015.
 3   Q.   Right.  Look at the lower left-hand side of page 1 of
 4        32, Exhibit 32, page 1.
 5   A.   Okay.
 6   Q.   Lower left-hand side, "Corizon Health Employee
 7        Orientation."  Do you see that?
 8   A.   Yes.
 9   Q.   Now, you're saying as of at least some point in the
10        recent time, to your knowledge, this is not being
11        provided to employees; is that what your testimony is?
12   A.   I think because there's been many changes in it.
13   Q.   All right.  Turning your attention to page 2 of
14        Exhibit 32 --
15   A.   Yes.
16   Q.   -- this provides an industry breakdown of the number
17        of inmates or the percentage of inmates that are in
18        state prisons and local jails.  Do you see that?
19   A.   Yes.
20   Q.   These are statistics as of 2014.  Do you recall, sir,
21        whether any statistics were provided to you prior to
22        2014 about the industry breakdown?
23   A.   I don't recall.
24   Q.   Continuing on with regard to the corrections industry
25        market share, Corizon, at least in its own
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1        publication, indicates that it has the largest market
 2        share of all the contracted business in the
 3        correctional health care model.  Do you see that?
 4   A.   Yes.
 5   Q.   Was that true back in 2012 through 2014, to your
 6        knowledge?
 7   A.   I don't know.
 8   Q.   You were initially employed with an entity called
 9        Prison Health Systems?
10   A.   Prison Health Services.
11   Q.   Thank you.  And then did it change to Correctional
12        Medical Services or was it acquired by Correctional
13        Medical Services?
14   A.   No.
15   Q.   Was there a merger between the two companies?
16   A.   Yes.
17   Q.   And then is that when it became Corizon Health?
18   A.   Yes.
19   Q.   And do you recall when that was?
20   A.   2012, 2013, somewhere in there.  I'm not exactly sure.
21   Q.   Okay.  On page 3 of this exhibit, there's a statement
22        near the top, it says:  As budgets for state and local
23        governments become more constrained, they turn to
24        outsourcing their correctional health care as a
25        cost-saving measure.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1                    Did I read that correctly?
 2   A.   Yes.
 3   Q.   Did you understand that to be the case since you've
 4        been on board with Corizon?
 5   A.   Yes.  We are more efficient in providing health care
 6        than government agencies are, typically.
 7   Q.   Do you understand the chart that appears sort of in
 8        the center of page 3, industry highlights?  Do you
 9        know what that is reflective of?
10   A.   I'm not sure if this is total revenue.  I'd have to
11        read the whole thing and see if they're referring to
12        specific states.  It looks like a figure denoting
13        growth in the corrections industry.
14   Q.   Growth in the number of individuals who are
15        incarcerated, correct?
16                  MS. VAN THOMME:  Object to foundation.
17   A.   I'm looking to see where the legends for the figure
18        is.  I can't see any legends.  But let's see what it
19        refers to here, money or population.  I'm not sure.
20   BY MS. STAMLER:
21   Q.   Okay.
22   A.   It doesn't really specify, but I would say it's
23        probably population.
24   Q.   So, for example, the graph shows a 1980 prison
25        population of 500,000, if that is in fact the prison
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 331

```
 1        population being depicted?
 2   A.   I think it's the prison population that was cared for
 3        by private corrections.
 4   Q.   Okay.  And then by 2014 that figure of 500,000 has at
 5        least, and it's actually true for 2010, appears to be
 6        somewhere between two million and 2.5 million,
 7        correct?
 8   A.   Correct.
 9   Q.   On this same page, towards the bottom of the page, it
10        indicates:  In the past decade, as the inmate patient
11        population increased and state and local government
12        budgets tightened, they searched for ways to reduce
13        costs.
14                 Did I read that correctly?
15   A.   Yes.
16   Q.   And so it's fair to say, based on your understanding
17        both as an employee and as an individual employed by
18        Corizon to train others, that part of what Corizon has
19        been called in to do is to help reduce costs for
20        health care for prisoner inmates, correct?
21   A.   It says that the states searched for ways to reduce
22        costs, and then Corizon Health has added many
23        sophisticated technological innovations, you know.
24   Q.   Keep reading, "improved care and reduce costs," is
25        that right?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 332

```
 1   A.   Yes.
 2   Q.   So one of the missions of Corizon is to assist states
 3        and local agencies that have jails to reduce their
 4        health care costs, correct?
 5   A.   To improve care --
 6   Q.   And?
 7   A.   -- and reduce health care costs.
 8   Q.   Right.  So one of the missions is to reduce costs for
 9        health care, correct?
10   A.   By at the same time improving health care outcomes.
11   Q.   Can you listen to my question, please?  Is one of the
12        goals of Corizon to reduce health care costs in the
13        prison and the jails, yes or no?
14   A.   No, because you can't separate the two.
15   Q.   Okay.  So it's not a goal, is that what you're telling
16        me?
17   A.   You can't separate improved care and reduce costs.
18        The goal is not to reduce costs; it's to improve care,
19        at the same time reducing costs.  It's a benefit you
20        get when you do things right.
21   Q.   And does Corizon always get it right?
22                MS. VAN THOMME:  Object to form.
23   A.   Nobody's perfect.
24   BY MS. STAMLER:
25   Q.   Right.  You've had inmates die, correct?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 333

```
 1                 MS. VAN THOMME:  Object to form.
 2   A.   Inmates die every day.
 3   BY MS. STAMLER:
 4   Q.   Inmates that have died due to improper medical care,
 5        correct?
 6                 MS. VAN THOMME:  Object to form and
 7        foundation.
 8   BY MS. STAMLER:
 9   Q.   You're aware of that, aren't you?
10   Q.   You sit on the sentinel committee, right, sentinel
11        events --
12   A.   Right.
13   Q.   Right.  I'm not getting into what you know, but you're
14        certainly cognizant, sir, that there have been inmates
15        since Corizon has been in the Michigan prison system
16        providing health care who have died, correct?
17                 MS. VAN THOMME:  Object to form and
18        foundation.
19   A.   There are patients who have died, yes.
20   BY MS. STAMLER:
21   Q.   Right.  Are you saying that Corizon is never at fault
22        in those circumstances?
23                 MS. VAN THOMME:  Object to form and
24        foundation.
25   A.   I can't speak -- you'd have to have a specific case.
```

