# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### DETROIT DIVISION

KAREN   FRANKLIN,   as   Personal
Representative  of  the  ESTATE  OF
KEITH FRANKLIN, Deceased,

     Plaintiff,

v.

STATE OF MICHIGAN, et al.,

     Defendants.

Case No: 2:16-cv-13587
Hon. Laurie J. Michelson
Magistrate Judge: David R. Grand

---

| | |
|---|---|
| HERTZ SCHRAM PC<br>Steve J. Weiss (P32174)<br>Patricia A. Stamler (P35905)<br>Attorneys for Plaintiff<br>1760 S. Telegraph Road, Suite 300<br>Bloomfield Hills, MI 48302<br>(248) 335-5000<br>sweiss@hertzschram.com<br>pstamler@hertzschram.com<br><br>MICHIGAN DEPT. OF ATTORNEY GENERAL<br>John L. Thurber (P44989)<br>Dana M. Wood (P71955)<br>Attorneys for MDOC Defendants<br>P.O. Box 30736<br>Lansing, MI 48909<br>(517) 373-6434<br>thurberj@michigan.gov<br>woodd9@michigan.gov | CHAPMAN LAW GROUP<br>Ronald W. Chapman Sr., M.P.A., LL.M (P37603)<br>Carly Van Thomme (P59706)<br>Kevin A. McQuillan (P79083)<br>Attorneys for Defendants Corizon Health, Inc.; Janak Bhavsar, M.D.; Scott Holmes, M.D.; and Daniel Carrel, D.O.<br>1441 West Long Lake Rd., Suite 310<br>Troy, MI 48098<br>(248) 644-6326<br>rchapman@chapmanlawgroup.com<br>cvanthomme@chapmanlawgroup.com<br>kmcquillan@chapmanlawgroup.com |

---

**EXHIBIT O**    Dr. Stoltz's Deposition Transcript

```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MICHIGAN
 2                      SOUTHERN DIVISION

 3
       KAREN FRANKLIN, as          )
 4     Personal Representative of  )
       the ESTATE OF KEITH         )
 5     FRANKLIN, Deceased,         )
                                   )
 6                 Plaintiff,      )
                                   )
 7            -v-                  )  Cause No. 2:16-CV-13587
                                   )
 8     STATE OF MICHIGAN, et al.,  )
                                   )
 9                 Defendants.     )

10

11

12            The deposition upon oral examination of

13     RANDALL STOLTZ, M.D., a witness produced and sworn

14     before me, Elizabeth A. Taylor, RPR, a Notary Public

15     in and for the County of Vanderburgh, State of

16     Indiana, taken on behalf of the Plaintiff at the

17     offices of Stewart Richardson & Associates, 915 Main

18     Street, Suite 405, Evansville, Indiana, on July 19,

19     2018, at 12:00 p.m., pursuant to the Federal Rules of

20     Civil Procedure.

21

22

23

24

25
```

```
 1                      APPEARANCES

 2    FOR THE PLAINTIFFS:

 3              Patricia A. Stamler, Esq. (via telephone)
                HERTZ SCHRAM, PC
 4              1760 S. Telegraph Road
                Suite 300
 5              Bloomfield Hills, MI  48302

 6
      FOR THE DEFENDANT,
 7    MICHIGAN DEPARTMENT OF CORRECTIONS:

 8              John Thurber, Esq. (via telephone)
                MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
 9              P.O. Box 30736
                Lansing, MI  48909
10

11    FOR THE DEFENDANTS,
      CORIZON HEALTH, INC.,
12    JANAK BHAVSAR, M.D.,
      SCOTT HOLMES, M.D., AND
13    DANIEL CARREL, D.O.:

14              Kevin A. McQuillan, Esq.
                CHAPMAN LAW GROUP
15              1441 West Long Lake Road
                Sute 310
16              Troy, MI  48098

17

18

19

20

21

22

23

24

25
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 3

```
 1                    INDEX OF EXAMINATION
                                                        PAGE
 2
     EXAMINATION
 3
     QUESTIONS BY MS. STAMLER                              6
 4   QUESTIONS BY MR. THURBER                            212

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX OF EXHIBITS

 2        NUM.              DESCRIPTION                    PAGE

 3     Exhibit 1     Curriculum Vitae                      27

 4     Exhibit 2     Expert Report of Dr. Stoltz           36

 5     Exhibit 3     Michigan Department of               102

 6                   Corrections Intake dated August
                     6, 2012
 7     Exhibit 4     Medical Record dated August 7,       104

 8                   2012

 9     Exhibit 5     Diagram                              111

10     Exhibit 6     Medical Record dated August 21,      113
                     2012
11     Exhibit 7     Medical Record dated August 31,      117

12                   2012

13     Exhibit 8     Medical Record dated November        119
                     16, 2012
14     Exhibit 9     Medical Record dated October 9,      127

15                   2013

16     Exhibit 10    Clinical Progress Note dated         147
                     October 30, 2013
17     Exhibit 11    Consultation dated November 25,      151

18                   2013

19     Exhibit 12    Medical Note dated February 13,      157
                     2014
20     Exhibit 13    Medical Record dated March 19,       166

21                   2014

22     Exhibit 14    Medical Record dated April 7,        170
                     2014
23     Exhibit 15    Medical Record dated April 17,       172

24                   2014

25
```

STOLTZ, M.D., RANDALL
07/19/2018                                                         Page 5

```
 1    Exhibit 16    Medical Record dated May 21,      176
 2                  2014
 3    Exhibit 17    Medical Record dated June 24,     184
 4                  2014
 5    Exhibit 18    Clinical Progress Note dated      196
 6                  6/30/2014
 7    Exhibit 19    Autopsy Report                    198
 8    Exhibit 20    Documents Reviewed by Dr. Stoltz   48
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    RANDALL STOLTZ, M.D.,

 2    called as a witness by the Plaintiff, having been first

 3    duly sworn, was examined and testified as follows:

 4    EXAMINATION

 5    QUESTIONS BY MS. STAMLER

 6    Q   Would you kindly state your full name for the

 7        record, sir?

 8    A   Yes.  Randall, R-a-n-d-a-l-l, S-t-o-l-t-z.

 9    Q   And Dr. Stoltz, you are a medical doctor; is that

10        correct?

11    A   Correct.

12    Q   You also have the initials of CCHP after your

13        medical doctor initials.  What does that stand for,

14        sir?

15    A   Certified Correctional Health Professional.

16    Q   And how long have you held that certification?

17    A   I would have to go and look back in my records to

18        know when I took that test.  I don't remember

19        exactly the dates.  For a good while.

20    Q   Can you give me a time frame?  Ten years?

21    A   I'm guessing approximately ten years.

22    Q   All right.  Dr. Stoltz, I understand you've had

23        your deposition taken before, but I want to go over

24        some ground rules for the deposition today.  Okay?

25    A   Yes.
```

```
 1   Q   And this is a challenge since we're doing it by

 2       telephone.  So I appreciate the -- a bit of a

 3       difficulty that we're going to encounter but bear

 4       with me.  It is important that you let me finish my

 5       question before you begin to answer so that our

 6       court reporter can take down your testimony and my

 7       question clearly.  Do you understand that?

 8   A   Yes.

 9   Q   If I pose a question to you that you do not

10       understand, please let me know and I will do my

11       best to clarify it for you.  Do you understand

12       that?

13   A   Yes.

14   Q   If I ask a question and you answer it, I will

15       assume that you've understood it as asked.  Is that

16       understood?

17   A   Yes.

18   Q   And finally, although you're permitted to take a

19       break when you need one, you cannot do so when a

20       question is pending.  Do you understand that?

21   A   Yes.

22   Q   All right.  You have produced as part of your

23       expert report in this case a curriculum vitae that

24       has an address of 839 Greengate Court, Evansville,

25       Indiana.  Is that your home or business address?
```

```
 1   A   Home.

 2   Q   Pardon?

 3   A   Home address.

 4   Q   You are currently employed as the medical director

 5       for Vanderburgh County Detention Center; is that

 6       correct?

 7   A   I'm an independent contractor.  I work for them,

 8       yes.

 9   Q   And how long -- is it correct that you've been an

10       independent contractor there since 1998?

11   A   That's correct.

12   Q   And on a weekly basis, how many hours do you devote

13       to your medical director work at the county

14       detention center?

15   A   Approximately 15 hours.

16   Q   And do you go onsite for that work or are you

17       working remotely?

18   A   On site.

19   Q   And you are in that position developing and

20       implementing health care plans for inmates; is that

21       correct?

22   A   Yes.

23   Q   Do you do anything else in that position?

24   A   Well, I educate nurses.  Typical -- get involved --

25       if there's CQI, continuous quality improvement,
```

```
 1        initiatives.  I look at protocols.  I mean, there's

 2        numerous things as the physician I do.

 3   Q    All right.  It is fair to say that in your capacity

 4        as the medical director, you are not providing

 5        direct care for the inmates at the Vanderburgh

 6        County Detention Center; is that right --

 7   A    I do provide direct patient care.

 8   Q    All right.  So out of the 15 hours that you spend

 9        there on a weekly basis, how much of that time is

10        devoted to direct patient care?

11   A    Fourteen.

12   Q    Fourteen?

13   A    Yes.

14   Q    And the balance would be in the domain of educating

15        or other administrative work?

16   A    Correct.

17   Q    Can you give me a size of the inmate census at the

18        county detention center?

19   A    You broke up a little bit there.  You want to know

20        the number of inmates there?

21   Q    Correct.  Not specifically but generally.

22   A    In the range of 500 to 700.

23   Q    And how many physicians are on staff there?

24   A    Two.

25   Q    And that would include you?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                              Page 10

```
 1   A   Yes.

 2   Q   How many nurse practitioners?

 3   A   Zero.

 4   Q   Are there any physician assistants?

 5   A   No.

 6   Q   What about nursing staff?

 7   A   There's full-time 24-hour coverage nursing staff.

 8   Q   Say that again.

 9   A   There is full-time 24-hour nursing staff coverage.

10   Q   And how many nurses?

11   A   I don't know the exact number.

12   Q   And do you supervise those nurses?

13   A   No.

14   Q   Who does?

15   A   There's a director of nursing.

16   Q   Do you supervise the director of nursing?

17   A   No.

18   Q   Do you have any supervision role in the Vanderburgh

19       County Detention Center?

20   A   Not directly where anyone -- no one reports

21       directly to me.

22   Q   The inmates that are housed at this detention

23       center, are they there short-term or long-term or a

24       combination of the two?

25   A   Combination of the two.
```

```
 1   Q   What's the longest typical sentence of an inmate at

 2       the detention center, if you know?

 3   A   I don't know for sure.  I know we see inmates there

 4       for a year or two at times.

 5   Q   So they're typically for a year or two at most; is

 6       that right?

 7   A   Typically.

 8   Q   And would it be fair to say that the vast majority

 9       of those inmates are there far less than a year?

10   A   That's correct.

11   Q   Of the inmates that you've treated in, say, the

12       last four years, have you had occasion to treat

13       inmates at the detention center with tonsillar

14       cancer?

15   A   I do not believe so.

16   Q   You are also employed at other facilities; is that

17       correct?

18   A   Correct.

19   Q   Where else are you currently working?

20   A   At the Warrick County Detention Center.

21   Q   Is that the place that is located in Boonville,

22       Indiana?

23   A   Yes.

24   Q   And how many hours a week do you devote to your

25       work there?
```

```
 1   A   Approximately three to four.

 2   Q   And are you likewise an independent contractor

 3       there as you are at the Vanderburgh County

 4       Detention Center?

 5   A   Yes.

 6   Q   And are you providing direct patient care at

 7       Warrick or not?

 8   A   Yes.

 9   Q   Do you do anything beyond direct patient care?

10   A   Not really.

11   Q   And you're the medical director in that position as

12       well?

13   A   Yes.

14   Q   Do you supervise any staff at Warrick?

15   A   No.

16   Q   Is the Warrick prison population similar to the

17       population at Vanderburgh?

18   A   No.

19   Q   All right.  Is this a more long-term facility?

20   A   No.  It's a county jail.  Short-term.

21   Q   And the length of stay at the county jail is

22       typically a year or less?

23   A   Yes.

24   Q   And it'd be fair to say that the vast majority of

25       the inmates at Warrick are there for far under a
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                  Page 13

```
 1      year; is that right?
 2   A  Yes.
 3   Q  In the last four years have you treated any inmates
 4      at Warrick who have tonsillar cancer?
 5   A  Not that I recall.
 6   Q  You also are currently employed at the Indiana
 7      University School of Medicine, but I believe it is
 8      as a volunteer faculty member; is that right?
 9   A  That's correct.
10   Q  So you're not receiving any remuneration from the
11      university; correct?
12   A  Correct.
13   Q  All right.  We'll get into that a little bit more
14      in terms of what you're actually doing there in a
15      moment.  Any other current places of employment
16      that we have not yet covered?
17   A  Not of employment, no.
18   Q  What else are you doing for income?
19   A  I work with the National Commission on Correctional
20      Health Care.
21   Q  Is that a paid position?
22   A  It's paid on a per work -- I do when I go out and
23      do audits or surveys of jails and prisons.
24   Q  All right.  So if I understand your testimony, you
25      are paid for your survey work associated with
```

```
 1        visiting various correctional facilities; is that
 2        correct?
 3   A    Yes.
 4   Q    And how frequently are you surveying correctional
 5        institutions?
 6   A    It varies from month to month.  Basically, I get to
 7        pick and choose when I want to do that.  Recently
 8        I've been going out two or three times a month.
 9   Q    So I want to make sure I hear you right because
10        it's a little bit foggy.  You're going to
11        facilities two to three times a month to do survey
12        work?
13   A    Most recently, yes.
14   Q    And when did that kind of frequency begin?
15   A    This year.
16   Q    Beginning in 2018?
17   A    Correct.
18   Q    Prior to that, what was your schedule as far as
19        survey work?
20   A    I would go out maybe once -- on average maybe once
21        a month, sometimes less.
22   Q    And of the facilities that you were doing survey
23        work for, were these prisons, county jails, or
24        detention centers?
25   A    All of the above.
```

```
 1   Q   All right.  And with regard to the survey work that
 2       you're performing for the National Commission on
 3       Correctional Health Care, are you doing that in
 4       regard to the medical services that are being
 5       rendered for inmates?
 6   A   Yes.
 7   Q   Have you ever had occasion to do a survey of any of
 8       the Michigan prisons?
 9   A   No.
10   Q   So it's fair to say you don't have any personal
11       information regarding the intake center at the RGC
12       in Jackson, Michigan, by way of example; is that
13       correct?
14   A   That's correct.
15   Q   Nor do you have any personal information regarding
16       the Carson City Correctional Facility; is that
17       right?
18   A   Correct.
19   Q   Nor do you have any personal information regarding
20       the Dwayne Waters Hospital entity; correct?
21   A   Correct.
22   Q   Have you ever been consulted by the state of
23       Michigan regarding any sort of lawsuits that were
24       brought against it or its facilities regarding
25       medical health care prior to this lawsuit?
```

```
 1            MR. McQUILLAN:  I'm going to place an
 2       objection to the extent that your question asks for
 3       information that may violate the attorney-client
 4       privilege and the attorney work product doctrine.
 5       But if you've had any discussion with -- if you've
 6       had a discussion --
 7    Q  I'm not asking for -- yeah.  I'm not asking for any
 8       information you may have discussed with counsel as
 9       it relates to being a consulting expert, but I'm
10       really sort of interested in whether you've had any
11       experience working for the state of Michigan
12       regarding its facilities.
13            MR. McQUILLAN:  If you've done that, you can
14       answer that question, but if you've ever talked to
15       any Attorney General lawyers or any other lawyers
16       that's responsive to that question, I'm instructing
17       you not to reveal conversations you've had with
18       attorneys.
19    A  I have been involved in a case, yes.
20    Q  All right.  What case or cases were you involved
21       in?
22    A  I don't recall the case or anything about it
23       offhand right now.
24    Q  Did you as a part of your work on that case
25       actually go to the facility at issue?
```

```
 1   A   No.

 2   Q   And are you familiar, sir, with the consent decree

 3       called the habis, h-a-b-i-s, consent decree.  Is

 4       that familiar to you?

 5   A   I've heard of it.  I don't know really information

 6       or details about it.

 7   Q   And do you recall how you heard about it?  I don't

 8       want to know if you heard about it from a lawyer,

 9       but did you read about it in some publication that

10       you would be reading about with regard to

11       correctional medicine?

12   A   Not that I recall.

13   Q   Do you know, sir, as you sit there today, whether

14       the habis consent decree applies to any of the

15       prisons within Michigan?

16           MR. McQUILLAN:  I'm going to object to the

17       form and foundation to the extent it calls for a

18       legal conclusion.  You can answer if you know.

19   Q   Go ahead and answer.

20   A   I do not know the details.

21   Q   Okay.  Any other current employment that you are

22       engaged in beyond what you've testified to?

23   A   Not presently.

24   Q   All right.  You also serve as an expert witness; is

25       that right?
```

```
 1   A   I have.

 2   Q   And how much of your annual income, and I'm not

 3       asking necessarily for dollar amount but a

 4       percentage if you're able to do so, do you earn

 5       from expert work?

 6   A   Approximately 10 percent.

 7   Q   And is it fair to say, Doctor, that you are

 8       typically, if not exclusively, hired by the defense

 9       in these types of cases?

10   A   That is correct.

11   Q   Have you ever served as an expert witness for a

12       plaintiff in a case that the plaintiff is against

13       the correctional institute or its physician?

14   A   No.

15           MR. McQUILLAN:  Form and foundation.

16   Q   I'm sorry.  Did you answer no to that question?

17   A   No.

18   Q   How many times, Dr. Stoltz, have you been retained

19       as an expert by the law firm of Chapman Law Group?

20           MR. McQUILLAN:  Objection.  That's privileged.

21           MS. STAMLER:  No, it's actually not.

22   A   I don't recall the exact number.

23   Q   Is it more than ten?

24   A   I'm not sure.

25   Q   Is it between five and ten to the best of your
```

```
 1    memory?

 2  A  It's possible.

 3  Q  Have you ever been retained by the entity known as

 4     Corizon or Correctional Medical Services as an

 5     expert?

 6  A  Not directly by them, no.

 7  Q  Okay.  That would have been through counsel?

 8  A  Correct.

 9  Q  Is that a yes?

10  A  Yes.

11  Q  Okay.  Have you served as an expert for both

12     Corizon and Correctional Medicine Services?

13  A  I believe so.

14  Q  Now, in addition to the testimony you've given to

15     me regarding your current employment, you have

16     produced, as we've discussed earlier, a previous

17     part of your report in this case; is that right?

18  A  Yes.

19  Q  In preparation for your deposition, did you review

20     any documents, Doctor?

21  A  Yes.

22  Q  What did you review?

23  A  It's actually in my expert report, the documents I

24     reviewed to make my report.

25         MR. McQUILLAN:  Well, now, she's asking a
```

```
 1      slightly different question.  She's asking about
 2      things you looked at prior to today to prepare for
 3      this deposition.  Obviously, you've documented in
 4      your report what you reviewed to prepare that.
 5   Q  My question was quite simple.  I want to know what
 6      documents, if any, you reviewed in preparation for
 7      your deposition.
 8   A  Okay.  Well, I reviewed my report again.  In
 9      addition, I went back and looked at some of the
10      information, other depositions and things in the
11      report briefly, and I looked at some affidavits I
12      was provided with yesterday as well as an expert
13      report from Dr. Mathis.
14   Q  All right.  Let me make sure I heard your testimony
15      because I think there was a pause in between.  You
16      reviewed your report; you looked at some of the
17      deposition transcripts; you looked at affidavits
18      that were provided to you yesterday, and you said
19      you read Dr. Mathis' report?
20   A  Deposition.
21   Q  Deposition.  Okay.  Of the depositions -- the other
22      depositions you looked at, which ones did you
23      review?
24   A  I looked over some of Dr. Bhavsar, Dr. Bomber, and
25      Dr. Carrel, and Holmes.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 21

```
 1   Q   And what affidavits were provided to you yesterday
 2       that you reviewed that you had not previously
 3       reviewed?
 4   A   I have to look on my e-mails.  I don't have those
 5       printed out.
 6   Q   Okay.  Go ahead.
 7   A   One is from Dr. Coleman, Pappendick, Bergman, and
 8       Lacey.
 9   Q   All right.  And then you said you read Dr. Mathis'
10       deposition.  Had you read Dr. Mathis' report prior
11       to your deposition?
12   A   I have in the past.  I did not review it last
13       night.
14   Q   I'm sorry.  You read it last night?
15   A   No.  I did not reread it again last night.  I have
16       in the past.
17   Q   Okay.  Thank you.  Having reviewed the affidavits
18       that were provided to you yesterday, did that in
19       any way alter your opinions that are set forth in
20       your report?
21   A   No.
22   Q   Do you have any opinions that you have rendered
23       that are not in your report?
24   A   I could revise a report and make comments on
25       Dr. Mathis' deposition, if need be.  I would change
```

```
 1      some information.

 2   Q  I'm not sure I understood your answer.  Did you say

 3      that you would go back and change your report?

 4   A  I said I could report my report based on some

 5      information from Dr. -- make comments on

 6      information from Dr. Mathis' deposition.

 7   Q  Other than that, is there anything else that you

 8      would change in your report?

 9   A  I would -- based on the affidavits provided, I

10      guess I would probably add in my report that it

11      does confirm my information that there was no

12      intentional disregard for Mr. Franklin's care and

13      expeditious care of his -- care from the

14      physician's standpoint at the prison.

15   Q  That's an opinion you held before you read those

16      affidavits; is that correct?

17   A  Correct.

18   Q  What specific things in your report would you

19      change based on Dr. Mathis' deposition?

20   A  It would not change my overall opinion.  I would

21      just add comments in regards to his opinions.

22   Q  Okay.  And I'm asking you what would you add.

23   A  That may take me a couple hours here if I had --

24      I'd have to go back and re-review, make notes,

25      comments, to determine exactly the wording I would
```

```
 1     want to place.

 2  Q  So you're not able to do that as you are sitting

 3     there today; is that right?

 4        MR. McQUILLAN:  Objection mischaracterizes his

 5     testimony.  He didn't say he couldn't.  He just

 6     said he needed more time.

 7  Q  I understand you can't do that right now; is that

 8     correct?

 9  A  I could do that if you want to wait a few hours.

10  Q  Well, we don't have a few hours to wait.  When did

11     you get Dr. Mathis' deposition transcript.

12  A  Yesterday.

13  Q  Have you in the course of your work, Doctor,

14     developed health care plans for patients who have

15     suspected cancer?

16  A  I have developed and worked with the patient and

17     worked with specialists, yes, in regards to the

18     plan of care of patients in our jail.

19  Q  My question was more specific.  So please listen

20     carefully.  Have you in the course of your work

21     developed health care plans for inmates who had

22     suspected cancer?

23  A  I guess I do not understand what all you mean by

24     plans.  I help develop -- or help order tests and

25     visits outside of the jail for care.
```

```
 1   Q   Specifically with respect to suspected cancer, have

 2       you developed plans of care which would include

 3       followups, testing, referral to specialists?  Yes

 4       or no?

 5   A   Yes.

 6   Q   How many times in the last five years have you

 7       developed a plan of care for an inmate with

 8       suspected cancer?

 9   A   I do not recall the number offhand, but I would

10       guess 20 plus times.

11   Q   And of those 20 plus times, were any of those

12       suspected cancers involving the neck?

13   A   I don't recall what all cancers offhand, but yes,

14       there has been some of the neck -- head and neck.

15   Q   But none involving tonsillar cancer; correct?

16   A   I don't recall a case of tonsillar cancer, no.

17   Q   I take it, Doctor, that you have specific areas of

18       expertise; is that correct?

19   A   Yes.

20   Q   And what do you deem yourself to be an expert in?

21   A   Well, I have extensive experience in correctional

22       medicine so I feel that I have expertise in that

23       area.  I guess there's other areas in medicine I

24       have expertise in, too, is clinical research, which

25       I did for 30 years, and primary care medicine,
```

```
 1      family practice, which I -- I've been in family

 2      practice for 30 years.

 3   Q  You are board certified in family medicine; is that

 4      right?

 5   A  Yes, ma'am.

 6   Q  There is not a board certification in clinical

 7      research, is there?

 8   A  There's a certification you can achieve.

 9   Q  Do you have that?

10   A  Yes.

11   Q  Have you ever testified as an expert in clinical

12      research?

13   A  No.

14   Q  Have you ever testified as an expert in family

15      medicine?

16   A  Not directly other than in these type of cases

17      which many times involve family medicine.

18   Q  Have you ever testified as an expert in

19      correctional medicine?

20   A  Yes.

21   Q  How many times?

22   A  Approximately 20.

23   Q  Is there a reason why on your curriculum vitae or

24      in your report you didn't list those 20 cases?

25          MR. McQUILLAN:  I'm going to object.  I
```

```
 1        believe the rule only requires a certain time frame

 2        of disclosure to be made, not for the entire

 3        lifetime that he's given testimony.  But if you

 4        know the answer, you can answer.

 5    Q   How many of those 20 times that you served as a

 6        correctional medicine expert was done within the

 7        last four years?

 8    A   Maybe I misunderstood your question to begin with.

 9        Is your question -- maybe clarify for me.  Was your

10        question actually testified in a deposition or in

11        court or did an expert review and report?

12    Q   I asked you about testifying as an expert.  In the

13        last four years, how many times have you testified

14        as an expert in correctional medicine?

15    A   Actually testified in a deposition or in trial,

16        four times now.

17    Q   Four times?

18    A   This is, I believe, number four.

19    Q   Does that include today?

20    A   Yes.

21    Q   So three times prior to this --

22    A   Yes.

23    Q   -- is that right?

24    A   Yes.

25    Q   And all three times, was that on behalf of Corizon
```

STOLTZ, M.D., RANDALL
07/19/2018                                                              Page 27

```
 1        or Correctional Medicine Services?

 2   A  I don't have that information in front of me right

 3        now to know who -- who it was with.

 4             MS. STAMLER:  Court reporter, can you locate

 5        Exhibit 1, please?  Would you please hand that to

 6        Dr. Stoltz and his lawyer.

 7             (Exhibit 1 was handed to the witness.)

 8   Q  Do you have Exhibit 1 in front of you, Dr. Stoltz?

 9   A  I do.

10   Q  And is this your curriculum vitae?

11   A  Yes.

12   Q  And is it complete and accurate as of today?

13   A  It was updated January 5th of this year.  I believe

14        it's still accurate as of today.

15   Q  With regard to your work at Covance Clinical

16        Development Services, you ceased working there in

17        2017; is that right?

18   A  Yes.

19   Q  And while you were there, you served as the medical

20        director over medical pharmacy staff; is that

21        right?

22   A  Yes.

23   Q  Is this one of the institutions where you were

24        doing clinical research?

25   A  Yes.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 28

```
 1   Q   And were these clinical researches work involving
 2       pharmaceutical companies?
 3   A   Yes.
 4   Q   So you were paid by pharmaceutical companies to
 5       conduct clinical trials; is that correct?
 6   A   No.
 7   Q   What were you paid to do?
 8   A   I actually was an employee of Covance.
 9   Q   Was Covance paid by the pharmaceutical industry to
10       perform the clinical trials?
11           MR. McQUILLAN:  If you know.
12   A   Yes.
13   Q   Do you know, sir, whether any of the clinical
14       trials that you were involved with while at Covance
15       involved any of the inmates either at Vanderburgh
16       or Warrick County?
17   A   No.
18   Q   You also have worked with West Pharmaceutical
19       Services.  Is that a clinical research position as
20       well?
21   A   Yes.
22   Q   And were you paid by the pharmaceutical company to
23       do the clinical research?
24   A   No.
25   Q   Who was paying for your work?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 29

```
 1   A   GFI Research paid me.

 2   Q   Who was paying GFI?

 3           MR. McQUILLAN:  If you know.

 4   A   The pharmaceutical companies.

 5   Q   On any of the clinical trial work that you were

 6       working on at either Covance or West

 7       Pharmaceutical, were you working on any cancer

 8       drugs?

 9   A   Yes.

10   Q   How many times?

11   A   I do not know.

12   Q   Were any of those cancer drugs being used to treat

13       tonsillar cancer?

14   A   The drugs we worked -- we did phase one clinical

15       research, which is the earliest in human research.

16       And for the most part, ours were in very early

17       development and not actually being used to treat

18       patients with diseases at that point.

19   Q   So the answer to my question I assume is no then?

20   A   No, we did not treat tonsillar cancer people at our

21       sites.

22   Q   So it's fair to say you are not an expert in

23       oncology; is that right?

24   A   I am not, no.

25   Q   Nor are you an expert in radiation oncology or
```

1    medical oncology; correct?

2  A  Correct.

3  Q  You are not an expert in ENT, ear, nose, and throat

4    work; is that correct?

5  A  Correct.

6  Q  Now, on page 2 of your C.V., it lists St. Mary's

7    Medical Center, Deaconess Hospital, and Evansville

8    Protestant Home, all the places where you're doing

9    work; is that right?

10 A  Well, I'm on staff.

11 Q  So you're on staff at St. Mary's and Deaconess; is

12    that correct?

13 A  That's correct.

14 Q  And you also list Evansville Protestant Home as

15    being a medical director; is that correct?

16 A  That is correct.

17 Q  Is that a paid position?

18 A  I'm sorry?

19 Q  Is that a paid position?

20 A  Yes, it is.

21 Q  Is there a reason why you didn't mention that to me

22    when I asked you about your current employment?

23 A  Honestly, I did not have my C.V. in front of me at

24    that time when you asked that question.  I forgot

25    about that.  It's a very minimal part of what I do.

1   Q   How many hours per week do you devote to your

2       medical director at Evansville Protestant home?

3   A   I would guess one to two hours per month.

4   Q   And what's the population at that home?

5   A   It's a nursing home.  It has, I would guess, 100 --

6       approximately 100 folks.

7   Q   Are you the only medical director?

8   A   Yes.

9   Q   So for 100 residents, you spend one to two hours

10      per month; is that correct?

11  A   I don't take care of 100 residents.

12  Q   Do you have a patient load?

13  A   I have one patient.

14  Q   You have one patient there?

15  A   I do.

16  Q   So are you the medical director over the entire

17      home or just that one patient?

18  A   The entire home.

19  Q   Well, what do you do as the medical director?

20  A   The home will call me if there's any issues with

21      other residents, if they cannot contact a

22      physician, if they need orders for something, if

23      there's a problems, then I get involved.

24  Q   Do you do any chart review?

25  A   Occasionally.

```
 1   Q   In your positions with the two county detention
 2       centers -- and if I've misstated what they're
 3       called, I apologize.  Vanderburgh and Warrick, do
 4       you do quality assurance review of medical records?
 5   A   I do reviews of health assessments by the nurses
 6       frequently.
 7   Q   What about the other physician's work?
 8   A   Yes.
 9   Q   And is part of your review of those medical records
10       a review in the way in which the charting is done?
11           MR. McQUILLAN:  Objection to form.  Vague.
12   Q   Go ahead and answer.
13   A   Repeat the question.
14   Q   Sure.  I asked you as part of your review of the
15       medical records, do you review the charting?
16   A   Yes.
17   Q   And do you provide feedback to the physician who is
18       charting on whether their charting is being done
19       accurately, correctly?
20   A   We have discussions from time to time about things
21       that should be charted or things in general.
22   Q   And you would agree with me, Dr. Stoltz, that
23       charting is something that you learned in medical
24       school; correct?
25   A   Yes.
```

1  Q  And it's something that you understand is critical

2     to the patient care; correct?

3  A  Can be.

4  Q  Is there a circumstance where charting wouldn't be

5     critical to a patient care?

6  A  Well, there's times you don't chart every single

7     little tiny bit of information because it's not

8     necessary.  That's very dependent patient specific.

9  Q  Would you agree, Doctor, that it's important that

10    key findings during a physical exam should be

11    charted?

12 A  Yes.

13 Q  Would you also agree with me, Doctor, that key

14    findings during a physical exam should be charted

15    accurately?

16 A  Yes.

17 Q  And you would agree that those charting

18    requirements that is to be complete and accurate

19    with regard to key findings are important in terms

20    of the patient's care; correct?

21 A  Could be.

22 Q  When were you first contacted to work on this case?

23       MR. McQUILLAN:  Objection.  Privileged.

24    Attorney work product doctrine.  Attorney-client

25    communications.

STOLTZ, M.D., RANDALL
07/19/2018                                                              Page 34

```
 1   Q   Are you declining to answer that question, Doctor?
 2          MR. McQUILLAN:  Can you restate your --
 3       actually, can the court reporter read back the
 4       question for us?
 5   Q   The question was, Doctor, when were you first
 6       contacted to begin working on this case?
 7          MR. McQUILLAN:  If you recall, I suppose
 8       that's all right.
 9   A   I don't recall.  I guess I could go back on billing
10       information to see when I first looked at something
11       to give you an approximate time.
12   Q   Okay.
13   A   One moment.
14   Q   What are you looking at as you're trying to answer
15       this question?
16   A   I was trying to see if I had a billing statement
17       handy.  Sometime in 2017, but I don't know the
18       exact date.
19   Q   And you've been paid for your expert opinions in
20       this case; correct?
21   A   Yes.
22   Q   How much have you been paid so far by the defense?
23   A   Just over 18,000.
24   Q   Can you give me the exact number at this point?
25   A   If you can add 10,375 plus 8,250, that will tell
```

```
 1      you.

 2   Q  Okay.  And what hourly rate were you charging for

 3      your work?

 4   A  $500 per hour.

 5   Q  And that was for case review; correct?

 6   A  Case review --

 7   Q  And you charge a higher -- pardon me?

 8   A  Case review and doing the report.

 9   Q  Okay.  And then you charge a higher fee of $750 per

10      hour to sit for a deposition; is that right?

11   A  Correct.

12   Q  Why do you charge a different rate for your

13      deposition?

14   A  It takes more time out of my day, and it's just my

15      -- it's my charges.  That's what I charge.

16   Q  But aren't you charging per hour whether it's for a

17      case review or a deposition?

18         MR. McQUILLAN:  Objection to form.

19   Q  Go ahead and answer.

20   A  Say that again.

21   Q  Aren't you charging for your time whether it's for

22      case review or deposition?

23   A  I charge for either one.

24   Q  Right.  But why the distinction between the hourly

25      rate for preparing a report or reviewing documents
```

```
 1      versus sitting for a deposition?
 2   A  I can prepare reports and review cases on my own
 3      time, evenings, weekends, whenever I want.
 4      Depositions or trial, I have to take time out of my
 5      day and schedule a day where I can't get anything
 6      else done.  I probably don't charge enough.
 7   Q  Your report is dated March 9th of 2018; is that
 8      right?
 9   A  Yes.
10   Q  Did you write this report on your own?
11   A  Yes.
12   Q  Did you type it?
13   A  Yes.
14   Q  So you typed every item that's contained in your
15      report; is that correct?
16   A  Yes, ma'am.
17         MS. STAMLER:  All right.  Madam Court
18      Reporter, would you locate Exhibit 2, please?
19         (Exhibit 2 was handed to the witness.)
20   Q  Before we start on Exhibit 2, can we go back for a
21      moment to Exhibit 1, Doctor?  And let me ask you if
22      I might.  Did you receive any sort of awards or
23      honors during your educational experience either in
24      your residency, obtaining your medical degree, or
25      your B.S. in biology?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 37

```
 1              MR. McQUILLAN:  You can use your C.V. if it
 2       helps refresh your recollection.
 3    A  I don't believe -- let's see.  I don't think it
 4       lists specifically awards other than I listed
 5       memberships on my C.V.
 6    Q  I'm asking about your education.  You did not
 7       receive any honors with regard to your degrees or
 8       your residency; is that correct?
 9              MR. McQUILLAN:  If you recall.
10              MS. STAMLER:  It's understood if you recall.
11       Kevin, please don't lead the witness.
12    A  In medical school, I had honors, in the University
13       School of Medicine.  Or actually, I believe -- yes.
14       But I did not list that on the C.V.  I probably
15       received other awards.  I don't keep track of that
16       type thing.
17    Q  On your C.V., you list membership and awards, but
18       is it fair to say that beginning near the bottom of
19       page 3 and continuing onto page 4, you don't list
20       any awards.  These are all memberships; correct?
21    A  That is correct.
22    Q  Do you have any honors or awards?
23    A  Well, I received some honors and awards from some
24       of those different groups such as Vanderburgh
25       County Medical Society, I got an award for being
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                  Page 38

```
 1        the president of the medical society for a while.
 2        An award from the Association Clinical Research
 3        Professionals at one point.  Different awards for
 4        different things.  American Academy of Family
 5        Physicians, the fellowship award.  I don't have it
 6        listed there.
 7   Q    Now, towards the last part of your C.V., you had an
 8        appendix with a number of publications listed;
 9        correct?
10   A    Yes.
11   Q    Is it fair to say that none of these publications
12        pertain to cancer; correct?
13   A    I would have to look at each one of them and see if
14        they're actually -- these drugs may actually work
15        within our clinical research.  There could be some
16        relationship to some cancer treatment with some of
17        the drugs.  I'd have to review those closely.
18        Let's see.
19   Q    If you need a minute to do that, we can go off the
20        record and come back on after you've reviewed it.
21        Do you want to do that?
22   A    We could.
23           MS. STAMLER:  Okay.  Why don't we take just a
24        couple minutes.  I'm going to take a quick break
25        and run to the restroom.  I'm going to keep the
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 39

```
 1      phone line on, and I'll be right back, okay, and

 2      give you a moment to look through that.

 3           (A brief recess was taken.)

 4   Q  Dr. Stoltz, we went off the record to give you an

 5      opportunity to look at the list of publications

 6      you've provided in appendix 1 to your C.V.  Did you

 7      do that, sir?

 8   A  Yes.

 9   Q  And in reviewing it, were you able to locate any

10      publications that pertain to cancer drugs?

11   A  Yes.

12   Q  Which articles?

13   A  On page 6, the third one from the bottom.

14   Q  Pharmacokinetics, that one?

15   A  Yes.

16   Q  What about that pertains to cancer?

17   A  That drug is actually still in development for

18      certain types of cancer.

19   Q  And do you know what type of cancer?

20   A  T-cell lymphomas for one, but I don't know what

21      else -- I'm not sure what all it's being developed

22      for.

23   Q  You're not currently working on that; right?

24   A  No.

25   Q  Anything else in your publications?
```

 1  A  Not for cancer that I can point out here.

 2  Q  And I take it that type of cancer is different from

 3     the type of cancer Mr. Franklin had; correct?

 4  A  As far as I know, yes.

 5  Q  Lymphoma is a type of blood disorder?

 6  A  I'm sorry.  What was the question?

 7  Q  Do you know how that type of cancer is defined?

 8  A  A T-cell lymphoma?

 9  Q  Yes.

10  A  It's a cancer of a lymph gland system.

11  Q  Can you tell me every publication on your list of

12     publications that pertain to drugs that may treat

13     cancer?

14  A  I don't think any of the rest of them were in

15     development for cancer.

16  Q  Now, turning to Exhibit 2 to your deposition, which

17     is a portion of your report because your report

18     also contained your C.V.; is that right?

19  A  Yes.

20  Q  All right.  So I split them up but Exhibit 2 is the

21     contents of your report; is that right?

22  A  Yes.

23  Q  Can you explain to me, sir, why the font is

24     different on multiple pages?

25  A  I can't give you a good explanation other than my

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 41

```
 1      Word -- Microsoft Word must have somehow when I

 2      typed it up come out that way.  I'm not an expert

 3      typist or computer expert.

 4  Q   So you would agree with me that on page 1, the

 5      caption of the case looks very different from case

 6      number, title of your report, and the date of

 7      settlement; correct?

 8  A   I tend to highlight in bigger font size on -- when

 9      I do my reports.

10  Q   The caption is an entirely different font; correct?

11  A   Yes.

12  Q   Do you know if you cut and pasted that from

13      somewhere else?

14  A   Not that I know of.  I don't know where I would cut

15      and paste it from.

16  Q   With respect to your volunteer faculty member work

17      for the university, how much time do you devote to

18      that work on a weekly basis?

19  A   That varies a lot.  It depends on -- the way it

20      works is the Indiana University School of Medicine

21      has medical students, either third or fourth year

22      medical students, who can do rotation in either --

23      they do it either in clinical research or spend

24      time with me and we actually would go to the jail

25      sometimes, but they would spend a month at a time
```

STOLTZ, M.D., RANDALL
07/19/2018                                                    Page 42

```
 1       in rotation.
 2            So one month, two or three months, we may have
 3       a student every month.  Other months, we would not.
 4       So it just varies.
 5   Q   Are you actually teaching courses?
 6   A   They would do, yes, a course in clinical
 7       pharmacology.  I did a lot last year.
 8   Q   Do you teach any other courses besides clinical
 9       pharmacology?
10   A   No.
11   Q   Your answer is no?
12   A   No other courses, no.  That was the title of the
13       course.
14   Q   Sorry.  What did you say?
15   A   The title of the course was clinical pharmacology.
16   Q   Then the students that are rotating through your
17       faculty work would be those students that are
18       studying pharmacology?
19   A   If they wanted to do a -- the way Indiana
20       University works is in your third and fourth year,
21       you can do elective rotations in different areas.
22       And so they could take an elective in clinical
23       pharmacology and spend a month with me.
24   Q   Have you taught any other courses at the Indiana
25       University School of Medicine?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 43

```
 1   A   No.

 2   Q   And you still work for the Indiana University

 3       School of Medicine as a volunteer faculty member is

 4       what you testified to?

 5   A   Yes.

 6   Q   Do you do any other work with the Indiana

 7       University School of Medicine?

 8   A   Not currently.

 9   Q   Have you in the past?

10   A   No.  Just volunteer education for medical students.

11   Q   In the area of pharmacology?

12   A   Yes.

13   Q   Have we covered all the work that you do for the

14       Indiana University School of Medicine?

15   A   I mean, I -- I even have it on my C.V.  They

16       sometimes will spend time with me in general family

17       medicine to understand what goes on with family

18       practice, that type of thing, and also they'll

19       actually come with me to the corrections to see

20       what I do in correctional health care, but the

21       rotation itself is not really called family

22       medicine or correctional health care.  It's

23       clinical pharmacology.

24   Q   You were retained by the Chapman Law Group to do

25       what in this case?
```

```
 1   A   To review this case and give an expert opinion.

 2   Q   What was your goal in this case?

 3           MR. McQUILLAN:  Objection.  Form.  Vague.

 4   Q   Go ahead and answer.

 5   A   My goal was to give an honest opinion -- expert

 6       opinion on my thoughts regarding the case.

 7   Q   And other than what's in your report, did you

 8       review anything else in rendering the requested

 9       opinions?

10   A   I don't believe so.

11   Q   You didn't rely on any publications, peer review

12       publications --

13   A   No.

14   Q   -- in reaching any of your opinions?

15   A   No.

16   Q   Do you consider yourself to be an experienced or

17       inexperienced expert witness?

18   A   I have experience doing it several times.

19   Q   On the last page of your report, Doctor, page

20       number 7, it lists your charges to serve as an

21       expert; correct?

22   A   Yes.

23   Q   It also indicates the list of your publications was

24       provided with your C.V., and then you list your

25       testimony by deposition, and you only listed one;
```

```
 1       is that right?

 2   A   At that time back in March, yes.

 3   Q   So since March of 2018, you've testified twice

 4       more; is that correct?

 5   A   Correct.

 6   Q   Were those by way of deposition?

 7   A   Yes.

 8   Q   Those were both for the Chapman Law Group as well?

 9   A   I believe so.

10   Q   Did you ever sign any affidavits on behalf of the

11       Chapman Law Group in any litigation?

12   A   I don't recall offhand.

13   Q   You don't recall?  Did you ever do any work on a

14       case with the plaintiff's name of Green?

15   A   That name sounds familiar.

16   Q   Do you recall a case named Chad Green versus

17       Correctional Care Solutions, Inc.?

18   A   Yes.

19   Q   You served as expert for Chapman Law; correct?

20   A   I don't have that information in front of me right

21       now.  I do not recall which law firm it was.

22   Q   Well, do you remember signing an affidavit in that

23       case?

24   A   I've signed affidavits in the past, but I don't

25       remember if it was that case or not, honestly.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                            Page 46

```
 1   Q   Well, do you remember a doctor by the name of
 2       Phillip Buroeher?
 3   A   I remember that name.
 4           MS. REPORTER:  Could you spell that?
 5           MS. STAMLER:  B-u-r-o-e-h-e-r.
 6   Q   Do you charge the same amount for your expert work
 7       for all clients that retain you?
 8   A   I do.
 9   Q   Do you have any notion of how the defense attorney
10       chose you to be an expert in this case?
11   A   No.
12   Q   Do you advertise your expert services?
13   A   I do not.
14   Q   Do you know how your name is out there as a
15       potential expert?
16   A   Honestly, I do not.  Although, I do know --
17   Q   I'm sorry.  Go ahead.  I thought you were done.
18   A   I'm sorry.  I was going to say maybe through the
19       NCCHC or the American Academy of Correctional
20       Physicians.  I think they do post names out there
21       at times of people willing to do expert work.
22   Q   Can you clarify on the record the two entities?
23       You used their acronyms, but if you could testify
24       for the record each of these entities.
25   A   And maybe -- I want to clarify what you said.  I do
```

```
 1      not personally advertise through their

 2      organizations, but I think they may list my name

 3      out there.  I don't know.

 4          One of them is the National Commission on

 5      Correctional Health Care, and the other one is the

 6      American College of Correctional Physicians.

 7   Q  And to your knowledge, they maintain some type of

 8      list of individuals who will serve as experts?

 9   A  I don't know that for a fact, but I do think the

10      ACCP does do that.

11   Q  Okay.  Anywhere else that your name might appear as

12      a potential expert in correctional medicine?

13   A  I don't know.

14   Q  Can you identify in the record for me, Doctor,

15      since I'm not sitting with you, whether you brought

16      documents with you in response to your notice for

17      the deposition?

18   A  Yes.

19   Q  What did you bring?

20   A  I brought in billing statements, a copy of the

21      report, and a copy of your request, and a flash

22      drive of Franklin's records.

23   Q  Okay.  I am going to ask the court reporter to mark

24      those as an exhibit to the -- all of those as an

25      exhibit to the deposition, but what I'll do, so we
```

```
 1     can keep these exhibit numbers in order, we'll mark
 2     them at the end -- we can do that now.  My last
 3     exhibit number currently is 19.  So if you wouldn't
 4     mind marking those as Exhibit 20, and we'll --
 5     actually, I think we've identified them on the
 6     record already.  And I'd like those to be made part
 7     of the record.
 8          (Exhibit 20 was marked for identification.)
 9   Q  Did you read, Dr. Stoltz, the deposition transcript
10     of Dr. Levin?
11   A  Yes.  Oh, expert report.  Not deposition but the
12     expert report?
13   Q  Do you know Dr. Levin?
14   A  No.
15   Q  You've already indicated that you read Dr. Mathis'
16     report and transcript of his deposition.  Do you
17     know Dr. Mathis?
18   A  No.
19   Q  Have you heard of him?
20   A  No.
21   Q  Do you know that he is an expert in correctional
22     medicine?
23   A  Okay.  I don't know him.
24   Q  And you didn't read his credentials or anything
25     like that?
```

```
 1   A   I don't believe I saw his C.V.

 2   Q   Do you know any of the defendants in this case

 3       personally?

 4   A   No.

 5   Q   Prior to being hired by the defendants to give

 6       expert opinions in this case, had you performed any

 7       record review for Keith Franklin's care of

 8       treatment while incarcerated in the Department of

 9       Corrections from August 2012 until his date of

10       death?

11   A   I think I missed what you said in the very

12       beginning there.

13   Q   Before you were hired to give an expert opinion for

14       the defendants, had you performed any record review

15       on Keith Franklin's care and treatment at the

16       Department of Corrections from August 2012 until

17       his date of death?

18   A   No.  I never had access to any of his information

19       prior to what was provided by counsel.

20   Q   Did you meet in preparation for your deposition

21       with defense counsel?

22           MR. McQUILLAN:  Objection.  Privileged.  Work

23       product doctrine.

24   Q   I'm not going to ask what you talked about.  Did

25       you meet to prep for your deposition?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 50

```
 1   A   Yes.

 2   Q   Was anybody else present besides you and the

 3       lawyer?

 4   A   No.

 5   Q   Did you fail any of your courses during medical

 6       school?

 7   A   No.

 8   Q   Did you complete your residency within three years?

 9   A   Yes.

10   Q   When was that done?

11   A   1984 to 1987 per the C.V.

12   Q   What year did you complete medical school?

13   A   1984.

14   Q   Have you been continuously board certified as a

15       family medicine physician?

16   A   Yes.

17   Q   Did you pass your boards the first time each time

18       you took the exam?

19   A   Yes.

20   Q   Is it fair to say that you only hold a medical

21       license in Indiana; is that right?

22   A   That is correct.

23   Q   Have you ever had your license revoked or

24       suspended?

25   A   No.
```

```
 1   Q   Have you ever held a license in any other state?

 2   A   No.

 3   Q   Did you pass your residency on your first attempt?

 4   A   Yes.

 5   Q   Did you have any fellowships following your

 6       residency?

 7   A   No.

 8   Q   Family medicine.  Pardon me?

 9   A   No.

10   Q   Can you tell me briefly what constitutes the

11       specialty of family medicine?

12   A   Family medicine is a broad specialty.  It

13       encompasses -- they sometimes say from cradle to

14       grave and everything in between taking care of

15       babies and teenagers and adults of general

16       medicine.  Sometimes obstetric practices.  A little

17       bit of everything you might say.

18   Q   Is family medicine synonymous with a general

19       practitioner?

20   A   It's -- the old fashioned days it was the same as

21       the general practitioner, but over time the general

22       practitioners tend to be non-board certified.  Then

23       became the specialty of family practice where you

24       had to go into the board certification, maintain

25       certification, and for the most part, weeded out
```

STOLTZ, M.D., RANDALL
07/19/2018                                                        Page 52

```
 1        what they used to call the general practitioner.
 2   Q    How is a family medicine doctor different from an
 3        internal medicine doctor?
 4   A    Internal -- well, that can vary a lot from place to
 5        place.  Internal medicine typically specialize more
 6        in hospital-based patients, more specific disease
 7        problems; whereas, family medicine took care of
 8        more the family in general, did minor office
 9        procedures, may take care of infants, kids;
10        whereas, internal medicine takes care of generally
11        adults only.
12   Q    Have you ever been qualified as a family medicine
13        expert by a judge?
14   A    I guess not, no.  I don't think so.
15   Q    Pardon?
16   A    No, not specifically as a family medicine expert.
17        I have not heard that term.
18   Q    And I think you testified earlier that a judge had
19        qualified you as a correctional medicine expert?
20   A    Yes.
21   Q    How many times?
22   A    Once.
23   Q    Was that in connection with the cases you cited to
24        in your report on page 7?
25   A    In my report or C.V.?
```

```
 1   Q  I didn't see it in your C.V.  The only place I saw
 2      your reference to case work --
 3   A  Oh, yes.  That's correct.
 4   Q  -- is in your report?
 5   A  Yeah, you're right.  You're correct.
 6   Q  So there you said you testified by deposition.  Did
 7      the judge qualify you as an expert in that case?
 8   A  No.  That was a different case from a deposition.
 9      This was actually in a courtroom situation.
10   Q  And what courtroom was that?
11   A  It was in Chicago.  I don't recall the -- part of
12      the medical licensing board in Chicago.
13   Q  Oh, this is for one that you listed as medical
14      licensing board matter?
15   A  Correct.
16   Q  That was not a civil problem involving correctional
17      medicine; correct?
18   A  Correct.
19   Q  Is that right?
20   A  Yes.
21   Q  And what type of case were you serving as an expert
22      in in relation to the medical licensing board?
23   A  I can't give you the details, but it was over a
24      physician in a jail, a matter in regards to doing
25      the proper thing against her medical license.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                     Page 54

```
 1   Q   And were you there on behalf of the physician or
 2       the state?
 3   A   The physician.
 4   Q   You were there for the physician; is that right?
 5   A   On the side of the physician, yes.
 6   Q   And I take it without getting into the details, did
 7       you render an opinion that the physician had done
 8       nothing wrong?
 9   A   Correct.
10   Q   Sir, what do you do to stay current in family
11       medicine?
12   A   In family medicine, you must stay current because
13       you have to have 50 hours of continuing education
14       per year.  The American Board of Family Practice or
15       Family Medicine makes you do a lot of things to
16       keep your hours up to date.  Online courses.  I go
17       to meetings.  I get pretty involved in the National
18       Commission on Correctional Health Care, going to
19       their meetings to get CMEs.  The American College
20       of Correctional Physician meeting and CMEs and a
21       variety of other journals you fill out and send in
22       request forms.
23   Q   Do you routinely review peer review articles in
24       family medicine?
25   A   Yes.
```

```
 1   Q   Do you routinely review peer review articles of

 2       correctional medicine?

 3   A   Correct.

 4   Q   And what type of publications are you reviewing

 5       with regard to correctional medicine?

 6   A   That can be a pretty broad topic.  Each month the

 7       National Commission puts out a journal of articles

 8       that I read as well as the Academy of Correctional

 9       Physicians does the same thing.

10   Q   Are there specific areas of interest that you focus

11       on or do you read these publications from cover to

12       cover?

13   A   I look at things that interest me.  There may be

14       articles that I have no interest in.  It just

15       depends on what the topic is.

16   Q   And are there specific areas of interest that you

17       focus in on with regard to correctional medicine?

18   A   I can't say in particular a certain area.  I like

19       to look at things in general to keep up to date on

20       what's going on.  Especially since I go out and do

21       the surveys for the National Commission of

22       different jails and prisons, I want to make sure

23       I'm up to date on what's going on out there.

24   Q   And have there been updates or modifications in

25       areas of surveying that you've seen in the last two
```

```
 1      years?

 2   A  Yes.

 3   Q  And has one of the areas that's been an area of

 4      focus in correctional medicine is the care and

 5      treatment of inmates with cancer?

 6   A  Not so much cancer itself.  There are different

 7      standards that the National Commission looks at to

 8      make sure there's access to care and there's

 9      continuity of care and chronic care guidelines are

10      developed and being followed, that type of thing.

11   Q  What is the definition of correctional medicine?

12   A  Correctional medicine is a branch of medicine that

13      deals with the care of inmates.  We call them

14      patients but deals with patients in a correctional

15      environment.

16   Q  And there is a unique aspect to that kind of care

17      and treatment; correct?

18   A  Yes.  You have custody issues that have to be dealt

19      with as well as general medical issues.

20   Q  And one of the distinctions between inmate

21      population and the medical care, is that the

22      medical care is on site for the non-specialty care;

23      correct?

24   A  That is quite typical, yes.

25   Q  And to the extent an inmate needs specialty care
```

```
 1        including testing or treatment, that typically

 2        happens off site; correct?

 3   A   More so than not.

 4   Q   Right?

 5   A   More so than not.  Some facilities offer in-house,

 6        but most of the time, they have to be sent out,

 7        especially in jail situations.

 8   Q   Well, that's what I'm referring to.  Prisoners in a

 9        jail or prison situation.  Are you familiar with

10        that?

11   A   Yes.

12   Q   You're familiar with the fact that inmates are

13        dependent upon the system, including the medical

14        providers and the administration of the treatment,

15        in order to get medical care; correct?

16   A   Correct.

17   Q   Do you have any disciplinary complaints lodged

18        against your medical license?

19   A   No.

20   Q   Have you been subjected to any discipline by any

21        board?

22   A   No.

23   Q   Have you been subjected to any discipline by any

24        organization?

25   A   No.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                        Page 58

```
 1   Q   Have you ever been sued for malpractice?

 2   A   No.

 3   Q   Have you ever been disqualified as an expert in any

 4       case?

 5   A   No.

 6   Q   The judge that qualified you as an expert in the

 7       medical licensing board trial, was that judge an

 8       administrative law judge?

 9   A   I don't know.

10   Q   I think I heard you testify to this.  You have not

11       testified as an expert in family medicine; is that

12       correct?

13   A   Not specifically in family medicine unless you're

14       including correctional work as part of family

15       medicine.  I mean, many times it is.  I'm not sure

16       what you're referring to.

17   Q   Well, in this case, have you been called upon to

18       serve as an expert in the area of correctional

19       medicine or family medicine?

20   A   This case, like most of the cases, it's in the area

21       of correctional medicine because it happened in a

22       correctional situation, but honestly, much -- even

23       in this case is the same thing a family practice

24       doctor does and probably these doctors are, you

25       know, just like me, family doctors.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 59

1   Q   So are you testifying as an expert in this case as
2       a correctional medicine expert and a family
3       medicine expert?
4   A   I guess I've never looked at it that way.  I'm
5       testifying as -- based on what my -- my background
6       and my experience in correctional medicine as well
7       as family practice, looking at the information
8       here, and based on my education, training, and
9       experience, I wrote the report.
10  Q   I understand that.  But I'm asking you, sir, are
11      you giving expert opinions on correctional medicine
12      in this case?
13  A   Yes.
14  Q   Are you giving expert opinions on family medicine
15      in this case?
16  A   I guess you could have a combination of both in
17      this case.
18  Q   Is that a yes?
19  A   Yes.
20  Q   You are not here to provide expert testimony in the
21      field of oncology, medical oncology, radiation
22      oncology, or chemotherapy; is that correct?
23  A   That is correct.
24  Q   Prior to serving as an expert in this case, were
25      you required to secure approval from any of your

STOLTZ, M.D., RANDALL
07/19/2018                                                                 Page 60

```
 1      employees to do this expert work?

 2   A  No.

 3   Q  Have you ever been told, sir, that you cannot do

 4      expert work for plaintiffs in prison medical cases?

 5   A  No, I have not ever been told that.

 6   Q  Do you hold a law degree, sir?

 7   A  No, ma'am.

 8   Q  Fair to say you are not qualified to give a legal

 9      opinion; is that right?

10   A  That's correct.

11   Q  Are you familiar with the term deliberate

12      indifference?

13   A  Yes.

14   Q  Yes?

15   A  Yes.

16   Q  Are you familiar with the statute 42 USC section

17      1983?

18   A  I'm not sure.

19   Q  Do you know that the term deliberate indifference

20      is a legal term?

21   A  Yes.

22   Q  Do you know that deliberate indifference is not a

23      medical term?

24   A  Correct.

25   Q  You said you understand or know that term
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 61

```
 1    deliberate indifference; is that right?

 2  A  Yes.

 3  Q  How did you gain your knowledge regarding that

 4     term?

 5  A  That's a term that's commonly brought up at annual

 6     meetings at the NCCHC or the ACCP as well as in

 7     other journals, articles that can be read and

 8     reviewed.

 9  Q  Have you ever read any legal opinions regarding

10     deliberate indifference?

11  A  I'm sure I probably have.

12  Q  Have you read opinions that indicate that a delay

13     in medical diagnosis can constitute deliberate

14     indifference?

15         MR. McQUILLAN:  Objection.  Calls for a legal

16     conclusion.

17  Q  Go ahead and answer.

18  A  Say the question again.

19  Q  Have you ever read a legal opinion or opinions that

20     indicate that a delay in a medical diagnosis can

21     constitute deliberate indifference?

22         MR. McQUILLAN:  Same objection.

23  A  I'm not sure if I ever read that or not.  I don't

24     know.

25  Q  Do you know that, sir, to be the case --
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 62

```
 1            MR. McQUILLAN:  Same objection.
 2   Q  -- that a delay -- let me just finish my
 3      question -- that a delay in medical diagnosis can
 4      constitute deliberate indifference?
 5            MR. McQUILLAN:  Objection.  Calls for a legal
 6      conclusion.
 7   Q  Go ahead and answer.
 8   A  I don't know that for a fact.
 9   Q  Sir, you used the term deliberate indifference in
10      your report, didn't you?
11   A  I may have mentioned that.
12   Q  May have?  Do you know if you did or not?
13   A  I have to read exactly the wording in the report.
14      What page are you referring to?
15   Q  Pardon me?
16   A  What page are you referring to?
17   Q  There are several parts of your report where that
18      term appears.  Beginning on page 2 under your Scope
19      of Engagement, do you see the term deliberately
20      indifferent contained therein?
21   A  Yes.
22   Q  And continuing on multiple pages thereafter, did
23      you use the term deliberately indifferent?  Yes or
24      no?
25   A  I'd have to look through the rest of the report and
```

```
 1        reread it to see if I actually used that exact
 2        term.
 3    Q   All right.  Well, if we need to take a break where
 4        you have to look at this --
 5    A   Sure.
 6    Q   We'll go off the record and I'll give you a moment
 7        to take a look to see if you can find any other
 8        spot where you use the term deliberate indifference
 9        or deliberately indifferent.  Let me know once
10        we're off the record when you're ready to get back
11        on the record after you've reviewed your report.
12            (A brief recess was taken.)
13    Q   We went off the record, Dr. Stoltz, so that you
14        could review your report to determine whether you
15        had stated in your report deliberately indifferent.
16        Did you do so?
17    A   No.
18    Q   Pardon?
19    A   No.
20    Q   No, you did not?
21    A   The only time I mentioned it was in the very
22        beginning -- the initial paragraph you mentioned,
23        the Scope of Engagement, which came off the
24        plaintiff's complaint.
25    Q   Did you -- so you wrote, "This report details my
```

```
 1      expert opinions as to whether Defendants from

 2      Corizon Corporation (providing medical services at

 3      the Michigan Department of Corrections) acted

 4      deliberately indifferent or deviated from the

 5      standard of care in regards to Keith Franklin's

 6      serious medical needs."  Did I read that correctly?

 7   A  Yes.

 8   Q  You wrote that, sir, correct?

 9   A  That's what I just said a moment ago.

10   Q  All right.  What did you mean by the term

11      deliberately indifferent?

12   A  That they intentionally delayed things,

13      intentionally did not work on the care of

14      Mr. Franklin while he was a patient there.

15   Q  So it's your understanding in evaluating the

16      records in this case and rendering your opinion

17      that you use that definition; is that correct?

18   A  Well, like I said previously, I'm not a lawyer.

19      I'm not a law expert but --

20   Q  Rendering an opinion as to the care in this case as

21      to whether it was a deliberately indifferent;

22      correct?

23         MR. McQUILLAN:  Counsel, please allow the

24      witness to finish answering before you interrupt

25      him with another question.
```

```
 1          MS. STAMLER:  Kevin, I apologize.  I thought
 2      he was done.
 3          MR. McQUILLAN:  Not a problem.
 4          MS. STAMLER:  I'm not there.  I can't see him
 5      so I apologize.
 6   Q  Did I cut you off, Doctor?
 7   A  I was going to say in my report, in my opinion, I
 8      commented on was there deliberate delays or
 9      intentional delays in care for this individual by
10      the medical team that we're referring to here.
11   Q  And in rendering your opinions, you used the
12      definition that you provided on the record, that is
13      that these individuals from your perspective did
14      not act intentionally.  Is that your testimony?
15          MR. McQUILLAN:  Objection.  Calls for a legal
16      conclusion.
17   Q  Go ahead and answer.
18   A  Well, I'd say refer to my report.  I mentioned I
19      did not feel they deliberately avoided or delayed
20      treatment of Mr. Franklin.
21   Q  And what I'm asking you, Doctor, the term that you
22      used is deliberately, and you've defined that term
23      as being acting intentionally; correct?
24   A  I guess I would use it more like a synonym, that in
25      my opinion did I feel that they intentionally did
```

STOLTZ, M.D., RANDALL
07/19/2018                                                      Page 66

```
 1        something to delay treatment or diagnosis or
 2        whatever to Mr. Franklin.
 3    Q   Do you understand, Doctor, as you sit here today
 4        that the term deliberate indifference includes an
 5        objective and subjective standard?  Yes or no?
 6            MR. McQUILLAN:  Objection.  Calls for a legal
 7        conclusion.
 8    Q   Go ahead and answer.
 9    A   I guess I'm somewhat confused.  I guess I'm not a
10        legal expert other than the fact I reviewed the
11        case to see if I felt there was either the word
12        deliberately or intentionally did not care for him
13        the way that I would expect them to respond to his
14        needs.
15    Q   And as you've testified, you used the term
16        deliberately as synonymous with intentionally;
17        correct?
18    A   Yes.
19    Q   Have you ever heard of the case of Estelle V.
20        Gamble?
21    A   Yes.
22    Q   What does that case from your understanding, I
23        understand you're not a lawyer but you're
24        correctional medicine doctor, what do you
25        understand that case stands for?
```

```
 1             MR. McQUILLAN:  Objection.  Calls for a legal

 2      conclusion.

 3   Q  Go ahead and answer.

 4   A  I don't have all the case information in front of

 5      me.  I don't -- I can't really comment on it right

 6      at this point.

 7   Q  Doctor, do you know whether failure to timely treat

 8      a serious medical condition can be deliberate

 9      indifference under the law?

10             MR. McQUILLAN:  Objection.  Calls for a legal

11      conclusion.

12   Q  Go ahead and answer.

13   A  I would agree that I cannot legally answer one way

14      or another.

15   Q  In your report, Doctor, on page 2, you have a

16      heading at the bottom that says the materials that

17      you reviewed and relied upon to make findings,

18      reach opinions, and draw conclusions; is that

19      right?

20   A  Yes.

21   Q  What is the difference between findings, opinions,

22      and conclusions?

23   A  Well, my findings are more or less the facts in the

24      case, and then I reach --

25   Q  What is your opinions?
```

```
 1   A   My opinions are based on the findings and the
 2       sequence of events, and the conclusions is the
 3       final statement of my findings and opinions
 4       altogether.
 5   Q   Let me understand.  Your findings are the facts.
 6       Your opinions are your findings based on -- I'm
 7       sorry.  What was your opinion?
 8   A   The opinions are my thoughts based on the facts and
 9       the sequence of events, and the conclusion is just
10       a final statement on -- after putting it
11       altogether, here is my conclusions.
12   Q   Are your conclusions different from your opinions?
13   A   They're part of the final statement of the
14       opinions.
15   Q   In the section of your report that's labeled
16       summary of findings, in this section you're
17       summarizing the sequence of events and the
18       generalized facts; is that right?
19   A   Yes.
20   Q   And I take it, sir, you created these findings
21       after reviewing the records that you've listed in
22       your report; correct?
23   A   Correct.
24   Q   In other words, you didn't have a timeline provided
25       to you from some other source; is that right?
```

```
 1   A   That's correct.

 2   Q   And I take it before you finalized your report, you

 3       made sure that what you wrote in your report was

 4       accurate; correct?

 5   A   That's my goal usually to do that.

 6   Q   And you were accurate both in terms of the sequence

 7       of events, that being the dates or the time of when

 8       things happened, and when you quoted things, you

 9       quoted them accurately; correct?

10   A   That's my intention.

11   Q   Well, did you do that, sir?

12   A   I hope so.  That's what I try to do every time.

13   Q   Pardon me?

14   A   I said that's my intention to do that every time I

15       do a report.

16   Q   Well, before you sign off on it, do you ensure that

17       it's complete and accurate from your standpoint?

18   A   I try to.

19   Q   Did you do that with this report?

20   A   I try to do it on every report.

21   Q   I want to know about this report.  I don't care

22       about your other reports.  Did you do that with

23       this report?

24   A   I do the same thing on every report.

25   Q   Is that a yes, you did that here?
```

```
 1   A   I tried to verify the facts and the timeline of

 2       events, yes.

 3   Q   How many drafts of your report did you have?

 4   A   I don't recall.

 5   Q   How many changes did you make to the report?

 6   A   I guess my report is probably a draft in progress

 7       as I go through the report until I finalize the

 8       report.

 9   Q   Do you recall what changes you made?

10   A   No.

11   Q   Did you in summarizing the sequence of events and

12       the generalized facts put into the report those

13       facts that you thought were key in reaching your

14       opinions?

15   A   Yes, I try to do that.

16   Q   Did you do that?

17   A   That's my goal, yes.

18   Q   Would you agree with me, Doctor, that a delay of

19       six months from diagnosing a suspicious mass of

20       cancer could be deliberately indifferent?

21           MR. McQUILLAN:   Objection.   Calls for a legal

22       conclusion.

23   Q   Go ahead and answer.

24   A   I don't know from a legal standpoint how you

25       conclude that, but I would say if someone has a
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 71

```
 1      true suspicious mass, you're worried about cancer,
 2      and you don't do anything about it, any evaluation,
 3      referral, anything, that's not good.
 4   Q  Well, I want to ask you the question I asked and
 5      see if you can answer it.  If you can't, tell me
 6      you can't.
 7          Do you agree that a delay of six months
 8      diagnosing a suspicious mass of cancer could
 9      constitute deliberate indifference?
10          MR. McQUILLAN:  Objection.  Calls for a legal
11      conclusion.
12   Q  Go ahead and answer.
13   A  I can't answer that without more information
14      probably.
15   Q  Would you agree with me, Doctor, that a delay of
16      eight months in treating a cancerous mass could be
17      deliberately indifferent?
18          MR. McQUILLAN:  Objection.  Calls for a legal
19      conclusion.
20   Q  Go ahead and answer.
21   A  Once again, I can't answer that from a legal
22      standpoint.
23   Q  How about from a medical standpoint?
24          MR. McQUILLAN:  Same objection.
25   Q  Go ahead and answer.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                              Page 72

```
 1   A   What's the question from a medical standpoint?

 2   Q   Do you believe that a delay of eight months in

 3       treating a cancerous mass could be deliberately

 4       indifferent to the patient's medical needs?

 5           MR. McQUILLAN:  Objection.  Calls for a legal

 6       conclusion.

 7   A   Once again, it's not from a medical standpoint.

 8       It's more of a legal standpoint.

 9   Q   You can't answer that; is that right?

10   A   That's correct.

11   Q   Do you agree with me, Doctor, that cancer is a

12       serious medical condition?

13           MR. McQUILLAN:  Objection.  Calls for a legal

14       conclusion.

15           MS. STAMLER:  How is that a legal conclusion?

16           MR. McQUILLAN:  I'd refer you to Blackmar

17       versus Calverton County from the Sixth Circuit, as

18       well as Napier versus Madison County from the Sixth

19       Circuit, Estelle versus Gamble, Farmer versus

20       Brennan, and Wilton versus Cider from the United

21       States Supreme Court.  All five of those cases make

22       reference to and give definitions to terms

23       including deliberate indifference, serious medical

24       needs --

25           MS. STAMLER:  I didn't ask about deliberate
```

1       indifference.  I asked about a serious medical

2       condition.

3    Q  Doctor, do you know what the term serious medical

4       condition means?

5            MR. McQUILLAN:  I'm sorry, Counsel.  I was

6       responding to the statement you asked of me.

7            MS. STAMLER:  I didn't ask for -- I did not

8       ask for a dissertation on the law.  I'm well aware

9       of the law.  I'm asking this doctor a medical

10      question.

11           MR. McQUILLAN:  I'm sorry.  Counsel, that's

12      not what I recall, and we can have the court

13      reporter read it back, but I would really like it

14      if you would stop with the argumentative and

15      shouting tone.  It's really unnecessary.

16           MS. STAMLER:  It's not -- I'm not shouting.

17      I'm trying to get my point across, and I'm on a

18      phone, and you're talking over me.  I am trying to

19      ask this witness, who is a physician in

20      correctional medicine, if he understands whether

21      cancer is a serious medical condition or not.

22           MR. McQUILLAN:  And once again, I object.

23   Q  Do you have an opinion, Doctor?

24           MR. McQUILLAN:  Once again, I object for a

25      question that is seeking to elicit a legal

1      conclusion.

2   Q   Go ahead and answer, Doctor.

3   A   Cancer can be a serious medical condition.

4   Q   Do you agree, Doctor, that a suspicion of cancer

5       can be a serious medical condition?

6          MR. McQUILLAN:  Objection.  Calls for a legal

7       conclusion.

8   Q   Go ahead and answer.

9   A   I think that's speculation.

10  Q   There are some suspicions of cancer that could not

11      be a serious medical condition?

12         MR. McQUILLAN:  Objection.  Calls for legal

13      conclusion.

14  Q   Go ahead and answer.

15  A   I guess I'm somewhat confused.  If there's a

16      suspicion for cancer, it should be evaluated.

17  Q   Okay.  And it should be evaluated, sir, because

18      cancer is, as you testified, potentially a serious

19      medical condition; correct?

20         MR. McQUILLAN:  Objection.  Calls for a legal

21      conclusion and mischaracterizes the witness'

22      testimony.

23  Q   Go ahead and answer.

24  A   If someone has cancer, it -- especially in their

25      eyes, it's going to be considered a serious medical

STOLTZ, M.D., RANDALL
07/19/2018                                                                Page 75

```
 1      problem.

 2   Q  Well, as a physician, do you consider cancer to be

 3      serious?

 4   A  It depends on what type of cancer.

 5   Q  What about tonsillar cancer?

 6   A  Probably quite serious.

 7   Q  Pardon me?

 8   A  It's probably quite -- can be quite serious.

 9   Q  And you would agree that cancer is a medical

10      condition; is that right?

11   A  Yes.

12   Q  And therefore tonsillar cancer is a serious medical

13      condition; correct?

14         MR. McQUILLAN:  Objection.  Calls for a legal

15      conclusion.

16   Q  Go ahead and answer.

17   A  From a medical standpoint, I'm not saying a legal

18      standpoint, but from a medical standpoint, it is a

19      serious medical problem that needs to be addressed.

20   Q  Are there certain characteristics of a palpable

21      lymph node in the neck that can make it a serious

22      medical condition?

23         MR. McQUILLAN:  Objection.  Calls for a legal

24      conclusion.

25   Q  Go ahead and answer.
```

1  A  There are potential findings on examination that

2     could increase the likelihood or suspicion of a

3     malignancy.

4  Q  And can you articulate those characteristics for

5     me?

6  A  Well, I think there's a lot more than just the

7     characteristics.  It obviously can be someone's

8     age, family history, personal history, personal

9     habits.  But then on examination, things such as a

10    lump in the neck, when it begins, how fast it's

11    enlarging.  Is it painful?  Is it mobile?  Is it

12    hard as a rock?  Is it soft?  Is it subcutaneous?

13    Is it deep?  There's a lot of different factors

14    that we look at.

15 Q  Size?  Would the size of the mass be important?

16 A  Sure.

17 Q  I think you said the texture is important; is that

18    right?

19 A  Yes.

20 Q  The location of the mass?

21 A  Potentially.

22 Q  Correct?

23 A  Yes.

24 Q  The fact that it's asymmetrical versus symmetrical;

25    is that right?

```
 1   A   Yes.

 2   Q   And I think you said there are factors beyond the

 3       actual palpable mass, in other words, what the

 4       doctor feels during the palpation process that

 5       should be considered as well, that includes the age

 6       of the patient; correct?

 7           MR. McQUILLAN:  Objection to form.

 8   Q   Go ahead and answer.

 9   A   Yeah, there's other factors.  That's why you need

10       to do a history and physical examination.

11   Q   One of those factors is the patient's age; correct?

12   A   Yes.

13   Q   And a patient who is above the age of 40 is at a

14       higher risk for certain types of cancer; correct?

15   A   Can be, yes.

16   Q   Well, do you know?

17   A   There's definitely certain types of cancer that are

18       higher incidents the older you get.

19   Q   And that would include neck cancers; correct?

20   A   Yes.

21   Q   And what about the patient who has been a smoker

22       for multiple decades?  Is that a risk factor?

23   A   Yes.

24   Q   And that would be a risk factor for neck and throat

25       cancer; correct?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                                    Page 78

```
 1   A   And lung cancer.

 2   Q   I'm asking about neck and throat cancer.

 3   A   Can be.

 4   Q   And if the patient has a history of alcohol use, is

 5       that a risk factor?

 6   A   Yes.

 7   Q   Did you understand, sir, in reviewing the records

 8       involving Mr. Franklin that he was above the age of

 9       40?

10   A   Yes.

11   Q   Did you understand he had been a smoker for many

12       decades?

13   A   Yes.

14   Q   Did you understand he had used alcohol?

15   A   Yes.

16   Q   You understood all of those to be risk factors

17       making him susceptible or to look for neck or

18       throat cancer; correct?

19   A   It could, yes.

20   Q   Did you in preparing your opinions in this case

21       review the contract between the state of Michigan

22       and Corizon?

23   A   I don't believe I did.

24   Q   Did you review the Michigan Department of

25       Corrections policy directives regarding health
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 79

```
 1     care?

 2   A  No, I did not have that.

 3   Q  Did you review Michigan Department of Corrections

 4      procedures for rules on prescription medications?

 5   A  No.

 6   Q  Do you have any personal knowledge regarding the

 7      procedure that Michigan Department of Corrections

 8      prisoners must follow in order to get off site

 9      treatment?

10   A  I do not know those exact procedures and policies.

11   Q  Do you have any personal knowledge regarding the

12      procedures for the physicians who work for Corizon

13      in the Michigan Department of Corrections

14      facilities to --

15   A  No.

16   Q  -- get off site treatment for the prisoners?

17   A  No.

18   Q  Do you have any personal knowledge regarding the

19      scheduling process that's used within the Michigan

20      Department of Corrections for instates to get off

21      site medical testing visits or treatment?

22   A  The only thing I saw was in -- I don't have

23      personal knowledge.  The only thing I saw in the

24      records was the submission of the 407 requests.

25   Q  Is that scheduling or is that requesting services,
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                     Page 80

```
 1      if you know?

 2   A  Requesting services from what I understand from the

 3      reports.

 4   Q  Right.  So my question had to do with scheduling of

 5      appointments.

 6   A  No.

 7   Q  Do you know any barriers that existed during

 8      August of 2012 through the date Mr. Franklin died

 9      to the Corizon physicians at Carson City from

10      pushing to expedite off site appointments for

11      inmates?

12          MR. McQUILLAN:  Objection to form.

13   Q  You can answer.

14   A  I think some of that broke up in that question.

15      Was it about audits?

16   Q  No.  Let me say it again.  Do you know of any

17      barriers to Corizon physicians located at Carson

18      City Correctional facilities during the time period

19      of August 2012 until Mr. Franklin's death that

20      prevented them from expediting off site

21      appointments for inmates?

22          MR. McQUILLAN:  Objection to form and

23      foundation.

24   Q  Go ahead and answer.

25   A  I don't know of barriers, per se, other than the
```

```
 1      routine barriers you see in corrections such as
 2      custody.  It depends on who makes the appointments
 3      and how soon specialists can get people in.
 4      There's a whole lot of things that go into
 5      scheduling as in private practice too.
 6   Q  Do you know of any -- are you guessing or are you
 7      aware of any specific barriers that existed?
 8   A  Well, the barriers I saw in the report were -- or
 9      the information was sometimes a different 407 had
10      to be submitted.  There was weather delays.  There
11      was custody delays of families knowing what's going
12      on.  Security issues.  Those are the barriers that
13      I reviewed in the report.
14   Q  Let me understand.  The schedule -- the referral
15      process was a barrier?  Is that one of your things
16      that you said?
17   A  I did not see that really being a barrier in the
18      report.  It seemed like that was taken care of
19      pretty quick.
20   Q  Okay.  What were the barriers that you just
21      identified?  You said weather and security?
22   A  I saw scheduling -- issues that delayed some of the
23      appointments were things such as security issues,
24      weather delays, patient was not prepped for a
25      procedure at one point, those type of things.
```

 1  Q  Anything else that you saw as a barrier to the

 2     doctors at Carson City Correctional in expediting

 3     off site appointments for inmates?

 4  A  Not that I'm aware of offhand.

 5  Q  Do you recall reading in any of the transcripts you

 6     reviewed that the physicians at Carson City

 7     Correctional Facility had the ability to talk to

 8     the scheduler and move appointments?  Did you read

 9     that?

10  A  I don't recall seeing that.

11  Q  You don't?

12  A  Not offhand right now, no.

13  Q  Did you know, sir, or do you know as you were

14     preparing your report that physicians who requested

15     referrals for off site testing and treatment could

16     do so as a routine request or an urgent request?

17        MR. McQUILLAN:  Objection.  Form of the

18     question.

19  Q  Go ahead and answer.

20  A  I read in some of the depositions and reports that

21     there were different ways you could request a 407.

22  Q  One of them was routine; correct?

23  A  Right.

24  Q  One was urgent; correct?

25  A  Right.

```
 1   Q   Are there any other ways in which a 407 could be

 2       requested or submitted rather?

 3   A   I don't know.

 4   Q   Did you in your review of the records, Doctor, see

 5       any 407 request that was done in an urgent fashion?

 6       Yes or no?

 7   A   I did not see ones that were requested urgent.  I

 8       did see a pretty urgent response to those.

 9   Q   I did not ask you that question.  Let me ask it

10       again.  Did you in your review of the records that

11       were provided to you find any 407s that were

12       submitted as an urgent request for off site

13       services or testing?

14           MR. McQUILLAN:  Objection.  Asked and

15       answered.

16   Q   Yes or no?  Go ahead and answer, please.

17           MR. McQUILLAN:  Objection.  Asked and

18       answered.

19   Q   Go ahead and answer.

20   A   From what I recall, the ones I saw were just

21       ordered routinely.

22   Q   Do you have any personal knowledge of the number of

23       doctors, nurse practitioners, or physician

24       assistants that worked in Carson City during 2012

25       to 2014?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                Page 84

```
 1    A   I do not know exactly, no.

 2    Q   Do you know how many inmates were housed in Carson

 3        City Correctional Facility during 2012 to 2014?

 4    A   I do not know.

 5    Q   Have you ever served as a medical director over

 6        facilities the size of Carson City?

 7    A   I don't know how many inmates are there.  So I

 8        can't answer that.

 9            MR. McQUILLAN:  Objection to foundation.

10    Q   What was the largest prison population that you've

11        been the medical director over?

12    A   I've never been medical director over a prison

13        population.

14    Q   What's the largest jail population that you've been

15        the medical director over?

16    A   Vanderburgh County.

17    Q   I'm sorry.  I did not hear your response.

18    A   The Vanderburgh County Detention Center.

19    Q   How many inmates?

20            MR. McQUILLAN:  Objection.  Asked and

21        answered.

22    Q   Is that the one that was five to 700?

23    A   Yes.

24    Q   Okay.  Have you published any peer review articles

25        on correctional medicine?
```

```
 1   A   No.

 2   Q   Have you published any peer review articles on

 3       family medicine?

 4   A   No.

 5   Q   Have you published any peer review articles on

 6       family medical care for inmates?

 7   A   No.

 8   Q   Have any of the articles that you wrote or co-wrote

 9       been rejected for publication at any point in time?

10   A   Many of the articles -- when I was involved in a

11       clinical research, those are submitted by -- many

12       of them are submitted by the pharmaceutical

13       companies, and I don't know if they were rejected

14       or not.  They go to different publication areas.

15       That, I don't know.

16   Q   Have you ever had anybody disagree with any of your

17       findings that were contained in any of your

18       published articles?

19   A   Not that I ever heard back on.

20   Q   Doctor, do you have an opinion as to which is more

21       scientifically reliable as a source, a patient's

22       recollection of his or her health or the doctor's

23       chart?

24   A   That's an interesting question.  That can vary a

25       lot from patient to patient.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 86

```
 1   Q   Are you able in this case to determine whether
 2       Keith Franklin was a reliable historian or not?
 3   A   It would be pure speculation.  It would be hard for
 4       me to say for sure if he's reliable or not.
 5   Q   Do you as a doctor view a patient's recitation of
 6       his or her medical history as accurate?
 7   A   Once again, a very interesting question that can
 8       vary a whole lot.  In corrections, you have to be
 9       very careful what patients tell you.  Many times,
10       they're very inaccurate.
11   Q   So you believe that inmates tell you his or her
12       medical condition is inaccurate more than not?
13   A   It all, once again, depends on the patient.  I
14       mean, I try to listen to the patient.  Me
15       personally, when I interview a patient, I try to
16       listen to their story, try to verify information.
17       Some people are drug seekers.  Some people have
18       alternative means to tell you something that may or
19       may not be true.  Some people hide information from
20       you for various reasons.  So it can be difficult in
21       this population sometimes to get accurate
22       information from the patient.
23   Q   What do you do given your work as a medical
24       director in the medical field to perform research?
25   A   Well, it depends on what the question at hand is,
```

```
 1        but we actually have them fill out a request for
 2        information form and request information from their
 3        doctor, from their pharmacy, from their hospital
 4        they've been to, wherever.  If there's something
 5        significant, we want to know about it.  If they
 6        come in and say they've got cancer, and they need
 7        treatment for their cancer, that's a common
 8        answer -- or a common question in a jail is we need
 9        to verify you have cancer, and it's not uncommon
10        we'll find out there's never ever been any history
11        of cancer whatsoever.  Other times, yeah, we verify
12        that sure enough they've had cancer therapy five
13        years ago.  So that's a broad question.
14   Q    Did you see anything in the records that you
15        reviewed related to Keith Franklin's medical care
16        from August 12th -- August 2012 to his date of
17        death where any of the treaters that were giving
18        him medical care sought to independently verify his
19        medical history?
20   A    I'm not sure I know what you're trying to refer to.
21        Are you trying to refer to information prior to him
22        coming to the DOC in the first place?
23   Q    Any of his medical history.
24   A    Well, I would --
25   Q    Hepatitis C, for example.
```

1  A  I would presume in most corrections when they get

2     transferred from one facility to the next, their

3     medical information goes with them.

4  Q  Well, did you see any verified -- or efforts to

5     verify his medical history beginning in August of

6     2012 until the date of his death?

7  A  I don't recall that offhand.

8  Q  If there's no documents to determine or there

9     wasn't efforts undertaken to determine whether this

10    report of his medical history was accurate or not,

11    do you take the patient's statement as accurate?

12 A  Well, I mean, personally I try to believe the

13    patient.  If he tells me, he's fine, he has no

14    health problems, no medical problems, I tend to

15    want to believe them.  If he tells me I've got HIV

16    or I've got some terrible disease, I want to

17    confirm what he has had, what his treatment has

18    been up to date.  I want to make sure the person

19    gets the right care.  So once again, it's a big

20    question, and it depends on the patient.

21 Q  Have you ever had a patient report medical history

22    that differed from what was in the medical chart?

23 A  Absolutely.

24 Q  What have you done to reconcile what the patient

25    reported versus what was in the chart?

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 89

```
 1   A   Well, if it's a significant disease problem, I'll
 2       -- I may do testing to verify that disease.  If he
 3       says he's got this and the record never shows it, I
 4       may say, well, let's check that.  If he says he's
 5       got HIV and there's no evidence of ever having
 6       that, let's do a test and let's confirm it.  Or
 7       Hepatitis or things we see commonly in the jail.  I
 8       want to confirm it.
 9   Q   Do you as part of your training of medical students
10       train them on how to chart?
11   A   Yes.
12   Q   And do you indicate that there are common errors
13       that occur?
14   A   It's common everywhere, yes.
15   Q   And is one of the common charting errors that
16       occurs the transposition of the side of the body
17       that finding has been made?
18   A   That's interesting you say that because I know
19       that's referred to much in this whole case here.
20       It's possible that can be done.
21   Q   It's a common charting error because the physician
22       is looking at the patient and the patient's left
23       side is the physician's right side; correct?
24   A   I would not say it's a common charting error.  I
25       would say it's an error that can occur.  I don't
```

```
 1        see it happen very commonly, thank goodness, but it

 2        can occur.  I mean, it's just human --

 3   Q    Well, you saw testimony in this case from

 4        Dr. Bomber, who is the state medical director for

 5        the Department of Corrections, and testified that

 6        it's a very common charting error.

 7   A    He mentioned that in his -- yes.

 8   Q    You saw that in other deposition transcripts;

 9        correct?

10   A    Say it again.

11   Q    Did you see, beyond Dr. Bomber's testimony, any

12        other witness in this case whether it was a

13        defendant or an expert in the case testifying

14        similarly that right left charting errors are

15        common?

16   A    I don't recall who else said that or where else I

17        may have seen that.  I don't remember.

18   Q    Would you disagree with that testimony?

19            MR. McQUILLAN:  Objection.  Form and

20        foundation.

21   A    I go back to my previous answer.  I said it is an

22        error that can occur.  I don't say it's extremely

23        common, thank goodness.

24   Q    Well, that's been your experience in your facility?

25   A    It's been my experience in medicine, period.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                Page 91

```
 1   Q   Have you ever transposed left and right in your
 2       charting?
 3   A   I don't recall.  I would never say never, but I
 4       don't remember if I did.
 5   Q   In rendering your opinions, you had to assume that
 6       what you read in the records were accurate;
 7       correct?
 8   A   Correct.
 9   Q   And when I say the records, I'm referring to
10       everything you looked at but most specifically, the
11       medical records in this case; correct?
12   A   Correct.
13   Q   By way of example with regard to the entry from
14       August 7 of 2012 involving the palpable mass, you
15       determined in your mind that the charting that was
16       done on that date was done accurately; correct?
17   A   I guess I would ask you what you mean by
18       accurately.
19   Q   You took what was written down to be accurate;
20       correct?
21   A   Oh, that is correct, yes.
22   Q   In other words, you assumed that Dr. Bhavsar
23       accurately recorded which side of Mr. Franklin's
24       body had the palpable mass; correct?
25   A   Correct.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                    Page 92

```
 1   Q   Did you see after that date, after August 7 of
 2       2012, multiple medical records where it's reported
 3       that the mass that was being evaluated was
 4       cancerous had been on Mr. Franklin's neck since
 5       August of 2012?
 6   A   Well, once -- in the records, it essentially states
 7       that Mr. Franklin reported by his history that the
 8       mass -- I guess it was in October of '13 to the
 9       nurse that it had been there for over a year,
10       15 months or whatever it was, for over a year at
11       that point.  So that was based on his history, not
12       on anything else.
13   Q   Right.  And that history was, quote, the mass being
14       detected in August of 2012; correct?
15           MR. McQUILLAN:  Objection to foundation.
16   Q   Go ahead and answer.
17   A   Well, that would be per Mr. Franklin's comments.
18   Q   Correct.  Did you disregard Mr. Franklin's reports
19       in the medical records that followed August 7,
20       2012?
21   A   I'm not quite understanding what you mean.  Did I
22       disregard the records?
23   Q   Did you --
24   A   I'm not sure I --
25   Q   Did you disregard his report that the mass that was
```

STOLTZ, M.D., RANDALL
07/19/2018                                                        Page 93

```
 1    being evaluated in October of 2013 and dates

 2    thereafter had been there since August of 2012?

 3         MR. McQUILLAN:  Objection.  Argumentative.

 4  Q  Go ahead and answer.

 5  A  I guess in my opinion from reading the facts in the

 6    records, obviously it's speculation.  Once again,

 7    Mr. Franklin may have felt he had some kind of lump

 8    in his neck.  Whether it was left or right, I don't

 9    know.  But he reflects he thought it was, you know,

10    the same area back 13 months ago.  It may not have

11    been the same area.  Who knows for sure.

12  Q  Did you take into account Mr. Franklin's repeated

13    reports that are contained in multiple medical

14    records after August of 2012 that the mass had been

15    there since August 2012?  Yes or no?

16         MR. McQUILLAN:  Objection to foundation.

17  Q  Go ahead and answer.

18  A  I can't -- I don't know.  Don't know.  Obviously

19    Mr. Franklin came in and out of different

20    facilities after that point and he was examined on

21    multiple occasions, and there was no mention and

22    actually no complaint by Mr. Franklin of any kind

23    of medical problem or lump in his neck, and it was

24    never mentioned on any examinations after that

25    point.
```

```
1   Q   Let me rephrase my question.  Or let me have the

2       court reporter read my question back.  I want you

3       to listen carefully, and I want you to answer the

4       question I've asked you.  And if you cannot answer

5       it, tell me you can't answer it.

6           MS. STAMLER:  May I have the question back,

7       please?

8           (The requested material was read back by the

9       court reporter.)

10          MR. McQUILLAN:  Objection to foundation and

11      mischaracterizes the evidence.

12  A   I took that into account when I reviewed the

13      information, yes, I took that into account.  But

14      like I mentioned previously, it doesn't match up

15      with all the other examinations and other

16      depositions of Dr. Bhavsar or however you pronounce

17      it, but sure, I took that into consideration.

18  Q   In rendering your opinion, you focused in on

19      Dr. Bhavsar having written a certain side of his

20      body; correct?

21  A   Yes.

22  Q   All right.  Now --

23          MR. McQUILLAN:  While we have a second, just

24      for the court reporter, this doctor who starts with

25      a B that we've gotten multiple pronunciations, it's
```

```
 1        spelled B-h-a-v-s-a-r.
 2            MS. STAMLER:  We'll get the spellings at the
 3        end.  Okay?  We'll be happy to give them to you.
 4        Thank you for that clarification.  I'm sure I'm
 5        butchering how to pronounce it.
 6   Q    Doctor, do you agree that there could be additional
 7        information that may exist beyond the documents
 8        that you reviewed that would alter your opinion in
 9        this case?
10            MR. McQUILLAN:  Object to foundation.
11   A    I base my opinion on the records I had.  If there's
12        other information, then I do have the ability to
13        change my report and change my opinion.
14   Q    When you were reviewing the documents that you've
15        listed in your report, did you have any questions
16        about what you were reviewing as you reviewed them?
17   A    I don't think so.  I don't recall specific
18        questions right now.
19   Q    Did you, after completing your review of the
20        records, have any unanswered question?
21            MR. McQUILLAN:  Objection to the extent it
22        seeks to elicit privileged attorney work product or
23        attorney-client communications.
24   Q    Go ahead and answer.
25   A    Once again, there's always unanswered questions
```

```
 1      that you never know.  Did Mr. Franklin tell the

 2      truth?  Why did he never complain about his issues

 3      for 13 months?  I mean, the common layperson, you

 4      and I, if you had a mass in your neck that was

 5      growing over a period of time, you would go to the

 6      doctor immediately.  You wouldn't wait a year and a

 7      half later type thing.  So, you know, sure, those

 8      are questions I had.

 9   Q  Are you familiar with the notion, Dr. Stoltz, that

10      inmates do not seek medical care because they think

11      it may delay parole?

12         MR. McQUILLAN:  Object to foundation.

13   Q  Is that something you're familiar with as a

14      correctional medicine doctor?  Yes or no?

15   A  I only take care of jail inmates.  So I'm not

16      really familiar with how prison inmates think

17      necessarily; although, I saw that in his comments.

18   Q  Do you know whether there was any other evidence in

19      this case regarding that particular topic?

20         MR. McQUILLAN:  Objection to form and

21      foundation.

22   Q  Go ahead and answer.

23   A  I'm not sure where or what you're talking about,

24      actually.

25   Q  It's fair to say, sir, you don't know anything
```

STOLTZ, M.D., RANDALL
07/19/2018                                                            Page 97

```
 1      about the Michigan Department of Corrections policy

 2      or the Carson City Correctional policy regarding

 3      inmates that are under medical care and how it

 4      might relate to their parole; correct?

 5   A  Correct.

 6   Q  Therefore, you can't really render an opinion as to

 7      why a person like Mr. Franklin might not have

 8      sought medical treatment; correct?

 9   A  I don't know.  Correct.

10   Q  Did you ever consider, Doctor, in rendering your

11      opinion that Mr. Franklin may not have sought

12      medical care for the mass that was on his neck

13      because Dr. Bhavsar never made a big point about

14      it?

15          MR. McQUILLAN:  Objection to the form and

16      mischaracterizes the evidence.  Foundation.

17   Q  Go ahead.

18   A  Well, that, I don't know.  Sometimes you can tell

19      patients things.  You don't document every word for

20      word what you tell a patient in the record.  So I

21      don't know what all Dr. Bhavsar told Mr. Franklin,

22      and I don't know -- don't know.  Can't say.

23   Q  Right.  It's possible, is it not, Doctor, that one

24      of the reasons Mr. Franklin may not have sought

25      medical treatment for the mass on his neck for many
```

```
 1      months could be because Dr. Bhavsar didn't make it

 2      out to be a big issue; correct?

 3          MR. McQUILLAN:  Objection to form.

 4      Foundation.  Mischaracterizes the evidence.

 5   Q  Go ahead and answer.

 6   A  Well, I'd say that's speculation.  I mean, I can't

 7      speculate that or not.  Who knows what he said or

 8      -- he said, who said, what said.  I don't know.

 9   Q  Prior to rendering your opinion in this case, did

10      you believe you had sufficient information to

11      render an opinion?

12   A  I felt based on the records that I had and the

13      sequence of events, that I had enough information

14      to base my opinion on, yes.

15   Q  Did you ever request any additional materials from

16      the defense prior to rendering your opinions?

17          MR. McQUILLAN:  To the extent that that seeks

18      to elicit attorney-client or work product doctrine,

19      I object to privilege.

20   Q  Go ahead and answer.

21   A  Say the question again.

22   Q  Sure.  Did you request any additional materials

23      from the defense prior to rendering your opinions?

24          MR. McQUILLAN:  Same objection.

25   A  And, actually, I don't recall.  It's been over a
```

STOLTZ, M.D., RANDALL
07/19/2018                                                              Page 99

```
 1      year and a half since I started on that -- a year

 2      or so since I started on this case.  I don't

 3      recall.

 4  Q   Did you consult with anyone other than your lawyer

 5      -- I'm not asking about any conversation you had

 6      with the attorneys.  Did you consult with anybody

 7      prior to writing your report?

 8  A   No.

 9  Q   Did you consult with anybody while you were writing

10      your report?

11  A   No.

12  Q   Did you consult with anybody after you drafted your

13      report and before you finalized it?

14  A   No.

15  Q   When you inserted the words deliberate or

16      deliberately indifferent in your report, where did

17      you get that language from?

18          MR. McQUILLAN:  Objection.  Asked and

19      answered.

20  A   I answered that previously.

21  Q   I'm sorry.  I did not hear your answer.

22  A   I said we discussed it, and I answered that

23      previously.

24  Q   Okay.  That was based on your years in the

25      correctional medicine field and being at seminars?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                           Page 100

```
 1              MR. McQUILLAN:  Objections.  Mischaracterizes
 2         the testimony.  The court reporter can read back
 3         the portion where he testified that the language
 4         about deliberate indifference came from plaintiff's
 5         complaint.
 6    Q    Is that the only place you got that language from,
 7         Doctor?
 8              MR. McQUILLAN:  Objection to form.
 9    Q    Go ahead and answer.
10    A    That's where I got it from, the complaint.
11    Q    It's your testimony in this case, sir, that you had
12         not heard the term or read the term deliberate
13         indifference prior to seeing the complaint in this
14         case?
15              MR. McQUILLAN:  Objection.  Mischaracterizes
16         the witness' testimony.
17    Q    I'm asking the question.  Have you seen that phrase
18         prior to seeing the plaintiff's complaint in this
19         case?
20    A    Yes, and we had a long discussion about that
21         earlier.
22    Q    So you have seen the term deliberately indifferent
23         in materials other than the complaint in this case
24         and you've seen them in connection with your work
25         as a correctional medicine doctor; correct?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 101

```
 1           MR. McQUILLAN:  Objection.  Compound question.
 2      Form.
 3   Q  Can you answer the question?
 4   A  Yes, I've seen that term before.
 5   Q  In your opinion, did Keith Franklin have any
 6      serious medical conditions during the time period
 7      of August 2012 until his death in 2014?
 8           MR. McQUILLAN:  Objection.  Calls for a legal
 9      conclusion.
10   Q  Go ahead and answer.
11   A  Well, he had a significant medical condition with
12      his tonsillar cancer.
13   Q  Anything else?
14   A  Well, it seemed to be connected -- his other issues
15      tend to be connected to that.
16   Q  Such as?
17   A  Such as having to go to therapy -- chemotherapy,
18      getting sick after chemotherapy, possible sepsis
19      and death.
20   Q  To the extent your report contains quotes from
21      medical records, you quoted the report accurately;
22      correct?
23   A  I hope so.
24   Q  I want you to go to page 3 of your report,
25      paragraph 4, and you wrote in part in the first
```

```
 1      paragraph of the Summary of Findings the following:

 2      And read along with me, please as I read this into

 3      the record.

 4           Quote, ? palpable lymph node 2 to 3

 5      centimeters below -- and then in all caps the

 6      words -- LEFT angle of the jaw, closed quote.  Did

 7      I read that correctly?

 8   A  Yes.

 9   Q  And that, sir, was a quote you took from the

10      August 7, 2012, medical record; is that correct?

11   A  Yes.

12           MS. STAMLER:  Court reporter, would you kindly

13      locate Exhibit 3?

14   A  Actually, when we get to a good stopping point, I

15      need to take a break myself.

16           MS. STAMLER:  Okay.  No problem.  We'll go off

17      the record.

18           (A brief recess was taken.)

19           (Exhibit 3 was handed to the witness.)

20   Q  We're back on the record.  Dr. Stoltz, you

21      understand you're still under oath?

22   A  Yes.

23   Q  Did you discuss your testimony while we were on a

24      break?

25   A  No.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 103

1   Q   The court reporter has handed you Exhibit 3 to your

2       deposition.  Have you seen this document before?

3   A   I don't 100 percent recall.  There's so many

4       records.

5   Q   Do you, in reviewing this record, recall the

6       history that's reported on the intake in part

7       includes alcohol and drug screening?

8   A   On the intake history you said?

9   Q   Yes.

10  A   Yes.

11  Q   And this indicates that Mr. Franklin drank beer

12      twice weekly, three drinks?

13  A   Correct.

14  Q   That he was a smoker of one pack for 30 years?

15  A   Yes.

16  Q   You noted his date of birth on this record as being

17      November 3 of '64?

18  A   Yes.

19  Q   Placing him above the age of 40?

20  A   Yes.

21  Q   Is that right?

22  A   Correct.

23  Q   So it's fair to say, Dr. Stoltz, that Mr. Franklin

24      had risk factors for throat cancer, did he not?

25  A   Yes.

STOLTZ, M.D., RANDALL
07/19/2018                                                      Page 104

```
 1   Q   That being his beer consumption, his smoking, and

 2       his age being above the age of 40; correct?

 3   A   Correct.

 4   Q   Did you detect any family history of cancer in

 5       reviewing the records?

 6   A   That, I do not recall offhand.

 7           MR. McQUILLAN:  I'm going to object to the

 8       form.  Patti, are you referring to just Exhibit 3

 9       or the entire record?

10   Q   Oh, no, the entire record.  That one wasn't just

11       for Exhibit 3.  Do you ever remember seeing any

12       record of a family history of cancer?

13   A   I don't recall that offhand, no.

14   Q   All right.  Would that -- that I think you

15       testified would have been part of a risk factor;

16       correct?

17   A   Yes.

18   Q   All right.  I want to now go to Exhibit 4 if the

19       court reporter will be kind enough to hand that to

20       the witness.

21           (Exhibit 4 was handed to the witness.)

22   A   Okay.

23   Q   Do you have that, sir?

24   A   Yes.

25   Q   On this form -- this is a provider visit dated
```

1      August 7 of 2012; is that correct?

2    A   Yes.

3    Q   Have you seen this document before?

4    A   Yes.

5    Q   And this is the provider that Mr. Franklin had with

6        Dr. Bhavsar on August 7, 2012; correct?

7    A   Correct.

8    Q   And on this first page of the document, Exhibit 4,

9        it indicates Mr. Franklin's age is 47 years old;

10       correct?

11   A   Yes.

12   Q   It indicates a smoking history; correct?  Page 2 of

13       the report.

14   A   Oh, I thought we were on page 1.  Yeah, page 2

15       does.

16   Q   Page 2 also notes that he has a history of alcohol

17       use; correct?

18   A   Yes.

19   Q   So at least according to Dr. Bhavsar's report, he

20       recorded several risk factors for neck cancer;

21       correct?

22   A   Those could be, yes.

23   Q   Now I want to turn your attention to page 3 of

24       Exhibit 4, the section that's labeled Physical

25       Exam.  Do you see that section?

STOLTZ, M.D., RANDALL
07/19/2018                                                                Page 106

```
 1   A   Yes.

 2   Q   And do you see that there are multiple areas for

 3       physical exam.  First of being Constitutional:

 4       Head/face, eyes, ears, nose, throat, mouth.

 5   A   Yes.

 6   Q   Right?

 7   A   Yes.

 8   Q   On the section that's head/face, eyes, ears, nose,

 9       mouth, throat, is that frequently abbreviated to

10       the capital letters of HEENT?

11   A   Yes.

12   Q   And that is separate and distinct from, at least on

13       this form for the physical exam, neck and thyroid;

14       correct?

15   A   They separate it separately, yes.

16   Q   Okay.  All right.  And on this form I want to read

17       into the record what it states.  "Inspection

18       reveals symmetry.  No thyromegaly or thyroid

19       nodules detected.  No cervical adenopathy.

20       Comments: ? palpable lymph node 2-3 cm below L

21       angle of jaw."  Did I read that correctly?

22   A   Yes.

23   Q   That is a verbatim quote of what's in the medical

24       record on that section marked Neck/Thyroid;

25       correct?
```

```
 1   A   Yes.

 2   Q   Does the words in all capitals LEFT appear in that

 3       entry?  Yes or no?

 4   A   No.

 5   Q   You in your report misquoted the medical record;

 6       correct?

 7   A   No.

 8   Q   You don't know?

 9   A   No, I did not misquote it, no.  I put the record

10       l-e-f-t, left to make -- make -- actually, I should

11       have added brackets.  Probably left -- forgot to

12       leave the brackets off, but it showed L as left.

13       To make it clear --

14   Q   Well, the word left -- you inserted the word left

15       into the quote.  Yes or no?

16   A   Yes, I did.

17   Q   Are you able to tell, Dr. Stoltz, from the entry

18       that Mr. -- Dr. Bhavsar made on August 7 of 2012

19       texture of the palpable lymph node?

20   A   No.

21   Q   Are you able to determine whether it is mobile or

22       fit?

23   A   No.

24   Q   Are you able to, from the entry that was made,

25       determine the size?
```

```
 1   A   No.

 2   Q   Are you able to determine the shape?

 3   A   No.

 4   Q   You're able to determine, are you not, that it was

 5       asymmetrical since it's listed for only being on

 6       one side; correct?

 7           MR. McQUILLAN:  Object to foundation.

 8   A   It appears so.

 9   Q   Go ahead and answer.

10   A   It appears that way, yes.

11   Q   Are there any other hallmarks of a palpable mass

12       that should have been reported in this record that

13       we haven't covered?

14           MR. McQUILLAN:  Objection to foundation.

15   Q   Go ahead and answer.

16           MR. McQUILLAN:  Oh, also it mischaracterizes

17       the record.  It says palpable lymph node.  It does

18       not say palpable mass.

19   Q   Doctor, do you think there's a distinction between

20       a palpable lymph node and a palpable mass?

21   A   It's hard to say.  Unless you're the doctor

22       actually examining the person at the time, it's

23       hard to say.

24   Q   So it's fair to say that a palpable lymph node

25       could be a palpable mass; is that right?
```

```
 1   A   It could be either one.

 2   Q   You record a palpable lymph node.  I think you've

 3       testified that there's no size noted here, correct,

 4       from your standpoint?

 5   A   Correct, correct.

 6   Q   There's no record of what the skin looked like

 7       around the lymph node area; correct?

 8   A   Correct.

 9   Q   There's no record of whether the skin was warm to

10       the touch; correct?

11   A   Correct.

12   Q   Now, you indicated in your note that Mr. Franklin

13       was seen at the Reception and Guidance Center with

14       nursing staff on day one, which would have been

15       August 6th; correct?

16   A   Yes.

17   Q   And then you said a "bubble" followup visit was

18       done the next day.  Is that what you wrote?

19   A   Yes.

20   Q   Where did you get that term bubble from?

21   A   Somewhere in the record that was -- I didn't make

22       that term up.  It was somewhere in the record.  I

23       don't remember where.

24   Q   Does it show anywhere on this form of August 7,

25       2012, that the visit he had on that date was a
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                   Page 110

```
 1      bubble visit?

 2   A  I don't see it on this form, but I -- that's a term

 3      I've not heard before.  That's why I put it in

 4      quotes there.  They called it a bubble visit.

 5   Q  And are you confident the bubble visit happened on

 6      August 7 of 2012?

 7   A  That's where I recall it from.

 8   Q  It says that a complete physical examination --

 9      this is in your report on page 3 -- done by

10      Dr. Bhavsar on August 7 of 2012 pertaining to the

11      complaint.  What complaint are you referring to

12      there?

13   A  Well, I was referring to the plaintiff's complaint

14      about being a mass in his neck.

15   Q  Okay.  Now, you indicate that Mr. Franklin was

16      scheduled to see Dr. Bhavsar for a clearance

17      physical exam on August 21 of 2012; is that right?

18   A  Yes.

19   Q  All right.  Now, I want to turn your attention to

20      the last part of this Exhibit 4 and ask you if

21      there's anything that you saw in the assessment or

22      plan indicating any followup he intended to do on

23      the palpable lymph node?

24   A  Well, I see under plan, number 2, medical provider,

25      MP, followup at med clearance or as needed.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 111

```
 1    Q   And where does that address the palpable lymph

 2        node?

 3    A   Well, it does not specifically say that.

 4    Q   Do you recall Dr. Bhavsar's testimony regarding

 5        whether he created a plan for followup on palpable

 6        lymph nodes?

 7    A   I don't believe he had a specific plan documented.

 8    Q   I now want to turn your attention to Exhibit 5, if

 9        the court reporter would hand it to the witness,

10        please.

11           (Exhibit 5 was handed to the witness.)

12    A   Yes.

13    Q   Dr. Stoltz, this is a representation, a photograph

14        with writing -- or typing on it, if you will, that

15        says lymph nodes of the head and neck.  Do you see

16        that?

17    A   Yes.

18    Q   Have you seen this document before?

19    A   No.

20           MR. McQUILLAN:  I'm going to object to

21        foundation.

22           MS. STAMLER:  I'm sorry?

23           MR. McQUILLAN:  I'm objecting to the

24        foundation of the exhibit.  I just want to note it

25        for the record.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                              Page 112

 1  Q  It was an exhibit to other depositions.  So are you

 2     saying you never saw the exhibits that may have

 3     contained this document?

 4         MR. McQUILLAN:  Is that a question for me or

 5     for the witness.

 6  Q  I'm asking Dr. Stoltz if he ever saw this as part

 7     of an exhibit to a deposition?

 8  A  No.

 9  Q  Have you seen representations of the lymph nodes

10     that appear in the head and neck during your

11     medical career?

12  A  Sure.

13  Q  Is this an accurate representation of the lymph

14     nodes of the head and neck?

15  A  Yes.

16  Q  Are you, sir, able to tell me based upon the

17     medical record of August 7, 2012, where the

18     palpable lymph node was located on this exhibit?

19         MR. McQUILLAN:  Objection to form.  You're

20     referring to two exhibits and then you said this

21     exhibit.  Could you clarify?

22  Q  Can you tell me based on the entry made on

23     August 7, 2012, where on Exhibit 5 the palpable

24     lymph node was located?

25  A  Well, it would actually be two to three centimeters

STOLTZ, M.D., RANDALL
07/19/2018                                                        Page 113

```
 1        below the left angle of the jaw.  So it would be

 2        below the ear, back where the angle of the jaw is

 3        and be back in that area somewhere.  Although it

 4        did not say it was for sure a lymph node.  It was a

 5        questionable palpable lymph node.

 6   Q    So understanding your testimony, is that closest to

 7        the line marked tonsillar?

 8   A    That's the only tonsillar line near that area you

 9        have marked there.  Actually, the -- this is the

10        right side of the neck on this picture you have.

11   Q    Right.  But we transposed the image and put it on

12        the left side.  That would be closest to the

13        tonsillar lymph nodes depicted there?

14   A    Probably in the general ballpark area.

15   Q    Now I want to turn your attention to Exhibit 6 if

16        the court reporter would be kind enough to hand

17        that to you, Dr. Stoltz.

18            (Exhibit 6 was marked for identification.)

19   A    Okay.

20   Q    Take a moment, if you would, to review it and let

21        me know when you're done.  Have you finished

22        reviewing?

23   A    Yes.

24   Q    All right.  Now, Exhibit 6 is the provider visit

25        that Mr. Franklin had with Dr. Bhavsar on August 21
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 114

```
 1       of 2012; correct?

 2    A  Yes.

 3    Q  And you indicated that the palpable lesion was no

 4       longer prevalent.  Is that what you wrote in your

 5       report?

 6    A  I wrote in the report that Dr. Bhavsar testified

 7       that the neck lesion was no longer present.

 8    Q  Does that say that in your report?

 9    A  It says it in my report, yes.

10    Q  Let's look at Exhibit 6.  Do you see any evidence

11       on page 2 on the section marked physical exam that

12       a physical exam of the neck was performed?

13    A  No.

14    Q  In fact, under the physical exam section it reads

15       in part, "Comments:  Complete physical examination

16       performed on 8-7-12."  Correct?

17    A  That's what it states.

18    Q  Pardon me?

19    A  That's what it states.

20    Q  And if you turn to the prior page under the section

21       marked HEENT, that is the section, sir, that

22       pertains to the section of head, eyes, ears, nose,

23       mouth, and throat; correct?

24    A  Yes.

25    Q  It does not pertain to the neck or thyroid area,
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 115

```
 1       does it?
 2    A  No, but commonly in medical documentation, you put
 3       that under HEENT.
 4    Q  Well, sir, looking at Exhibit 4 -- I'm not asking
 5       you what commonly is done.  What did Dr. Bhavsar do
 6       on August 7 of 2012?
 7    A  He separated it out there.
 8    Q  Page 3.
 9    A  He separated it out there.  Typically, you will
10       separate it out if you have a finding.  That's most
11       likely why he did it, I would speculate.
12    Q  You're speculating, aren't you?
13    A  I don't know what his normal practice is.  That's
14       what I would do.  I would separate it out if I find
15       a finding.
16    Q  I'm asking you what Dr. Bhavsar did on August 7.
17    A  He separated it out.
18          MR. McQUILLAN:  I'm going to object to
19       foundation to the extent that Dr. Stoltz wasn't in
20       the room at the time.
21          MS. STAMLER:  I'm sorry.  I really didn't hear
22       your objection, Kevin.
23          MR. McQUILLAN:  Foundation.  That's all.
24    Q  Okay.  Doctor, you have no proof as it relates to
25       what's in Exhibit 6 that Dr. Bhavsar wrote anything
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 116

```
 1      in Exhibit 6 reflecting an examination of

 2      Mr. Franklin's neck; correct?

 3   A  Correct.

 4   Q  And you read both volumes of Dr. Bhavsar's

 5      testimony in this case, didn't you?

 6   A  Yes.

 7   Q  And you recall, don't you, that Dr. Bhavsar had no

 8      independent memory of Keith Franklin; correct?

 9   A  That's what I recall, yes.

10   Q  And he had no independent memory of performing any

11      examination of his neck on August 21, 2012;

12      correct?

13   A  Right.

14   Q  I did not hear your answer.

15   A  I said right.

16   Q  Did you review the interim transfer summary that

17      was received by Carson City Correctional Facility

18      when Mr. Franklin was transferred there?

19   A  I don't recall offhand right now.  It should have

20      been with the -- I hope with the MDOC medical

21      records.

22   Q  Yes.

23         MS. STALER:  Court Reporter, would you please

24      hand the witness Exhibit 7, please.

25
```

```
 1              (Exhibit 7 was handed to the witness.)

 2   A   Okay.

 3   Q   It's two pages.  The first page is a summary of

 4       information that was sent Mr. Franklin to Carson

 5       City Correctional Facility; correct?

 6   A   Yes.

 7   Q   Page 2 is an intake form that appears to have been

 8       completed by a nurse on August 31, 2012.  Did you

 9       review that?

10   A   Yes.

11   Q   Did you see any evidence on this form that the

12       nurse did a physical examination of Mr. Franklin?

13   A   Only took a history, which he denied any medical

14       problems at that time.

15   Q   Where did you see that there's a denial of medical

16       history on --

17   A   Page 1 under subjective, line 2.

18   Q   That's not a medical history that she took.  That's

19       a summary that came from the transferring facility.

20       I'm asking you about page 2 of Exhibit 7, sir.

21   A   Well, I don't see that on page 2.  I was talking

22       about page 1.

23   Q   I understand.  That isn't the intake form.  That is

24       a summary.

25   A   Well, under subjective, it says, patient has no
```

STOLTZ, M.D., RANDALL
07/19/2018                                                        Page 118

```
 1      medical, behavior health or dental complaint.  I
 2      would presume that's something they're asking the
 3      patient.
 4  Q   Do you know whether she asked him or whether this
 5      was the summary of the information that came from
 6      the transferring facility?
 7  A   I don't know.  Usually subjective means what comes
 8      from the patient.  That's what I would assume.
 9      That's the way medical --
10  Q   You do not know where that information came from,
11      do you?
12  A   I can only look at what the record documents here.
13  Q   And what's it called?
14  A   I'm sorry.  What?
15  Q   What is the first page of Exhibit 7 called?
16  A   It's the receiving transfer summary -- Intrasystem
17      Transfer Summary - Receiving Facility.
18  Q   And you don't know how this information was placed
19      into the record or where it came from; correct?
20  A   Not 100 percent no, I don't.  I don't know exactly
21      how it's done.
22  Q   Turning to page 2 intake form dated August 31,
23      2012.  Is there any reference to a physical
24      examination being performed on that date?
25  A   Just vital signs.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                    Page 119

```
 1   Q   The neck of Mr. Franklin was not examined on that
 2       date; correct?
 3           MR. McQUILLAN:  Object to foundation.
 4   A   No documentation of that here.
 5   Q   Turning to Exhibit 8 if the court reporter would
 6       please hand that to the witness.
 7           (Exhibit 8 was handed to the witness.)
 8   A   Okay.
 9   Q   This is a chronic care visit dated November 16,
10       2012.  And it appears to have been authored by a
11       physician assistant with the last name of
12       Filsinger.  That's page -- the first two pages.  I
13       want to start there.  Did you review this chronic
14       care visit form?
15   A   Yes.
16   Q   And did you indicate that in your report the
17       physician assistant did a physical exam of
18       Mr. Franklin?
19   A   Yes.
20   Q   Did you indicate whether the physician assistant
21       actually did a physical exam of Mr. Franklin's
22       neck?
23   A   In my report I said there's no mention of any lymph
24       node or neck issues.
25   Q   What I want to ask you now looking at Exhibit 8,
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 120

```
 1     page 2, did the physician's assistant physically

 2     examine Mr. Franklin's neck as it relates to what

 3     he reported in his report?

 4  A  Not that is documented specifically.

 5  Q  There's no reference to checking his neck; correct?

 6  A  Correct.

 7  Q  Turning to the next page of Exhibit 8, this is a

 8     chronic care visit dated June 6th of 2013.  This is

 9     a three-page report, also generated by the

10     physician assistant Filsinger; correct?

11  A  Yes.

12  Q  And you indicated in your report that on this date,

13     there was no mention of neck problems; is that

14     right?

15  A  Yes.

16  Q  Did you determine in reviewing this report dated

17     June 6th, 2013, whether the physician assistant

18     examined Mr. Franklin's neck?

19  A  Well, I would want to clarify actually from the

20     previous exam and this exam both.  In medical

21     practice, whether it be in an office practice on

22     the outside or inside a jail situation or prison,

23     you -- you actually base your examination on

24     complaints of the patient.  And if you see the

25     patient says he has no problems or concerns, then
```

```
 1        you see him for his general chronic care visit,
 2        which is for his infectious disease hepatitis C and
 3        his hand deformity or whatever.  You don't -- you
 4        may not examine the neck at all.  There's no reason
 5        to examine the neck if he has no complaints of any
 6        neck issues.  You focus your examination on
 7        complaints.  You don't do a full head to toe
 8        complete physical exam.  You don't see a groin on
 9        here.  You don't see an anal exam on here.  You
10        don't do those things unless there's complaints in
11        regards to that area or if you're seeing them for
12        that chronic care problem.
13   Q    Thank you, Doctor.  I didn't ask you all that, but
14        I appreciate your explanation.  Now let's go back
15        since you brought that up.
16   A    Sure.
17   Q    On November 16th, 2012, he was there for a chronic
18        care visit; correct?
19   A    Correct.
20   Q    A physical examination was performed, wasn't it?
21   A    Yes.
22   Q    Respiratory was checked.  Cardiovascular was
23        checked.  Abdomen was checked.  His musculoskeletal
24        was checked.  Psychiatric was checked, wasn't it?
25   A    Yes.
```

```
 1   Q   No check of the neck; correct?

 2   A   No.

 3   Q   Turning to June 2013, a physical exam was

 4       performed, was it not?

 5   A   Yes.

 6   Q   And although he was there for a chronic care visit,

 7       a physical exam was performed, was it not?

 8   A   Yeah.  I would call it a brief physical exam, but

 9       yes.

10   Q   Well, the lumbar spine was evaluated, wasn't it?

11   A   Yes.  And the reason is because there was a

12       specific complaint.  The pain is located in his low

13       back and is not radiating to his legs.  So they

14       actually did a more extensive exam because that was

15       part of his history or present illness when he

16       presented that day.

17   Q   The respiratory system was examined; correct?

18   A   Yes.

19   Q   His cardiovascular was checked; correct?

20   A   Yes.

21   Q   His abdomen was checked; correct?

22   A   Yes.  And I'll be willing to bet that that's part

23       of the standard -- every time they come in for a

24       chronic care visit, most likely they probably get

25       the general systems checked.
```

```
 1   Q   Did I ask you that, Doctor?  I'm not asking you to

 2       speculate.  I would really appreciate it if you

 3       would simply answer the question I'm posing to you.

 4           MR. McQUILLAN:  And Counsel, we'd appreciate

 5       it if you refrain --

 6           MS. STAMLER:  We will get through this a lot

 7       quicker.

 8           MR. McQUILLAN:  We would appreciate it --

 9           MS. STAMLER:  I did not ask you to state -- I

10       did not ask you to take a bet on whether this was

11       or wasn't a standard examination.

12           MR. McQUILLAN:  And we would --

13           MS. STAMLER:  You don't know that and you are

14       speculating; correct?

15           MR. McQUILLAN:  We would appreciate it if you

16       would refrain from your argumentative tone.

17           MS. STAMLER:  I'm not argumentative.  I'm

18       trying to get him to answer my questions.

19   Q   Doctor, you do not know if this is a standard

20       routine physical exam or not, do you?

21           MR. McQUILLAN:  The record will reflect that

22       plaintiff's counsel is screaming on the phone

23       currently.

24           MS. STAMLER:  I am not screaming.  That is

25       absurd, Kevin, and you know it.
```

| | | |
|---|---|---|
| 1 | Q | Doctor, can you answer my question? |
| 2 | A | I can say I'm not probably 100 percent speculating |
| 3 | | because it's the same thing listed on each one of |
| 4 | | these.  It's probably a medical electronic record. |
| 5 | | Each one of these things are listed on the record |
| 6 | | at each one of the visits because it's the same |
| 7 | | thing both times, unless there's a specific |
| 8 | | complaint. |
| 9 | Q | You're speculating; correct? |
| 10 | A | No. |
| 11 | Q | So you know definitively that's the standard that's |
| 12 | | done every time; correct? |
| 13 | A | I see that in the record.  It speaks for itself. |
| 14 | | That's all I can say. |
| 15 | Q | All right.  Let's go to the next portion of |
| 16 | | Exhibit 8.  We're now at August 6th of 2013.  This |
| 17 | | is a provider visit scheduled.  His chief complaint |
| 18 | | is infectious disease; is that right? |
| 19 | A | Yes. |
| 20 | Q | Physical exam was performed; correct? |
| 21 | A | Yes. |
| 22 | Q | Was there a review of systems done on this date? |
| 23 | A | Yes. |
| 24 | Q | Has there been a review of systems done on the |
| 25 | | prior chronic care visits? |

STOLTZ, M.D., RANDALL
07/19/2018                                                                          Page 125

```
 1    A   Well, this was not a chronic care visit.  It

 2        doesn't say.

 3    Q   Had there been a review of systems done on

 4        November 16, 2012?

 5    A   Yes.

 6    Q   That was a chronic care visit?

 7    A   Yes.

 8    Q   So all chronic care visit forms are not identical,

 9        are they?

10            MR. McQUILLAN:  Objection to foundation.  Go

11        ahead, Doctor.

12    A   The way I read the visits here, the first two were

13        chronic care visits.  The last one was not a

14        chronic care visit.  It was a provider visit

15        scheduled.

16    Q   And the chronic care visits that was the first of

17        the two that we went over also did a review of

18        systems, didn't it?

19    A   Yes.

20    Q   The second one did not; correct?

21    A   No, the second one did too.  All three of them did.

22    Q   Did a review of systems?

23    A   On the June 6th, 2013, visit?  Page 1 down at the

24        bottom, review of systems.

25    Q   Okay.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 126

1           MR. McQUILLAN:  Doctor, for the record, why
2       don't you state which page of the entire exhibit it
3       is since we're dealing with several medical records
4       here.
5           THE WITNESS:  Page 3 of Exhibit 8.
6           MR. McQUILLAN:  Thank you.
7    Q  Doctor, on August 6th of 2013, was a physical exam
8       performed?  Yes or no?
9    A  August 6th of 2013, yes.
10   Q  You see that recorded on the form; is that right?
11   A  Yes.
12   Q  And does this physical exam form in terms of the
13      top look identical to the prior physical exam forms
14      that are part of Exhibit 8?
15   A  Yes.
16   Q  So were the extremities physically examined on
17      November 16th of 2012 and June 6th of 2013 as far
18      as the physical exam?
19   A  Musculoskeletal.
20   Q  So it's written differently, isn't it?
21   A  It's the same area you're covering, I guess.  There
22      was a specific complaint on the one on June 6,
23      2013, of back problems.  So it goes into more
24      detail in the musculoskeletal section of the back
25      and spine evaluation.

STOLTZ, M.D., RANDALL
07/19/2018                                                                          Page 127

```
 1   Q   Is the back an extremity?

 2   A   You usually include it in the musculoskeletal

 3       system, the spine, the extremities.

 4   Q   Pardon me?

 5   A   The back is included in the musculoskeletal system.

 6   Q   That wasn't my question.  Is the back an extremity?

 7           MR. McQUILLAN:  Asked and answered.

 8   Q   Is that a yes, it is an extremity?

 9   A   It's a part of the musculoskeletal evaluation.

10   Q   So is that a yes?

11   A   The spine is not an extremity.

12   Q   Looking at the physical exam that was performed on

13       August 6 of 2013, was Mr. Franklin's neck examined?

14       Yes or no?

15   A   No.

16   Q   Now I'm turning to Exhibit 9.  Let me know when you

17       have that in front of you.

18           (Exhibit 9 was handed to the witness.)

19   A   Okay.

20   Q   All I want you to do at this point is look at the

21       first two pages of Exhibit 9 and let me know when

22       you're done reviewing it.

23   A   Okay.

24   Q   Are you finished looking at the first two pages of

25       Exhibit 9?
```

```
 1   A   Yes.

 2   Q   Have you seen this document before?

 3   A   Yes.

 4   Q   And you've noted it in your report; correct?

 5   A   Yes.

 6   Q   And you sort of paraphrase her entry as being a

 7       mass in his right neck that was five to six times

 8       larger than a year ago.  That's what you wrote;

 9       correct?

10   A   Correct.

11   Q   That's not really what she wrote in her report, did

12       she?  She wrote in part, noted patient has a large

13       firm nodule on R side of neck.  States he had it

14       evaluated one year ago in August and it is now 5-6

15       times larger.  Did I read that portion of that

16       entry correct?

17   A   Yes.

18   Q   You omitted that he had reported it and it had been

19       evaluated one year prior in August which would have

20       made it August of 2012; correct?

21   A   Yes.

22   Q   And he's reporting it's now five to six times

23       larger; correct?

24   A   That's what the record states.

25   Q   Did it occur to you, Doctor, that it was possible
```

STOLTZ, M.D., RANDALL
07/19/2018                                                              Page 129

```
 1     upon reading Dr. -- I'm sorry, nurse Harold's entry
 2     that Dr. Bhavsar had placed the mass that he
 3     detected in August of 2012 on the wrong side of
 4     Mr. Franklin's neck?
 5  A  That is speculation.  It's he say, her say, who
 6     say, what say.
 7  Q  It's not speculation if you take as being accurate
 8     Mr. Franklin's report to Nurse Hearld; correct?
 9        MR. McQUILLAN:  Objection.  Foundation.
10  Q  Go ahead and answer.
11  A  Repeat the question, please.
12        MS. STAMLER:  May I have the question read
13     back?
14        (The requested material was read back by the
15     court reporter.)
16        MR. McQUILLAN:  Same objection.
17  A  I find it speculation in the fact that if he's had
18     -- like I said previously in the deposition here,
19     if he had this mass progressively enlarged in a
20     years plus time period and has never been mentioned
21     in any other visits and no complaints of it, it
22     seems odd to me that all of a sudden he would bring
23     it up at this point.
24  Q  Did he even bring it up to the nurse at this point
25     or not?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 130

```
 1   A   I don't know.

 2   Q   Well, let's look at the record.  What's the

 3       presenting chief complaint noted on the first page

 4       of Exhibit 9?

 5   A   Genitourinary/renal.

 6   Q   He was not there with a complaint about his neck;

 7       correct?

 8   A   Well, under the comments under objective, I don't

 9       know if he brought it up or if she found that.  I

10       don't see a physical exam saying that -- under the

11       objective, it doesn't say examination prior to the

12       comments.  I don't know who brought that up.  I

13       don't know.

14   Q   Well, he was there with a chief complaint noted,

15       not the neck; correct?

16   A   Well, I have patients all the time in my jail come

17       in with one complaint, and then the next thing you

18       know, they have ten more when they come and sit on

19       the exam table.  All the time.  That happened to me

20       yesterday.

21   Q   I'm not asking about what you have experienced in

22       the jail that you're working in.  I'm asking what's

23       in this record, Doctor.  I'm not asking you to

24       speculate what might have happened.  What does the

25       record here state?  That his chief complaint was
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 131

```
 1    not about his neck; correct?

 2         MR. McQUILLAN:  Objection.  The record speaks

 3    for itself.

 4  Q  Go ahead and answer.

 5  A  I already answered that.

 6  Q  Did you read as part of the entry that he had not

 7    asked for treatment because he was concerned it

 8    would hold up his parole?

 9  A  Yes.

10  Q  When you read that statement in tandem with the

11    fact that it wasn't observed that as a chief

12    complaint that it's possible that the nurse

13    detected this and not Mr. Franklin complained about

14    it?

15         MR. McQUILLAN:  Objection to foundation.

16  Q  Go ahead and answer.

17  A  You could speculate that.

18  Q  Would you, Doctor, consider the finding of a large

19    firm nodule on the side of a neck of a patient who

20    has a history of smoking and drinking and had it

21    there one year prior and is now five to six times

22    larger a serious medical condition?

23         MR. McQUILLAN:  Objection.  Calls for a legal

24    conclusion.  Also mischaracterizes the evidence.

25    Foundation.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                           Page 132

```
 1   Q   Go ahead and answer.

 2   A   Well, if a patient came in to me and said he had a

 3       lump on his neck that had been there for a year and

 4       it progressively enlarged and I felt it, I would

 5       probably be concerned that something is going on

 6       here that needs to be investigated.

 7   Q   You wouldn't ignore it, would you?

 8   A   No.

 9   Q   Would you immediately seek an x-ray?

10   A   It all would depend on exactly what it felt like to

11       me.  I would have to put all the history together,

12       but I might.

13   Q   Well, based on what's in this report of

14       October 9th, 2013, a large firm nodule on the right

15       side of his neck and evaluated one year prior and

16       it's now five to six times larger, would you

17       immediately seek an x-ray?

18   A   Something could be done looking for a soft tissue

19       mass.  It could be done, yes.

20   Q   So you would follow the order of seeking an x-ray;

21       is that right?

22   A   I think it's a reasonable thing, especially in many

23       of these places have x-ray on site.  I don't know

24       if they do or not there.  I don't recall.  But if

25       there's x-ray on site, that'd be a reasonable thing
```

1    to do.

2  Q  If it's on site, would you expect it to have been

3     done that day or the next day?

4  A  Well, within a few days.

5  Q  What's a few?  Three?

6  A  I mean, it depends on -- I don't know how it's set

7     up there.  It depends on when the x-ray tech is on

8     site.  I mean, some places they're only there once

9     a week.  I don't know what the setup is there.  But

10    within a reasonable time frame.  Within a week or

11    two.  I wouldn't wait two months to get an x-ray.

12 Q  So you're perfectly comfortable with having an

13    x-ray done on October 22 of 2013 when this lump

14    that had been there for, as reported, one year

15    prior and it's now five to six times larger.  Is

16    that your testimony?

17       MR. McQUILLAN:  Objection to foundation.  You

18    can answer.

19 A  Yeah, I would say if it's been there for a year,

20    two or three weeks is not going to make a big huge

21    difference in how fast you get it evaluated.

22 Q  Did you ever hear, Doctor, the medical opinion as

23    to whether the sooner you treat cancer, the better

24    the prognosis?

25 A  Sure.

```
 1   Q   The sooner you diagnose cancer, the sooner you can

 2       begin treating cancer?

 3           MR. McQUILLAN:  Objection.  That seems to be

 4       outside this witness' expertise.  You've already

 5       asked him and he's already answered that he's not

 6       an oncologist.

 7   Q   Are you following your lawyer's advice and you're

 8       not going to answer that question?  You can't

 9       answer that?

10           MR. McQUILLAN:  I just stated an objection.  I

11       didn't give any instruction either way.  Doctor, if

12       you want to answer it, you can go right ahead.

13   A   What was the question again?

14           MS. STAMLER:  Can I have the question, please?

15           (The requested material was read back by the

16       court reporter.)

17   A   That's probably true of any condition.  The sooner

18       you diagnose diabetes, the sooner you can treat it.

19   Q   I'm not -- I would really appreciate it if you

20       would confine your responses to the question I'm

21       posing.  I'm not asking about diabetes.  I'm asking

22       about cancer.  Is your answer yes, the sooner you

23       diagnose it, the sooner you can treat it?

24   A   I would say the sooner you diagnose any condition

25       is -- you can take action on it as soon as you
```

STOLTZ, M.D., RANDALL
07/19/2018                                                      Page 135

```
 1      diagnose.

 2   Q  And that would include cancer --

 3   A  That would include cancer, yes.

 4   Q  -- correct?  I want to turn your attention to the

 5      next page of Exhibit 9 entitled X-Ray Requisition.

 6      Do you see that?

 7   A  Yes.

 8   Q  Do you see that Dr. Holmes did not order an x-ray

 9      until October 16 of 2013; is that right?

10   A  It appears that way.

11   Q  Do you know that the x-ray was not performed until

12      October 22nd of 2013; correct?

13   A  Yes.

14   Q  Do you see anywhere in the ordering of the x-ray by

15      Dr. Holmes that he requested that this be done

16      urgently?

17   A  No.

18   Q  Continuing to the next page, which is an

19      administrative note, directing your attention to

20      when the x-ray was going to be taking place, it

21      confirms that it is going to occur on October 22,

22      2013; correct?

23   A  Yes.

24   Q  This is how many days after Nurse Hearld documented

25      the mass?
```

1    A   About two weeks.

2    Q   And that in your opinion, Doctor, as a correctional

3        medical expert is acceptable; is that right?

4    A   Well, once again, I would -- mentioned previously

5        this lesion had been there for -- reportedly for

6        15 months.  Two weeks is not going to make a huge

7        difference in anything if it's been there for over

8        a year.

9    Q   Now, would you agree or disagree with the

10       proposition that the fact that the mass was in

11       there for over a year might require that it be

12       addressed more urgently, not less urgently?

13   A   It's like anything, the sooner the better.  It

14       depends on when you can get things done.

15   Q   And, therefore, waiting to get an x-ray is not in

16       the patient's best interest, is it?

17   A   I think it depends on the time frame.  I mean, I

18       don't think two weeks is a problem.  If it'd been

19       two months, it might be a different problem.

20   Q   Turning your attention -- I'm going to skip a page

21       because it's just a clinical progress note

22       indicating that the x-ray was ordered but now going

23       to the next page is a radiology report; correct?

24   A   Yes.

25   Q   Now, in your practice as a family medicine

```
 1      physician and as a correctional medicine doctor, do
 2      you order x-rays for masses?
 3   A  I might.
 4   Q  Pardon me?
 5   A  Yeah, I might.
 6   Q  Might.  I'm asking you have you done that?
 7   A  Oh, I'm sure I have over the years.
 8   Q  In your opinion, is that a test to determine what
 9      the mass is?
10   A  If I'm concerned about a mass, it's not the best
11      test.  It doesn't look at soft tissue lesions as
12      well as a CAT scan or MRI scan would.
13   Q  So it would be correct to say -- correct me if I'm
14      wrong -- that a better test would have been an MRI
15      or a CT scan to determine what that mass was;
16      correct?
17          MR. McQUILLAN:  Objection to foundation.
18   Q  Go ahead and answer.
19   A  Well, I feel at some point that needs to be --
20      obviously it's one step at a time.  So you got the
21      plain x-ray first and went from there.
22   Q  I'm sorry.  So you are saying the x-ray is the
23      first test you should do.  Is that your testimony?
24   A  There's no -- you know, medicine is an art and a
25      science.  There's no 100 percent way you do things
```

```
 1      every time for everybody.  It depends on the
 2      situation.  I wasn't there at the time.  I wasn't
 3      doing the examination of the person.  You know, it
 4      all depends on the gut feeling of the physician or
 5      the provider at the time what he or she feels is
 6      the best thing for the patient to start the
 7      management process of the concerned area.
 8  Q   Are you familiar with the software system called
 9      UpToDate?
10  A   Yes.
11  Q   Do you use that routinely in your practice?
12  A   At times.  Not routinely but at times.
13  Q   You're familiar with the systems in that you put in
14      information regarding a particular set of symptoms
15      and it gives you guidance on what you do as far as
16      testing and followup; is that right?
17  A   It does, yes.  It can.
18  Q   Pardon me?
19  A   It can, yes.
20  Q   Are you familiar with the UpToDate system as it
21      pertains to masses found on a person's neck?
22  A   No.  I've not used that for that lately.
23  Q   So you would not be able to testify as to whether a
24      mass of this specific size requires a specific type
25      of Endogen; is that correct?
```

```
 1  A  No.  That's correct.  Yeah, I don't know exactly
 2     what UpToDate says regarding that at this point
 3     today.
 4  Q  And do you recollect as you sit here today what
 5     Dr. Mathis testified in that regard?
 6  A  I don't have his report in front of me, but I do
 7     remember him mentioning something about four
 8     centimeters or greater.
 9  Q  But you don't recall what type of tests should be
10     done with what type of size of mass; correct?
11  A  I don't have that in front of me.  I remember him
12     mentioning the MRI, but I don't remember the
13     details of what was in his report.
14  Q  And, therefore, you can't comment or opine with
15     regard to his opinion on that issue; correct?
16  A  Yes.  Correct.
17  Q  Continuing now with Exhibit 9.  The next page is a
18     provider visit dated October 23, 2013.  Do you see
19     that document?
20  A  Yes.
21  Q  Have you seen this before?
22  A  Yes.
23  Q  This is a document authored apparently by
24     Dr. Holmes; correct?
25  A  Yes.
```

```
 1   Q   And he writes in part that he's -- that the

 2       patient's there for neck pain and frequency of

 3       urination; correct?

 4   A   Yes.

 5   Q   Then he says that -- I'm skipping to the next line.

 6       About the lump on his neck, that it's been there

 7       15 months ago and is getting bigger and it's not

 8       painful.  Do you see an inconsistency there, that

 9       he complains of neck pain but it's not painful?

10   A   Well, I see -- the patient first noticed this

11       15 months ago.  It's getting bigger and it's not

12       painful.

13   Q   Do you see earlier in the summary he's there for

14       neck pain?

15   A   Yes.

16   Q   Do you see an inconsistency in this record?  Yes or

17       no?

18   A   Yes.

19   Q   Now, part of what Dr. Holmes notes on this report

20       -- on the neck/thyroid exam is the size of the

21       mass; correct?

22   A   Yes.

23   Q   I'm now on page 2 of his report.

24   A   Yes.

25   Q   Indicates it's four centimeters in diameter;
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 141

```
 1      correct?

 2  A   Yes.

 3  Q   Indicates it's not freely mobile; correct?

 4  A   Yes.

 5  Q   That it's rubbery in texture and is affixed to the

 6      underlying structures; correct?

 7  A   Yes.

 8  Q   Records that it's not thyroid as it does not move

 9      with thyroid gland in swallowing maneuver and it

10      feels deep to the SCM; correct?

11  A   Yes.

12  Q   What does SCM stand for?

13  A   Sternocleidomastoid muscle.

14  Q   In your review of that entry, Doctor, do you have

15      an opinion as to whether what Dr. Holmes charted on

16      that date was a suspicion of a cancerous mass?

17  A   In my opinion, it was suspicious.  He puts in his

18      notes down below there's a suspicious neck mass.

19  Q   Do you agree with that opinion?

20  A   Yes.

21  Q   And you agree that that mass required further

22      evaluation; correct?

23  A   Correct.

24  Q   In your mind, what is the mass suspicious for?

25  A   My speculation would be that the doctor was
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                          Page 142

```
 1      suspicious for cancer.

 2  Q   Would you agree from a medical perspective that

 3      that condition was a serious condition, medical

 4      condition?

 5          MR. McQUILLAN:  Objection.  Calls for a legal

 6      conclusion.

 7  Q   Go ahead and answer.

 8  A   Well, once again, I would say it has the potential

 9      to be a significant medical problem that needs to

10      be evaluated, yes.

11  Q   And you would agree with me given the size, the

12      length of time, texture, all of the other

13      descriptions that are contained in Dr. Holmes'

14      entry of this date indicated that this be evaluated

15      promptly; correct?

16  A   Correct.

17  Q   And in your mind, how prompt is promptly?

18  A   Well, it's sometimes different in a correctional

19      institution because there's processes and

20      procedures you have to go through to get approvals

21      and scheduling and set up to have CAT scans, MRI,

22      whatever outside testing done.  So it's not like

23      something as simple as doing it today.

24  Q   What is your answer, Doctor?  How prompt is

25      promptly?
```

```
 1   A   I don't know in that actual situation in that
 2       prison how long it takes to get that scheduling
 3       done, but I would hope within a matter of a few
 4       weeks it could be done.
 5   Q   A matter of a few weeks would be acceptable from
 6       your standpoint.  Is that your testimony?
 7   A   At the longest, a few weeks.
 8   Q   The longest is two weeks you said?
 9   A   No.  I said within a few weeks, I would hope it
10       could be done.
11   Q   Well --
12   A   Within two to three weeks, I would hope.
13   Q   -- I want to be -- I want to be clear, Dr. Stoltz,
14       on your testimony.  When you say a few weeks, are
15       you saying three weeks, 21 days?
16   A   In an ideal situation, you would hope it could be
17       done within a week, but like I said, in a
18       correctional institution, it's not always that easy
19       to get it done within a matter of days.  Sometimes
20       it takes several weeks to get something like this
21       set up.  I would hope within a matter of two,
22       three, four weeks at the most it would be done.
23   Q   I understand what you're saying.  I appreciate your
24       testimony.  I am trying to figure out your opinions
25       here.  In what you would deem to be prompt medical
```

```
 1        care for a person with this documented mass of

 2        about four centimeters maximum in diameter and with

 3        the descriptions that is contained in the report by

 4        Dr. Holmes, you would want the CT scan done within

 5        one week, if possible; correct?

 6   A    In my own private practice, I would hope so.  The

 7        thing is also that Dr. Holmes put him on a round of

 8        antibiotics to see if that would make any

 9        difference.  If for some lucky reason, within a

10        matter of a week, ten days, the antibiotics shrunk

11        it down and it was gone, you don't need to proceed

12        with further testing.

13   Q    You wouldn't have waited for the antibiotic to do

14        the CT scan in a private practice; correct?

15   A    I might -- well, I might wait a week to see what it

16        would do.  It all depends on the patient.  You

17        know, if you know your patient, if it's a patient

18        I've taken care of for 20 years, I know their

19        reliability, I know everything, it's a lot

20        different from somebody in a jail/prison situation.

21        They're not your long-term patient.  You don't know

22        them necessarily, how much can you fully believe

23        their whole story.  It's speculation.  A lot of

24        this is speculation.

25   Q    I'm not asking you to speculate.  I'm asking you
```

```
 1      for your medical opinion on what would be
 2      appropriate in terms of promptness to get a CT scan
 3      done.  What I think I heard you say is that based
 4      on your knowledge in the correctional medicine
 5      field, inmates -- it takes longer for inmates to
 6      get CT scans done.  Is that what you're testifying?
 7   A  Typically it does.
 8   Q  And did you review in the context of Dr. Holmes'
 9      request for a CT scan to be ordered that -- I'm
10      still on Exhibit 9.  I apologize.  I'm skipping
11      ahead to past the end of Dr. Holmes' report after
12      his medication orders where he ordered the
13      Penicillin, and now I'm on the consultation
14      request.  Do you see that form?
15   A  Yes.
16   Q  And this is the form that Dr. Holmes sent to the
17      Department of Corrections to get a referral;
18      correct?
19   A  Apparently so, yes.
20   Q  And it's fair to say that Dr. Holmes did not make
21      an urgent request for this CT scan; correct?
22   A  Other than the fact he noted CT scan of neck to
23      evaluate worrisome neck mass, which sometimes
24      triggers a thought of this needs to be done quicker
25      than average.
```

1    Q   Do you see that it was requested as urgent or not?

2    A   I don't know where that's -- where you would put

3        that on at.  I don't know how that -- that works.

4    Q   Did you see in the testimony of Dr. Holmes that he

5        did not make his request urgently or any other

6        requests for consultation urgently?

7    A   I believe that's what he said, yes.

8    Q   Do you know when the CT scan was actually

9        performed?

10   A   On 11-21-13.

11   Q   And where did you find that document?

12   A   Actually, it was in my report.  I don't know where

13       the document is offhand.

14   Q   Okay.  Before we get to the MRI or CAT scan,

15       rather, I just want to finish up on Exhibit 9.  Did

16       you see that prior to the CAT scan being done

17       another x-ray was performed?

18   A   The one on 10-30?

19   Q   Yes.

20   A   Yes.

21   Q   Do you have any notion of why that was ordered?

22   A   Don't know.  Except -- well, I could -- I could

23       actually --

24   Q   Sorry.  Go ahead.

25   A   No.  Just one second here.

```
 1   Q   I'm having a hard time hearing you because I think
 2       you're moving some papers.
 3   A   Well, the first x-ray on 10-22-13 was just a basic
 4       cervical spine x-ray that looked at the bones
 5       themselves, so to speak.  But the one on 10-30 was
 6       a specific one for soft tissue of the neck, AP and
 7       lateral views, but it was looking more to see if
 8       you could see any kind of mass in the neck on plain
 9       x-rays, looking at soft tissues, whether it be a
10       foreign body present or something else going on in
11       the neck.  I'm sure it was ordered because they
12       wanted to make sure they could see it in the soft
13       tissues.
14   Q   Okay.  Going to the next exhibit, which is 10.
15           (Exhibit 10 was handed to the witness.)
16   A   Yep.
17   Q   Do you see that there's a clinical progress note
18       dated October 30th reflecting that a 407 for the CT
19       of the neck was sent and that x-rays were ordered?
20   A   Yes.
21   Q   Correct?
22   A   Yes.
23   Q   And I think we've already gone over this.  This is
24       another consultation form.  I believe two were
25       submitted for the CAT scan.  And, again, on this
```

```
 1      Exhibit 10, page 2, the request is done routinely;
 2      correct?
 3   A  This is the same as the other -- same as the other
 4      form.  It's not a different request.
 5   Q  There were two forms submitted.
 6   A  Oh, okay.  One by the nurse and one by Dr. Holmes.
 7   Q  Okay.  And, again, it appears to be done routinely;
 8      correct?
 9   A  I don't know where on this form you mark urgent or
10      routine.  I don't know if there is a special place.
11      I don't know how their forms worked.
12   Q  Based on earlier testimony of your review of the
13      transcript in this case, Dr. Holmes testified he
14      always done routine referrals; correct?
15   A  Correct.
16   Q  All right.  Continuing to the next page dated
17      November 5, 2013, and this is a health assessment.
18      And this is -- it appears to be a review of the
19      soft tissue neck x-ray; is that correct?
20   A  Yes.
21   Q  Are you there?
22   A  Yes.
23   Q  Okay.  Do you know when Mr. -- you may have
24      testified to this.  I apologize -- Mr. Franklin
25      actually had the CT scan performed?
```

```
 1   A   I don't have the report in front of me, but it says
 2       it was scheduled on 11-21-13.
 3   Q   Okay.  How long after was that from the time when
 4       Nurse Hearld detected the mass on the right side of
 5       his neck?
 6   A   About six weeks.
 7   Q   How long after the first x-ray that was performed
 8       did that occur?
 9   A   The first x-ray was on 10-22.  So it was about a
10       month later.
11   Q   Now, returning -- I'm sorry.  Turning to the very
12       last page of Exhibit 10.
13   A   Okay.
14   Q   It indicates that the CT had occurred, right --
15   A   Yes.
16   Q   -- on November 22nd.  Do you see what Dr. Holmes
17       wrote after that -- I'm sorry, Dr. Carrel.  Forgive
18       me.  This is an entry by Dr. Carrel.  Did it say
19       quote, I scheduled a visit next month to discuss
20       the result, closed quote?
21   A   Yes.
22   Q   When did Dr. Carrel see Mr. Franklin?
23   A   On December 13th, about a couple weeks later.
24   Q   Twenty-three days after the CAT scan was obtained;
25       right?
```

```
 1   A   Well, Dr. Holmes saw him three days later.

 2   Q   Dr. Holmes saw who three days later?

 3   A   Well, actually, Dr. Holmes reviewed the CT report

 4       three days after it was done.

 5   Q   Right.  But Dr. Holmes did not see Mr. Franklin

 6       then, did he?

 7   A   No.  He actually made referrals for ENT and biopsy

 8       and started the process for further evaluation.

 9   Q   That wasn't my question.  When was Mr. Franklin

10       next seen to discuss the results of the CT scan?

11   A   I'd have to look at other parts of the record to

12       make sure about that.

13   Q   Did you put that in your report?

14   A   I said Dr. Holmes reviewed the CT on 11-25 which

15       showed the possible neoplasty process of the neck

16       and made a referral for ENT and biopsy.  And put an

17       ENT specialist, Dr. Greenberg, on -- he was seen on

18       January 6th.

19   Q   That wasn't my question.  Did you record in your

20       record the next time Mr. Franklin was seen

21       following the CAT scan?

22   A   I said Dr. Carrel saw Mr. Franklin on 12-13-13 for

23       a provider visit.

24   Q   Okay.  So in between the time that Mr. Franklin had

25       the CT scan done and the results were in, 23 days
```

```
 1      elapsed before he saw another doctor; is that

 2      right?

 3   A  Well, yeah, it appears before he saw somebody, but

 4      he actually had things in the process of getting

 5      referrals prior to that it appears from the record.

 6   Q  Can you answer my question?  Is it correct that the

 7      next time Keith Franklin saw a doctor regarding the

 8      mass was on December 13, 2013, 23 days after the CT

 9      results were in?  Yes or no?

10          MR. McQUILLAN:  Object to foundation.

11   Q  Go ahead and answer.

12   A  That's what I have in my report.

13   Q  Is that a yes?

14   A  Yes.

15   Q  All right.  If the court reporter would please hand

16      the Exhibit 11 to the witness.

17          (Exhibit 11 was handed to the witness.)

18   Q  Have you seen Exhibit 11 before?

19   A  Yes.

20   Q  And, again, this is a -- the first two pages of

21      this pertain to a consultation request that

22      Dr. Holmes made for an ENT to do a biopsy of the

23      suspicious mass of the right neck; correct?

24   A  Correct.

25   Q  Based on your review of the transcript of
```

```
 1        Dr. Holmes, he testified that this request was made

 2        routine and not urgent; correct?

 3   A    Correct.

 4   Q    The date of this ENT request was November 25, 2013;

 5        is that right?

 6   A    Yes.

 7   Q    Do you know what date the appointment with

 8        Dr. Greenberg was made?

 9   A    On January 6th.

10   Q    Do you see it on page 2?

11   A    January 6, '13.

12   Q    How many days after the CT scan results were in was

13        the appointment scheduled for Dr. Greenberg to

14        occur?

15   A    Approximately six weeks.

16   Q    And that's a time frame that was approved by

17        Dr. Holmes; is that correct?

18   A    I don't know how that approval process works.  I

19        mean, he put the referral in.  I don't know who

20        schedules the appointments.  I don't know how long

21        it takes for the ENT -- to get into their office.

22        So I don't know how long --

23   Q    Let me direct your attention to page 2 of the

24        exhibit.  See where it says the appointment date

25        and time?
```

```
 1   A   Yes.

 2   Q   And who it's to be with.  What's the last thing it

 3       says -- that appears in that sentence.  Time frame

 4       approved by Dr. Holmes.  Did I read that correctly?

 5   A   Yes.

 6   Q   So Dr. Holmes, at least according to this document,

 7       and I believe he testified accordingly, approved a

 8       six-week time frame for Mr. Franklin to be seen for

 9       a biopsy; correct?

10   A   According to this document.

11   Q   Is it your opinion, Doctor, that a six-week delay

12       between the CAT scan results and getting a biopsy

13       performed is acceptable?

14           MR. McQUILLAN:  Objection to form and

15       foundation.

16   Q   Go ahead and answer.

17   A   Well, I just base it on my experience.  Even in my

18       hometown here, to get somebody from private

19       practice or even in -- from the jail.  To see an

20       ENT, it can take two or three months sometimes.

21       Six weeks is probably pretty quick, honestly.

22       They're busy.  They don't put people in within two

23       weeks when you call and set an appointment up.

24   Q   So is it your testimony -- do you know anything

25       about Jackson, Michigan?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                    Page 154

```
 1   A   I do not.  Never been there.

 2   Q   Do you know anything about the patient population

 3       or the physicians that are available in Jackson,

 4       Michigan?

 5   A   No.

 6   Q   You can't testify whether six weeks is reasonable

 7       or not, can you, in Jackson, Michigan?

 8   A   No.  I don't know.

 9   Q   And is it your testimony, Doctor, that you've never

10       had a patient with a mass of this size in the neck

11       area with all the other characteristics noted in

12       the medical records to have an expedited biopsy

13       done?

14   A   I would love to get a biopsy done within a week,

15       but unfortunately, it's the way the process of

16       medicine works many places.  You've got to schedule

17       appointments.  You've got to go through all the ins

18       and outs of the processes -- the approvals.  I

19       mean, insurance even, preauthorization, the right

20       provider is on your list, et cetera, et cetera,

21       et cetera.  It's a headache out there.

22   Q   Can you answer my question?  Have you ever had a

23       patient with a neck mass that was four to five

24       centimeters in size that had been there for

25       approximately a year with the characteristics noted
```

```
 1        in Mr. Franklin's record get an expedited biopsy?

 2        Yes or no?

 3   A    I don't think I've ever had the opportunity to get

 4        an expedited quick biopsy in a matter of a few

 5        weeks, no.

 6   Q    What's the fastest time you've had a biopsy

 7        performed on a patient with a neck mass of this

 8        size that had been present for roughly a year?

 9             MR. McQUILLAN:  Objection to foundation.

10   A    About the only time I can get it expedited is if

11        someone is actually admitted to the hospital and

12        they're seen in the hospital on an urgent basis.

13   Q    Is that because of the area that you reside in?

14   A    I don't know.  I'd be interested in calling every

15        ENT office in your area and see how fast they could

16        get in there.  I would be surprised they could get

17        in within two weeks unless the ENTs are not very

18        busy there.

19   Q    You'd be surprised if you could get in within two

20        weeks?

21   A    That would surprise me.

22   Q    Do you know what the standard of care is in this

23        situation in that you're not an oncologist or an

24        ENT?

25   A    I'm not an oncologist or an ENT.  I mean,
```

STOLTZ, M.D., RANDALL
07/19/2018                                                      Page 156

```
 1      obviously, the sooner the better for everything.
 2   Q  Right.  But you don't know what the standard of
 3      care is with those specialties; correct?
 4         MR. McQUILLAN:  Objection to form.  Vague.
 5   Q  Go ahead and answer.
 6   A  Like I said, the sooner, the better for everything
 7      in a situation such as this.  But in practical
 8      terms, there's a lot of other factors that go into
 9      it.  Scheduling appointments, getting approvals,
10      getting custody.  This, this, this, things set up.
11   Q  Would you agree with this proposition, Doctor, that
12      inmates in the correctional facilities that you've
13      cared for are at a disadvantage of getting prompt
14      medical care because of all the layers that they
15      have to go through to get approval?
16         MR. McQUILLAN:  Objection.  Form.  Foundation.
17   Q  Go ahead and answer.
18   A  I would say at times there's a disadvantage.  Some
19      specialists won't see inmates or they'll put them
20      at delayed times or whatever.  They're probably at
21      a disadvantage.  So are people without insurance in
22      the community.  You can't --
23   Q  You understand, Doctor, being in a correctional
24      medicine field of expertise that inmates have a
25      constitutional right to medical care?
```

1   A   Yes.

2   Q   Do you understand that their constitutional right

3       to medical care is equivalent to those people who

4       are not incarcerated?

5   A   Yes.

6           MR. McQUILLAN:   Objection.   Calls for a legal

7       conclusion.

8   Q   Now, I want to turn your attention, Doctor, to

9       Exhibit 12 if the court reporter will please hand

10      that to you.

11          (Exhibit 12 was handed to the witness.)

12  A   Okay.

13  Q   I want to direct your attention to the first two

14      pages of Exhibit 12.   You've seen this document

15      before; correct?   Hello?

16  A   I was looking to verify.

17  Q   Have you seen this before?

18  A   Yes, yes, yes.

19  Q   Okay.   This is a medical record indicating a

20      provider visit scheduled February 13, 2014.   Does

21      it indicate in this record in part that

22      Mr. Franklin saw Dr. Greenberg on February 10,

23      2014?

24  A   Yes.

25  Q   That was about four months after Nurse Hearld

```
 1      documented the mass on October 9 of 2013; correct?

 2  A   Correct.

 3  Q   And in your opinion, that was not a delay that

 4      constituted deliberate indifference; correct?

 5          MR. McQUILLAN:  Objection.  Trying to elicit a

 6      legal conclusion and mischaracterizes the

 7      testimony.

 8  Q   Go ahead and answer.

 9  A   I'm not trying to make a legal conclusion on

10      deliberate indifference.

11  Q   Do you think that getting a biopsy performed four

12      months after a mass of this size and all the other

13      characteristics that were noted, that meets the

14      standard of care?

15          MR. McQUILLAN:  Objection.  Form.

16  Q   Go ahead and answer.

17  A   I would say it's not an ideal situation, but when I

18      look at all the information involved, including

19      weather in Michigan and the ENT cancelled

20      appointment because their office was closed or

21      whatever, weather delays, some things are beyond

22      the control of the medical staff.

23  Q   Did you see anything in your review of the records,

24      Doctor, where any physician that was treating

25      Mr. Franklin did anything to get him in to see
```

STOLTZ, M.D., RANDALL
07/19/2018                                                      Page 159

```
 1      Dr. Greenberg in an expedited fashion?  Yes or no?
 2           MR. McQUILLAN:  Objection to form and
 3      foundation.
 4   Q  Go ahead and answer.
 5   A  I guess what I saw in the record was the fact that
 6      they put in the request.  They kept the process
 7      going to get the patient in to see the specialist
 8      for further evaluation.
 9   Q  Did you see anything in the records, Doctor, that
10      either Dr. Holmes or Dr. Carrel did anything to
11      expedite Mr. Franklin being seen by Dr. Greenberg?
12      Yes or no?
13   A  Once again, I did not see the word expedited, but
14      they actually did make appointments.  They did put
15      in 407s.  They did make sure the guy was getting in
16      to get his care.  There's things beyond their
17      control, scheduling, custody, et cetera, weather
18      delays that they can't control.
19   Q  Did you read anything in the records or in the
20      deposition transcripts where either Dr. Carrel or
21      Dr. Holmes made any effort to call Dr. Greenberg or
22      have anybody on behalf of Mr. Franklin reach out to
23      Dr. Greenberg to get an appointment earlier than
24      either of the two dates that were scheduled?  Yes
25      or no?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                        Page 160

1            MR. McQUILLAN:  Objection to form.

2       Foundation.

3    Q  Go ahead and answer.

4    A  I do not recall seeing that, no.

5    Q  Now, turning to page 2 of Exhibit 12, do you see

6       under the neck thyroid/area "comments"?

7    A  Yes.

8    Q  Do you see that?  Do you see it says 11 by 5

9       centimeter R neck mass at the angle of the jaw?

10   A  Yes.

11   Q  Do you see that?

12   A  Yes.

13   Q  You understood that the first mass that was noted

14      by Dr. Bhavsar was also at the angle of the jaw?

15   A  Yes.

16   Q  Do you in reading these comments believe that the

17      mass that was documented by Nurse Hearld had grown

18      since October of 2013?

19   A  Which exhibit was that?

20   Q  The ones with Nurse Hearld.

21   A  Yes.

22   Q  Is that what you're asking?

23   A  Yes.

24   Q  That would have been Exhibit 9.

25   A  I don't know from her notation.

```
 1   Q   What about from the subsequent notes from her entry
 2       to this date of February 13th of 2014, did you
 3       detect any growth from what either Dr. Holmes or
 4       Dr. Carrel had noted in their records?
 5   A   I believe Dr. Holmes stated it was approximately
 6       four centimeters.  Here it says 11 by 5
 7       centimeters.
 8   Q   Would you draw a conclusion from that that the mass
 9       was growing?
10   A   Yes.
11   Q   Now, page 3 of Exhibit 12, you see that this is a
12       report from Dr. Greenberg?
13   A   Yes.
14   Q   Did you review this as part of your opinion?
15   A   Yes.
16   Q   Does it indicate in part that the mass is greater
17       than six centimeters in its greatest diameter?
18   A   Yes.
19   Q   Does it indicate in this report that the patient
20       told this doctor that the mass had been present for
21       19 to 20 months and is growing rapidly now?
22   A   Yes.
23   Q   If we look back in time, 19 to 20 months from
24       February 10 of 2014, does that put that at about
25       August of 2012?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                      Page 162

```
 1   A   Approximately.

 2   Q   With regard to the treatment or the physical

 3       findings section of this report towards the bottom

 4       of this report, do you see what the doctor said,

 5       that the findings were worrisome for a primary

 6       malignant involving the tonsil with regional spread

 7       to the lymph nodes in the right neck area?  Do you

 8       see that?

 9   A   Which paragraph are you on?  Oh, yes, I do.  At the

10       very bottom.

11   Q   Do you see that?

12   A   Yes.

13   Q   Doctor, from a medical standpoint, Mr. Franklin

14       suffered from a serious medical condition.

15           MR. McQUILLAN:  Counsel is that a question or

16       a statement?

17   Q   I'm asking you.  Was he -- I asked you, was he

18       suffering from a serious medical condition at this

19       point in time?

20           MR. McQUILLAN:  Objection.  Calls for a legal

21       conclusion.

22   Q   Go ahead and answer.

23   A   Well, I'm not trying to make a legal conclusion but

24       this is a significant medical problem.

25   Q   Is there a difference in your mind between a
```

```
 1      serious medical problem and a significant medical
 2      problem?
 3   A  It depends on if you're trying to say from a legal
 4      perspective or from medical terminology.
 5   Q  I asked you from a medical perspective.
 6   A  From medical terminology, it's a serious problem --
 7      it's a serious medical problem.
 8   Q  Because it's clear that it appears Mr. Franklin
 9      likely had cancer; correct?
10   A  Correct.
11   Q  Turning your attention to the next page.  That
12      appears to be a form that Dr. Greenberg completed
13      indicating the next set of tests that needed to be
14      done; correct?
15   A  Yes.
16   Q  Following that, there's a chart update.  That form
17      was completed by Dr. Greenberg on February 7th,
18      2014; correct?
19   A  Yes.
20   Q  The next entry that I have is chart update of
21      February 18th of 2014, eight days later; is that
22      right?
23   A  Yes.
24   Q  And that's a chart update by Dr. Carrel indicating
25      he sent out a 407 for EGD; correct?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 164

```
 1   A   Yes.

 2   Q   And as you reviewed Dr. Carrel's testimony, this

 3       request was not made urgently; is that right?

 4   A   I don't recall the actual testimony on that, but I

 5       do recall that they were not sent out urgently in

 6       general.

 7   Q   What is an EGD?

 8   A   Esophagogastroduodenoscopy.

 9   Q   And did you understand that that was something that

10       Dr. Greenberg requested be done?

11   A   Yes.

12   Q   Continuing on to the next page.  There's another

13       request for laryngoscopy and biopsy.  Do you see

14       that?

15   A   Yes.

16   Q   It's fair to say that you saw nothing in the

17       records or in the testimony indicating that this

18       request was made urgently; is that right?

19   A   As far as I know, yes, you're right.

20   Q   Now, turning to the next page, when was the

21       appointment scheduled for Dr. Greenberg for the

22       procedures to occur?

23   A   3-18-14.

24   Q   How much time between the time when Dr. Greenberg

25       issues his report on February 10, 2014, and the
```

```
 1      request for the tests on that same date elapsed

 2      before he was scheduled to see Dr. Greenberg for

 3      those procedures?

 4   A  A little over a month later.

 5   Q  A month and one week; right?

 6   A  Right.

 7   Q  Do you know when the biopsy was actually performed?

 8      I can help you.  We'll get to it in a second.

 9   A  Yeah.  I don't mean have that page.  I was trying

10      to look at the page in front of me.

11   Q  On March 11, 2014, which is the next entry of the

12      chronic care visit?

13   A  Correct.

14   Q  Do you see under physical exam that Dr. Carrel

15      notes that the mass was growing?

16   A  Yes.

17   Q  Under the neck and thyroid?

18   A  Yes.

19   Q  And it says it appears to be growing out and also

20      it is more painful for him?

21   A  Yes.

22   Q  Do you see that?  Turning to the next page, does it

23      indicate that Mr. Franklin had just returned from

24      the biopsy?

25   A  Yes.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 166

```
 1   Q   Continuing -- if we can mark Exhibit 13 now.
 2           (Exhibit 13 was handed to the witness.)
 3           MS. REPORTER:  Can we take a short break?
 4           MS. STAMLER:  Sure.  Absolutely.
 5           (A brief recess was taken.)
 6   Q   Doctor, do you have Exhibit 13 in front of you?
 7   A   Yes.
 8   Q   Okay.  Thirteen is the March 19, 2014, provider
 9       visit unscheduled; is that right?
10   A   Correct.
11   Q   That's the first two pages anyway.  This is his
12       followup to an off site visit with the ENT where a
13       biopsy of his tonsils had been performed and the
14       path was pending; correct?
15   A   Yes.
16   Q   In his report, he indicates that the ENT told him
17       that this was cancer but the path report was
18       pending; is that right?
19   A   Yes.
20   Q   And then on -- continuing to the next chart update,
21       which is March 25, 2014, this was a chart update
22       that was done by Dr. Carrel; is that right?
23   A   Yes.
24   Q   And immediately behind that is the report from
25       Dr. Greenberg dated March 20, 2014; correct?
```

```
 1   A   Yes.

 2   Q   And looking to both the chart update, which appears

 3       to mirror in part Dr. Greenberg's report, it

 4       indicates that Mr. Franklin has squamous cell

 5       carcinoma involving the right tonsil with regional

 6       spread to the right neck area; is that right?

 7   A   Yes.

 8   Q   It's fair to say that Mr. Franklin as of March 20,

 9       2014, was diagnosed with cancer; correct?

10   A   Correct.

11   Q   The diagnosis was of the right tonsil with regional

12       spread to the right neck area; correct?

13   A   Yes.

14   Q   You understand what it means when it says spread to

15       the right neck, is that in the lymph nodes?

16   A   I believe that's what they're referring to, yes.

17   Q   Fair to say from your medical --

18   A   I'm not an oncologist or -- I don't have --

19   Q   No, no, no.  I understand.  I'm not asking you

20       that.  I'm about to ask you a different question.

21   A   Okay.

22   Q   You would agree with me on March 20, 2014, the

23       diagnosis that Mr. Franklin received was from a

24       medical opinion a serious medical condition?

25           MR. McQUILLAN:  Objection.  Calls for a legal
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                Page 168

```
 1      conclusion.
 2   Q  Go ahead and answer.
 3   A  I would -- from a medical perspective, not legal, I
 4      would say it does constitute definitely a serious
 5      medical problem.
 6   Q  Now, from the date that Mr. Franklin was diagnosed
 7      with the squamous cell carcinoma involving the
 8      right tonsil and the regional spread to the right
 9      neck area, when did he first start chemotherapy?
10   A  I don't have the date.  I believe it was not until
11      June.
12   Q  Pardon me?
13   A  He was admitted on June 16th of '14.
14   Q  The chemo began June 19, 2014.  Do you have any
15      reason to dispute that?
16   A  No.  I actually have in my note he was admitted for
17      chemotherapy on June 16th and he started it on
18      June 19th.
19   Q  Right.  And the reason he didn't start sooner was
20      in part because he needed more testing; right?
21   A  Right.  A PET scan.
22   Q  Do you know when the PET scan was originally
23      scheduled to occur?
24   A  I know he had to be rescheduled due to some
25      security issues.  I don't have it right in front of
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 169

```
 1      me what the original date was.  On June 9th, he had
 2      to have -- it was noted by the nurse it had to be
 3      rescheduled due to security issues.
 4   Q  Did you read Dr. Kolvalski's medical records and
 5      her deposition in this case?
 6   A  I did.
 7   Q  Do you recall, Dr. Stoltz, that Dr. Kolvalski
 8      indicated that first seeing Mr. Franklin on
 9      April 7, 2014, she wanted chemotherapy to begin
10      within three weeks, which would have been
11      April 28th; is that right?
12   A  I don't have her record in front of me to verify
13      that.
14   Q  So you don't recall one way or the other?
15   A  I don't right offhand, no.
16   Q  You would agree with me the sooner that
17      Mr. Franklin received chemotherapy given his
18      diagnosis as of March 20, 2014, the better his
19      prognosis?
20   A  Honestly, I'm not an oncologist and the stage of
21      his cancer at that point, I don't know if it would
22      make any difference really prognostically or not.
23      So I can't answer that.
24   Q  You did read Dr. Levin's testimony in that regard;
25      correct?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                            Page 170

```
 1   A   I did read it, but I don't have it right in front

 2       of me right now.

 3   Q   You're not rendering an opinion on that one way or

 4       the other; correct?

 5   A   Like I said, I'm not a specialist from that

 6       category, so I would let them give those opinions.

 7   Q   Let me take a look now at Exhibit 14, please.

 8           (Exhibit 14 was handed to the witness.)

 9   A   Okay.

10   Q   Do you see the first page is a clinical progress

11       note?

12   A   Yes.

13   Q   And on April 7, 2014, Dr. Kolvalski had indicated

14       that Mr. Franklin needs an MRI with dye and

15       radiation oncology.  Do you see that?

16   A   Yes.

17   Q   On the next page April 8th, 2014, Mr. Franklin is

18       seen for an unscheduled visit; correct?

19   A   Yes.

20   Q   Do you know where this provider obtained a

21       diagnosis date of April 8, 2014?

22   A   I don't know where that came from, no.

23   Q   That would not be in keeping with what

24       Dr. Greenberg's record says of March 20, 2014;

25       correct?
```

```
 1   A   Correct.

 2   Q   Continuing to the next -- skipping forward to the

 3       consultation request that was made for the MRI

 4       three pages from the back of this exhibit.

 5           MR. McQUILLAN:  Patti, if your copy has MDOC

 6       Bates numbers, maybe you could read those off just

 7       to make sure that we're talking about the same

 8       thing.

 9           MS. STAMLER:  Sure.  MDOC 0194.

10   A   Okay.

11   Q   On April 7, 2014, Dr. Kolvalski requested that an

12       MRI be ordered.  When was the appointment actually

13       scheduled for Mr. Franklin to have the MRI?

14   A   I see an appointment 4-16-14.

15   Q   This is literally a month after Dr. Greenberg had

16       diagnosed the cancer; is that right?

17   A   One moment.

18   Q   Sir, did you answer?

19   A   I was looking at something.

20           MR. McQUILLAN:  He's reviewing the exhibits.

21   A   But yes, it was about that long after, yes.

22   Q   Continuing on the next page, I'm now on MDOC 184

23       and 185.  That's a chronic care visit dated April

24       14, 2014.  Have you seen this document before?

25   A   Yes.
```

1    Q   And this is a -- these are notes prepared by

2        Dr. Carrel; is that correct?

3    A   Yes.

4    Q   And Dr. Carrel writes his findings on the neck and

5        thyroid; is that right?

6    A   Yes.

7    Q   Would it appear to you from this entry that the

8        masses are growing?

9    A   Yes.

10   Q   Continue to Exhibit 15, please.

11           (Exhibit 15 was marked for identification.)

12   Q   First page is a chart update dated 4-17-14 that's

13       authored by Dr. Carrel indicating in part that he

14       sent out a note to cancel the 407 for radiology

15       nuclear medicine because it was the wrong service.

16       Did I read that correctly?

17   A   That's what it says, yes.

18   Q   Continuing to the second page of this exhibit.

19       It's a chart update from the same date of 4-17-14.

20       And he is comparing the MRI and the CT scan;

21       correct?

22   A   Yes.

23   Q   And did you detect in reading through Dr. Carrel --

24       I'm sorry, the ENT's entry on this date that the

25       masses that were found on Mr. Franklin's neck were

STOLTZ, M.D., RANDALL
07/19/2018                                                                Page 173

```
 1    growing?

 2  A  Yes.

 3  Q  Continuing to the next page.  This is 4-29-14.

 4     This is a chart update dated April 29 indicating

 5     that Mr. Franklin had returned from an off site

 6     appointment on 4-25-14.  Clearly this is a late

 7     entry; correct?

 8  A  Right.  Four days later.

 9  Q  Right.  And in this chart entry, Dr. Carrel

10     indicates that he sent out a request for a PET-CT

11     to occur in May; is that right?

12  A  Yes.

13  Q  And if you turn to the next page -- again, I know

14     you don't have the records necessarily in front of

15     you that are complete, but you do recollect that

16     Dr. Carrel did not request that this PET scan be

17     done urgently; is that right?

18  A  From what the testimony was, yes.

19  Q  And the first PET scan appointment was scheduled

20     for May 19th, 2014; is that right?

21  A  Yes.

22  Q  How many months after the initial diagnosis with

23     cancer was that PET scan scheduled to occur?

24  A  Two.

25  Q  Pardon me?
```

```
 1   A   Two.

 2   Q   Continuing to the next page is a chart update dated

 3       April 30, 2014, with a followup appointment in

 4       May and June scheduled which were inadvertently

 5       combined and so they were reordered.  Do you know

 6       what this is in reference to?

 7   A   Yeah.  I think there was a 407 -- actually, I don't

 8       have it in front of me right now to know exactly

 9       what the combination was.

10   Q   Okay.

11   A   So I guess I'd say no, I'm not 100 percent sure.

12   Q   Do you know whether that caused a delay in his

13       getting tested or treated?

14   A   I don't know 100 percent.

15   Q   Turning to the next page is a form entitled Nurse

16       Protocol.  Are you on that page?

17   A   Yes, yes.

18   Q   This is dated 5-19-2014, and this is in reference

19       to the PET scan being cancelled; correct?

20   A   Yes.

21   Q   Did you see below where it says "assessment:

22       knowledge deficit"?

23   A   Yes.

24   Q   Do you know what that means?

25   A   Well, I presume from reading the objective
```

STOLTZ, M.D., RANDALL
07/19/2018                                                    Page 175

```
 1      information above that he didn't have the proper --
 2      he was told how to prep and what to eat and what
 3      not to eat, and he did not follow all the
 4      recommendations.  Thus, they're saying he had
 5      knowledge deficit of proper prep.  So it wasn't
 6      done at that time.
 7   Q  Continuing to the next page, it's a clinical
 8      progress note from May 19, 2014.  Did you note that
 9      part of the reason his PET scan was rescheduled is
10      because he arrived late?
11   A  That's what it says as well as not following --
12   Q  Do you know who has -- pardon me?
13   A  As well as it says not following prep guidelines.
14   Q  Right.  I said in part because he arrived late;
15      correct?
16   A  Right.
17   Q  Tardiness is not within Mr. Franklin's control, is
18      it?
19   A  No, nor is it the provider's either.
20   Q  Well, it's under the -- whose fault is it if he's
21      late to an appointment?
22   A  Custody.
23   Q  Whose fault is it if a patient isn't informed of an
24      appointment?
25   A  That could be anybody working there.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                    Page 176

1    Q   The person who informs him; right?

2    A   Correct.

3    Q   One of the hallmarks of giving medical care in a

4        prison is to make sure that the prisoner doesn't

5        know that he or she is being taken off site because

6        of security reasons; correct?

7    A   Yes.

8    Q   They could have stayed; correct?

9    A   Yes.

10   Q   Turning to Exhibit 16.

11           (Exhibit 16 was handed to the court reporter.)

12   Q   First page is a chronic care visit dated May 21,

13       2014.

14   A   Yes.

15   Q   As of this date, Mr. Franklin still has not had the

16       PET scan; is that right?

17   A   Correct.

18   Q   Did you notice that in reading this chronic care

19       visit report that Mr. Franklin's cancer is getting

20       worse and his range of motion has decreased?

21   A   Yes.

22   Q   Did you understand in reading these records from

23       May 21, 2014, in the preceding visits that he had

24       that Mr. Franklin was in substantial pain?

25   A   Yes.

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 177

```
 1   Q   Continuing to the next page to the Kite Response
 2       dated June 6th, do you see here that it appears
 3       that Melinda Johnston told Mr. Franklin's mother
 4       about his scheduled PET scan?
 5   A   I don't see where she said that she told the mother
 6       that.  I apologize.
 7   Q   Do you see under detail where it says PET scan
 8       rescheduled due to family member and patient again
 9       aware of the date?
10   A   Yes.
11   Q   It doesn't indicate how they learned that; right?
12   A   Right.
13   Q   Do you know who Dr. Drakovich is?
14   A   No.
15   Q   Did you read any documents related to any report
16       that Dr. Drakovich prepared?
17   A   Actually, I do not believe so, no.
18   Q   Now, are you familiar enough with the effects
19       chemotherapy has on a cancer patient as it relates
20       to their becoming more susceptible infection
21       following chemotherapy?  Do you know anything about
22       that?
23   A   Yes, a little bit.
24   Q   Is it fair to say that cancer patients who get
25       chemotherapy are susceptible to infection and
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 178

```
 1      sepsis?

 2   A  Yes.

 3   Q  And you would agree with me that sepsis is a

 4      serious medical condition?

 5          MR. McQUILLAN:  Objection.  Calls for a legal

 6      conclusion.

 7   Q  Doctor, do you understand sepsis from a medical

 8      perspective is a serious medical condition?

 9          MR. McQUILLAN:  Same objection.

10   Q  Go ahead and answer.

11   A  From a medical perspective, sepsis can be very

12      serious.

13   Q  Do you have any knowledge, Doctor, as to what step

14      or steps should be taken with an individual who is

15      getting chemotherapy to guard against sepsis?

16   A  Well, unfortunately, you can't prevent it

17      100 percent, but you obviously want to check the

18      blood counts, check to make -- if they have a

19      fever, how they're feeling, and see if there's any

20      significant change in their condition.

21   Q  Would you monitor their vital signs such as

22      shortness of breath, chest pain, things like that?

23   A  That could be part of it, yes.

24   Q  What about dehydration?

25   A  It could eventually be part of that.
```

```
 1   Q   What about low blood pressure?

 2   A   That could be a sign of -- it can go along with

 3       sepsis.

 4   Q   So understanding that you can monitor those sorts

 5       of physical symptoms, are there any medications to

 6       your knowledge that can be prescribed to guard

 7       against dehydration following chemotherapy?

 8   A   I'm not so -- I mean, it depends on the situation.

 9       If you're nauseous, you're vomiting, you treat with

10       medication, and if you're not drinking fluids, you

11       encourage fluids.  You may put in IV fluids, those

12       type of things.

13   Q   Are there any medications you're aware of that are

14       used to prevent nausea and vomiting in a

15       chemotherapy patient?

16   A   Yes.

17   Q   Do those include Compazine and Zofran?

18   A   Yes.

19   Q   And are you aware that upon discharge from McLaren

20       Hospital, Mr. Franklin had various prescriptions

21       ordered --

22   A   Yes.

23   Q   -- by the doctor discharging him?

24   A   Yes.

25   Q   Did you understand that two of the prescriptions
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 180

```
 1     were Compazine and Zofran?

 2  A  Yes.

 3  Q  Did you understand upon his return to Carson City

 4     Hospital that Compazine was not filled and was not

 5     given to him?

 6  A  Yes.

 7  Q  Do you understand that Compazine and Zofran treat

 8     aspects of both conditions and work differently?

 9  A  They work differently, but the bottom line is to

10     help control nausea and vomiting.

11  Q  Did you see anything in the August 7, 2012, record

12     where Dr. Bhavsar indicated the palpable lymph node

13     was a lipoma?

14  A  I do not believe so, no.

15  Q  What is the distinction between a lipoma and a

16     palpable lymph node?

17  A  Well, just by palpating, you may not be able to

18     tell the difference.  You may have to -- only be

19     able to tell with a biopsy or incision of biopsy.

20  Q  Do you have any expertise in staging, diagnosing,

21     or treating tonsillar cancer?

22  A  No.

23  Q  Did you read Dr. Kolvalski's discharge summary for

24     Mr. Franklin?

25  A  I did.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                    Page 181

```
 1   Q   And did you read that Dr. Kolvalski indicated that
 2       Mr. Franklin should be placed at Duane Waters?
 3   A   I did see a mention of that.
 4   Q   Did you read her testimony regarding that?
 5   A   I did, but I don't recall exactly the wording.  I
 6       don't have it in front of me.
 7   Q   But did you take into consideration the statements
 8       that she made during her testimony about why she --
 9       her discharge summary stated that Mr. Franklin
10       should be placed at Duane Waters Hospital?
11   A   I don't remember her exact comments.
12   Q   Do you recall that she recommended he be placed
13       there rather than the general prison population so
14       he could be properly monitored?
15   A   I recall something to that degree, yes.
16   Q   Do you remember anything about her testimony in
17       that regard?
18   A   Not in detail right now, no.
19   Q   Do you think that Mr. Franklin would have had
20       better monitoring had he been at Duane Waters
21       Hospital versus being returned to the general
22       prison population?
23   A   I would hope so.
24   Q   And that is because Duane Waters Hospital is a
25       hospital where there's medical personnel monitoring
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 182

```
 1      patients; correct?

 2   A  Correct.

 3   Q  In the general prison system, you don't have

 4      ongoing monitoring of the prisons.  They get

 5      medical care if they're called out for an

 6      appointment or if they seek sick call; correct?

 7         MR. McQUILLAN:  Object to foundation.

 8   Q  Go ahead and answer.

 9   A  Well, it depends.  Most prisons have an infirmary

10      where they take people discharged from the

11      hospital, put them in a more closely observed area

12      until they're stable or released by the provider to

13      go back to the general population.

14   Q  Did Mr. Franklin get placed into an infirmary

15      setting upon his return from chemotherapy?

16   A  I don't know.

17   Q  Well, did you see any record indicating that he was

18      placed in the infirmary upon his return to the

19      prison?

20   A  I don't recall where he was actually placed.

21   Q  Would that make a difference in your opinion?

22         MR. McQUILLAN:  Objection.  Form.  Which

23      opinion?

24   Q  Any opinion in this case.

25   A  Not in my overall opinion of the care or, you know,
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 183

```
 1        the intentional not taking care of him, referring
 2        him, et cetera, that we talked about earlier.
 3   Q    So upon his discharge from McLaren Hospital, you
 4        would have expected him to be placed in an
 5        infirmary for monitoring; correct?
 6   A    Well, I -- I don't know how -- the condition he was
 7        in at the time.  Obviously, even in my note here,
 8        when he came back to the facility, he stated he
 9        felt better than he did prior to leaving the
10        facility.  So obviously he wasn't in terrible
11        distress the day he came back to the DOC.  So it
12        all depends on the situation --
13   Q    Did he -- sorry.  Go ahead.
14   A    I said it all depends on the situation at the time.
15   Q    So you don't -- do you have an opinion one way or
16        the other as to whether he should have had closer
17        monitoring upon his return from chemotherapy?  Yes
18        or no?
19   A    Well, retrospectively, you can say all kind of
20        things, but, you know, like I said, most --
21   Q    That's all we can do here.
22   A    Of course.
23   Q    I'm saying retrospectively.
24   A    In most prisons I go to, like I said, when they
25        come out of a hospital for surgery or whatever
```

1    else, they tend to put in a medical holding area or

2    some kind of more closer observation until they're

3    released or sent back to G.P. by the providers.  I

4    don't know what their policy is up there at the

5    DOC.

6  Q  Did you read Dr. Bomber's testimony regarding the

7    way they now handle cancer patients who are getting

8    chemotherapy upon discharge from chemotherapy?

9  A  I don't recall if I saw that or not.

10 Q  You don't recall that Dr. Bomber testified that

11   after June of 2014, after Mr. Franklin's death,

12   that the policy now is to place individuals at

13   Duane Waters Hospital following discharge from

14   chemotherapy?

15 A  I don't recall what he said, no.

16 Q  Turning your attention to Exhibit 17.

17       (Exhibit 17 was marked for identification.)

18 A  Okay.

19 Q  Page one of Exhibit 17 is a case -- inpatient case

20   management note from the Department of Corrections.

21   It's a clinical note from Ingham Regional Medical

22   Center - McLaren where Mr. Franklin was receiving

23   chemotherapy.  Do you see the entry dated June 23,

24   2014, that he was receiving around-the-clock

25   alternating Compazine and Reglan for nausea and

STOLTZ, M.D., RANDALL
07/19/2018                                                      Page 185

```
 1      vomiting?

 2   A  Improving, yes.

 3   Q  I want to turn your attention to the next page,

 4      which is a Nurse Protocol.  On this form, it

 5      indicates all the medications that Mr. Franklin is

 6      receiving.  Do you see that?

 7   A  Yes.

 8   Q  Do you see anywhere on that medication list drugs

 9      Compazine or generic equivalent?

10   A  No.

11   Q  Turning to page -- the third page of this exhibit

12      which is MDOC28, Nurse Protocol form.

13   A  Yes.

14   Q  Now, Mr. Franklin returned from chemotherapy on

15      June 24; is that correct?

16   A  Yes.  Discharged on 6-23-14.

17   Q  23-14?

18   A  Page one.

19   Q  Thank you.  So he was discharged back to Carson

20      City Hospital -- or Carson City Correctional

21      Facility on the 23rd of June, 2014; is that right?

22   A  From the note, yes.

23   Q  And when is the first time he was seen by a medical

24      person after his return?

25   A  The nursing note is on 6-27-14.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                   Page 186

```
 1   Q   Is that four days later?

 2   A   Apparently.

 3   Q   Is that right?

 4   A   It appears to be that way.

 5   Q   And do you see what his blood pressures are on

 6       June 27, 2014, beginning with the first entry at

 7       9:26 a.m.?

 8   A   Yes.

 9   Q   70 over 45; is that right?  Is that hypotensive?

10       Hello?

11   A   Yes.

12   Q   I didn't hear your answer.

13   A   Yes.

14   Q   It is hypotensive?

15   A   Yes.

16   Q   Are all of the blood pressures that are recorded on

17       6-27 beginning at 9:26 and concluding at 1:15 p.m.

18       indicative of hypotension?

19   A   I don't know what his baseline blood pressure was

20       when he was in the hospital, but it could be.

21   Q   Did you see that based upon what was happening, he

22       was having nausea, vomiting, and diarrhea for four

23       days --

24   A   Yes.

25   Q   -- post chemotherapy?
```

```
 1   A   Yes.

 2   Q   He's dehydrated; correct?

 3   A   Good possibility, yes.

 4   Q   Well, doesn't the medical records show he was

 5       dehydrated?

 6   A   It suggests that.

 7   Q   How soon after Mr. Franklin was seen by the nurse

 8       was a doctor contacted?

 9   A   At 9:26 a.m., there's a note Dr. Carrel was

10       informed of the patient's condition.  Will do

11       verbal orders and start IV fluids.

12   Q   So 9:26 a.m. and you're on page Bates 27 -- MDOC27;

13       is that right?

14   A   I'm on 0029.

15   Q   0029?  I'm on 0027 where it says SOAP Note.

16   A   Okay.

17   Q   Are you on that page?

18   A   Yeah.  I'm on that -- I guess it kind of correlates

19       with 0029 as well.

20   Q   Okay.  Well, I want you to turn to 0027.

21   A   Okay.  Yeah, it's the same -- same note.  Anyway --

22       yeah.

23   Q   All right.  This SOAP Note -- what does SOAP stand

24       for?

25   A   Subjective, objective, assessment, and plan.
```

```
 1   Q   And this was prepared by Dr. -- I'm sorry, Nurse
 2       Newhall?
 3   A   Yes.
 4   Q   Is that correct?
 5   A   Yes.
 6   Q   And this indicates that the nurse was contacted by
 7       the unit officer; is that right?
 8   A   Yes.
 9   Q   And apparently Mr. Franklin was complaining that
10       his tongue felt like it was swelling.  What does
11       that indicate to you, Doctor?
12   A   That's hard to know.  That's subjective from his
13       standpoint.  So I don't know what -- I can't say.
14   Q   What about the complaint of pain with talking and
15       swallowing?
16   A   What about it?
17   Q   What does that indicate?
18   A   He could have swelling in his throat from his
19       cancer, from his tonsils.
20   Q   On the objective section, it says, MP notified of
21       BP.  Do you know what that means?
22   A   Medical providers notified of blood pressure.
23   Q   Did you see in the prior note that we were looking
24       at that the nurse was deeming Mr. Franklin's
25       condition to be emergent?  Hello?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                              Page 189

```
 1   A   Well, I'm just looking.  I don't know where -- what
 2       do you see on the note it talks about emergent?
 3   Q   On the page -- on the page -- two pages before
 4       this, the nurse protocol, does it indicate anywhere
 5       on that form that it was urgent or emergent?
 6   A   Not that I see.
 7   Q   How about the next page?  There's two pages.  If
 8       you continue on the nurse protocol, page two, does
 9       it say emergent/urgent right below his blood
10       pressure result?
11   A   Yeah, under low blood pressure, there's a line that
12       says emergent/urgent.  I don't know what that line
13       means.
14   Q   Would you say that a person who has got a blood
15       pressure of 70 over 45, has been vomiting for four
16       days and has just completed chemotherapy for cancer
17       is reviewed as somebody with potential sepsis and
18       be treated emergently?
19           MR. McQUILLAN:  Objection to form.
20   A   I don't know -- sepsis could be a consideration,
21       but obviously this could be dehydration from not
22       being able to take fluids in.  Nausea, vomiting,
23       diarrhea doesn't necessarily mean sepsis.
24   Q   Did you see that his pharynx and uvula were swollen
25       and had white patches?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 190

```
 1   A   Yes.

 2   Q   Is that in your mind a sign of infection or not?

 3   A   It could be.  He could have thrush.

 4   Q   Can thrush turn into sepsis?

 5   A   Uncommonly, but I never say never.  It could.

 6   Q   Do you think that on June 27, 2014, at 9:26 a.m.

 7       Mr. Franklin was in urgent or emergent need of

 8       medical attention?

 9   A   I'd say yes.

10   Q   And do you know that there was a hospital within

11       two miles of the prison that treated prisoners

12       called the Carson City Hospital?

13           MR. McQUILLAN:  Objection to foundation.

14   A   Yeah.  I don't --

15   Q   Can you answer?

16   A   I don't know that for a fact, but I know that IV

17       fluids were started, which is something you want --

18       that's what you would do.  You would urgently get

19       IV fluids going on somebody dehydrated and

20       hypotensive, which was done by Dr. Carrel's orders.

21   Q   Did I ask you that question?

22           MR. McQUILLAN:  Objection.  Argumentative.

23   Q   I want an answer to my question.  Did you read any

24       medical records in your review of this case showing

25       that Mr. Franklin had previously received medical
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                    Page 191

```
 1     attention at the Carson City Hospital?  Yes or no?

 2  A  Previously received -- I don't know.  Not that I

 3     recall.

 4  Q  Do you recall reading any testimony in this case

 5     from any of the witnesses, expert or otherwise,

 6     regarding the fact that there was a hospital within

 7     approximately two miles of the prison where

 8     prisoners were treated?  Yes or no?

 9        MR. McQUILLAN:  Object to foundation.

10  A  I do remember -- recall reading something to that

11     degree, yes.

12  Q  Do you know whether Mr. Franklin was taken to the

13     closest hospital from the prison to treat his

14     urgent/emergent medical needs?

15  A  Like I said previously, they acted right there at

16     the prison starting IV fluids, which is the first

17     thing you would do anyway.  So they got things

18     begun there.  And then from what I understand, he

19     was transferred to the Duane Waters -- he was

20     stabilized there and sent to Duane Waters for

21     further care.

22  Q  Do you know if Mr. Franklin received emergent

23     medical attention at the closest hospital to the

24     prison?  Yes or no?

25        MR. McQUILLAN:  Object to foundation.
```

1  A  I don't know for sure.

2  Q  And do you know, sir, whether Mr. Franklin was

3     transported by ambulance or by van from the prison

4     to Duane Waters Hospital?

5         MR. McQUILLAN:  Objection.  Form.  Vague.  A

6     van could be an ambulance.  I don't know.  Maybe

7     you want to rephrase your question.

8  Q  Well, a non-ambulance van versus an ambulance, do

9     you know, sir, how he was transported to Duane

10    Waters Hospital?

11 A  I don't have that record in front of me, but I do

12    have in my report on June 27th at 1:24 p.m. Nurse

13    Bush noted that he was in a wheelchair ready to be

14    transferred.  He had no complaints at the time of

15    his departure.

16 Q  I didn't ask you that.  Do you know how he was

17    transported, sir?  Yes or no?

18 A  I don't know the exact method of transportation,

19    no.

20 Q  Were you provided with a transfer blog from the

21    defense attorney in this case?

22 A  I don't recall that.

23 Q  It's not listed in your documents that you reviewed

24    in rendering your opinion; is that right?

25 A  Yeah, I don't recall that at all, no.

```
 1   Q   Would you agree with me that treating sepsis
 2       emergently increases the patient's chance of
 3       survival?  Yes or no?
 4   A   Yes.
 5   Q   Do you know how long between the time when
 6       Dr. Carrel first saw Mr. Franklin being 9:26 a.m.
 7       on June 27th to when he actually got to Duane
 8       Waters Hospital, do you know how much time elapsed?
 9           MR. McQUILLAN:  Objection to form.
10   Q   Go ahead and answer.
11   A   My notes and my report says at 4:47 p.m., PA Longer
12       noted that Mr. Franklin ambulated into the ER
13       without difficulty, and he was stable.  He was
14       given IV fluids and seemed to be doing better.
15   Q   So he got to Duane Waters Hospital at what time?
16   A   I don't have the exact arrival time.  I just
17       note -- a note by the PA there said 4:47 p.m. that
18       he -- Mr. Franklin ambulated into the ER without
19       difficulty and was stable.
20   Q   How much time elapsed between when Dr. Carrel saw
21       Mr. Franklin and when he was supposedly ambulating
22       in the ER in Duane Waters Hospital?
23   A   I have a note here on 0026, it says Dr. Carrel
24       documented -- a document generated at 11:57 a.m.
25   Q   You testified earlier he saw Mr. Franklin at 9:26
```

```
 1      a.m.  Didn't you say that?

 2   A  I said the IV fluids -- actually, I said that the

 3      nurse notified him at 9:26 a.m.

 4   Q  So two hours elapsed between the time of when the

 5      nurse notified Dr. Carrel and Dr. Carrel actually

 6      saw Mr. Franklin.  Is that your testimony?

 7         MR. McQUILLAN:  Object to foundation.

 8   A  If you look at Bates Number 0025, that's what it

 9      says, 11:26 a.m. provider visit per Dr. Carrel.

10   Q  Two hours went by; is that correct?

11   A  Yes.

12   Q  And then he did not get to Duane Waters until --

13      the notation in the ER was what time?  4:00?

14   A  Around 4:00 p.m.

15   Q  So almost another five -- four and a half hours

16      later; is that right?

17   A  Appears to be, yes.

18   Q  Someone with sepsis going that long without

19      antibiotics could cause death, couldn't it?

20         MR. McQUILLAN:  Object to form, vague.

21   Q  Go ahead and answer.

22   A  Well, when I look at the record, there was not a --

23      I mean, there was not the thought of sepsis at the

24      time.  He was actually -- Dr. Carrel's note -- I

25      mean, yeah, Dr. Carrel's note here, the guy was
```

```
 1     talking.  He was stable.  His blood pressure

 2     apparently had improved.  So there wasn't the grave

 3     sepsis opinion or appearance of the patient at that

 4     point.

 5  Q  Let me ask my question again, Doctor, and listen

 6     carefully.  Someone who has sepsis with the delay

 7     of treatment of antibiotics from 9:26 a.m. until

 8     4:00 p.m. could cause someone's death; correct?

 9         MR. McQUILLAN:  Objection to form.

10     Mischaracterizes the evidence and asked and

11     answered.

12  Q  Answer my question.

13  A  I'd say it's pure speculation.

14  Q  Therefore, you can't answer that; is that correct?

15  A  Correct.

16  Q  Did you read a late entry that was prepared

17     by (inaudible)?

18         MS. REPORTER:  I'm sorry.  Could you repeat

19     that?

20         MR. McQUILLAN:  Patti, you kind of broke up in

21     between words there.  Could you try restating that

22     one more time?

23  Q  Sure.  I'm moving on to the next Exhibit 18.  Can

24     you find that?

25
```

1            (Exhibit 18 was marked for identification.)

2    A   Yes.

3    Q   Page 1 of 18 is a clinical progress note; correct?

4    A   Yes.

5    Q   It indicates that Mr. Franklin died on June 29th,

6        2014; is that right?

7    A   Yes.

8    Q   Do you know what his cause of death was?

9    A   I believe sepsis.

10   Q   Did you read an autopsy report related to

11       Mr. Franklin?

12   A   I did.

13   Q   Do you recall that his cause of death was neck

14       cancer and complications thereof?

15   A   Yes.

16   Q   And is it your view that Mr. Franklin's death from

17       sepsis was not preventable?

18   A   I have no comment on that.  It's speculation.

19   Q   You have no opinion on that one way or the other;

20       is that right?

21   A   Correct.

22   Q   Okay.  On page 2 of Exhibit 18 -- did you ever see

23       Jeremy McMullen's name in any medical record that

24       you reviewed prior to this late entry?

25   A   I don't believe so.

STOLTZ, M.D., RANDALL
07/19/2018                                                        Page 197

```
 1   Q  Do you know who he is?

 2   A  I don't know him personally.  He's a nurse

 3      according to this form here.

 4   Q  Do you know if he ever even had contact with

 5      Mr. Franklin?

 6   A  I don't know.

 7   Q  Do you know that this late entry was made the day

 8      after Mr. Franklin was dead?

 9   A  It says on June 30th, 2014.

10   Q  That was the day after Mr. Franklin had died;

11      correct?

12   A  Correct.

13   Q  Did you use this late entry in formulating your

14      opinion?

15   A  No.

16   Q  You did not?  Is that what you just testified, you

17      did not use it in formulating your opinion?

18   A  It actually has no bearing really on my opinion.

19   Q  I'm sorry, Doctor.  I did not understand what you

20      just said.  Could you please repeat that?

21   A  I said I likely reviewed it but it had no bearing

22      on my opinions.

23   Q  Did it stand out to you as odd to see an addendum

24      to a medical record placed in a medical record the

25      day after somebody died?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                                Page 198

```
 1   A   I see late entries quite often when I go out and do
 2       audits or surveys of jails and prisons.  If it was
 3       something that was totally out of place in the late
 4       entry, I would be questioning what's going on.
 5   Q   Well, do you see late entries in cases that you've
 6       done surveys on where the patient is already dead?
 7   A   Yes.  Yeah, it's pretty common, actually.  They'll
 8       make anyone involved in the case put in a late
 9       entry to summarize the events that occurred at a
10       jail or prison.
11   Q   Well, these summaries -- the summary of events
12       pertain to events that happened six days prior to
13       this entry.
14   A   Correct.
15   Q   And that in your mind is completely -- is the norm;
16       is that right?
17   A   I'd say it's not in the norm, no.
18   Q   Now, I want to turn your attention to Exhibit 19 to
19       your deposition, and I'm going to represent on the
20       record that it's the autopsy reports to Franklin.
21           (Exhibit 19 was handed to the witness.)
22   A   Yes.
23   Q   And it's got numbers at the lower right-hand side
24       starting with A many zeros and then 1 and continues
25       on all the way to number seven is the last page?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 199

```
 1   A   Yes.

 2   Q   Do you see where it says cause of death, sir?

 3   A   Yes.

 4   Q   And it says neck cancer and complications thereof;

 5       is that correct?

 6   A   Yes.

 7   Q   Is that what it says?

 8   A   Yes.

 9   Q   Do you agree or disagree with this statement, that

10       a new neck mass is a relatively common head and

11       neck problem that patients present to doctors?

12   A   It's a relatively common problem.

13   Q   So you would agree with that?

14   A   Yes.

15   Q   You agree that new neck masses often have no

16       associated symptoms other than recognition of a new

17       lump noted incidentally on palpation?

18   A   Yes.

19   Q   You agree that a mass may be the only manifestation

20       of a serious and potentially malignant pathology

21       especially in the adult population?

22           MR. McQUILLAN:  Objection to form and

23       foundation.

24   A   That's always a possibility.

25   Q   Go ahead and answer.
```

```
 1   A   That's always a possibility.

 2   Q   You agree that a doctor's failure to properly

 3       document the characteristics of a lymph node mass

 4       can be deliberately indifferent?

 5           MR. McQUILLAN:  Objection to form, foundation,

 6       and calls for legal conclusion.

 7   Q   Go ahead and answer.

 8   A   Once again, it calls for a legal conclusion, which

 9       I'm not here to do.

10   Q   Do you think what a doctor says to properly

11       document characteristics of a lymph node mass can

12       violate the standard of care?

13           MR. McQUILLAN:  Form and foundation.

14   Q   Go ahead and answer.

15   A   I do think it's important you should document size

16       and characteristics of any lump of any nodes,

17       whether it be the neck, legs, arms, the head,

18       anywhere.

19   Q   Do you think it's ever proper to ignore a mass on a

20       lymph node that has been palpated and is

21       questionable?

22           MR. McQUILLAN:  Objection to form.

23   Q   Go ahead and answer.

24   A   My comment would be I don't think it's appropriate

25       to avoid any kind of lump anywhere on the body that
```

```
 1     someone has and presents to you and it's new.  But

 2     to clarify that, you actually sometimes will -- I

 3     mean, I frequently tell the patient, this is

 4     probably nothing to worry about.  If it enlarges or

 5     it changes or it's not gone in a couple weeks or a

 6     month, I want to see you back.  So you put the onus

 7     on the patient to followup many times.  I don't see

 8     everyone back that has a lump here and there.

 9  Q  You would put the onus on the patient.  Is that

10     your testimony?

11  A  I frequently do, yes.

12  Q  Do you change that whether the patient is a

13     prisoner versus a non-prisoner?

14  A  No.

15  Q  Just give me a minute.  I'm looking through my

16     notes.  Give me one second.  I'm getting close.  We

17     can go off the record for a minute.  Let me just

18     look at my notes.

19         (A brief recess was taken.)

20  Q  I want to go back to your report, Doctor, which was

21     Exhibit 2 to the deposition.  I'm now on your

22     section of the report labeled discussion and

23     conclusion.

24         MR. McQUILLAN:  Just a second.  We're finding

25     the exhibit.  We've got a lot of paper here.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                             Page 202

```
 1              MS. STAMLER:  That's okay.  Let me know when
 2         you get to it.
 3    A    Which page?
 4    Q    I'm on page 5 of your report section five,
 5         Discussion and Conclusions?
 6    A    Okay.
 7    Q    Your first opinion is stated in paragraph one;
 8         correct?
 9    A    Yes.
10    Q    What specific facts do you rely on in formulating
11         your first opinion?
12    A    Well, I put I strongly oppose the claim the medical
13         providers deliberately delayed the evaluation and
14         treatment of Mr. Franklin.
15              MS. REPORTER:  Could you slow down?
16              THE WITNESS:  Oh, sorry.
17    A    I put I strongly oppose the claim that the medical
18         providers deliberately delayed evaluation and
19         treatment of Mr. Franklin.  And I base that on --
20    Q    Sorry.  Go ahead.
21    A    I base that on --
22    Q    And what facts did you rely on for the opinion?
23    A    The facts I relied was the fact that when I follow
24         the sequence of events, the providers saw this
25         person on a regular basis.  They put in 407s to get
```

```
 1        things done.  There was progress along the way.

 2        There was never an intentional delay.  There was

 3        never -- obviously there's many factors that go

 4        into timing of events, such that we mentioned

 5        previously, security, weather, right preparation

 6        for different things, seeing specialists, getting

 7        reports back, et cetera, et cetera, et cetera.  But

 8        the providers themselves at the institution put in

 9        requests for the x-rays, put in requests for

10        referrals for specialists.  It wasn't like they

11        intentionally said, no, we're not going to send you

12        to an oncologist or to whatever.  That's what I

13        based my opinion on.

14   Q    So is that -- those are the facts that you're

15        pointing to; is that correct?

16   A    That's correct.

17   Q    With regard to your use of the term strongly

18        opposed and earlier in that paragraph opposed, it

19        sounds to me as if you're advocating for a specific

20        opinion; is that correct?

21            MR. McQUILLAN:  Objection to form.

22   Q    Go ahead and answer.

23   A    I'm just stating that I strongly oppose the claim

24        that the providers intentionally delayed progress

25        on the care of this patient.
```

1    Q   Do you understand, and if you don't you can tell

2        me, whether a provider in a correctional medicine

3        situation can be held responsible under the law for

4        the delay even though it's not necessarily

5        intentional but rather reckless?

6            MR. McQUILLAN:  Objection.  Calls for a legal

7        conclusion, and I think I'm going to instruct my

8        client not to answer that.  That is not a good

9        question, Patti.

10   Q   Go ahead and answer.

11           MS. STAMLER:  You can't instruct him not to

12       answer.  You know that, Kevin.

13   A   I have no opinion on that.

14   Q   What's that?

15   A   I have no opinion on that.

16   Q   With regard to your second opinion, where is that

17       located in your discussion and conclusions?

18   A   What are you referring to?

19   Q   Pardon me?

20   A   I'm not sure what you're referring to.

21   Q   Is there a second opinion that you proffer in your

22       report or is that the sum and substance of your

23       report in terms of your opinion?

24   A   I was reading my report here for a moment.

25   Q   Do you have any other opinions, Doctor, other than

```
 1      what you've just read into the record?

 2   A  Well, I think that summarizes my general overall

 3      opinion.  The other paragraphs supplement that but

 4      I think that's my overall opinion.

 5   Q  I want to go to page 6 of your report, paragraph

 6      that begins with "The general standard of care for

 7      evaluation and management of someone with this

 8      rather poor prognosis"...  Do you see that

 9      sentence?

10   A  Yes.

11   Q  Sir, do you have expertise to render that opinion?

12   A  It was my opinion from my perspective things were

13      evaluated and managed appropriately by the

14      individuals working at the prison.

15   Q  Let me ask you the question again.  I'm focusing

16      now on the specific sentence that you wrote, "The

17      general standard of care for evaluation and

18      management of someone with this rather poor

19      prognosis cancer at the stage of initial evaluation

20      in October of 2013 was followed appropriately with

21      requests to needed testing and specialty referrals

22      as well as specialists' treatment."

23          Are you testifying as an expert on the

24      evaluation and management of cancer?

25   A  No.  Maybe it's misunderstood here.  I'm talking
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 206

```
 1      about the folks that work at the prison.  Their

 2      management and evaluation and plan of someone -- is

 3      who I'm referring to.  I'm not referring to the

 4      actual management by the ENT or the oncologist or

 5      the radiation therapist.  I'm not an expert in

 6      those areas at all.

 7   Q  And how do you know what his prognosis was on

 8      October of 2013?

 9   A  I don't know what his exact prognosis was.  Like I

10      said, I'm not an oncologist or radiation therapist.

11   Q  When you wrote in your report this rather poor

12      prognosis cancer at the stage of the initial

13      evaluation October 2013, you can't really support

14      that statement, can you?

15   A  Well, it was my opinion it was probably a rather

16      poor prognosis even at that stage, but like I said,

17      I'm not an expert to give you the details of all

18      the prognostic indicators of that type of cancer,

19      no.

20   Q  And when you reference in your report on page 5

21      that there was a plan of care for this -- for

22      Mr. Franklin, did you ever see a plan of care for

23      the palpable lymph node detected on August 7, 2012?

24          MR. McQUILLAN:  Objection.  Form.  Foundation.

25   Q  Go ahead and answer.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                    Page 207

```
 1   A   Well, once again, that would be all speculation,
 2       but I could speculate and from Mr. Bhavsar's
 3       testimony that he felt that it was benign and he
 4       felt that it was resolved by the time he was
 5       released from there, and so you would not make a
 6       plan -- you would not have a plan of care for
 7       something like that.  If you felt it was benign in
 8       the first place, you may have told the patient, if
 9       it's not resolved in a couple weeks, come back and
10       see me.  I don't know what he told him.
11   Q   You're speculating, aren't you?
12   A   Absolutely.  You have to speculate on something
13       like that.
14   Q   And in reading Dr. Bhavsar's testimony -- do you
15       have his transcript in front of you by chance?  Did
16       you bring it with you to your deposition?
17   A   It's on the flash drive.
18   Q   You testified that he had no independent
19       recollection of Keith Franklin; correct?
20   A   Yes.
21   Q   And he testified that he had no independent
22       recollection of ever touching his neck on
23       August 21st, 2012; correct?
24   A   Yes.
25   Q   And he testified that he did not write a plan
```

```
 1      regarding the lymph node on August 7, 2012;

 2      correct?

 3   A  Correct.

 4   Q  You stated on page 6 towards the end of the second

 5      to last paragraph, "Sepsis can occur after

 6      chemotherapy without much warning and can carry a

 7      poor prognosis, especially in a cancer patient."

 8      Sir, what do you base that on?

 9   A  What do I base that on?

10   Q  Yes.  Do you have any peer review literature that

11      states that?

12   A  Well, it's well known in medicine.  You're taught

13      that in medical school and residency training.

14      I've seen it many times in patients.  I've taken

15      care of many cancer patients through the years that

16      you see that.  Unfortunately, their immune system

17      is compromised, and they get sepsis no matter what

18      you do.  You can't reverse it many times.

19   Q  How many patients with the type of cancer that

20      Mr. Franklin had with his age and his other medical

21      conditions died from sepsis following chemotherapy?

22      Do you have any specifics on that, Doctor?

23         MR. McQUILLAN:  I'm sorry.  Are you asking in

24      the whole world or in Dr. Stoltz's experience?

25   Q  I'm asking for statistics.  Do you have any
```

```
 1      statistics as to how many patients with the type of
 2      cancer that Mr. Franklin had at his age with his
 3      medical condition died from sepsis following
 4      chemotherapy?
 5          MR. McQUILLAN:  Objection to form and
 6      foundation.
 7    A I don't know.
 8    Q Go ahead and answer.
 9    A I don't know.
10    Q You can't give an opinion on the fact that it's
11      rare or not rare; is that right?
12          MR. McQUILLAN:  Form and foundation.
13    A I don't have an opinion.
14    Q Dr. Stoltz, did you -- I'm sorry.  Did you have an
15      answer?
16    A I don't have an opinion.
17    Q Did you see the opinions that were proffered in
18      this case by the experts as to the percentage of
19      individuals that had died from sepsis following
20      chemotherapy with this type of cancer and with
21      Mr. Franklin's age?
22          MR. McQUILLAN:  Objection to form and
23      foundation.  What experts?
24    Q Did you see any testimony in that regard, Doctor?
25      Yes or no?
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 210

```
 1          MR. McQUILLAN:  Same objection.
 2   A  And I don't recall.
 3   Q  Therefore, you cannot quarrel with the notion that
 4      under 5 percent of individuals receiving
 5      chemotherapy for this type of cancer died from
 6      sepsis?
 7          MR. McQUILLAN:  Form and foundation.
 8   Q  Dr. Stoltz, do you have an opinion?
 9   A  I don't have an opinion.
10   Q  So when you said that sepsis can occur after
11      chemotherapy without much warning, how many times
12      in your experience has that happened?
13   A  Well, I cannot give you an exact number, but I
14      spent a lot of time up on the cancer units at
15      Indiana University Hospital, and it was fairly
16      frequent at that time.
17   Q  What time period was that, sir?
18   A  Back in probably 1983.
19   Q  There has been improvements, haven't there been,
20      sir, since 1983 with Malasta (phonetic) and
21      Nutrigen (phonetic) and other drugs to guard
22      against that?
23          MR. McQUILLAN:  Form and foundation.
24   Q  Go ahead and answer.  Do you know?
25   A  Well, I would say there's a lot of factors that go
```

STOLTZ, M.D., RANDALL
07/19/2018                                                          Page 211

```
 1      into it.  If you have terminal cancer and you're on
 2      chemotherapy, it depends what chemotherapy drug is
 3      being used.  There's a lot of factors that can
 4      suppress your immune system.  So I really can't
 5      give you any professional opinion on that.
 6   Q  The fact of the matter is your statement was based
 7      upon your experience from 1983; is that right?
 8   A  That was a big experience I had, but I've had other
 9      patients myself, nursing home patients, other
10      patients that have been, you know, immunosuppressed
11      and that's -- many times they die from sepsis.
12          MR. McQUILLAN:  Anything else, Patti?
13          MS. STAMLER:  I'm looking.  Just give me one
14      moment.
15   Q  Isn't your opinion, Dr. Stoltz, premised upon the
16      retrospective look at the medical records and other
17      documents you reviewed in preparing your report?
18   A  My opinion was based on the review of the records I
19      had placed in the report.
20   Q  Isn't it a retrospective view of what transpired?
21   A  Well, yes.
22   Q  Yes or no?
23   A  Yes.
24          MS. STAMLER:  I don't have any further
25      questions subject to John's questions.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                              Page 212

```
 1            MR. McQUILLAN:  Go ahead, John.

 2    EXAMINATION

 3    QUESTIONS BY MR. THURBER

 4    Q  Doctor, my name is John Thurber.  I introduced

 5       myself at the beginning of the deposition, I

 6       believe.  And I represent Dr. Daniel Heyns who is

 7       the former director of the Michigan Department of

 8       Corrections.  In the report that you authored, did

 9       you offer or are you offering any sort of opinion

10       as to the policy of the Michigan Department of

11       Corrections and how health care is administered

12       through those policies?

13    A  No.

14    Q  Do you know Mr. Heyns at all?

15    A  No.

16    Q  And are you offering any expertise or expert

17       opinion as to his performance as the director of

18       the Department of Corrections as it relates to

19       providing health care to prisoners?

20    A  No.

21            MS. STAMLER:  Thank you, Doctor.  I don't have

22       any questions -- any more questions.

23            MR. McQUILLAN:  Nothing from me.

24            (The deposition concluded at 5:37 p.m.)

25
```

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF MICHIGAN

 3                  SOUTHERN DIVISION

 4
    KAREN FRANKLIN, as Personal   )
 5  Representative of the         )
    ESTATE OF KEITH FRANKLIN,     )
 6  Deceased,                     )
                                  )    Cause No.
 7              Plaintiff,        )  2:16-CV-13587
                                  )
 8          -v-                   )
                                  )
 9  STATE OF MICHIGAN, et al.,    )
                                  )
10              Defendants.       )

11

12          The deposition of RANDALL STOLTZ, M.D., taken

13  in the above-captioned matter, on July 19, 2018, and at

14  the time and place set out on the title page hereof.

15          It was requested that the deposition be

16  transcribed by the reporter and that same be

17  reduced to typewritten form.

18          It was agreed that the reading and signature

19  by the deponent to the deposition were waived

20  on behalf of the parties Plaintiff and Defendants

21  by their respective counsel, the witness being

22  present and consenting thereto, the deposition

23  to be read with the same force and effect as if

24  signed by said deponent.

25
```

```
 1   STATE OF INDIANA        )

 2                           )

 3   COUNTY OF VANDERBURGH   )

 4

 5          I, Elizabeth A. Taylor, RPR, a Notary Public

 6   in and for said county and state, do hereby certify

 7   that the deponent herein, RANDALL STOLTZ, M.D., was by

 8   me first duly sworn to tell the truth, the whole

 9   truth, and nothing but the truth in the aforementioned

10   matter;

11          That the foregoing deposition was taken on

12   behalf of the Plaintiff; that said deposition was

13   taken at the time and place heretofore mentioned

14   between 12:00 p.m. and 5:37 p.m.;

15          That said deposition was taken down in

16   stenograph notes and afterwards reduced to typewriting

17   under my direction; and that the typewritten

18   transcript is a true record of the testimony given by

19   said deponent;

20          And that the reading and signature by the

21   deponent to the deposition were waived on behalf of

22   the parties Plaintiff and Defendants by their

23   respective counsel, the witness being present and

24   consenting thereto, the deposition to be read with the

25   same force and effect as if signed by said deponent.
```

STOLTZ, M.D., RANDALL
07/19/2018                                                            Page 215

1           I do further certify that I am a disinterested

2    person in this cause of action; that I am not a

3    relative of the attorneys for any of the parties.

4           IN WITNESS WHEREOF, I have hereunto set my

5    hand and affixed my notarial seal this 30th day of

6    July, 2018.

7

8

9

10                   _____

11                   Elizabeth A. Taylor, RPR

12                   Notary Public - State of Indiana
                     My Commission Expires - 08-14-2023
13

14

15

16

17

18

19

20

21

22

23

24

25

STOLTZ, M.D., RANDALL
07/19/2018

Page Index: $500..64

**$**

**$500**  35:4

**$750**  35:9

**0**

**0025**  194:8

**0026**  193:23

**0027**  187:15,20

**0029**  187:14,15, 19

**0194**  171:9

**1**

**1**  27:5,7,8 36:21 39:6 41:4 105:14 117:17,22 125:23 196:3 198:24

**10**  18:6 147:14,15 148:1 149:12 157:22 161:22 164:25

**10,375**  34:25

**10-22**  149:9

**10-22-13**  147:3

**10-30**  146:18 147:5

**100**  31:5,6,9,11 103:3 118:20 124:2 137:25 174:11,14 178:17

**11**  151:16,17,18 160:8 161:6 165:11

**11-21-13**  146:10 149:2

**11-25**  150:14

**11:26**  194:9

**11:57**  193:24

**12**  157:9,11,14 160:5 161:11

**12-13-13**  150:22

**12th**  87:16

**13**  92:8 93:10 96:3 151:8 152:11 157:20 166:1,2,6

**13th**  149:23 161:2

**14**  168:13 170:7,8 171:24

**15**  8:15 9:8 92:10 136:6 140:7,11 172:10,11

**16**  119:9 125:4 135:9 176:10,11

**16th**  121:17 126:17 168:13,17

**17**  184:16,17,19

**18**  195:23 196:1, 3,22

**18,000**  34:23

**184**  171:22

**185**  171:23

**18th**  163:21

**19**  48:3 161:21,23 166:8 168:14 175:8 198:18,21

**1983**  60:17 210:18,20 211:7

**1984**  50:11,13

**1987**  50:11

**1998**  8:10

**19th**  168:18 173:20

**1:15**  186:17

**1:24**  192:12

**2**

**2**  30:6 36:18,19,20 40:16,20 62:18 67:15 102:4 105:12,14,16 110:24 114:11 117:7,17,20,21

**118:22**  120:1 140:23 148:1 152:10,23 160:5 196:22 201:21

**2-3**  106:20

**20**  24:10,11 25:22,24 26:5 48:4,8 144:18 161:21,23 166:25 167:8,22 169:18 170:24

**2012**  49:9,16 80:8,19 83:24 84:3 87:16 88:6 91:14 92:2,5,14, 20 93:2,14,15 101:7 102:10 105:1,6 107:18 109:25 110:6,10, 17 112:17,23 114:1 115:6 116:11 117:8 118:23 119:10 121:17 125:4 126:17 128:20 129:3 161:25 180:11 206:23 207:23 208:1

**2013**  93:1 120:8, 17 122:3 124:16 125:23 126:7,9, 17,23 127:13 132:14 133:13 135:9,12,22 139:18 148:17 151:8 152:4 158:1 160:18 205:20 206:8,13

**2014**  83:25 84:3 101:7 157:20,23 161:2,24 163:18, 21 164:25 165:11 166:8,21,25 167:9,22 168:14 169:9,18 170:13, 17,21,24 171:11, 24 173:20 174:3 175:8 176:13,23 184:11,24 185:21 186:6 190:6 196:6 197:9

**2017**  27:17 34:17

**2018**  14:16 36:7 45:3

**21**  110:17 113:25 116:11 143:15 176:12,23

**21st**  207:23

**22**  133:13 135:21

**22nd**  135:12 149:16

**23**  139:18 150:25 151:8 184:23

**23-14**  185:17

**23rd**  185:21

**24**  185:15

**24-hour**  10:7,9

**25**  152:4 166:21

**27**  186:6 187:12 190:6

**27th**  192:12 193:7

**28th**  169:11

**29**  173:4

**29th**  196:5

**3**

**3**  37:19 101:24 102:4,13,19 103:1,17 104:8, 11 105:23 110:9 115:8 126:5 161:11

**3-18-14**  164:23

**30**  24:25 25:2 103:14 174:3

**30th**  147:18 197:9

**31**  117:8 118:22

**4**

**4**  37:19 101:25 104:18,21 105:8, 24 110:20 115:4

**4-16-14**  171:14

**4-17-14**  172:12, 19

**4-25-14**  173:6

**4-29-14**  173:3

**40**  77:13 78:9 103:19 104:2

**407**  79:24 81:9 82:21 83:1,5 147:18 163:25 172:14 174:7

**407s**  83:11 159:15 202:25

**42**  60:16

**45**  186:9 189:15

**47**  105:9

**4:00**  194:13,14 195:8

**4:47**  193:11,17

**5**

**5**  111:8,11 112:23 148:17 160:8 161:6 202:4 206:20 210:4

**5-19-2014**  174:18

**5-6**  128:14

**50**  54:13

**500**  9:22

**5:37**  212:24

**5th**  27:13

**6**

**6**  39:13 113:15,18, 24 114:10 115:25 116:1 126:22 127:13 152:11 205:5 208:4

**6-23-14**  185:16

**6-27**  186:17

**6-27-14**  185:25

**64**  103:17

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

STOLTZ, M.D., RANDALL
07/19/2018

**6th** 109:15 120:8, 17 124:16 125:23 126:7,9,17 150:18 152:9 177:2

_____

**7**

**7** 44:20 52:24 91:14 92:1,19 102:10 105:1,6 107:18 109:24 110:6,10 112:17, 23 115:6,16 116:24 117:1,20 118:15 169:9 170:13 171:11 180:11 206:23 208:1

**70** 186:9 189:15

**700** 9:22 84:22

**7th** 163:17

_____

**8**

**8** 119:5,7,25 120:7 124:16 126:5,14 170:21

**8,250** 34:25

**8-7-12** 114:16

**839** 7:24

**8th** 170:17

_____

**9**

**9** 127:16,18,21,25 130:4 135:5 139:17 145:10 146:15 158:1 160:24

**9:26** 186:7,17 187:9,12 190:6 193:6,25 194:3 195:7

**9th** 36:7 132:14 169:1

**A**

**a.m.** 186:7 187:9, 12 190:6 193:6, 24 194:1,3,9 195:7

**abbreviated** 106:9

**abdomen** 121:23 122:21

**ability** 82:7 95:12

**Absolutely** 88:23 166:4 207:12

**absurd** 123:25

**Academy** 38:4 46:19 55:8

**acceptable** 136:3 143:5 153:13

**access** 49:18 56:8

**account** 93:12 94:12,13

**ACCP** 47:10 61:6

**accurate** 27:12, 14 33:18 69:4,6, 17 86:6,21 88:10, 11 91:6,19 112:13 129:7

**accurately** 32:19 33:15 69:9 91:16, 18,23 101:21

**achieve** 25:8

**acronyms** 46:23

**act** 65:14

**acted** 64:3 191:15

**acting** 65:23

**action** 134:25

**actual** 77:3 143:1 164:4 206:4

**add** 22:10,21,22 34:25

**added** 107:11

**addendum** 197:23

**addition** 19:14 20:9

**additional** 95:6 98:15,22

**address** 7:24,25 8:3 111:1

**addressed** 75:19 136:12

**adenopathy** 106:19

**administered** 212:11

**administration** 57:14

**administrative** 9:15 58:8 135:19

**admitted** 155:11 168:13,16

**adult** 199:21

**adults** 51:15 52:11

**advertise** 46:12 47:1

**advice** 134:7

**advocating** 203:19

**affidavit** 45:22

**affidavits** 20:11, 17 21:1,17 22:9, 16 45:10,24

**affixed** 141:5

**age** 76:8 77:5,11, 13 78:8 103:19 104:2 105:9 208:20 209:2,21

**agree** 32:22 33:9, 13,17 41:4 67:13 70:18 71:7,15 72:11 74:4 75:9 95:6 136:9 141:19,21 142:2, 11 156:11 167:22

169:16 178:3 193:1 199:9,13, 15,19 200:2

**ahead** 17:19 21:6 32:12 35:19 44:4 46:17 61:17 62:7 65:17 66:8 67:3, 12 70:23 71:12, 20,25 74:2,8,14, 23 75:16,25 77:8 80:24 82:19 83:16,19 92:16 93:4,17 95:24 96:22 97:17 98:5, 20 100:9 101:10 108:9,15 125:11 129:10 131:4,16 132:1 134:12 137:18 142:7 145:11 146:24 151:11 153:16 156:5,17 158:8, 16 159:4 160:3 162:22 168:2 178:10 182:8 183:13 193:10 194:21 199:25 200:7,14,23 202:20 203:22 204:10 206:25 209:8 210:24 212:1

**alcohol** 78:4,14 103:7 105:16

**alter** 21:19 95:8

**alternating** 184:25

**alternative** 86:18

**altogether** 68:4, 11

**ambulance** 192:3,6,8

**ambulated** 193:12,18

**ambulating** 193:21

**American** 38:4 46:19 47:6 54:14, 19

**amount** 18:3 46:6

**anal** 121:9

**angle** 102:6 106:21 113:1,2 160:9,14

**annual** 18:2 61:5

**answering** 64:24

**antibiotic** 144:13

**antibiotics** 144:8,10 194:19 195:7

**AP** 147:6

**apologize** 32:3 65:1,5 145:10 148:24 177:6

**apparently** 139:23 145:19 186:2 188:9 195:2

**appearance** 195:3

**appears** 62:18 108:8,10 117:7 119:10 135:10 148:7,18 151:3,5 153:3 163:8,12 165:19 167:2 177:2 186:4 194:17

**appendix** 38:8 39:6

**applies** 17:14

**appointment** 152:7,13,24 153:23 158:20 159:23 164:21 171:12,14 173:6, 19 174:3 175:21, 24 182:6

**appointments** 80:5,10,21 81:2, 23 82:3,8 152:20 154:17 156:9 159:14

**appropriately** 205:13,20

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**approval** 59:25
152:18 156:15

**approvals**
142:20 154:18
156:9

**approved** 152:16
153:4,7

**approximate**
34:11

**approximately**
6:21 8:15 12:1
18:6 25:22 31:6
152:15 154:25
161:5 162:1
191:7

**April** 169:9,11
170:13,17,21
171:11,23 173:4
174:3

**area** 24:23 43:11
55:18 56:3 58:18,
20 93:10,11
109:7 113:3,8,14
114:25 121:11
126:21 138:7
154:11 155:13,15
162:7 167:6,12
168:9 182:11
184:1

**areas** 24:17,23
42:21 55:10,16,
25 56:3 85:14
106:2 206:6

**argumentative**
73:14 93:3
123:16,17 190:22

**arms** 200:17

**around-the-
clock** 184:24

**arrival** 193:16

**arrived** 175:10,
14

**art** 137:24

**articles** 39:12
54:23 55:1,7,14
61:7 84:24 85:2,
5,8,10,18

**articulate** 76:4

**asks** 16:2

**aspect** 56:16

**aspects** 180:8

**assessment**
110:21 148:17
174:21 187:25

**assessments**
32:5

**assistant**
119:11,17,20
120:1,10,17

**assistants** 10:4
83:24

**Association**
38:2

**assume** 7:15
29:19 91:5 118:8

**assumed** 91:22

**assurance** 32:4

**asymmetrical**
76:24 108:5

**attempt** 51:3

**attention** 105:23
110:19 111:8
113:15 135:4,19
136:20 152:23
157:8,13 163:11
184:16 185:3
190:8 191:1,23
198:18

**attorney** 16:4,15
33:24 46:9 95:22
192:21

**attorney-client**
16:3 33:24 95:23
98:18

**attorneys** 16:18
99:6

**audits** 13:23
80:15 198:2

**August** 49:9,16
80:8,19 87:16
88:5 91:14 92:1,
5,14,19 93:2,14,

15 101:7 102:10
105:1,6 107:18
109:15,24 110:6,
10,17 112:17,23
113:25 115:6,16
116:11 117:8
118:22 124:16
126:7,9 127:13
128:14,19,20
129:3 161:25
180:11 206:23
207:23 208:1

**authored** 119:10
139:23 172:13
212:8

**autopsy** 196:10
198:20

**average** 14:20
145:25

**avoid** 200:25

**avoided** 65:19

**award** 37:25
38:2,5

**awards** 36:22
37:4,15,17,20,22,
23 38:3

**aware** 73:8 81:7
82:4 177:9
179:13,19

———————

**B**

**B-H-A-V-S-A-R**
95:1

**B-U-R-O-E-H-E-
R** 46:5

**B.S.** 36:25

**babies** 51:15

**back** 6:17 20:9
22:3,24 34:3,9
36:20 38:20 39:1
45:2 63:10 73:13
85:19 90:21
93:10 94:2,6,8
100:2 102:20
113:2,3 121:14
122:13 126:23,24
127:1,5,6 129:13,

14 134:15 161:23
171:4 182:13
183:8,11 184:3
185:19 201:6,8,
20 203:7 207:9
210:18

**background**
59:5

**balance** 9:14

**ballpark** 113:14

**barrier** 81:15,17
82:1

**barriers** 80:7,17,
25 81:1,7,8,12,20

**base** 95:11 98:14
120:23 153:17
202:19,21 208:8,
9

**based** 22:4,9,19
59:5,8 68:1,6,8
92:11 98:12
99:24 112:16,22
132:13 145:3
148:12 151:25
186:21 203:13
211:6,18

**baseline** 186:19

**basic** 147:3

**Basically** 14:6

**basis** 8:12 9:9
41:18 155:12
202:25

**Bates** 171:6
187:12 194:8

**bear** 7:3

**bearing** 197:18,
21

**beer** 103:11
104:1

**began** 168:14

**begin** 7:5 14:14
26:8 34:6 134:2
169:9

**beginning** 14:16
37:18 49:12
62:18 63:22 88:5

186:6,17 212:5

**begins** 76:10
205:6

**begun** 191:18

**behalf** 26:25
45:10 54:1
159:22

**behavior** 118:1

**benign** 207:3,7

**Bergman** 21:7

**bet** 122:22 123:10

**Bhavsar** 20:24
91:22 94:16,19
97:13,21 98:1
105:6 107:18
110:10,16 113:25
114:6 115:5,16,
25 116:7 129:2
160:14 180:12

**Bhavsar's**
105:19 111:4
116:4 207:2,14

**big** 88:19 97:13
98:2 133:20
211:8

**bigger** 41:8
140:7,11

**billing** 34:9,16
47:20

**biology** 36:25

**biopsy** 150:7,16
151:22 153:9,12
154:12,14 155:1,
4,6 158:11
164:13 165:7,24
166:13 180:19

**birth** 103:16

**bit** 7:2 9:19 13:13
14:10 33:7 51:17
177:23

**Blackmar** 72:16

**blog** 192:20

**blood** 40:5
178:18 179:1
186:5,16,19

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

188:22 189:9,11,
14 195:1

**board** 25:3,6
50:14 51:24
53:12,14,22
54:14 57:21 58:7

**boards** 50:17

**body** 89:16 91:24
94:20 147:10
200:25

**Bomber** 20:24
90:4 184:10

**Bomber's** 90:11
184:6

**bones** 147:4

**Boonville** 11:21

**bottom** 37:18
39:13 67:16
125:24 162:3,10
180:9

**BP** 188:21

**brackets** 107:11,
12

**branch** 56:12

**break** 7:19 38:24
63:3 102:15,24
166:3

**breath** 178:22

**Brennan** 72:20

**briefly** 20:11
51:10

**bring** 47:19
129:22,24 207:16

**broad** 51:12 55:6
87:13

**broke** 9:19 80:14
195:20

**brought** 15:24
47:15,20 61:5
121:15 130:9,12

**bubble** 109:17,20
110:1,4,5

**Buroeher** 46:2

**Bush** 192:13

**business** 7:25

**busy** 153:22
155:18

---

**C**

**C.V.** 30:6,23 37:1,
5,14,17 38:7 39:6
40:18 43:15
44:24 49:1 50:11
52:25 53:1

**call** 31:20 52:1
56:13 122:8
153:23 159:21
182:6

**called** 6:2 17:3
32:3 43:21 58:17
110:4 118:13,15
138:8 182:5
190:12

**calling** 155:14

**calls** 17:17 61:15
62:5 65:15 66:6
67:1,10 70:21
71:10,18 72:5,13
74:6,12,20 75:14,
23 101:8 131:23
142:5 157:6
162:20 167:25
178:5 200:6,8
204:6

**Calverton** 72:17

**cancel** 172:14

**cancelled** 158:19
174:19

**cancer** 11:14
13:4 23:15,22
24:1,8,15,16
29:7,12,13,20
38:12,16 39:10,
16,18,19 40:1,2,
3,7,10,13,15
56:5,6 70:20
71:1,8 72:11
73:21 74:3,4,10,
16,18,24 75:2,4,
5,9,12 77:14,17,

25 78:1,2,18
87:6,7,9,11,12
101:12 103:24
104:4,12 105:20
133:23 134:1,2,
22 135:2,3 142:1
163:9 166:17
167:9 169:21
171:16 173:23
176:19 177:19,24
180:21 184:7
188:19 189:16
196:14 199:4
205:19,24
206:12,18 208:7,
15,19 209:2,20
210:5,14 211:1

**cancerous** 71:16
72:3 92:4 141:16

**cancers** 24:12,13
77:19

**capacity** 9:3

**capital** 106:10

**capitals** 107:2

**caps** 102:5

**caption** 41:5,10

**carcinoma** 167:5
168:7

**cardiovascular**
121:22 122:19

**care** 8:20 9:5,7,10
12:6,9 13:20
15:3,25 22:12,13
23:14,18,21,25
24:2,7,25 31:11
33:2,5,20 43:20,
22 45:17 47:5
49:7,15 51:14
52:7,9,10 54:18
56:4,8,9,13,16,
21,22,25 57:15
64:5,13,20 65:9
66:12 69:21 79:1
81:18 85:6 87:15,
18 88:19 96:10,
15 97:3,12 119:9,
14 120:8 121:1,
12,18 122:6,24
124:25 125:1,6,8,
13,14,16 144:1,

18 155:22 156:3,
14,25 157:3
158:14 159:16
165:12 171:23
176:3,12,18
182:5,25 183:1
191:21 200:12
203:25 205:6,17
206:21,22 207:6
208:15 212:11,19

**cared** 156:13

**career** 112:11

**careful** 86:9

**carefully** 23:20
94:3 195:6

**Carrel** 20:25
149:17,18,22
150:22 159:10,20
161:4 163:24
165:14 166:22
172:2,4,13,23
173:9,16 187:9
193:6,20,23
194:5,9

**Carrel's** 164:2
190:20 194:24,25

**carry** 208:6

**Carson** 15:16
80:9,17 82:2,6
83:24 84:2,6 97:2
116:17 117:4
180:3 185:19,20
190:12 191:1

**case** 7:23 16:19,
20,22,24 18:12
19:17 24:16
33:22 34:6,20
35:5,6,8,17,22
41:5 43:25 44:1,
2,6 45:14,16,23,
25 46:10 49:2,6
53:2,7,8,21 58:4,
17,20,23 59:1,12,
15,17,24 61:25
64:16,20 66:11,
19,22,25 67:4,24
78:20 86:1 89:19
90:3,12,13 91:11
95:9 96:19 98:9
99:2 100:11,14,
19,23 116:5

148:13 169:5
182:24 184:19
190:24 191:4
192:21 198:8
209:18

**cases** 16:20 18:9
25:16,24 36:2
52:23 58:20 60:4
72:21 198:5

**CAT** 137:12
142:21 146:14,16
147:25 149:24
150:21 153:12

**category** 170:6

**caused** 174:12

**CCHP** 6:12

**ceased** 27:16

**cell** 167:4 168:7

**census** 9:17

**center** 8:5,14 9:6,
18 10:19,23 11:2,
13,20 12:4 15:11
30:7 84:18
109:13 184:22

**centers** 14:24
32:2

**centimeter** 160:9

**centimeters**
102:5 112:25
139:8 140:25
144:2 154:24
161:6,7,17

**certification**
6:16 25:6,8
51:24,25

**certified** 6:15
25:3 50:14 51:22

**cervical** 106:19
147:4

**cetera** 154:20,21
159:17 183:2
203:7

**Chad** 45:16

**challenge** 7:1

**chance** 193:2

STOLTZ, M.D., RANDALL
07/19/2018

207:15

change 21:25
22:3,8,19,20
95:13 178:20
201:12

Chapman 18:19
43:24 45:8,11,19

characteristics
75:20 76:4,7
154:11,25 158:13
200:3,11,16

charge 35:7,9,12,
15,23 36:6 46:6

charges 35:15
44:20

charging 35:2,
16,21

chart 31:24 33:6
85:23 88:22,25
89:10 163:16,20,
24 166:20,21
167:2 172:12,19
173:4,9 174:2

charted 32:21
33:11,14 141:15

charting 32:10,
15,18,23 33:4,17
89:15,21,24 90:6,
14 91:2,15

check 89:4 122:1
178:17,18

checked 121:22,
23,24 122:19,21,
25

checking 120:5

chemo 168:14

chemotherapy
59:22 101:17,18
168:9,17 169:9,
17 177:19,21,25
178:15 179:7,15
182:15 183:17
184:8,14,23
185:14 186:25
189:16 208:6,21
209:4,20 210:5,
11 211:2

chest 178:22

Chicago 53:11,
12

chief 124:17
130:3,14,25
131:11

choose 14:7

chose 46:10

chronic 56:9
119:9,13 120:8
121:1,12,17
122:6,24 124:25
125:1,6,8,13,14,
16 165:12 171:23
176:12,18

Cider 72:20

Circuit 72:17,19

circumstance
33:4

cited 52:23

City 15:16 80:9,
18 82:2,6 83:24
84:3,6 97:2
116:17 117:5
180:3 185:20
190:12 191:1

civil 53:16

claim 202:12,17
203:23

clarification
95:4

clarify 7:11 26:9
46:22,25 112:21
120:19 201:2

clear 107:13
143:13 163:8

clearance
110:16,25

client 204:8

clients 46:7

clinical 24:24
25:6,11 27:15,24
28:1,5,10,13,19,
23 29:5,14 38:2,
15 41:23 42:6,8,

15,22 43:23
85:11 136:21
147:17 170:10
175:7 184:21
196:3

close 201:16

closed 102:6
149:20 158:20

closely 38:17
182:11

closer 183:16
184:2

closest 113:6,12
191:13,23

cm 106:20

CMES 54:19,20

co-wrote 85:8

Coleman 21:7

College 47:6
54:19

combination
10:24,25 59:16
174:9

combined 174:5

comfortable
133:12

comment 67:5
139:14 196:18
200:24

commented
65:8

comments 21:24
22:5,21,25 92:17
96:17 106:20
114:15 130:8,12
160:6,16 181:11

Commission
13:19 15:2 47:4
54:18 55:7,21
56:7

common 87:7,8
89:12,14,15,21,
24 90:6,15,23
96:3 198:7
199:10,12

commonly 61:5
89:7 90:1 115:2,5

communication
s 33:25 95:23

community
156:22

companies 28:2,
4 29:4 85:13

company 28:22

comparing
172:20

Compazine
179:17 180:1,4,7
184:25 185:9

complain 96:2

complained
131:13

complaining
188:9

complains 140:9

complaint 63:24
93:22 100:5,10,
13,18,23 110:11,
13 118:1 122:12
124:8,17 126:22
130:3,6,14,17,25
131:12 188:14

complaints
57:17 120:24
121:5,7,10
129:21 192:14

complete 27:12
33:18 50:8,12
69:17 110:8
114:15 121:8
173:15

completed 117:8
163:12,17 189:16

completely
198:15

completing
95:19

complications
196:14 199:4

Compound
101:1

compromised
208:17

computer 41:3

concerned 131:7
132:5 137:10
138:7

concerns 120:25

conclude 70:25

concluded
212:24

concluding
186:17

conclusion
17:18 61:16 62:6
65:16 66:7 67:2,
11 68:9 70:22
71:11,19 72:6,14,
15 74:1,7,13,21
75:15,24 101:9
131:24 142:6
157:7 158:6,9
161:8 162:21,23
168:1 178:6
200:6,8 201:23
204:7

conclusions
67:18,22 68:2,11,
12 202:5 204:17

condition 67:8
72:12 73:2,4,21
74:3,5,11,19
75:10,13,22
86:12 101:11
131:22 134:17,24
142:3,4 162:14,
18 167:24 178:4,
8,20 183:6
187:10 188:25
209:3

conditions 101:6
180:8 208:21

conduct 28:5

confident 110:5

confine 134:20

confirm 22:11
88:17 89:6,8

confirms 135:21

**confused** 66:9 74:15

**connected** 101:14,15

**connection** 52:23 100:24

**consent** 17:2,3, 14

**consideration** 94:17 181:7 189:20

**considered** 74:25 77:5

**constitute** 61:13, 21 62:4 71:9 168:4

**constituted** 158:4

**constitutes** 51:10

**constitutional** 106:3 156:25 157:2

**consult** 99:4,6,9, 12

**consultation** 145:13 146:6 147:24 151:21 171:3

**consulted** 15:22

**consulting** 16:9

**consumption** 104:1

**contact** 31:21 197:4

**contacted** 33:22 34:6 187:8 188:6

**contained** 36:14 40:18 62:20 85:17 93:13 112:3 142:13 144:3

**contents** 40:21

**context** 145:8

**continue** 172:10 189:8

**continues** 198:24

**continuing** 37:19 54:13 62:22 135:18 139:17 148:16 164:12 166:1,20 171:2,22 172:18 173:3 174:2 175:7 177:1

**continuity** 56:9

**continuous** 8:25

**continuously** 50:14

**contract** 78:21

**contractor** 8:7, 10 12:2

**control** 158:22 159:17,18 175:17 180:10

**conversation** 99:5

**conversations** 16:17

**copy** 47:20,21 171:5

**Corizon** 19:4,12 26:25 64:2 78:22 79:12 80:9,17

**Corporation** 64:2

**correct** 6:10,11 8:6,9,11,21 9:16, 21 11:10,17,18 13:9,11,12 14:2, 17 15:13,14,18, 20,21 18:10 19:8 22:16,17 23:8 24:15,18 28:5 30:1,2,4,5,12,13, 15,16 31:10 32:24 33:2,20 34:20 35:5,11 36:15 37:8,20,21 38:9,12 40:3 41:7,10 44:21

45:4,5,19 50:22 53:3,5,15,17,18 54:9 55:3 56:17, 23 57:2,15,16 58:12 59:22,23 60:10,24 64:8,17, 22 65:23 66:17 68:22,23 69:1,4,9 72:10 74:19 75:13 76:22 77:6, 11,14,19,25 78:18 82:22,24 89:23 90:9 91:7, 8,11,12,16,20,21, 24,25 92:14,18 94:20 97:4,5,8,9 98:2 100:25 101:22 102:10 103:13,22 104:2, 3,16 105:1,6,7, 10,12,17,21 106:14,25 107:6 108:6 109:3,5,7, 8,10,11,15 114:1, 16,23 116:2,3,8, 12 117:5 118:19 119:2 120:5,6,10 121:18,19 122:1, 17,19,21 123:14 124:9,12,20 125:20 128:4,9, 10,16,20,23 129:8 130:7,15 131:1 135:4,12, 22 136:23 137:13,16 138:25 139:1,10,15,16, 24 140:3,21 141:1,3,6,10,22, 23 142:15,16 144:5,14 145:18, 21 147:21 148:2, 8,14,15,19 151:6, 23,24 152:2,3,17 153:9 156:3 157:15 158:1,2,4 163:9,10,14,18, 25 165:13 166:10,14,25 167:9,10,12 169:25 170:4,18, 25 171:1 172:2, 21 173:7 174:19 175:15 176:2,6,8, 17 182:1,2,6

183:5 185:15 187:2 188:4 194:10 195:8,14, 15 196:3,21 197:11,12 198:14 199:5 202:8 203:15,16,20 207:19,23 208:2, 3

**correctional** 6:15 13:19 14:1,4 15:3,16 17:11 18:13 19:4,12 24:21 25:19 26:6, 14 27:1 43:20,22 45:17 46:19 47:5, 6,12 48:21 52:19 53:16 54:18,20 55:2,5,8,17 56:4, 11,12,14 58:14, 18,21,22 59:2,6, 11 66:24 73:20 80:18 82:2,7 84:3,25 96:14 97:2 99:25 100:25 116:17 117:5 136:2 137:1 142:18 143:18 145:4 156:12,23 185:20 204:2

**corrections** 43:19 49:9,16 64:3 78:25 79:3, 7,13,20 81:1 86:8 88:1 90:5 97:1 145:17 184:20 212:8,11,18

**correctly** 32:19 64:6 102:7 106:21 153:4 172:16

**correlates** 187:18

**counsel** 16:8 19:7 49:19,21 64:23 73:5,11 123:4,22 162:15

**counts** 178:18

**county** 8:5,13 9:6,18 10:19 11:20 12:3,20,21

14:23 28:16 32:1 37:25 72:17,18 84:16,18

**couple** 22:23 38:24 149:23 201:5 207:9

**courses** 42:5,8, 12,24 50:5 54:16

**court** 7:6,24 26:11 27:4 34:3 36:17 47:23 72:21 73:12 94:2, 9,24 100:2 102:12 103:1 104:19 111:9 113:16 116:23 119:5 129:15 134:16 151:15 157:9 176:11

**courtroom** 53:9, 10

**Covance** 27:15 28:8,9,14 29:6

**cover** 55:11,12

**coverage** 10:7,9

**covered** 13:16 43:13 108:13

**covering** 126:21

**CQI** 8:25

**cradle** 51:13

**created** 68:20 111:5

**credentials** 48:24

**critical** 33:1,5

**CT** 137:15 144:4, 14 145:2,6,9,21, 22 146:8 147:18 148:25 149:14 150:3,10,14,25 151:8 152:12 172:20

**current** 13:15 17:21 19:15 30:22 54:10,12

**curriculum** 7:23

25:23 27:10

**custody** 56:18
81:2,11 156:10
159:17 175:22

**cut** 41:12,14 65:6

---

**D**

**Daniel** 212:6

**date** 34:18 41:6
49:9,17 54:16
55:19,23 80:8
87:16 88:6,18
91:16 92:1
103:16 109:25
118:24 119:2
120:12 124:22
141:16 142:14
152:4,7,24 161:2
165:1 168:6,10
169:1 170:21
172:19,24 176:15
177:9

**dated** 36:7
104:25 118:22
119:9 120:8,16
139:18 147:18
148:16 166:25
171:23 172:12
173:4 174:2,18
176:12 177:2
184:23

**dates** 6:19 69:7
93:1 159:24

**day** 35:14 36:5
109:14,18 122:16
133:3 183:11
197:7,10,25

**days** 51:20 133:4
135:24 143:15,19
144:10 149:24
150:1,2,4,25
151:8 152:12
163:21 173:8
186:1,23 189:16
198:12

**Deaconess** 30:7,
11

**dead** 197:8 198:6

**dealing** 126:3

**deals** 56:13,14

**dealt** 56:18

**death** 49:10,17
80:19 87:17 88:6
101:7,19 184:11
194:19 195:8
196:8,13,16
199:2

**decades** 77:22
78:12

**December**
149:23 151:8

**declining** 34:1

**decreased**
176:20

**decree** 17:2,3,14

**deem** 24:20
143:25

**deeming** 188:24

**deep** 76:13
141:10

**defendant** 90:13

**defendants**
49:2,5,14 64:1

**defense** 18:8
34:22 46:9 49:21
98:16,23 192:21

**deficit** 174:22
175:5

**defined** 40:7
65:22

**definition** 56:11
64:17 65:12

**definitions** 72:22

**definitively**
124:11

**deformity** 121:3

**degree** 36:24
60:6 181:15
191:11

**degrees** 37:7

**dehydrated**

187:2,5 190:19

**dehydration**
178:24 179:7
189:21

**delay** 61:12,20
62:2,3 66:1 70:18
71:7,15 72:2
96:11 153:11
158:3 174:12
195:6 203:2
204:4

**delayed** 64:12
65:19 81:22
156:20 202:13,18
203:24

**delays** 65:8,9
81:10,11,24
158:21 159:18

**deliberate** 60:11,
19,22 61:1,10,13,
21 62:4,9 63:8
65:8 66:4 67:8
71:9 72:23,25
99:15 100:4,12
158:4,10

**deliberately**
62:19,23 63:9,15
64:4,11,21 65:19,
22 66:12,16
70:20 71:17 72:3
99:16 100:22
200:4 202:13,18

**denial** 117:15

**denied** 117:13

**dental** 118:1

**Department**
49:8,16 64:3
78:24 79:3,7,13,
20 90:5 97:1
145:17 184:20
212:7,10,18

**departure**
192:15

**depend** 132:10

**dependent** 33:8
57:13

**depends** 41:19
55:15 75:4 81:2

86:13,25 88:20
133:6,7 136:14,
17 138:1,4
144:16 163:3
179:8 182:9
183:12,14 211:2

**depicted** 113:13

**deposition** 6:23,
24 19:19 20:3,7,
17,20,21 21:10,
11,25 22:6,19
23:11 26:10,15
35:10,13,17,22
36:1 40:16 44:25
45:6 47:17,25
48:9,11,16 49:20,
25 53:6,8 90:8
103:2 112:7
129:18 159:20
169:5 198:19
201:21 207:16
212:5,24

**depositions**
20:10,21,22 36:4
82:20 94:16
112:1

**descriptions**
142:13 144:3

**detail** 126:24
177:7 181:18

**details** 17:6,20
53:23 54:6 63:25
139:13 206:17

**detect** 104:4
161:3 172:23

**detected** 92:14
106:19 129:3
131:13 149:4
206:23

**detention** 8:5,14
9:6,18 10:19,22
11:2,13,20 12:4
14:24 32:1 84:18

**determine** 22:25
63:14 86:1 88:8,9
107:21,25 108:2,
4 120:16 137:8,
15

**determined**
91:15

**develop** 23:24

**developed**
23:14,16,21 24:2,
7 39:21 56:10

**developing** 8:19

**development**
27:16 29:17
39:17 40:15

**deviated** 64:4

**devote** 8:12
11:24 31:1 41:17

**devoted** 9:10

**diabetes** 134:18,
21

**diagnose** 134:1,
18,23,24 135:1

**diagnosed** 167:9
168:6 171:16

**diagnosing**
70:19 71:8
180:20

**diagnosis** 61:13,
20 62:3 66:1
167:11,23 169:18
170:21 173:22

**diameter** 140:25
144:2 161:17

**diarrhea** 186:22
189:23

**die** 211:11

**died** 80:8 196:5
197:10,25 208:21
209:3,19 210:5

**differed** 88:22

**difference** 67:21
133:21 136:7
144:9 162:25
169:22 180:18
182:21

**differently**
126:20 180:8,9

**difficult** 86:20

**difficulty** 7:3
193:13,19

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**direct** 9:5,7,10 12:6,9 152:23 157:13

**directing** 135:19

**directives** 78:25

**directly** 10:20,21 19:6 25:16

**director** 8:4,13 9:4 10:15,16 12:11 27:20 30:15 31:2,7,16, 19 84:5,11,12,15 86:24 90:4 212:7, 17

**disadvantage** 156:13,18,21

**disagree** 85:16 90:18 136:9 199:9

**discharge** 179:19 180:23 181:9 183:3 184:8,13

**discharged** 182:10 185:16,19

**discharging** 179:23

**disciplinary** 57:17

**discipline** 57:20, 23

**disclosure** 26:2

**discuss** 102:23 149:19 150:10

**discussed** 16:8 19:16 99:22

**discussion** 16:5, 6 100:20 201:22 202:5 204:17

**discussions** 32:20

**disease** 52:6 88:16 89:1,2 121:2 124:18

**diseases** 29:18

**disorder** 40:5

**dispute** 168:15

**disqualified** 58:3

**disregard** 22:12 92:18,22,25

**dissertation** 73:8

**distinct** 106:12

**distinction** 35:24 108:19 180:15

**distinctions** 56:20

**distress** 183:11

**DOC** 87:22 183:11 184:5

**doctor** 6:9,13 18:7 19:20 23:13 24:17 33:9,13 34:1,5 36:21 44:19 46:1 47:14 52:2,3 58:24 65:6,21 66:3,24 67:7,15 70:18 71:15 72:11 73:3, 9,23 74:2,4 77:4 83:4 85:20 86:5 87:3 94:24 95:6 96:6,14 97:10,23 100:7,25 108:19, 21 115:24 121:13 123:1,19 124:1 125:11 126:1,7 128:25 130:23 131:18 133:22 134:11 136:2 137:1 141:14,25 142:24 151:1,7 153:11 154:9 156:11,23 157:8 158:24 159:9 161:20 162:4,13 166:6 178:7,13 179:23 187:8 188:11 195:5 197:19 200:10 201:20 204:25 208:22 209:24 212:4,21

**doctor's** 85:22 200:2

**doctors** 58:24,25 82:2 83:23 199:11

**doctrine** 16:4 33:24 49:23 98:18

**document** 97:19 103:2 105:3,8 111:18 112:3 128:2 139:19,23 146:11,13 153:6, 10 157:14 171:24 193:24 200:3,11, 15

**documentation** 115:2 119:4

**documented** 20:3 111:7 120:4 135:24 144:1 158:1 160:17 193:24

**documents** 19:20,23 20:6 35:25 47:16 88:8 95:7,14 118:12 177:15 192:23 211:17

**dollar** 18:3

**domain** 9:14

**draft** 70:6

**drafted** 99:12

**drafts** 70:3

**Drakovich** 177:13,16

**drank** 103:11

**draw** 67:18 161:8

**drinking** 131:20 179:10

**drinks** 103:12

**drive** 47:22 207:17

**drug** 39:17 86:17 103:7 211:2

**drugs** 29:8,12,14 38:14,17 39:10 40:12 185:8

210:21

**Duane** 181:2,10, 20,24 184:13 191:19,20 192:4, 9 193:7,15,22 194:12

**due** 168:24 169:3 177:8

**duly** 6:3

**Dwayne** 15:20

**dye** 170:14

———————

**E**

**e-mails** 21:4

**ear** 30:3 113:2

**earlier** 19:16 52:18 100:21 140:13 148:12 159:23 183:2 193:25 203:18

**earliest** 29:15

**early** 29:16

**earn** 18:4

**ears** 106:4,8 114:22

**easy** 143:18

**eat** 175:2,3

**educate** 8:24

**educating** 9:14

**education** 37:6 43:10 54:13 59:8

**educational** 36:23

**effects** 177:18

**effort** 159:21

**efforts** 88:4,9

**EGD** 163:25 164:7

**elapsed** 151:1 165:1 193:8,20 194:4

**elective** 42:21,22

**electronic** 124:4

**elicit** 73:25 95:22 98:18 158:5

**emergent** 188:25 189:2,5 190:7 191:22

**emergent/urgent** 189:9,12

**emergently** 189:18 193:2

**employed** 8:4 11:16 13:6

**employee** 28:8

**employees** 60:1

**employment** 13:15,17 17:21 19:15 30:22

**encompasses** 51:13

**encounter** 7:3

**encourage** 179:11

**end** 48:2 95:3 145:11 208:4

**Endogen** 138:25

**engaged** 17:22

**Engagement** 62:19 63:23

**enlarged** 129:19 132:4

**enlarges** 201:4

**enlarging** 76:11

**ensure** 69:16

**ENT** 30:3 150:7, 16,17 151:22 152:4,21 153:20 155:15,24,25 158:19 166:12,16 206:4

**ENT's** 172:24

**entire** 26:2 31:16, 18 104:9,10

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

126:2

entities 46:22,24

entitled 135:5
174:15

entity 15:20 19:3

entries 198:1,5

entry 91:13
107:3,17,24
112:22 128:6,16
129:1 131:6
141:14 142:14
149:18 161:1
163:20 165:11
172:7,24 173:7,9
184:23 186:6
195:16 196:24
197:7,13 198:4,9,
13

ENTS 155:17

environment
56:15

equivalent 157:3
185:9

ER 193:12,18,22
194:13

error 89:21,24,25
90:6,22

errors 89:12,15
90:14

Esophagogastr
oduodenoscopy
164:8

essentially 92:6

Estelle 66:19
72:19

evaluate 145:23

evaluated 74:16,
17 92:3 93:1
122:10 128:14,19
132:15 133:21
142:10,14 205:13

evaluating 64:15

evaluation 71:2
126:25 127:9
141:22 150:8
159:8 202:13,18

205:7,17,19,24
206:2,13

Evansville 7:24
30:7,14 31:2

evenings 36:3

events 68:2,9,17
69:7 70:2,11
98:13 198:9,11,
12 202:24 203:4

eventually
178:25

evidence 89:5
94:11 96:18
97:16 98:4
114:10 117:11
131:24 195:10

exact 10:11 18:22
34:18,24 63:1
79:10 181:11
192:18 193:16
206:9 210:13

exam 33:10,14
50:18 105:25
106:3,13 110:17
114:11,12,14
119:17,21 120:20
121:8,9 122:3,7,
8,14 123:20
124:20 126:7,12,
13,18 127:12
130:10,19 140:20
165:14

examination 6:4
76:1,9 77:10
110:8 114:15
116:1,11 117:12
118:24 120:23
121:6,20 123:11
130:11 138:3
212:2

examinations
93:24 94:15

examine 120:2
121:4,5

examined 6:3
93:20 119:1
120:18 122:17
126:16 127:13

examining

108:22

exclusively 18:8

exhibit 27:5,7,8
36:18,19,20,21
40:16,20 47:24,
25 48:1,3,4,8
102:13,19 103:1
104:8,11,18,21
105:8,24 110:20
111:8,11,24
112:1,7,18,21,23
113:15,18,24
114:10 115:4,25
116:1,24 117:1,
20 118:15 119:5,
7,25 120:7
124:16 126:2,5,
14 127:16,18,21,
25 130:4 135:5
139:17 145:10
146:15 147:14,15
148:1 149:12
151:16,17,18
152:24 157:9,11,
14 160:5,19,24
161:11 166:1,2,6
170:7,8 171:4
172:10,11,18
176:10,11
184:16,17,19
185:11 195:23
196:1,22 198:18,
21 201:21,25

exhibits 112:2,20
171:20

exist 95:7

existed 80:7 81:7

expect 66:13
133:2

expected 183:4

expedite 80:10
159:11

expedited
154:12 155:1,4,
10 159:1,13

expediting 80:20
82:2

expeditious
22:13

experience
16:11 24:21
36:23 44:18 59:6,
9 90:24,25
153:17 208:24
210:12 211:7,8

experienced
44:16 130:21

expert 7:23 16:9
17:24 18:5,11,19
19:5,11,23 20:12
24:20 25:11,14,
18 26:6,11,12,14
29:22,25 30:3
34:19 41:2,3
44:1,5,17,21
45:19 46:6,10,12,
15,21 47:12
48:11,12,21 49:6,
13 52:13,16,19
53:7,21 58:3,6,
11,18 59:1,2,3,
11,14,20,24 60:1,
4 64:1,19 66:10
90:13 136:3
191:5 205:23
206:5,17 212:16

expertise 24:18,
22,24 134:4
156:24 180:20
205:11 212:16

experts 47:8
209:18,23

explain 40:23

explanation
40:25 121:14

extensive 24:21
122:14

extent 16:2 17:17
56:25 95:21
98:17 101:20
115:19

extremely 90:22

extremities
126:16 127:3

extremity 127:1,
6,8,11

eyes 74:25 106:4,
8 114:22

F

facilities 11:16
14:1,11,22 15:24
16:12 57:5 79:14
80:18 84:6 93:20
156:12

facility 12:19
15:16 16:25 82:7
84:3 88:2 90:24
116:17 117:5,19
118:6,17 183:8,
10 185:21

fact 47:9 57:12
62:8 66:10 76:24
114:14 129:17
131:11 136:10
145:22 159:5
190:16 191:6
202:23 209:10
211:6

factor 77:22,24
78:5 104:15

factors 76:13
77:2,9,11 78:16
103:24 105:20
156:8 203:3
210:25 211:3

facts 67:23 68:5,
8,18 70:1,12,13
93:5 202:10,22,
23 203:14

faculty 13:8
41:16 42:17 43:3

fail 50:5

failure 67:7 200:2

fair 9:3 11:8 12:24
15:10 18:7 29:22
37:18 38:11
50:20 60:8 96:25
103:23 108:24
145:20 164:16
167:8,17 177:24

fairly 210:15

familiar 17:2,4
45:15 57:9,12
60:11,16 96:9,13,
16 138:8,13,20

STOLTZ, M.D., RANDALL
07/19/2018

177:18

**families** 81:11

**family** 25:1,3,14,
17 38:4 43:16,17,
21 50:15 51:8,11,
12,18,23 52:2,7,
8,12,16 54:10,12,
14,15,24 58:11,
13,14,19,23,25
59:2,7,14 76:8
85:3,6 104:4,12
136:25 177:8

**Farmer** 72:19

**fashion** 83:5
159:1

**fashioned** 51:20

**fast** 76:10 133:21
155:15

**fastest** 155:6

**fault** 175:20,23

**February** 157:20,
22 161:2,24
163:17,21 164:25

**fee** 35:9

**feedback** 32:17

**feel** 24:22 65:19,
25 137:19

**feeling** 138:4
178:19

**feels** 77:4 138:5
141:10

**fellowship** 38:5

**fellowships** 51:5

**felt** 66:11 93:7
98:12 132:4,10
183:9 188:10
207:3,4,7

**fever** 178:19

**field** 59:21 86:24
99:25 145:5
156:24

**figure** 143:24

**fill** 54:21 87:1

**filled** 180:4

**Filsinger** 119:12
120:10

**final** 68:3,10,13

**finalize** 70:7

**finalized** 69:2
99:13

**finally** 7:18

**find** 63:7 83:11
87:10 115:14
129:17 146:11
195:24

**finding** 89:17
115:10,15 131:18
201:24

**findings** 33:10,
14,19 67:17,21,
23 68:1,3,5,6,16,
20 76:1 85:17
102:1 162:3,5
172:4

**fine** 88:13

**finish** 7:4 62:2
64:24 146:15

**finished** 113:21
127:24

**firm** 18:19 45:21
128:13 131:19
132:14

**fit** 107:22

**flash** 47:21
207:17

**fluids** 179:10,11
187:11 189:22
190:17,19 191:16
193:14 194:2

**focus** 55:10,17
56:4 121:6

**focused** 94:18

**focusing** 205:15

**foggy** 14:10

**folks** 31:6 206:1

**follow** 79:8
132:20 175:3

202:23

**followup** 109:17
110:22,25 111:5
138:16 166:12
174:3 201:7

**followups** 24:3

**font** 40:23 41:8,
10

**foreign** 147:10

**Forgive** 149:17

**forgot** 30:24
107:11

**form** 17:17 18:15
32:11 35:18 44:3
77:7 80:12,22
82:17 87:2 90:19
96:20 97:15 98:3
100:8 101:2
104:8,25 106:13,
16 109:24 110:2
112:19 117:7,11,
23 118:22 119:14
126:10,12
145:14,16 147:24
148:4,9 153:14
156:4,16 158:15
159:2 160:1
163:12,16 174:15
182:22 185:4,12
189:5,19 192:5
193:9 194:20
195:9 197:3
199:22 200:5,13,
22 203:21 206:24
209:5,12,22
210:7,23

**forms** 54:22
125:8 126:13
148:5,11

**formulating**
197:13,17 202:10

**forward** 171:2

**found** 130:9
138:21 172:25

**foundation**
17:17 18:15
80:23 84:9 90:20
92:15 93:16
94:10 95:10

96:12,21 97:16
98:4 108:7,14
111:21,24
115:19,23 119:3
125:10 129:9
131:15,25 133:17
137:17 151:10
153:15 155:9
156:16 159:3
160:2 182:7
190:13 191:9,25
194:7 199:23
200:5,13 206:24
209:6,12,23
210:7,23

**Fourteen** 9:11,12

**fourth** 41:21
42:20

**frame** 6:20 26:1
133:10 136:17
152:16 153:3,8

**Franklin** 40:3
64:14 65:20 66:2
78:8 80:8 86:2
92:7 93:7,19,22
96:1 97:7,11,21,
24 101:5 103:11,
23 105:5 109:12
110:15 113:25
116:8,18 117:4,
12 119:1,18
131:13 148:24
149:22 150:5,9,
20,22,24 151:7
153:8 157:22
158:25 159:11,22
162:13 163:8
165:23 167:4,8,
23 168:6 169:8,
17 170:14,17
171:13 173:5
176:15,24 179:20
180:24 181:2,9,
19 182:14 184:22
185:5,14 187:7
188:9 190:7,25
191:12,22 192:2
193:6,12,18,21,
25 194:6 196:5,
11 197:5,8,10
198:20 202:14,19
206:22 207:19
208:20 209:2

**Franklin's** 22:12
47:22 49:7,15
64:5 80:19 87:15
91:23 92:4,17,18
93:12 105:9
116:2 119:21
120:2,18 127:13
129:4,8 155:1
172:25 175:17
176:19 177:3
184:11 188:24
196:16 209:21

**freely** 141:3

**frequency** 14:14
140:2

**frequent** 210:16

**frequently** 14:4
32:6 106:9 201:3,
11

**front** 27:2,8 30:23
45:20 67:4
127:17 139:6,11
149:1 165:10
166:6 168:25
169:12 170:1
173:14 174:8
181:6 192:11
207:15

**full** 6:6 121:7

**full-time** 10:7,9

**fully** 144:22

**G**

**G.P.** 184:3

**gain** 61:3

**Gamble** 66:20
72:19

**general** 16:15
32:21 43:16
51:15,18,21 52:1,
8 55:19 56:19
113:14 121:1
122:25 164:6
181:13,21 182:3,
13 205:2,6,17

**generalized**
68:18 70:12

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

STOLTZ, M.D., RANDALL
07/19/2018

Page Index: generally..hypotensive

**generally** 9:21 52:10

**generated** 120:9 193:24

**generic** 185:9

**Genitourinary/ renal** 130:5

**GFI** 29:1,2

**give** 6:20 9:17 34:11,24 39:2,4 40:25 44:1,5 49:5,13 53:23 60:8 63:6 72:22 95:3 134:11 170:6 201:15,16 206:17 209:10 210:13 211:5,13

**giving** 59:11,14 87:17 176:3

**gland** 40:10 141:9

**goal** 44:2,5 69:5 70:17

**good** 6:19 40:25 71:3 102:14 187:3 204:8

**goodness** 90:1, 23

**grave** 51:14 195:2

**greater** 139:8 161:16

**greatest** 161:17

**Green** 45:14,16

**Greenberg** 150:17 152:8,13 157:22 159:1,11, 21,23 161:12 163:12,17 164:10,21,24 165:2 166:25 171:15

**Greenberg's** 167:3 170:24

**Greengate** 7:24

**groin** 121:8

**ground** 6:24

**Group** 18:19 43:24 45:8,11

**groups** 37:24

**growing** 96:5 161:9,21 165:15, 19 172:8 173:1

**grown** 160:17

**growth** 161:3

**guard** 178:15 179:6 210:21

**guess** 22:10 23:23 24:10,23 31:3,5 34:9 52:14 59:4,16 65:24 66:9 70:6 74:15 91:17 92:8 93:5 126:21 159:5 174:11 187:18

**guessing** 6:21 81:6

**guidance** 109:13 138:15

**guidelines** 56:9 175:13

**gut** 138:4

**guy** 159:15 194:25

**H**

**h-a-b-i-s** 17:3

**habis** 17:3,14

**habits** 76:9

**half** 96:7 99:1 194:15

**hallmarks** 108:11 176:3

**hand** 27:5 86:25 104:19 111:9 113:16 116:24 119:6 121:3 151:15 157:9

**handed** 27:7 36:19 102:19 103:1 104:21 111:11 117:1 119:7 127:18 147:15 151:17 157:11 166:2 170:8 176:11 198:21

**handle** 184:7

**handy** 34:17

**happen** 90:1

**happened** 58:21 69:8 110:5 130:19,24 198:12 210:12

**happening** 186:21

**happy** 95:3

**hard** 76:12 86:3 108:21,23 147:1 188:12

**Harold's** 129:1

**head** 24:14 111:15 112:10,14 114:22 121:7 199:10 200:17

**head/face** 106:4, 8

**headache** 154:21

**heading** 67:16

**health** 6:15 8:20 13:20 15:3,25 23:14,21 32:5 43:20,22 47:5 54:18 78:25 85:22 88:14 118:1 148:17 212:11,19

**hear** 14:9 84:17 99:21 115:21 116:14 133:22 186:12

**heard** 17:5,7,8 20:14 48:19 52:17 58:10

66:19 85:19 100:12 110:3 145:3

**hearing** 147:1

**Hearld** 129:8 135:24 149:4 157:25 160:17,20

**HEENT** 106:10 114:21 115:3

**held** 6:16 22:15 51:1 204:3

**helps** 37:2

**hepatitis** 87:25 89:7 121:2

**Heyns** 212:6,14

**hide** 86:19

**higher** 35:7,9 77:14,18

**highlight** 41:8

**hired** 18:8 49:5, 13

**historian** 86:2

**history** 76:8 77:10 78:4 86:6 87:10,19,23 88:5, 10,21 92:7,11,13 103:6,8 104:4,12 105:12,16 117:13,16,18 122:15 131:20 132:11

**HIV** 88:15 89:5

**hold** 50:20 60:6 131:8

**holding** 184:1

**Holmes** 20:25 135:8,15 139:24 140:19 141:15 144:4,7 145:16, 20 146:4 148:6, 13 149:16 150:1, 2,3,5,14 151:22 152:1,17 153:4,6 159:10,21 161:3, 5

**Holmes'** 142:13 145:8,11

**home** 7:25 8:1,3 30:8,14 31:2,4,5, 17,18,20 211:9

**hometown** 153:18

**honest** 44:5

**honestly** 30:23 45:25 46:16 58:22 153:21 169:20

**honors** 36:23 37:7,12,22,23

**hope** 69:12 101:23 116:20 143:3,9,12,16,21 144:6 181:23

**hospital** 15:20 30:7 87:3 155:11, 12 179:20 180:4 181:10,21,24,25 182:11 183:3,25 184:13 185:20 186:20 190:10,12 191:1,6,13,23 192:4,10 193:8, 15,22 210:15

**hospital-based** 52:6

**hour** 35:4,10,16

**hourly** 35:2,24

**hours** 8:12,15 9:8 11:24 22:23 23:9, 10 31:1,3,9 54:13,16 194:4, 10,15

**housed** 10:22 84:2

**huge** 133:20 136:6

**human** 29:15 90:2

**hypotension** 186:18

**hypotensive** 186:9,14 190:20

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**I**

**ideal** 143:16
158:17

**identical** 125:8
126:13

**identification**
48:8 113:18
172:11 184:17
196:1

**identified** 48:5
81:21

**identify** 47:14

**ignore** 132:7
200:19

**illness** 122:15

**image** 113:11

**immediately**
96:6 132:9,17
166:24

**immune** 208:16
211:4

**immunosuppres
sed** 211:10

**implementing**
8:20

**important** 7:4
33:9,19 76:15,17
200:15

**improved** 195:2

**improvement**
8:25

**improvements**
210:19

**Improving** 185:2

**in-house** 57:5

**inaccurate**
86:10,12

**inadvertently**
174:4

**inaudible** 195:17

**incarcerated**
49:8 157:4

**incidentally**
199:17

**incidents** 77:18

**incision** 180:19

**include** 9:25 24:2
26:19 77:19
127:2 135:2,3
179:17

**included** 127:5

**includes** 66:4
77:5 103:7

**including** 57:1,
13 58:14 72:23
158:18

**income** 13:18
18:2

**inconsistency**
140:8,16

**increase** 76:2

**increases** 193:2

**independent**
8:7,10 12:2
116:8,10 207:18,
21

**independently**
87:18

**Indiana** 7:25
11:22 13:6 41:20
42:19,24 43:2,6,
14 50:21 210:15

**indicating**
110:22 136:22
157:19 163:13,24
164:17 172:13
173:4 182:17

**indicative**
186:18

**indicators**
206:18

**indifference**
60:12,19,22 61:1,
10,14,21 62:4,9
63:8 66:4 67:9
71:9 72:23 73:1
100:4,13 158:4,
10

**indifferent**
62:20,23 63:9,15
64:4,11,21 70:20
71:17 72:4 99:16
100:22 200:4

**individual** 65:9
178:14

**individuals** 47:8
65:13 184:12
205:14 209:19
210:4

**industry** 28:9

**inexperienced**
44:17

**infants** 52:9

**infection** 177:20,
25 190:2

**infectious** 121:2
124:18

**infirmary** 182:9,
14,18 183:5

**information**
15:11,15,19 16:3,
8 17:5 20:10
22:1,5,6,11 27:2
33:7 34:10 45:20
49:18 59:7 67:4
71:13 81:9 86:16,
19,22 87:2,21
88:3 94:13 95:7,
12 98:10,13
117:4 118:5,10,
18 138:14 158:18
175:1

**informed** 175:23
187:10

**informs** 176:1

**Ingham** 184:21

**initial** 63:22
173:22 205:19
206:12

**initials** 6:12,13

**initiatives** 9:1

**inmate** 9:17 11:1
24:7 56:20,25

**inmates** 8:20 9:5,

20 10:22 11:3,9,
11,13 12:25 13:3
15:5 23:21 28:15
56:5,13 57:12
80:11,21 82:3
84:2,7,19 85:6
86:11 96:10,15,
16 97:3 145:5
156:12,19,24

**inpatient** 184:19

**ins** 154:17

**inserted** 99:15
107:14

**inside** 120:22

**Inspection**
106:17

**instates** 79:20

**institute** 18:13

**institution**
142:19 143:18
203:8

**institutions** 14:5
27:23

**instruct** 204:7,11

**instructing**
16:16

**instruction**
134:11

**insurance**
154:19 156:21

**intake** 15:11
103:6,8 117:7,23
118:22

**intended** 110:22

**intention** 69:10,
14

**intentional** 22:12
65:9 183:1 203:2
204:5

**intentionally**
64:12,13 65:14,
23,25 66:12,16
203:11,24

**interest** 55:10,
13,14,16 136:16

**interested** 16:10
155:14

**interesting**
85:24 86:7 89:18

**interim** 116:16

**internal** 52:3,4,5,
10

**interrupt** 64:24

**interview** 86:15

**Intrasystem**
118:16

**introduced**
212:4

**investigated**
132:6

**involve** 25:17

**involved** 8:24
16:19,20 28:14,
15 31:23 54:17
85:10 158:18
198:8

**involving** 24:12,
15 28:1 53:16
78:8 91:14 162:6
167:5 168:7

**issue** 16:25 98:2
139:15

**issues** 31:20
56:18,19 81:12,
22,23 96:2
101:14 119:24
121:6 164:25
168:25 169:3

**item** 36:14

**IV** 179:11 187:11
190:16,19 191:16
193:14 194:2

**J**

**Jackson** 15:12
153:25 154:3,7

**jail** 12:20,21
23:18,25 41:24
53:24 57:7,9
84:14 87:8 89:7

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

STOLTZ, M.D., RANDALL
07/19/2018

96:15 120:22
130:16,22 153:19
198:10

**jail/prison**
144:20

**jails** 13:23 14:23
55:22 198:2

**January** 27:13
150:18 152:9,11

**jaw** 102:6 106:21
113:1,2 160:9,14

**Jeremy** 196:23

**John** 212:1,4

**John's** 211:25

**Johnston** 177:3

**journal** 55:7

**journals** 54:21
61:7

**judge** 52:13,18
53:7 58:6,7,8

**June** 120:8,17
122:3 125:23
126:17,22
168:11,13,14,17,
18 169:1 174:4
177:2 184:11,23
185:15,21 186:6
190:6 192:12
193:7 196:5
197:9

─────────

**K**

**keeping** 170:23

**Keith** 49:7,15
64:5 86:2 87:15
101:5 116:8
151:7 207:19

**Kevin** 37:11 65:1
115:22 123:25
204:12

**key** 33:10,13,19
70:13

**kids** 52:9

**kind** 14:14 56:16
93:7,22 104:19

113:16 147:8
183:19 184:2
187:18 195:20
200:25

**kindly** 6:6 102:12

**Kite** 177:1

**knowing** 81:11

**knowledge** 47:7
61:3 79:6,11,18,
23 83:22 145:4
174:22 175:5
178:13 179:6

**Kolvalski** 169:7
170:13 171:11
181:1

**Kolvalski's**
169:4 180:23

─────────

**L**

**l-e-f-t** 107:10

**labeled** 68:15
105:24 201:22

**Lacey** 21:8

**language** 99:17
100:3,6

**large** 128:12
131:18 132:14

**larger** 128:8,15,
23 131:22 132:16
133:15

**largest** 84:10,14

**laryngoscopy**
164:13

**late** 173:6 175:10,
14,21 195:16
196:24 197:7,13
198:1,3,5,8

**lateral** 147:7

**law** 18:19 43:24
45:8,11,19,21
58:8 60:6 64:19
67:9 73:8,9 204:3

**lawsuit** 15:25

**lawsuits** 15:23

**lawyer** 17:8 27:6
50:3 64:18 66:23
99:4

**lawyer's** 134:7

**lawyers** 16:15

**layers** 156:14

**layperson** 96:3

**lead** 37:11

**learned** 32:23
177:11

**leave** 107:12

**leaving** 183:9

**left** 89:22 90:14
91:1 93:8 102:6
107:2,10,11,12,
14 113:1,12

**legal** 17:18 60:8,
20 61:9,15,19
62:5 65:15 66:6,
10 67:1,10 70:21,
24 71:10,18,21
72:5,8,13,15
73:25 74:6,12,20
75:14,17,23
101:8 131:23
142:5 157:6
158:6,9 162:20,
23 163:3 167:25
168:3 178:5
200:6,8 204:6

**legally** 67:13

**legs** 122:13
200:17

**length** 12:21
142:12

**lesion** 114:3,7
136:5

**lesions** 137:11

**letters** 106:10

**Levin** 48:10,13

**Levin's** 169:24

**license** 50:21,23
51:1 53:25 57:18

**licensing** 53:12,
14,22 58:7

**lifetime** 26:3

**likelihood** 76:2

**likewise** 12:2

**lipoma** 180:13,15

**list** 25:24 30:14
37:14,17,19 39:5
40:11 44:23,24
47:2,8 154:20
185:8

**listed** 37:4 38:6,8
44:25 53:13
68:21 95:15
108:5 124:3,5
192:23

**listen** 23:19
86:14,16 94:3
195:5

**lists** 30:6 37:4
195:5

**literally** 171:15

**literature** 208:10

**litigation** 45:11

**load** 31:12

**locate** 27:4 36:18
39:9 102:13

**located** 11:21
80:17 112:18,24
122:12 204:17

**location** 76:20

**lodged** 57:17

**long** 6:16 8:9
100:20 143:2
149:3,7 152:20,
22 171:21 193:5
194:18

**long-term** 10:23
12:19 144:21

**longer** 114:4,7
145:5 193:11

**longest** 11:1
143:7,8

**looked** 20:2,9,11,
16,17,22,24
34:10 59:4 91:10
109:6 147:4

**lot** 41:19 42:7
52:4 54:15 76:6,
13 81:4 85:25
86:8 123:6
144:19,23 156:8
201:25 210:14,25
211:3

**love** 154:14

**low** 122:12 179:1
189:11

**lower** 198:23

**lucky** 144:9

**lumbar** 122:10

**lump** 76:10 93:7,
23 132:3 133:13
140:6 199:17
200:16,25 201:8

**lung** 78:1

**lymph** 40:10
75:21 102:4
106:20 107:19
108:17,20,24
109:2,7 110:23
111:1,6,15 112:9,
13,18,24 113:4,5,
13 119:23 162:7
167:15 180:12,16
200:3,11,20
206:23 208:1

**lymphoma** 40:5,
8

**lymphomas**
39:20

─────────

**M**

**M.D.** 6:1

**Madam** 36:17

**made** 26:2 48:6
69:3 70:9 89:17
97:13 107:18,24
112:22 128:20
150:7,16 151:22
152:1,8 159:21
164:3,18 171:3
181:8 197:7

**Madison** 72:18

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**maintain** 47:7 51:24

**majority** 11:8 12:24

**make** 14:9 19:24 20:14 21:24 22:5, 24 55:22 56:8 67:17 70:5 72:21 75:21 88:18 98:1 107:10,13 109:21 133:20 136:6 144:8 145:20 146:5 147:12 150:12 158:9 159:14,15 162:23 169:22 171:7 176:4 178:18 182:21 198:8 207:5

**makes** 54:15 81:2

**making** 78:17

**Malasta** 210:20

**malignancy** 76:3

**malignant** 162:6 199:20

**malpractice** 58:1

**managed** 205:13

**management** 138:7 184:20 205:7,18,24 206:2,4

**maneuver** 141:9

**manifestation** 199:19

**March** 36:7 45:2, 3 165:11 166:8, 21,25 167:8,22 169:18 170:24

**mark** 47:23 48:1 148:9 166:1

**marked** 48:8 106:24 113:7,9, 18 114:11,21 172:11 184:17 196:1

**marking** 48:4

**Mary's** 30:6,11

**mass** 70:19 71:1, 8,16 72:3 76:15, 20 77:3 91:14,24 92:3,8,13,25 93:14 96:4 97:12, 25 108:11,18,20, 25 110:14 128:7 129:2,19 132:19 135:25 136:10 137:9,10,15 138:24 139:10 140:21 141:16, 18,21,24 144:1 145:23 147:8 149:4 151:8,23 154:10,23 155:7 158:1,12 160:9, 13,17 161:8,16, 20 165:15 199:10,19 200:3, 11,19

**masses** 137:2 138:21 172:8,25 199:15

**match** 94:14

**material** 94:8 129:14 134:15

**materials** 67:16 98:15,22 100:23

**Mathis** 20:13 48:17 139:5

**Mathis'** 20:19 21:9,10,25 22:6, 19 23:11 48:15

**matter** 53:14,24 143:3,5,19,21 144:10 155:4 208:17 211:6

**maximum** 144:2

**Mclaren** 179:19 183:3 184:22

**Mcmullen's** 196:23

**Mcquillan** 16:1, 13 17:16 18:15, 20 19:25 23:4 25:25 28:11 29:3

32:11 33:23 34:2, 7 35:18 37:1,9 44:3 49:22 61:15, 22 62:1,5 64:23 65:3,15 66:6 67:1,10 70:21 71:10,18,24 72:5, 13,16 73:5,11,22, 24 74:6,12,20 75:14,23 77:7 80:12,22 82:17 83:14,17 84:9,20 90:19 92:15 93:3, 16 94:10,23 95:10,21 96:12, 20 97:15 98:3,17, 24 99:18 100:1,8, 15 101:1,8 104:7 108:7,14,16 111:20,23 112:4, 19 115:18,23 119:3 123:4,8,12, 15,21 125:10 126:1,6 127:7 129:9,16 131:2, 15,23 133:17 134:3,10 137:17 142:5 151:10 153:14 155:9 156:4,16 157:6 158:5,15 159:2 160:1 162:15,20 167:25 171:5,20 178:5,9 182:7,22 189:19 190:13,22 191:9,25 192:5 193:9 194:7,20 195:9,20 199:22 200:5,13,22 201:24 203:21 204:6 206:24 208:23 209:5,12, 22 210:1,7,23 211:12 212:1,23

**MDOC** 116:20 171:5,9,22

**MDOC27** 187:12

**MDOC28** 185:12

**means** 73:4 86:18 118:7 167:14 174:24 188:21 189:13

**med** 110:25

**medical** 6:9,13 8:4,13 9:4 12:11 15:4,25 19:4 27:19,20 30:1,7, 15 31:2,7,16,19 32:4,9,15,23 36:24 37:12,25 38:1 41:21,22 43:10 50:5,12,20 53:12,13,22,25 56:19,21,22 57:13,15,18 58:7 59:21 60:4,23 61:13,20 62:3 64:2,6 65:10 67:8 71:23 72:1,4,7, 12,23 73:1,3,9,21 74:3,5,11,19,25 75:9,12,17,18,19, 22 79:21 84:5,11, 12,15 85:6 86:6, 12,23,24 87:15, 18,19,23 88:3,5, 10,14,21,22 89:9 90:4 91:11 92:2, 19 93:13,23 96:10 97:3,8,12, 25 101:6,11,21 102:10 106:23 107:5 110:24 112:11,17 115:2 116:20 117:13, 15,18 118:1,9 120:20 124:4 126:3 131:22 133:22 136:3 142:2,3,9 143:25 145:1 154:12 156:14,25 157:3, 19 158:22 162:13,14,18,24 163:1,4,5,6,7 167:17,24 168:3, 5 169:4 176:3 178:4,7,8,11 181:25 182:5 184:1,21 185:23 187:4 188:22 190:8,24,25 191:14,23 196:23 197:24 202:12,17 208:13,20 209:3 211:16

**medication** 145:12 179:10 185:8

**medications** 79:4 179:5,13 185:5

**medicine** 13:7 17:11 19:12 24:22,23,25 25:3, 15,17,19 26:6,14 27:1 37:13 41:20 42:25 43:3,7,14, 17,22 47:12 48:22 50:15 51:8, 11,12,16,18 52:2, 3,5,7,10,12,16,19 53:17 54:11,12, 15,24 55:2,5,17 56:4,11,12 58:11, 13,15,19,21 59:2, 3,6,11,14 66:24 73:20 84:25 85:3 90:25 96:14 99:25 100:25 136:25 137:1,24 145:4 154:16 156:24 172:15 204:2 208:12

**meet** 49:20,25

**meeting** 54:20

**meetings** 54:17, 19 61:6

**meets** 158:13

**Melinda** 177:3

**member** 13:8 41:16 43:3 177:8

**membership** 37:17

**memberships** 37:5,20

**memory** 19:1 116:8,10

**mention** 30:21 93:21 119:23 120:13 181:3

**mentioned** 62:11 63:21,22 65:18 90:7 93:24 94:14 129:20 136:4

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

203:4

**mentioning**
139:7,12

**method** 192:18

**Michigan** 15:8,
12,23 16:11
17:15 64:3 78:21,
24 79:3,7,13,19
97:1 153:25
154:4,7 158:19
212:7,10

**Microsoft** 41:1

**miles** 190:11
191:7

**mind** 48:4 91:15
141:24 142:17
162:25 190:2
198:15

**minimal** 30:25

**minor** 52:8

**minute** 38:19
201:15,17

**minutes** 38:24

**mirror** 167:3

**mischaracterize
s** 23:4 74:21 94:11
97:16 98:4 100:1,
15 108:16 131:24
158:6 195:10

**misquote** 107:9

**misquoted** 107:5

**missed** 49:11

**misstated** 32:2

**misunderstood**
26:8 205:25

**mobile** 76:11
107:21 141:3

**modifications**
55:24

**moment** 13:15
34:13 36:21 39:2
63:6 64:9 113:20
171:17 204:24
211:14

**monitor** 178:21
179:4

**monitored**
181:14

**monitoring**
181:20,25 182:4
183:5,17

**month** 14:6,8,11,
21 31:3,10 41:25
42:2,3,23 55:6
149:10,19 165:4,
5 171:15 201:6

**months** 42:2,3
70:19 71:7,16
72:2 92:10 93:10
96:3 98:1 133:11
136:6,19 140:7,
11 153:20 157:25
158:12 161:21,23
173:22

**mother** 177:3,5

**motion** 176:20

**mouth** 106:4,9
114:23

**move** 82:8 141:8

**moving** 147:2
195:23

**MP** 110:25 188:20

**MRI** 137:12,14
139:12 142:21
146:14 170:14
171:3,12,13
172:20

**multiple** 40:24
62:22 77:22 92:2
93:13,21 94:25
106:2

**muscle** 141:13

**musculoskeletal**
121:23 126:19,24
127:2,5,9

---

**N**

**named** 45:16

**names** 46:20

**Napier** 72:18

**National** 13:19
15:2 47:4 54:17
55:7,21 56:7

**nausea** 179:14
180:10 184:25
186:22 189:22

**nauseous** 179:9

**NCCHC** 46:19
61:6

**necessarily** 18:3
96:17 144:22
173:14 189:23
204:4

**neck** 24:12,14
75:21 76:10
77:19,24 78:2,17
92:4 93:8,23 96:4
97:12,25 105:20
106:13 110:14
111:15 112:10,14
113:10 114:7,12,
25 116:2,11
119:1,22,24
120:2,5,13,18
121:4,5,6 122:1
127:13 128:7,13
129:4 130:6,15
131:1,19 132:3,
15 138:21 140:2,
6,9,14 141:18
145:22,23 147:6,
8,11,19 148:19
149:5 150:15
151:23 154:10,23
155:7 160:6,9
162:7 165:17
167:6,12,15
168:9 172:4,25
196:13 199:4,10,
11,15 200:17
207:22

**neck/thyroid**
106:24 140:20

**needed** 23:6
110:25 163:13
168:20 205:21

**neoplasty**
150:15

**Newhall** 188:2

**night** 21:13,14,15

**node** 75:21 102:4
106:20 107:19
108:17,20,24
109:2,7 110:23
111:2 112:18,24
113:4,5 119:24
180:12,16 200:3,
11,20 206:23
208:1

**nodes** 111:6,15
112:9,14 113:13
162:7 167:15
200:16

**nodule** 128:13
131:19 132:14

**nodules** 106:19

**non-ambulance**
192:8

**non-board** 51:22

**non-prisoner**
201:13

**non-specialty**
56:22

**norm** 198:15,17

**normal** 115:13

**nose** 30:3 106:4,
8 114:22

**notation** 160:25
194:13

**note** 109:12
111:24 135:19
136:21 147:17
168:16 170:11
172:14 175:8
183:7 184:20,21
185:22,25 187:9,
15,21,23 188:23
189:2 193:17,23
194:24,25 196:3

**noted** 103:16
109:3 128:4,12
130:3,14 145:22
154:11,25 158:13
160:13 161:4
169:2 192:13
193:12 199:17

**notes** 22:24
105:16 140:19
141:18 161:1
165:15 172:1
193:11 201:16,18

**notice** 47:16
176:18

**noticed** 140:10

**notified** 188:20,
22 194:3,5

**notion** 46:9 96:9
146:21 210:3

**November**
103:17 119:9
121:17 125:4
126:17 148:17
149:16 152:4

**nuclear** 172:15

**number** 9:20
10:11 18:22 24:9
26:18 34:24 38:8
41:6 44:20 48:3
83:22 110:24
194:8 198:25
210:13

**numbers** 48:1
171:6 198:23

**numerous** 9:2

**nurse** 10:2 83:23
92:9 117:8,12
129:1,8,24
131:12 135:24
148:6 149:4
157:25 160:17,20
169:2 174:15
185:4,12 187:7
188:1,6,24 189:4,
8 192:12 194:3,5
197:2

**nurses** 8:24
10:10,12 32:5

**nursing** 10:6,7,9,
15,16 31:5
109:14 185:25
211:9

**Nutrigen** 210:21

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

STOLTZ, M.D., RANDALL
07/19/2018

## O

**oath** 102:21

**object** 17:16
25:25 73:22,24
95:10 96:12
98:19 104:7
108:7 111:20
115:18 119:3
151:10 182:7
191:9,25 194:7,
20

**objecting** 111:23

**objection** 16:2
18:20 23:4 32:11
33:23 35:18 44:3
49:22 61:15,22
62:1,5 65:15 66:6
67:1,10 70:21
71:10,18,24 72:5,
13 74:6,12,20
75:14,23 77:7
80:12,22 82:17
83:14,17 84:9,20
90:19 92:15 93:3,
16 94:10 95:21
96:20 97:15 98:3,
24 99:18 100:8,
15 101:1,8
108:14 112:19
115:22 125:10
129:9,16 131:2,
15,23 133:17
134:3,10 137:17
142:5 153:14
155:9 156:4,16
157:6 158:5,15
159:2 160:1
162:20 167:25
178:5,9 182:22
189:19 190:13,22
192:5 193:9
195:9 199:22
200:5,22 203:21
204:6 206:24
209:5,22 210:1

**Objections**
100:1

**objective** 66:5
130:8,11 174:25
187:25 188:20

**observation**
184:2

**observed** 131:11
182:11

**obstetric** 51:16

**obtained** 149:24
170:20

**obtaining** 36:24

**occasion** 11:12
15:7

**Occasionally**
31:25

**occasions** 93:21

**occur** 89:13,25
90:2,22 128:25
135:21 149:8
152:14 164:22
168:23 173:11,23
208:5 210:10

**occurred** 149:14
198:9

**occurs** 89:16

**October** 92:8
93:1 132:14
133:13 135:9,12,
21 139:18 147:18
158:1 160:18
205:20 206:8,13

**odd** 129:22
197:23

**offer** 57:5 212:9

**offering** 212:9,16

**offhand** 16:23
24:9,13 45:12
82:4,12 88:7
104:6,13 116:19
146:13 169:15

**office** 52:8
120:21 152:21
155:15 158:20

**officer** 188:7

**older** 77:18

**omitted** 128:18

**oncologist** 134:6
155:23,25 167:18

169:20 203:12
206:4,10

**oncology** 29:23,
25 30:1 59:21,22
170:15

**ongoing** 182:4

**Online** 54:16

**onsite** 8:16

**onus** 201:6,9

**opine** 139:14

**opinion** 22:15,20
44:1,5,6 49:13
54:7 60:9 61:19
64:16,20 65:7,25
68:7 73:23 85:20
93:5 94:18 95:8,
11,13 97:6,11
98:9,11,14 101:5
133:22 136:2
137:8 139:15
141:15,17,19
145:1 153:11
158:3 161:14
167:24 170:3
182:21,23,24,25
183:15 192:24
195:3 196:19
197:14,17,18
202:7,11,22
203:13,20
204:13,15,16,21,
23 205:3,4,11,12
206:15 209:10,
13,16 210:8,9
211:5,15,18
212:9,17

**opinions** 21:19,
22 22:21 34:19
44:9,14 49:6
59:11,14 61:9,12,
19 64:1 65:11
67:18,21,25 68:1,
3,6,8,12,14 70:14
78:20 91:5 98:16,
23 143:24 170:6
197:22 204:25
209:17

**opportunity** 39:5
155:3

**oppose** 202:12,

17 203:23

**opposed** 203:18

**order** 23:24 48:1
57:15 79:8
132:20 135:8
137:2

**ordered** 83:21
136:22 145:9,12
146:21 147:11,19
171:12 179:21

**ordering** 135:14

**orders** 31:22
145:12 187:11
190:20

**organization**
57:24

**organizations**
47:2

**original** 169:1

**originally** 168:22

**outs** 154:18

## P

**p.m.** 186:17
192:12 193:11,17
194:14 195:8
212:24

**PA** 193:11,17

**pack** 103:14

**pages** 40:24
62:22 117:3
119:12 127:21,24
151:20 157:14
166:11 171:4
189:3,7

**paid** 13:21,22,25
28:4,7,9,22 29:1
30:17,19 34:19,
22

**pain** 122:12
140:2,9,14
176:24 178:22
188:14

**painful** 76:11
140:8,9,12

165:20

**palpable** 75:20
77:3 91:14,24
102:4 106:20
107:19 108:11,
17,18,20,24,25
109:2 110:23
111:1,5 112:18,
23 113:5 114:3
180:12,16 206:23

**palpated** 200:20

**palpating** 180:17

**palpation** 77:4
199:17

**paper** 201:25

**papers** 147:2

**Pappendick**
21:7

**paragraph** 63:22
101:25 102:1
162:9 202:7
203:18 205:5
208:5

**paragraphs**
205:3

**paraphrase**
128:6

**pardon** 8:2 35:7
51:8 52:15 62:15
63:18 69:13 75:7
114:18 127:4
137:4 138:18
168:12 173:25
175:12 204:19

**parole** 96:11 97:4
131:8

**part** 7:22 16:24
19:17 29:16
30:25 32:9,14
38:7 48:6 51:25
53:11 58:14
68:13 89:9
101:25 103:6
104:15 110:20
112:6 114:15
122:15,22 126:14
127:9 128:12
131:6 140:1,19
157:21 161:14,16

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

**U. S. LEGAL SUPPORT**
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

STOLTZ, M.D., RANDALL
07/19/2018

167:3 168:20
172:13 175:9,14
178:23,25

**parts** 62:17
150:11

**pass** 50:17 51:3

**past** 21:12,16
43:9 45:24
145:11

**paste** 41:15

**pasted** 41:12

**patches** 189:25

**path** 166:14,17

**pathology**
199:20

**patient** 9:7,10
12:6,9 23:16
31:12,13,14,17
33:2,5,8 64:14
77:6,13,21 78:4
81:24 85:25
86:13,14,15,22
88:13,20,21,24
89:22 97:20
117:25 118:3,8
120:24,25 128:12
131:19 132:2
138:6 140:10
144:16,17,21
154:2,10,23
155:7 159:7
161:19 175:23
177:8,19 179:15
195:3 198:6
201:3,7,9,12
203:25 207:8
208:7

**patient's** 33:20
72:4 77:11 85:21
86:5 88:11 89:22
136:16 140:2
187:10 193:2

**patients** 23:14,
18 29:18 52:6
56:14 86:9 97:19
130:16 177:24
182:1 184:7
199:11 208:14,
15,19 209:1
211:9,10

**Patti** 104:8 171:5
195:20 204:9
211:12

**pause** 20:15

**paying** 28:25
29:2

**peer** 44:11 54:23
55:1 84:24 85:2,5
208:10

**pending** 7:20
166:14,18

**Penicillin** 145:13

**people** 29:20
46:21 81:3 86:17,
19 153:22 156:21
157:3 182:10

**percent** 18:6
103:3 118:20
124:2 137:25
174:11,14 178:17
210:4

**percentage** 18:4
209:18

**perfectly** 133:12

**perform** 28:10
86:24

**performance**
212:17

**performed** 49:6,
14 114:12,16
118:24 121:20
122:4,7 124:20
126:8 127:12
135:11 146:9,17
148:25 149:7
153:13 155:7
158:11 165:7
166:13

**performing** 15:2
116:10

**period** 80:18
90:25 96:5 101:6
129:20 210:17

**permitted** 7:18

**person** 88:18
97:7 108:22
138:3 144:1

**person's** 138:21

**personal** 15:10,
15,19 76:8 79:6,
11,18,23 83:22

**personally** 47:1
49:3 86:15 88:12
197:2

**personnel**
181:25

**perspective**
65:13 142:2
163:4,5 168:3
178:8,11 205:12

**pertain** 38:12
39:10 40:12
114:25 151:21
198:12

**pertaining**
110:10

**pertains** 39:16
114:22 138:21

**PET** 168:21,22
173:16,19,23
174:19 175:9
176:16 177:4,7

**PET-CT** 173:10

**pharmaceutical**
28:2,4,9,18,22
29:4,7 85:12

**Pharmacokineti
cs** 39:14

**pharmacology**
42:7,9,15,18,23
43:11,23

**pharmacy** 27:20
87:3

**pharynx** 189:24

**phase** 29:14

**Phillip** 46:2

**phone** 39:1 73:18
123:22

**phonetic** 210:20,
21

**photograph**
111:13

**phrase** 100:17

**physical** 33:10,
14 77:10 105:24
106:3,13 110:8,
17 114:11,12,14,
15 117:12 118:23
119:17,21 121:8,
20 122:3,7,8
123:20 124:20
126:7,12,13,18
127:12 130:10
162:2 165:14
179:5

**physically** 120:1
126:16

**physician** 9:2
10:4 18:13 31:22
32:17 50:15
53:24 54:1,3,4,5,
7,20 73:19 75:2
83:23 89:21
119:11,17,20
120:10,17 137:1
138:4 158:24

**physician's**
22:14 32:7 89:23
120:1

**physicians** 9:23
38:5 46:20 47:6
55:9 79:12 80:9,
17 82:6,14 154:3

**pick** 14:7

**picture** 113:10

**place** 11:21 16:1
23:1 52:4,5 53:1
87:22 100:6
135:20 148:10
184:12 198:3
207:8

**places** 13:15
30:8 132:23
133:8 154:16

**Placing** 103:19

**plain** 137:21
147:8

**plaintiff** 6:2
18:12

**plaintiff's** 45:14
63:24 100:4,18
110:13 123:22

**plaintiffs** 60:4

**plan** 23:18 24:7
110:22,24 111:5,
7 187:25 206:2,
21,22 207:6,25

**plans** 8:20 23:14,
21,24 24:2

**point** 29:18 34:24
38:3 40:1 67:6
73:17 81:25 85:9
92:11 93:20,25
97:13 102:14
127:20 129:23,24
137:19 139:2
162:19 169:21
195:4

**pointing** 203:15

**policies** 79:10
212:12

**policy** 78:25
97:1,2 184:4,12
212:10

**poor** 205:8,18
206:11,16 208:7

**population**
12:16,17 31:4
56:21 84:10,13,
14 86:21 154:2
181:13,22 182:13
199:21

**portion** 40:17
100:3 124:15
128:15

**pose** 7:9

**posing** 123:3
134:21

**position** 8:19,23
12:11 13:21
28:19 30:17,19

**positions** 32:1

**possibility** 187:3
199:24 200:1

**post** 46:20
186:25

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**potential** 46:15 47:12 76:1 142:8 189:17

**potentially** 74:18 76:21 199:20

**practical** 156:7

**practice** 25:1,2 43:18 51:23 54:14 58:23 59:7 81:5 115:13 120:21 136:25 138:11 144:6,14 153:19

**practices** 51:16

**practitioner** 51:19,21 52:1

**practitioners** 10:2 51:22 83:23

**preauthorization** 154:19

**preceding** 176:23

**premised** 211:15

**prep** 49:25 175:2, 5,13

**preparation** 19:19 20:6 49:20 203:5

**prepare** 20:2,4 36:2

**prepared** 172:1 177:16 188:1 195:16

**preparing** 35:25 78:20 82:14 211:17

**prepped** 81:24

**prescribed** 179:6

**prescription** 79:4

**prescriptions** 179:20,25

**present** 50:2 114:7 122:15

147:10 155:8 161:20 199:11

**presented** 122:16

**presenting** 130:3

**presently** 17:23

**presents** 201:1

**president** 38:1

**pressure** 179:1 186:19 188:22 189:10,11,15 195:1

**pressures** 186:5, 16

**presume** 88:1 118:2 174:25

**pretty** 54:17 55:6 81:19 83:8 153:21 198:7

**prevalent** 114:4

**prevent** 178:16 179:14

**preventable** 196:17

**prevented** 80:20

**previous** 19:16 90:21 120:20

**previously** 21:2 64:18 94:14 99:20,23 129:18 136:4 190:25 191:2,15 203:5

**primary** 24:25 162:5

**printed** 21:5

**prior** 14:18 15:25 20:2 21:10 26:21 49:5,19 59:24 87:21 98:9,16,23 99:7 100:13,18 114:20 124:25 126:13 128:19 130:11 131:21 132:15 133:15 146:16 151:5

183:9 188:23 196:24 198:12

**prison** 12:16 22:14 57:9 60:4 84:10,12 96:16 120:22 143:2 176:4 181:13,22 182:3,19 190:11 191:7,13,16,24 192:3 198:10 205:14 206:1

**prisoner** 176:4 201:13

**prisoners** 57:8 79:8,16 190:11 191:8 212:19

**prisons** 13:23 14:23 15:8 17:15 55:22 182:4,9 183:24 198:2

**private** 81:5 144:6,14 153:18

**privilege** 16:4 98:19

**privileged** 18:20 33:23 49:22 95:22

**problem** 53:16 65:3 75:1,19 89:1 93:23 102:16 121:12 136:18,19 142:9 162:24 163:1,2,6,7 168:5 199:11,12

**problems** 31:23 52:7 88:14 117:14 120:13,25 126:23

**procedure** 79:7 81:25

**procedures** 52:9 79:4,10,12 142:20 164:22 165:3

**proceed** 144:11

**process** 77:4 79:19 81:15 138:7 150:8,15 151:4 152:18

154:15 159:6

**processes** 142:19 154:18

**produced** 7:22 19:16

**product** 16:4 33:24 49:23 95:22 98:18

**professional** 6:15 211:5

**Professionals** 38:3

**proffer** 204:21

**proffered** 209:17

**prognosis** 133:24 169:19 205:8,19 206:7,9, 12,16 208:7

**prognostic** 206:18

**prognostically** 169:22

**progress** 70:6 136:21 147:17 170:10 175:8 196:3 203:1,24

**progressively** 129:19 132:4

**prompt** 142:17, 24 143:25 156:13

**promptly** 142:15, 17,25

**promptness** 145:2

**pronounce** 94:16 95:5

**pronunciations** 94:25

**proof** 115:24

**proper** 53:25 175:1,5 200:19

**properly** 181:14 200:2,10

**proposition**

136:10 156:11

**Protestant** 30:8, 14 31:2

**protocol** 174:16 185:4,12 189:4,8

**protocols** 9:1

**provide** 9:7 32:17 59:20

**provided** 20:12, 18 21:1,18 22:9 39:6 44:24 49:19 65:12 68:24 83:11 192:20

**provider** 104:25 105:5 110:24 113:24 124:17 125:14 138:5 139:18 150:23 154:20 157:20 166:8 170:20 182:12 194:9 204:2

**provider's** 175:19

**providers** 57:14 184:3 188:22 202:13,18,24 203:8,24

**providing** 9:4 12:6 64:2 212:19

**Psychiatric** 121:24

**publication** 17:9 40:11 85:9,14

**publications** 38:8,11 39:5,10, 25 40:12 44:11, 12,23 55:4,11

**published** 84:24 85:2,5,18

**pure** 86:3 195:13

**pushing** 80:10

**put** 70:12 107:9 110:3 113:11 115:2 132:11 138:13 144:7 146:2 150:13,16

152:19 153:22
156:19 159:6,14
161:24 179:11
182:11 184:1
198:8 201:6,9
202:12,17,25
203:8,9

**puts** 55:7 141:17

**putting** 68:10

---

**Q**

**qualified** 52:12,
19 58:6 60:8

**qualify** 53:7

**quality** 8:25 32:4

**quarrel** 210:3

**question** 7:5,7,9,
14,20 16:2,14,16
18:16 20:1,5
23:19 26:8,9,10
29:19 30:24
32:13 34:1,4,5,15
40:6 61:18 62:3
64:25 71:4 72:1
73:10,25 80:4,14
82:18 83:9 85:24
86:7,25 87:8,13
88:20 94:1,2,4,6
95:20 98:21
100:17 101:1,3
112:4 123:3
124:1 127:6
129:11,12 134:8,
13,14,20 150:9,
19 151:6 154:22
162:15 167:20
190:21,23 192:7
195:5,12 204:9
205:15

**questionable**
113:5 200:21

**questioning**
198:4

**questions** 6:5
95:15,18,25 96:8
123:18 211:25
212:3,22

**quick** 38:24

81:19 153:21
155:4

**quicker** 123:7
145:24

**quote** 92:13
102:4,6,9 106:23
107:15 149:19,20

**quoted** 69:8,9
101:21

**quotes** 101:20
110:4

---

**R**

**R-A-N-D-A-L-L**
6:8

**radiating** 122:13

**radiation** 29:25
59:21 170:15
206:5,10

**radiology** 136:23
172:14

**Randall** 6:1,8

**range** 9:22
176:20

**rapidly** 161:21

**rare** 209:11

**rate** 35:2,12,25

**re-review** 22:24

**reach** 67:18,24
159:22

**reaching** 44:14
70:13

**read** 17:9 20:19
21:9,10,14 22:15
34:3 48:9,15,24
55:8,11 61:7,9,
12,19,23 62:13
64:6 73:13 82:8,
20 91:6 94:2,8
100:2,12 102:2,7
106:16,21 116:4
125:12 128:15
129:12,14 131:6,
10 134:15 153:4
159:19 169:4,24

170:1 171:6
172:16 177:15
180:23 181:1,4
184:6 190:23
195:16 196:10
205:1

**reading** 17:10
82:5 93:5 129:1
160:16 172:23
174:25 176:18,22
191:4,10 204:24
207:14

**reads** 114:14

**ready** 63:10
192:13

**reason** 25:23
30:21 121:4
122:11 144:9
168:15,19 175:9

**reasonable**
132:22,25 133:10
154:6

**reasons** 86:20
97:24 176:6

**recall** 13:5 16:22
17:7,12 18:22
24:9,13,16 34:7,9
37:9,10 45:12,13,
16,21 53:11 70:4,
9 73:12 82:5,10
83:20 88:7 90:16
91:3 95:17 98:25
99:3 103:3,5
104:6,13 110:7
111:4 116:7,9,19
132:24 139:9
160:4 164:4,5
169:7,14 181:5,
12,15 182:20
184:9,10,15
191:3,4,10
192:22,25 196:13
210:2

**receive** 36:22
37:7

**received** 37:15,
23 116:17 167:23
169:17 190:25
191:2,22

**receiving** 13:10

118:16,17
184:22,24 185:6
210:4

**recently** 14:7,13

**Reception**
109:13

**recess** 39:3
63:12 102:18
166:5 201:19

**recitation** 86:5

**reckless** 204:5

**recognition**
199:16

**recollect** 139:4
173:15

**recollection**
37:2 85:22
207:19,22

**recommendatio
ns** 175:4

**recommended**
181:12

**reconcile** 88:24

**record** 6:7 38:20
39:4 46:22,24
47:14 48:6,7
49:7,14 63:6,10,
11,13 65:12 89:3
97:20 102:3,10,
17,20 103:5,16
104:9,10,12
106:17,24 107:5,
9 108:12,17
109:2,6,9,21,22
111:25 112:17
118:12,19 123:21
124:4,5,13 126:1
128:24 130:2,23,
25 131:2 140:16
150:11,19,20
151:5 155:1
157:19,21 159:5
169:12 170:24
180:11 182:17
192:11 194:22
196:23 197:24
198:20 201:17
205:1

**recorded** 91:23
105:20 126:10
186:16

**records** 6:17
32:4,9,15 47:22
64:16 68:21 78:7
79:24 83:4,10
87:14 91:6,9,11
92:2,6,19,22
93:6,14 95:11,20
98:12 101:21
103:4 104:5
116:21 126:3
141:8 154:12
158:23 159:9,19
161:4 164:17
169:4 173:14
176:22 187:4
190:24 211:16,18

**refer** 65:18 72:16
87:20,21

**reference** 53:2
72:22 118:23
120:5 174:6,18
206:20

**referral** 24:3 71:3
81:14 145:17
150:16 152:19

**referrals** 82:15
148:14 150:7
151:5 203:10
205:21

**referred** 89:19

**referring** 57:8
58:16 62:14,16
65:10 91:9 104:8
110:11,13 112:20
167:16 183:1
204:18,20 206:3

**reflect** 123:21

**reflecting** 116:1
147:18

**reflects** 93:9

**refrain** 123:5,16

**refresh** 37:2

**regard** 15:1,4
17:10 27:15
33:19 37:7 55:5,
17 91:13 139:5,

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

15 162:2 169:24
181:17 203:17
204:16 209:24

**regional** 162:6
167:5,11 168:8
184:21

**Reglan** 184:25

**regular** 202:25

**rejected** 85:9,13

**relate** 97:4

**related** 87:15
177:15 196:10

**relates** 16:9
115:24 120:2
177:19 212:18

**relation** 53:22

**relationship**
38:16

**released** 182:12
184:3 207:5

**reliability** 144:19

**reliable** 85:21
86:2,4

**relied** 67:17
202:23

**rely** 44:11 202:10,
22

**remember** 6:18
45:22,25 46:1,3
90:17 91:4
104:11 109:23
139:7,11,12
181:11,16 191:10

**remotely** 8:17

**remuneration**
13:10

**render** 54:7 97:6
98:11 205:11

**rendered** 15:5
21:22

**rendering** 44:8
64:16,20 65:11
91:5 94:18 97:10
98:9,16,23 170:3
192:24

**reordered** 174:5

**repeat** 32:13
129:11 195:18
197:20

**repeated** 93:12

**rephrase** 94:1
192:7

**report** 7:23
19:17,23,24 20:4,
8,11,13,16,19
21:10,20,23,24
22:3,4,8,10,18
25:24 26:11 35:8,
25 36:7,10,15
40:17,21 41:6
44:7,19 47:21
48:11,12,16
52:24,25 53:4
59:9 62:10,13,17,
25 63:11,14,15,
25 65:7,18 67:15
68:15,22 69:2,3,
15,19,20,21,23,
24 70:3,5,6,7,8,
12 81:8,13,18
82:14 88:10,21
92:25 95:13,15
99:7,10,13,16
101:20,21,24
105:13,19 107:5
110:9 114:5,6,8,9
119:16,23 120:3,
9,12,16 128:4,11
129:8 132:13
136:23 139:6,13
140:19,23 144:3
145:11 146:12
149:1 150:3,13
151:12 161:12,19
162:3,4 164:25
166:16,17,24
167:3 176:19
177:15 192:12
193:11 196:10
201:20,22 202:4
204:22,23,24
205:5 206:11,20
211:17,19 212:8

**reported** 88:25
92:2,7 103:6
108:12 120:3
128:18 133:14

**reportedly** 136:5

**reporter** 7:6 27:4
34:3 36:18 46:4
47:23 73:13 94:2,
9,24 100:2
102:12 103:1
104:19 111:9
113:16 116:23
119:5 129:15
134:16 151:15
157:9 166:3
176:11 195:18
202:15

**reporting** 128:22

**reports** 10:20
36:2 41:9 69:22
80:3 82:20 92:18
93:13 198:20
203:7

**represent** 198:19
212:6

**representation**
111:13 112:13

**representations**
112:9

**request** 47:21
54:22 82:16,21
83:5,12 87:1,2
98:15,22 145:9,
14,21 146:5
148:1,4 151:21
152:1,4 159:6
164:3,13,18
165:1 171:3
173:10,16

**requested** 44:8
82:14 83:2,7 94:8
129:14 134:15
135:15 146:1
164:10 171:11

**requesting**
79:25 80:2

**requests** 79:24
146:6 203:9
205:21

**require** 136:11

**required** 59:25
141:21

**requirements**
33:18

**requires** 26:1
138:24

**Requisition**
135:5

**reread** 21:15 63:1

**rescheduled**
168:24 169:3
175:9 177:8

**research** 24:24
25:7,12 27:24
28:19,23 29:1,15
38:2,15 41:23
85:11 86:24

**researches** 28:1

**reside** 155:13

**residency** 36:24
37:8 50:8 51:3,6
208:13

**residents** 31:9,
11,21

**resolved** 207:4,9

**respect** 24:1
41:16

**respiratory**
121:22 122:17

**respond** 66:13

**responding** 73:6

**response** 47:16
83:8 84:17 177:1

**responses**
134:20

**responsible**
204:3

**responsive**
16:16

**rest** 40:14 62:25

**restate** 34:2

**restating** 195:21

**restroom** 38:25

**result** 149:20
189:10

**results** 150:10,25
151:9 152:12
153:12

**retain** 46:7

**retained** 18:18
19:3 43:24

**retrospective**
211:16,20

**retrospectively**
183:19,23

**return** 180:3
182:15,18 183:17
185:24

**returned** 165:23
173:5 181:21
185:14

**returning** 149:11

**reveal** 16:17

**reveals** 106:18

**reverse** 208:18

**review** 19:19,22
20:23 21:12
26:11 31:24 32:4,
9,10,14,15 35:5,
6,8,17,22 36:2
38:17 44:1,8,11
49:7,14 54:23
55:1 63:14 78:21,
24 79:3 83:4,10
83:25 84:2,5
95:19 113:20
116:16 117:9
119:13 124:22,24
125:3,17,22,24
141:14 145:8
148:12,18 151:25
158:23 161:14
190:24 208:10
211:18

**reviewed** 19:24
20:4,6,8,16 21:2,
3,17 38:20 61:8
63:11 66:10
67:17 81:13 82:6
87:15 94:12 95:8,
16 150:3,14
164:2 189:17
192:23 196:24
197:21 211:17

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

reviewing 35:25
39:9 55:4 68:21
78:7 95:14,16
103:5 104:5
113:22 120:16
127:22 171:20

reviews 32:5

revise 21:24

revoked 50:23

RGC 15:11

right-hand
198:23

risk 77:14,22,24
78:5,16 103:24
104:15 105:20

rock 76:12

role 10:18

room 115:20

rotating 42:16

rotation 41:22
42:1 43:21

rotations 42:21

roughly 155:8

round 144:7

routine 81:1
82:16,22 123:20
148:10,14 152:2

routinely 54:23
55:1 83:21
138:11,12 148:1,
7

rubbery 141:5

rule 26:1

rules 6:24 79:4

run 38:25

— S —

S-T-O-L-T-Z 6:8

scan 137:12,15
144:4,14 145:2,9,
21,22 146:8,14,
16 147:25 148:25
149:24 150:10,

21,25 152:12
153:12 168:21,22
172:20 173:16,
19,23 174:19
175:9 176:16
177:4,7

scans 142:21
145:6

schedule 14:18
36:5 81:14
154:16

scheduled
110:16 124:17
125:15 149:2,19
152:13 157:20
159:24 164:21
165:2 168:23
171:13 173:19,23
174:4 177:4

scheduler 82:8

schedules
152:20

scheduling
79:19,25 80:4
81:5,22 142:21
143:2 156:9
159:17

school 13:7
32:24 37:12,13
41:20 42:25 43:3,
7,14 50:6,12
208:13

science 137:25

scientifically
85:21

SCM 141:10,12

Scope 62:18
63:23

screaming
123:22,24

screening 103:7

section 60:16
68:15,16 105:24,
25 106:8,24
114:11,14,20,21,
22 126:24 162:3
188:20 201:22
202:4

secure 59:25

security 81:12,
21,23 168:25
169:3 176:6
203:5

seek 96:10 132:9,
17 182:6

seekers 86:17

seeking 73:25
132:20

seeks 95:22
98:17

seminars 99:25

send 54:21
203:11

sentence 11:1
153:3 205:9,16

separate 106:12,
15 115:10,14

separated 115:7,
9,17

separately
106:15

sepsis 101:18
178:1,3,7,11,15
179:3 189:17,20,
23 190:4 193:1
194:18,23 195:3,
6 196:9,17 208:5,
17,21 209:3,19
210:6,10 211:11

sequence 68:2,
9,17 69:6 70:11
98:13 202:24

serve 17:24
44:20 47:8 58:18

served 18:11
19:11 26:5 27:19
45:19 84:5

service 172:15

services 15:4
19:4,12 27:1,16
28:19 46:12 64:2
79:25 80:2 83:13

serving 53:21
59:24

set 21:19 133:6
138:14 142:21
143:21 153:23
156:10 163:13

setting 182:15

settlement 41:7

setup 133:9

shape 108:2

short 166:3

short-term 10:23
12:20

shortness
178:22

shouting 73:15,
16

show 109:24
187:4

showed 107:12
150:15

showing 190:24

shows 89:3

shrunk 144:10

sick 101:18 182:6

side 54:5 89:16,
23 91:23 94:19
108:6 113:10,12
128:13 129:3
131:19 132:15
149:4 198:23

sign 45:10 69:16
179:2 190:2

signed 45:24

significant 87:5
89:1 101:11
142:9 162:24
163:1 178:20

signing 45:22

signs 118:25
178:21

similar 12:16

similarly 90:14

simple 20:5
142:23

simply 123:3

single 33:6

sir 6:7,14 17:2,13
28:13 39:7 40:23
54:10 59:10 60:3,
6 61:25 62:9 64:8
68:20 69:11
74:17 78:7 82:13
96:25 100:11
102:9 104:23
112:16 114:21
115:4 117:20
171:18 192:2,9,
17 199:2 205:11
208:8 210:17,20

sit 17:13 35:10
66:3 130:18
139:4

site 8:18 56:22
57:2 79:8,16,21
80:10,20 82:3,15
83:12 132:23,25
133:2,8 166:12
173:5 176:5

sites 29:21

sitting 23:2 36:1
47:15

situation 53:9
57:9 58:22
122:22 138:2
143:1,16 144:20
155:23 156:7
158:17 179:8
183:12,14 204:3

situations 57:7

six-week 153:8,
11

Sixth 72:17,18

size 9:17 41:8
76:15 84:6
107:25 109:3
138:24 139:10
140:20 142:11
154:10,24 155:8
158:12 200:15

skin 109:6,9

skip 136:20

skipping 140:5

STOLTZ, M.D., RANDALL
07/19/2018

145:10 171:2

**slightly** 20:1

**slow** 202:15

**smoker** 77:21
78:11 103:14

**smoking** 104:1
105:12 131:20

**SOAP** 187:15,23

**society** 37:25
38:1

**soft** 76:12 132:18
137:11 147:6,9,
12 148:19

**software** 138:8

**Solutions** 45:17

**someone's** 76:7
195:8

**sooner** 133:23
134:1,17,18,22,
23,24 136:13
156:1,6 168:19
169:16

**sort** 15:23 16:10
36:22 128:6
212:9

**sorts** 179:4

**sought** 87:18
97:8,11,24

**sounds** 45:15
203:19

**source** 68:25
85:21

**speak** 147:5

**speaks** 124:13
131:2

**special** 148:10

**specialist** 150:17
159:7 170:5

**specialists**
23:17 24:3 81:3
156:19 203:6,10

**specialists'**
205:22

**specialize** 52:5

**specialties**
156:3

**specialty** 51:11,
12,23 56:25
205:21

**specific** 22:18
23:19 24:17 33:8
52:6 55:10,16
81:7 95:17 111:7
122:12 124:7
126:22 138:24
147:6 202:10
203:19 205:16

**specifically** 9:21
24:1 37:4 52:16
58:13 91:10
111:3 120:4

**specifics** 208:22

**speculate** 98:7
115:11 123:2
130:24 131:17
144:25 207:2,12

**speculating**
115:12 123:14
124:2,9 207:11

**speculation** 74:9
86:3 93:6 98:6
129:5,7,17
141:25 144:23,24
195:13 196:18
207:1

**spell** 46:4

**spelled** 95:1

**spellings** 95:2

**spend** 9:8 31:9
41:23,25 42:23
43:16

**spent** 210:14

**spine** 122:10
126:25 127:3,11
147:4

**split** 40:20

**spot** 63:8

**spread** 162:6
167:6,12,14

168:8

**squamous** 167:4
168:7

**St** 30:6,11

**stabilized** 191:20

**stable** 182:12
193:13,19 195:1

**staff** 9:23 10:6,7,
9 12:14 27:20
30:10,11 109:14
158:22

**stage** 169:20
205:19 206:12,16

**staging** 180:20

**STALER** 116:23

**STAMLER** 6:5
18:21 27:4 36:17
37:10 38:23 46:5
65:1,4 72:15,25
73:7,16 94:6 95:2
102:12,16 111:22
115:21 123:6,9,
13,17,24 129:12
134:14 166:4
171:9 202:1
204:11 211:13,24
212:21

**stand** 6:13
141:12 187:23
197:23

**standard** 64:5
66:5 122:23
123:11,19 124:11
155:22 156:2
158:14 200:12
205:6,17

**standards** 56:7

**standpoint**
22:14 69:17
70:24 71:22,23
72:1,7,8 75:17,18
109:4 143:6
162:13 188:13

**stands** 66:25

**start** 36:20
119:13 138:6
168:9,19 187:11

**started** 99:1,2
150:8 168:17
190:17

**starting** 191:16
198:24

**starts** 94:24

**state** 6:6 15:22
16:11 51:1 54:2
78:21 90:4 123:9
126:2 130:25

**stated** 63:15
134:10 161:5
181:9 183:8
202:7 208:4

**statement** 34:16
68:3,10,13 73:6
88:11 131:10
162:16 199:9
206:14 211:6

**statements**
47:20 181:7

**states** 72:21 92:6
106:17 114:17,19
128:13,24 208:11

**stating** 203:23

**statistics** 208:25
209:1

**statute** 60:16

**stay** 12:21 54:10,
12

**stayed** 176:8

**step** 137:20
178:13

**steps** 178:14

**Sternocleidoma
stoid** 141:13

**Stoltz** 6:1,9,22
18:18 27:6,8
32:22 39:4 48:9
63:13 96:9
102:20 103:23
107:17 111:13
112:6 113:17
115:19 143:13
169:7 209:14
210:8 211:15

**Stoltz's** 208:24

**stop** 73:14

**stopping** 102:14

**story** 86:16
144:23

**strongly** 202:12,
17 203:17,23

**structures** 141:6

**student** 42:3

**students** 41:21,
22 42:16,17
43:10 89:9

**studying** 42:18

**subcutaneous**
76:12

**subject** 211:25

**subjected** 57:20,
23

**subjective** 66:5
117:17,25 118:7
187:25 188:12

**submission**
79:24

**submitted** 81:10
83:2,12 85:11,12
147:25 148:5

**subsequent**
161:1

**substance**
204:22

**substantial**
176:24

**sudden** 129:22

**sued** 58:1

**suffered** 162:14

**suffering** 162:18

**sufficient** 98:10

**suggests** 187:6

**sum** 204:22

**summaries**
198:11

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

**U. S. LEGAL SUPPORT**
Bingham Farms/Southfield | Grand Rapids

Phone:   888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**summarize**
198:9

**summarizes**
205:2

**summarizing**
68:17 70:11

**summary** 68:16
102:1 116:16
117:3,19,24
118:5,16,17
140:13 180:23
181:9 198:11

**supervise** 10:12,
16 12:14

**supervision**
10:18

**supplement**
205:3

**support** 206:13

**suppose** 34:7

**supposedly**
193:21

**suppress** 211:4

**Supreme** 72:21

**surgery** 183:25

**surprise** 155:21

**surprised**
155:16,19

**survey** 13:25
14:11,19,22 15:1,
7

**surveying** 14:4
55:25

**surveys** 13:23
55:21 198:2,6

**survival** 193:3

**susceptible**
78:17 177:20,25

**suspected**
23:15,22 24:1,8,
12

**suspended**
50:24

**suspicion** 74:4,
16 76:2 141:16

**suspicions**
74:10

**suspicious**
70:19 71:1,8
141:17,18,24
142:1 151:23

**swallowing**
141:9 188:15

**swelling** 188:10,
18

**swollen** 189:24

**sworn** 6:3

**symmetrical**
76:24

**symmetry**
106:18

**symptoms**
138:14 179:5
199:16

**synonym** 65:24

**synonymous**
51:18 66:16

**system** 40:10
57:13 122:17
127:3,5 138:8,20
182:3 208:16
211:4

**systems** 122:25
124:22,24 125:3,
18,22,24 138:13

———————

**T**

**T-CELL** 39:20
40:8

**table** 130:19

**takes** 35:14 52:10
143:2,20 145:5
152:21

**taking** 51:14
135:20 183:1

**talk** 82:7

**talked** 16:14

49:24 183:2

**talking** 73:18
96:23 117:21
171:7 188:14
195:1 205:25

**talks** 189:2

**tandem** 131:10

**Tardiness**
175:17

**taught** 42:24
208:12

**teach** 42:8

**teaching** 42:5

**team** 65:10

**tech** 133:7

**teenagers** 51:15

**telephone** 7:2

**tells** 88:13,15

**ten** 6:20,21 18:23,
25 130:18 144:10

**tend** 41:8 51:22
88:14 101:15
184:1

**term** 52:17 60:11,
19,20,23,25 61:4,
5 62:9,18,19,23
63:2,8 64:10
65:21,22 66:4,15
73:3 100:12,22
101:4 109:20,22
110:2 203:17

**terminal** 211:1

**terminology**
163:4,6

**terms** 13:14
33:19 69:6 72:22
126:12 145:2
156:8 204:23

**terrible** 88:16
183:10

**test** 6:18 89:6
137:8,11,14,23

**tested** 174:13

**testified** 6:3
17:22 25:11,14,
18 26:10,13,15
43:4 45:3 52:18
53:6 58:11 66:15
74:18 90:5 100:3
104:15 109:3
114:6 139:5
148:13,24 152:1
153:7 184:10
193:25 197:16
207:18,21,25

**testify** 46:23
58:10 138:23
154:6

**testifying** 26:12
59:1,5 90:13
145:6 205:23

**testimony** 7:6
13:24 19:14
20:14 23:5 26:3
44:25 59:20
65:14 74:22 90:3,
11,18 100:2,11,
16 102:23 111:4
113:6 116:5
133:16 137:23
143:6,14,24
146:4 148:12
153:24 154:9
158:7 164:2,4,17
169:24 173:18
181:4,8,16 184:6
191:4 194:6
201:10 207:3,14
209:24

**testing** 24:3 57:1
79:21 82:15
83:13 89:2
138:16 142:22
144:12 168:20
205:21

**tests** 23:24 139:9
163:13 165:1

**texture** 76:17
107:19 141:5
142:12

**that'd** 132:25

**therapist** 206:5,
10

**therapy** 87:12
101:17

**thereof** 196:14
199:4

**thing** 37:16 43:18
53:25 55:9 56:10
58:23 69:24
79:22,23 96:7
124:3,7 130:17
132:22,25 138:6
144:7 153:2
171:8 191:17

**things** 9:2 20:2,
10 22:18 32:20,
21 38:4 54:15
55:13,19 64:12
69:8 76:9 81:4,
15,23,25 89:7
97:19 121:10
124:5 136:14
137:25 151:4
156:10 158:21
159:16 178:22
179:12 183:20
191:17 203:1,6
205:12

**Thirteen** 166:8

**thought** 46:17
65:1 70:13 93:9
105:14 145:24
194:23

**thoughts** 44:6
68:8

**three-page**
120:9

**throat** 30:3 77:24
78:2,18 103:24
106:4,9 114:23
188:18

**thrush** 190:3,4

**Thurber** 212:3,4

**thyroid** 106:13,
18 114:25 141:8,
9 165:17 172:5

**thyroid/area**
160:6

**thyromegaly**
106:18

STOLTZ, M.D., RANDALL
07/19/2018

**time**  6:20 9:9 23:6
26:1 30:24 32:20
34:11 35:14,21
36:3,4 41:17,24,
25 43:16 45:2
50:17 51:21 57:6
63:21 69:7,12,14
80:18 85:9 96:5
101:6 108:22
115:20 117:14
122:23 124:12
129:20 130:16,19
133:10 136:17
137:20 138:1,2,5
142:12 147:1
149:3 150:20,24
151:7 152:16,25
153:3,8 155:6,10
161:23 162:19
164:24 175:6
183:7,14 185:23
192:14 193:5,8,
15,16,20 194:4,
13,24 195:22
207:4 210:14,16,
17

**timeline**  68:24
70:1

**timely**  67:7

**times**  11:4 14:8,
11 18:18 24:6,10,
11 25:17,21 26:5,
13,16,17,21,25
29:10 33:6 44:18
46:21 52:21
58:15 86:9 87:11
124:7 128:7,15,
22 131:21 132:16
133:15 138:12
156:18,20 201:7
208:14,18 210:11
211:11

**timing**  203:4

**tiny**  33:7

**tissue**  132:18
137:11 147:6
148:19

**tissues**  147:9,13

**title**  41:6 42:12,15

**today**  6:24 17:13
20:2 23:3 26:19

**tone**  73:15
123:16

27:12,14 66:3
139:3,4 142:23

**toe**  121:7

**told**  60:3,5 97:21
161:20 166:16
175:2 177:3,5
207:8,10

**tongue**  188:10

**tonsil**  162:6
167:5,11 168:8

**tonsillar**  11:13
13:4 24:15,16
29:13,20 75:5,12
101:12 113:7,8,
13 180:21

**tonsils**  166:13
188:19

**top**  126:13

**topic**  55:6,15
96:19

**totally**  198:3

**touch**  109:10

**touching**  207:22

**track**  37:15

**train**  89:10

**training**  59:8
89:9 208:13

**transcript**  23:11
48:9,16 148:13
151:25 207:15

**transcripts**
20:17 82:5 90:8
159:20

**transfer**  116:16
118:16,17 192:20

**transferred**  88:2
116:18 191:19
192:14

**transferring**
117:19 118:6

**transpired**
211:20

**transportation**
192:18

**transported**
192:3,9,17

**transposed**  91:1
113:11

**transposition**
89:16

**treat**  11:12 29:12,
17,20 40:12 67:7
133:23 134:18,23
179:9 180:7
191:13

**treated**  11:11
13:3 174:13
189:18 190:11
191:8

**treaters**  87:17

**treating**  71:16
72:3 134:2
158:24 180:21
193:1

**treatment**  38:16
49:8,15 56:5,17
57:1,14 65:20
66:1 79:9,16,21
82:15 87:7 88:17
97:8,25 131:7
162:2 195:7
202:14,19 205:22

**trial**  26:15 29:5
36:4 58:7

**trials**  28:5,10,14

**triggers**  145:24

**true**  71:1 86:19
134:17

**truth**  96:2

**turn**  105:23
110:19 111:8
113:15 114:20
135:4 157:8
173:13 185:3
187:20 190:4
198:18

**turning**  40:16
118:22 119:5
120:7 122:3

127:16 136:20
149:11 160:5
163:11 164:20
165:22 174:15
176:10 184:16
185:11

**Twenty-three**
149:24

**type**  25:16 36:12
37:16 39:19 40:2,
3,5,7 43:18 47:7
53:21 55:4 56:10
75:4 81:25 96:7
138:24 139:9,10
179:12 206:18
208:19 209:1,20
210:5

**typed**  36:14 41:2

**types**  18:9 39:18
77:14,17

**typical**  8:24 11:1
56:24

**typically**  11:5,7
12:22 18:8 52:5
57:1 115:9 145:7

**typing**  111:14

**typist**  41:3

───────

**U**

───────

**unanswered**
95:20,25

**uncommon**  87:9

**Uncommonly**
190:5

**underlying**
141:6

**understand**  6:22
7:7,10,11,20
13:24 23:7,23
33:1 43:17 59:10
60:25 66:3,23,25
68:5 78:7,11,14
80:2 81:14
102:21 117:23
143:23 156:23
157:2 164:9
167:14,19 176:22

178:7 179:25
180:3,7 191:18
197:19 204:1

**understanding**
64:15 66:22
92:21 113:6
179:4

**understands**
73:20

**understood**
7:15,16 22:2
37:10 78:16
160:13

**undertaken**  88:9

**unique**  56:16

**unit**  188:7

**United**  72:20

**units**  210:14

**university**  13:7,
11 37:12 41:17,
20 42:20,25 43:2,
7,14 210:15

**unnecessary**
73:15

**unscheduled**
166:9 170:18

**update**  163:16,
20,24 166:20,21
167:2 172:12,19
173:4 174:2

**updated**  27:13

**updates**  55:24

**Uptodate**  138:9,
20 139:2

**urgent**  82:16,24
83:5,7,8,12
145:21 146:1
148:9 152:2
155:12 189:5
190:7

**urgent/
emergent**  191:14

**urgently**  135:16
136:12 146:5,6
164:3,5,18
173:17 190:18

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

STOLTZ, M.D., RANDALL
07/19/2018

**urination** 140:3

**USC** 60:16

**uvula** 189:24

—————————

**V**

**vague** 32:11 44:3
156:4 192:5
194:20

**van** 192:3,6,8

**Vanderburgh**
8:5 9:5 10:18
12:3,17 28:15
32:3 37:24 84:16,
18

**varies** 14:6 41:19
42:4

**variety** 54:21

**vary** 52:4 85:24
86:8

**vast** 11:8 12:24

**verbal** 187:11

**verbatim** 106:23

**verified** 88:4

**verify** 70:1 86:16
87:9,11,18 88:5
89:2 157:16
169:12

**versus** 36:1
45:16 72:17,18,
19,20 76:24
88:25 181:21
192:8 201:13

**view** 86:5 196:16
211:20

**views** 147:7

**violate** 16:3
200:12

**visit** 104:25
109:17,25 110:1,
4,5 113:24 119:9,
14 120:8 121:1,
18 122:6,24
124:17 125:1,6,8,
14,23 139:18
149:19 150:23

**157:**20 165:12
166:9,12 170:18
171:23 176:12,19
194:9

**visiting** 14:1

**visits** 23:25 79:21
124:6,25 125:12,
13,16 129:21
176:23

**vitae** 7:23 25:23
27:10

**vital** 118:25
178:21

**volumes** 116:4

**volunteer** 13:8
41:16 43:3,10

**vomiting** 179:9,
14 180:10 185:1
186:22 189:15,22

—————————

**W**

**wait** 23:9,10 96:6
133:11 144:15

**waited** 144:13

**waiting** 136:15

**wanted** 42:19
147:12 169:9

**warm** 109:9

**warning** 208:6
210:11

**Warrick** 11:20
12:7,14,16,25
13:4 28:16 32:3

**Waters** 15:20
181:2,10,20,24
184:13 191:19,20
192:4,10 193:8,
15,22 194:12

**ways** 82:21 83:1

**weather** 81:10,
21,24 158:19,21
159:17 203:5

**weeded** 51:25

**week** 11:24 31:1

**133:**9,10 143:17
144:5,10,15
154:14 165:5

**weekends** 36:3

**weekly** 8:12 9:9
41:18 103:12

**weeks** 133:20
136:1,6,18 143:4,
5,7,8,9,12,14,15,
20,22 149:6,23
152:15 153:21,23
154:6 155:5,17,
20 169:10 201:5
207:9

**West** 28:18 29:6

**whatsoever**
87:11

**wheelchair**
192:13

**white** 189:25

**Wilton** 72:20

**witness'** 74:21
100:16 134:4

**witnesses** 191:5

**word** 41:1 66:11
97:19,20 107:14
159:13

**wording** 22:25
62:13 181:5

**words** 68:24 77:3
91:22 99:15
102:6 107:2
195:21

**work** 8:7,13,16
9:15 11:25 13:19,
22,25 14:12,19,
23 15:1 16:4,24
18:5 23:13,20
27:15 28:1,25
29:5 30:4,9 32:7
33:22,24 35:3
38:14 41:16,18
42:17 43:2,6,13
45:13 46:6,21
49:22 53:2 58:14
60:1,4 64:13
79:12 86:23
95:22 98:18

**100:**24 180:8,9
206:1

**worked** 23:16,17
28:18 29:14
83:24 148:11

**working** 8:17
11:19 16:11
27:16 29:6,7 34:6
39:23 130:22
175:25 205:14

**works** 41:20
42:20 146:3
152:18 154:16

**world** 208:24

**worried** 71:1

**worrisome**
145:23 162:5

**worry** 201:4

**worse** 176:20

**write** 36:10
207:25

**writes** 140:1
172:4

**writing** 99:7,9
111:14

**written** 91:19
94:19 126:20

**wrong** 54:8 129:3
137:14 172:15

**wrote** 59:9 63:25
64:8 69:3 85:8
101:25 109:18
114:4,6 115:25
128:8,11,12
149:17 205:16
206:11

—————————

**X**

**x-ray** 132:9,17,
20,23,25 133:7,
11,13 135:5,8,11,
14,20 136:15,22
137:21,22 146:17
147:3,4 148:19
149:7,9

**x-rays** 137:2
147:9,19 203:9

—————————

**Y**

**year** 11:4,5,9
12:22 13:1 14:15
27:13 41:21 42:7,
20 50:12 54:14
92:9,10 96:6 99:1
128:8,14,19
131:21 132:3,15
133:14,19 136:8,
11 154:25 155:8

**years** 6:20,21
11:12 13:3 24:6,
25 25:2 26:7,13
50:8 56:1 87:13
99:24 103:14
105:9 129:20
137:7 144:18
208:15

**yesterday** 20:12,
18 21:1,18 23:12
130:20

—————————

**Z**

**zeros** 198:24

**Zofran** 179:17
180:1,7