UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAREN FRANKLIN, personal
representative of the estate
of Keith Franklin,

      Plaintiff,

v.

CORIZON HEALTH, INC., *et al.*,

      Defendants.

Case No. 16-13587
Honorable Laurie J. Michelson
Magistrate Judge David R. Grand

---

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [82], GRANTING IN PART AND DENYING IN PART CORIZON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [80], AND GRANTING DEFENDANT HEYN'S MOTION FOR SUMMARY JUDGMENT [81]

In 2014, Keith Franklin died of cancer. At the time, he was an inmate in the Michigan Department of Corrections. Franklin's mother, as the representative of his estate, brings this lawsuit challenging the medical care Franklin received while incarcerated. Ms. Franklin says the individual doctors who treated her son, the company they work for, and the head of MDOC all violated Franklin's Eighth Amendment rights.

In time, all parties moved for summary judgment. And for the reasons that follow, one of Franklin's claims needs to go to a jury. The rest are dismissed.

**I.**

**A.**

On August 6, 2012, Keith Franklin began serving a one- to five-year term of incarceration in the Michigan Department of Corrections for his second DUI offense. (ECF No. 93, PageID.615–618, 1238.) On that day, Franklin arrived at MDOC's Reception and Guidance Center, where,

among other things, he had his intake physical. (ECF No. 80, PageID.1590.) At the intake physical, an MDOC medical professional discovered that Franklin had Hepatitis C, so he was scheduled for a "bubble" appointment the next day. (*Id.* at PageID.1622–1623.) A bubble appointment, not normally longer than 90 minutes (*id.* at PageID.1775–1776), is used to further evaluate a prisoner who presents at intake with a chronic illness (ECF No. 80, PageID.1754–1756).

### 1.

Dr. Janak Bhavsar performed Franklin's bubble exam. (ECF No. 80, PageID.1586.) Bhavsar has a fuzzy memory of it. (*Compare* ECF No. 80, PageID.1725–1726, 1757, 1883, *with id.* at PageID.1873–1875.) But Bhavsar's charting helps fill in some of the gaps. It appears Bhavsar educated Franklin on the importance of monitoring his Hepatitis C symptoms, getting regular exercise, and taking his medications. (*Id.* at PageID.1586.) And as part of the appointment, Bhavsar took a snapshot of Franklin's medical history, learning, among other things, that Franklin was a pack-a-day smoker for decades. (*Id.* at PageID.1584.)

Importantly, the bubble appointment includes a physical exam. (*Id.* at PageID.1583–1586.) As part of the physical, Bhavsar palpated Franklin's head, neck, and thyroid. (*Id.*) Although Bhavsar charted that his inspection of those areas "reveal[ed] symmetry," he also left a cryptic comment: "? palpable lymphnode 2-3 cm below L angle of jaw." (*Id.*) Beyond the cryptic notation, Bhavsar's charting is otherwise silent about what he did to follow up on a possible palpable lymph node. However, Bhavsar did order a "CBC" (*id.* at PageID. 1586), short for a complete blood panel, a thorough blood test Bhavsar says he did not ordinarily order for every patient (*id.* at PageID.1793). Eventually, Franklin's blood test came back normal. (*Id.* at PageID.1594–1611.)

Two weeks later, Bhavsar saw Franklin again, this time for a clearance physical. (ECF No. 80, PageID.1563–1565, 1754–56.) The clearance physical is a medical appointment prior to a

prisoner's transfer from the Reception and Guidance Center to a longer-term facility within MDOC. (*Id.*) Once more Bhavsar conducted a physical exam. (ECF No. 80, PageID.1812.) The physical exam's charting does not say one way or another whether Bhavsar palpated Franklin's neck and thyroid. (*Id.* at PageID.1563–1564.) And the chart is also silent about the presence or absence of any palpable lymph node. But the charting is clear that Bhavsar reviewed the previously ordered lab work, ordered more labs, took Franklin's vitals, and educated him about routine health issues. (*Id.* at PageID.1564–1565.) Then he labeled Franklin a chronic care patient (because of his Hepatitis C) ready to be transferred anywhere within the prison system. (*Id.* at PageID.1561, 1732–1733.)

### 2.

Franklin was transferred to the Carson City Correctional Facility. There, he was under the care of Dr. Scott Holmes and Dr. Daniel Carrel. (ECF No. 86, PageID.8552–8553, 8580–8581.) And from September 2012 through October 2013, Franklin's medical records show he received care related to his Hepatitis C and other minor health issues. (*Id.* at PageID.1477–1558.)

Circumstances changed in October 2013. On October 9, Franklin sought treatment for frequent urination. (ECF No, 80, PageID.1485.) The nurse who treated Franklin conducted a physical exam. (ECF No, 80, PageID.1485.) During the physical, the nurse found a mass on the right side of Franklin's neck. (*Id.*) The nurse charted the mass as large and firm. (*Id.*) Notably, her charting reflects that Franklin said the mass had been evaluated last August but was now "5-6 times larger." (*Id.*) The chart also notes that Franklin had not sought treatment for the mass because doing so, he thought, might hold up his parole. (*Id.*) So the nurse referred Franklin for further evaluation in two weeks and ordered an x-ray. (*Id.*)

Further evaluation came on October 23, 2013, when Franklin saw Dr. Holmes. Holmes charted that Franklin had "a lump to the right side of the neck." (ECF No 80, PageID. 1471–1475.) Holmes did a physical exam and noted that the lump was persistent, firm, about four centimeters in diameter, not freely mobile, rubbery, and fixed. (*Id.* at PageID.1472.) He indicated it did not feel like lymph node material. (*Id.* at PageID.1475.) Holmes, too, charted that Franklin said he first noticed the lump 15 months prior, and the mass had been growing in the interim. (*Id.* at PageID.1471.) Holmes concluded by recording his "suspicion here for [an] ominous neck mass that needs further evaluation." (*Id.*)

Consistent with this note, Holmes set a treatment plan in place. Although he believed the mass was not likely a symptom of an infection, he prescribed a dose of penicillin. (ECF No. 80, PageID.1472.) Then he ordered imaging. Within the prison's clinic, he sent Franklin for an x-ray with a low dose of radiation, thinking he might be able to quickly get a picture of the neck's soft tissue. (*Id.* at PageID.1463, 1466, 2255.) And he submitted a request for an outside medical provider to do a CT scan. (*Id.* at PageID.1465.)

Although Holmes had ordered the CT scan on October 23, 2013, the results did not come back until late November. (ECF No. 80, PageID.1441–1445, 1458.) They showed a "bulky heterogenous mass deep to the SCM muscle with considerable mass effect . . . and inseparable from the tonsillar pillar." (*Id.* at PageID.1437.) The CT results strongly suggested cancer, which necessitated a biopsy. (*Id.*) So Holmes referred Franklin to an Ear Nose and Throat specialist for a consult about a biopsy. (*Id.*)

Like the CT scan, scheduling the ENT consult took some time. In early December, the prison booked Franklin's consult for January 6, 2014. (ECF No. 80, PageID.1436.) The consult confirmation included in Franklin's medical records says Dr. Holmes approved of the time frame.