US LEGAL SUPPORT

The Power of Commitment™

JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 334

```
 1    BY MS. STAMLER:
 2    Q.    Going to page 4 of this exhibit, do you see the
 3          section that's entitled "Our Industry, Increased
 4          demand for outsourced health care services"?
 5    A.    Yes.
 6    Q.    Do you see that section?
 7    A.    Yes.
 8    Q.    And it says:  Since 2011, the outsourced market share
 9          has grown 25 percent?
10    A.    Yes.
11    Q.    And then there are a number of factors listed.  Is
12          that right?
13    A.    Yes.
14    Q.    Including an aging population of inmates, correct?
15    A.    Yes.
16    Q.    Including the prevalence of complex and chronic
17          diseases, correct?
18    A.    Yes.
19    Q.    And then increased or longer sentences, right?
20    A.    Mmm-hmm, yes.
21    Q.    And there are others.  But it would be correct to say,
22          sir, that cancer is a chronic disease, correct?
23    A.    Well, although, you know, some cancers can be cured,
24          we always consider that there's a possibility of
25          recurrence.  So, yes, it is a chronic disease.
```



US LEGAL SUPPORT
The Power of Commitment™

JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1   Q.   And you would agree that cancer is a complex disease?
 2   A.   Yes.
 3   Q.   Going to the bottom of page 4, there's a bullet point,
 4        the last bullet point, that says:  The industry is
 5        also seeing an increase of complex, chronic diseases.
 6        These are costly for our clients to manage and they
 7        are interested in letting an outside company assume
 8        that risk.
 9             Did I read that correctly?
10   A.   Yes.
11   Q.   In the context of that quote, is the client the prison
12        system?
13   A.   Or jails, yes.
14   Q.   All right.  It's not the patient inmate, is it?
15   A.   Not directly, no.  They're referring to contracts.
16   Q.   And what does it mean, to your understanding, by the
17        outside company, in this instance being Corizon,
18        assuming the risk?  What does that mean?
19   A.   Well, for example, when we have certain contracts, we
20        assume the risk for hospitalization, for example.  So
21        when patients are admitted to the hospital, that's
22        part of our contract and we're responsible for that.
23             In Michigan, if patients are referred out
24        for specialty services, we're, you know, responsible
25        for that.  The term at risk -- "that risk" is used in
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1        that context, but, to me, it's more of a
 2        responsibility.
 3   Q.   So they take on the risk of making sure that prisoners
 4        get the appropriate medical care, correct?
 5   A.   That's correct.
 6   Q.   Within the confines of the Eighth Amendment, correct?
 7   A.   Yes.
 8             MS. VAN THOMME:  Object to foundation and
 9        form.
10   BY MS. STAMLER:
11   Q.   Going to the next page, page -- it may not be the next
12        page, but page 6 of this document, "Corizon Health
13        Today," do you see that?
14   A.   Yes.
15   Q.   Do you see the section where it says that 11 percent
16        of privatized correction health care market is $1.3
17        billion in revenue as of 2015?
18   A.   Yes.
19   Q.   Did you get annual reports, Doctor, in your role at
20        Corizon as to how much money Corizon was making on an
21        annual basis for its services provided to inmates?
22             MS. VAN THOMME:  Object to form.
23   A.   I don't recall.
24   BY MS. STAMLER:
25   Q.   Do you recognize, as you sit here today, that at least
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1        as of 2015, Corizon was making $1.3 billion in
 2        revenue?
 3   A.   This would have been what I saw.  I didn't see
 4        anything more detailed than that.
 5                MS. VAN THOMME:  Object to foundation.
 6   BY MS. STAMLER:
 7   Q.   Do you have any reason to doubt the accuracy of what's
 8        in this document?
 9   A.   No.
10   Q.   You understood that Corizon was doing very well
11        financially --
12                MS. VAN THOMME:  Object to --
13   BY MS. STAMLER:
14   Q.   -- back in 2015?
15                MS. VAN THOMME:  Object to form,
16        foundation.
17   A.   I can't speak -- it talks about revenue.  It doesn't
18        talk about liabilities.
19   BY MS. STAMLER:
20   Q.   Let's go to page 7 of Exhibit 32.  Do you see the
21        heading "Corizon Health Business Partners"?
22   A.   Yes.
23   Q.   Do you see where it states that it's providing health
24        care services to more than three hundred thousand
25        inmate patients in five hundred plus facilities
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 338

```
 1          through two hundred plus separate correctional agency
 2          contracts?
 3    A.    Yes.
 4    Q.    And it shows a map of all the places where Corizon is
 5          providing health care to inmates, correct?
 6    A.    Correct.
 7    Q.    Obviously, Michigan is highlighted, correct?
 8    A.    Correct.
 9    Q.    Going to the next page, Doctor, page 8, do you see a
10          chart here that lists the components of Corizon Health
11          spending?
12    A.    Yes.
13    Q.    And there's a breakdown, where it shows labor, 60
14          percent; off-site, 20 percent; pharmacy, 10 percent;
15          and other, 10 percent.  Did I read that correctly?
16    A.    Yes.
17    Q.    Below that chart it gives an explanation as to each of
18          those percentages, correct?
19                    MS. VAN THOMME:  Object to foundation.
20    A.    Yes.
21    BY MS. STAMLER:
22    Q.    "For every dollar spent, 60 cents goes to labor, which
23          includes employee salaries, benefits, overtime, agency
24          fees, locums, and PRNs.  Did I read that correctly?
25    A.    Yes.
```