(*Id.*) But on the day of the appointment, a snowstorm forced the ENT's office to close. (*Id.* at PageID.1422, 2405–2406.) So Franklin's appointment had to be rescheduled for February 10, 2014. (*Id.* at PageID. 1413, 2406.)

While Franklin waited to see the ENT for a consult, he started to complain of pain. (ECF No. 80, PageID.1422.) In mid-December 2013, Dr. Carrel saw Franklin and recorded that Franklin had "some masses at the angle of the R jaw and a 2.1 cm submandibular mass." (*Id.* at PageID.1431.) The masses caused pain, so Carrel prescribed some non-steroidal anti-inflammatory pain medications (i.e., generic versions of Advil, Tylenol, and Aleve). (*Id.*) A month later, Carrel again saw Franklin and charted that Franklin "feels the mass is growing." (*Id.* at PageID.1422.) Franklin even started to feel pain when he opened his mouth. (*Id.*) And by then, Carrel described Franklin as having a "solid fixed lesion on his R neck that is 15 cm by 5 cm." (*Id.*) Again, Carrel increased Franklin's dosages of generic Advil, Tylenol, and Aleve. (*Id.* at PageID.1423.)

On February 10, 2014, Franklin had his consult with the ENT. (ECF No. 80, PageID.1413.) And that same week, Dr. Carrel went over the ENT's report with Franklin. (*Id.*) The ENT wanted Franklin to have two procedures. The first was a biopsy done via laryngoscopy. (*Id.*) The second was an esophagoscopy (a scope of the esophagus) "in the operating room under general anesthesia." (*Id.*) Carrel filled out a request for the two treatments. (*Id.* at PageID.1404.)

But Carrel incorrectly filled out the request. Corizon required each procedure to have its own paperwork. (ECF No. 80, PageID.1404–1405.) Carrel put the laryngoscopy and the esophagoscopy on the same piece of paper. (*Id.*) So Carrel's first request was denied (*id.* at PageID.1405), and the next day Carrel tried again (*id.* at PageID.1399, 1402). He submitted two

requests, both were approved, and Franklin's biopsy was set for March 18, 2014, about a month later. (*Id.* at PageID.1396.)

While he waited for the biopsy, Franklin again complained about the pain. As the mass expanded, Franklin's jaw started to hurt. (ECF No. 80, PageID.1376.) In response, Carrel added Norco to Franklin's pain medications. (*Id.* at PageID.1375.)

On March 18, 2014, the ENT performed the biopsy. (ECF No. 80, PageID.1364.) And, before the results came back, the ENT told Franklin to prepare for a cancer diagnosis. (ECF No. 80, PageID.1364.) Shortly after, the ENT's pathology report confirmed the cancer was an "invasive, moderately-differentiated squamous cell carcinoma." (*Id.* at PageID.1356.) The squamous cell carcinoma was staged at "T2N3" of the right tonsil with spread to the right neck. (*Id.*) To begin treatment, the ENT recommended the prison refer Franklin to a medical oncologist and a radiation oncologist. (*Id.*)

Two days after receiving the pathology report, Dr. Carrel completed the referrals Franklin needed to see radiation and medical oncologists. (ECF No. 80, PageID.1353.)

Less than a month later, Franklin saw a medical oncologist, Dr. Cheryl Kovalski. (ECF No. 80, PageID.1332.) At the appointment with Kovalski, Franklin asked if it was possible to delay his treatment for three months so he could seek a medical parole. (*Id.*) But Kovalski said Franklin might not have that long to live. (*Id.*) So Kovalski asked Corizon to refer Franklin for an MRI, which confirmed a right-sided mass with likely metastasis. (*Id.* at PageID.1299.)

A short time later, Franklin saw the radiation oncologist. (*Id.* at PageID.1288.) The radiation oncologist recommended a PET-CT scan. (*Id.*) And depending on the PET-CT results, he would recommend a particular course of chemotherapy to shrink the tumor prior to starting radiation. (*Id.*)

Carrel scheduled Franklin's PET-CT scan for May 2014. (*Id.*) But Franklin did not properly prepare for it. (ECF No. 80, PageID. 1259, 1264.) So the scan was rescheduled for, and occurred in, mid-June. (*Id.* at PageID. 1259, 1206.) Yet the delay in obtaining a PET-CT scan meant Franklin had to wait for chemotherapy to begin. (ECF No. 85, PageID.6937–6938.)

By April, Franklin had "four masses on his R neck." (*Id.* at PageID.1321.) The masses caused pain, which Carrel continued to address. (ECF No. 80, PageID.1320.) Carrel increased Franklin's pain medication. (*Id.* at PageID.1319.) But Franklin's pain grew worse, and he requested higher doses of pain killers. (ECF No. 80, PageID.1254.) By late May Franklin told Carrel the pain medication did nothing at all. (ECF No. 80, PageID. 1247, 1245.)

Also by May, Carrel knew Franklin's situation was dire. (ECF No. 80, PageID.1319.) And he realized Franklin had yet to start chemotherapy. (*Id.*) So Carrel recorded that he would seek a medical parole for Franklin. (*Id.* at PageID.1319.) And Franklin's records show he received a parole date for early July. (*Id.* at PageID.1167.)

The medical professionals at Carson City continued to treat and monitor Franklin's cancer. In early June, they completed the paperwork necessary for Franklin to receive chemotherapy under Kovalski's care. (ECF No. 80, PageID.1185–1186.) Then on June 19, 2014, Franklin was admitted to McLaren hospital for his first round of chemotherapy. (ECF No. 80, PageID.1210, 1212.) Over five consecutive days, Franklin received five chemotherapy treatments. (*Id.* at PageID.1171–1173.)

But five straight days of chemotherapy left Franklin nauseated and vomiting. (*Id.* at PageID.1171.) To alleviate the nausea and emesis, the hospital treated Franklin with Compazine and Zofran. (ECF No. 86, PageID.9782.) The treatments worked, and the side-effects subsided by

his last day of treatment. (*Id.*) As a result, Franklin successfully completed his first round of treatment and was stable enough to be discharged to the prison system. (*Id.* at PageID.9782–9783)

Kovalski believed Franklin would be discharged from McLaren to Duane Waters, MDOC's hospital. (ECF No. 85, PageID.6926–6927; ECF No. 86, PageID.9682, 9783.) So Kovalski discharged Franklin with detailed instructions for his follow-up care. (ECF No. 86-7; ECF No. 86, PageID.9683–84, 9701). The plan stretched for weeks. (*See* ECF No. 86, PageID.9783.) Among other things, Kovalski recommended giving Franklin a dose of Zofran every eight hours, meant to mitigate Franklin's nausea and vomiting, along with doses of Compazine as needed. (ECF No. 86, PageID.9783.) And the instructions urged the prison medical staff to monitor Franklin's white blood cell count. (*Id.*) Overall, though, the discharge report said Franklin was in stable condition and noted he had his next appointment with Dr. Kovalski in a few weeks. (*Id.*) Kovalski expected Franklin to make that appointment. (ECF No. 85, PageID.6943.)