US LEGAL SUPPORT
The Power of Commitment™

JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1   Q.   And then:  The next largest component is 20 cents out
 2        of every dollar is used for off-site services, which
 3        includes hospitalization, outpatient and diagnostic
 4        services that are not performed at the correctional
 5        facility.
 6             Did I read that correctly?
 7   A.   Yes.
 8   Q.   And then there's a statement that follows, quote:
 9        Maintaining proper utilization of labor management and
10        managing health care costs are critical, as these two
11        components make up the majority of Corizon Health's
12        spending.
13             Did I read that correctly?
14   A.   Yes.
15   Q.   "Pharmacy is the third element, at ten percent."  What
16        does that mean, pharmacy costs?
17             MS. VAN THOMME:  Object to foundation.
18   BY MS. STAMLER:
19   Q.   If you know.
20   A.   I don't know exactly, no.  I didn't write this.
21   Q.   All right, and:  "Other" is comprised of costs for
22        medical supplies and equipment used for on-site
23        diagnosis and treatment.
24             Correct?  Did I read that correctly?
25   A.   Yes.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1   Q.   Do you have any reason to dispute the components of
 2        what's contained on page 8 of this exhibit?
 3   A.   No.
 4   Q.   I'm not going to mark these.  I just want to show you,
 5        Doctor -- I'm just going to hand you one of many of
 6        these and ask you if you've ever seen anything like
 7        these documents before?
 8   A.   Yes.
 9   Q.   You have?
10   A.   Yes.
11   Q.   All right, I guess we're going to mark them, then.
12                  MARKED FOR IDENTIFICATION:
13                  DEPOSITION EXHIBIT 33
14                  12:33 p.m.
15   BY MS. STAMLER:
16   Q.   You've been handed Exhibit 33 to your deposition,
17        Dr. Bomber.  Have you seen this document before?
18   A.   Not this specific one, but similar documents.  This
19        looks like an excerpt from a spreadsheet.
20   Q.   And what is the spreadsheet in reference to?
21   A.   This particular one is in reference to an inmate
22        Franklin.
23   Q.   But what is this spreadsheet addressing?
24   A.   It addresses some diagnoses; it says hypoxemia,
25        multilobular pneumonia, sepsis, neutropenia, and
```



US LEGAL SUPPORT
The Power of Commitment™

JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 341

```
 1        fever.
 2   Q.   And would this document, if you know, contain
 3        information that is otherwise in his medical record?
 4   A.   Yeah, this should all like -- well, this may have even
 5        been partially from his medical record.  It looks like
 6        the notes on the far right could be extracted from the
 7        medical record where we -- every day we have an
 8        inpatient note, when a patient is an inpatient, and
 9        that goes into the EMR, and --
10   Q.   Then you can generate a report that looks like this?
11   A.   I'd have to -- as far as I know, I think you have to
12        do that manually.  I'm not sure how this is created.
13   Q.   Okay.  On the left-hand side there's a reference to
14        Murray, I assume that's a physician name, then DWH
15        would be Duane Waters Hospital.  What's PHS stand for?
16   A.   Well, there used to be a company called PHS, but I'm
17        not sure why they would put that there.
18   Q.   And why would it be there for 2014, when Corizon was
19        in place at that time?
20   A.   I'm not certain.
21   Q.   You have never seen, if you just want to page through
22        quickly, any of these documents that relate to
23        Mr. Franklin, is that right?  Because all of these
24        spreadsheets and these daily inpatient census
25        documents pertain to Mr. Franklin.  You would not have
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 342

```
 1        seen these before today, is that correct?
 2   A.   That's correct.
 3   Q.   Do you know what daily inpatient census documents
 4        pertain to?
 5   A.   Yes, we keep a daily inpatient census.  We have an
 6        inpatient team that follows all our inpatients.
 7   Q.   And where is that team located?
 8   A.   That team's located here in Lansing.
 9   Q.   So when you look on page 3 of the exhibit and at the
10        bottom, it's noted page 18 --
11   A.   Okay.
12   Q.   Keep going.
13   A.   Keep going?
14   Q.   It's the next -- it should say "Daily Inpatient
15        Census" on it.
16   A.   Yes.
17   Q.   Oh, you're there, I'm sorry.
18   A.   Mmm-hmm.
19   Q.   The top on the left-hand side says Corizon and an
20        address in Brentwood, Tennessee.  Can you explain why
21        that's there?
22   A.   Because all of the patients are also tracked
23        centrally.
24   Q.   In Tennessee?
25   A.   Yeah.  The day-to-day care of the patient is provided
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1          by the hospital, of course, and then we follow them
 2          here in our regional office, as well.
 3     Q.   And then are you familiar with a document called
 4          "Inpatient Days Log"?
 5     A.   That sounds familiar to a log that I've seen, yes.
 6     Q.   And how's that different from daily inpatient census?
 7     A.   I'm not certain.
 8     Q.   Okay.  Do you know who Jeanne Ghiardi, G-H-I-A-R-D-I,
 9          is?
10     A.   Yes.
11     Q.   Who is that?
12     A.   Jeanne Ghiardi is our utilization management director
13          for the regional office here in Lansing.
14     Q.   And does she have any role in addressing patient
15          safety, patient sentinel events?
16     A.   No.  She's not a member of that group.
17     Q.   What about Nikkida Price, do you know who she is?
18     A.   Yes.
19     Q.   And who is she?
20     A.   She's one of our UM clerks.
21     Q.   And does she have any role in investigating -- I'm
22          sorry, addressing patient safety or sentinel events?
23     A.   No.  She's not a member of that committee.
24     Q.   And what about Nicolle Reslock, who is she?
25     A.   She's our former utilization management director, RN.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 344