### 3.

Franklin died less than five days after his discharge from McLaren. (ECF No. 80, PageID.1031.)

Contrary to Kovalski's expectation, Franklin was not discharged to Duane Waters hospital. Instead, on June 23, 2014, consistent with MDOC's policies, Franklin was returned to his unit at the Carson City Correctional facility. (ECF No. 80, PageID.1169, 2845.) In line with the discharge instructions, a nurse at the prison gave Franklin a dose of Zofran and told Franklin to return eight hours later for the next dose. (*Id.* at PageID.1170.) And because Franklin still felt nauseous, prison medical staff allowed him to bring a foot basin with him to his cell. (*Id.* at PageID.1169–1170.)

Three days passed. On the morning of June 27, the officer in charge of Franklin's unit contacted the chronic care clinic. (ECF No. 80, PageID.1163.) The unit officer said for the past

few days Franklin had been suffering from nausea, vomiting, and diarrhea. (*Id.*) Franklin was dehydrated and his blood pressure was abnormally low. (*Id.*) A nurse contacted Carrel and started Franklin on intravenous fluids.

Carrel saw Franklin and charted that his "overall appearance is ill-appearing." (ECF No. 80, PageID.1162.) Franklin had difficulty breathing and experienced pain when he talked or swallowed. (*Id.*) And because he had been vomiting, Franklin could not keep his medications down. (*Id.*) Carrel consulted with Dr. Coleman, another Corizon physician. (*Id.*) The pair agreed Franklin needed to be admitted to a hospital. (*Id.*) They arranged to send him to Duane Waters Hospital. (*Id.*)

Duane Waters Hospital is about 80 miles from the Carson City prison. Franklin left Carson City around 1 pm on June 27 and arrived at Duane Waters around 4:45 pm that evening. (ECF No. 80, PageID.1157, 1159.) Duane Waters medical professionals noted that Franklin was hypotensive, dehydrated, and struggling to breathe. (*Id.*) They treated him throughout the night, and initially had some success, recording that Franklin's hypotension was resolving. (*Id.* at PageID.1149.)

But on the morning of June 28, Franklin's condition turned grave. (ECF No. 80, PageID.1145.) Franklin was again hypotensive, had difficulty breathing, and his skin was hot to the touch. (*Id.*) So Duane Waters medical professionals arranged to send him to the emergency room at nearby Allegiance Hospital. (*Id.*) Once at Allegiance, Franklin's respiratory problems worsened and were compounded by multi-organ system failure and shock. (*Id.* at PageID.1142.) Franklin died the next morning. (*Id.* at PageID.1031.) Allegiance's death summary indicates Franklin died of sepsis and other complications from cancer. (*Id.* at PageID.1031.)

**B.**

Franklin's mother, as the representative of her son's estate, sued MDOC, Corizon, and all the doctors involved in Franklin's care. (ECF No. 1.) As the case progressed, some Defendants settled. (*See* ECF No. 58.) The remaining Defendants are Bhavsar, Holmes, Carrel, and Corizon health, along with former Director of the Michigan Department of Corrections Daniel Heyns. Now they move for summary judgment on all of Franklin's claims. (ECF No. 80, 81.) And for her part, Franklin's mother moves for summary judgment on her deliberate indifference claims against the individual doctors. (ECF No. 82.)

For the reasons that follow, one of Franklin's claims will proceed to trial. And the remainder of Franklin's claims will be dismissed.

**II.**

Summary judgment is appropriate where the moving party is entitled to judgment as a matter of law and there are no genuine issues of material fact. Fed. R. Civ. P. 56(a). If there are genuine disputes of material fact, then the appropriate finder of fact must resolve the dispute. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). And even though both parties move for summary judgment, it does not necessarily follow that the parties see all the facts the same way. *See Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003). The Court must "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003). And the Court must apply the burden-shifting framework governing summary judgment.

The burden-shifting framework is as follows. When a party moves for summary judgment on a claim for which it does not bear the burden at trial, it must establish that the record lacks evidence to support the non-moving party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986). Then the burden shifts to the non-moving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when a party moves for summary judgment on a claim for which it does bear the burden at trial, the moving party has a heavier initial burden. To discharge its heavier burden, the moving party must lay out the elements of its claim, and the facts satisfying those elements, and then "demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

### III.

Franklin's estate brings a § 1983 action against MDOC, Corizon, and the individual doctors. Start with the law on § 1983 claims against the individual doctors. Section 1983 permits suit against individuals who, while acting under color of state law, "deprived the claimant of rights, privileges or immunities secured by the Constitution or laws of the United States."[1] *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citing *McKnight v. Rees*, 88 F.3d 417, 419 (6th Cir. 1996)). Karen Franklin alleges the individual doctors violated the Eighth Amendment's ban on cruel and unusual punishment because they were deliberately indifferent to her son's cancer. U.S. Const. amend. VIII; *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

The Eighth Amendment's "cruel and unusual punishments" clause grants prisoners a constitutional right to medical care. U.S. Const. amend. VIII; *Estelle*, 429 U.S. at 104–05. And the "deliberate indifference to an [inmate's] serious medical needs" violates that right. *Id.* at 104. A deliberate indifference claim has two parts. The first is an objective component: Franklin must show that the "deprivation of medical care was serious enough to violate the Eighth Amendment."

---

[1] The individual actors do not dispute that they were acting under color of state law.

*Rhinehart*, 894 F.3d at 737. The second is a subjective component: Franklin must establish that each "defendant has 'a sufficiently culpable state of mind in denying medical care.'" *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)). Deliberate indifference on the part of a medical professional requires a showing of something greater than negligence, but less "than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Blackmore v. Kalamazoo Cnty*, 390 F.3d 890, 895–96 (6th Cir. 2004) (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)); *accord Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) ("Deliberate indifference . . . can be characterized as 'obduracy and wantonness' rather than 'inadvertence or error in good faith'" (quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991))).

So the Court turns to Franklin's deliberate indifference claims against the individual doctors. To direct the traffic of multiple motions, the Court considers, first, the individual doctors' motions for summary judgment. Resolving the individual doctors' motions also resolves Franklin's motion for summary judgment. And because the subjective component of a deliberate indifference claim must be analyzed individually as to each doctor, the Court will take in turn the claims against each of Franklin's doctors.

## A.

Dr. Janak Bhavsar saw Franklin twice in August 2012. Franklin's estate starts with the first appointment, when Bhavsar charted a "? palpable lymphnode 2-3 cm below L angle of jaw." That notation, says the estate, meant Bhavsar found a two- to three-centimeter mass on Franklin's right side. And it was the first sign of Franklin's potentially fatal cancer. (ECF No. 86, PageID.10200, 12364.) Potentially fatal cancer is an objectively serious medical condition. *See Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir. 2012). And even though Bhavsar knew a palpable lymph

node like the one he found could be a sign of cancer (ECF No, 80, PageID.1765–1766), Franklin's estate continues, he never tried to rule out cancer (or any other serious medical condition for that matter) and never developed a treatment plan of any kind. Indeed, Bhavsar never followed up at all. So Bhavsar left the palpable lymph node untreated and thus consciously disregarded Franklin's serious medical need.