```
 1   Q.   Same question.  Does she have any role in patient
 2        safety or investigating sentinel events?
 3   A.   She was not on the committee.
 4   Q.   Do any of those individuals, Jeanne Ghiardi, Nikkida
 5        Price, or Nicolle Reslock, have any role in addressing
 6        peer review?
 7   A.   The only role that they would have would be providing
 8        documentation and information.
 9   Q.   What about Dr. Coleman?
10   A.   Dr. Coleman does serve on the patient safety
11        committee.
12   Q.   Okay.  And does he also work on sentinel events
13        investigations?
14   A.   Yes.
15   Q.   And I assume he has a role in peer review?
16   A.   He has.  He currently doesn't, but he has, yes.
17   Q.   Did he in 2014?
18   A.   Yes.
19   Q.   Donna McClure, do you know who she is?
20   A.   Can't place her.
21   Q.   Do you know who Regina Walker is?
22   A.   Yes.
23   Q.   Who is she?
24   A.   Regina Walker is one of our RN inpatient nurses.  We
25        have two.  One follows community hospitals and the
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 345

```
 1         other follows our secured units.
 2    Q.   Does she, to your knowledge, have any role in patient
 3         safety, peer review, or sentinel events?
 4    A.   Only in the role of providing information.
 5    Q.   Do you know who Karen Bodell is, B-O-D-E-L-L?
 6    A.   I can't recall.
 7    Q.   Do you know who Marianne Graham is?
 8    A.   I can't recall.
 9    Q.   What about Maxine Collard?
10    A.   Yes, Maxine Collard is an MDOC employee.  She's
11         involved in scheduling transfers, those sorts of
12         issues.  I don't know her exact title.
13    Q.   Would she have any role in patient safety, peer
14         review, or sentinel events?
15    A.   She's not a Corizon employee, which -- I mean, there
16         may be instances where she would provide information
17         for us.
18    Q.   Okay.  Dr. Steven Bergman, do you know him?
19    A.   Yes.
20    Q.   And do you know whether he had any role in 2014
21         regarding patient safety or peer review?
22    A.   Yes.
23    Q.   Who is Erin Orlebeke?
24    A.   Erin, it's Orlebeke.
25    Q.   Thank you.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 346

```
 1   A.    Dr. Orlebeke was my State medical director when I was
 2         a regional director.  She was me.  I am now her.
 3   Q.    Okay.  And did she, to your knowledge, in 2014 have
 4         any role in either patient safety or peer review?
 5   A.    Yes.
 6   Q.    And do you know who Karen Mason is?
 7   A.    Yes.
 8   Q.    And who is she?
 9   A.    Karen Mason is our continuing safety quality and
10         improvement director.
11   Q.    Fair to say she would have a role in patient safety
12         and peer review?
13   A.    Yes.
14   Q.    I don't know if I mentioned this name before; Donna
15         McClure, do you know who she is?
16   A.    I can't recall.
17             MS. STAMLER:  Can we go off the record for
18         just a second?
19             (Off the record at 12:42 p.m.)
20             (Back on the record at 12:43 p.m.)
21             MS. STAMLER:  I don't have any further
22         questions.
23                          EXAMINATION
24   BY MS. VAN THOMME:
25   Q.    Dr. Bottom, do you recall whether Correctional Medical
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 347

1        Services preceded Prison Health Services?

2    A.   Yes.

3    Q.   Okay.  And then they combined to form Corizon, is that

4         correct?

5    A.   Correct.

6    Q.   I might not say this correctly, but with

7         lymphadenitis, what kind of follow-up would be

8         appropriate for that condition?

9    A.   Yes, lymphadenitis sometimes is just observed, because

10        it can be inflammatory or from a virus.  Sometimes it

11        can be a bacterial infection.  So a patient would be

12        treated -- sometimes in the community a patient would

13        be instructed to call if, you know, not improving, or

14        whatever, or schedule a follow-up appointment, of

15        course.

16   Q.   Do you recall when off-site appointments started being

17        included in NextGen instead of separately tracked in

18        MTrax?

19   A.   MTrax -- we migrated from MTrax, that would be late

20        2014 or 2015.

21   Q.   Okay.  If a condition was not urgent or not marked

22        urgent by a provider in 2012 to 2014, what was a

23        typical time frame for 407 approval?

24             MS. STAMLER:  Objection, form and

25        foundation.



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 348

```
 1  A.   The average over that time period would still be only
 2       two days.
 3  BY MS. VAN THOMME:
 4  Q.   Is charting and proper documentation something that
 5       providers typically learn in medical school or during
 6       their training if they're a mid-level?
 7  A.   Yes.
 8  Q.   And when I say training as a mid-level, I mean their
 9       education before they're licensed?
10  A.   Yes.
11  Q.   During 2012 to 2014, did Corizon strive to diagnose
12       and treat cancer in a timeline that was similar to in
13       the community?
14                MS. STAMLER:  Objection to the form and
15       foundation.
16  A.   Yes.
17  BY MS. VAN THOMME:
18  Q.   Is there a common abbreviation that medical providers,
19       and I'm not just talking about within Corizon, but
20       just generally, is there a common abbreviation that
21       providers use for "left"?
22  A.   Yes, L is used for left.
23  Q.   Earlier it was mentioned that CM is an abbreviation
24       for centimeters.  Can that describe the location of
25       something as well as the distance between one thing
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1       and another?
 2                MS. STAMLER:  Objection to form and
 3       foundation.
 4  A.   If C was referring to cervical, for example, yes.
 5  BY MS. VAN THOMME:
 6  Q.   Okay, or if it's just --
 7                MS. STAMLER:  You're leading.  You're
 8       leading, Counsel, object to the form.
 9                MS. VAN THOMME:  I'm asking another
10       question.
11  BY MS. VAN THOMME:
12  Q.   If CM refers to centimeters, could that be used to
13       describe a location as well as a distance --
14                MS. STAMLER:  Objection to --
15  BY MS. VAN THOMME:
16  Q.   -- depending on the context?
17                MS. STAMLER:  Sorry.  Objection to form and
18       foundation.
19  A.   Yes.
20  BY MS. VAN THOMME:
21  Q.   Do you recall what the criteria for CHOICES I was in
22       2014?
23  A.   In general, yes, for advanced debilitating illnesses
24       such as cancer, patients in cancer treatment; it could
25       be advanced diabetes COPD and other diseases, as well.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 350