Bhavsar takes a different view of "? palpable lymphnode 2-3 cm below L angle of jaw." Bhavsar eventually came to the conclusion that "L angle" of Franklin's jaw means the lymph node he palpated was on Franklin's left side. (ECF No. 80, PageID.1788–1789.) And later entries in Franklin's medical records all (save one) locate Franklin's cancerous mass on Franklin's right side. (*See, e.g.*, *id.* at PageID.1471, 1485; *but see* ECF No. 80, PageID.1437.) So Bhavsar says Franklin's fatal, right-sided neck mass was entirely different from the left-sided palpable lymph node he detected at the first appointment. (*Id.* at PageID.994–995, 1010–1011.) Bolstering that conclusion, says Bhavsar, his chart from the second appointment makes no mention of any palpable lymph node. (*Id.* at PageID.1011.) Bhavsar says that must mean the lymph node had cleared up by then, likely because it was a lipoma (a harmless fatty deposit), or the result of a minor infection. (*Id.*; *see also id.* at PageID.1661.) Therefore, Bhavsar says that as of August 2012, no reasonable jury could conclude Franklin had an objectively serious medical condition.

### 1.

The objective component of a deliberate-indifference claim may be satisfied a number of ways. One route is to show that the prison's doctors failed to provide treatment for a serious medical condition. *Rhinehart*, 894 F.3d at 737. And "because a serious medical condition carries with it a serious medical need, when prison officials fail to provide treatment for an inmate's

serious medical condition, the inmate has endured an objectively serious deprivation." *Id.* (citing *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 896–99 (6th Cir. 2004)).

The two sides dispute whether Franklin had an objectively serious medical condition as of August 2012. The estate says the lymph node Bhavsar palpated was cancer; Bhavsar says the lymph node was a fatty deposit. And the nub of the disagreement is Bhavsar's charting. Whether Bhavsar is right, and thus deserving of summary judgment, depends on whether Franklin's palpable lymph node was the first sign of his cancer. And making that determination requires figuring out what Bhavsar meant on August 7, 2012, when he charted a finding of a "? palpable lymphnode 2-3 cm below L angle of jaw."

The first problem is how to interpret "2-3 cm." Does "2-3 cm" refer to the size of the lymph node, or does it chart the node's proximity to the jaw? Franklin's experts interpreted "2-3 cm" to refer to the lymph node's size. (ECF No. 86, PageID.10173, 12365.) And based on that interpretation, the experts said Franklin's two- to three-centimeter lymph node was a serious medical condition: most likely cancer. (*Id.* at PageID.10173, 12364.) However, Bhavsar testified that he was pretty sure that "2-3 cm" referred to the node's location—i.e., "2-3 cm" below the jaw—even though his expert was less sure. (*Compare* ECF No. 80, PageID.1744–1745, 1782 *with id.* at PageID.1963.) And neither Bhavsar nor his expert was at all sure of the node's size. (ECF No. 80, PageID.1782; *id.* at PageID.1973.) Eventually, Bhavsar came around to the belief that the lymph node was probably under one centimeter. (*Id.* at PageID.1854.) And at that size, neither Bhavsar nor his expert immediately jumped to cancer as the cause of the lymph node. (ECF No. 80, PageID.1853–1854, 1956.) A small lymph node like that usually turns out to be a symptom of a minor infection or lipoma. (*id.* at PageID.1854, 1947–1948, 1973–1974.) Yet Bhavsar's expert acknowledged that a palpable lymph node could be a sign of cancer. (*Id.* at PageID.1968–1969.)

Regardless of the lymph node's size, the second problem is how to interpret "L angle of jaw." At his deposition, Bhavsar eventually came around to the firm conviction that "L angle" meant Franklin's *left side*. (ECF No. 80, PageID.1788–1789; *see also id.* at PageID.2241.) He insisted he used anatomical position in his charting. (*Id.* at PageID.1672.) And because virtually all of Franklin's medical records locate Franklin's cancerous mass on Franklin's *right side*, Bhavsar says the left-sided node he found, regardless of its size, could not have been the first sign of cancer. Yet Franklin's post-August 2012 medical records are not as clear as Bhavsar thinks they are. (*Compare* ECF No. 80, PageID.1485 ("R side of neck"), *with id.* at PageID.1437 ("mass in the left neck").)

Even Bhavsar's expert conceded Bhavsar's charting from August 2012 was too ambiguous to determine the lymph node's exact location. (ECF No. 80, PageID.1963.) Plus, when Franklin's neck mass was charted in October 2013, Franklin told the nurse that it was the same mass Bhavsar palpated in August 2012. (ECF No, 80, PageID.1485.) Other entries in Franklin's medical records also say Franklin's neck mass was first detected in August 2012. (*Id.* at PageID.1471.) Also, Bhavsar's expert said a common charting error is to record a patient's physical feature without a clear indication whether the finding is from the physician's perspective or the patient's perspective. (*Id.* at PageID.1946–1947.) Other medical professionals said the same thing. (*See* ECF No. 86, PageID.9486, 12364, 12683–12684.) Absent a clear indication of location, physicians reading the chart later on (like Franklin's expert, for example) are left to guess at the physical feature's precise location. (*See, e.g.*, ECF No. 86, PageID.10175.) And Franklin's estate emphasizes that Bhavsar likely made that charting error: recording the palpable lymph node at "L angle" of jaw but meaning physician's left rather than patient's left. (ECF No. 86, PageID.8195.) Charting the lymph node

from the perspective of the physician's left would mean the palpable lymph node was actually on Franklin's right side. (*See* ECF No. 86, PageID.12364, 12683–12684.)

In sum, whether Franklin had an objectively serious medical condition as of August 2012 boils down to an ambiguous notation in Bhavsar's chart and physicians and experts who have offered competing interpretations of that notation. And a reasonable jury could find either interpretation credible. Put stock in one part of the record and Bhavsar palpated a small, harmless lymph node on Franklin's left side that had cleared up two weeks later. In that case, Franklin did not have an objectively serious medical condition. But credit another part of the record and Bhavsar palpated a sizeable, cancerous mass on Franklin's right side. So a reasonable jury could believe Franklin had an objectively serious medical condition as of August 2012. Thus, at least as to the objective component, there exists a genuine issue of material fact.

### 2.

That leaves the subjective component. Even though a genuine issue of material fact exists as to the objective component, Franklin still has to establish Bhavsar's "sufficiently culpable state of mind." *Blackmore*, 390 F.3d at 895. Bhavsar's culpable state of mind must have been "equivalent to criminal recklessness." *Santiago*, 734 F.3d at 591 (citing *Farmer*, 511 U.S. at 834, 839–40); *see also Rhinehart*, 894 F.3d at 738. Criminal recklessness requires more than evidence of a doctor's "errors in medical judgment or other negligent behavior." *Rhinehart*, 894 F.3d at 738. Rather, it requires showing that Bhavsar "'subjectively perceived facts from which to infer substantial risk to [Franklin], that he did in fact draw the inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it." *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)). And if the record does not permit a jury to so find, then Bhavsar is entitled to summary judgment.