```
 1   Q.   Would all cancer patients automatically qualify for
 2        CHOICES I?
 3   A.   Oh, not necessarily.  I can't say all, no.
 4   Q.   On the previous date of your deposition, you looked at
 5        various organizational charts that were Exhibits 5
 6        through 13, and on one of those you talked about how
 7        at one time regional medical directors filled in after
 8        the utilization management physician had left.
 9                  Do you recall which utilization management
10        physician that was?
11   A.   Yes, there were, there was myself, Dr. Bergman,
12        Dr. Coleman, and Dr. Orlebeke.
13   Q.   Okay.  Do you recall which utilization management
14        physician had left?
15   A.   Yes, Dr. Harriet Squire.
16   Q.   Okay.  And who replaced her, ultimately?
17   A.   Dr. Keith Papendick.
18   Q.   Okay.
19                  MS. VAN THOMME:  I don't have Exhibit 8.
20        Do you have that here?  I might be able to pull it up
21        if you don't have it here.
22                  MS. STAMLER:  Let me see if I have it.  I
23        think I do.
24                  MS. STAMLER:  Carly, what is it so I know
25        what I'm looking for?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 351

```
 1                    MS. VAN THOMME:  It is one of the
 2        organizational charts.
 3   BY MS. VAN THOMME:
 4   Q.   All right, during your previous day of deposition, you
 5        testified that one of the regional medical directors
 6        had left, and that was what was different about this
 7        organizational chart compared to the previous one.
 8                    Do you know which regional medical director
 9        had left?
10   A.   That would have been Dr. John Steel.
11   Q.   And do you recall when that was?
12   A.   Around this time, 2014, somewhere in there.
13   Q.   On the organizational charts, one of the positions
14        listed is Corizon chief medical officer.  Is that a
15        national position or is that a position here in
16        Michigan?
17   A.   That's a national position.
18   Q.   And where is that person located?
19   A.   The central office, in Brentwood, Tennessee.
20   Q.   When you were a regional medical director, did you
21        sometimes occasionally see patients?
22   A.   I did.
23   Q.   And as the State medical director, do you see patients
24        currently?
25                    MS. STAMLER:  Object to form and
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1       foundation.
 2  A.   I do not as the State medical director.
 3  BY MS. VAN THOMME:
 4  Q.   And at the last deposition, you were presented with an
 5       affidavit that was marked as Exhibit 14 that had an
 6       error in it in that regard?
 7                MS. STAMLER:  I object to the form of the
 8       question.  It's not an affidavit and it --
 9                MS. VAN THOMME:  Or a declaration.
10  BY MS. VAN THOMME:
11  Q.   Have you since executed an amended version of that
12       document?
13  A.   I have.
14                MS. STAMLER:  How come it hasn't been
15       produced, Counsel?
16                MS. VAN THOMME:  Did you ask for it?
17                MS. STAMLER:  If you're amending his
18       testimony, I think I ought to be able to see it so I
19       can cross-examine him on it.
20                MS. VAN THOMME:  Well, I'll see if I can
21       get it.  I can send it to you, but it just --
22                MS. STAMLER:  Well, I don't want to have to
23       come back.
24                MS. VAN THOMME:  I don't think you're going
25       to have to come back for that.  He's already testified
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

1          what was wrong about it.  It's been fixed.  You'll be

2          able to see the difference.  I think it's already been

3          covered.

4     BY MS. VAN THOMME:

5     Q.   What does ATP stand for?

6     A.   Alternative treatment plan.

7     Q.   What is an alternative treatment plan?

8     A.   In our setting, when a provider requests either a

9          special consultation or a test that the utilization

10         management physician feels is inappropriate at that

11         time, the utilization management physician will

12         provide an alternative treatment plan.

13              It could be, for example, if a provider

14         requests an MRI, the UM physician might know that a

15         CT scan or ultrasound is better in that circumstance

16         and give an alternative treatment, or it may be

17         physical therapy would be an alternative treatment for

18         a given injury rather than surgery, et cetera.

19    Q.   Okay.  Do you know when a 409 goes to a specialist?

20              MS. STAMLER:  409?  You mean 407?

21              MS. VAN THOMME:  No, 409.

22              MS. STAMLER:  Objection to the form and

23         foundation.

24    A.   A 409 is a MDOC form that is supposed to be filled out

25         by the specialist and then accompany the patient back



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 354

```
 1         to the site.  It's a description of what the
 2         specialist did.
 3    BY MS. VAN THOMME:
 4    Q.   And that's something at the time of the visit or the
 5         procedure, or whatever the thing is --
 6                   MS. STAMLER:  Objection to form and
 7         foundation.
 8    A.   Yes.
 9    BY MS. VAN THOMME:
10    Q.   -- that's what you're referring to by at the time?
11                   MS. STAMLER:  Object to form and
12         foundation.
13    BY MS. VAN THOMME:
14    Q.   Do foreign-educated physicians have to meet the same
15         state licensing requirements as physicians educated in
16         the United States?
17    A.   As far as I know, yes.
18                   MS. STAMLER:  Object to the form and
19         foundation.
20    BY MS. VAN THOMME:
21    Q.   Take a look at Exhibit 27 again.  Earlier you were
22         asked to look at the paragraph that begins "On-Site
23         diagnostic tests available/x-rays."  Does that
24         paragraph say -- does that paragraph mention MRIs?
25    A.   No.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 355

```
 1    Q.    What about that paragraph, if anything, is applicable
 2          to MRIs?
 3    A.    Nothing, that I can see.
 4    Q.    Okay.  I'd like you to look at Exhibit 29 again.  Do
 5          you see toward the bottom of the first page where it
 6          says, "32, stock meds," and then it has a list of
 7          medications?
 8    A.    Yes.
 9    Q.    You were asked some questions earlier about formulary
10          versus non-formulary medications in reference to this
11          list.  Are all formulary medications stock
12          medications?
13    A.    No.
14    Q.    Is this list -- would this list of stock medications
15          be a complete list of the formulary?
16    A.    No.
17    Q.    Are there occasions in the community when health care
18          providers need to be aware that patients might be
19          seeking secondary gain?
20    A.    Certainly.
21                  MS. STAMLER:  Objection to form.
22    BY MS. VAN THOMME:
23    Q.    So that consideration is not unique to the corrections
24          environment, just perhaps more pronounced?
25                  MS. STAMLER:  Objection, form.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 356