Franklin's estate says Bhavsar knew palpable lymph nodes were serious; knew how to triage and follow up on a palpable lymph node; knew Franklin had a palpable lymph node; and did not do anything. So Bhavsar consciously disregarded a substantial risk to Franklin.

Bhavsar insists he was not criminally reckless. He returns to his argument that there is nothing in the record to suggest Franklin's August 2012 palpable lymph node was cancerous. (ECF No. 80, PageID.1010.) Again, he thinks it was probably a minor lipoma or infection. (*Id.* at PageID.1010–1011.) So he could not have perceived facts from which to infer a substantial risk to Franklin, did not actually know Franklin was substantially at risk, and thus did not disregard any risk. (*Id.* at PageID.1011.)

Assessing Bhavsar's state of mind requires analysis of Bhavsar's deposition. At his deposition, Bhavsar explained his training in cancer detection. (ECF No. 80, PageID.1651.) He learned to palpate for tumors during his residency. (*Id.*) And he learned a standard operating procedure for how to triage a suspicious finding, like a palpable lymph node. (*Id.* at PageID.1653, 1766.) Bhavsar knew suspicious lymph nodes could be a sign of a variety of conditions. (*Id.* at PageID.1669.) And not all need to be seen by a specialist. (*Id.*) To make the best decision about a patient's medical care, he knew to gather and record data. On a case-by-case basis he would want to know the size, location, color, temperature, and texture of the mass. (*Id.* at PageID.1658–1659, 1748–1749.) And he would want to know the patient's history. (*Id.* at PageID.1653–1654.) Depending on all of the above, he might order imaging to learn more, or he might first rule out an infection. (*Id.* at PageID.1653–1654.) Ruling out an infection could mean checking vital signs and ordering lab tests, like blood work. (*Id.* at PageID.1654.) If the blood work and testing came back normal, then he might prescribe antibiotics. (*Id.*) And no matter what, Bhavsar would want to stay in regular communication with the patient, including follow-up appointments. (*Id.* at PageID.1655,

1752, 1766.) Follow up appointments would have required referring back to charting from earlier appointments. (*Id.* at PageID.1682.) Only upon completion of his "workup," would he determine whether the patient had a serious medical condition, like cancer. (*Id.* at PageID.1657–1658.)

Bhavsar also knew to chart his findings as he went along with his standard operating procedure. Medical school taught him the importance of accurate charting. (ECF No. 80, PageID.1665.) And he learned how to use Corizon's specific system when he came on board. (*Id.* at PageID.1666.) In the prison system, especially, Bhavsar understood accurate charting to be a key component of continuity of care. (*Id.* at PageID.1666–1667.) Other medical professionals in the prison system would read and rely on his charting. (*Id.* at PageID.1714.) So he knew to be careful with his abbreviations and locate physical findings using anatomical position as a standard reference. (*Id.* at PageID.1672.) And in his charting, he would record whether he educated the patient about any specific findings or medical conditions. (*Id.* at PageID.1686–1687.)

However, in Franklin's case, Bhavsar did not follow his standard operating procedure. True, Bhavsar charted a finding of a palpable lymph node. And Bhavsar did record some of Franklin's history, noting his pack-a-day smoking habit for decades. And Bhavsar took at least some steps to rule out minor causes, like infection.

But Bhavsar did not gather the other information he said he would need to judge the significance of the palpable lymph node. Bhavsar did not include any information about the node's texture, color, or temperature. And even Bhavsar's expert acknowledged Bhavsar's charting was too ambiguous to determine the node's size or location.

And the information Bhavsar did collect tended to rule out something minor. Franklin's vitals and white blood count all came back normal, two indications Franklin was not fighting off an infection. (ECF No. 80, PageID.1597, 1604; *id.* at PageID.1654–1655.) And Bhavsar's chart

from the clearance physical says he reviewed the lab work with Franklin. (ECF No. 80, PageID.1564.) The chart also indicates normal vital signs. (*Id.*) So Bhavsar had reason to doubt Franklin had an infection.

More significantly, Bhavsar's charting left no indication of any follow up. Yet Bhavsar knew a palpable lymph node required follow up. He knew it might make sense to prescribe antibiotics or order imaging to learn more. He did neither. And Bhavsar's expert saw no evidence of follow up in the charting. (ECF No. 80, PageID. 1956–1958, 1968.) Indeed, the chart from the first appointment does not say whether Bhavsar educated Franklin on what a palpable lymph node might mean. (*Id.* at PageID.1804.) That was the case even though Bhavsar knew Franklin's age and chronic smoking habit were warning signs for cancer. (*Id*. at PageID.1723.) Later at the clearance physical, the charting offers nothing to indicate Bhavsar checked in on the lymph node. (*Id.* at PageID.1814–1815, 1885–1887.) Even though the chart says Bhavsar conducted a physical exam, the physical exam does not appear to have included any palpations of the throat or thyroid. (*Id.* at PageID.1814.) Instead, Bhavsar cleared Franklin for transfer anywhere within the prison system. (*Id.* at PageID.1564, 1818–1819.)

Bhavsar eventually explained why he deviated from his standard operating procedure. Bhavsar's deposition occurred over two days in 2017. (*Id.* at PageID.1832.) On day one, and even at times on day two, Bhavsar said he had no recollection of Franklin or the August 2012 appointments with Franklin. (*Id.* at PageID.1725, 1791,1883.) And he admitted his August 2012 charting left him unable to answer specific questions about the lymph node, or any follow up he did to keep track of it. (*Id.* at PageID.1789–1791, 1812–1817, 1821.) Yet on day two, after some reflection and discussions with his lawyer (*id.* at PageID.1860), Bhavsar's memory improved (*id.* at PageID.1851, 1874; *but see id.* at PageID.1875). Bhavsar came to remember that the real focus

of the bubble appointment was Franklin's Hepatitis C and constipation. (*Id.* at PageID.1851.) The palpable lymph node was just an incidental finding, but something Bhavsar was nonetheless not entirely sure about. (*Id.* at PageID.1851, 1854.) The question mark jogged his memory (*Id.*) The question mark, he now recalled, was intentional: it indicated Bhavsar believed Franklin had something odd on his neck, but something minor, like a lipoma. (*Id.* at PageID.1852–1853.) And because Bhavsar believed Franklin had something minor like a lipoma, the lymph node must have had a normal texture—soft, mobile, and not fixed to any surrounding tissue. (*Id.* at PageID.1852–1853.) And because the palpable lymph node must have had a normal texture, the lymph node must have been fairly normal in size, which would mean smaller than one centimeter. (*Id.* at PageID.1853–1854.) And because the palpable lymph node was a small, normal lipoma, by the August 21 clearance physical, Bhavsar said he was sure the palpable lymph node was gone. (*Id.* at PageID.1859, 1864.) And with the neck mass cleared up, Bhavsar went ahead and cleared Franklin for transfer.