```
 1    BY MS. VAN THOMME:
 2    Q.   Would that be accurate?
 3                 MS. STAMLER:  Objection, form and
 4         foundation.
 5    A.   Yes.
 6                 MS. VAN THOMME:  That's all I have.
 7                 MR. WOOD:  No questions from me, thank you.
 8                 MS. STAMLER:  I have some follow-up
 9         questions.
10                      RE-EXAMINATION
11    BY MS. STAMLER:
12    Q.   Doctor, when did you sign your new declaration?
13    A.   I can't recall the specific date.  It was recent.  It
14         was after, after our first deposition.
15    Q.   And did you sign that one under penalty of perjury, as
16         well?
17    A.   I don't understand.
18    Q.   You don't understand what you signed?
19    A.   No, I don't understand your question.
20    Q.   Do you understand that that declaration contained
21         language that you were signing it under penalty of
22         perjury, just like your first one?
23    A.   Yes.
24    Q.   What did you change in your first declaration to your
25         second declaration?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 357

```
 1                    MS. VAN THOMME:  Object to form.
 2   A.   There was the question of whether or not I'd seen
 3        patients or not as a medical director.
 4   BY MS. STAMLER:
 5   Q.   And what did you change?
 6   A.   In the initial document, I signed a document that said
 7        I no longer do not see patients as medical director.
 8   Q.   And what does the new one say?
 9   A.   The new one, I can't give you the exact language, has
10        changed that part of it.
11   Q.   Well, what does it say?
12   A.   It says that I had seen patients during that time
13        period.
14   Q.   You were asked some questions by your counsel about
15        lymph --
16   A.   Lymphadenitis.
17   Q.   Lymphadenitis.  What what that condition?
18   A.   That's inflammation of lymph nodes or swelling of
19        lymph nodes.
20   Q.   And that's typically symmetrical?
21   A.   Oh, no, it can be -- it can vary quite a bit,
22        depending on the cause, but the majority, I would say,
23        and I'd have to look up the percentage, the majority
24        would be symmetrical.
25   Q.   Right.  And would the majority be fixed or mobile?
```



US LEGAL SUPPORT
The Power of Commitment™

JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 358

```
 1    A.    The majority would be mobile.
 2    Q.    And the majority would be firm, or not?
 3    A.    The majority would be -- from lymphadenitis, they
 4          would be typically softer than from a cancer.
 5    Q.    Would they be -- would you expect to feel warmth on
 6          the skin if there was an infection?
 7    A.    Yes.
 8    Q.    Would you expect that condition to have a mass the
 9          size of three centimeters?
10    A.    They can be.
11    Q.    And you did indicate that you wouldn't just ignore it;
12          there would be a follow-up plan, correct?
13    A.    Usually there would be a follow-up plan.
14    Q.    And you've articulated what you, as a physician, would
15          do, correct?
16    A.    Yes.
17    Q.    You were asked about the typical time frame for
18          treating a routine 407.  Do you remember those
19          questions and your answers?
20    A.    Yes.
21    Q.    Do you remember your refusal to answer those questions
22          at your last deposition, indicating that was part of a
23          patient safety analysis?
24              MS. VAN THOMME:  Object to form.
25    A.    No.  I remember answering that the time has varied
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 359

```
 1        over time, but they have --
 2   BY MS. STAMLER:
 3   Q.   And that there's been improvements made?
 4   A.   Yes, we're always making improvements.
 5   Q.   But you wouldn't give me the time frames, because that
 6        was part of a patient safety analysis.  Do you
 7        remember that?
 8   A.   I'd have to hear the question back.
 9              MS. VAN THOMME:  Object to form.
10   BY MS. STAMLER:
11   Q.   The average that you just testified to, what time
12        frame was that based on?
13   A.   That was the average turnaround on the 407, it's
14        really not --
15   Q.   When, for what period of time?
16   A.   For most of the time in the last ten years, it's been
17        about two days.
18   Q.   Most, ten years?
19   A.   Yes.
20   Q.   Have you actually conducted a study?
21   A.   We do track that because it's contractual.  Again, we
22        can't exceed the two-week period and --
23   Q.   Who's "we"?  When you say "we track it," who'S tracked
24        that information?
25   A.   We, Corizon.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 360

```
 1   Q.   Corizon?
 2   A.   Yeah.
 3   Q.   Where is it reported?
 4   A.   We have a UM department that records the turnaround
 5        time.
 6   Q.   And is that part of the patient safety analysis?
 7   A.   It depends on the context.  If we're talking about a
 8        specific patient, then, yes, it could be.
 9   Q.   Well, I'm speaking generally.  You're saying that
10        these statistics are reported to UM, is that what your
11        testimony is?
12   A.   I'm saying they're gathered in UM.
13   Q.   Right.  And what's done with that information?  Where
14        does it go?
15   A.   Well, the State also tracks it, because, again, it's
16        contractual.
17   Q.   I'm not asking about the State.  I'm asking about your
18        knowledge and what Corizon does with this information.
19   A.   It doesn't go anywhere, I mean, other than the State
20        sees it and we keep it.
21   Q.   And have you reviewed all of those statistics --
22   A.   No, I have not.
23   Q.   -- for the ten-year period?
24   A.   Not all of the statistics, no.
25   Q.   So when you testified earlier in response to your
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 361