Given all of the above, a genuine issue of fact exists as to the subjective component. Recall that the subjective component requires three things: Bhavsar's perception of facts "from which to infer substantial risk" to Franklin, evidence that Bhavsar inferred a substantial risk, and proof that he "disregarded that risk by failing to take reasonable measures to abate it." *Rhinehart*, 894 F.3d at 738. Whether Franklin has established these things depends on who you believe.

A reasonable jury could conclude Bhavsar was not criminally reckless. Reasonable minds could credit Bhavsar's testimony from the second day of his deposition and thus conclude that Bhavsar never inferred a substantial risk to Franklin. Yes, Bhavsar found a palpable lymph node. But he made clear that a lymph node, at most, *could* be serious. And Bhavsar eventually said Franklin had all the signs of a non-serious one. Supporting that conclusion is the charting. The

question mark showed he was not sure, and by the clearance physical it was gone so he did not bother to mention it.

Or a reasonable jury could go the other way. Reasonable jurors could find incredible Bhavsar's recovered memories. Instead, as already noted, a reasonable jury could believe that Bhavsar palpated a questionable lymph node that bore the warning signs of cancer. And they could reject Bhavsar's claim that the absence of evidence amounts to evidence of absence. A reasonable jury could infer from Bhavsar's charting that he did nothing to assess, let alone treat, a lymph node he knew could be serious. So a reasonable jury could find Bhavsar subjectively perceived facts from which to infer a substantial risk and did nothing to alleviate the risk.

But could a reasonable jury find that Bhavsar actually drew the inference? To make out an Eighth Amendment claim, it is not enough to insist Bhavsar *should* have known. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001). Importantly, however, Bhavsar's knowledge of a substantial risk may be established by circumstantial evidence. *See Rhinehart*, 894 F.3d at 738. If a risk is "obvious" and "well-documented" and the circumstances "suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge." *Id.* (internal quotations and citations omitted). Here, Bhavsar palpated a lymph node on a long-time smoker over the age of 40. Bhavsar knew that age and smoking amplified a cancer risk. And Bhavsar knew that a palpable lymph node could be a sign of an infection, or a sign of a tumor, so he put a question mark by it. Then he obtained blood work and vital signs that tended to rule out infection. And Bhavsar said he used the UpToDate system to keep abreast of best practices. According to Franklin's expert, in 2012 UpToDate indicated that a neck mass, though common, could be the only symptom of a "serious and potentially malignant pathology, especially in the adult population." (ECF No. 86,

PageID.12366.) Bhavsar used UpToDate, (ECF No. 80, PageID.1692), and left open the possibility that he referenced it in Franklin's case (*Id.* at PageID.1693). Add up all of the above and the evidence is sufficient for a reasonable jury to find that Bhavsar knew of a substantial risk to Franklin. So a reasonable jury could conclude that Bhavsar "consciously expos[ed] [Franklin] to an excessive risk of serious harm." *Richmond v. Huq*, 885 F.3d 928, 940 (6th Cir. 2018).

At bottom, Bhavsar's state of mind in August 2012 depends on which Bhavsar a reasonable jury believes. A reasonable jury could credit Bhavsar on day two of his deposition and find he was never criminally reckless. Or a reasonable jury could credit Bhavsar from day one of the deposition could conclude that Bhavsar had a sufficiently culpable state of mind to violate the Eighth Amendment. Put simply, the facts needed to determine the subjective component turn on a credibility determination.

Summary judgment in favor of Bhavsar is not warranted.

### B.

Next is Dr. Scott Holmes. He treated Franklin at the Carson City Correctional Facility. Franklin's estate says Holmes discovered an objectively serious medical condition in October 2013. Yet almost eight months passed before Franklin started chemotherapy. Franklin's estate attributes the eight-month delay, in part, to Holmes. Specifically, Holmes could have marked as "urgent" all the referrals Corizon required to schedule specialist care. (ECF No. 80, PageID.2934–2935.) Urgent referrals would have meant immediate responses to the requests. (*Id.* at PageID.2941.) Franklin required a lot of specialist care. And Holmes' failure to speed up the referrals for specialist care, over time, drastically delayed Franklin's diagnosis and treatment. So the failure to mark the referrals "urgent" establishes deliberate indifference on Holmes' part.

Holmes disagrees. First he says no reasonable jury could conclude Franklin had an objectively serious medical condition until February 2014. And then Holmes says from February 2014 onward, he did everything he could to treat and monitor Franklin's cancer. So no reasonable jury could find Holmes consciously disregarded a substantial risk to Franklin's health.

Although the parties disagree over whether Franklin had an objectively serious medical condition in October 2013, assume, for the sake of argument, he did. Even so, from October 2013 onward, no reasonably jury could find Holmes consciously disregarded a substantial risk by delaying Franklin's treatment. *See Rhinehart*, 894 F.3d at 743. "When 'a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted.'" *Id.* (quoting *Self v. Crum*, 439 F.3d 1227, 1232–33 (10th Cir. 2006)).

Beginning in October 2013, Holmes treated and monitored Franklin's condition. From the start, Holmes labeled Franklin's neck mass "ominous." (ECF No. 80, PageID.1471.) So he perceived the substantial risk. Accordingly, he first prescribed a dose of penicillin to rule out minor causes, and then he immediately ordered imaging. (*Compare* ECF No. 80, PageID.1471 *with id.* at PageID.1475.) The first imaging he ordered, an x-ray with a certain dose of radiation, was intended to speed up Franklin's diagnosis. (ECF No. 80, PageID.2255.) And Holmes requested a CT scan. Three days after the CT scan results revealed a "bulky" mass, Holmes referred Franklin to an ENT for a biopsy. (*Id.* at PageID.1437.) The biopsy confirmed Franklin's cancer and set off months of follow-up tests and treatments. In the meantime, Holmes treated Franklin for pain as needed.

And Holmes did not illegally delay. Throughout the time he treated Franklin, the medical records show Holmes promptly submitted referrals. (*See, e.g.*, *id.* at PageID.1472, 1437.) True,

Holmes never marked the referrals as urgent. But all Holmes' referrals were approved in under a week anyway. (*Id.*) And from January to June 2014, at least, almost all of Holmes' referrals were approved within 24 hours. (*See* ECF No. 80-17.) Plus, Holmes attributed any delay in scheduling appointments not to the referral system, but to the number of schedulers employed by the prison, none of whom are defendants in this case. (*Id.* at PageID.2137–2138; *see also id.* at PageID.3493.) Plus, some of the delay is not attributable to anyone at all. Unfortunately, a major snowstorm forced the cancellation of Franklin's first ENT appointment. And even if Holmes was negligent in not acting faster "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

To be sure, the eight-month delay in Franklin's case is troubling. Yet the estate's argument relies too much on hindsight bias. Looking at the entirety of Franklin's medical record, knowing how Franklin's medical treatment turned out, it is easy to second-guess Holmes' decision-making along the way. But Holmes is owed more deference than that. *Cf. Richmond*¸ 885 F.3d at 940. And taking each of Holmes' referrals on its own, nothing in the record would allow a reasonable jury to conclude that Holmes was consciously disregarding a substantial risk to Franklin every time he referred Franklin for cancer treatment. *See Triplett v. Palmer*, 592 F. App'x 534, 536 (8th Cir. 2015). So no reasonable jury could say Holmes' failure to mark every referral as urgent amounted to recklessness.