```
 1        counsel's question that it was an average turnaround
 2        time of two days, that was a guess, wasn't it?
 3                 MS. VAN THOMME:  Object to form.
 4   A.   It's been -- in my experience, that's been the
 5        average, but --
 6   BY MS. STAMLER:
 7   Q.   That's your experience, but you've done no statistical
 8        analysis and you've not reviewed the statistics, isn't
 9        that true?
10                 MS. VAN THOMME:  Object to form.
11   A.   No.  I've seen the numbers periodically.  I don't look
12        at them every month, but I have seen them.
13   BY MS. STAMLER:
14   Q.   Right.  But, you as you sit here today, can't tell me
15        definitively that that is the average that existed in
16        2012, correct?
17   A.   No.
18   Q.   And you can't tell me definitively, as you sit here
19        today, that that was the average turnaround time in
20        2013, correct?
21   A.   I can tell you it's an average, but I can't tell you
22        definitively at that time period.
23   Q.   Nor can you tell me that it was an average for the
24        time period of 2014, correct?
25                 MS. VAN THOMME:  Object to form.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

```
 1   A.   It has been our typical average, but I can't speak to
 2        a specific date.
 3   BY MS. STAMLER:
 4   Q.   Right.  And even though it's a, from your standpoint,
 5        typical average, there are always exceptions, aren't
 6        there, Doctor?
 7   A.   Certainly.
 8   Q.   Right.  So some of them could have gone as many as two
 9        weeks, correct?
10   A.   That would be the maximum.  As far as I know, we've
11        never exceeded the contractual terms.
12   Q.   Right.  When you say you saw statistics about the
13        average turnaround time on a routine 407, did somebody
14        actually put together an analysis of the average time
15        frame, or did you just take a look at the stats and do
16        your own calculation?
17   A.   No, that was provided to me by the UM physician.
18   Q.   What was provided to you?
19   A.   The average turnaround time.
20   Q.   Somebody took the time frames and then did an analysis
21        of the average time frame?
22   A.   Yes.
23   Q.   And where is that published?
24   A.   It's not published.
25                  MS. VAN THOMME:  Object to form.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 363

1    A.    It's kept in-house.

2    BY MS. STAMLER:

3    Q.    You were asked about the charting education that's

4          done in medical schools, whether it's a foreign

5          physician or a physician that's educated in the United

6          States.  Do you remember your responses to those

7          questions?

8    A.    Yes.  The training starts in medical school, or in PA

9          school or NP school.

10   Q.    And you would agree with me, sir, that part of the

11         onboarding training that you've testified at length

12         about includes proper charting, correct?

13   A.    Correct.

14   Q.    You were asked about Corizon striving to meet

15         timelines that were consistent in the community for

16         care of cancer.  Do you remember those questions and

17         your answers?

18   A.    Generally.

19   Q.    Right.  You were striving.  Did you always meet those

20         standards?

21              MS. VAN THOMME:  Object to foundation.

22   A.    Well, as I testified previously, those, quote,

23         standards, unquote, are not largely published, and a

24         statistical analysis of that time interval in the

25         community is very difficult to obtain.



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 364

```
 1   BY MS. STAMLER:
 2   Q.   So how could you testify, then, that you were striving
 3        to meet timelines in the community if there aren't,
 4        from your standpoint, standards?
 5   A.   There are articles in the literature that allude to
 6        the time intervals, but there's no standard set by the
 7        AMA, for example.  There are literature reports that
 8        you can look at, but there's no standard that's
 9        published.
10   Q.   You would agree with me, sir, a patient who has a
11        diagnosis of metastatic cancer should be seen as soon
12        as possible?
13                 MS. VAN THOMME:  Object to form.
14   A.   They should -- they've probably already been diagnosed
15        and followed, yes.
16   BY MS. STAMLER"
17   Q.   So is your answer, yes, they should be seen as soon as
18        possible?
19   A.   Yes.
20                 MS. VAN THOMME:  Object to form.
21   BY MS. STAMLER:
22   Q.   There shouldn't be a delay from March, let's say March
23        of 2013 until chemotherapy in June of 2014, should
24        there?
25                 MS. VAN THOMME:  Object to form and
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 365

```
 1        foundation.
 2   A.   I'd have to see the specifics of the case.
 3   BY MS. STAMLER:
 4   Q.   Is there any circumstance, as you sit here today, sir,
 5        that you would think would be proper to delay
 6        chemotherapy for a patient who has metastatic cancer
 7        diagnosed in March of 2013 until June of 2014?
 8               MS. VAN THOMME:  Object to form and
 9        foundation.
10   A.   I'd have to defer that to an oncologist.
11   BY MS. STAMLER:
12   Q.   So you can't answer that question?
13   A.   I can't answer that question, not knowing the
14        specifics of the patient, the cancer, and what the
15        specialist said about the treatment, no.
16   BY MS. STAMLER:
17   Q.   You testified that the letter L is an abbreviation for
18        left; isn't that your testimony?
19   A.   It is used for that, yes.
20   Q.   What's the standard abbreviation say in your own
21        materials marked as an exhibit to this case?
22   A.   I don't recall.  I think there was a --
23   Q.   All right.  Well, let's find the document.
24   A.   There's a place, I think, for left lower in there --
25   Q.   I'm just saying the letter L, sir.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 366

```
 1   A.   The letter L alone, no-no.

 2   Q.   The letter L says liter, does it not?

 3   A.   Yes.

 4   Q.   What does a 409 stand for?

 5   A.   It's a number that was -- I don't know how,

 6        historically how they chose the number 409, but it is

 7        a form that is used for the specialty appointment, and

 8        it's supposed to be filled out during the visit and

 9        returned with the patient.

10   Q.   Right.  You would never have filled one of those out.

11        That's a specialist who completes it, correct?

12   A.   Yes.

13   Q.   So what's contained in it and how it's prepared, and

14        so forth, is not something you personally do, isn't

15        that true?