## C.

That leaves Daniel Carrel. Franklin's estate says Carrel exhibited deliberate indifference in June 2014. At that time, the estate says, Carrel provided inadequate care for the early symptoms of Franklin's sepsis, and when Franklin's condition turned emergent, Carrel made an indefensible

decision to send Franklin to a hospital 80 miles away. (ECF No. 86, PageID.10179.) So Franklin's estate says Carrel's care violated the Eighth Amendment.

As for the objective component, the parties agree Franklin had a serious medical condition by the time Carrel first saw him. (ECF No. 80, PageID.1012; ECF No. 86, PageID.8199.) So once more, the only issue is whether Franklin can establish Carrel acted with a sufficiently culpable state of mind.

It is true that Franklin's health deteriorated rapidly after his discharge from chemotherapy. Medical records after the discharge show Franklin appears to have spent around three days suffering from vomiting and diarrhea without any care from the medical professionals at Carson City Correctional. But for those three days, nothing in the record suggests Carrel had any idea Franklin was deteriorating. (ECF No. 86, PageID.10178.) And Carrel read the discharge papers. (ECF No. 80, PageID.295–296,) He saw nothing concerning. (*Id.* at PageID.296.) Franklin was in stable condition with normal labs, normal blood pressure, good white blood cell count, and breathing well. (*Id.* at PageID.296–299.) Carrel first learnedof Franklin's worsening condition on the morning of June 27. (ECF No. 80, PageID.1163.) By that time, Franklin had a fever and complained of chest pain. (ECF No. 86, PageID.10178.)

Within two hours, Carrel saw Franklin. (*Compare* ECF No. 80, PageID.1161 *with id.* at PageID.1163.) According to the estate's expert, Franklin's symptoms were signs of sepsis. (ECF No. 86. PageID.10178.) And the estate's expert says Carrel responded consistent with how to treat sepsis. (ECF No. 86, PageID.10178, 10179.) And Carrel knew Franklin's condition was an emergency, so he phoned Dr. Coleman to determine where Franklin should go for emergent care. So even if Carrel "should have known" about Franklin's condition earlier, that is not enough to establish deliberate indifference. *See Watkins*, 273 F.3d at 686.

It is also true that Carrel's call to Coleman caused Franklin to be sent to a hospital 80 miles from Carson City Correctional. But the decision to send Franklin to Duane Waters is not evidence of deliberate indifference. For one, Carrel did not decide to send Franklin to Duane Waters. Coleman did. (ECF No. 80, PageID.2846.) Coleman decided on Duane Waters because Franklin needed care in an infirmary setting. (ECF No. 80, PageID.2846–2847.) Duane Waters was an infirmary and it was close enough to another hospital for a transfer if Franklin worsened. (*Id.*) And Coleman believed the staff at Carson City Correctional could stabilize Franklin for the trip to Duane Waters. (*Id.*)

Initially, Franklin responded positively to the care provided at Duane Waters. (ECF No. 80, PageID.1149.) But the next morning his condition worsened, and the staff transferred him to the nearby hospital. (ECF No. 80, PageID.2847.) Not long after, Franklin died at that nearby hospital.

Given all of the above, no reasonable jury could conclude Carrel consciously exposed Franklin to a substantial risk of serious harm. "A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful." *Rhinehart*, 894 F.3d at 738 (citing *Farmer*, 511 U.S. at 844). Carrel saw Franklin two hours after he was first notified of Franklin's grave condition. Carrel treated Franklin for the early signs of sepsis and stabilized him for a trip to the hospital. Then Carrel consulted with another physician to ensure Franklin could receive emergent care consistent with the prison's security needs. Franklin died almost two days after leaving Carrel's care. So Carrel provided reasonable treatment for Franklin's sepsis, even though the outcome was "insufficient."

**D.**

Franklin's estate also brings an individual-capacity claim against Heyns. The estate says Heyns "deprived Keith Franklin. . . of his Eighth Amendment rights by personally maintaining policies that deprived Franklin of healthcare because he was seeking an early release from prison on parole." (ECF No. 85, PageID.6149.) The estate says they are not suing on a *Monell* theory, nor do they bring suit against Heyns in his official capacity. (*Id.*) Because MDOC allegedly has this parole policy, and Heyns admitted he was responsible for all MDOC policies, and the estate thinks the parole policy unconstitutionally delayed Franklin's medical care, the estate says Heyns' is individually liable for a deprivation of Franklin's Eighth Amendment rights. (*Id*. at PageID.6156.) Put another way, the estate thinks Heyns should be liable because he was in charge of MDOC, and all its policies, at the time of Franklin's death. But that is a theory of respondeat superior. And respondeat superior cannot "sustain a § 1983 claim against state employees in their individual capacities[.]" *Colvin v. Caruso*, 605 F.3d 282, 292 (6th Cir. 2010). Heyns is entitled to summary judgment on Franklin's estate's individual capacity claim.

The result is the same on the merits. According to the estate, MDOC has a policy that allows the parole board to consider an inmates' medical condition when making a parole decision. (ECF No. 85-10, 85-11.) And according to the estate, the policy expressly allows the board to deny parole to those inmates suffering from serious medical conditions. So the state thinks MDOC's policy acts as a cruel and unusual barrier to parole for inmates suffering from a serious medical condition.

Plaintiff misreads MDOC operating procedure 06.05.104A. (ECF No. 85-10.) The policy ensures that "prisoners who receive a positive parole action are screened appropriately, that the parole is properly authorized, and that necessary arrangements are completed prior to parole."

(ECF No. 85, PageID.8159.) True, the factors the parole board must consider include a prisoner's physical and mental health. (ECF No. 85, PageID.8167.) And MDOC's policy allows the parole board to delay parole for medical reasons, if necessary. (*Id.* at PageID.8160.) But Heyns' counsel rightly explained the policy as a bridge not a barrier. The policy safeguards against a disruption of medical care as a result of parole. For example, the policy requires MDOC to line up community-based medical care where possible. (*Id.*) And if a parolee is on medication, MDOC must provide the parolee with a 30-day supply. (*Id.*) Overall, the policy is intended to alert the parole board to a parolee's medical needs such that any parole decision does not negatively affect the parolee's medical care. And Plaintiff's counsel could not identify another inmate who was delayed medical care as a result of this policy. So no reasonable jury could conclude that the policy is designed to frustrate parole for an inmate with a serious medical condition.

And even assuming MDOC's policy is problematic, Franklin received a parole date. Recall that Carrel advocated for a medical parole. Indeed, by Spring of 2014, Franklin's medical records reflect a parole date of early July 2014. And although Franklin may have worried that treatment for his neck mass might hold up his parole, nothing in the record suggests that actually occurred or there was any policy to that effect.