16   A.   Correct.

17   Q.   Do you know anything about the licensing requirements

18        for foreign-educated physicians, yes or no?

19   A.   I know that they still have to get the license to

20        practice.  As far as the specifics that they're

21        required to do, no, I don't know them exactly.

22             MS. STAMLER:  Can I see Exhibit 27, please?

23   BY MS. STAMLER:

24   Q.   You were asked by your attorney about the paragraph

25        entitled on-site diagnostic tests that are available,
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 367

```
 1        with a back slash of x-rays.  That paragraph does not
 2        mention MRIs.  It's much broader.  It says radiology
 3        tests, doesn't it?
 4   A.   It refers to radiology testing from site to site.
 5   Q.   Correct.  And radiology testing is more expansive than
 6        x-rays, isn't it?
 7   A.   Not on our sites, no.
 8   Q.   I didn't say on sites.  It also references --
 9   A.   That's what it says.  It says site right there.
10   Q.   It also says off-site, doesn't it?
11   A.   It says:  Many facilities contract with off-site
12        radiology companies that come to the facility on a
13        regular or emergent basis.  But not MRIs.  We don't
14        have MRIs at the facility.
15   Q.   I understand that.  An off-site facility that comes
16        on-site could bring MRI equipment, correct?
17   A.   We don't have those contracts.
18   Q.   All right, so that means --
19   A.   There's no place for them to park.
20   Q.   So that means they have to go off-site; is that your
21        testimony?
22   A.   If a patient needs an MRI, they would have to go
23        off-site.
24   Q.   You were asked some questions about stock medications,
25        and formulary and non-formulary; do you remember that?
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 368

```
 1    A.    Yes.
 2    Q.    What's the distinction between formulary and stock
 3          medications?
 4    A.    Most of the stock medications are formulary.  There
 5          are some not formulary stock medications.
 6    Q.    What does that mean?
 7    A.    That means that if they're on the formulary, you can
 8          write for them without having to get a non-formulary
 9          approval by the utilization physician.
10    Q.    And I think I asked you earlier whether compazine was
11          on the formulary or non-formulary, do you remember
12          that, and you testified that compazine is a
13          non-formulary drug.  Is that correct?
14    A.    I thought you asked me if it was on the list that was
15          provided to me, and I said, no, I do not see it there.
16    Q.    Okay.  Well, let me ask you this.  Do you know whether
17          compazine is a non-formulary or formulary drug?
18    A.    At the time in 2012, I can't be certain.  I know --
19    Q.    How about 2014?
20    A.    I'd have to look at the formulary to be a hundred
21          percent certain, but I think our preferred at the time
22          was Zofran.
23    Q.    Do they do the exact same thing, Zofran and compazine?
24                MS. VAN THOMME:  Object to foundation.
25    A.    Did they --
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 369

```
 1   BY MS. STAMLER:
 2   Q.   Do they address the same conditions, Zofran and
 3        compazine?
 4                MS. VAN THOMME:   Object to foundation.
 5   A.   Yes, they both are antiemetics, so ...
 6   BY MS. STAMLER:
 7   Q.   Right.  And do you understand that a person who's
 8        getting chemotherapy for cancer can have side effects
 9        of nausea and vomiting?
10   A.   Yes.
11   Q.   Do you understand that both Zofran and compazine
12        address vomiting and nausea?
13   A.   Yes.
14   Q.   Do you understand that physicians may prescribe both
15        of those medications to address those conditions?
16                MS. VAN THOMME:   Object to foundation.
17   A.   Both simultaneously?
18   BY MS. STAMLER:
19   Q.   Yes.
20   A.   It's done sometimes.
21   Q.   Right.  And now my question is, sir, do you know --
22        you don't know whether compazine was a formulary or
23        non-formulary, correct?
24   A.   I'd have to look at the formulary to be a hundred
25        percent certain, but ...
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 370

```
 1   Q.   If the drug was non-formulary, if compazine back in
 2        2014 was non-formulary, it would have taken a longer
 3        period of time to get that prescription filled,
 4        because it would have had to go through UM review, is
 5        that right?
 6              MS. VAN THOMME:  Object to form and
 7        foundation.
 8   A.   Yes.
 9              MS. STAMLER:  I don't have any other
10        questions.
11              MS. VAN THOMME:  I have a follow-up.
12                   RE-EXAMINATION
13   BY MS. VAN THOMME:
14   Q.   Back in 2012 to 2014, who, and by "who," I mean what
15        position, handled approval of non-formulary
16        medications?
17   A.   That would have been the chief medical officer for the
18        Michigan Department of Corrections.
19   Q.   At some point did that change to utilization
20        management reviewing those?
21   A.   Yes.
22   Q.   And when was that, if you know?
23   A.   That was August of 2016.
24   Q.   Thank you.
25              MS. VAN THOMME:  That's it.
```



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 371

1                (The deposition was concluded at 1:16 p.m.

2             Signature of the witness was not requested by

3             counsel for the respective parties hereto.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



JEFFREY BOMBER, D.O., 30(B)(6)
January 22, 2018

Page 372

```
 1                    CERTIFICATE OF NOTARY

 2    STATE OF MICHIGAN )

 3                     ) SS

 4    COUNTY OF KENT    )

 5

 6              I, REBECCA L. RUSSO, certify that this

 7    deposition was taken before me on the date

 8    hereinbefore set forth; that the foregoing questions

 9    and answers were recorded by me stenographically and

10    reduced to computer transcription; that this is a

11    true, full and correct transcript of my stenographic

12    notes so taken; and that I am not related to, nor of

13    counsel to, either party nor interested in the event

14    of this cause.

15

16

17

18

19

20

21

22              REBECCA L. RUSSO, CSR-2759

23              Notary Public,

24              Kent County, Michigan.

25    My Commission expires: 6-3-2023
```