The claims against Heyns will be dismissed.

### E.

At this point a brief summary is in order. Thus far, the Court has denied summary judgment as to Dr. Bhavsar. A jury needs to decide whether Bhavsar was deliberately indifferent to Franklin's medical care. However, no reasonable jury could conclude that either Dr. Carrel or Dr. Holmes was deliberately indifferent to Franklin's medical care. So the Court grants summary judgment as to them. And the estate's individual capacity claim against Heyns is out. Moreover,

the disposition of the individual defendants' motion for summary judgment also takes care of the estate's motion. The fact issue preventing summary judgment in favor of Bhavsar likewise prevents summary judgment in favor of the estate's claim against Bhavsar. And because the record establishes that no reasonable jury could find Carrel or Holmes violated the Eighth Amendment, *a fortiori*, the estate cannot establish that the record "is so one-sided as to rule out the prospect of a finding in favor of [Holmes or Carrel] . . . ." *Hotel 71 Mezz Lender LLC*, 778 F.3d at 601.

## IV.

What remains is Defendants' motion for summary judgment on Franklin's *Monell* claims against Corizon. Section 1983 permits suit against Corizon, consistent with *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *See West v. Atkins*, 487 U.S. 42, 54 (1988). But Franklin's claims against Corizon must be "premised on some policy that caused a deprivation of [his] Eighth Amendment rights." *Starcher v. Correctional Medical Services*, 7 F. App'x 459, 465 (6th Cir. 2001); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996); *see also Monell*, 436 U.S. at 690–91. A policy may be formal and written, or informal, such as "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute 'custom or usage' with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (citations omitted).

Franklin's estate says three Corizon policies violate the Eighth Amendment. They point to Corizon's utilization management system as a policy intended to delay the provision of specialist care; a cost-saving approach to the provision of medical care; and a failure to train doctors on proper charting procedures.

Corizon is entitled to summary judgment on all three.

**A.**

Consider, first, the estate's failure-to-train claim. The estate says Corizon failed to instruct its employees on the proper standard of care for prisoners. (ECF No. 86, PageID.8208.) The estate says Corizon's employees had no idea they were not to act with deliberate indifference to prisoners' medical needs. (*Id.*) So Corizon's policy violates the Eighth Amendment.

To succeed on a failure-to-train claim, Franklin needs to establish "'prior instances of unconstitutional conduct demonstrating that [Corizon] ha[d] ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). The estate has not provided any facts showing prior instances of unconstitutional conduct such that Corizon was on notice that its training on the standard of care was lacking. *See Burgess v. Fischer*, 735 F.3d 462, 478–79 (6th Cir. 2013). And neither side addresses whether Franklin's case falls "in a narrow range of circumstances" where "a pattern of similar violations might not be necessary to show deliberate indifference." *Connick v. Thompson*, 563 U.S. 51, 63 (2011). So no reasonable jury could return a verdict in favor of Franklin's estate on the failure-to-train claim.

**B.**

Next turn to Corizon's utilization management system. This is the referral process Corizon doctors had to use if they wanted to send prisoners for specialist care. (ECF No. 86, PageID.8204.) The estate thinks the system unconstitutionally delayed Franklin's specialist care. (ECF No. 86, PageID.8204–8205.) And the estate points to a revision of the utilization management system, implemented in 2016, as evidence that the system was flawed when Franklin needed it. (*Id.* at PageID.8205–8206.)

Again, Franklin must show a deprivation of his Eighth Amendment rights. *See Miller*, 606

F.3d at 255. And while Franklin's estate has evidence that the referral system allowed Corizon

physicians up to two weeks to approve routine requests for specialist care, (*see* ECF No. 86,

PageID.12674) at the time of Franklin's incarceration, the average response time was much lower

(*id.* at PageID.12436). Specific to Franklin's case, the Corizon physician who actually approved

the requests moved quite quickly. (ECF No. 80-17.) On average the requests were approved in

under two days. (ECF No. 80, PageID.3493.) So no reasonable jury could conclude that Corizon's

utilization-management system violated Franklin's Eighth Amendment rights. *See Runkle v.*

*Kemen*, 529 F. App'x 418, 424 (6th Cir. 2013).

## C.

Lastly, Franklin alleges Corizon pushed cost savings over care. (ECF No. 86,

PageID.8207.) The estate gleans Corizon's cost-cutting ethos from a company brochure given to

practitioners. (*Id.*) The brochure explains that an increase in inmate populations across the country

has brought with it an increase in costs to states plus an increase in the need to treat complex,

chronic illness. (*Id.*) Looking to mitigate the risks and cap the costs, the brochure says states

contract with Corizon to care for inmates. (*Id.*) Franklin's estate says that language implies Corizon

takes a cost-savings-over-quality-care approach to treating chronic illness. (*Id.*) And Franklin's

cancer was a chronic illness. So in Franklin's case, Corizon violated the Eighth Amendment by

putting costs over care.

Assume, for the sake of argument, Corizon has an informal policy of cost cutting. Even so,

Franklin's estate has to show that the cost cutting violated Franklin's Eighth Amendment right to

medical care. With respect to Franklin's care, the estate is not clear where Corizon cut costs.

Franklin appears to argue that Corizon was brought in largely to limit money spent on outside

specialists. (ECF No. 86, PageID.8207–8208.) But the record shows that every time Holmes or Carrel requested specialist care, their requests were approved. (ECF No. 80-17.) True, sometimes the requests were denied. (*Id.*) But those requests were denied either because they were duplicates or because the paperwork was not filled out correctly. And once corrected, the referrals were approved. (*Id.*) So to the extent the estate challenges Corizon's cost cutting, no reasonable jury could find that Corizon's cost cutting violated Franklin's Eighth Amendment rights.

## V.

The Court is not unsympathetic to the Plaintiff's tragic loss. But its task is to determine whether the record supports that the Defendants violated Franklin's constitutional rights. And in the end, Defendants are entitled to summary judgment on most of the estate's claims.

No reasonable jury could find Holmes or Carrel deliberately indifferent to Franklin's cancer. Accordingly, the estate cannot show that the record is so one-sided as to preclude a verdict in favor of Carrel or Holmes. And no reasonable jury could return a verdict for the estate on the *Monell* claims against MDOC and Corizon. Nor can Franklin proceed on an individual-capacity claim against Heyns. However, as for Bhavsar, genuine issues of material fact preclude a grant of summary judgment for either side. So the estate's claim against Bhavsar will proceed to trial. Therefore, the Court GRANTS in part and DENIES in part the Corizon defendants' motion for summary judgment (ECF No. 80), GRANTS Heyns' motion for summary judgment (ECF No. 81), and DENIES the estate's motion for summary judgment (ECF No. 82).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE


Date: March 22, 2019

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was served upon counsel of record and/or pro se parties on this date, March 22, 2019, using the Electronic Court Filing system and/or first-class U.S. mail.

<u>s/William Barkholz</u>
Case Manager